# EXHIBIT 1

## TRANSCRIPT OF 2/15/2018 DEPOSITION OF MICHAEL MILLER, M.D.

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEVADA

3

4    - - - - - - - - - - - - - X

5    AMARIN PHARMA, INC.,      : Case No.:

6    et al.,                   : 2:16-CV-02525-MMD-NJK

7              Plaintiffs      :

8    vs.                       : (Consolidated with

9    WEST-WARD PHARMACEUTICALS : 2:16-CV-02562-MMD-NJK,

10   CORP., et al.,            : 2:16-CV-02658-MMD-MJK,

11             Defendants.     : 2:17-CV-02641-RFB-GWF)

12   - - - - - - - - - - - - - X

13

14   ███████████████████████████████████████

15

16     Videotaped Deposition of MICHAEL MILLER, M.D.

17                  Washington, D.C.

18            Thursday, February 15, 2018

19                     8:03 a.m.

20

21

22   Job No. 225981

23   Pages:  1 - 272

24   Reported by:  Dana C. Ryan, RPR, CRR

25
```

Page 2

```
 1                                                     1     A P P E A R A N C E S   C O N T I N U E D
 2                                                     2
 3                                                     3     ON BEHALF OF THE DEFENDANTS
 4                                                     4     DR. REDDY'S LABORATORIES, INC. AND
 5                    February 15, 2018                5     DR. REDDY'S LABORATORIES LIMITED:
 6                       8:03 a.m.                     6         CAROLINE SUN, ESQ.
 7                                                     7         Budd Larner, P.C.
 8                                                     8         150 John F. Kennedy Parkway
 9                                                     9         Short Hills, New Jersey 07078
10       Videotaped Deposition of MICHAEL MILLER,    10
11   M.D., held at the law offices of Covington &    11
12   Burling LLP, One City Center, 850 Tenth Street, 12
13   Northwest, Washington, D.C., pursuant to the    13     ON BEHALF OF THE DEFENDANT
14   Federal Rules of Civil Procedure, before Dana C.14     TEVA PHARMACEUTICALS USA INC.:
15   Ryan, Registered Professional Reporter, Certified15       CHANDRIKA VIRA, ESQ.
16   Realtime Reporter and Notary Public in and for  16         Sterne, Kessler, Goldstein &
17   District of Columbia.                           17            Fox, P.L.L.C.
18                                                   18         1100 New York Avenue, Northwest
19                                                   19         Washington, D.C. 20005
20                                                   20
```

Page 4, Page 3, Page 5 — APPEARANCES sections:

ON BEHALF OF THE PLAINTIFF:
  MICHAEL N. KENNEDY, ESQ.
  HAN PARK, ESQ.
  Covington & Burling LLP
  One City Center
  850 Tenth Street, Northwest
  Washington, D.C. 20001

ON BEHALF OF THE DEFENDANTS
WEST-WARD PHARMACEUTICALS CORP. AND WEST-WARD
PHARMACEUTICALS INTERNATIONAL LIMITED:
  ALAN B. CLEMENT, ESQ.
  Locke Lord LLP
  Brookfield Place
  200 Vesey Street, 20th Floor
  New York, New York 10281

A P P E A R A N C E S   C O N T I N U E D
Also present:
  Francis Solomon, Videographer
  Jennifer Scarpati
  Deepti Jain

Page 6

1                  C O N T E N T S

2    EXAMINATION OF MICHAEL MILLER, M.D.:      PAGE:

3    By Mr. Clement                            11

4

5

6

7                   E X H I B I T S

8            (Attached to the Transcript)

9    MILLER DEPOSITION                         PAGE:

10   Exhibit 1    Notice Of Deposition         16

11   Exhibit 2    Declaration Of Michael       22

12               Miller, M.D., On

13               Claim Construction

14   Exhibit 3    Materials Considered         24

15   Exhibit 4    Reply Declaration Of Michael 27

16               Miller, M.D., On Claim

17               Construction

18   Exhibit 5    Curriculum Vitae             39

19   Exhibit 6    March 4, 2010 Email Chain    44

20               Bates Stamped AMRN03022275

21               Through 03022276

22   Exhibit 7    March 24, 2010 Draft Notes Of 47

23               Meeting With Dr. Miller Bates

24               Stamped AMRN01017280 Through

25               01017281

Page 7

1         E X H I B I T S   C O N T I N U E D

2            (Attached to the Transcript)

3    MILLER DEPOSITION                         PAGE:

4    Exhibit 8    Dr. Miller's Consulting Time 60

5               For Amarin For September

6               Through December 2010, Bates

7               Stamped AMRN02739796

8    Exhibit 9    Dr. Miller's Consulting Time 62

9               For Amarin For January

10               Through June 2011, Bates

11               Stamped AMRN02769565

12   Exhibit 10   Slide Deck Titled 2014       63

13               Clinical Development

14               Department Goals - Status,

15               Bates Stamped AMRN03121925

16               Through 03121931

17   Exhibit 11   Dr. Miller's Consulting Time 64

18               For Amarin For July Through

19               December 2011, Bates Stamped

20               AMRN01077327

21   Exhibit 12   November 19, 2012 Email Chain 67

22               With Attachment, Bates

23               Stamped AMRN01638777 Through

24               01638778

25

Page 8

1         E X H I B I T S   C O N T I N U E D

2            (Attached to the Transcript)

3    MILLER DEPOSITION                         PAGE:

4    Exhibit 13   May 28, 2013 Email Chain     75

5               Bates Stamped AMRN02702696

6    Exhibit 14   U.S. Patent Number 8,293,728 88

7    Exhibit 15   Document Titled Third Report 122

8               Of The National Cholesterol

9               Education Program Expert

10               Panel On Detection,

11               Evaluation, And Treatment Of

12               High Blood Cholesterol In

13               Adults (Adult Treatment Panel

14               III) Final Report, Bates

15               Stamped AMRN00289915 Through

16               00290194

17   Exhibit 16   Declaration Of Harold E. Bays 136

18               Bates Stamped AMRN03058234

19               Through 03059940

20   Exhibit 17   January 2007 Epadel Package  150

21               Labeling Bates Stamped

22               ICOSAPENT_DFNDTS00008961

23               Through 00008969

24

25

Page 9

1         E X H I B I T S   C O N T I N U E D

2            (Attached to the Transcript)

3    MILLER DEPOSITION                         PAGE:

4    Exhibit 18   Document Titled              177

5               Hypertriglyceridemia And

6               Cardiovascular Risk

7               Reduction Bates Stamped

8               ICOSAPENT_DFNDTS00010211

9               Through 00010225

10   Exhibit 19   Document Titled Triglycerides 187

11               And Cardiovascular Disease, A

12               Scientific Statement From The

13               American Heart Association

14   Exhibit 20   Document Titled Efficacy And 257

15               Safety Of Cholesterol-

16               Lowering Treatment:

17               Prospective Meta-Analysis Of

18               Data From 90056 Participants

19               In 14 Randomised Trials Of

20               Statins, Bates Stamped

21               AMRN03130228 Through 03130239

22

23

24

25

Page 10

1                    P R O C E E D I N G S
2              THE VIDEOGRAPHER:  Good morning.  This
3    is tape number 1 in the videotape deposition of
4    Dr. Michael Miller taken by counsel for the
5    defendants in the matter of Amarin Pharmaceutical,
6    Inc., et al., plaintiffs, versus West-Ward
7    Pharmaceutical Corp., et al., defendants, in the
8    United States District Court for the District of
9    Nevada, case number 2:16-CV-02525-MMD-NJK.
10             This deposition is being held at the
11   law office of Covington & Burling LLP on
12   February 15th, 2018.  My name is Solomon Francis
13   from the firm of U.S. Legal Support.  I'm the
14   legal video specialist.  The court reporter is
15   Dana Ryan also of U.S. Legal Support.
16             We are on the record at 8:03 a.m.
17             At this time will counsel state their
18   appearances and affiliations for the record.
19             (Counsel state appearances for the
20   video record.)
21             THE VIDEOGRAPHER:  At this time will
22   the court reporter please swear the witness?
23
24
25

Page 11

1    - - - - - - - - - - - - - -
2              MICHAEL MILLER, M.D.,
3    having been duly sworn or affirmed, was examined
4        and did testify under oath as follows:
5    - - - - - - - - - - - - - -
6              THE VIDEOGRAPHER:  Please proceed,
7    Counsel.
8    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
9       WEST-WARD PHARMACEUTICALS CORP. AND
10   WEST-WARD PHARMACEUTICALS INTERNATIONAL LIMITED
11      BY MR. CLEMENT:
12      Q    Good morning, Dr. Miller.
13      A    Good morning.
14      Q    My name is Alan Clement.  I represent
15   West-Ward Pharmaceuticals in this case, and we're
16   going to have your deposition today.
17           Have you ever been deposed before?
18      A    I have.
19      Q    Okay.  And in what type of case was
20   that -- or how many -- let me ask this.  How many
21   times have you been deposed before?
22      A    At least ten.
23      Q    At least ten.
24           Were any of those in patent cases?
25      A    One.

Page 12

1       Q    One, okay.
2            And do you recall what case that was?
3       A    The case was with pitavastatin or
4    Livalo, so it was on behalf of Kowa
5    Pharmaceuticals.
6       Q    Kowa.
7            You worked with Dave Conklin and
8    Kathleen Carr?
9       A    I did.
10      Q    Yeah, okay.
11           And were -- you were deposed in that
12   case?
13      A    Yes.
14      Q    Okay.  And that's a stat- -- that's a
15   statin drug, pitavastatin?
16      A    Correct.
17      Q    Okay.  And did you appear at trial in
18   this case?
19      A    I did.
20      Q    And when was that trial?
21      A    I believe it was January of 2017.
22      Q    And Kowa was the brand pharmaceutical
23   company; correct?
24      A    That is correct.
25      Q    They were the patent owner and Takeda

Page 13

1    is the brand?
2       A    I believe so.
3       Q    And do you recall what courtroom --
4    what court -- was that Delaware?
5       A    It was in Manhattan.
6       Q    Manhattan, okay.
7            Do you recall who the defendant was in
8    that case?
9       A    There were several, but I don't
10   recall --
11      Q    Okay.
12      A    -- specifically.
13      Q    That's fine.
14           Okay.  And the other nine cases were
15   not patent cases -- you said -- let me strike
16   that.
17           You said at least ten times you've been
18   deposed.  You were -- I guess, you weren't quite
19   sure, and I'm not trying to pin you down to a
20   number.
21           So the other cases, other than the
22   patent case, what type of cases were those?
23      A    Primarily malpractice-related cases,
24   and then I was also involved in a case for Pfizer.
25      Q    And then you said a case for Pfizer,

Page 14

1  what type of case was the case for Pfizer?
2      A    Okay.  That was an MDL.
3      Q    Okay.  Was it a product liability-type
4  case?
5      A    Yeah.  The -- the case centered around
6  the development of diabetes amongst women.
7      Q    And in the patent case, the
8  pitavastatin case, were you testifying regarding
9  infringement?
10     A    Yeah -- yes.
11     Q    What about validity or invalidity?
12     A    Well, as I recall, I was asked to
13 testify about the method that made the drug -- the
14 compound unique in its class.
15     Q    And what made the compound unique in
16 its class?
17     A    Well, there are several properties of
18 pitavastatin both -- both from a chemical
19 standpoint as well as a clinical standpoint that
20 was associated with reduced side effects that may
21 have been experienced by patients taking other
22 medications --
23     Q    So reduced --
24     A    -- other statins.
25     Q    -- reduced drug interactions?

Page 15

1      A    That is correct.
2      Q    Okay.  And different from other
3  statins, it would have reduced side effects; is
4  that what you're --
5      A    Correct.
6      Q    -- saying?
7           Okay.  All right.  So you've been
8  deposed before, so, I guess, you know kind of the
9  drill here.  I'm going to ask you a series of
10 questions.  You know nods of the head can't be
11 recorded, so I'd ask for verbal responses, yes or
12 no if it's a yes/no question.
13     A    Yes.
14     Q    Is that okay?
15     A    Yes.
16     Q    All right.  And if you don't understand
17 the question, please let me know and I'll try and
18 rephrase.
19     A    Thank you.
20     Q    Okay.  And is there any reason you
21 can't answer the questions I have today
22 truthfully?
23     A    No.
24     Q    Okay.  You're not on any medications
25 that would impair your ability to answer

Page 16

1  truthfully; correct?
2      A    Correct.
3      Q    Okay.  All right.  Let's mark the first
4  exhibit.
5           (Miller Deposition Exhibit 1 was marked
6  for identification and attached to the
7  transcript.)
8  BY MR. CLEMENT:
9      Q    Dr. Miller, what the court reporter has
10 put before you -- and marked as Miller Exhibit 1,
11 is a Defendant's Notice of Deposition of Dr.
12 Michael Miller.
13          Have you ever seen this document
14 before?
15     A    (Witness reviews document.)
16          I'm not sure that I have.
17     Q    Okay.  How did you know to come here
18 today?
19     A    Well, I came here today because I've
20 been working on this case with Covington.
21     Q    And they informed you that your
22 deposition was going to be today?
23     A    That is correct.
24     Q    Okay.  You know, this is more a formal
25 -- just, you know, take some of the mystery out of

Page 17

1  it, this is more of a formal document and why
2  Covington told you -- I'll represent to you at
3  least my belief.  It's why Covington told you to
4  appear here today, but that's fine you haven't
5  seen the document.
6           Did you prepare for your deposition
7  today?
8      A    I did.
9      Q    Okay.  And about how long did you
10 prepare for your deposition today?
11     A    In terms of hours?
12     Q    Days, hours.
13     A    I don't have an exact number at this
14 time.
15     Q    Okay.  Was it -- did you meet with
16 counsel yesterday?
17     A    I did.
18     Q    How many times did you meet with
19 counsel for prep -- for your deposition
20 preparation?
21     A    For the deposition preparation, I
22 believed -- I believe that I met with counsel
23 twice.
24     Q    Twice, okay.
25          And when was that?  One was yesterday;

Page 18

1  is that correct?
2      A    One was yesterday.
3      Q    And when was the other?
4      A    Within the past two weeks.
5      Q    And about -- within the past -- so
6  the -- let's strike that.
7           So the first meeting, the one that
8  was -- occurred other than yesterday, was that an
9  in-person meeting or telephone?
10     A    In person.
11     Q    In person.
12          And that was at Covington's offices?
13     A    That is correct.
14     Q    And was that a full-day meeting?
15     A    How do you define "full day"?
16     Q    Eight hours.
17     A    No.
18     Q    Okay.  Part of a day?
19     A    That's correct.
20     Q    Okay.  Did it start in the morning?
21     A    Yes.
22     Q    Go through lunch?
23     A    Yes.
24     Q    And into the afternoon?
25     A    Early to mid-afternoon.

Page 19

1      Q    Okay.  So six hours would be a
2  reasonable estimate?
3      A    Yes.
4      Q    Did you review documents?
5      A    Yes.
6      Q    Do you recall what documents you
7  reviewed?
8      A    Primarily the documents related to this
9  case.
10     Q    Do you recall which ones?
11     A    My declaration.
12     Q    Any others?
13     A    The patents, prosecution history.
14     Q    All the prosecution histories or any
15  one in particular?
16     A    As it related to my declaration.
17     Q    So in your exhibits to your
18  declaration, you had excerpts from the '727
19  prosecution history and the '728 prosecution
20  history.
21          Any -- did you review other -- other
22  than those two, did you review prosecution
23  histories?
24     A    I would have to refer to my declaration
25  to see which other patents I reviewed.

Page 20

1      Q    Do you recall reviewing anything other
2  than what was in your declaration in your meetings
3  with Covington preparing for the deposition?
4      A    I think I did.
5      Q    Okay.  Could you recall what documents
6  those were?
7      A    Again, I would have to review my
8  declaration to see the documents.
9      Q    Okay.  So none come to mind as
10  documents that you did not have as an exhibit to
11  your declaration that you reviewed in preparation
12  for your deposition?
13     A    Well, I reviewed Wharton's deposition.
14     Q    Okay.  Did you review his report as
15  well?
16     A    I reviewed his declaration as well.
17     Q    Declaration, thank you.
18          Okay.  Do you recall any other
19  documents not exhibits to your declaration --
20     A    I don't recall.
21     Q    -- that you reviewed?
22          Okay.  And then yesterday you met with
23  counsel, also?
24     A    That is correct.
25     Q    Okay.  Who did you meet with yesterday?

Page 21

1      A    I met with Mike Kennedy, Han, Megan
2  Keane.
3      Q    Anyone else?
4      A    Joe was in the room.
5      Q    Anyone else?
6      A    I believe that's it.
7      Q    Okay.  And was yesterday a full day?
8      A    Yesterday was a full day.
9      Q    Okay.  And, again, did you review any
10  documents yesterday in preparation for today's
11  deposition that were not exhibits to your
12  declaration?
13     A    I don't believe so.
14     Q    Okay.  But you might have -- did you
15  review Wharton's deposition transcript yesterday?
16     A    Minimally.
17     Q    Okay.  And what about his
18  declaration -- his declaration?
19     A    Minimally.
20     Q    Okay.  Do you recall how you became an
21  expert in this case?
22     A    I believe I was contacted by Covington
23  sometime last summer.
24     Q    Were you aware that there was a prior
25  case involving the same drug between Amarin and

Page 22

1    defendants that was pending in New Jersey a few
2    years ago?
3        A    No.
4        Q    So the first time you were contacted by
5    Covington regarding working on a Vascepa
6    litigation was last summer?
7        A    That is correct.
8        Q    And do you recall who contacted you?
9        A    I don't.
10       Q    Okay.  Let's mark your declaration as
11   Miller Exhibit 2.
12            (Miller Deposition Exhibit 2 was marked
13   for identification and attached to the
14   transcript.)
15       BY MR. CLEMENT:
16       Q    And Dr. Miller, what I've put before
17   you is a copy of your first declaration in this
18   case without the exhibits.
19            Can you take a look at page 47 and
20   confirm that's your signature?
21       A    Yes, this is my signature.
22       Q    And you signed that on November 1st,
23   2017?
24       A    I did.
25       Q    Do you know who wrote this declaration?

Page 23

1        A    Well, the declaration was a
2    collaborative effort between my attorneys and
3    myself.  The opinions in this declaration are
4    mine.
5        Q    Who typed it?
6        A    I have no idea.
7        Q    Okay.  You did not type it?
8        A    I did not type it.
9        Q    Okay.  So drafts went back and forth
10   between you and counsel.  You commented on it.
11   And this is the final product, and it contains
12   your opinions; right?
13       A    That is correct.
14       Q    Okay.  Have you ever been involved in
15   a -- do you under- -- well, strike that.
16            Do you understand that your declaration
17   pertains to something called claim construction?
18       A    Yes.
19       Q    Okay.  Have you ever been involved in a
20   claim construction proceeding before?
21       A    No.
22       Q    No.
23            So you're -- in the pitavastatin case,
24   you were not involved in the claim construction?
25       A    Correct.

Page 24

1        Q    Okay.  Okay.  And I think you say in
2    this declaration, and correct me if I'm wrong, but
3    you understand that all of the patents involved in
4    this lawsuit except for one, the '594, they all
5    share the same patent specification?
6        A    Yes.
7        Q    Okay.  So it will be okay by you if
8    when we refer to column and line numbers unless I
9    indicate otherwise, I'm going to be referring to
10   the '728 patent; is that okay?
11       A    Yes.
12       Q    Okay.  And the last time you reviewed
13   your declaration was yesterday?
14       A    This morning.
15       Q    This morning.  Okay.
16            And in reviewing your declaration, did
17   you note any corrections or revisions that you
18   wanted to make?
19       A    I don't believe so.
20       Q    Okay.
21            MR. CLEMENT:  All right.  Let's mark as
22   Miller Exhibit 3 a copy of the materials
23   considered which was Exhibit 2 to your
24   declaration.
25            (Miller Deposition Exhibit 3 was marked

Page 25

1    for identification and attached to the
2    transcript.)
3        BY MR. CLEMENT:
4        Q    Okay.  Dr. Miller, can you confirm this
5    is the materials you considered for your opening
6    declaration?
7        A    Yes.
8        Q    And where did you get these materials?
9        A    The majority of the materials were
10   provided to me by my attorneys.
11       Q    Okay.  And did your counsel provide you
12   any materials to look at that are not on this
13   list?
14       A    I don't believe so.
15       Q    Did you do any research to find
16   materials?
17       A    I didn't do additional research beyond
18   what appears here.
19       Q    So all of the materials that are in
20   these materials considered Miller Exhibit 3 came
21   from counsel?
22       A    Well, I was familiar with a number of
23   the publications prior to counsel providing them
24   to me.
25       Q    Did you instruct counsel to find those

Page 26

1  for you or they just happened to show up from
2  counsel?
3      A    They were provided by counsel, but,
4  again, I was familiar with many of the
5  publications.
6      Q    All right.  Understood.  And that's --
7  that's great.  That's fine.
8          I just want to understand that all the
9  materials here -- did you ask for counsel to
10 provide you with any of those materials?
11         MR. KENNEDY:  Objection to form.
12         THE WITNESS:  (Reviews document.)
13         There might have been one or two
14 publications, but I -- I don't recall specifically
15 which ones.
16         BY MR. CLEMENT:
17     Q    And looking at that list doesn't
18 refresh your recollection?
19     A    Bays, Davidson and Jacobson are
20 manuscripts that I'm familiar with, but, again, I
21 don't recall whether I specifically suggested one
22 or more of those.
23     Q    Okay.  And when you referred to Bays
24 just then, that was number 34?
25     A    Thirty-four and 35.  Davidson is 36 --

Page 27

1      Q    Okay.
2      A    -- and Jacobson is 37.
3      Q    Okay.  But you don't recall whether or
4  not those were provided to you by counsel or you
5  asked for them; is that fair?
6      A    That's fair.
7      Q    Great.
8          MR. CLEMENT:  Okay.  Let's mark as the
9  next exhibit a copy of your reply declaration as
10 Miller 4.
11         (Miller Deposition Exhibit 4 was marked
12 for identification and attached to the
13 transcript.)
14         BY MR. CLEMENT:
15     Q    And, Dr. Miller, if you'll take a quick
16 look through that, and can you identify that
17 document for the record?
18     A    (Witness reviews document.)
19         I can.
20     Q    And what is Miller Exhibit 4?
21     A    It is a reply declaration.
22     Q    And is that your signature on page 9 of
23 that declaration?
24     A    Yes, it is.
25     Q    And you signed that on February 2nd,

Page 28

1  2018?
2      A    That is correct.
3      Q    With this declaration, you did -- you
4  didn't include a list of additional materials
5  considered; correct?
6      A    (Witness reviews document.)
7          That is correct.
8      Q    Did you consider additional materials
9  in preparing your reply -- reply declaration in
10 addition to what you considered for your initial
11 declaration?
12     A    I don't believe that I did.
13     Q    Well, you would have considered the
14 Wharton declaration; right?
15     A    Right.  This is -- this is a reply to
16 Wharton.
17     Q    Okay.  And you would have considered
18 the Wharton transcript as well -- his deposition
19 transcript?
20     A    I am not sure that the Wharton
21 transcript was part of this response.  I believe
22 it was in response to his declaration.
23     Q    Okay.  So you don't recall if you saw
24 the Wharton deposition transcript before
25 February 2nd?

Page 29

1      A    I don't recall.
2      Q    Okay.  And did you consider the
3  exhibits that were attached to Dr. Wharton's
4  declaration?
5      A    I believe I reviewed many of them.
6      Q    Okay.  Do you recall any other
7  materials that you considered for your reply
8  declaration other than your materials considered
9  in your first declaration and the Wharton
10 declaration and Wharton exhibits?
11     A    Yeah, I don't believe so.
12     Q    Okay.  And your declaration -- this
13 reply declaration, Miller Exhibit 4 --
14     A    Yes.
15     Q    -- you only opine on two terms;
16 correct?
17     A    I only opine on two terms, but I
18 believe I make a statement specifically on page 2,
19 and that would be under number 2 where I say, I
20 have not responded to every statement in the
21 Wharton declaration in this reply declaration.  If
22 I have not responded to a particular statement, it
23 should not be assumed that I agree with
24 Dr. Wharton's opinions.
25     Q    Okay.  But the opinions you provided

Page 30

1 related to two terms; correct?

2      A      In this reply declaration, that is

3 correct.

4      Q      Okay. And that was the

5 "concurrent/concomitant lipid-altering therapy"

6 term; that would be one of them?

7      A      That is correct.

8      Q      And then also the "without

9 substantially increasing LDL-C" terms; right?

10      A      That is correct.

11      Q      And why did you only choose to put in

12 your reply declaration responses regarding those

13 two terms?

14      A      To provide clarification.

15      Q      And you didn't think any further

16 clarification was required for the other terms

17 that Dr. Wharton opined on?

18      A      Well, not necessarily, but this --

19 these were the most important claim terms that I

20 wanted to comment on.

21      Q      Okay. And you didn't feel the need to

22 comment on the other terms that Dr. Wharton opined

23 on; correct?

24      A      That's correct.

25      Q      Do you know how these two terms were

Page 31

1 selected? Did you select these two terms or did

2 counsel?

3      A      I did not select the claim terms.

4      Q      So counsel asked you to opine further

5 on "concurrent/concomitant lipid-altering therapy"

6 and the "without substantially increasing" terms?

7      MR. KENNEDY: I caution the witness --

8 the witness can answer that question yes or no,

9 but I caution the witness to avoid revealing the

10 substance of communications he may have had with

11 counsel.

12 BY MR. CLEMENT:

13      Q      Yes or no is fine.

14      A      Can you repeat the question, please?

15      MR. CLEMENT: Can you read that back?

16      (The Record was read as requested.)

17      THE WITNESS: Yes.

18 BY MR. CLEMENT:

19      Q      And when was the last time you reviewed

20 your reply declaration, Miller 4?

21      A      Within the past 24 hours.

22      Q      And, again, do you have any corrections

23 or revisions you want to make on this exhibit?

24      A      I don't believe so.

25      Q      And, again, how was this document

Page 32

1 prepared? Was this, again, a collaborative effort

2 similar to the first declaration?

3      A      Yes.

4      Q      Did you know Amarin Pharmaceuticals

5 before you became involved in this case?

6      A      I did.

7      Q      And how did you know Amarin

8 Pharmaceuticals before coming -- becoming involved

9 in this case?

10      A      They make Vascepa.

11      Q      Okay. Any other way?

12      A      They contacted me to serve on the

13 steering committee for a clinical outcome study.

14      Q      Any other ways?

15      A      That was our initial -- that was how we

16 made contact.

17      Q      Okay. But did they -- have you been

18 involved with Amarin other than -- and outside the

19 scope of this case, have you been involved with

20 Amarin other than as the steering committee on a

21 clinical outcome study?

22      A      Yes.

23      Q      In what way or ways?

24      A      They -- they asked me to give a

25 presentation at the EMDAC meeting on

Page 33

1 triglycerides.

2      Q      Any other ways?

3      A      I advise them.

4      Q      So you serve as a consultant for them?

5      A      Yes, I serve as a consultant primarily

6 as it relates to REDUCE-IT.

7      Q      Is REDUCE-IT different than the

8 clinical outcome study you referred to?

9      A      That is the clinical outcome study.

10      Q      And you say "primarily," you consult

11 with them primarily as to REDUCE-IT.

12      Do you consult with them as to other?

13      A      I've worked with them to provide

14 training for physicians.

15      Q      And can you be a little bit more

16 specific? How do you work with them to provide

17 training for physicians?

18      A      They -- they have a -- as with other

19 pharmaceutical companies, they have a -- a

20 platform where potential speakers will discuss in

21 a disease-management-fashion triglyceride

22 lowering, the importance of triglycerides, and

23 I've helped to build on that foundation.

24      Q      So when you say platform for speakers,

25 are you talking about a conference?

Page 34

1    A    It -- it -- it's really more for
2  teaching physicians about management of
3  triglycerides.  So teaching the physicians who
4  will go out and perform these activities.
5    Q    Right.
6         But, I guess --
7    A    So I don't -- I don't -- I don't speak
8  for Amarin, but I've advised them on teaching
9  other physicians.
10   Q    Okay.  So you were -- how they would go
11 and teach other physicians.
12        Is it for their sales reps?  I mean,
13 I'm just trying to understand.
14   A    No, it's other physicians in -- in the
15 field and essentially providing educational
16 information.
17   Q    So is this something that takes place
18 at Amarin's facilities, or is it at a --
19   A    Does not take place --
20   Q    -- different location?
21   A    Does not take place at Amarin's
22 facilities.
23   Q    Okay.  Does this take place off-site
24 somewhere -- some -- give me -- can you -- I
25 guess -- strike that.

Page 35

1         Can you give me an example of where
2  this would take place?
3    A    Yeah, it takes place -- it's
4  basically -- it could take place at a -- at an
5  outside venue.
6    Q    Uh-huh.
7         Do you recall any outside venues where
8  it did take place?
9    A    There was a conference that took place
10 in California.
11   Q    Okay.  Do you recall when that was and
12 where in California?
13   A    That was about a year ago.
14   Q    And where in California?
15   A    San Diego.
16   Q    Okay.  Can you recall any other
17 examples of these meetings that took place at
18 outside venues?
19   A    There was one in Florida.
20   Q    Any others?
21   A    That's it.
22   Q    Okay.  And where in Florida and when?
23   A    South Florida.
24   Q    Okay.  And do --
25   A    Within --

Page 36

1    Q    -- you recall when?
2    A    Within the last six months.
3    Q    And the attendees at these meetings are
4  just you and Amarin or are other people attending?
5    A    The attendees at these meetings are
6  physicians, generally, who are interested in
7  treating lipid disorders.  Many of them are
8  certified by the National Lipid Association.
9         So these are individuals who have
10 familiarity and are accustomed to seeing patients
11 with lipid disorders.
12   Q    And do you speak at these -- I guess
13 I'm a little con- -- I'm trying to understand
14 better.  I can't recall.  Did you say you -- do
15 you speak to these physicians at these outside
16 venues we just discussed?
17   A    I speak to the physicians; that is
18 correct.
19   Q    Are you on, like, a panel?
20   A    Yes.
21   Q    Okay.  Do you recall who else was on
22 the panels with you?  Let's take the California
23 one.
24   A    There -- there were a few that I -- I'd
25 have to go through the NLA review to take -- take

Page 37

1  a look at that.
2    Q    Okay.  Do you recall who was in the
3  Florida one -- six months ago?
4    A    Again, I would have to look at the
5  review.
6    Q    Okay.  You also said you gave a
7  presentation to EMDAC as part of some of the other
8  consulting work you do for Amarin; is that
9  correct?
10   A    That was about five years ago.
11   Q    What is EMDAC?
12   A    It is a -- an FDA endocrinology
13 committee that -- that is assigned to review, I
14 guess, companies who are looking to seek a change
15 either in -- a new label or a change in a label,
16 an indication for their compound.
17   Q    Okay.  So we've talked about your
18 serving on the steering committee for the
19 REDUCE-IT study; right?
20   A    Yes.
21   Q    We talked about the EMDAC -- EMDAC
22 meeting that you attended and also the California
23 conference and Florida conference.
24   A    Correct.
25   Q    Any other work for Amarin?

Page 38

1    A    No.
2    Q    Okay.  Do you get paid for your work on
3    the steering committee?
4    A    Yes.
5    Q    Do you get paid for your work at -- at
6    the EMDAC meeting?
7    A    I did, yes.
8    Q    And do you get paid for your work when
9    you attend -- attended the California -- on the
10   panel at the California conference?
11   A    Yes.
12   Q    And also at the Florida conference?
13   A    Yes.
14   Q    Do you recall about how much you've
15   been paid by Amarin for this work?
16   A    I don't.
17   Q    Okay.  So when you're at these
18   conferences, do you advise the physicians to
19   prescribe drugs -- any drugs?
20   A    I don't.
21   Q    You don't advise them to prescribe
22   Vascepa if the patient presents in a certain
23   manner?
24   A    I don't.
25   Q    Okay.  Do you present on -- I guess --

Page 39

1    can you give me an example of what you present on?
2    A    Sure.
3         I -- at the most recent meeting, I
4    talked about treating high risk patients and the
5    areas that have not received attention as much.
6    So the talk focused on LDL centricity, that is,
7    treatment of patients with high LDL specifically.
8         Another part of the treatment --
9    another part focused on treatment of inflammation;
10   another part focused on diabetes.
11   Q    When you say "LDL centricity," what do
12   you mean by centricity?
13   A    Yeah.  So there are some that believe
14   that all you need to do to treat a patient with
15   heart disease with respect to treatment of lipid
16   disorders -- lipid disorders, quote/unquote, is to
17   put them on a statin to lower LDL and nothing else
18   really matters.  So it is an LDL-centric focus.
19   Q    Gotcha.  Okay.  Thank you.
20   MR. CLEMENT:  Okay.  Let's mark the
21   next exhibit which is a copy of your CV, and
22   that's Miller 5; correct?
23        (Miller Deposition Exhibit 5 was marked
24   for identification and attached to the
25   transcript.)

Page 40

1    BY MR. CLEMENT:
2    Q    And Dr. Miller, what the court reporter
3    has placed in front of you I'll represent to you
4    is a copy of the CV that you attached to your
5    initial declaration in this case as Exhibit 1.
6         Can you just take a quick look at --
7    A    Well, I believe it was Exhibit 5.
8    Q    Right.  It is Exhibit 5, but I believe
9    it was Exhibit 1 to your declaration.  It is
10   Exhibit 5 here, yes.
11   A    Got it.
12   Q    I think we're going to get a little
13   confused with the exhibit numbers.
14   A    (Witness reviews document.)
15   Q    Okay.  Do you know when this is
16   up-to-date as of -- as of when?
17   A    It says November 2017.
18   Q    Okay.  Is there any additions or
19   revisions?
20   A    I think paper 160 has been published.
21   Q    And what page is that on?
22   A    That is page 35.
23   Q    Okay.  Any other revisions or
24   supplementations?
25   A    No, I don't believe so.

Page 41

1    Q    Okay.  If you'll turn to page 7 of this
2    Miller Exhibit 5, you have there in 2012 an entry
3    saying that you were on the international steering
4    committee, Amarin: REDUCE-IT trial; correct?
5    A    That's correct.
6    Q    Okay.  And that's what we talked about
7    earlier?
8    A    Yes.
9    Q    Okay.  And that was the clinical
10   outcomes -- you referred to it as the clinical
11   outcomes trial?
12   A    Yes.
13   Q    And what was that clinical trial about?
14   A    Well, the -- the trial is still
15   ongoing, and it's about examining whether patients
16   that have hypertriglyceridemia with cardiovascular
17   disease may reduce their risk with ethyl
18   eicosapentaenoic.
19   MR. CLEMENT:  We'll get you the
20   spellings after.
21   BY MR. CLEMENT:
22   Q    Is that -- are you still serving on
23   that steering committee then?
24   A    I am.
25   Q    How -- how -- I guess, how much work

Page 42

1  does that involve?  I mean, how -- in the last 12
2  months, how much time have you spent?
3      A    We have teleconferences quarterly.
4      Q    And you get paid for that work;
5  correct?
6      A    I do.
7      Q    Do you recall how much?
8      A    I don't, but it's -- it's modest.
9      Q    And you've been serving on this
10 REDUCE-IT steering committee since 2012?
11     A    Yes.
12     Q    And what does it -- I guess, what do
13 you do as a member of the steering committee for
14 the REDUCE-IT trial?

                    REDACTED

21     Q    Okay.  And -- is that -- you're still
22 discussing that in steering committee meetings
23 today or has it evolved over the -- what is it --
24 five or six years that you've been involved?

                    REDACTED

Page 43

                    REDACTED

17          MR. KENNEDY:  Let me just state I'd
18 like a -- if you're going to get deeper into it, I
19 would like a chance to consult with my client
20 about the exact contours of his confidentiality
21 obligation.  Sitting here today, I'm not sure it's
22 covered by the litigation protective order.
23          MR. CLEMENT:  That's fair.  I don't
24 think I'm going to get too deep into it.  I
25 just . . .

Page 44

1          MR. KENNEDY:  Okay.
2  BY MR. CLEMENT:

                    REDACTED

10     Q    What does retention mean?
11     A    Retention is -- is keeping or trying to
12 maintain a subject in a clinical trial.  What
13 sometimes happens is patients may move, so we need
14 to try to find another site for them.  Things
15 happen.
16     Q    Uh-huh.
17     A    So we try to maintain as many of our
18 patients in the study until trial end.
19     Q    Okay.
20          MR. CLEMENT:  Let's mark as the next
21 exhibit Miller 6, a copy of some email
22 correspondence.
23          (Miller Deposition Exhibit 6 was marked
24 for identification and attached to the
25 transcript.)

Page 45

1  BY MR. CLEMENT:
2      Q    Dr. Miller, I guess, have you ever seen
3  this document before?
4      A    It looks like I have.
5      Q    And would you agree with me that it's a
6  copy of some email correspondence between you and
7  Paresh Soni?
8      A    Correct.
9      Q    And there's three emails on the page?
10     A    Yes.
11     Q    Who is Paresh Soni?
12     A    Paresh Soni was -- is a physician who
13 worked with Amarin and -- on -- on this compound
14 and was involved in -- in the REDUCE-IT clinical
15 trial.
16     Q    Now, this is dated 2010; right?
17     A    Correct.
18     Q    So were you working on the REDUCE-IT
19 trial before you were a member of the steering
20 committee?
21     A    No.  No, I -- the -- the -- the -- the
22 basic premise of this email was when I was
23 originally contacted by Paresh, I was involved
24 in -- in writing an American Heart Association
25 statement, and, so, it was unclear whether or not

Page 46

1   I could participate in -- in -- in working with --
2   on this committee.
3           So I had to go through my channels at
4   the American Heart Association as well as the
5   National Institutes of Health, and as stated in
6   that March 4, 2010 email, that I had been cleared
7   to -- to work with Paresh and the Amarin team.
8       Q    Okay.  So this was before you were on
9   the REDUCE-IT steering committee; right?
10      A    Correct.
11      Q    And the outcome study that is referred
12  to in the very bottom email, that would be the
13  REDUCE-IT study?
14      A    That is correct.
15      Q    And in the top email Paresh says the
16  first step is to execute the consulting agreement.
17          Do you see that?
18      A    I do.
19      Q    Do you recall executing the consulting
20  agreement?
21      A    I -- I must have.
22      Q    Okay.  And would that have been
23  pre-serving on this steering committee for
24  REDUCE-IT?
25      A    Yes.

Page 47

1       Q    Do you recall -- have you got paid for
2   that consultant -- consultancy?
3       A    Well, I've been paid.  It's -- it's
4   been the same agreement once I entered into the
5   REDUCE-IT team or I should say steering committee.
6       Q    Okay.
7           MR. CLEMENT:  Let's mark the next
8   exhibit.  It's Miller 7.
9           (Miller Deposition Exhibit 7 was marked
10  for identification and attached to the
11  transcript.)
12      BY MR. CLEMENT:
13      Q    And, Dr. Miller, I put some draft notes
14  dated March 24, 2010, in front of you.
15          Have you ever seen these before?
16      A    I don't recall.
17      Q    Do you see the header for the exhibit,
18  Miller 7?  It says, Meeting with Michael Miller -
19  University of Maryland School of Medicine?
20      A    Yes.
21      Q    And attendees M. Miller, P. Soni, B.
22  Stirtan, and R. Braeckman?
23      A    Yes.
24      Q    That Michael Miller is you; right?
25      A    That is me.

Page 48

1       Q    Okay.  Do you know who B. Stirtan is?
2       A    I believe he worked with Amarin at that
3   time.
4       Q    And R. Braeckman?
5       A    Yeah, that's Rene Braeckman.  He and
6   Paresh were -- were, I believe, on the invention
7   of -- of many if not all of the patents.
8       Q    Do you consider them experts in the
9   field, Paresh and Rene Braeckman?
10      A    Well, I consider them experts with
11  respect to this particular compound, but if you
12  could clarify what you mean by "experts" -- in
13  what field.
14      Q    Lipidology.
15      A    Yeah, Paresh, I believe, was an M.D.
16  Ph.D., so I -- but I'm not sure his clinical
17  involvement.  But -- but certainly he had a pretty
18  good knowledge base.  If he was not seeing
19  patients, then I would -- I would think that he
20  would consult with those that do, same with Rene.
21      Q    Would you consider them -- I guess, in
22  this case you recall you gave a definition of a
23  person of ordinary skill in the art.
24      A    (Witness nods head.)
25      Q    Would you consider Paresh Soni to meet

Page 49

1   that definition?
2           MR. KENNEDY:  Objection to form.
3           THE WITNESS:  I don't know that I
4   would.
5       BY MR. CLEMENT:
6       Q    What about Rene Braeckman?
7       A    I don't --
8           MR. KENNEDY:  Same objection.
9           THE WITNESS:  I don't know that I
10  would.
11      BY MR. CLEMENT:
12      Q    Okay.  Why don't you know that you
13  would?
14      A    Well, because in my opinion a person of
15  ordinary skill in the art as it relates to this
16  particular field is a clinician who has pretty
17  extensive experience in treating lipid disorders,
18  and I -- I don't know the extent to which either
19  of these individuals do.
20      Q    Okay.  And when you say "a person of
21  ordinary skill in the art as it relates to this
22  particular field," how do you define that field?
23      A    The field of very high triglycerides;
24  that's VHTG.  These are triglycerides at or
25  exceeding 500 milligrams per deciliter -- to

Page 50

1 distinguish it from patients that come in after a
2 cardiac event that a cardiologist will prescribe a
3 statin for.
4         Q      Okay.  In this email he talks about
5 a -- you were not able to join Amarin at a
6 February 27th ad board meeting.
7                Do you see that?
8         A      Yes.
9         Q      Do you know what an ad board meeting
10 is?
11        A      I don't know how it was used within
12 this context.  Ad board meetings can mean a lot of
13 things.  It can mean anything from putting
14 together the clinical trial for all I know.
15        Q      Do you recall being on an ad board for
16 Amarin?
17        A      Well, as I said, I -- serving -- I
18 would view myself as serving in the capacity of an
19 advisor by virtue of being on the steering
20 committee for REDUCE-IT.  That would constitute
21 advising.
22                So, yes, ad board could be used
23 interchangeably.
24        Q      Okay.  Great.
25                And then they -- it looks like here

Page 51

1 that they did consult with you on March 24th even
2 though you weren't able to join that February 27th
3 meeting?
4         A      I believe they came to Baltimore.
5         Q      So you recall that meeting?
6         A      I -- I -- I do because we had -- they
7 also met with a colleague of mine who then died
8 tragically subsequently.  It was very unfortunate.
9         Q      Sorry to hear that.
10                And it says P. Soni presented the ad
11 board slide deck and Rene Braeckman reviewed the
12 outcome study synopsis.
13                Do you remember -- do you have a
14 recollection of what that ad board slide deck was?
15        A      I -- I have no idea.  What -- what I do
16 recall is we discussed the REDUCE-IT study.
17        Q      Okay.  Now, they also talk here under
18 the general comments about a GSK outcome study.
19                Do you see that?
20        A      I do.
21        Q      Is that a different outcome study?
22        A      So GSK was in the process of putting
23 together an outcome study with Lovaza.
24        Q      And GSK would be GlaxoSmithKline?
25        A      That is correct.

Page 52

1         Q      So that would be a different outcome
2 study than the REDUCE-IT?
3         A      Yes.
4         Q      They also refer here to a Roche:
5 dal-OUTCOMES.
6                Do you know what that is?
7         A      I do.
8         Q      What is that?
9         A      Dal-OUTCOMES was a clinical outcome
10 study looking at cholesteryl ester transfer
11 protein or or CETP inhibitor that at that time was
12 ongoing.
13        Q      And what about the AIM-HIGH study?
14        A      The AIM-HIGH study was another clinical
15 trial looking to determine if raising HDL with
16 niacin on top of standard of care therapy that
17 included statin therapy would reduce
18 cardiovascular risk.
19        Q      And then it refers to a Bill Stanley?
20        A      This is my colleague who died.
21        Q      Oh, okay.
22                Then the next category here is EPA
23 versus DHA Discussion.
24                Do you see that?
25        A      I do.

Page 53

1         Q      Was that something you were involved
2 in?
3         A      I don't recall -- we may have had
4 discussions about it, but -- and I -- I remember
5 that Martek produced DHA, but I don't recall much
6 more beyond that.
7         Q      And it says here, Thoughts on MOA for
8 LDL increase by DHA.
9                Do you have any -- do you have an
10 understanding of what MOA means?
11        A      Mechanism of action.
12        Q      Okay.  Then the next part of the email
13 talks about the AMR101 outcome study
14 considerations.
15        A      I see that.
16        Q      What -- do you know what AMR101 is?
17        A      That's the ethyl eicosapentaenoic.
18 That is the compound that was used before it
19 became Vascepa.
20        Q      Okay.  Can we say icosapent to make it
21 easier for the court reporter?
22        A      Sure.
23        Q      Okay.  Then it talks about some
24 inclusion criteria?
25        A      Yes.

Page 54

1  Q   Is that something you talk about when
2  you're on the recruitment phase on the steering
3  committee as what patients to include, what
4  inclusion criteria to have?
5  A   This actually proceeded that, so this
6  was a discussion as to what the entry criteria
7  should be when the study was formalized.
8  Q   Okay.  Were you involved in these
9  discussions on what the inclusion criteria should
10 be?
11 A   I think they asked my -- I'm presuming
12 that they asked my opinion back -- as these notes
13 relate to --
14 Q   Uh-huh.
15 A   -- but beyond that I -- I don't recall.
16 Q   And do you see under the TG entry level
17 there's a little Roman numeral II?
18 A   Yes.
19 Q   And it talks about a 15 percent leeway
20 in triglyceride measure to enroll patients at
21 either end of the range?
22 A   Yes.
23 Q   I guess -- do you know what that
24 15 percent refers to?
25 A   Variability.

Page 55

1  Q   But, so, was that 15 percent above or
2  below 500?
3  A   Either -- either way.
4  Q   Either way.
5      So it could be 15 percent above 500?
6  A   I think it was at the lower limit.  The
7  discussion was more focusing on 150.
8  Q   Okay.  So that was 15 percent above or
9  below the 150?
10 A   I believe so.
11 Q   Not the 500?
12 A   No.
13 Q   Going down to the risk factors, do you
14 see there's a reference to post-ACS patients?
15 A   Yes.
16 Q   Do you know what that refers to?
17 A   A post-ACS is after an acute coronary
18 syndrome.
19 Q   Then if we turn down to fibrates at the
20 bottom.  It says, Fibrates are in trouble except
21 for high TG, low HDL population.
22 A   Yes.
23 Q   Do you know what that refers to?
24 A   It -- it refers to the clinical trials
25 that had looked at fibrates and found that by and

Page 56

1  large the study was null, the clinical trial was
2  null, with the exception of the
3  hypertriglyceridemia, low HDL subgroup.
4  Q   And there it was shown to be effective?
5  A   These were post hoc analyses, so
6  they're what we refer to as hypothesis generating.
7  And, therefore, it wasn't shown because the study
8  wasn't designed to specifically evaluate it, but
9  it raised the suggestion that if you focused
10 another trial on a patient population with high
11 TG, for example, that you may have a different
12 outcome.
13 Q   Different outcome meaning it would have
14 been effective?
15 A   Well, we don't know.
16 Q   Right.  But that would have been the
17 hypothesis?
18 A   That's why Amarin stepped up to the
19 plate to do the trial.
20 Q   The --
21 A   First --
22 Q   -- trial on fibrates?
23 A   The first -- Amarin was the first
24 company to do a clinical trial specifically
25 evaluating this high risk group.

Page 57

1      So essentially Abbott turned it down,
2  GSK turned it down, but Abbott went up to the
3  plate and took the risk to do the study, and that
4  study is called REDUCE-IT.
5  Q   Okay.  I think you said Abbott.  You
6  meant Amarin; right?
7  A   Amarin came -- stepped up to the plate;
8  that is correct.
9  Q   But this is referring to fibrates;
10 right?
11 A   Correct.
12 Q   And the --
13 A   Fibrates were the -- the study for
14 fibrates was a Abbott study.
15 Q   And the post hoc analysis you were
16 referring to was looking at what the hypothesis
17 would be for fibrates or for icosapent?
18 A   For a -- a medicine that would lower
19 triglyceride which fibrates lower triglyceride,
20 but in the studies that had been done, they did
21 not hone in or focus specifically on a
22 hypertriglyceridemia population.
23 Q   Okay.  And then below that is TPP
24 feedback.
25     Do you see that?

Page 58

1      A      I don't know what TPP is.
2      Q      Okay.  So just going back to the
3   fibrates and the post hoc analysis, is that
4   because in a clinical study you have to define
5   what you're looking for before the study occurs
6   and looking at things afterwards can have bias?
7             MR. KENNEDY:  Objection to form.
8             THE WITNESS:  That's actually not true.
9             What -- what happened with the -- the
10  study for the Abbott sponsored trial known as
11  ACCORD, it was not -- Abbott provided the
12  medication, but it was an N- -- it was an NHLBI
13  study, National Heartland Blood Institute study.
14            And even though I was not involved in
15  putting together the study, some of my colleagues
16  were.  And they asked NHLBI to focus in on a
17  diabetic population with hypertriglyceridemia, and
18  NHLBI said no.  They turned them down.
19            Hence the intention was there to do the
20  proper study.  It didn't get done.  But they were
21  able to get in in the study a prespecified
22  endpoint which looked at the hypertriglyceridemia,
23  low HDL subgroup.
24            So when the study was over even though
25  the results were negative -- no surprise to many

Page 59

1   of us -- they did have that prespecified endpoint
2   of the hypertriglyceridemia, low HDL subgroup and
3   within that group that was positive.
4             So, therefore, that led to Amarin
5   stepping up to the plate to do the REDUCE-IT
6   trial.
7             BY MR. CLEMENT:
8      Q      But that positive finding, right, on
9   this other endpoint, not the primary endpoint, but
10  that other endpoint, that was based on patients
11  taking fibrates?
12     A      So the way the ACCORD study was
13  devised -- is that diabetic patients with vascular
14  disease were assigned to LDL-lowering therapy.  So
15  they all had to be on a statin and on top of that
16  half the group was randomized to also receive the
17  Abbott compound, the fibrate.
18            And the results here -- so the study
19  was not powered sufficiently to -- to hone in on
20  the hypertriglyceridemia, low HDL group, but the
21  results -- certain -- trended in favor of benefit
22  amongst those -- amongst that subgroup.
23     Q      Taking the fibrate?
24     A      Taking the combination.
25     Q      Combination of fibrate and statin.

Page 60

1      A      Right.
2      Q      Right?
3      A      It's what I would refer to as
4   concomitant lipid-lowering therapy/concurrent
5   lipid-lowering therapy --
6      Q      Okay.
7      A      -- combination.
8      Q      Okay.
9             MR. KENNEDY:  You okay?  Do you need a
10  break?
11            THE WITNESS:  I'm fine.
12            MR. CLEMENT:  Let's mark as Miller 8, a
13  document with the Bates number -- I'm sorry.  I
14  should have been -- have been reading these --
15  2739796.
16            (Miller Deposition Exhibit 8 was marked
17  for identification and attached to the
18  transcript.)
19            BY MR. CLEMENT:
20     Q      Okay.  Dr. Miller, I've put before you
21  what looks like an invoice to me, Miller
22  Exhibit 8.
23            Can you identify this for the record?
24     A      Yes, it's Exhibit 8.  It is to Paresh
25  in regard to my consulting time for Amarin.

Page 61

1      Q      And this is for the time period
2   September through December 2010?
3      A      That is correct.
4             REDACTED
5
6      Q      And this is before serving on the
7   steering committee for REDUCE-IT; is that correct?
8      A      I believe at this time I was on the
9   steering committee.
10     Q      Even though on your CV it says 2012 and
11  this is 2010 work, you think you started the
12  steering committee work earlier?
13     A      Yeah, because the -- I was approved by
14  the American Heart Association and the NIH.  If we
15  go back to Exhibit 6, it looks like in March of
16  2010 --
17     Q      Uh-huh.
18     A      -- at which time I signed the
19  consulting agreement, and then, I guess, we were
20  in the process of finalizing the REDUCE-IT study.
21  And, so, this would reflect that.
             REDACTED

Page 62

REDACTED

8        MR. CLEMENT:  Let's mark the next one.
9   And this is going to be Miller 9, Bates
10  number 2769565.
11       (Miller Deposition Exhibit 9 was marked
12  for identification and attached to the
13  transcript.)
14  BY MR. CLEMENT:
15       Q    Dr. Miller, can you identify for the
16  record what Miller Exhibit 9 is?
17       A    This exhibit, again, is to Paresh
18  regarding my consulting time between January and
19  June of 2011.

REDACTED

Page 63

REDACTED

4        MR. CLEMENT:  Okay.  Let's mark the
5   next one.  Let's mark this Miller 10, a document
6   with the Bates numbers 3121925 through 3121931.
7        (Miller Deposition Exhibit 10 was
8   marked for identification and attached to the
9   transcript.)
10  BY MR. CLEMENT:
11       Q    Okay.  Dr. Miller, have you ever seen
12  this document before?
13       A    I do not believe I have.
14       Q    Okay.  If you can just turn to the page
15  with the Bates number 3121930.,
16       I guess, before turning there, this is
17  a document that's talking about Amarin and the
18  REDUCE-IT study in 2014.
19       Do you see that?
20       A    I do.

REDACTED

Page 64

REDACTED

10       MR. CLEMENT:  Let's mark Miller 11, a
11  document with Bates number 1077327.
12       (Miller Deposition Exhibit 11 was
13  marked for identification and attached to the
14  transcript.)
15  BY MR. CLEMENT:
16       Q    And, Dr. Miller, have you ever seen
17  this document before?
18       A    I see it now.
19       Q    Okay.  And this is another invoice that
20  you sent to Amarin?
21       A    Yes.
22       Q    For the time period -- I guess, for two
23  different time periods; right?
24       A    That's correct.
25       Q    One is for November 1 through

Page 65

1   December -- let's take it from the top.
2        The first one is for July through
3   October 31, 2011; right?
4        A    Correct.

REDACTED

7        Q    And then the next period is November 1
8   through December 16, 2011.
9        A    Right.  All related to REDUCE-IT.  That
10  is correct.

REDACTED

19       Q    -- again?
20       Have you ever, sir -- I guess, have you
21  ever heard the term "KOL"?
22       A    I've heard -- I've heard of it.  I
23  don't know what it means.
24       Q    Key opinion leader.
25       A    Oh, okay.

Page 66

1    Q    Have you heard of that?
2    A    Now I have, yes.
3    Q    Okay.  Have you ever served as a KOL
4  for Amarin?
5    A    Well, I guess not in the sense that I
6  think of a key opinion leader.  What
7  pharmaceutical companies have done in the past and
8  I don't know because things have changed over --
9  over the years, but key opinion leaders can vary
10  between companies, and oftentimes a key opinion
11  leader might be asked to do -- to do speaking
12  engagements.
13         But in this particular case, this was
14  related to serving on a committee for a clinical
15  trial.
16    Q    And forgive me if I misled you.  I'm
17  not speaking about that exhibit anymore.
18         I'm just asking have you ever served as
19  a kay -- key opinion leader for Amarin in any
20  context?
21    A    I -- I'm not sure what that means, what
22  the context you're referring to is.
23    Q    Who do you currently interact -- so
24  you're still working in some sort of
25  consultancy -- consultancy capacity for Amarin;

Page 67

1  right?
2    A    Right.  I consider myself a member of
3  the steering committee for the REDUCE-IT trial --
4    Q    Okay.
5    A    -- and advise them accordingly.
6    Q    And who do you interact with at Amarin
7  currently?
8    A    A gentleman by the name of -- of Ralph
9  Doyle.
10    Q    Anyone else?
11    A    There are others.  I just don't
12  remember all their names.
13    Q    Okay.  Do you remember any others, as
14  you sit here today?
15    A    No, but if you gave me a list of names,
16  I could probably point them to you.
17    Q    If I had a list, I -- we'll see.  As
18  we -- as we go through, if something comes to your
19  mind, you know, just let me know, please.
20    MR. CLEMENT:  Okay.  Let's mark the
21  next exhibit which will be Miller 12, a document
22  with Bates range 1638777 through -- it's 877
23  and -- and through 8778, but there's also
24  attach- -- an attachment.
25         (Miller Deposition Exhibit 12 was

Page 68

1  marked for identification and attached to the
2  transcript.)
3    BY MR. CLEMENT:
4    Q    Oh, I need to give it to you.  Okay.
5         And, Dr. Miller, have you ever seen
6  this document before?
7    A    I do not believe so.
8    Q    You're not listed on the emails; right?
9    A    (Witness shakes head.)
10    Q    Although it does talk -- it does
11  note -- it says, Please note that Doctors Miller,
12  Weintraub and Nissen are not involved in the
13  trials.  And it's giving a contact list for some
14  KOLs.
15    A    I see that.
16    Q    Do you know who -- Paresh Soni, we have
17  talked about; correct?
18    A    Yes.
19    Q    Do you know who this Martina
20  Schwarzkopf is?
21    A    I don't.
22    Q    Do you know who David Schull is?
23    A    I do not.
24    Q    Or Elliott Fox?
25    A    I do not.

Page 69

1    Q    Or Russo Partners?
2    A    I do not.
3    Q    Okay.  If you turn to the attachment,
4  do you see you're listed there -- I guess this is
5  their -- their list of key opinion leaders.
6         Do you see that?
7    A    I see the list.
8    Q    Okay.  And your name is on that list?
9    A    I see that.
10    Q    And do you see a guy named John Kas- --
11  Kastelein?
12    A    Yes.
13    Q    Do you know who he is?
14    A    Yes.
15    Q    Okay.  Would you consider him to be a
16  person of ordinary skill in the art as you've set
17  forth in your opinions in your declaration?
18    A    Yes.
19    Q    How about as an expert in the field?
20    A    Yes.
21    MR. KENNEDY:  Object.
22    BY MR. CLEMENT:
23    Q    And what about Harold Bays.  Do you
24  know who that is?
25    A    Yes.

Page 70

1    Q    And would you consider him to be a
2  person of ordinary skill in the art?
3    A    Yes.
4    Q    And an expert?
5    A    Yes.
6    Q    And what about James McKenney?  Do you
7  know who that is?
8    A    Yes.
9    Q    And would you consider that person to
10  be a -- at least meet the standards of a person of
11  ordinary skill in the art as you've defined it?
12    A    I don't believe that Jim sees patients,
13  so I'm not as sure about that.
14    Q    Okay.  What about Steven Nissen?
15    A    Yes, I know him.
16    Q    Okay.  Would you consider him to at
17  least be a person of ordinary skill in the art as
18  you defined it in your declaration?
19    A    Well, again, I don't know -- he's a
20  cardiologist.  I don't know how many patients he
21  really sees with VHTG.  It's important to -- to
22  make a distinction because cardiologists, as a
23  general rule, do not treat patients with VHTG.
24         There are exceptions.  I'm one of the
25  exceptions, but I have colleagues that are

Page 71

1  cardiologists that also see them.  But by and
2  large VHTG, because -- because of its relative
3  rarity and the fact that it's not viewed as
4  strikingly associated with cardiovascular disease,
5  is generally not seen by cardiologist.
6    Q    Okay.  If you turn to your declaration
7  which was Miller 2, I guess, and -- and look at
8  your definition of -- I guess, which paragraph
9  would you say contains your definition of a person
10  of ordinary skill in the art.
11    A    I believe we're looking at 15.
12    Q    Okay.  And where in 15 does it say that
13  a person of ordinary skill in the art is required
14  to have -- treat VHTG?
15    A    So, one, I never used the word
16  "required," and, secondly, Including severe
17  hypertriglyceridemia is the way that this -- the
18  two sentences are written, Including severe
19  hypertriglyceridemia.  And cardiologists, as a
20  general rule, do not see those patients.
21         At the University of Maryland, for
22  example, within my division, the
23  echocardiographers, the interventionalists, the
24  electrophysiologist refer -- they hear about a
25  patient with very high triglycerides, they send

Page 72

1  them to me.
2         A general cardiologist does not
3  typically see these patients.
4    Q    Okay.  So when you say, "including
5  hypertriglyceridemia," that's a act-- -- that's
6  actually a requirement for your person of ordinary
7  skill in the art.  They actually -- they have to
8  have that.  It's in a -- it's a requirement when
9  you say "including"?
10    A    Well, again, to make them a more --
11  more reputable in field, you have to have
12  experience in -- in treating whatever -- whatever
13  your -- you're determining you're titled to.
14         Very high triglycerides are relatively
15  uncommon.  They're not -- it's not a
16  bread-and-butter patient that a cardiologist sees
17  that had -- that a cardiologist would simply place
18  a person on a statin and say, you know, I treat
19  patients with lipid disorders.  That -- this is a
20  little bit different.
21    Q    Okay.  Again, I'm just asking a
22  question.  I understand your position there.
23         Is it a requirement -- when you say,
24  "including severe hypertriglyceridemia," is that a
25  requirement for your person of ordinary skill in

Page 73

1  the art, that they are treating patients
2  specifically with hypertriglyceridemia?
3    A    Yes, I think they have to have some
4  experience in this field, absolutely.
5    Q    When you say "some experience," what
6  does that mean?
7    A    Seeing and treating patients with
8  triglyceride levels of at least 500 on a regular
9  basis, not once every five or ten years, but on a
10  relatively frequent basis.
11    Q    Okay.  And going back to Exhibit 12
12  which was that list of KOLs.  Do you still have
13  that?
14    A    Yes.
15    Q    Thank you.
16         I think we left off -- the next one is
17  Howard Weintraub?
18    A    Yes.
19    Q    And is he -- do you know who that is?
20    A    Yes.
21    Q    And is he someone who is at least a
22  person of ordinary skill in the art?
23    A    I believe he would be.
24    Q    And an expert?
25    A    I believe he would be.

Page 74

```
1     Q     And, again, you don't know how this
2  list was compiled; correct?
3     A     That is correct.
4           MR. CLEMENT:  Can we take a break.
5           MR. KENNEDY:  Yeah, it's a good time
6  for a break.
7           THE VIDEOGRAPHER:  The time is
8  9:28 a.m.  This completes tape number 1.  We are
9  going off the record.
10          (Recess -- 9:28 a.m.)
11          (After recess -- 9:49 a.m.)
12          (Jennifer Scarpati and Deepti Jain
13  present.)
14          THE VIDEOGRAPHER:  The time is 9:49
15  a.m.  This begins media unit number 2.
16          Please proceed, Counsel.
17  BY MR. CLEMENT:
18    Q     Dr. Miller, do you still have Exhibit
19  12 front of you?
20    A     I do.
21    Q     Just one further question.  Bill
22  Stirtan, do you know who that is?  Did we talk
23  about him before?
24    A     We may have.  I think I remember
25  meeting him, but I don't know his whereabouts now.
```

Page 75

```
1  I don't believe he's with the company, but I just
2  don't know.
3     Q     Okay.  Do you know if he's -- do you
4  understand -- does he practice medicine or --
5     A     I don't think so, but, again, I don't
6  know.
7     Q     Okay.
8           MR. CLEMENT:  All right.  Let's mark
9  the next document, document with Bates
10  number 2702696.
11          (Miller Deposition Exhibit 13 was
12  marked for identification and attached to the
13  transcript.)
14  BY MR. CLEMENT:
15    Q     Dr. Miller, the court reporter has
16  placed before you what's been marked as Miller
17  Exhibit 13.  Have you ever seen this document
18  before?
19    A     I -- I don't recall, but I'm seeing it
20  now.
21    Q     Well, it's a email from Steven Ketchum
22  to you; correct?
23    A     Yes.
24    Q     And dated May 28th, 2013?
25    A     That's what it says.
```

Page 76

```
1     Q     Do you recall this document --
2  referring this document?
3     A     I -- I really don't.
4     Q     Can you take a second to just review
5  it?
6     A     (Witness reviews document.)  Yes.
7     Q     Okay.  Did reading it refresh your
8  recollection as to what it's about?
9     A     Yes.
10    Q     Okay.  What -- what do you recall about
11  it?
12    A     Yeah.  There was a -- there was a
13  primary care conference with Pri-Med.  So this is
14  a conference that primary care physicians attend.
15  It's continuing medical education.  And a
16  colleague and I gave a talk related to hyp- -- I
17  spoke on hyp- -- just the general aspect of
18  hypertriglyceridemia, and I believe he talked
19  about treatment.
20          And I think that's probably where this
21  came from.
22    Q     And who was the other colleague?
23    A     I don't recall now.
24    Q     Okay.  And was this part of your
25  consultancyship with Amarin --
```

Page 77

```
1     A     No.
2     Q     -- that you appeared at this?
3     A     No, so primary care -- I mean, Pri-Med
4  conferences are CME conferences that are borne out
5  from Harvard.
6           And, so, one of my colleagues, Peter
7  Libby, over at Harvard does the cardiology and
8  there are a number of colleagues from Harvard that
9  are involved, so I get involved to speak at those.
10    Q     Do you know who Steven Ketchum is who
11  wrote this email to you?
12    A     I do.
13    Q     Okay.  Who is Steven Ketchum?
14    A     At the time at least of what was dated
15  May of 2013, he was president of research and
16  development and senior vice president of Amarin.
17    Q     Okay.  He sent you this little news
18  wire, right, at the bottom?
19    A     Correct.
20    Q     And you were a member of the -- well,
21  it says -- it says here that the firm says one
22  lecture conducted by a member of Amarin's steering
23  committee.
24          Are they referring to you there?
25    A     I don't believe so.
```

Page 78

1    Q    Do you have any idea who they were
2  referring to?
3    A    I believe it was probably the other
4  speaker.
5    Q    Okay.  And you still -- you don't
6  recall --
7    A    No.
8    Q    -- who that was?
9    Okay.  And it says here that he said --
10 and, I guess, that's the other speaker?
11   A    Correct.  It was a male.
12   Q    Male, okay.
13   However fish oil is one of many
14 treatments that can lower triglycerides; right?
15   A    That's what it says.
16   Q    Okay.  So there are other medications
17 that can lower triglycerides in addition to fish
18 oil; right?
19   A    Correct.
20   Q    And do you know what that was for --
21 that was for levels above 500; right?
22   A    I -- I don't recall, so I'm -- like
23 you, I am looking at this -- at this text to
24 understand the context of it.
25   Q    Okay.  Do you recall having -- I mean,

Page 79

1  it says here that, you know, in the top, the email
2  portion, it talks about Mike is -- he's writing to
3  you, and he's saying he has some questions
4  regarding the newswire piece and for you to feel
5  free to call him.
6    Do you recall having a conversation
7  with him about this?
8    A    I -- I don't.
9    Q    Okay.  Have you ever talked to the
10 patent inventors in this case?
11   A    Well, I think as I -- as I said, I --
12 two of the patent inventors, Paresh Soni and Rene
13 Braeckman, who approached me during the early part
14 of the trial, but they both left the company, and
15 I have not seen or spoken with them since.
16   Q    Since -- do you remember -- give me a
17 time frame?
18   A    I'm guessing they left the company
19 around 2013, maybe, '12.
20   Q    Okay.
21   A    Somewhere between '12 and '13.
22   Q    And what about any of the other
23 inventors on the patent?
24   A    I don't believe I recognize them.
25   Q    Do you know if any of them -- what -- I

Page 80

1  may have asked this before.  Was Paresh Soni
2  someone you considered a person of ordinary skill
3  in the art?
4    A    Well, again, I don't know the extent to
5  which he is still in the field.  This was 2012, so
6  at that time he was -- at the very least he was
7  familiar with the compound.  And whether or not he
8  had access to a clinician if he, himself, wasn't
9  seeing those patients, is another issue.
10   Q    So I guess I'm asking whether or not
11 you can -- based on the knowledge as you sit here
12 today, you can't tell me -- you don't know whether
13 he was a person of ordinary skill in the art; is
14 that correct?
15   A    Well, I think based upon -- so if I may
16 and go back to my declaration.
17   MR. KENNEDY:  Yeah, you might have -- I
18 think it's --
19   THE WITNESS:  And I will go to that
20 section of person of ordinary skill in the art.
21   And I said, It is my opinion that a
22 POSA at the time of the invention would be a
23 clinician with an M.D. or D.O. -- so he qualifies
24 in that regard -- and at least two or three years
25 experience of the diagnosis and diagnosis of

Page 81

1  treatment of lip- -- of treatment of lipid
2  disorders including hypertriglyceridemia.
3    So that's just the part I'm just
4  unclear of.
5    BY MR. CLEMENT:
6    Q    All right.  So sitting here today, I
7  guess, in answer to my question, you don't -- you
8  can't tell me whether or not he was a person of
9  ordinary skill in the art; right?
10   A    At that particular time, back -- back
11 in 2011, that -- based on my -- that -- that --
12 again, this is my opinion, it doesn't
13 invalidate in any way the opinions offered in
14 number 17; otherwise, it wouldn't change my
15 opinions expressed in this declaration, provided
16 that the POSA as defined by defendants and
17 plaintiffs is or has access to a clinician.
18 That's number 18.
19   Q    Okay.  And right.  This -- and if we
20 look at paragraph 17, right, plaintiffs in their
21 preliminary validity contentions, you know, they
22 don't make -- they don't talk about this severe
23 hypertriglyceridemia; correct?
24   A    They mention expertise in lipid
25 metabolism.

Page 82

1      Q     But they don't men- -- mention severe
2  hypertriglyceridemia; correct?
3      A     They don't say severe
4  hypertriglyceridemia.
5      Q     Okay.
6      A     But they talk about expertise in lipid
7  metabolism which might fall under the umbrella of
8  a VHTG.
9      Q     So it may or may not include it.  I'm
10  not saying it excludes it.  It may or may not
11  include it; right?
12      A     Correct.
13      Q     Okay.  What's a D.O.?
14      A     That's a -- a doctor of osteopathic
15  medicine.
16      Q     Okay.  And you also say alternatively,
17  right, a POSA that can be a nurse practitioner,
18  physicians assistant with the criteria you spell
19  out?
20      A     Yes.
21      Q     So they don't have to be a doctor?
22      A     They don't have to -- they don't have
23  to have a medical degree or an osteopathic degree,
24  but they certainly need to have experience in
25  treating patients with lipid blood disorders that

Page 83

1  include severe hypertriglyceridemia.
2      Q     Can they prescribe medications, nurse
3  practitioners?
4      A     I think it depends on the state and the
5  same holds true for physician assistants.
6      Q     Again, turning back to the inventors,
7  Rene Braeckman, sitting here today, can you tell
8  me whether or not he meets your definition of a
9  person of ordinary skill in the art?
10      A     Again, based on this, I -- I don't
11  know.  He may.
12      Q     All right.
13      A     He may not.  I don't know.
14      Q     All right.  Sitting here today, you
15  don't know; correct?
16      A     That is correct.
17      Q     And you don't know any of the other
18  inventors, so you can't opine on whether or not
19  they would meet that --
20      A     That --
21      Q     -- criteria?
22      A     -- is correct.
23      Q     Okay.  Now, you're affiliated with the
24  University of Maryland, Baltimore; is that right?
25      A     Yes.

Page 84

1      Q     And what's your position there?
2      A     I am a professor of cardiovascular
3  medicine, epidemiology and public health at the
4  school of medicine.
5      Q     Can you define "epidemiology"?
6      A     Epidemiology is the study of -- of
7  populations and assessing various entities which
8  might be disease or characteristics at least from
9  a cardiovascular standpoint.
10      Q     When you say "populations," you're
11  talking a number of people; right?
12      A     Correct.
13      Q     And in your practice, do you also see
14  patients?
15      A     Yes.
16      Q     Okay.  And are they only patients who
17  have severe hypertriglyceridemia?
18      A     No.
19      Q     How -- I guess, what percentage of your
20  patients have severe hypertriglyceridemia?
21      A     So let's call it just VHTG.
22      Q     Okay.
23      A     It will make -- it will make -- it will
24  make it much easier --
25      Q     Thank you.

Page 85

1      A     -- defined as a triglyceride of at
2  least 500 milligrams per deciliter.
3            In the U.S. population that -- the
4  prevalence is approximately one in 100
5  individuals.  In my practice, I probably see
6  somewhere -- prior to my declaration, about 20 a
7  month.  So 20 a month would be a relatively small
8  percentage of the patients that I see in general.
9      Q     Are you affiliated with any other
10  medical institutions?
11      A     No.
12      Q     And, I guess, what percentage of your
13  time, a ballpark, in any given year do you spend
14  seeing patients?
15      A     I believe I have in my declaration
16  approximately two-thirds.
17      Q     And do you prescribe medications?
18      A     I do.
19      Q     Do you describe -- prescribe blood
20  thinners?
21      A     I do.
22      Q     To patients with over -- who are VHTG?
23      A     If they need it.
24      Q     So you do have patients who are over --
25  who are VHTG and on blood thinners?

Page 86

1    A    Yes.

2    Q    Do you prescribe Lovaza?

3    A    Yes.

4    Q    Vascepa?

5    A    It's Vascepa, yes.

6    Q    Vascepa, okay.  Thank you.  I've been

7  pronouncing it wrong for a few years now.

8         And that's an Amarin product; right?

9    A    Yes.

10   Q    Is that their only product?

11   A    I don't know.

12   Q    Okay.  Do you prescribe statins?

13   A    Yes.

14   Q    Ezetimibe, if I pronounce that

15  correctly?

16   A    Ezetimibe or Zetia.

17   Q    Ezetimibe or Zetia, yes.

18   A    Yeah.

19   Q    Fenofibrates?

20   A    Yes.

21   Q    Do you prescribe fenofibrates to

22  patients who are VHTG?

23   A    Yes.

24   Q    What about niacin?

25   A    I don't use a whole lot of niacin any

Page 87

1  more.

2    Q    But you still do -- you still do

3  prescribe it?

4    A    There might be a patient who has been

5  on the medication for many years that does not

6  want to go off of it, so -- but I do not -- it

7  would be uncommon for me to initiate a new script

8  for niacin.

9    Q    Okay.  And are you familiar with

10  package inserts?

11   A    Yes.

12   Q    Also -- do you also refer to them as

13  labels sometimes, or do you prefer package

14  inserts?

15   A    It doesn't matter.

16   Q    Okay.  And do pharmaceutical companies

17  in coordination with FDA often get revisions to

18  their package inserts?

19        MR. KENNEDY:  Objection to form.

20        Go -- go ahead.

21        THE WITNESS:  They may.

22        BY MR. CLEMENT:

23   Q    So different versions can include

24  different information, right, of a package insert?

25   A    Yes.

Page 88

1    Q    And they usually have a date on them

2  with the last revision?

3    A    I'll accept that.

4    Q    Okay.  And that would be the date of

5  the package insert?

6    A    I don't know, but I'll accept that.

7    Q    Okay.  All right.  Turning back to the

8  person of ordinary skill in the art, I think you

9  stated in your declaration -- and feel free to

10  look at it -- but that we -- you have in there a

11  2009 date for the person of ordinary skill in the

12  art, I think, if you look at paragraph 14.

13   A    Yes.

14   Q    And do you know how you came up with

15  that date?

16   A    Yeah, I believe that was when the

17  earliest patent application was filed.

18   Q    Give me one second here.

19        MR. CLEMENT:  Sorry about that.  Let's

20  mark as Miller Exhibit 14 a copy of U.S. patent

21  number 8,293,728.

22        (Miller Deposition Exhibit 14 was

23  marked for identification and attached to the

24  transcript.)

25  BY MR. CLEMENT:

Page 89

1    Q    Dr. Miller, the court reporter has

2  marked -- put before you as Miller Exhibit 14 the

3  '728 patent.

4         And you've reviewed that; right?

5    A    Yes.

6    Q    And, I guess, do you know where on this

7  patent it shows where the filing dates were for

8  the -- by which you determine the 2009 date for a

9  person of ordinary skill in the art?

10   A    Well, I'm not sure this patent refers

11  to the 2009 -- there -- there was a '727 and other

12  patents that preceded it.

13   Q    Okay.  But if you look at -- if you

14  look at the front page of this document, okay?

15   A    Yes.

16   Q    You see, like, in the left hand column

17  there's numbers in parentheticals?

18   A    I see those numbers.

19   Q    Okay.  And there's one that says 60?

20   A    Yes.

21   Q    Okay.  Do you see where it has

22  provisional applications based on a 2009 date?

23   A    Yes.

24   Q    Is that where you got it from?

25   A    Provisional.  I believe so.

Page 90

1    Q    So the earliest -- if we want to get to
2  the actual date, the earliest date that this
3  application has for its priority, at least on the
4  front page of this document, is February 10, 2009;
5  right?
6    A    That's what it says.
7    Q    Okay.  And I think we've already agreed
8  that paragraph 15 of your opening declaration,
9  that's where your definition of the person of
10 ordinary skill in the art is?
11   A    Yes.
12   Q    Okay.  How many people in the United
13 States do you think meet your definition of the
14 person of ordinary skill in the art?
15   A    I would say -- I don't have -- I can't
16 give you a number.
17   Q    How about a -- you're in the Baltimore
18 area?  Is that where your practice is?
19   A    (Witness nods head.)
20   Q    How many in the Baltimore area do you
21 think meet your definition of the person of
22 ordinary skill in the art?
23   A    Oh, probably about one to two dozen.
24   Q    And do you know what the NLA is?
25   A    I do.

Page 91

1    Q    And what is the NLA?
2    A    NLA is the National Lipid Association
3  which is at -- the flagship organization for those
4  interested in lipid disorders and treating lipid
5  disorders.
6    Q    What about in the D.C. area?  Do you
7  have an estimate of how many doctors you think in
8  the D.C. area or people in the D.C. area would
9  be -- meet your definition of a person of ordinary
10 skill in the art?
11   A    I would have to look to see.  I'm not
12 as familiar with --
13   Q    Okay.
14   A    -- the -- who I might view as experts
15 in this area.
16   Q    But how many cardiologists do you think
17 there are in the Baltimore area?
18   A    Myself and at least three at Johns
19 Hopkins.
20   Q    Are the only cardiologists?
21   A    That are interested in lipids.
22   Q    Okay.  What about --
23   A    But -- that treat lipid disorders --
24 not treating a patient that comes in -- that they
25 put on a statin for an elevated LDL that they call

Page 92

1  a lipid disorder when it's not.
2    Q    Well, let me ask you this question.
3  Would you turn to paragraph 17 of your declaration
4  which has plaintiff's definition and their
5  validity -- preliminary validity contentions.
6    A    Uh-huh.
7    Q    How many people have an advanced degree
8  and advanced training expertise in lipid
9  metabolism or cardiology or have experience in the
10 diagnosis, evaluation and treatment of blood
11 disorders?  How many of those do you think are in
12 the Baltimore area?
13   A    Probably about a dozen.
14   Q    You realize this doesn't limit it to
15 people who treat VHTG?
16   A    So that -- that -- my interpretation
17 here would include the treatment of VHTG -- would
18 include --
19   Q    Would include but wouldn't be limited
20 to that; right?
21   A    No.
22   Q    So if we don't limit it to people who
23 treat VHTG, you think there's only a dozen people
24 in the Baltimore area that meet that definition?
25   A    Probably, give or take.

Page 93

1    Q    Have you ever heard of the term
2  "dyslipidemia"?
3    A    Yes.
4    Q    What does that mean?
5    A    Abnormal level of lipids and/or
6  lipoproteins.
7    Q    So is that only people who have VHTG?
8    A    No.
9    Q    What about the term "monotherapy"?
10 Have you ever heard that -- heard that term
11 before?
12   A    MT, yes.
13   Q    And what does that mean?
14   A    Monotherapy, to me, is using a single
15 drug.
16   Q    What about the term "adjunct" or
17 "adjunctive therapy"?
18   A    Very general term.
19   Q    Okay.  What does that term mean?
20   A    Adding to -- adding therapy to whatever
21 is existing already.
22   Q    So you have -- if you have adjunctive
23 therapy, the therapies are overlapping?
24   A    It could be.
25   Q    They're happening at the same time?

Page 94

1    A    Patients can take -- can incorporate
2  them together.
3    Q    They're concomitant?
4    A    Well, concomitant, the way it's defined
5  in this specific patent refers to lipid-lowering
6  therapy, so that's outside the definition that
7  you're referring to.  But within the scope of this
8  patent, concomitant refers to lipid-lowering
9  medication -- medications.
10   Q    Okay.  But at -- at -- what I'm asking
11 you is, adjunctive therapy, is that similar to
12 concurrent therapy?
13        MR. KENNEDY:  Objection to form.
14        THE WITNESS:  It may or may not be.
15 BY MR. CLEMENT:
16   Q    Is it similar to concomitant therapy?
17        MR. KENNEDY:  Same objection.
18        THE WITNESS:  It may or may not be.
19 BY MR. CLEMENT:
20   Q    How -- how might it not be?
21   A    Well, so the way I view concomitant
22 therapy, for example, in the sense of taking a
23 combination of lipid-lowering medications would be
24 that a patient has -- is -- comes in, is found to
25 have hyperlipidemia and is placed on a statin.

Page 95

1  LDL is still high so that ezetimibe is added to
2  continue LDL reduction.
3        So that is -- I would view that as
4  concomitant lipid-lowering therapy.
5    Q    Would you view that as adjunctive
6  therapy?
7    A    I don't think of it like that.  I just
8  don't.
9    Q    But adjunctive therapy is still
10 overlap -- therapies that overlap?
11   A    Therapies that overlap, but in the
12 field we -- I don't think of it like that.
13   Q    Do you own -- have any -- are you an
14 inventor on any patents?
15   A    Not as of 2009.
16   Q    How about to- -- as you sit here today?
17   A    Not today.
18   Q    Are you an inventor on a patent
19 application?
20   A    Not today.
21   Q    Not today, okay.
22        It's like -- what I'm trying to get at
23 is, you know, your prior experience with patents,
24 let's say, in 2009 -- well, let's -- let's say --
25 well, strike that.

Page 96

1        I guess, what is your understanding of
2  what claim construction is?
3    A    If I may refer back to my
4  declaration --
5    Q    Uh-huh.
6    A    -- where I define "claim construction
7  principles," and that's on page 7.  And that is a
8  claim term that is given its plain and ordinary
9  meaning as it would be understood by a person of
10 the ordinary skill in the art within the context
11 of patent claims, specification, prosecution
12 history.
13   Q    Anything else?
14   A    It could be extrinsic evidence as well.
15   Q    Okay.  Have you ever heard of the
16 doctrine of claim differentiation?
17   A    No.
18   Q    And you cite to the prosecution history
19 in support of what a claim construction could be;
20 right?
21   A    Yes.
22   Q    What is your understanding of what a
23 prosecution history is?
24   A    Well, prosecution history is basically
25 all of the elements -- the history behind the --

Page 97

1  the patent submission.
2    Q    And have you ever been involved in a
3  patent prosecution proceeding?
4    A    No.
5    Q    And before this case, have you ever
6  looked at a prosecution history?
7    A    I don't believe so.
8    Q    Now, in paragraph 20 of your report,
9  you talk about the patentee can expressly define
10 the claim term.
11        Do you see that?
12   A    Yes.
13   Q    Did you find any express definitions on
14 the claim terms you opined on?
15   A    If I may go through.
16   Q    Sure.  Take a minute.
17        (Witness reviews document.)
18        So if we go to . . .
19        (Witness continues reviewing document.)
20        Yes, I think throughout where there's
21 discussion as to the use of this medication to
22 lower triglycerides without raising LDL and/or to
23 lower ApoB which is certainly within the --
24 something that I've spoken about.
25   Q    Okay.  I'm asking do you have any

Page 98

1   instances of where the patent specification gave
2   you an express -- an express definition of a claim
3   term.
4           I guess -- I'm confused by your answer.
5   Maybe you can help make --
6       A   I guess --
7           MR. KENNEDY:  Objection to form.
8           THE WITNESS:  I guess, I'm confused by
9   your question.
10  BY MR. CLEMENT:
11      Q   You say here in paragraph 20, right, I
12  also -- I also understand that the patentee may
13  expressly define the claim term in the patent
14  specification, and if the claim is defined, then
15  that definition will govern.
16          So I guess I'm asking you was there a
17  place in the patent that you looked to -- the
18  patent specification that you looked to that gave
19  an express definition of a claim term.  And you
20  said, okay, that's what the specification said;
21  that's how it's defined?
22      A   Yeah, I think for -- in the instance of
23  administering, for example, that's one example in
24  the patent specification -- I mean, in the
25  prosecution history.

Page 99

1       Q   I'm asking the patent specification.
2       A   I believe there are in the patent
3   application and patent specification.  There are
4   instances where I've discussed that, so I'm going
5   to have to go through these.  So if you give me a
6   moment here.
7           If we go to page 24, under number 55,
8   in discussing lipid-altering therapy, it is clear
9   from the specification that concurrent and
10  concomitant lipid-altering therapy concur solely
11  to medications.  For example, the specification
12  describes that in one embodiment the subject being
13  treated in accordance with methods of the
14  invention is not otherwise on lipid-lowering
15  therapy.  For example, statin, fibrate, niacin
16  and/or ezetimibe therapy.
17      Q   And you consider that an express
18  definition; is that your testimony?
19          MR. KENNEDY:  Objection to form.
20          THE WITNESS:  Well, I'm not an
21  attorney, but based on what is written, I go into
22  a claim term within the patent specification, and
23  that claim term here relates to concurrent
24  lipid-altering therapy to the extent that that is
25  discussed in the specification.

Page 100

1       BY MR. CLEMENT:
2       Q   And that's -- you have the '728 patent,
3   column -- you rely on the columns 12, lines 43 to
4   46 for that?
5       A   (Witness reviews document.)  Yes.
6       Q   And you consider that as the declarant
7   of your deposition, you consider that to be -- I
8   just want to get your testimony correct.
9           You -- as the declarant of this
10  declaration, you consider that to be an express
11  definition that the patent was given; correct?
12          MR. KENNEDY:  Objection to form.
13          THE WITNESS:  I think this is one of a
14  number of examples as it relates specifically to
15  the specification.
16      BY MR. CLEMENT:
17      Q   That's not what I'm asking.
18          I'm asking as the declarant, the person
19  whose opinions are contained in your declaration,
20  you consider what is at column 12, lines 43 to 46,
21  to be an express definition; is that correct?
22          MR. KENNEDY:  Objection to form; asked
23  and answered.
24          THE WITNESS:  Yeah, I -- as I've
25  already said, I'm not an attorney and based on the

Page 101

1   information as presented with -- with regard to
2   the specification on concurrent lipid-altering
3   therapy and concomitant lipid-altering therapy in
4   one embodiment within the '728 claim -- the '728
5   patent, that that information suggests that.
6       BY MR. CLEMENT:
7       Q   Well, that's one embodiment; right.  An
8   embodiment is an example.  It's not a definition;
9   right?
10          MR. KENNEDY:  Objection to form.
11          THE WITNESS:  Correct.
12      BY MR. CLEMENT:
13      Q   Okay.  So is that an expressed
14  definition -- sitting here today -- you're the one
15  who wrote the declaration and offered opinions and
16  you talked about expressed definitions in your
17  declaration.  I'm just asking you is that -- under
18  your understanding, not an attorney's -- under
19  your understanding as a declarant offering
20  opinions in this case if what's at columns 12,
21  lines 43 to 46, is an expressed definition of the
22  term "concurrent or concomitant lipid-altering
23  therapy"?
24          MR. KENNEDY:  Same objection.
25          THE WITNESS:  Yeah, and I think you

Page 102

1   need to review not only the term and the
2   specification, but you also need to review the --
3   and incorporate prosecution history and extrinsic
4   evidence.
5        BY MR. CLEMENT:
6        Q    If it was an expressed definition,
7   would you need to consult the prosecution history
8   as well?
9        MR. KENNEDY:  Objection to form.
10       THE WITNESS:  And, again, I'm not an
11  attorney, so I'm -- I'm not as -- as --
12       BY MR. CLEMENT:
13       Q    When you say --
14       A    -- as well as an expert in
15  this specific --
16       Q    In paragraph 20 you say -- I
17  understand, right, that the patentee may expressly
18  define the claim term in the patent specification,
19  and if the term is defined, then that definition
20  will govern.
21       So there will be no need to go to the
22  prosecution history, right, if there was an
23  express definition?
24       A    Well, but the next sentence says, I
25  understand that an applicant may also

Page 103

1   intentionally disavow or limit the scope and claim
2   of the statements made to the patent office during
3   prosecution which is prosecution history.
4        Q    Understood.
5        But, again, if the term is defined and
6   that definition -- are you telling me that what's
7   at column 12, lines 43 to 46 -- is that or is that
8   not an express definition of the claim term
9   "concurrent or concomitant lipid-altering
10  therapy"?
11       MR. KENNEDY:  Objection to form.
12       THE WITNESS:  Yeah, I'm not sure.  In
13  and of itself, it's an expressed term, but it is
14  certainly one example of -- as noted in the
15  specification for which concomitant/concurrent --
16       BY MR. CLEMENT:
17       Q    Okay.
18       A    -- therapies --
19       Q    So you're not sure.  That's fine.
20  That's a fair answer.
21       I'm asking you are there any instances
22  in the patent specification where you think the
23  patentee expressly defined a claim term in the
24  patent specification that you have relied on in
25  your declaration?

Page 104

1        MR. KENNEDY:  Objection to form.
2        THE WITNESS:  Yes, I -- I have not
3   relied uniquely on the patent specification.  I've
4   considered it as I've considered all of the
5   intrinsic evidence and to some extent extrinsic
6   evidence.  So I've looked at all the information
7   presented to me.
8        BY MR. CLEMENT:
9        Q    Understood.
10       I'm asking a question.  You know,
11  it's -- to me, it's a yes/no question, but -- are
12  there any instances where you thought that in the
13  specification there was an express definition of a
14  patent claim term that you opined on?
15       MR. KENNEDY:  Objection to form.
16       THE WITNESS:  Yeah, I'm not sure that I
17  did.
18       BY MR. CLEMENT:
19       Q    Okay.  Now, the next part of your
20  sentence -- your statement in paragraph 20 talks
21  about the prosecution history, right, where there
22  can be an intentional disavowal or a limiting of
23  the scope of the claim; right?
24       A    Yes.
25       Q    Did you find instances of either of

Page 105

1   those, an intentional disavowal -- I guess, strike
2   that.  Let's take it back a step.
3        What do you mean by "intentionally
4   disavow"?
5        A    Oh, boy.  Go against, disprove.
6        Q    Okay.  But intentionally disavow or
7   limit the scope of a claim -- so I guess take it
8   in context.
9        A    Yeah.
10       Q    Are you still good with go against or
11  disprove?
12       A    Yeah, that's fine.
13       Q    Okay.  What about limit?  Same?
14       A    Yeah.
15       Q    And are there any instances of an
16  intentional disavowment or limitation of the scope
17  of a claim in a statement made to the patent --
18  patent office during prosecution that you relied
19  on in your declaration?
20       A    I don't believe so.
21       Q    Now in paragraph 21 you discuss the use
22  of extrinsic evidence; right?
23       A    That is correct.
24       Q    What is extrinsic evidence?
25       A    Well, it is information that may have

Page 106

1  not been part of the original submission related
2  to the patent prosecution history specification.
3      Q    Do you know what intrinsic evidence is
4  with regard to claim construction proceeding?
5      A    Intrinsic evidence incorporates.
6      Q    The intrinsic?
7      A    Extrinsic evidence is -- is outside of
8  the intrinsic evidence.
9      Q    Okay.  And what is the intrinsic
10 evidence?
11     A    And the intrinsic evidence includes
12 specification, prosecution history.
13     Q    And the claims?
14     A    And the claims.
15     Q    Okay.  And extrinsic evidence is
16 anything other than the intrinsic evidence; right?
17     A    Yes.
18     Q    Okay.  Are you aware of any limitations
19 on the use of extrinsic evidence in claim
20 construction?
21          MR. KENNEDY:  Objection to form.
22          THE WITNESS:  Again, I'm not an
23 attorney, and I don't know.
24     BY MR. CLEMENT:
25     Q    Yeah, I'm not asking as an attorney.

Page 107

1  I'm asking as a declarant.
2          You relied on some extrinsic evidence;
3  right?
4      A    I did.
5      Q    Okay.  I'm just wondering -- are you
6  aware of any limitations on the use of extrinsic
7  evidence in claim construction?
8      A    Well --
9          MR. KENNEDY:  Objection to form.
10         THE WITNESS:  Only insofar as if the
11 extrinsic evidence comes out after the patent
12 application has been submitted.
13     BY MR. CLEMENT:
14     Q    So if it postdates that 2009 date --
15     A    Yes.
16     Q    -- it shouldn't be considered; right?
17     A    Well, the 2009 -- I think we have
18 patents that extend into the 2012, 2013 time
19 frame.  I mean, there are a number of different
20 patents.
21     Q    Right.  But they all rely on a 2009
22 filing date; right?
23     A    Right.  Correct.  Correct.
24     Q    So anything after that 2009 date should
25 not be considered extrinsic evidence; right?

Page 108

1      A    Yes.
2      Q    Do you know if extrinsic evidence is
3  given lesser or greater import than intrinsic
4  evidence?
5          MR. KENNEDY:  Objection to form.
6          THE WITNESS:  I would say it's given
7  less evidence.
8      BY MR. CLEMENT:
9      Q    When did you first learn of using fish
10 oil in treating lipid blood disorders?
11     A    Well, my interest in fish oil dates
12 back to 1987.  I was a Fellow at Johns Hopkins
13 and -- actually it dates earlier than that.  To
14 get the position at Hopkins I had to write a
15 grant.
16         So it was an NIH grant that looked at
17 the -- how different fatty acids were taken up,
18 and it was my idea for the grant -- submitted the
19 grant.  It was funded.  We did the study.  And it
20 was the first demonstration of looking at
21 different oils taken up by cellular -- into the
22 cells of a fibroblast.
23         And I looked at palmitate, oleate.  So
24 palmitate is a saturated fat.  Oleate is an
25 example of a monounsaturated fat.  And I also

Page 109

1  looked at EPA.  Back in those days EPA was quite
2  expensive.  I used half my grant to buy EPA, but
3  there had been no data in the field at that time.
4          And showed -- it was one of those ah-ha
5  moments when I looked at the simulation counter
6  and found that when you use EPA compared to
7  palmitate or oleate, it was directly taken up into
8  cellular phospholipids with minimal amount taken
9  up into triacylglycerol.
10         And, so, that sparked interest in -- in
11 understanding this field better.  So this was
12 back -- this was circa -- circa 1987 when I did
13 those experiments.
14         So that was my first entry into the
15 field and subsequent to that the studies came out
16 to show that actually a -- triglycerides are
17 reduced in patients that had degrees of
18 hypertriglyceridemia, and, so, there are studies
19 done here in the States as well as outside the
20 U.S. that have demonstrated in
21 hypertriglyceridemic states -- omega-3
22 was preference.  I mean, we actually identified
23 the mechanism by which we believe -- to be taken
24 up at the cell level.
25         And studies have demonstrated time and

Page 110

1  again that omega-3 preps, EPA, DHA as well, can
2  reduce -- can lower triglycerides pretty
3  significantly.
4       Q    Now, EPA, that's icosapent?
5       A    Correct.
6       Q    And in that grant that you were talking
7  about that you did back in circa 1987, were you
8  getting purified EPA?
9       A    Got purified EPA.
10      Q    Do you recall how pure?
11      A    It was -- as far as I knew, it was over
12  95 percent pure.
13      Q    Now, when was the first time you
14  learned of using purified EPA to treat high or
15  VHTG?
16           MR. KENNEDY:  Objection to form.
17           THE WITNESS:  Well, in -- in -- in the
18  United States, we -- I don't recall that we had a
19  purified EPA product that was available until
20  Vascepa came out.
21  BY MR. CLEMENT:
22      Q    What about not in the United States?
23      A    Yeah.  There were preparations that
24  were not used in the United States.
25      Q    What preparation were those?

Page 111

1       A    There was a -- a preparation that was
2  also EPA based.
3       Q    Can you tell me what it was?
4       A    Well, it was Japanese.  A preparation
5  known as Epadel was marketed.
6       Q    That was to treat VHTG?
7           MR. KENNEDY:  Objection to form;
8  outside the scope of --
9           THE WITNESS:  Yeah, it --
10          MR. KENNEDY:  -- the --
11          THE WITNESS:  -- was --
12          MR. KENNEDY:  -- declarations.
13          THE WITNESS:  As far as I know, it was
14  not used to treat VHTG.  The first time that my
15  understanding for the use of purified EPA to treat
16  VHTG was here in the States.  The other -- there
17  was another preparation, but it was not -- as far
18  as I know, it was not tested for VHTG outside the
19  United States.
20  BY MR. CLEMENT:
21      Q    What other preparation are you
22  referring to?
23      A    The --
24          MR. KENNEDY:  Objection to form.
25          THE WITNESS:  The Epadel compound.

Page 112

1  BY MR. CLEMENT:
2       Q    The Epadel, okay.
3            Just so far as you know, it wasn't used
4  to treat VHTG?
5       A    Yeah, I'm not -- I don't recall
6  publications on VHTG.
7       Q    Okay.  But you do recall hearing about
8  Epadel before 2009?
9       A    Yes.
10      Q    To try high triglycerides at least?
11      A    No, it was not used to treat high
12  triglycerides.
13      Q    What was it used to treat?
14      A    It was -- it was used in a clinical
15  trial called JELIS, and there was an outcome
16  study.  And, in fact, I believe they excluded
17  patients that had VHTG.  So it was specifically
18  looking at whether or not the addition of this
19  compound to standard of care in a Japanese
20  population would lower their risk of
21  cardiovascular events.  It was a non-VHTG
22  population.
23      Q    Okay.  Even though it was a non-VHTG
24  population, was it used to treat lowering
25  triglycerides in this non-VHTG population?

Page 113

1           MR. KENNEDY:  Objection to form.
2           THE WITNESS:  No, it was not.
3  BY MR. CLEMENT:
4       Q    What was it used for?
5       A    It was used to determine whether it had
6  cardioprotective effects.  And, in fact, in the
7  original study, the amount of triglyceride
8  reduction was -- was about 5 percent.  It was
9  not -- nowhere near as robust as we see with the
10  studies that have -- for example, the MARINE study
11  that had come out in VHTG patients.
12      Q    So in the JELIS study or the use of
13  Epadel, they weren't measuring reductions in
14  triglycerides in the patient population that was
15  studied; correct?
16      A    It was not -- it was not a primary
17  measurement.  They did a whole lot of measurements
18  in that and triglycerides like LDL, like HDL, like
19  inflammatory parameters, it was just one of the
20  number of markers that was looked at.  But it
21  was -- the study was not designed to hone in -- to
22  look at triglyceride reduction.
23      Q    Understood.
24           But I guess my question is
25  triglycerides was one of the markers that they did

Page 114

1 measure in that JELIS study?
2          MR. KENNEDY:  Objection to form.
3          THE WITNESS:  It was one of a number of
4 many, many markers, so I would discount the
5 relevancy of triglyceride in this study.
6       BY MR. CLEMENT:
7       Q    Okay.  Now, in paragraph 22 of your
8 declaration, you talk about how -- or determine
9 what the patents were related to; right?
10          Do you see that?
11      A    I do.
12      Q    How did you determine what to put in
13 that statement?
14      A    Well, that -- that was -- that was
15 determined based on the dose used in the MARINE
16 trial to cause reductions in triglyceride as well
17 as not to raise levels of LDL, also lowered levels
18 of ApoB.
19      Q    It says nothing about LDL or ApoB in
20 paragraph 22; right?  I'm not missing something?
21      A    That's correct, not in that particular
22 paragraph.
23      Q    Did you look at the claims of the
24 patents-in-suit because you -- I mean -- strike
25 that.

Page 115

1          Did you look at the claims of the
2 patents-in-suit in figuring out what to say in
3 paragraph 22?
4          MR. KENNEDY:  Objection to form.
5          THE WITNESS:  I looked at the
6 patents-in-suit, but the patents really relate to
7 the use of this compound ethyl icosapent at a dose
8 of 4 grams a day in patients with very high
9 triglycerides.
10      BY MR. CLEMENT:
11      Q    So you didn't look at the claims in
12 coming to this statement; is that your testimony?
13          MR. KENNEDY:  Objection to form.
14          THE WITNESS:  I looked at the claims
15 for this study.
16      BY MR. CLEMENT:
17      Q    You looked at the claims of the
18 patent --
19      A    Of the patents, correct.
20      Q    -- in coming to this statement in
21 paragraph 22?
22      A    Well, I think this is just one
23 paragraph.  As we go on, we talk more about some
24 of the other elements.  But as far as technical
25 background, the idea of treating very high

Page 116

1 triglyceride levels with this particular therapy
2 was really -- the -- the first demonstration of
3 effectiveness without causing undue related
4 issues.
5          Now, I do talk about the effects on LDL
6 and ApoB a little bit later on --
7      Q    Right.
8      A    -- but, no, for this particular
9 paragraph, that's the way this paragraph was
10 written.
11      Q    Okay.  And did it come from the claims
12 of the patent?  And I agree you have other stuff
13 in here, but I'm just asking whether or not this
14 paragraph -- did it come from the claims?
15      A    I'd have to go look at all the claims
16 to see if I took word for word out of this, but I
17 think this is just a general idea of -- of the
18 reason for considering this particular medication.
19      Q    Did the claims play a role in forming
20 your opinion in paragraph 22?
21          MR. KENNEDY:  Objection to form.
22          THE WITNESS:  Well, the claims talk
23 about some elements noted in paragraph 22.
24      BY MR. CLEMENT:
25      Q    Okay.  Which elements?

Page 117

1      A    Very high -- very high triglyceride
2 levels.  Now, the claims might say 500 to 1500.
3 They generally talk about the dose of 4 grams, and
4 they -- and some of the claims talk about some of
5 the -- well, some of those effects are also --
6 are -- are discussed in -- in the prosecution
7 history.  Some of them -- so if this is kind of a
8 statement related to --
9      Q    But some of them are talked -- right,
10 the cause-specific effects on lipid parameters in
11 patients; right?  Some of those are talked about
12 in the claims; right?
13      A    If I may refer to '728 --
14      Q    Sure.
15      A    So if we look at '728 in claim 1, it
16 does say it's a method of reducing triglycerides
17 in a VHTG patient and goes on to say to effect a
18 reduction in triglycerides without increasing LDL.
19      Q    So that's part of -- so part of
20 paragraph -- so just correct me if I'm wrong.  You
21 did consider the claims in coming to your
22 statement in paragraph 22 of your declaration;
23 right?
24      A    Yes.
25      Q    And here you say, To cause specific

Page 118

1  effects on the lipid parameters in patients;
2  right?  Is that correct?
3      A    To cause specific effects.
4           Well, we know now; it was not
5  appreciated back then.  So when the study was
6  designed, the finding of a -- a rise or lack of a
7  rise in LDL was unexpected finding.
8      Q    Understood.
9      A    But at the time -- when I wrote this,
10  it was --
11      Q    And you said it -- it was to cause the
12  specific effects on lipid parameters in patients;
13  right?
14      A    Correct.
15      Q    In paragraph 22?
16      A    Correct.
17      Q    You did not say intend to cause;
18  correct?
19           MR. KENNEDY:  Objection to form.
20      BY MR. CLEMENT:
21      Q    Correct?
22      A    Correct.
23      Q    Okay.  And what is your definition of
24  "patients"?
25      A    Well, as it relates to the -- to the

Page 119

1  patents in this particular case, patients are a
2  class of -- a class of individuals who have very
3  high triglyceride defined as a --
4      Q    Okay.
5      A    -- triglyceride of at least 500.
6      Q    Very good.  That -- that's fine.
7           I guess, what is -- a patient in
8  general -- I guess, can you give me your general
9  definition of "patient"?
10           MR. KENNEDY:  Objection to form.
11           THE WITNESS:  Yes.  So this is --
12  you're referring to something outside --
13      BY MR. CLEMENT:
14      Q    Outside the patent.
15      A    -- outside the patent.
16           A patient is someone who has various --
17  one or more medical issues that they're coming in
18  for evaluation.
19      Q    And would you agree a individual can be
20  a patient or may not be a patient; right?
21      A    I would agree.
22      Q    Okay.  And when we go back -- going
23  back to the patent now, and we're talking about
24  the definition of treating -- I'm sorry.
25           We're talking about how you state in

Page 120

1  paragraph 22 that there's a method of treating;
2  right?  What is your definition of "treating"?
3      A    Well, in this particular case it's
4  using the medication ethyl icosapent
5      Q    To relieve the symptoms or to relieve
6  the VHTG?
7      A    To lower triglycerides and perhaps
8  other effects.
9      Q    Now, if you look at the '728 patent for
10  me at column 2, line 33 to 40.
11           Do you see that section?
12      A    I do.
13      Q    If you'll just read that to yourself
14  and let -- I guess, my question while you're
15  reading that is if that's basically your
16  understanding of what treatment means with regard
17  to these patents.
18      A    (Witness reviews document.)
19           Yes, I'll agree with that.
20      Q    Okay.  And you also discuss ApoB in
21  your report?
22      A    I do.
23      Q    Okay.  ApoB is short for what --
24  apolipoprotein B?
25      A    Apolipoprotein B.

Page 121

1      Q    Okay.  I wasn't sure if I was
2  pronouncing that one right either.
3      A    Yeah.
4      Q    We'll just use ApoB.
5      A    Sure.
6      Q    What is ApoB?
7      A    Well, it is a -- it is a protein that
8  resides on the surface of lipoprotein particles.
9  There are lot of different ApoBs and lots of
10  different Apo- lipoproteins.  And they may be
11  taken up by specific receptors or send signals to
12  allow that particle to be metabolized and so
13  forth.
14      Q    And is it used as a measure of the
15  number of VLDL, IDL, and LDL particles in the
16  blood?
17      A    Yes, it's -- it is often used as a
18  surrogate for the so-called non-HDL so all
19  lipoproteins but HDL.
20      Q    And who uses it as such a measure?
21      A    Well, oftentimes it's -- it's used in
22  clinical trials.
23      Q    How about in general practice?
24      A    Not commonly.
25      Q    When you see patients with VHTG, do you

Page 122

1  order -- when you take blood and -- do you order
2  an ApoB --
3      A    Not --
4      Q    -- level?
5      A    Not usually.  I might on some
6  occasions, but not all the time.
7      Q    Let's mark the next exhibit -- we're up
8  to --
9           THE COURT REPORTER:  Fifteen.
10          MR. CLEMENT:  -- 15 -- a document with
11  a Bates range 289915 through 290194.
12          (Miller Deposition Exhibit 15 was
13  marked for identification and attached to the
14  transcript.)
15      BY MR. CLEMENT:
16      Q    And, Dr. Miller, have you ever seen
17  this document before?
18      A    I have.
19      Q    Can you identify it for the record?
20      A    This is the third report of the
21  national cholesterol education program expert
22  panel on detection, evaluation and treatment of
23  high blood cholesterol in adults, also known as
24  the adult treatment panel III, final report.
25      Q    And this is a -- this was an exhibit to

Page 123

1  your opening declaration; right?
2      A    I believe --
3      Q    If you can look at paragraph 13 of your
4  report, that might help you.
5      A    I think part of it was, but . . .
6      Q    Not paragraph 13.  I'm sorry.  Page 13.
7      A    Yes.
8      Q    Okay.  And in -- on page 13, you -- you
9  define that report, what we've marked as Miller
10  15, as the operative report discussing lipid
11  parameters and standard of care as of 2009; right?
12      A    Yes.
13      Q    Has there been a subsequent report?  Is
14  there a --
15      A    Yes, in 2013.
16      Q    Okay.
17      A    But it's not part of the National
18  Cholesterol Education Program.  It was reformatted
19  under the auspices of the American Heart
20  Association and the American college of
21  cardiology.
22      Q    Okay.  Now, if you look on the first
23  page of this report -- actually on every page at
24  the very bottom there's a downloaded notation.
25          Do you see at the very bottom?

Page 124

1      A    Uh-huh.  I do.
2      Q    Downloaded on November 13, 2014.
3           Do you see that?
4      A    I do.
5      Q    Did you download it on November 13,
6  2014?
7      A    I don't recall.
8      Q    Did this document come from counsel for
9  preparation of your report?
10      A    It could have.  I've -- certainly have
11  downloaded the report in the past.  I just don't
12  know if that was the day I did it.
13      Q    So if you turn to page 289557 --
14          MR. KENNEDY:  I'm sorry.  Did you say
15  557?
16          MR. CLEMENT:  289957.
17          MR. KENNEDY:  957.
18          MR. CLEMENT:  I'm sorry.
19          MR. KENNEDY:  Thank you.
20          MR. CLEMENT:  I misspoke.  Thank you.
21      BY MR. CLEMENT:
22      Q    And that's a discussion of ApoB?
23      A    Yes.
24      Q    And it says there that ApoB is a
25  potential marker for all atherogenic lipoproteins;

Page 125

1  right?
2      A    Yes.
3      Q    What are atherogenic lipoproteins?
4      A    All lipoproteins besides HDL.
5      Q    Okay.  And this is saying it's a
6  potential marker for those; right?
7      A    Yes.
8      Q    And that's what it was in 2009; right?
9      A    Yes.
10      Q    And then it says a couple of sentences
11  later that the body of evidence in favor of
12  apolipoprotein B has not been developed
13  sufficiently to justify replacing LDL cholesterol;
14  right?
15      A    Yes.
16      Q    Do you agree with that statement?
17      A    I -- I think with -- in -- in 2009
18  that is probably the way it was viewed.
19      Q    I think consistent with your practice,
20  what you just told me about your practice and that
21  you don't typically order ApoB tests on your
22  patients, the final sentence on that paragraph
23  that carries over to the next column says that the
24  non-HDL cholesterol measure is readily available
25  in clinical practice whereas standardized ApoB

Page 126

1    measures are not widely available and in any case
2    would add expense beyond routine lipoprotein
3    analysis.
4            Would you agree with that statement as
5    of 2009 time period?
6       A    As -- as the -- yes, as -- as the way
7    it was written, I would.
8       Q    Okay.  We can put that away right now.
9            I think in your report you also talk
10   about chylomicrons.
11      A    Yes.
12      Q    What are chylomicrons?
13      A    Chylomicrons are basically a -- fat
14   particles that occur after diet ingestion of
15   fat -- dietary ingestion of fat.
16      Q    And, I guess, you know, one -- if you
17   turn to paragraph 31 of your declaration, and
18   maybe it's just the way I'm reading it but just
19   trying to get some clarity on something.
20           The last sentence of that paragraph
21   says, Lipid levels are -- lipid levels are
22   typically measured in the fasting state in order
23   to eliminate chylomicrons which are highly
24   variable in the circulation based on dietary
25   intake of fat.

Page 127

1            Do you see that?
2       A    No.  What page are you talking to?
3       Q    Are you on paragraph 31?
4       A    Oh, paragraph 31.
5       Q    Sorry.
6            And I'm just looking at the last
7    sentence.
8            My question is how does measuring lipid
9    levels in the fasting state eliminate
10   chylomicrons, or am I misreading the point you're
11   making?
12      A    So after you have a meal that contains
13   dietary fat, depending on how much fat you
14   consume, that fat gets processed into chylomicrons
15   which enter into the circulation shortly after you
16   have a fat meal, peaks in the circulation
17   somewhere in terms of triglyceride levels -- peaks
18   somewhere at about four hours and then over time
19   generally gets metabolized out.  That's why you
20   tend to have a higher triglyceride level after you
21   eat dietary fat, and that is related to
22   chylomicron uptake.
23           But if you look at the fasting state,
24   then you're presumably ridden of chylomicrons.
25   And you're honing into the other primary

Page 128

1    triglyceride-rich particle or microprotein which
2    is VLDL.
3       Q    So you're just saying here that if you
4    measure lipid levels in the fasting state, you're
5    likely not to have chylomicrons?
6       A    Well, generally, yes.
7       Q    And that's what you're trying to convey
8    here?
9       A    Yes.
10      Q    Okay.  All right.  Are elevated -- in
11   2009, were elevated levels of triglycerides
12   associated with atherosclerosis?
13           MR. KENNEDY:  Object.
14           THE WITNESS:  To a point.
15   BY MR. CLEMENT:
16      Q    What do you mean "to a point"?
17      A    To a point.  Elevated levels are
18   viewed -- elevated levels of triglycerides tend to
19   be viewed as associated with atherosclerosis until
20   you get to very high levels.
21           So there is a distinction that the
22   writers of ATP III going back to the 1980s -- well
23   known for a person of ordinary skill in the art
24   who treats patients with lipid disorders; that as
25   triglycerides get into the very high range,

Page 129

1    they're susceptibility to atherosclerosis is
2    reduced, whereas the -- the likelihood toward or
3    the risk of pancreatitis goes up.
4       Q    So, I guess, what levels -- when you
5    say "very high range," as the triglycerides get
6    into the very high range, what range are you
7    referring to there?
8       A    About 500.
9       Q    About 500?
10      A    About 500 starts to set the stage.
11      Q    So about 500 triglycerides are not
12   associated with atherosclerosis?
13           MR. KENNEDY:  Object to the form.
14           THE WITNESS:  I didn't say that.
15   BY MR. CLEMENT:
16      Q    Okay.  Then maybe I misunderstood.
17   That's why I'm asking the question.
18      A    Above 500, the level is still up.  But
19   as you continue to go up there's what we refer to
20   as an inverted U-shape distribution as it relates
21   to triglycerides in cardiovascular disease.
22           And anybody who treats patients with
23   lipid disorders and treats high triglycerides
24   would appreciate that at very high triglyceride
25   levels, somewhere probably about 800 to a

Page 130

1   thousand -- we say 500, but clearly that -- that
2   risk is still increased -- but it starts to go
3   down as we move up closer to 800 to a thousand.
4       Q    So what risk goes -- starts to go down
5   as you get to 800 --
6       A    Well, cardiovascular.
7       Q    Cardiovascular?
8       A    Cardiovas-- some -- it peaks
9   somewhere in the 2- to 600 range and then starts
10  to go down.  It's not a continuum risk as LDL
11  level is.  It's different.
12      Q    So even below 500, triglycerides are
13  associated with atherosclerosis?
14           MR. KENNEDY:  Objection.
15           THE WITNESS:  The risk of
16  atherosclerosis probably starts to go up somewhere
17  in the hundreds.
18  BY MR. CLEMENT:
19      Q    And is it something doctors want to
20  treat if they get a patient who has a level of 350
21  triglyceride?  Is that something they want to
22  treat to help prevent atherosclerosis in the 2009
23  time frame?
24           MR. KENNEDY:  Objection to form.
25           THE WITNESS:  And -- and this is where

Page 131

1   we've begged to have a clinical trial to look at
2   this.  It had not been looked at in the way that
3   we had been hoping for, and that is to design a
4   clinical trial where you're looking at patients
5   that have a triglyceride in that sweet spot of
6   atherosclerosis, which is somewhere in the 200 to
7   500 range, that sweet spot, to determine whether
8   low triglycerides in that range on top of standard
9   of care therapies reduces the risk of
10  cardiovascular events.  Hence Amarin steps up to
11  the plate and does the study.
12  BY MR. CLEMENT:
13      Q    At about 500?
14      A    No, we're now talking about between 200
15  to 500, the REDUCE-IT study.  That's the study.
16      Q    Okay.
17      A    500 is pancreatitis -- above 500 we're
18  talking about pancreatitis.  Below 500 -- 200 to
19  500 is really the sweet spot of atherosclerosis.
20      Q    So above 500, you're really worried
21  about pancreatitis; is that --
22      A    So the way -- the way it works is that
23  the numbers -- you know, you take -- and these are
24  approximations for each 100-milligram per
25  deciliter increment above 500, give or take again,

Page 132

1   the risk of pancreatitis goes up approximately
2   4 percent.
3           So not everybody that has a
4   triglyceride of a thousand will develop a
5   pancreatitis, but there is an increased risk.
6       Q    So is it that above 500 the risk of
7   pancreatitis becomes greater than the risk of
8   atherosclerosis?
9       A    If the triglyceride gets to a level of
10  nearing approximating a thousand.
11      Q    Okay.
12      A    Eight -- even 800 -- I would say
13  starting somewhere in that 800 to a thousand
14  range.
15      Q    Now, do you . . .
16           Now, in paragraph 35 of your report --
17  I think this is kind of what we were just talking
18  about that once the triglycerides are decreased
19  below the critical level -- and you say about 500
20  mgs per dl?
21      A    Right.  And the adult treatment panel
22  basically made those cut points for a reason.
23      Q    But here you say "about"; right?
24      A    Yeah, about.  I mean, that -- that's
25  a -- so generally speaking, triglycerides are not

Page 133

1   a primary treatment for clinicians unless levels
2   exceed 500.  Then it becomes the primary therapy
3   in order to lower those triglycerides and
4   presumably reduce their risk.
5       Q    Do you treat a patient who presents to
6   you with a triglyceride level of 495 differently
7   than you treat one who has a level of 501?
8       A    Yeah.
9           MR. KENNEDY:  Objection to form.
10          THE WITNESS:  So, again, the number
11  there is -- gives you and gives any person who
12  treats patients some reference to use.  These are
13  guidelines, and if you treat patients, you would
14  come up with kind of an idea of who the patient --
15  which patients pose most risk.
16          So am I going to differentiate between
17  a 499 and a 501 -- of course not.  But it kind of
18  puts me in the ballpark of where I need to be a
19  bit concerned with respect to that issue of very
20  high triglycerides than I would be if the level
21  was 100.
22  BY MR. CLEMENT:
23      Q    So if you turn to the patent, the '728
24  patent which I think you have there --
25      A    I do.

Page 134

1    Q    -- and you look at column 2 --
2    A    Yes.
3    Q    -- and do you see there in lines 7
4  through 11?
5    A    Yes.
6    Q    And it says -- is this kind of like
7  what you're saying that when they have numerical
8  values in here, right, it says they're stated as
9  approximations as though the minimum and maximum
10  value within the stated range were both preceded
11  by the word "about"?
12    A    Right.
13    Q    Okay.  Even some of the claims, right,
14  I think, say about 500 as opposed to just 500,
15  right, if you look at claim 19 of the '728 patent.
16    A    Yes, I would agree with that.
17    Q    And would you say "about" is, what,
18  plus or minus 10 percent?  I mean, do you have a
19  figure in your head?
20    A    Give or take, 10 percent is reasonable.
21    MR. CLEMENT:  All right.  Is this a
22  good time for a break?
23    MR. KENNEDY:  Sure.
24    MR. CLEMENT:  Can we go off the record?
25    THE VIDEOGRAPHER:  The time is

Page 135

1  11:08 a.m.  We're going off the record.
2    (Recess -- 11:08 a.m.)
3    (After recess -- 11:24 a.m.)
4    THE VIDEOGRAPHER:  The time is
5  11:24 a.m.  This begins media unit number 3 and on
6  the record.
7    Please proceed, Counsel.
8    BY MR. CLEMENT:
9    Q    Thank you.
10    Dr. Miller, in paragraph 37 of your
11  report -- not your report, your declaration -- I'm
12  sorry.
13    A    Yes.
14    Q    You talk about in 2009 there being
15  recognized problems for SHTG -- VH -- what was the
16  acronym we were using VHTG?
17    A    VHTG.
18    Q    Severe and very would be the same?
19    A    Sure.
20    Q    All right.  So you're talking about in
21  2009 there's some recognized problems; right?
22    A    Yes.
23    Q    And you cite to some labels, some
24  package inserts, right, in support of that?
25    A    I believe I do, yes.

Page 136

1    Q    You can look right there on yours.
2  Correct?
3    A    Yes.
4    Q    And that's all you cite in that
5  paragraph; right?
6    A    Yes.
7    MR. CLEMENT:  Okay.  Let's mark as
8  Exhibit Number 16 a document with Bates range
9  3058234 through 3059940.
10    (Miller Deposition Exhibit 16 was
11  marked for identification and attached to the
12  transcript.)
13    BY MR. CLEMENT:
14    Q    And that's -- Dr. Miller, I'll
15  represent to you those are the -- that's the --
16  was Exhibit 18 to your declaration -- that's
17  excerpts to the '727 file history.
18    A    Okay.
19    Q    And that's what you cited to in
20  paragraph 37 of your report; right?
21    A    I believe so.
22    Q    Okay.  Let's turn to the first one,
23  package insert for TriCor, which is at 3059121.
24  Maybe it starts at 9120.  Okay.  And that's the
25  package insert for TriCore that you relied on;

Page 137

1  right?
2    A    Yes.  I might need a magnifying glass,
3  though.
4    Q    Sorry.  I -- it's the way it's printed.
5    So if you look at page 9123 for a
6  second, in the bottom right you see it says,
7  Revised: October 2010.
8    A    Yes.
9    Q    So it's after the 2009 date; correct?
10    A    Yes.
11    Q    And, so, this is not -- this document
12  that you have here as your exhibit or that you
13  relied on is not something a person of ordinary
14  skill in the art would have known about; correct?
15    MR. KENNEDY:  Objection to form.
16    THE WITNESS:  Right.  But I would also
17  want to look and see the prior -- the prior
18  version because there might have been no
19  substantial change to this.
20    BY MR. CLEMENT:
21    Q    But we don't know; right?
22    A    I don't have that one.
23    Q    Right.  Because you didn't attach it to
24  your declaration; right?  Correct?
25    A    Correct.

Page 138

1    Q    You did not rely on an earlier version
2  for your declaration; right?
3    A    That is correct.
4    Q    And you rely specifically on page 2 of
5  this package insert, right, which is at 9121?
6    A    Yes.
7    Q    That's what you cite to -- 9121 is what
8  you cite to in paragraph 37 of your declaration;
9  right?
10   A    Correct.
11   Q    Do you recall what exactly you were
12 relying on 9121?
13   A    Let's see what it says here.
14        (Witness reviews document.)
15        So I have to look at these tables.  It
16 would be nice to . . .
17        (Witness continues reviewing document.)
18        So there's one table here in
19 patients -- in Table 2 where LDL levels go up from
20 baseline of 120 to a baseline of 128, and then
21 right below that are baseline LDL levels in --
22 with triglycerides of 5- to 1500 where LDL goes up
23 45 percent.
24   Q    But this -- this -- this product,
25 TriCor, it's not contraindicated in people with

Page 139

1  VHTG; right?
2    A    I -- it is not contraindicated in
3  people with VHTG.
4        Remember, though, the first goal is to
5  try to reduce the likelihood that very high
6  triglyceride levels will in and of itself be
7  problematic.
8    Q    Okay.  But, again, it's not
9  contraindicated --
10   A    No.
11   Q    -- and you prescribe it with people
12 with VHTG; right?
13   A    Yes.
14   Q    Okay.  Let's go to the next label for
15 Lopid, 305 -- page 9106.
16   A    And -- and I -- I should say that I
17 prescribe in 2009, right, at the time of -- we're
18 talking about when these prescriptions --
19   Q    Okay.
20   A    When we talk about prescriptions as
21 opposed to now.  I just want to clarify that.
22   Q    So if you can turn to three --
23 page 9106, same exhibit.
24        I'm sorry.  We're going to go through
25 each of these labels --

Page 140

1    A    Okay.
2    Q    -- package inserts that you discussed
3  in paragraph 37 of your declaration.
4    A    Uh-huh.
5    Q    Okay.  And this one is for Lopid;
6  right?
7    A    Yes.
8    Q    Which is gemfibrozil?
9    A    Correct.
10   Q    And if you turn to page 118, the bottom
11 left, do you see it's a 2000 -- September 2010
12 document?
13   A    I see that.
14   Q    That's after the 2009 date; right?
15   A    That's what it says.
16   Q    So this document would not have been
17 available to the person of ordinary skill in the
18 art in 2009; right?
19   A    Well, I don't know.  If you look at
20 page 100, it says revised July 2001.  So I'm not
21 sure -- it says additional adverse reactions have
22 been reported including cholecystitis and
23 cholelithiasis.  To me, that suggests that only
24 that paragraph on page 101 was from 2010, but the
25 one from 100 was revised in 2001, and everything

Page 141

1  preceding that would be related to 2001 time
2  frame.
3    Q    What page are you on?
4    A    If you look at page 9118 --
5    Q    Right.
6    A    -- so that said -- now go to 9117.  At
7  the top of 9117 it says, Revised July 2001.
8        So my interpretation would be that
9  unless there are other revisions above that that
10 everything related to Exhibit B, Lopid, through
11 page 9117 would -- would be valid through
12 July 2001; and then the additional wordage
13 regarding -- the additional changes and adverse
14 reactions were added in, and that revision came
15 through in September of 2010.
16   Q    Okay.  But we don't know because we
17 don't have the 2001 label here; right?
18   A    Well, but it says, Revised July 2001,
19 incorporating all -- all this information.
20        So to me it would seem that all this
21 information related to -- to 2001 or before.
22   Q    Okay.  Now, you cite this document for
23 saying that certain fibrate drugs increase the
24 risk of rhabdomo- -- rhabdomyol- -- myol- -- I
25 guess you can pronounce it.

Page 142

1    A    Rhabdomyolysis.
2    Q    Thank you.
3         When combined with a statin; right?
4    A    Correct.
5    Q    Okay.  If we turn to page 110 of this
6  document in the contraindications section, it only
7  lists one statin, right, in the contraindication
8  section; correct?
9    A    Combination of therapy with
10  cerivastatin due to the increased risk of myopathy
11  and rhabdo.
12   Q    And cerivastatin, that was a Bayer
13  drug?
14   A    That's correct.
15   Q    Baycol?
16   A    Correct.
17   Q    No longer on the market; right?
18   A    Correct.
19   Q    And no other medications -- statins are
20  indicated in the contraindications; right?
21   A    None were identified in the
22  contraindications; although, I will tell you for
23  POSAs treating patients in this time frame that it
24  would be a concern combining Lopid with any
25  statin.

Page 143

1    Q    Okay.  But that's not what it says here
2  in the contraindications --
3    A    No --
4    Q    -- right?
5    A    -- that's true.
6    Q    There are other statins out there;
7  correct?
8    A    That's correct.
9    Q    And some of them metabolize or interact
10  with drugs differently?
11   A    Yes.
12   Q    Kind of like the pitavastatin you were
13  mentioning this morning that you were involved in?
14   A    That's correct.
15   Q    Okay.  Let's turn to 3059150, the next
16  one, Lovaza.  And if you look on page 9150, it
17  says, Revised: December 2010.
18   A    I see that.
19   Q    So this one also was not available to
20  the person of ordinary skill in the art in 2009;
21  correct?
22   A    Well, again, it's unclear to me what
23  was revised in 2010.
24   Q    Well, if you go --
25   A    And --

Page 144

1    Q    I'm sorry.  Go ahead.  Finish.  I
2  didn't mean to speak over you.
3    A    And --
4    Q    I mean, we can look --
5    A    That's what I'm --
6    Q    We can look at page 159, and that 2010
7  date is also there; right?  And we can look at on
8  163, and that 2010 --
9    A    Right.
10   Q    -- date is there?
11        So this document itself, right, that
12  you were relying on, this wasn't -- this document
13  was not available to the person of ordinary skill
14  in the art in 2009; right?
15   A    Well, not the way it is written.
16  And -- and for -- for all intents and purposes,
17  there may have just been one paragraph that was
18  revised.  I have to look at the 2009 --
19   Q    But you didn't provide us the 2009
20  label; right?
21   A    I did not.
22   Q    Okay.  And you didn't rely on the 2009
23  label in your paragraph 37; right?  You relied on
24  this one?
25   A    (Witness reviews document.)

Page 145

1         I relied on this (indicating) document.
2    Q    Okay.  Is there anything in this
3  document that says you shouldn't treat patients
4  with triglyceride levels of 500 to 1500 mgs per dl
5  with Lovaza?
6    MR. KENNEDY:  Objection to form.
7    THE WITNESS:  No.
8         But, again, we have to put things in
9  perspective, and that perspective is when a
10  patient has very high triglyceride, the first
11  order of treatment is to lower VHTG, and then from
12  there we take additional steps.  But the first
13  order is to lower the triglyceride.
14   BY MR. CLEMENT:
15   Q    Okay.  And if you look -- you rely on
16  page 157; right?  And this is talking about
17  patients with very high triglyceride levels, above
18  500 mgs per dl; right?
19   A    Yes.
20   Q    It doesn't say don't treat patients
21  with Lovaza.  All it says is patient should be
22  monitored; right?
23   A    Yes.
24   Q    Now let's look at Niaspan, 3059139.
25  Can you turn to 9139, please?

Page 146

```
1              MR. KENNEDY:  It's back the other way.
2         BY MR. CLEMENT:
3         Q    Okay.  And this is the fourth package
4    insert you rely on for paragraph 37; correct?
5         A    Yes.
6         Q    And this is also a 2010 revision
7    document; right?
8         A    Yes.
9         Q    So this one wouldn't have been
10   available to the person of ordinary skill of the
11   art in 2009; correct?
12        A    Well, again, I don't know that.  We
13   know that there was clearly information that was
14   available, and the extent to which there might
15   have been changes between 2009 or 2008 and 2010
16   whatever, previous version is, is -- is unclear.
17        Q    Right.
18             But, again, we don't know because you
19   didn't provide that in your declaration; right?
20   What you provided was a 2010 re- -- revision;
21   correct?
22        A    That's correct.
23        Q    And the 2010 revision, the document
24   here that's before us on 9139 through 9148, that
25   was not -- this document as it exists here was not
```

Page 147

```
1    available to the person of ordinary skill in the
2    art in 2009; right?
3         A    Well, the document wasn't -- may have
4    not been in its exact form, but it was certainly
5    recognized that LDL increases did exist with some
6    of these agents including gemfibrozil, including
7    fenofibrate.  And some of the side effects I've
8    alluded to with niacin have been known well before
9    2009 -- well before then.
10        Q    Right.  But you didn't provide that
11   document to us.  You provided a 2010 document that
12   was after the date of the patent filing; right?
13        A    Well, but, again, I can -- my
14   experience in this field dating back to the 1980s,
15   I could verify that these problems existed well
16   before this time frame.
17        Q    You could have verified that before you
18   submitted your declaration or before you submitted
19   your reply declaration and you didn't; correct?
20        A    Well, I think part of the declaration
21   also attests to my level of experience in the
22   field which predates 2009.
23        Q    Understood.
24             But you relied on this document for
25   your statement in paragraph 37, and this document
```

Page 148

```
1    is dated after 2009; right?
2         A    The document is dated after 2009.
3         Q    Okay.  Now --
4         A    -- I will agree.
5         Q    -- let's look at the document.  You
6    relied on -- I guess, on -- you say in
7    paragraph 57 you rely on page -- I'm sorry.  You
8    say in paragraph 37 of your declaration you rely
9    on pages 139 to 148 of this document; right?
10             I'm just wondering what exactly in this
11   document you're relying on?
12        Q    If you'll give me just one minute to
13   review it.
14        Q    Sure.
15        A    (Witness reviews document.)
16             So the discussion with respect to
17   niacin is the issues of the side effects, and
18   those issues are described on 146, 147, 148.
19        Q    But all drugs have side effects; right?
20             MR. KENNEDY:  Object.
21             THE WITNESS:  Niacin has side effects
22   that can be intolerable to patients, more than the
23   other triglyceride-lowering drugs.
24        BY MR. CLEMENT:
25        Q    Okay.  They all -- again, all drugs
```

Page 149

```
1    have side effects; right?
2             MR. KENNEDY:  Same objection.
3             THE WITNESS:  There is a difference in
4    tolerability of some drugs compared to others.
5    Niacin often is not tolerated in a sizeable
6    percentage of patients whereas other medications
7    to treat very high triglyceride levels are.
8         BY MR. CLEMENT:
9         Q    Now --
10        A    So, yes, all drugs have side effects,
11   but the degree and extent of side effects that may
12   limit its usage is different.
13        Q    Okay.  But it's not contraindicated
14   with patients who have VHTG; right?
15        A    No, it was -- at the time it was
16   recommended for patients with VHTG.
17        Q    Okay.  Now, you -- I think we talked
18   earlier about Epadel?
19        A    Yes.
20        Q    And that was a Japanese medication;
21   right?
22        A    That -- that was my understanding.
23        Q    Now, you don't cite to Epadel in your
24   declaration as all; right?
25        A    Correct.  It's outside of the scope of
```

Page 150

1  my declaration.
2      Q    Why is it outside the scope of your
3  declaration?
4      A    It just wasn't cited.
5      Q    Okay.  We -- did you not cite it
6  because it was a Japanese drug instead of a U.S.
7  drug or --
8      A    I -- I really haven't given it that
9  much thought.
10          MR. CLEMENT:  Let's mark as Miller
11  16 --
12          THE COURT REPORTER:  Seventeen.
13          MR. CLEMENT:  -- 17, sorry, a document
14  with defendants Bates range 8961 through 8969.
15          (Miller Deposition Exhibit 17 was
16  marked for identification and attached to the
17  transcript.)
18  BY MR. CLEMENT:
19      Q    Dr. Mill- -- Dr. Miller, have you ever
20  seen this document before?
21      A    No.
22      Q    It's dated January 2007.
23      A    I see that.
24      Q    It's indicated for hyperlipidemia,
25  page 2?

Page 151

1      A    In Japan, I take it?
2      Q    Yeah.
3           Correct?
4      A    Yes.
5      Q    And it says to increase the dose when
6  excess triglycerides are present; right?
7          MR. KENNEDY:  Objection: outside the
8  scope of his opinions.
9          THE WITNESS:  It's outside the scope --
10         MR. KENNEDY:  I mean --
11         THE WITNESS:  -- of my opinions.
12         MR. KENNEDY:  -- you can answer.  I
13  have to make my objections.
14  BY MR. CLEMENT:
15      Q    You can answer.
16         MR. KENNEDY:  You can answer if you
17  can.
18         THE WITNESS:  That's what it says.
19  BY MR. CLEMENT:
20      Q    And, again, Epadel was pure icosapent?
21         MR. KENNEDY:  Objection to form;
22  outside the scope.
23         THE WITNESS:  It's ethyl
24  eicosapentaenoic acid.
25         BY MR. CLEMENT:

Page 152

1      Q    With a high purity?
2          MR. KENNEDY:  Same objections.
3          THE WITNESS:  I don't know what the
4  purity is.
5  BY MR. CLEMENT:
6      Q    Now have you ever been involved in a
7  clinical study?
8      A    I have.
9      Q    And have you ever drafted a clinical
10  protocol?
11     A    I have not.
12     Q    Do you know what the purpose of --
13     A    Oh, let -- let me take that back.
14     Q    Okay.
15     A    Clinical -- could you be a little more
16  specific?
17     Q    I guess I -- protocol for a clinical
18  study?
19     A    I've done studies but not drug-based
20  studies.  Well, I take that back.  I did do -- I
21  did do an investigator initiated study a number of
22  years ago, so I did draft that protocol.
23     Q    What -- so what is a protocol?  What's
24  the purpose of it?
25     A    Well, the purpose of a protocol is to

Page 153

1  really have set -- a set format and blueprint for
2  how you would conduct a trial, and that would
3  include a number of variables.
4      Q    Are there different types of studies
5  that you can conduct in the clinical -- as far as
6  a clinical study goes?
7      A    Well, of course there are studies that
8  are observational in nature whereas there are
9  studies that are treatment designed.
10     Q    Okay.  And what about, like, a
11  double-blind study?  Have you ever heard of that?
12     A    Yes.
13     Q    Okay.  And, in fact, on your CV, I
14  think on page 12, you talk about a double-blind
15  study.
16          You can check on your CV.
17     A    Yes.
18     Q    What is a -- what does the "double"
19  refer to?
20     A    Well, the double refers to maintaining
21  a blinding status from both the standpoint of the
22  patient and the standpoint of the
23  investigators/coordinators conducting the trial.
24     Q    So -- and blind refers to what?
25     A    Neither party knows whether the

Page 154

1  treatment is active or inactive.
2      Q    You don't know if you're taking the
3  medication or a placebo?
4      A    Correct.
5      Q    And is that different than an
6  open-label study?
7      A    Yes.
8      Q    How is that different from an
9  open-label study?
10     A    In an open-label study, the medication
11 is provided and the patient and investigator
12 generally know that the medication is being used.
13     Q    Right.
14          And what about a placebo-controlled
15 study?  Do you know what that means?
16          I think in your -- on your -- on
17 your -- your CV you talk about double-blind and
18 placebo-controlled.  That's where I'm getting it
19 from.
20     A    Right.  A placebo-controlled study
21 would be that the comparative nature includes the
22 active compound versus the inactive compound.
23     Q    In order to have an inactive compound,
24 some of the subjects of the study are actually
25 taking a pill that have -- just doesn't have

Page 155

1  medicament in it; correct?
2      A    Yeah, ideally you'd want to take -- for
3  all intents and purposes, you would want the shell
4  to resemble each other -- of course the shell
5  being inactive whether it's pharmaceutical grade
6  or nonpharmaceutical grade, but the composition
7  inside is what differentiates.
8      Q    The person doesn't know looking at it
9  from the outside whether they have the placebo on
10 the one hand or the active medication in the
11 other; right?
12     A    Correct.
13     Q    But they're actually -- even the ones
14 who are the controlled part of the study getting a
15 placebo, they're actually swallowing a pill?
16     A    Well, the -- whether it's in a clinical
17 trial or in practice, it's more than just
18 swallowing a pill.  It's being advised what to
19 take and when to take it, so it's administering
20 from the caregiver.  And ultimately one part of
21 that process is that the patient or the subject if
22 it's a clinical trial will take the pill -- will
23 swallow the pill.
24     Q    Swallow the pill, okay.
25     A    If -- if it is -- depending upon, I

Page 156

1  mean, how it is prescribed, right, because I
2  haven't seen too many double-blind studies where
3  there -- well, it could be injectable --
4      Q    Okay.
5      A    -- there are a lot of injectable
6  studies out there.
7      Q    That's fair enough.  I'm talking about
8  an oral.
9      A    Right.
10     Q    Okay.  All right.  What about a
11 parallel -- what's a -- I guess -- have you ever
12 heard of a crossover study?  Let's start there.
13     A    Yes.
14     Q    Do you know what a crossover study is?
15     A    Yes.
16     Q    Can you --
17     A    A crossover study is when the
18 volunteers are assigned to more than one arm, and
19 they crossover.  So they will go on, let's say,
20 medication A for a period of time, have a washout
21 period, then medication B for a period of time,
22 have a washout.
23          And that's usually what we refer to as
24 randomized and counterbalanced which means that
25 the volunteer doesn't know which phase -- which

Page 157

1  medication, and it's counterbalanced so that if
2  you look at 50 subjects, 25 of them get medication
3  A first, and 25 of them will get medication B
4  first.
5      Q    When you said there's two arms, what do
6  you mean by the arms?
7      A    The arms is -- is really that portion
8  of the study where that assignment of medication
9  is -- is identified or blinded, if you will.
10     Q    And is that different than a parallel
11 study?
12     A    Yeah, I don't do -- I've not really
13 participated too much in parallel studies.
14     Q    I think on page 16 of your CV you talk
15 about a grant that was a -- it says, Parallel
16 group.  So, I don't know, maybe that wasn't a
17 parallel study.  Maybe I'm misreading --
18     A    That's not a parallel study.
19     Q    What did you mean by "parallel group"
20 there, though.  Do you see that one, April 2005 to
21 March 2007?
22     A    Yes, I -- I -- I think it's just
23 running them in parallel, so you're having
24 patients receiving either the combination arm or
25 receiving the atorvastatin only arm.

Page 158

1    Q    So they're not crossed over?  You get
2  one --
3    A    They're not --
4    Q    -- arm or the other?
5    A    -- crossed over; correct.
6    Q    Okay.  I guess, what knowledge -- do
7  you consider you're an ex- -- strike that.
8         Do you consider yourself an expert in
9  statistics?
10   A    No.
11   Q    Okay.  Do you consider yourself
12  knowledgeable about statistics?
13         MR. KENNEDY:  Objection to form.
14         THE WITNESS:  I usually will confer
15  with a statistician in regard to studies that are
16  conducted.  Interpreting results of studies, I
17  have some basic knowledge.
18         BY MR. CLEMENT:
19   Q    Do you know what the concept of
20  statistical significance is?
21   A    Yes.
22   Q    Okay.  What is that to you?
23   A    Well, it's usually related to trying to
24  determine whether or not group A is different from
25  group B, and oftentimes a study is powered to show

Page 159

1  that there's a significant difference of less than
2  or equal to 5 percent which means less than
3  5 percent of the time you would see -- expect to
4  see virtually the same value.
5    Q    Okay.  And do you know what a
6  confidential interval is?
7    A    Yes.
8    Q    What is a confidence interval?
9    A    Confidence interval tells you the basic
10  branch points of a study, so if it's 95 percent,
11  you could be 95 percent sure that the data will
12  fall within a step range, specific range.
13   Q    And when you say that -- when you're
14  looking at statistical significance, that's
15  usually predefined what that level will be.  You
16  said 95 percent.  Is it pre- -- usually predefined
17  in the medical protocol what that level you're
18  looking for is to determine whether it's
19  statistically significant or not?
20   A    As a general rule, you would
21  predetermine -- you would power the study so that
22  a statistician will do a calculation to determine
23  the number of participants needed to see a
24  difference between whatever your variables are.
25   Q    And that's predetermined, right, you

Page 160

1  don't do that after you conduct the study; you do
2  that before?
3         MR. KENNEDY:  Objection to form.
4         THE WITNESS:  Yeah, in some trials they
5  actually have what we call an interim analysis.
6  So you can make some changes although that -- that
7  adversely affects your power -- I mean, that
8  adversely -- right, so that does -- that does
9  exist.
10         BY MR. CLEMENT:
11   Q    Okay.  Is that something you'd use a
12  Bonferroni correction for?  Do you know what a
13  Bonferroni correction is?
14   A    Yeah, I've seen Bonferroni, but I think
15  it's somewhere along -- in that ballpark.
16   Q    And does the type of statistics a
17  statistician will use will depend on whether the
18  data is normal or not normal?
19   A    Yes.
20   Q    Do you know why they use different
21  tests?
22   A    Yeah.  Well, you know, in the sense
23  of -- depends on if there's a normal distribution.
24  So if -- if the distribution is -- is abnormal or
25  highly variable, they may need to kind of tighten

Page 161

1  it up.  And, so, they may use different forms of
2  stats such as log transformation -- is one way to
3  tighten it up.
4    Q    Or Mann-Whitney?
5    A    Or Mann-Whitney.  There are a bunch of
6  different --
7    Q    Bunch --
8    A    -- ones.
9    Q    -- of ones, right.
10         And I think we talked a little bit
11  earlier that in a study typically it might have a
12  primary efficacy variable and a secondary
13  variable?
14   A    (Witness nods head.)
15   Q    I think nods of the head -- I just want
16  to make sure the court reporter is getting that.
17   A    Yes.
18   Q    Thank you.
19   A    And it depends on the specific study
20  you're looking at.  But primary efficacy -- well,
21  there are lots of different outcomes you could
22  talk about.  In early phase trials you're looking
23  at safety and efficacy.  In more advanced stages
24  you're looking at clinical outcomes.  And, so,
25  yes, an efficacy endpoint may be how you derived

Page 162

1  the blood pressure -- a degree of blood pressure
2  lowering that might be anticipated. At higher
3  stages you might look to see patients with blood
4  pressure being placed on blood pressure medication
5  A versus B may have a -- a reduction in
6  cardiovascular events.
7       Q    And might you use different
8  significance levels for each of those different
9  variables that you might look at?  Is it always
10 going to be .05 or --
11      A    Yeah, it varies. I mean, typically --
12 traditionally in outcome studies .05 is the
13 number, but it does vary. And if you're doing
14 genetic studies, then sometimes it goes out to the
15 order of magnitude of up to minus ten -- fifth to
16 tenth power, so it depends on a lot of variables
17 that -- that statisticians are familiar with.
18      Q    Okay. Let's turn to paragraph 39 of
19 your report. And in paragraph 39 -- are you
20 there?
21      A    I am here.
22      Q    Great.
23           The third sentence you say, The methods
24 developed by the inventors covered administering a
25 high dose, 4 grams per day.

Page 163

1       A    I'm sorry. I'm on -- is it -- I'm
2  looking at page 39, but you're looking at --
3       Q    Sorry. Paragraph 39.
4       A    Paragraph 39.
5       Q    Sorry.
6            Okay. You see the third sentence
7  begins, The method -- methods developed by the
8  inventors covered, and it goes on?
9       A    (Witness nods head.)
10      Q    Okay. What did you mean by "covered"?
11           Is that what the inventors claimed? I
12 guess that's the question I'm trying to get to.
13      A    Yeah, I think I'm -- the methods
14 developed by the inventors covered administering
15 this dose to very high TG patients.
16           Yeah, covered was -- that's how they
17 solve the problem which is noted two sentences up.
18      Q    Okay. Is that what they claimed, or
19 was it something different?
20      A    Well, the claimed composition is
21 discussed a little bit beforehand, but in terms
22 of -- of covered, I think I was referring to
23 basically the administration of this medication
24 that would result in -- in some of the changes
25 here related to TG and ApoB.

Page 164

1       Q    I guess, you know, you say here they
2  cover this, and they say to very high TG patients
3  receiving diet and lifestyle-change counseling.
4            And, I guess, where did you get that
5  from, receiving diet and lifestyle-change
6  counseling?
7       A    Yes, so that was part of the MARINE
8  study. In the MARINE study, patients get -- being
9  considered for inclusion into the study needed to
10 be first placed on a diet and lifestyle change.
11 So they received counseling, and they received the
12 therapeutic, lifestyle-change counseling.
13      Q    Okay. That was in the studies. Do you
14 equate the patent and the study?
15           MR. KENNEDY:  Objection to form.
16           THE WITNESS:  No, a patent is -- is --
17 relies upon the study, but -- and the results
18 obtained in the study in formulating the patent.
19 But a study and the patent are not one and the
20 same.
21      BY MR. CLEMENT:
22      Q    Okay. Because in claim 1 or any of the
23 claims in the '728 or any of the patents-in-suit,
24 does that language exist, "diet and
25 lifestyle-change counseling"?

Page 165

1           MR. KENNEDY:  Objection to form.
2           THE WITNESS:  I would have to review
3  that.
4       BY MR. CLEMENT:
5       Q    Well, take a look at at least the '728
6  patent since we have that here.
7       A    Right. So if we look at claim 1 in the
8  '728 patent, the focus here is on concomitant
9  lipid-altering therapy, which would not be
10 inclusive of lifestyle therapy. It's distinct
11 because lifestyle therapy had already been
12 instituted, at least -- everybody goes on
13 lifestyle therapy. That -- that's a given. And,
14 so, this is beyond that point. It's patients that
15 have residual triglyceride elevation between 5- to
16 1500.
17      Q    Okay. So you're saying that everyone
18 in claim 1 was on lifestyle therapy; is that what
19 you're saying?
20           MR. KENNEDY:  Objection to form.
21           THE WITNESS:  I'm not -- I'm referring
22 to everybody in the MARINE study who participated
23 in that clinical trial were placed on diet and
24 lifestyle therapy in order to determine whether
25 they would still be potentially eligible to

Page 166

1  participate in the trial.
2       BY MR. CLEMENT:
3       Q    I think we're in agreement on that.
4            But I guess my question is for the
5  claim, right -- is this claim trying to claim what
6  was in that example?
7       MR. KENNEDY:  Objection to form.
8       THE WITNESS:  It's really looking at
9  patients and -- and my -- my interpretation is
10  that it is looking at patients who we encounter in
11  practice who have a fasting baseline level in this
12  range, viewed in the very high triglyceride range.
13      BY MR. CLEMENT:
14      Q    So in the patients who you encounter,
15  they may or may not be on a lifestyle counseling,
16  right, the first time you see them?
17      A    Correct.
18      Q    Right.
19           And the first therapy -- the first line
20  of therapy, am I correct, would be put them on
21  some sort of diet and exercise regimen?
22      MR. KENNEDY:  Objection to form.
23      THE WITNESS:  The first line of therapy
24  for any patient we see -- it doesn't have to be
25  very high triglyceride patient; it's any patient

Page 167

1  that we would see -- we're going to recommend
2  lifestyle therapy.
3            So it doesn't matter if they're -- what
4  they're -- if their triglyceride is normal or
5  abnormal.  They may have high -- some degree of
6  elevated blood pressure.  They're going to go on
7  lifestyle therapy.  They may have some degree of
8  elevated blood glucose.  They're going to go on
9  lifestyle therapy.  They may have some degree of
10  obesity and want to lose weight.  They are going
11  to go on lifestyle therapy.
12           The point being that "lifestyle
13  therapy" is a very broad term.  Patients should go
14  on lifestyle therapy.  Did -- it's -- it's really
15  initial management of any patient that has any
16  cardiovascular risk factor.
17      BY MR. CLEMENT:
18      Q    But that includes VH -- VHTG patients
19  that present to you.  The first thing you'll do
20  for therapy is put them -- give them ther- --
21  lifestyle counseling, right --
22      MR. KENNEDY:  Objection.
23      BY MR. CLEMENT:
24      Q    -- diet and exercise regime?
25      MR. KENNEDY:  Objection to form.

Page 168

1       THE WITNESS:  So it really does depend
2  on the clinical scenario.  So as I've said, they
3  automatically -- they all go on it, and then
4  question is are we also going to institute
5  pharmacologic measures at that time.  So I think
6  that's maybe where that --
7       BY MR. CLEMENT:
8       Q    Okay.  But, again --
9       A    They all go on -- they all go on
10  lifestyle therapy.
11      Q    Including those with triglyceride
12  levels above 500 mgs per dl?
13      A    They all go -- I refer to it as a
14  therapeutic lifestyle change.  It's something
15  that's not unique.  It's broad-based.  It's for
16  any patient.  And it's different than blood
17  pressure therapy, blood pressure medication,
18  lipid-lowering therapy, lipid-lowering medication,
19  hypoglycemic agents, glucose-lowering therapies.
20      Q    I understand all of that.
21           I guess my question to you, though,
22  remains, the person who comes in and their lipid
23  levels are -- they have a triglyceride level of
24  500 -- more than 500 mgs per dl.  The first thing
25  you're going to -- the first form of therapy that

Page 169

1  you're going to tell them to do is to go on some
2  sort of diet and exercise regiment; correct?
3       MR. KENNEDY:  Objection to form.
4       THE WITNESS:  Yeah.  You know, I look
5  at it as a lifestyle change.
6       BY MR. CLEMENT:
7       Q    Okay.
8       A    It's a lifestyle change.
9       Q    Okay.
10      A    That's what it is.
11      Q    That's fair enough.  Okay.
12           Now, you say here in 39, also -- you
13  talk about the claimed composition.  I mean, I
14  guess, I just want to make sure we're on the same
15  ballpark.  My understanding is all the
16  patents-in-suit, they claim a method of treating;
17  right?
18      A    Yes.
19      Q    Okay.  They're not claiming the
20  composition, per se?
21      A    No.
22      Q    Right.
23      A    It's method of treatment.
24      Q    Okay.  Now, also if you look at claim 1
25  of the '728 patent --

Page 170

1    A    Yes.
2    Q    -- and do you see about one, two,
3  three, four, five lines down in that claim there's
4  the term "pharmaceutical composition"?
5    A    Yes.
6    Q    All right.  Do you have knowledge as to
7  whether the parties are disputing the meaning of
8  that term?
9    A    I don't believe I commented that in
10  my --
11    Q    All right.  That's going to be my next
12  question.
13    A    Yeah.
14    Q    I mean, have you given any opinions on
15  the term "pharmaceutical composition" in your
16  declaration?
17    A    I don't believe so.
18    Q    And in your reply declaration?
19    A    I don't believe so.
20    Q    And you weren't asked to give opinions
21  by counsel on the term "pharmaceutical
22  composition" --
23    A    I am not --
24    Q    -- right?
25    A    -- not there.

Page 171

1    Q    And are you a formulator?
2    A    I am not.
3    Q    And you don't consider yourself an
4  expert in formulation; right?
5    A    That is correct.
6    Q    And in claim 1 there, right, I think
7  we -- I might have asked this already, but --
8  well, strike that.
9          Now, let's assume the pa-- patient
10  comes with you, right, at a triglyceride level of
11  above 500 mgs per dl; right?
12    A    Yes.
13    Q    Let's -- let's take this back to
14  2009 --
15    A    Okay.
16    Q    -- okay?
17          The first thing you're going to do is
18  say lifestyle changes; right?
19    A    That is part and parcel of our
20  discussion, yes.
21    Q    And then if that doesn't take care of
22  the problem, right, then you might prescribe also
23  a medication; right?
24    A    Not necessarily.
25    Q    Not necessarily, okay.

Page 172

1    A    I may -- I may -- it depends.  It
2  depends on the scenario.  Certainly if they're
3  coming to see me and they have a history of
4  pancreatitis and they're not taking any medication
5  at that time, I'm going to put them on
6  medication --
7    Q    Okay.
8    A    -- at that time --
9    Q    And --
10    A    -- triglyceride-lowering medication.
11    Q    And could that include statins?
12    A    Probably not.
13    Q    Probably not, okay.
14    A    Not in that specific scenario.  Now,
15  there are other scenarios where that might be the
16  case, but not the one we just discussed.
17    Q    Okay.  But there are cases where you
18  might prescribe statins; right?  That would be --
19  I guess, my question -- do you agree with me that
20  statins would be a concomitant lipid-altering
21  therapy?
22        MR. KENNEDY:  Objection to form.
23        THE WITNESS:  It is a concomitant
24  lipid-altering therapy as -- as stated here
25  combined with, here, ethyl eicosapentaenoic --

Page 173

1  ethyl icosapent.
2        BY MR. CLEMENT:
3    Q    Okay.  Just -- so you're saying that
4  someone who is also on icosapent, if you were to
5  prescribe them a statin in addition to the
6  icosapent you would agree that is a concomitant
7  lipid-altering therapy; correct?
8    A    Yes.
9    Q    Do you know if the patent covers
10  methods for people not receiving diet and
11  lifestyle change counseling?
12        MR. KENNEDY:  Objection to form.
13        THE WITNESS:  Diet and lifestyle is --
14        BY MR. CLEMENT:
15    Q    You know what -- let me --
16    A    Yeah.  Sorry.
17    Q    -- rephrase that.  Okay.  Let me strike
18  that and rephrase.
19        Do you know if the patent claims
20  methods for people -- patients not receiving diet
21  and lifestyle change counseling?
22        MR. KENNEDY:  Objection to form.
23        THE WITNESS:  I would have to look
24  at -- at the patents to see if that wording is
25  used.

Page 174

BY MR. CLEMENT:

Q    Okay.  Well, if you'd look to claim, let's say, 15 of the '728.

A    I see it.

Q    All right.  There it says the subject is on a -- is consuming a western diet; right?

A    (Witness nods head.)

Q    So if they're on a western -- can you tell me -- do you have -- do you have -- strike that.

Do you agree with me that's what that claim is saying?

A    Yes.

Q    Do you know what a western diet is?

A    I do.

Q    And what is a western diet?

A    The west --

MR. KENNEDY:  Objection to form.

Sorry.  Go ahead.

THE WITNESS:  A western diet is a diet that is consumed in westernized societies that typically is unhealthy because it contains a fair amount of unhealthy fats and perhaps other processed foods with an associated elevated risk of heart disease compared to eastern diets which

Page 175

are generally healthier.

BY MR. CLEMENT:

Q    Okay.  And the patent actually says what a western diet is; right?  If you turn to column 9, line 29 to 38, I guess it is.

A    Yes, that -- that --

Q    You'd agree with that definition in the patent?

A    Yes.

Q    And, so, someone who is consuming that diet is not on lipid-altering therapy; right?

MR. KENNEDY:  Objection.

MR. CLEMENT:  I'm sorry.  Thank you.

All right.  Strike that.

BY MR. CLEMENT:

Q    And, so, the person on a western diet is not, in your opinion, receiving therapeutic lifestyle counseling; right?

A    (Witness reviews document.)

The western diet is not a diet that I would prescribe to my patients.

Q    But it is within the scope of claim 1 of the patent, right, because it's in claim 15 which depends on claim 1?

MR. KENNEDY:  Objection:  Outside the

Page 176

scope.

THE WITNESS:  I see that, and -- and -- and, so, the idea, again, is that you could recommend a medication in patients who are coming with elevated triglyceride even if they are on a western diet.

BY MR. CLEMENT:

Q    And that would be different than the example in patent or the MARINE study, right, because there everybody was on the lifestyle counseling; right?

MR. KENNEDY:  Objection to form.

THE WITNESS:  That is different than what was used in MARINE.

BY MR. CLEMENT:

Q    And -- right.  Okay.

And what's exam- -- the example of the patent; right?

A    Well --

MR. KENNEDY:  Same objection.

THE WITNESS:  Yeah, as listed in 15.

BY MR. CLEMENT:

Q    Okay.

MR. CLEMENT:  Now, I'm going to mark the next exhibit which is going to be Miller 17 --

Page 177

18.  And it's a document with defendants Bates range 10211 through 10225.

(Miller Deposition Exhibit 18 was marked for identification and attached to the transcript.)

BY MR. CLEMENT:

Q    And Dr. Miller, can you -- let me know if you've ever seen this document?

A    I have.

Q    And this is one that you're an author on?

A    I am.

Q    This was published in 2007?

A    It was, yes.

Q    Okay.  And it's with Terry Jacobson?

A    Yes.

Q    Who is Terry Jacobson?

A    He is a colleague of mine who is based out of Atlanta.  He is a cardiologist.

Q    Would he be a person of ordinary skill in the art?

A    Yes.

Q    And an expert in the field that we're talking about?

A    Yes.

Page 178

1    Q    What about Ernst Schaefer?
2    A    Yeah, Ernie is based out of the Bo- the
3  Boston area, another --
4    Q    And is he --
5    A    -- physician -- another expert.
6    Q    Would you consider him a person of
7  ordinary skill in the art --
8    A    Yes.
9    Q    -- at least a person of ordinary
10 skill --
11   A    Yes.
12   Q    -- in the art as you defined?
13   A    Yes.
14   Q    What about as an expert?
15   A    He's an expert.
16   Q    Okay.  Is -- is this a review article?
17   A    Yes.
18   Q    And what does that mean, it's a review
19 article?
20   A    Basically reviews the substantive
21 information at the time as it relates to the topic
22 being evaluated.
23   Q    All right.  And you don't do any
24 additional clinical research; you're just looking
25 at what's been published before?

Page 179

1    A    Right.  There -- there are no new -- or
2  no new studies in here or no new original studies.
3    Q    And what was this article about?
4    A    Basically the issue as it relates to
5  cardiovascular disease and elevated triglycerides.
6    Q    And on page 764, the lower left hand
7  column, you talk about a meta-analysis; right?
8    A    (Witness nods head.)
9    Q    Is that what was conducted here, a
10 meta-analysis?
11   A    Well, not conducted for this.  We
12 reviewed the data that included meta-analysis.
13   Q    Meta-analysis, okay.
14        And a "meta-analysis" -- can you define
15 that for us?
16   A    Yeah.  So meta-analysis is really
17 designed to enhance the stature -- the recognition
18 of a finding that -- that now incorporates a
19 number of studies and a number of additional
20 subjects.
21        For example, you could have several
22 clinical trials that may trend towards
23 significance, and now you -- and they are studying
24 relatively similar topic, and now you're putting
25 them altogether.  So now you have more power to

Page 180

1  see changes.
2        So the small scale studies may have not
3  really shown you a lot, but now when you put it
4  altogether in a meta-analysis, it can drive one
5  way or the other the -- the thoughts or the
6  hypothesis that were being generated.
7    Q    Okay.  And on the very first page of
8  this article of yours, you have a results section;
9  right?
10   A    Yes.
11   Q    And you say, Concern over the
12 increasing rate of hypertriglyceridemia; right?
13 Is that 500 or above --
14   A    No.
15   Q    -- mgs per dl?
16   A    Not necessarily.
17   Q    No, no?
18   A    It's not, let's say, very high
19 triglycerides.  Hypertriglyceridemia can be
20 defined as a triglyceride as low as 200.
21   Q    But it could also include people above
22 500?
23   A    Not -- not in this context.
24   Q    Not in this context?
25   A    No.

Page 181

1    Q    Okay.
2        But they do talk about lipid-lowering
3  agents that could be used for
4  hypertriglyceridemia, right, in this results
5  section?
6    A    Yes.
7    Q    And that includes statins, fibrates,
8  niacin, thiazolidinediones and prescription
9  omega-3 fatty acids?
10   A    Yes.
11   Q    And it says, Along with lifestyle
12 changes; right?
13   A    Yes.
14   Q    And you don't -- there's no -- in these
15 results, there's no mention of any problems with
16 statins or fibrates or niacin; right?
17        MR. KENNEDY:  Objection to form.
18        THE WITNESS:  Not in this paragraph,
19 no.
20 BY MR. CLEMENT:
21   Q    And on page 766, right, you talk about
22 treatment recommendations; right?
23   A    Yes.
24   Q    Do you see that?
25        And these are recommendations by virtue

Page 182

1  of this publication you were trying to inform
2  doctors about; correct?
3      A     Yeah, we were just kind of summarizing
4  the available information.
5      Q     If you go to the next page, 767 where
6  you talk about triglyceride-lowering therapy,
7  lifestyle modification?
8      A     Yes.
9      Q     And you note there, right, that weight
10 loss and exerc- -- increased exercise are the
11 cornerstones of TG-lowering therapy; right?
12     A     As they are for blood pressure
13 reduction, glucose reduction, weight loss, LDL
14 reduction, weight loss and increased exercise are
15 the corner stones of all -- virtually all
16 therapies to reduce heart disease risk.
17     Q     Okay.
18     A     So it's not unique to triglycerides.
19 It is a broad -- it's broad-based, and it is part
20 and parcel of treatment for everybody.  It is not
21 specifically lipid-lowering therapy.  I would not
22 classify it as lipid-lowering therapy as I would
23 for ezetimibe, a lipid-lowering therapy --
24 ezetimibe to lower LDL or statins to lower LDL or
25 fibrates to lower TG.  So difference --

Page 183

1      Q     Understood.
2      A     But it is -- but it is -- it is the
3  cornerstone of all preventative types of
4  therapies.
5      Q     Understood.
6            But here your sentence says, Weight
7  loss and increased exercise are the cornerstones
8  of TG-lowering therapy.  So here you were
9  specifically talking about T- -- triglyceride
10 lowering; right?
11     A     Because it's a triglyceride paper.  If
12 this was an LDL paper, I would have said weight
13 loss and increased exercise are the cornerstone of
14 LDL-lowering --
15     Q     Very --
16     A     -- therapy.
17     Q     Very well, but that's all -- I
18 understand.
19            I'm just saying --
20     A     Okay.  I just want to --
21     Q     -- do --
22     A     -- put it in perspective.
23     Q     But you agree with that statement
24 sitting here today, right, that weight loss and
25 increased exercise are the cornerstones of

Page 184

1  TG-lowering therapy, right, true then and true
2  now?
3      A     Yeah.
4      Q     Okay.  And that would include for
5  severe hypertriglyceridemia in addition to hyp- --
6  just general hypertriglyceridemia; correct?
7      MR. KENNEDY:  Objection to form.
8      THE WITNESS:  Yeah, severe
9  hypertriglyceridemia is a -- is a -- a little
10 bit -- while we -- while we certainly recommend
11 weight loss and increased exercise, more often
12 than not we would need to highly consider the use
13 of a lipid or a triglyceride-lowering medication.
14     BY MR. CLEMENT:
15     Q     In addition to the --
16     A     Well --
17     Q     -- diet and exercise regiment; right?
18     A     Diet and exercise is -- is exclusive to
19 that.  We -- we -- that -- that is broad-based.
20 We recommend that to everybody.  That is not what
21 I would refer to as lipid-lowering medication.
22            And, so, in patients who have very high
23 triglycerides, above 500, more often than not they
24 will need to go on medication and diet.  While we
25 would certainly want them to employ therapeutic

Page 185

1  lifestyle changes, more often than not they will
2  also need medication.
3      Q     Okay.  That's fair.  Then on the next
4  page you talk about -- on page 768, fibrates;
5  right?
6      A     Yes.
7      Q     And these are recommended therapies;
8  right -- treatment recommendations?
9      A     In 2009, that is correct.
10     Q     Yeah.
11            And no mention of rhabdomyolysis here;
12 right?
13     A     I would actually have to look at the
14 rest of the article to see if it's in here, but
15 not in that paragraph.
16     Q     And niacin is also here as a
17 recommended therapy?
18     A     Actually, I -- if you go to page 770,
19 under the fibrate section and that paragraph,
20 there is a statement.  We say, A review of reports
21 in the FDA's Adverse Event Reporting System found
22 when these agents were coadministered with the
23 statin the rate of rhabdomyolysis was 15 times
24 higher, and this is with gemfibrozil than with
25 fenofibrate.

Page 186

1    Q    Okay.  But it also says on page 770,
2  right, in the paragraph 70 beginning, Gemfibrozil
3  and fenofibrate, that they're commonly prescribed
4  fibrates in the U.S.; right?
5    A    Yes.
6    Q    And then it says, These agents are
7  generally well tolerated; right?
8    A    Generally well tolerated, right, but
9  it -- it doesn't take away from the concern as a
10 physician -- the first thing we learn in medical
11 school is "primum non nocere," first do no harm.
12       So even though these medications and
13 others are well tolerated, we always have to take
14 into consideration the possibility of harm, and
15 hence that has to be included in a review paper or
16 any other paper.
17   Q    That's -- that's true of any
18 medication, right, first do no harm.  You don't
19 want to -- you don't want to give them something
20 that could just be an allergic rela- -- reaction
21 to one of the ingredients; right?  You want to --
22 you don't want to do any harm.  No question about
23 it -- that's a given.
24       But this says they're generally well
25 tolerated; right?

Page 187

1    A    Generally well tolerated, yeah, sure.
2        MR. CLEMENT:  All right.  Why don't we
3  break for lunch.
4        THE VIDEOGRAPHER:  The time is 12:29.
5  This concludes tape number 3.
6        (Recess -- 12:29 p.m.)
7        (After recess -- 1:15 p.m.)
8        THE VIDEOGRAPHER:  The time is
9  1:15 p.m.  This begins tape number 4.  We're on
10 the record.
11       Please proceed, Counsel.
12       MR. CLEMENT:  Okay.  I will have the
13 court reporter mark an AHA Scientific Statement
14 article authored by Michael Miller, Exhibit 19.
15       (Miller Deposition Exhibit 19 was
16 marked for identification and attached to the
17 transcript.)
18       BY MR. CLEMENT:
19   Q    Okay.  Dr. Miller, have you ever seen
20 what's been put before you as Miller Exhibit 19?
21   A    Yes.
22   Q    And that's a -- is that an article --
23 would you call that an article?
24   A    It's really a -- a summary statement
25 from the American Heart Association.

Page 188

1    Q    And you're listed as the chair?
2    A    Correct.
3    Q    Okay.  And there's a Neil Stone also on
4  this --
5    A    Yes.
6    Q    -- article --
7    A    Yes.
8    Q    -- or statement, I should say.
9    A    Yes.
10   Q    Who is Neil Stone?
11   A    Neil Stone is a professor at
12 Northwestern who is also the chair of the national
13 guidelines 2013, American -- AHA/ACC.
14   Q    And would you consider him as a person
15 of ordinary skill in the art?
16   A    Yes.
17   Q    And as an expert?
18   A    Yes.
19   Q    How about Christie Ballantyne?
20   A    Christie Ballantyne is -- is in -- at
21 Baylor in Houston.
22   Q    And is she a --
23   A    It's a he.
24   Q    It's a he.  Sorry.
25       And is he a person --

Page 189

1    A    Yes.
2    Q    -- you would consider a person of
3  ordinary skill in the art?
4    A    Yes.
5    Q    And an expert?
6    A    Yes.
7    Q    And the same questions for Vera
8  Bittner?
9    A    Vera is over in Alabama, and, yes,
10 she's an expert.
11   Q    And at least a person of ordinary skill
12 in the art as you've defined; right?
13   A    Correct.
14   Q    And how about Michael Criqui?
15   A    Mike is in San Diego, and, yes, he is,
16 also.
17   Q    At least a person of ordinary skill in
18 the art?
19   A    Yes.
20   Q    And what Henry Ginsberg?
21   A    Henry is in New York and one of a
22 number of New Yorkers who are experts in this
23 field.
24   Q    And Anne Goldberg?
25   A    Anne Goldberg is in WashU in St. Louis

Page 190

1  where my daughters go next year.  And --
2      Q     Congratulations.
3      A     Thank you.
4            And, yes, she is an expert.
5      Q     What about William James?
6      A     Bill Howard, he's in Wa- -- he's in
7  Washington.  He may be retired now, but he was
8  viewed as an expert.
9      Q     And Marc Jacobson, he was on the
10 article with you before?
11     A     That was Terry.
12     Q     Terry, okay.
13     A     But Marc and Kris and Terry and Moshe
14 and Ted are -- Subramanian would all be viewed as
15 experts.
16     Q     So Terry Lennie would be viewed as a
17 person of ordinary skill?
18     A     Yes.
19     Q     And same as Moshe Levi?
20     A     Yes.
21     Q     Same as Theodore Mazzone?
22     A     Ted Mazzone, yes.
23     Q     And also Subramanian Pennathur?
24     A     Subramanian, yes.
25     Q     All right.  And this article is dated

Page 191

1  2011; right?
2      A     Yes.
3      Q     Okay.  You can put that away.
4            In your review of the patent, the '728
5  patent -- let's stick with that one -- did that
6  describe a completed study or a -- just the
7  protocol for a study?
8      A     Well, it's -- it's a -- a protocol for
9  a study, and I don't know where that study stood
10 at the time of the filing, but ultimately it
11 became very important.
12     Q     Okay.  And that was known as the MARINE
13 study?
14     A     Yes.
15     Q     Okay.  If we -- do we have -- do you
16 have the '727 file wrapper excerpts there?
17           Do you have the '727 patent file
18 wrapper?
19           MR. KENNEDY:  Is it Exhibit 16 or --
20           MR. CLEMENT:  I'm trying to remember
21 what I marked it as.
22           MR. KENNEDY:  Yeah, I mean, I have the
23 Bays declaration if that's what you're talking
24 about.
25           MR. CLEMENT:  It should be the whole

Page 192

1  document, the excerpts.  No?  It should start
2  with -- yeah, it starts with the Bays declaration
3  exactly.  Yeah.
4            MR. KENNEDY:  Yeah.  Then I think
5  that's the --
6            MR. CLEMENT:  That's the cover page of
7  16.
8      BY MR. CLEMENT:
9      Q     Okay.  If you can turn to 3058248,
10 towards the beginning.  Do you have that page?
11     A     I do.
12     Q     Okay.  And this was something you
13 relied on, right, in your declaration?
14     A     Yes.
15     Q     And this is a -- this was attached to
16 the Bays declaration; is that true?
17     A     I believe so.
18     Q     Yeah.
19           And what's on this page, 8248?  Is
20 that, like, the description of the study?
21     A     Yes, it's the introduction methods and
22 study design.
23     Q     And that should be -- match up with the
24 study in the patent?
25           MR. KENNEDY:  Objection to form.

Page 193

1            THE WITNESS:  It should be reasonably
2  close certainly from the standpoint of lipid
3  eligibility criteria --
4      BY MR. CLEMENT:
5      Q     Okay.
6      A     -- and medications that patients were
7  taking.
8      Q     Okay.  You agree this was a
9  double-blind study; right?
10     A     Yes.
11     Q     And the study in the patent is also
12 described as double-blind; right?  And feel free
13 to take a look if you --
14     A     I would --
15     Q     -- need to.
16     A     -- have to take --
17     Q     It's not a --
18     A     -- a look at that.
19     Q     -- memory test, yeah.
20     A     I don't remember how it's . . .
21           (Witness reviews document.)
22           I don't believe it says -- at least
23 certainly not in the claim, I don't see where it
24 says double-blind.
25     Q     If you look at -- if you look at the

Page 194

1  example in column 13.
2      A      Okay.  So in the -- in the
3  specification?
4      Q      Yeah, in the specification.
5      A      In the specification.
6      Q      Yeah.
7      A      Yes.
8      Q      Okay.  And how many arms were there on
9  this study?
10     A      I understand it to be two arms.
11     Q      And what were --
12     A      Oh, actually three arms.  Sorry.
13         There was a placebo arm, an arm with
14  Amarin at 2 grams a day and Amarin 101, 4 grams a
15  day for a 12-week period.
16     Q      And AMR101, we understand that to be a
17  Vascepa?
18     A      Amarin 101 is Amarin 101, yeah.
19  That's -- that's Vascepa.
20     Q      Vascepa, I keep saying Vascepa.
21         Okay.  And it says that there's a
22  matching placebo administered daily -- twice
23  daily, right, in the --
24     A      Yes.
25     Q      And what does that mean?

Page 195

1      A      Well, it means that if this was given
2  one to one to one, then one out of every three
3  patients would have been assigned to the Amarin
4  101, 4 grams a day, which is two capsules of
5  active icosapent twice daily.  Group two would
6  have been assigned to Amarin 101, 2 grams a day,
7  and group three would have been assigned to a
8  placebo.
9      Q      And the --
10     A      Everybody getting two capsules twice a
11  day.
12     Q      Right.
13         And the capsules would all look
14  identical from the outside?
15     A      Capsules should look identical.
16     Q      And what was the primary endpoint for
17  the study?
18     A      The primary endpoint was looking at the
19  effects on lipids, so if we now turn to page --
20  page 8249, the next page, the primary endpoint,
21  the change in triglycerides level from baseline to
22  week 12, and then there were secondary endpoints
23  as well.
24     Q      Right.  What were the secondary
25  endpoints?

Page 196

1      A      Secondary endpoints included changes in
2  VLDL, ApoB and another marker known as Lp-PLA2.
3      Q      And were the tests for statistical
4  differences different from the primary and
5  secondary variables?
6      A      So I don't know the detail of how they
7  determined statistics, but there were different
8  significance levels assigned.
9         Again, as we spoke, it -- it's how the
10  statistician determines, based on the power of the
11  study, how many patients they need to enroll to
12  get to those specified endpoints.
13     Q      And for the primary efficacy
14  variable -- strike that.  For the primary
15  endpoint, the significance level is .01; right?
16     A      That's what it says.
17     Q      And for the secondary variables, it was
18  .05; right?
19     A      That's what it says.
20     Q      Now, do you know if this -- this test
21  for the secondary endpoints was contained in the
22  patent?
23         MR. KENNEDY:  Objection to form.
24         THE WITNESS:  Yeah, I -- I do not know.
25  BY MR. CLEMENT:

Page 197

1      Q      Well, can you take a look?  I think
2  that the statistics -- at least the only part of
3  the statistics I can find in the patent, I think
4  that you cite to in your declaration, is column
5  16, lines 31 to 50.
6      A      Right.  That discusses the primary
7  efficacy analysis, and then they also say they
8  could use the same model for analysis of secondary
9  efficacy variables.
10     Q      But according to what we looked at
11  under -- in the follow-up for the '727, they were
12  different; right?
13     A      Well, I actually don't know.  I mean, I
14  think this is under the auspices of the
15  statistician who could tell you -- get into the
16  weeds with you and go into the specific rational
17  and why the patent might look a little different.
18         I just don't know.
19     Q      Okay.  But this -- you're sitting here,
20  and you are the declarant and one of the terms
21  we're talking about is "statistical significance."
22         And is there anything in this patent
23  that says for the secondary endpoints you should
24  use a significance level of p as .05?
25         MR. KENNEDY:  Objection to form.

Page 198

1    THE WITNESS: Yeah, again, I'm not a
2  statistician, so I don't know. And I was not
3  involved in the MARINE trial, so --
4    BY MR. CLEMENT:
5    Q    So sitting here today, you can't point
6  to anything in the patent showing that the
7  statistical significance level for the secondary
8  endpoints should be .05; right?
9    MR. KENNEDY: Objection to form.
10    THE WITNESS: Actually, I don't know if
11 that's true because I would need to go through in
12 fine detail the prosecution history where that
13 information may reside, and I could also go
14 through the specification to --
15    BY MR. CLEMENT:
16    Q    That's fair.
17    A    -- see if it's there.
18    Q    But I'd like you to look through the
19 specification. I don't think we need to look
20 through the prosecution history right now. I'd
21 like you to look at the specification.
22    A    (Witness reviews document.)
23    So with respect to the specification, I
24 don't see -- I -- I can't answer your specific
25 question, but that doesn't preclude the

Page 199

1  possibility that that information resides in the
2  prosecution -- elsewhere in the prosecution
3  history.
4    Q    But it's not in the patent
5  specification; right?
6    A    I -- I do not see it.
7    Q    And both change in --
8    A    Oh, one second. Hold -- hold -- hold
9  on one second. Sorry.
10    Your question related to .05 and .01;
11 is that right?
12    Q    Right.
13    A    So .05 is under column 16 starting at
14 line 31 where they said, The least square means,
15 standard error and two-tailed 95 percent
16 confidence interval for each treatment.
17    And then going to line 47 when they're
18 talking about the sample size number needed to
19 identify a difference with a significance level
20 of -- as less than .01.
21    Q    That's not .05; right?
22    A    The statistical analysis in -- on
23 page 8249 says, The primary efficacy analysis was
24 performed using a Wilcoxon rank-sum test at a
25 significance of 0.01. And if we look at line 45

Page 200

1  on, it says, Assuming a standard deviation of
2  45 percent TG measurements and a significance
3  level of less than .01.
4    So those who are consistent.
5    Q    Right. I agree. That's the primary
6  variable. I'm asking about the secondary which is
7  the LDL and the ApoB; right?
8    A    I -- I don't see it in the '728. It
9  doesn't rule out the possibility that it may exist
10 in one of the other asserted patents.
11    Q    Okay. But you don't see it here in the
12 '728; right?
13    A    I haven't -- I didn't see it when I
14 just glanced over it.
15    Q    Okay. What is the NCEP therapeutic
16 lifestyles changes diet?
17    A    So a therapeutic lifestyle diet is --
18 is really a diet that incorporates lower amount
19 of -- of fat in the diet, usually a reduction in
20 total unsaturated fat, maintaining macro nutrient
21 composition in a manner that may be reflective for
22 allowing a subject to reduce his or her weight.
23    I mean, they're general -- they're
24 general recommendations.
25    Q    I guess -- yeah. So what -- do you --

Page 201

1  do you have the NCEP -- third report of the NCEP
2  panel there which would have been Miller 15?
3    A    I have it right here.
4    Q    Okay. If you turn to 290029, and I
5  just want to know if that's kind of what you're
6  talking about with regard to what the TLC would
7  be?
8    A    So 290029?
9    Q    Yep.
10    A    Essential components of a therapeutic
11 lifestyle change, so the recommendation is to
12 reduce saturated fat, reduce dietary cholesterol,
13 adjust total caloric intake for -- either to
14 maintain body weight or perhaps to lose some,
15 physical activity.
16    Q    Right. So what's described in Tables
17 1, 2 and 3 on that page, would that be your
18 understanding of --
19    A    So that would be -- so that's -- Table
20 1 is essential components, Table 2 is
21 macronutrient recommendations and Table 3 is --
22 I'm not sure about Table 3. I mean, it's dietary
23 guidelines for Americans.
24    Q    Okay. So 1 and 2?
25    A    One and 2 I think are --

Page 202

1    Q    Okay.
2    A    -- reasonable.
3    Q    That's good.  Okay.
4         Now, in the study protocol for the
5    example in the patent, right, the '728 patent,
6    remember the example?
7    A    Yes.
8    Q    When were the baseline triglyceride
9    measurements taken?
10   A    Yes, I -- I believe the blood levels,
11   if I'm not mistaken, were taken after this four-
12   to six-week washout period.  And then there was an
13   average.  You could have one drawn after the four-
14   to six-week period and then you could -- then you
15   would repeat that, I believe, within a week or
16   two; take the average of those two and -- then
17   determine eligibility with the possibility that if
18   that person's triglyceride was outside that range
19   but in the ballpark, you may do a third one and
20   then take the average of the third one and the
21   second one.  Typic- -- the typical way that
22   clinical trials are conducted.
23   Q    Okay.  And once you got that number,
24   that was your baseline; right?
25   A    That would be -- that would determine

Page 203

1    actual eligibility to participate in the clinical
2    trial.
3    Q    And if you were eligible to participate
4    in the clinical trial, that would represent the
5    baseline for that subject.
6    A    That would represent the baseline for
7    that subject.
8    Q    Okay.  Now, it is true that subjects --
9    A    For the -- for the purposes of the --
10   of the clinical trial.
11   Q    Of the clinical trial?
12   A    Of the clinical trial.
13   Q    Right.
14        So the subject could then change his
15   diet or no?
16   A    No, the diet was recommended throughout
17   the study --
18   Q    But if they --
19   A    -- as -- as is generally done.
20        Now, whether or not a patient veers off
21   his or her diet is a different issue, but the idea
22   is for patients to maintain that -- that lifestyle
23   that they were moni- -- following.
24   Q    But if they were to change their diet
25   or exercise, either more or less, that could skew

Page 204

1    the results; right?
2         MR. KENNEDY:  Objection to form.
3         THE WITNESS:  Well, in any clinical
4    trial if you go off your medications or you do
5    things you're not -- you shouldn't be doing, then
6    of course it could skew -- it might skew your
7    results.
8    BY MR. CLEMENT:
9    Q    Now, in the protocol were the subjects
10   allowed to -- the subjects who -- strike that.
11        In -- in the protocol -- in the example
12   in the patent, were subjects allowed -- if they
13   were taking a statin, were they allowed to
14   continue taking a statin?
15   A    That was my recollection, is that they
16   could be on a statin -- a percentage of those
17   patients, maybe 25 percent, were taking a statin,
18   and they could remain on a statin.
19        The only medications -- they could not
20   remain on other medications, but they could remain
21   on a statin -- they -- I mean, I think ezetimibe
22   might have been permitted.  But they couldn't
23   remain on medication that might affect
24   triglycerides.
25   Q    That was one -- another one of my

Page 205

1    questions.  I can't -- I don't remember if I
2    remember clearly.  Was ezetimibe allowed to be
3    continued?
4    A    I'll have to look.  Let me -- Let me
5    check.
6    Q    Go ahead and take a look.  Sure.
7    A    Because I -- again, I was not a part of
8    the study but if recollection serves me correctly,
9    that was the case.
10        MR. KENNEDY:  Do you need the patent?
11        THE WITNESS:  No, I'm looking actually
12   for the clinical trial.
13        MR. KENNEDY:  Oh, I think it is one of
14   the big -- big guys.
15        THE WITNESS:  One of the big guys?
16   BY MR. CLEMENT:
17   Q    I think it's in one of the file
18   histories.  If you want to look at that -- that
19   document we were just looking at, it's in Miller
20   16.
21        MR. KENNEDY:  The Bates --
22        THE WITNESS:  Oh, there it is.
23        MR. KENNEDY:  There you go.
24        THE WITNESS:  Great.  What page was
25   that?

Page 206

1    BY MR. CLEMENT:
2    Q    I think it's on --
3    A    Okay.  I got that.
4    Q    -- 248.
5         Feel free to look it up, whatever you
6    think you need to.
7    A    (Witness reviews document.)
8         So inclusion -- let's see.  If on
9    backgrounds statin therapy no change to statin
10   type or dose during the study was allowed.
11        With respect to ezetimibe, I would
12   actually have to look at the paper because I don't
13   see it here.
14   Q    But statins, they were allowed to
15   continue on; right?
16   A    Yes, correct.
17   Q    With icosapent and the statin, the
18   statin would be considered concomitant
19   lipid-altering therapy; right?
20   A    Yes.
21   Q    Does the patent say how many patients
22   were on the statins?
23   A    Again, I would have to look through the
24   information presented both in specification and
25   prosecution history.

Page 207

1    Q    Well --
2    A    My -- I -- I think I would -- I believe
3    that it would be in prosecution history if it
4    wasn't present in specification.
5    Q    Okay.  Maybe in the pros- -- I'm -- but
6    my question is in the patent itself.  I'm just
7    asking in the patent itself.
8         Is there a recitation of what
9    percentage of patient -- of subjects of the study
10   were on a statin?
11   A    I'll probably have to look through
12   that.
13   Q    And just so you know --
14   A    And, again -- sorry.  And this is
15   specifically '728.
16   Q    Yeah.
17   A    (Witness reviews document.)
18        I -- I do not see reference to --
19   Q    I -- I didn't --
20   A    -- the percentage --
21   Q    -- see it either.
22   A    -- of patients.
23   Q    Yeah.
24        Also I did just notice -- just maybe it
25   solves our mystery a little bit, but if you look

Page 208

1    at the column of 13 about line 63, it says, If
2    statin therapy (with or without ezetimibe) is to
3    be continued, dose must be stable for four weeks.
4         Does that mean if they were already on
5    ezetimibe in addition to the statin, they were
6    allowed to continue?
7    A    Yes, that -- that -- that was my
8    understanding.
9    Q    Okay.  And ezetimibe is not a statin;
10   right?
11   A    That is correct.
12   Q    But it is -- when taken in combination
13   with icosapent and a statin, ezetimibe would also
14   be considered a concomitant lipid-altering
15   therapy?
16   A    Yes.
17   Q    Is there any statistical-significance
18   testing for subjects who are on statin therapy
19   versus -- as opposed to subjects who are not?
20   They didn't break that out; right?
21        MR. KENNEDY:  Objection to form.
22   BY MR. CLEMENT:
23   Q    Do you follow my question, or am I --
24   A    I understand --
25   Q    -- being unclear?

Page 209

1    A    -- your question.
2         I -- I -- again, I know there were
3    differences in the triglyceride reduction such
4    that those volunteers in the trial who received
5    both statin and icosapent appear to have better
6    reduction in triglycerides than those who were on
7    icosapent in the absence of statin.
8    Q    Okay.  But do you know if there was a
9    difference in the statistical-significance testing
10   for those -- for those two different types of
11   subjects?
12   A    We'd have to look through it.
13   Q    It's not mentioned in patent; right?
14   A    I don't recall.
15   Q    Okay.  Let's take a look at
16   paragraph 40 of your opening declaration which is
17   Miller 2.
18        Okay.  At the end of that paragraph --
19   and feel free to read the entire paragraph, but
20   you say, The clinical trial demonstrated that the
21   invented method has numerous, unexpected and
22   beneficial effects on lipid profiles in patients
23   with very high triglyceride levels receiving diet
24   and lifestyle-change counseling; right?
25   A    Yes.

Page 210

```
 1   Q    So would you -- I guess, did you base
 2  that on the claim of the patent?
 3       MR. KENNEDY:  Objection to form.
 4  BY MR. CLEMENT:
 5   Q    What the invented method was?
 6       MR. KENNEDY:  Objection to form.
 7       THE WITNESS:  I based that on the
 8  totality of the infor- -- information that I had
 9  available to me.
10  BY MR. CLEMENT:
11   Q    Okay.  And this invented method, right,
12  that was -- included giving -- administering the
13  4 grams of purified icosapent?
14   A    Yes.
15   Q    Did they take -- did the patients or
16  the subjects take anything else?
17       MR. KENNEDY:  Objection to form.
18       THE WITNESS:  Well, if they may have
19  also been taking their statin therapy and/or
20  ezetimibe.
21  BY MR. CLEMENT:
22   Q    Okay.  And then their lipid parameters,
23  right, those -- that were talking about
24  triglycerides -- talking about triglycerides and
25  ApoB for purposes of -- and LDL-C --
```

Page 211

```
 1   A    Yes.
 2   Q    -- okay.  Those were measured; right?
 3   A    Measured or calculated, correct.
 4   Q    Okay.  And those lipid levels, right,
 5  that the -- were measured or calculated from the
 6  patient -- from the subject's bloods, those were
 7  the natural result of a patient ingesting the
 8  medication?
 9       MR. KENNEDY:  Objection to form;
10  outside the scope.
11       THE WITNESS:  Yeah, I -- I think it was
12  basically a by-product of having the physician
13  recommending that the patient take the medication,
14  telling the patient what time he or she should
15  take the medication, and then ultimately as part
16  of this process the patient taking the medication.
17       MR. KENNEDY:  By -- by the way just
18  so -- so the record's clear, I think you've
19  developed a habit of saying yeah before a lot of
20  your answers.  I don't know if that's intended or
21  not, but in context sometimes yeah doesn't make
22  any sense.
23       THE WITNESS:  Okay.
24       MR. KENNEDY:  So if you could just be
25  precise, and --
```

Page 212

```
 1       MR. CLEMENT:  Yeah, that's fair, but
 2  let's stop coaching the witness, too.
 3       MR. KENNEDY:  Okay.
 4  BY MR. CLEMENT:
 5   Q    So, again, it's really -- what
 6  happens -- the lipid levels, right, that -- that
 7  are developed in the patient's bloodstream; right?
 8  Because that's what they do, they take the blood,
 9  and then they run it through some sort of assay or
10  some analysis.  And they can measure for
11  triglycerides, let's say, milligrams per
12  deciliter; right?
13   A    Yes.
14   Q    That -- those numbers that come out of
15  the blood or -- get -- when they're analyzed,
16  that's because of just when the patient ingests
17  the product, the body just metabolizes it however
18  the body metabolizes it; right?
19       MR. KENNEDY:  Objection to form.
20       THE WITNESS:  Well, it's a little
21  bit -- that -- it's more than -- that's an
22  oversimplification.
23       So after the instruction --
24  instructions are given with regard to
25  administration and the patient takes the
```

Page 213

```
 1  medication, then that medication is absorbed and
 2  catabolized to some degree, and there are
 3  different kinetic parameters involved in the
 4  bioavailability of the medication.
 5  BY MR. CLEMENT:
 6   Q    That's all natural processes occurring
 7  withinside the body.  That's how the body acts on
 8  the medication.
 9       MR. KENNEDY:  Objection to form.
10       THE WITNESS:  That's how ultimately it
11  gets processed.
12  BY MR. CLEMENT:
13   Q    Yeah.
14       And that would include for the ApoB
15  levels, the LDL-C levels and the triglyceride
16  levels; right?
17       MR. KENNEDY:  Objection to form.
18       THE WITNESS:  For all those blood
19  levels that were being evaluated, they would be --
20  blood sampling be taken after a period of
21  time that the patient had been exposed to either
22  the active compound or the inactive compound.
23  BY MR. CLEMENT:
24   Q    And that -- you know, there would be a
25  protocol for that; right?  What time do you draw
```

Page 214

1  the blood; right? There's all sorts of protocols
2  that have to be taken within plus or minus five
3  minutes of certain times, right, spelled out in
4  the protocol?
5      A    I think that might be a little
6  specific. I'm not sure that a patient had to have
7  his or her blood drawn at a specified time period.
8      Q    Uh-huh.
9      A    It's usually when a patient comes in
10  for his or her follow-up visit, that designated
11  time. There -- there is a window when you would
12  want that patient to come back, and that's
13  specified in the protocol.
14      Q    Okay. And, again, the -- the resulting
15  ApoB levels in the blood is just from the patient,
16  you know, taking the medication as prescribed, and
17  it's just what comes out of the blood at that --
18  after that point; right? There's nothing -- no
19  intervening act after the patient ingests the
20  medication other than natural processes in the
21  body that give you that ApoB level or that LDL-C
22  level; right?
23      MR. KENNEDY: Objection to form.
24      THE WITNESS: Yeah, I'm not -- I'm not
25  quite sure if -- if it's as simple as that because

Page 215

1  it's not as if you're taking or drinking a
2  milkshake and then determining the number of
3  chylomicrons. So to see effects on a given
4  parameter, it doesn't happen instantaneously. And
5  to see lipid effects, we're looking at a period of
6  time where those changes are observed, so --
7      BY MR. CLEMENT:
8      Q    And I'm not suggesting it happens
9  instantaneously. I agree with you. It takes
10  time. But everything that time is is things that
11  the body is naturally doing in its course of
12  absorption, metabolism, distribution and
13  elimination; right?
14      A    But, again, I want to point out that
15  the process of administration is a broad term.
16  It's not limited to somebody putting a pill in his
17  or her mouth and then monitoring the blood levels.
18      Q    Right. I'm not going there.
19      I'm just saying after they take the
20  pill -- I'm not using the word "administering" at
21  all. Okay.
22      After the person takes the pill when
23  you then later at some point in time take the
24  blood sample, okay, to measure their ApoB levels
25  or LDL-Cs according to whatever the protocol is,

Page 216

1  that's all natural processes; right?
2      MR. KENNEDY: Objection to form.
3      THE WITNESS: May or may not be natural
4  because, again, we'd like to believe that it's
5  natural, but there could be some other --
6      BY MR. CLEMENT:
7      Q    But --
8      A    -- you know, intervening circumstance.
9      Q    But you would agree it's all how the
10  body is acting on the drug after it's been
11  ingested; right?
12      A    For the most part.
13      Q    Yeah.
14      Well, what part wouldn't be?
15      A    Well, you know, how one person responds
16  to a medication could be different than another
17  person.
18      Q    Right. But that would be by their own
19  inherent body makeup; right?
20      A    It's just -- I -- I think with -- when
21  we view metabolism, it's -- it's a little bit more
22  complex, but I think the point you're suggesting
23  is -- is -- is fairly reasonable.
24      Q    Okay. Okay. What does the word
25  "concurrent" mean?

Page 217

1      A    Concurrent is usually with -- with
2  something else.
3      Q    And what about "concomitant"?
4      A    I view them very similarly.
5      Q    Okay. They're kind of synonymous;
6  right?
7      A    I think so.
8      Q    Will exercise alter lipid levels?
9      MR. KENNEDY: Objection to form.
10      THE WITNESS: Exercise might have an
11  effect on lipids as it would on blood pressure and
12  weight and glucose. So, yes, exercise is another
13  broad-based measure that could -- that could
14  affect a lot of things.
15      BY MR. CLEMENT:
16      Q    And diet can also alter lipid levels;
17  right?
18      A    As it could blood pressure and weight
19  and glucose and so forth.
20      Q    All right. But lipid levels included;
21  right?
22      A    It could affect lipids. It's not a
23  lipid-lowering therapy, but it can affect lipids.
24      Q    Okay. If you turn to paragraph 53 in
25  your declaration. And here you're talking about

Page 218

1 concomitant and concurrent lipid-altering therapy;
2 right?
3      A    Yes.
4      Q    And you say they're understood in the
5 field to refer to other medications that a patient
6 may be taking that will overlap with a prescribed
7 course of treatment; right?
8      A    Yes.
9      Q    What do you mean by "overlap"?
10     A    Well, as I've stated earlier, lifestyle
11 therapy or -- or therapeutic lifestyle change as
12 it is often referred to really is an initial
13 recommendation for all patients that are
14 presenting with any level of cardiovascular risk.
15          So in this particular case here for
16 patients that have -- or may need to be treated
17 because of an abnormal lipid or an abnormal blood
18 pressure or abnormal glucose, then we would make
19 recommendations for lifestyle therapy.
20     Q    And then on paragraph 55 of your
21 declaration, where you rely on -- you talk, again,
22 more about concomitant and concurrent
23 lipid-altering therapies; right?
24     A    Yes.
25     Q    And you rely on the patent, right,

Page 219

1 here, column 12, lines 43 to 46 of the '728?
2      A    I believe that's in the specification.
3      Q    Okay.  And if you turn to that, I mean,
4 would you consider that to be -- I mean, we talked
5 earlier about definitions, right, that a
6 specification gives; right?
7      A    Yes.
8      Q    Is this definitional, do you think?
9          MR. KENNEDY:  Objection to form.
10          THE WITNESS:  Well, from the standpoint
11 of this particular patent, it appears to be
12 medication.  Lipid-altering therapy, I would -- I
13 would view as lipid-altering medication given the
14 examples of statin, fibrate, niacin and/or
15 ezetimibe all of which are medications.
16     BY MR. CLEMENT:
17     Q    Okay.  But this is not defining --
18 do -- do you think this is defining the term
19 "lipid-altering therapy" -- I'm sorry.  Strike
20 that.
21          Do you think this portion of the '728
22 patent, column 12, lines 43 to 46, is defining the
23 term "concomitant lipid-altering therapy"?
24     A    I'm not sure this specific one is, but
25 there are others that I refer to in my

Page 220

1 declaration.
2      Q    So -- so you're relying on this portion
3 just to support your understanding of the term,
4 not necessarily as a definition; right?
5      A    Correct.
6      Q    Okay.  Because "embodiment," that just
7 means it's giving an example; right?
8      A    Yes.
9      Q    And even when it lists the medicaments,
10 right, it says, For example; correct?
11     A    I'm sorry.  Where are you?
12     Q    So where it says, Statin, fibrate,
13 niacin and/or ezetimibe therapy.  Do you see that?
14     A    Yes.
15     Q    It's prefaced by that.  The language is
16 prefaced by "for example"; right?  Do you see
17 that?
18     A    Right.  They could have included bile
19 acid sequestrants as well, and they didn't.
20     Q    They could have included a lot of
21 things.  They just gave examples; right?
22     A    Well, no, this is medicine.  This is
23 clear as day to me that this refers specifically
24 to medication.  These are all medicines.  I have
25 no reason to believe that it is anything

Page 221

1 otherwise.
2      Q    Understood.
3          But they're just giving examples;
4 rights?
5      A    Yes.
6      Q    And statin -- some of the people in the
7 example were on statins; right?
8      A    As part of this clinical trial, the
9 MARINE clinical trial, yes.
10     Q    So if someone is on statins at the same
11 time they're on the icosapent and the claim says
12 not otherwise on lipid-altering therapies, they're
13 outside the scope of that; right?
14          MR. KENNEDY:  Objection to form.
15          THE WITNESS:  All right.  Could you
16 point to me where that is --
17     BY MR. CLEMENT:
18     Q    Look at --
19     A    -- specifically --
20     Q    -- claim 1 --
21     A    -- said.
22     Q    -- and it says, A method of reducing
23 triglycerides in a subject having a fasting
24 baseline triglyceride level of 500 mgs to dl to
25 about 1500 mgs per dl who does not receive

Page 222

1  concomitant lipid-altering therapy; right?
2        So if they're on a statin, they're not
3  included on that claim, right, because they're on
4  a concomitant lipid-altering therapy under your
5  definition; right?
6    A    Yes, so my -- my -- my understanding of
7  concomitant lipid-altering therapy are those
8  individuals who may have been receiving niacin,
9  fibrates or other triglyceride-lowering
10  medications.
11    Q    So --
12    A    That was -- that was my understanding.
13    Q    But the patent says otherwise.  It
14  says, For example, statins and ezetimibe; right?
15    A    Statins and ezetimibe were permitted as
16  part of the MARINE trial.
17    Q    Are they permitted as part of this
18  claim if it says they do not receive concurrent
19  lipid-altering therapy?
20        MR. KENNEDY:  Objection to form.
21        THE WITNESS:  Well, I think it would
22  have to be linked to the prosecution history where
23  in the prosecution history it does establish that
24  the MARINE trial consisted of patients who
25  received eicosapentaenoic and may also have

Page 223

1  received statin --
2        BY MR. CLEMENT:
3    Q    Is it possible --
4    A    -- or ezetimibe.
5    Q    -- the MARINE -- is it possible the
6  MARINE trial -- the patients on that -- the
7  statins and the ezetimibe in the MARINE trial just
8  aren't included in this claim?
9        MR. KENNEDY:  Objection to form.
10        THE WITNESS:  Oh, I -- I -- I -- I
11  wouldn't interpret it that way.
12        BY MR. CLEMENT:
13    Q    Well, you've agreed with me before,
14  right, that statins are a concomitant
15  lipid-altering therapy; right?
16    A    They are a concomitant lipid-altering
17  therapy, but they are not a specific agent to
18  lower triglycerides.
19        And this specific claim is to have
20  patients who have elevated -- very high
21  triglycerides of at least 500 and statins would
22  not be thought of as a triglyceride-lowering
23  therapy as you would think of niacin and fibrates
24  and so forth.
25    Q    So let me get -- understand this.  So

Page 224

1  it's your position, it's your opinion that statins
2  although when taken with icosapent in general are
3  a concomitant lipid-altering therapy.
4        When you look at it in the context of
5  this claim, it's not?  Is that what you're telling
6  me?
7    A    I'm not saying it's not.  But what --
8  what I'm saying is when I'm looking at concurrent
9  lipid-lowering medications, I'm thinking more in
10  terms of the specific triglyceride-lowering
11  medications.
12    Q    The patent says in the section you
13  pointed to, column 3, lines 43 -- column 12, lines
14  43 to 46, all right, not otherwise -- that in
15  accordance with the methods of the invention, not
16  otherwise on lipid-altering therapy, for
17  example -- the first one is statin.
18        Now you're telling me that doesn't
19  count?  Is that your testimony?
20    A    Well, statins count.  What I'm
21  specifically referring to are
22  triglyceride-lowering medications.
23    Q    Well --
24    A    Statins -- statins count.  I think --
25  what my understanding here is lipid --

Page 225

1  lipid-altering therapy or medications that lower
2  lipids -- medications that lower lipids, and
3  that -- and that is how --
4    Q    Well, statins lower lipids; right?
5    A    Yes, the --
6    Q    Okay.
7    A    -- primary treatment for the use of
8  statins is to lower LDL.
9    Q    Which is a lipid?
10    A    Yes.
11    Q    And they're talking here -- they don't
12  say in the claim triglyceride-lowering concomitant
13  therapies, they say concomitant lipid-altering
14  therapy which would include LDL?
15    A    But I think they -- the point here is
16  that the focus is on the hyper -- the very high
17  triglyceride patient, VHTG baseline triglyceride
18  of at least 500.  And, so, when you're thinking of
19  patients in the -- in the trial -- in the MARINE
20  study with a fasting baseline triglyceride of 500,
21  they excluded or washed out patients that were
22  receiving other triglyceride-lowering medications.
23        So there is a distinction between a
24  triglyceride-lowering medication and another agent
25  such as --

Page 226

1    Q    A lipid-altering therapy; right?
2 Triglyceride --
3    A    No, the L- -- the primary
4 LDL-lowering --
5    Q    All right.
6    A    -- therapy.
7    Q    But an LD- -- so would you -- would you
8 agree with me, if I'm looking at a venn diagram,
9 lipid-altering therapy could be drugs that treat
10 any lipid and triglyceride-lowering therapies
11 would be just within that -- a circle within that
12 that treat -- that lower triglycerides; right?
13    A    You're looking at VHTG, so it's a
14 special group of patients.
15    Q    And --
16    A    Very high triglycerides.
17    Q    25 percent of them in the patent met --
18 for example, I think you said were also on
19 statins --
20    A    Yes.
21    Q    -- and/or ezetimibe.
22    A    I'm not --
23    Q    Right?
24    A    I'm not saying that -- I'm not
25 discounting statins.

Page 227

1    Q    Okay.
2    A    I'm just saying my -- my reading is --
3 in terms of the MARINE study was to exclude
4 patients that were not on triglyceride-lowering
5 medications because of the population being
6 studied.
7    Q    Okay.  But I'm asking about
8 lipid-altering.  Are you telling me now, sitting
9 here today, that when the patent claim here says
10 concurrent lipid-altering therapy that should be
11 read to say concurrent triglyceride --
12    A    No.
13    Q    -- altering therapy?
14    A    Of course not.  I mean, it could be any
15 lipid-lowering medication.
16    Q    Such as a statin?
17    A    Of course.
18    Q    So if someone is on a statin at the
19 same time they're on the icosapent, they're on a
20 concurrent lipid-altering therapy; right?
21    A    Yes.
22    Q    And then it -- since this says who does
23 not receive concurrent lipid-altering therapy,
24 they would not be in the -- within the claim;
25 right?

Page 228

1    A    Well, again, I want to be careful
2 because obviously in the MARINE study statins were
3 permitted to be used.
4    Q    I'm not asking in the MARINE -- I'm
5 asking about the claim.
6    A    500 to 1500, the focus is on
7 triglyceride-lowering medications.
8    Q    And patients on five -- who have over
9 500 milligrams per deciliter of triglycerides, are
10 also sometimes on statins; right?
11    A    Yes.
12    Q    Okay.  So there are patients who
13 have -- who are on this -- above the five --
14 between the 500 and the 15 who are also on a
15 statin.  And my question is when we give them the
16 icosapent, does that mean that they are receiving
17 concurrent lipid-altering therapy?
18    MR. KENNEDY:  Objection to form.
19    THE WITNESS:  If they are receiving a
20 combination of eico- -- eicosapentaenoic and
21 another cholesterol or lipid-lowering medication.
22    BY MR. CLEMENT:
23    Q    And, so, then they can't be considered
24 someone who is not receiving a concurrent
25 lipid-altering therapy; correct?

Page 229

1    A    Again, with -- with respect to the
2 clinical trial, patients in the clinical trial
3 with triglyceride levels between 5- to 1500 could
4 not be taking or had to be washed out of a
5 triglyceride-lowering medication.  They did not
6 have -- they did not have to be washed out of a
7 statin.
8    Q    I understand that.  But I'm asking
9 within the scope of a claim, and I think we agreed
10 a person who is taking -- who has 500 to 1500 mgs
11 per dl of triglycerides, that is taking icosapent
12 and is also taking a statin, they are on a
13 concurrent lipid-altering therapy; right?
14    A    Yes.
15    Q    And I'm just looking at the claim.  I'm
16 not looking at the study.  I want to just keep
17 this focused on the claim.
18    Within the scope of that claim if it
19 says they are not receiving concurrent
20 lipid-altering therapy, they can't also be -- that
21 would exclude people who have both icosapent and a
22 statin; right?
23    A    (Witness reviews document.)
24    Within -- within this interpretation of
25 what -- of what you said, that would be -- that

Page 230

1 would be the case.
2 Q Okay. You also talked about Katayama;
3 right?
4 A Correct.
5 Q In your declaration.
6 Let's turn to Katayama which, I guess,
7 is in the '728 file wrapper.
8 Did I mark that one? I don't know if I
9 marked that one yet.
10 MR. KENNEDY: I don't think so.
11 MR. CLEMENT: Let's skip that for now.
12 I'll find it at the break.
13 BY MR. CLEMENT:
14 Q All right. Can a patient administer a
15 medication to his or herself?
16 A Yes.
17 Q And that's by taking the medication?
18 A Yes.
19 Q So, I guess, one of the questions I'm
20 having and I'm not even sure this is a dispute
21 between plaintiff and defendants on the term
22 "administering". My view of it is that
23 administering can include the doctor prescribing.
24 It can include all those steps before, but that it
25 has to include the patient actually ingesting the

Page 231

1 medication.
2 Is that your understanding?
3 A No.
4 Q No, okay.
5 Tell me where I'm wrong.
6 A I write a prescription for a patient.
7 I advise the patient to take the medication at X
8 time. Patient goes on his or her way. I don't --
9 I don't know what happened. But as far as I'm
10 concerned, I administered the medication.
11 Q So just by writing that script and
12 talking to the patient, that's administering?
13 A That is -- that is administering. I'm
14 not going to be there to see -- to watch every
15 time the patient takes the medication. I -- I
16 presume that to be the case, but administering
17 encom- -- is, again, another broad term that
18 encompasses one of several different avenues, if
19 you will.
20 Q Okay. So maybe we do have a dispute on
21 this.
22 Okay. And if you prescribe it, you're
23 saying you don't know if the patient takes the
24 medication; right?
25 A Well, I presume the patient is taking

Page 232

1 it.
2 Q But patient compliance is an age old
3 problem, right, between doctor and patients?
4 A Well, it's not so much between doctors
5 and patients. It's usually -- we try to do our
6 job.
7 Q Right.
8 And the patients --
9 A You can bring --
10 Q -- don't always do theirs?
11 A You can bring the horse to water.
12 Q Right. Okay.
13 But patient compliance is an issue when
14 you're trying to treat a patient; right?
15 A It can be.
16 Q It can be. Okay.
17 So patients -- while you would like
18 them to always take the drug, they don't always?
19 A Yes.
20 Q And they don't always take it as
21 prescribed maybe?
22 A Correct.
23 Q But you do agree that administering
24 could include the patient actually taking the
25 medication?

Page 233

1 A Yes.
2 Q So they can self-administer?
3 A Yes.
4 Q Which has nothing to do with writing a
5 prescription; right? They're just taking the pill
6 then?
7 A That's part --
8 MR. KENNEDY: Objection to form.
9 THE WITNESS: That's part of the
10 process. They -- they can't take the pill if I
11 haven't prescribed it.
12 BY MR. CLEMENT:
13 Q Well, what if they just go -- an
14 off-the-shelf medication, can they administer an
15 off-the-shelf medication to themselves, omega-3,
16 whatever, fatty acids that are off the shelf?
17 A They can do that without my knowledge.
18 Q That would still be administering?
19 A Not a for -- not -- not -- not a -- a
20 prescription form. Prescription form has to be
21 written with directions provided by the health
22 care professional.
23 Q Okay. Do you know if the term "oral
24 administration" is defined in the patent? All
25 right. Some of the claim term -- claims use oral

Page 234

1 administration; right?
2     A     Yeah, I believe it was.
3     Q     And that's at column 12, line 49?
4     A     Yes.
5     Q     And they're defining oral
6 administration, right, in that -- in that
7 paragraph?
8     A     They are.
9     Q     Is there anything about a prescription
10 being written in that paragraph?
11         MR. KENNEDY:  Objection to form.
12         THE WITNESS:  I believe that
13 information is presented elsewhere in the
14 intrinsic evidence.
15     BY MR. CLEMENT:
16     Q     Okay.  But it's not in that paragraph;
17 right?
18     A     Not in this specific paragraph.
19     Q     But what is in that paragraph is the
20 patient actually putting it in their mouth; right?
21     A     In this particular paragraph, that's
22 the case.  But elsewhere, there are other examples
23 within the intrinsic evidence demonstrating that
24 administration includes the action by a physician.
25     Q     But here they're defining oral

Page 235

1 administration; right?
2     A     Within this one paragraph.
3     Q     Okay.
4     MR. CLEMENT:  Why don't we -- have we
5 been going an hour.
6     MR. KENNEDY:  Yeah.  Yeah.
7     MR. CLEMENT:  Let's take a break.
8     THE VIDEOGRAPHER:  The time is
9 2:16 p.m.  We are going off the record.  This
10 concludes tape number 4.
11         (Recess -- 2:16 p.m.)
12         (After recess -- 2:36 p.m.)
13     THE VIDEOGRAPHER:  The time is
14 2:36 p.m.  This begins tape number 5.  Going on
15 the record.
16         Please proceed, Counsel.
17     BY MR. CLEMENT:
18     Q     Okay.  Dr. Miller, if you turn to
19 paragraph 79 in your report, and there you're
20 talking about the definiteness; right?
21     A     Yes.
22     Q     And you say that defendants -- you said
23 you understand that defendants must prove by clear
24 and convincing evidence that a claim is
25 indefinite; right?

Page 236

1     A     Yes.
2     Q     What does "clear and convincing
3 evidence" mean to you?
4     A     I -- I would say clear and convincing
5 evidence is -- is -- it's the usual term.
6     Q     What does that mean, "usual term"?
7 What does it mean to you?
8     A     That it doesn't exist.  That there's
9 evidence to -- to -- to otherwise refute.
10     Q     So it's your understanding there's no
11 other -- in order to meet the clear and convincing
12 evidence standard, there has to be no evidence
13 otherwise to refute?
14     A     To refute it, to refute what is viewed
15 as -- as -- as it's been written.
16     Q     Okay.  What is your understanding of
17 what "indefiniteness" means in the context of your
18 declaration?
19         And feel free to glance through.
20     A     Yeah, I mean, as I say in paragraph 79,
21 Fails to inform a person of ordinary skill in the
22 art about the scope of invention with reasonable
23 certainty.
24     Q     In general are statistically
25 significant changes always clinical meaning --

Page 237

1 clinically meaningful?
2     A     No.
3     Q     Would you agree that it's your opinion
4 that a -- and I'm looking at paragraph 81 -- that
5 a substantial increase in lipid levels is one that
6 would affect how a clinician would respond to such
7 an increase?
8     A     Yes.
9     Q     And is that different for different
10 patients?
11     A     Could be.
12     Q     So for a different increase in lipid
13 levels depending on how else the patient presents,
14 you might treat them differently?
15     A     Depends on the -- the lipid you're
16 looking at and evaluating.
17     Q     What about for -- if you're looking at
18 triglycerides?
19     A     Yeah.  You know, as we've said, the
20 patients that have very high triglycerides are
21 viewed differently than patients who have very
22 normal triglycerides.
23     Q     Do you view all your patients who have
24 very high triglyceride levels, above the 500 mgs
25 per dl, similarly or do you treat them as they --

Page 238

1  individually as they come and might treat them
2  differently depending how they present?
3      A    I was --
4          MR. KENNEDY:  Objection to form.
5          THE WITNESS:  I -- I treat patients
6  based on -- I treat them individually.
7  BY MR. CLEMENT:
8      Q    Based on their overall health and all
9  their levels of different --
10     A    Yes.
11     Q    -- markers; yeah?
12         Can you say without seeing a patient
13 whether a 5 percent rise in LDL-C is clinically
14 meaningful?
15         MR. KENNEDY:  Objection to form;
16 incomplete hypothetical.
17         THE WITNESS:  Right.  So as a -- and
18 this is -- your question is outside the scope of
19 the patent; is that correct?
20         BY MR. CLEMENT:
21     Q    Yeah.
22     A    Yeah, so if a patient -- you know, as a
23 clinician, that -- that is viewed as a threshold,
24 that a 5 percent change -- and in this particular
25 case we're talking about approximate 5 percent

Page 239

1  increase in LDL.  Was that what you were referring
2  to?
3      Q    A 5 percent rise, yes --
4      A    A 5 --
5      Q    -- increase.
6      A    -- percent rise in incr- -- in LDL
7  would be viewed as kind of the threshold where --
8  where I or another POSA might consider making dose
9  adjustments.
10     Q    What if -- so 10 percent or 15 percent,
11 that would -- you would also consider that
12 clinical --
13     A    Yeah, I think about 5 percent give or
14 take the threshold above which we would make
15 changes, or we'd certainly consider making
16 changes.
17     Q    But you would want to know more about
18 the patient before you decided whether or not to
19 make changes; right?
20     A    We'd always want to know more about the
21 patient.
22     Q    Is a 5 percent rise in an LDL-C
23 level -- is that -- for patients with over 500 mgs
24 per dl, is a 5 percent rise in an LDL-C level a
25 treatment challenge?

Page 240

1          MR. KENNEDY:  Objection to form.
2          THE WITNESS:  Right.  So remember in a
3  patient for whom triglyceride levels are in a very
4  high range, above 500, our -- our first and
5  foremost goal is to try to lower triglycerides.
6          Once we get it below 500, give or take,
7  then we move from the concern of pancreatitis risk
8  to the concern of coronary risk.
9  BY MR. CLEMENT:
10     Q    And when you were talking about that
11 5 percent -- when we were talking about the
12 5 percent number just a few minutes ago, was that
13 based on your rule of six?
14     A    Yeah, 5 to 6 percent is in part based
15 on the rule of six.
16     Q    In the rule of six, did you mention
17 that in the -- your opening declaration?
18     A    I believe I may have mentioned it in my
19 response, my second --
20     Q    Right.  I'm asking about your opening.
21     A    I'm not sure if it was mentioned in the
22 opening, but I believe it was mentioned in the
23 second.
24     Q    Okay.  I agree with you it was
25 mentioned in the second, but, again, you didn't

Page 241

1  mention it in the first; right?
2      A    I -- I would have to go through that
3  again.  I know it was mentioned in the second.
4      Q    So in paragraph 81 of your opening
5  report -- declaration, you talk about a
6  substantial increase in lipid levels being one
7  that would alter how a physician would view the
8  patient's risk of developing a disease and would
9  necessitate consideration of a new treatment or
10 change to existing treatment; right?
11     A    Yes.
12     Q    So as a physician, would you consider
13 an increase of LDL-C from 90 to 100 significant?
14     A    Well, I think -- again, this is
15 hypothetical, and I think you would need to look
16 at the patient's overall risk and what other risk
17 factors may be evident.
18     Q    How about a 100 to 106 rise in LDL?
19     A    So, again, as I just mentioned before,
20 this is hypothetical, and a 100 to 106 is an
21 approximate 6 percent increase in LDL if my math
22 serves me correctly.  Again, that is the -- that
23 is a little bit -- right around the threshold
24 where you need to at least consider that.
25     Q    But you'd want to see the patient;

Michael H. Davidson, M.D.
02/15/2018                                          242 to 245

Page 242

1   right?
2       A     I don't play telemedicine.
3       Q     Okay.  So let's look at paragraph 83 of
4   your declaration, and you're saying, Doctor -- you
5   say, The applicants submitted a declaration from
6   Dr. Bays reporting a 4-gram per day dose of AMR101
7   reduced triglycerides over 35 percent without a
8   significant change in LDL-C.
9             Do you see that?
10      A     Yes.
11      Q     So what was that significant change; do
12  you know -- or without a significant change?
13            And I think you have the '727 file
14  wrapper there with you if you need to look at that
15  and --
16      A     Yeah, why don't I -- don't I take a
17  look at that.
18            (Witness reviews document.)
19            So for LDL cholesterol, the difference
20  between the Amarin 4 grams a day versus placebo
21  was approximately 2 percent --
22      Q     Okay.  Which --
23      A     -- and 3 percent.
24      Q     Which page are you looking at?
25      A     I'm looking at page 8246.

Page 243

1       Q     8246.
2             And what numbers are you looking at?
3       A     I'm looking at Amarin 4 grams a day
4   versus placebo, and this is baseline -- percent
5   change from baseline in the MARINE study.
6       Q     And that was a 2.3 --
7       A     Correct.
8       Q     Negative 2.3; right?
9       A     Negative 2.3.
10      Q     So that's not five or six; right?
11      A     That is not five or six.
12      Q     And you also look at the Weintraub --
13  or, no, I'm sorry.
14            In the '727 file wrapper, you also --
15  and Dr. Bays was talking about significant change
16  and not substantial; is that correct?
17            MR. KENNEDY:  Objection to form.
18            THE WITNESS:  Let me see the specific
19  wording that he used.  I'd have to look to see
20  exactly.  Let's see.
21            (Reviews document.)
22            Right.  He says significant change.
23            BY MR. CLEMENT:
24      Q     So that doesn't really support your
25  substantial change being five or six, right,

Page 244

1   that -- that -- that citation to that?
2             MR. KENNEDY:  Objection to form.
3             THE WITNESS:  I was referring more to
4   what would be viewed as a clinically meaningful
5   change, so --
6             BY MR. CLEMENT:
7       Q     Right.  But this is a paragraph you put
8   in your declaration in this section, and I -- I
9   thought it was -- what was the purpose of putting
10  it in there if it wasn't to support what a
11  substantial change is?  It's under
12  the substantially -- "without substantially
13  increasing" claim term; right?
14            MR. KENNEDY:  Objection to form.
15            THE WITNESS:  Let me see if that's
16  actually -- I'm -- I'm looking at a -- on a
17  different page.  Let me see if I can find that
18  specific page.
19            (Reviews document.)
20            So now I'm looking at on page 20 which
21  is actually 0317 Bates number 9808 where he
22  mentions this with respect to reduction in ApoB
23  and substantially no increase in LDL as well as
24  the satisfaction of a long felt, unmet medical
25  need.

Page 245

1             BY MR. CLEMENT:
2       Q     Okay.  Where is that again?  You're on
3   page 9- 9808?
4       A     I'm on page 9808.
5       Q     Where are you reading from?
6       A     I'm reading from the second paragraph.
7       Q     The one that begins -- which one?
8   Beginning, Even if a prima facie case or --
9       A     Yes.
10      Q     Okay.  Is this a -- the Bays
11  declaration?
12      A     Well, this is in the prosecution
13  history, and it may be -- let's see.  It may be
14  from one of the examiners, but it does refer to
15  Bays.
16      Q     Where does it refer to Bays?
17      A     Well, if you go to the previous page,
18  it talks about Bays Declaration III.
19      Q     Okay.  But, again, my question is --
20  was there something -- you cited to -- I was
21  looking at your declaration, paragraph 80 -- no,
22  wait -- I'm sorry -- paragraph 83.  And I'm just
23  trying to get an understanding of why you cited to
24  paragraph -- the Bays pages 3058235 to 36.
25            Does that or does that not support your

Page 246

1  argument that substantial change means 5,
2  6 percent?
3      A     Yeah, I mean Bays says with -- with an
4  LDL rise may necessitate the initiation of
5  lipid-altering drug therapy.
6      Q     But where does he say what that -- what
7  rise?  Is it any rise?  Is it 5 to -- where does
8  it say 5 or 6 percent?
9      A     (Witness reviews document.)
10            Yeah, the 5 to 6 percent is -- is
11  mentioned in other parts of the prosecution
12  history.  I'll find those for you.
13      Q     No, that's fine.  I'm just wondering --
14  is it mentioned in the -- in the -- and we can go
15  there after.
16            I just want to know, for the record, is
17  there anything in the Bays declaration that you
18  cite to in page 83 of your report that supports
19  your 5 to 6 percent number for substantial change?
20      A     I think there is, but I would actually
21  have to go through the entire document.
22      Q     Sitting here today -- sitting here
23  today, you can't do that?  I mean, you cited --
24      A     I can do that.
25      Q     Okay.  You --

Page 247

1      A     I can --
2      Q     -- cited --
3      A     -- do that sitting here today, but it's
4  going to take sometime.
5      Q     All right.  Why don't you take, you
6  know, five or ten minutes and see if you can do
7  that.
8      A     Okay.
9            (Witness reviews document.)
10            I know Dr. Weintraub says it.
11      Q     Okay.
12      A     So I will find where Dr. Bays says it.
13            (Witness continues reviewing document.)
14      Q     May -- I see you flipping through
15  there.  Are you looking at the Bays declaration --
16      A     I'm looking --
17      Q     -- or the --
18      A     I'm looking at the Bays declaration
19  right here, specifically right here.
20            (Witness continues reviewing document.)
21            Yes, he -- he talks primarily about the
22  increases in LDL-C with other therapies, and
23  not -- he doesn't specifically talk about 5 to
24  6 percent, but -- but Weintraub does.
25      Q     Okay.  So let's stick with Bays.  Bays

Page 248

1  doesn't talk about 5 to 6 percent; right?
2      A     He does not talk about 5 --
3      Q     Okay.
4      A     -- to 6 percent.
5      Q     But you say -- but you say Weintraub
6  does; right?
7      A     That was -- that was my recollection.
8      Q     Do you want to show me where?
9      A     (Witness reviews document.)
10            Yeah, it's like he says -- and I say
11  this on -- on number 85, Dr. Weintraub explained
12  in a declaration submitted to the patent office:
13  Even a small increase in LDL caused by
14  triglyceride-lowering drug can have serious
15  complications for patient.  For example, an
16  increase in concentration of LDL by about
17  6 percent can result in a need to double the
18  concentration of a statin.
19            To mitigate this increase in LDL.  This
20  can result in an increase in cost for the therapy
21  and a significantly higher risk of statin-related
22  adverse events.
23            And then subsequent to that in 86 --
24  mentioned that typically an increase in LDL of
25  about 5 to 6 percent in a hyperlipidemic patient

Page 249

1  would cause a physician to consider additional
2  LDL-lowering treatment.  The ATP guidelines
3  explain that to decrease LDL by 6 percent double
4  the dose of his statin.
5      Q     Let's go one at a time.  Okay?
6      A     Sure.
7      Q     So you're relying on this paragraph at
8  the top of page 38 for your basis saying that
9  Weintraub supports your 6 percent is a substantial
10  increase; correct?
11      A     It's substantial enough to consider a
12  medication.
13      Q     Okay.  Is the word "substantial" in
14  that paragraph?
15      A     No, he uses --
16      Q     He uses small increase; right?  He
17  doesn't even say substantial.  He says, Small
18  increase; right?
19      A     Right.  Because what he's -- what he's
20  basing it on is the relative differences between
21  what was observed in -- in the clinical trials
22  inasmuch as -- in some cases the increase is a lot
23  higher.
24      Q     He says -- he's saying, Even a small
25  increase.

Page 250

1    A    Yeah.
2    Q    He never says substantial.  He says,
3  Small?
4    A    Yeah.  Correct.
5    Q    So he doesn't say 6 percent is
6  substantial.  He says that might be a small
7  increase; right?
8    A    Right.  I believe I said substantial.
9    Q    You said substantial.  Exactly.
10        Let's look at what else you cite.  You
11  go on and in that same paragraph 85 you have
12  another citation to the request for continued
13  examination; right?
14    A    Yes.
15    Q    Okay.  And that's at AMRN3059047, but
16  first can you turn to AMRN3059035.
17        Do you see that's -- I'm sorry.  Let me
18  know when you get there.  That's a request for
19  continued examination.
20        Do you see that?
21    A    Request for continued examination, yes.
22    Q    Do you know what that is?
23    A    It sounds like what is stated.
24    Q    Okay.  Do you have any other knowledge
25  as to what one of those -- what a request for

Page 251

1  continued exam -- is that something the examiner
2  says?
3    A    I'm -- I'm not a patent attorney, so
4  I'm just taking it for what it says.
5    Q    Okay.  And your page -- your citation
6  to page 9047 is within this request for continued
7  examination document that you're not 100 percent
8  sure of what it is; right?
9    A    Well, I'm -- I'm -- I'm presuming it's
10  related to the unexpected results of Amarin 101.
11    Q    Well, there's a section on that; right,
12  on page 047 of that document?  The whole document
13  is not related to the unexpected results; right?
14    A    Right, but . . .
15        (Witness reviews document.)
16        So I am presuming that this is related
17  to claims that -- for the patent.
18    Q    Okay.  Now, what do you -- you rely on
19  this -- I guess, this 4.5 number on the table the
20  9047; is that what you're --
21    A    Correct.
22    Q    And there's a footnote with regard to
23  that; right?
24    A    There is a footnote.
25    Q    And that's for Lovaza data not for

Page 252

1  Amarin -- AMR101; correct?
2    A    That is correct.
3    Q    And it says, Lovaza data in borderline
4  high/high triglycerides.
5        So does that even rate -- relate to
6  very high triglycerides?
7    A    No, but that may be where the small
8  increase comes from because when you look at the
9  4.5 percent compared to results with Lovaza 4
10  grams a day in patients with very high
11  triglycerides, you -- there was a 44.5 percent
12  increase in LDL.  So it's -- the 4.5 percent is --
13  is smaller compared to the 44.5 --
14    Q    Understood.
15    A    -- percent.
16    Q    But your -- is the 4 -- are you -- I
17  guess, let me ask this question.  Are you relying
18  on this 4.5 percent number for your -- the basis
19  for your understanding that without substantial
20  increase in LDL-C -- is a substantial -- you know,
21  that it would be understood to be 6 percent by a
22  person of ordinary skill in the art?
23        MR. KENNEDY:  Objection to form.
24        THE WITNESS:  Yeah, you know, I'm
25  putting -- I'm trying to put this into context.

Page 253

1  And -- and as you see in paragraph 85, I
2  specifically say that this was reported in
3  patients -- the 4.5 percent LDL increase was
4  reported in patients in the borderline high-TG to
5  high-TG patient population.
6        BY MR. CLEMENT:
7    Q    Okay.
8    A    So that is -- that's the context by --
9  by which I put that.
10    Q    Okay.  So is that supporting your 5 to
11  6 percent number for substantial increase, or is
12  it just nice information to know?
13    A    I think it's all additional
14  information.  I think where -- the information is
15  based upon a number of different areas that
16  include the intrinsic evidence, so it's
17  prosecution history, specification.
18        And, so, this is all part of the
19  prosecution history.
20    Q    Understood.
21        But does that support your --
22  determine -- this 4.5 percent number, are you
23  using that to say that that's the 5 to
24  6 percent -- as a person of ordinary skill in the
25  art would understand that a 5 to 6 percent change

Page 254

1  in patients with very high triglycerides -- would
2  know that's what substantial change means?
3              MR. KENNEDY:  Objection to form.
4              THE WITNESS:  I think that 4.5 percent
5  increase -- despite the fact that it's in a
6  borderline high TG to TG patient population, a
7  person of ordinary skill in the art would -- would
8  see that, would notice that.
9         BY MR. CLEMENT:
10        Q     Would notice that.
11              Would they -- would they assume that
12  supports your 5 or 6 percent number for what a
13  substantial change is in the very high
14  triglyceride?
15        A     Well, obviously this was not done in a
16  very high triglyceride, and I pointed that out.
17  It's in paragraph 85.  I specifically say it's
18  borderline high to high TG.
19        Q     Okay.  And it doesn't say anywhere in
20  here that there's substantial, but that means
21  substantial; right?  I'm looking on what's on this
22  page 9047.
23        A     Yeah, I'm not sure if -- if that
24  specific term was used.  It doesn't detract from
25  the fact that I think that substantial is

Page 255

1  clinically meaningful.
2         Q     And do you see that in the footnote 2
3  on that page?
4         A     Which page?
5         Q     The same page we were looking at, 9047.
6               Do you see the footnotes at the bottom
7  referring to the table?
8         A     The statistical reviews noted that the
9  significance of the small increase requires
10  clinical judgment.
11        Q     All right.  This says a small increase
12  there or not?  Sub- -- substantial increase;
13  right?
14        A     Right because it is a small increase
15  relative to the 44.5 percent --
16        Q     Okay.
17        A     -- noted below that.
18        Q     But they said it's was a small
19  increase, not a substantial increase; correct?
20        A     Correct.
21        Q     Okay.  What about the 8.4 percent
22  number on the Epadel, right?  Do you see that?
23        A     Correct.
24        Q     So even though that's a larger number
25  than the 4.5, the footnote for that says it wasn't

Page 256

1  statis- -- statistical significant; right?
2         A     I see that.
3         Q     And you're not relying on that entry
4  for support of what "substantial change" means;
5  correct?
6         A     Correct.
7         Q     And you know in footnote 2 they talk
8  about this Lovaza approval package.
9               Do you see that?
10        A     I see that sentence.
11        Q     Have you ever seen the Lovaza approval
12  package?
13        A     I believe I have.
14        Q     Did you look at it in context for
15  preparing your declarations in these case -- in
16  this case?
17        A     If it's within this prosecution
18  history, then I did.
19        Q     No, I don't think it is.
20        A     Then I may not have.
21        Q     You also rely on a Baigent article; is
22  that right?
23        A     Baigent.
24        Q     Baigent.
25        A     Yes.

Page 257

1         Q     I'll get a copy of that for you.
2               MR. CLEMENT:  Let's mark as Miller
3  Exhibit 20 a copy of a -- the Baigent article
4  Bates numbers 3130228 through 0239.
5               (Miller Deposition Exhibit 20 was
6  marked for identification and attached to the
7  transcript.)
8         BY MR. CLEMENT:
9         Q     Dr. Miller, we put before you as Miller
10  Exhibit 20 a copy of the Baigent article; right?
11        A     I have that, yes.
12        Q     And that's something you've seen
13  before; right?
14        A     Yes.
15        Q     And that's something you had attached
16  as an exhibit to your declaration?
17        A     Correct.
18        Q     It wasn't within the file history of
19  any patent; right?
20        A     I would have to check that.
21        Q     Would you consider this to be --
22  actually, I guess, would you consider this to be
23  extrinsic evidence?
24        A     If it wasn't part of the prosecution
25  history, then it would be.

Page 258

1    Q    Did you find this article or was this
2 something counsel provided to you?
3    A    I've known about this article for
4 years.
5    Q    Again, did you find this article or was
6 this something that counsel provided to you for
7 purposes --
8    A    I --
9    Q    -- of drafting your declaration?
10    A    I actually think I may have brought
11 this article up --
12    Q    Okay.
13    A    -- to their attention.
14    Q    And it says -- a 2005 article?
15    A    I believe that's the date.
16    Q    And where in this article does it
17 define or talk about what a substantial increase
18 is for LDL-C?
19        MR. KENNEDY:  Objection to form.
20        THE WITNESS:  Yeah, I'm not sure that
21 that is defined in this article.  The point of
22 bringing this article was to show that as LDL
23 increases, the risk for cardiovascular events also
24 increases.
25    BY MR. CLEMENT:

Page 259

1    Q    Okay.  But it doesn't say anything
2 about your 5 or 6 percent number; correct?
3    A    I'm not sure that it was put in the
4 context of the 5 to 6 percent.  In fact, the
5 the -- the -- the way this is read is a POSA would
6 understand that for every increase in LDL there
7 was a corresponding increase in cardiovascular
8 risk, and that's shown in the paper in Figure 3.
9    Q    I went through it and didn't see
10 anything about 5 or 6 percent.  And, I guess, if
11 you had seen it, you would have put it in there,
12 or do you want to take some time to take a look
13 through it and see if you see anything, or you
14 don't think it's there?
15    A    Well, again, I don't -- I don't put
16 this paper within the context of 5 to 6 percent.
17 I put it in context of the preceding sentence
18 which says, A POSA would understand that for every
19 increase in LDL there is a corresponding increase
20 in cardiovascular risk, and that is shown in
21 Figure 3.
22    Q    Figure 3 doesn't say anything about 5
23 or 6 percent; right?
24    A    Correct.
25    Q    And, again, sitting here today, you

Page 260

1 don't -- you recall putting this paper in here for
2 that -- support of that statement but not in
3 support of your opinion that substantial increase
4 means 5 or 6 percent; right?
5    A    Again, it's really the totality of data
6 that I'm looking at.  I'm looking at -- I'm
7 considering all of the -- all of the evidence
8 whether it's based on the specification or based
9 on the prosecution history or even here some of
10 the extrinsic evidence that this -- this statement
11 is based on the totality of evidence that I have.
12    Q    Okay.  But, again, do you recall,
13 sitting here today, any statement in this -- and I
14 understand you're looking at the totality of
15 evidence.  I just want to know for purposes of my
16 small mind is there anything in here that says
17 substantial increase should be 5 or 6 percent?
18    A    And -- and as I pointed out before,
19 the -- the sentence specifically talks about the
20 increase in LDL.  There was a corresponding
21 increase in cardiovascular risk.
22        So if you have a 5 or a 10 percent
23 increase in LDL, then you're going to have an
24 increase in cardiovascular risk.
25    Q    It says for every increase.  So if you

Page 261

1 have a 1 percent, you have an increase; right?
2    A    Correct.
3    Q    And the Baigent article, that's not
4 mentioned anywhere in the patent; right?
5    A    I'd have to go through all those
6 patents, but I'm not sure.
7    Q    And then finally you rely on the ATP
8 guidelines, right, for your -- explain that to
9 decrease LDL-C by 6 percent, you double the dose
10 of the statin; right?
11    A    Yes, if I could refer back to the
12 ATP III?
13    Q    Sure, if you have that, I'll get mine.
14    A    Yes.
15    Q    Okay.  Where are you looking at?
16    A    I'm looking at Bates 0098.
17    Q    Okay.  And specifically where?
18    A    Specifically on the first paragraph, in
19 the middle of the paragraph, For example, the dose
20 of a statin may be doubled at each visit to
21 achieve an additional 6 to 7 percent LDL lowering
22 with each dose titration.
23    Q    Okay.  That's referring to a lowering,
24 right, a reduction?
25    A    And the converse is also true.

Page 262

1    Q    I'm asking does that refer to a
2  lowering.
3    A    That is correct.
4    Q    And the patent refers to an increase;
5  right?
6    A    Yes.
7    Q    I don't see the word "increase" in here
8  at all, do you?
9    A    No, but as I said it is -- it is --
10 converse is -- also holds.
11   Q    That's what you say, but I didn't see
12 it in that article.  Did you?
13   A    No, but you would see it in the Baigent
14 article where you see that association quite well.
15        And that gets back to the point if you
16 look at Figure 3 of this relationship between LDL
17 and coronary disease.
18   Q    One second.  I've got to find my page.
19 I'm sorry.  Okay.  Go ahead.  Sorry.
20   A    And -- and, so, what -- what has been
21 established -- what we had known for many years is
22 that as you go up in this association, as -- for
23 every LDL increase, there is an increased risk of
24 events.  Conversely as you reduce LDL you also
25 have a similar reduction in coronary events.

Page 263

1        So both directions work.
2    Q    But Baigent doesn't mention anything
3  about the 5 or 6 percent or rule of six at all;
4  right?
5    A    Again, we're looking at the totality of
6  evidence which puts this -- pieces all -- this
7  information -- puts it together.
8    Q    Is this rule of six that you're talking
9  about or the 5 or 6 percent number for substantial
10 increase in LDL-C mentioned within the '728 patent
11 specification?
12   A    I would have to look at the patent
13 specification --
14   Q    Go ahead.
15   A    -- to see if that's specifically
16 mentioned.
17   Q    You didn't cite to anything, right, in
18 your declaration?
19        MR. KENNEDY:  Objection to form.
20        THE WITNESS:  (Reviews document.)
21        There was a mention of specification of
22 LDL.
23        BY MR. CLEMENT:
24   Q    Where are you?
25   A    Let me see what page.  Column 5 under

Page 264

1  D.
2    Q    All right.  But no mention of
3  substantial increase; right?
4    A    No.  It talks about 5 percent
5  increase -- less than 5 percent.
6    Q    Talks about ten, 50, 20, 30, 35 -- it
7  talks about all of them; right?
8    A    Right.  But, again, as I -- as I
9  pointed out 5 to 6 percent would be the threshold
10 by which we would consider adjustment of therapy
11 and -- and, yes, so 10 percent for sure,
12 20 percent and 30 percent and higher levels of
13 course, but 5 percent is that lower threshold
14 limit.
15   Q    Right.
16        But it doesn't say that's a substantial
17 increase; right?  It just mentions 5 percent;
18 correct?
19   A    Correct.  And, again, looking at the
20 totality of evidence in the prosecution history as
21 part of the intrinsic evidence, so all of these
22 are pieces that when put together provides, I
23 think --
24   Q    Did you cite to column 5, lines 37 to
25 46 in any of your declarations of the '728 patent

Page 265

1  in support of your understanding of the term
2  "substantial increase"?
3    A    I don't know if I -- if I did, but now
4  that I'm reviewing the specifications, I see it
5  here.  I think it's, again, part of the -- of the
6  history.
7    Q    So is there anywhere in this patent
8  that says substantial and gives a description that
9  substantial increase in LDL-C means 5 or 6 percent
10 other than what you just pointed me to?
11   A    Yeah, it -- the 5 to 6 percent is a
12 well-recognized number that we would derive as
13 clinically meaningful in order to determine
14 whether or not we might consider altering a
15 patient's therapy.
16   Q    Is your rule of six mentioned in the
17 patent?
18   A    That is -- I'm not sure if it's
19 mentioned in the patent, but it is part of my
20 declaration.
21   Q    I understand it's part of your
22 declaration.  I'm asking if it's in the patent.
23   A    I don't know if it's in the patent.
24   Q    Is doubling the dose of a statin in the
25 patent?

Page 266

1      A     I don't know if it's in the patent.
2      Q     Wouldn't doubling the dose of a statin
3  be some sort of a lipid -- additional
4  lipid-lowering therapy?
5            MR. KENNEDY:  Objection to form.
6            THE WITNESS:  Again, the focus here was
7  to evaluate and treat patients with very high
8  triglycerides.  And the focus is lowering
9  triglycerides.  The focus wasn't to specifically
10  also lower LDL.  It was to lower triglycerides.
11           By the way, this medication seemed to
12  not raise LDL compared to other medications that
13  lowered very high triglyceride and did raise LDL.
14  This did not do that.
15  BY MR. CLEMENT:
16      Q     Understood.
17           But is there anything in the patent
18  that talks about -- that you should double the
19  dose of statins to figure out what substantial
20  decrease in LDL means?
21      A     I'm not sure.
22      Q     Even doubling the dose of a statin,
23  that would be additional lipid-altering therapy;
24  correct?
25      A     Yes.  Again, I'm not sure that's

Page 267

1  relayed in the patent.
2            MR. CLEMENT:  Okay.  Why don't we take
3  a break.
4            MR. KENNEDY:  Okay.
5            THE VIDEOGRAPHER:  The time is
6  3:28 p.m.  We're going off the record.
7            (Recess -- 3:28 p.m.)
8            (After recess -- 3:43 p.m.)
9            THE VIDEOGRAPHER:  The time is
10  3:43 p.m.  We're back on the record.
11           Please proceed, Counsel.
12           MR. CLEMENT:  Okay.  Dr. Miller, thank
13  you very much for your time today.  At this point
14  in time, we have no further questions.
15           MR. KENNEDY:  Amarin has no questions
16  for you at this time.
17           I would like to designate the
18  transcript highest level of confidentiality
19  because I think some internal documents were
20  marked.  We can talk at some point about, you
21  know, limiting the designation, but I would like
22  to make that designation.
23           I would like to reserve the witness'
24  right to read and sign the transcript, then I
25  think we're done.

Page 268

1            MR. CLEMENT:  Sounds great.  Thank you.
2            THE VIDEOGRAPHER:  The time is
3  3:44 p.m.  This concludes today's deposition given
4  by Dr. Michael Miller.  We are now off the record.
5
6
7
8            (Signature having not been waived, the
9  Videotaped Deposition of MICHAEL MILLER, M.D.,
10  ended at 3:44 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 269

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Dana C. Ryan, Registered Professional
3  Reporter, Certified Realtime Reporter, the officer
4  before whom the foregoing proceedings were taken
5  do hereby certify that the foregoing transcript is
6  a true and correct record to the best of my
7  ability of the proceedings; that said proceedings
8  were taken by me stenographically and thereafter
9  reduced to typewriting under my supervision; and
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to this case and
12  have no interest, financial or otherwise, in its
13  outcome.
14       IN WITNESS WHEREOF, I have hereunto set
15  my hand and affixed my notarial seal this 28th day
16  of February 2018.
17  My Commission expires:
18  July 15, 2020
19
20
21
22
23  NOTARY PUBLIC IN AND FOR THE
24  DISTRICT OF COLUMBIA
25

Page 270

```
1              INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4   carefully and make any necessary corrections.  You
5   should state the reason in the appropriate space
6   on the errata sheet for any corrections that are
7   made.
8          After doing so, please sign the errata
9   sheet and date it.
10         You are signing same subject to the
11  changes you have noted on the errata sheet which
12  will be attached to your deposition.
13         It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to do
17  so, the deposition transcript may be deemed to be
18  accurate and may be used in court.
19
20
21
22
23
24
25
```

Page 272

```
1              ACKNOWLEDGMENT OF DEPONENT
2
3          I, Michael Miller, M.D., do hereby
4   acknowledge that I have read and examined the
5   foregoing testimony, and the same is a true,
6   correct and complete transcription of the
7   testimony given by me and any corrections appear
8   on the attached Errata sheet signed by me.
9
10
11  _____    _____
12  (DATE)                  (SIGNATURE)
13
14
15            CERTIFICATE OF NOTARY PUBLIC
16  Sworn and subscribed to before me this
17  _____ day of _____, _____
18
19
20  _____    _____
21  NOTARY PUBLIC            MY COMMISSION EXPIRES
22
23
24
25
```

Page 271

```
1              E R R A T A   S H E E T
2   IN RE:  AMARIN PHARMA, INC., et al. v. WEST-WARD
3   PHARMACEUTICALS CORP., et al.
4   RETURN BY: _____
5   PAGE  LINE              CORRECTION AND REASON
6   _____ _____             _____
7   _____ _____             _____
8   _____ _____             _____
9   _____ _____             _____
10  _____ _____             _____
11  _____ _____             _____
12  _____ _____             _____
13  _____ _____             _____
14  _____ _____             _____
15  _____ _____             _____
16  _____ _____             _____
17  _____ _____             _____
18  _____ _____             _____
19  _____ _____             _____
20  _____ _____             _____
21  _____ _____             _____
22  _____ _____             _____
23  _____ _____             _____
24  _____          _____
25   (DATE)                  (SIGNATURE)
```

```
1              E R R A T A   S H E E T

2    IN RE:  AMARIN PHARMA, INC., et al. v. WEST-WARD

3    PHARMACEUTICALS CORP., et al.

4    RETURN BY:     _____

5    PAGE   LINE              CORRECTION AND REASON
```

| PAGE | LINE | CORRECTION AND REASON |
|------|------|------------------------|
| 41 | 18 | "eicosapentaenoic" to "eicosapentaenoate" / Transcription Error |
| 53 | 17 | "eicosapentaenoic" to "eicosapentaenoate" / Transcription Error |
| 54 | 5 | "proceeded" to " preceded" / Transcription Error |
| 56 | 7 | "shown" to "known" / Transcription Error |
| 58 | 13 | "Heartland" to "Heart, Lung, and" / Transcription Error |
| 99 | 10 | "concur" to "refer" / Transcription Error |
| 109 | 5 | "simulation" to "scintillation" / Transcription Error |
| 128 | 1 | "microprotein" to "lipoprotein" / Transcription Error |
| 131 | 8 | "low" to "lowering" / Transcription Error |
| 172 | 25 | "eicosapentaenoic" to "eicosapentaenoate" / Transcription Error |
| 194 | 14 | "Amarin at 2 grams a day and Amarin 101" to "AMR 101 at 2 grams a day and AMR 101" / Transcription Error |
| 194 | 18 | "Amarin 101 is Amarin 101" to "AMR 101 is AMR 101" / Transcription Error |
| 195 | 3-4 | "Amarin 101" to "AMR 101" / Transcription Error |
| 195 | 6 | "Amarin 101" to "AMR 101" / Transcription Error |
| 200 | 4 | "who" to "two" / Transcription Error |
| 200 | 20 | "total unsaturated" to "total and saturated" / Transcription Error |
| 222 | 25 | "eicosapentaenoic" to "eicosapentaenoate" / Transcription Error |
| 227 | 4 | "were not" to "were" / Transcription Error |
| 228 | 20 | "eicosapentaenoic" to "eicosapentaenoate" / Transcription Error |
| 251 | 10 | "Amarin 101" to "AMR 101" / Transcription Error |

```
    (DATE)                        (SIGNATURE)

    3/20/18
```

Case 2:16-cv-02525-MMD-NJK   Document 119-3   Filed 04/17/18   Page 72 of 72
Michael Miller, M.D. Highly Confidential
02/15/2018

272

1                ACKNOWLEDGMENT OF DEPONENT

2            I, Michael Miller, M.D., do hereby

3  acknowledge that I have read and examined the

4  foregoing testimony, and the same is a true,

5  correct and complete transcription of the

6  testimony given by me and any corrections appear

7  on the attached Errata sheet signed by me.

8

9

10

11

3/20/18

                _____        _____

12  (DATE)                        (SIGNATURE)

13

14

15              CERTIFICATE OF NOTARY PUBLIC

16  Sworn and subscribed to before me this

17  _____ day of _____, _____

18

19

20  _____      _____

21  NOTARY PUBLIC          MY COMMISSION EXPIRES

22

23

24

25

**0071**

**0071**