1
2
3

           UNITED STATES DISTRICT COURT
              DISTRICT OF NEVADA
   BEFORE THE HONORABLE NANCY J. KOPPE, MAGISTRATE JUDGE
               ---o0o---

4
5
6
7
8
9
10

Amarin Pharma, Inc., and   :
Amarin Pharmaceuticals    : No. 2:16-cv-2525-MMD-NJK
Ireland Limited,       :
                  :
         Plaintiff,    :
                  : January 14, 2019
      -vs-        :
                  :
Hikma Pharmaceuticals USA,  : United States District Court
Inc., et al.,         : 333 Las Vegas Blvd
                  : Las Vegas, Nevada
        Defendant.
_____:

11
12

            TRANSCRIPT OF MOTIONS HEARING

13

A P P E A R A N C E S:

14
15
16

FOR THE PLAINTIFF:      Christopher N. Sipes
                  Jason D. Smith
                  Michael Kennedy
                  Attorneys at Law

17
18
19
20

FOR THE DEFENDANT:      Constance Huttner
                  Michael Rounds
                  Caroline Sun
                  Wayne Shaffer
                  Alan Clement
                  Eimeric Reig-Plessis
                  Attorneys at Law

**NJK/FTR: 011418@2:06pm**

21
22
23

Proceedings recorded by digital recording, produced by
computer-aided transcript

24
25

Transcribed by:         KATHRYN M. FRENCH, RPR, CCR
                  NEVADA LICENSE NO. 392
                  CALIFORNIA LICENSE NO. 8536

2

05:17:52   1          Las Vegas, Nevada, Monday, January 14, 2019, 2:06 p.m.

05:18:29   2                          ---OoO---

05:19:00   3

05:19:04   4                 THE CLERK:  This is the time set for a motion

05:19:06   5      hearing in the matter of Amarin Pharma, Incorporated, et al

05:19:16   6      versus West-Ward Pharmaceuticals Corporation, et al.  The case

05:20:22   7      number is 2:16-cv-2525-MMD-NJK.

05:20:38   8             Beginning with plaintiff's counsel on the telephone

05:20:43   9      line, please state your name for the record.

05:20:46  10                 MR. SIPES:  This is Christopher Sipes of

05:21:46  11      Covington Burling for Amarin.

05:21:49  12                 THE COURT:  All right.  Good afternoon,

05:21:54  13      Mr. Sipes.

05:21:55  14                 MR. SIPES:  Good afternoon.

05:22:30  15                 MR. KENNEDY:  Michael Kennedy with Covington &

05:22:32  16      Burling for Amarin.

05:22:34  17                 THE COURT:  Good afternoon, Mr. Kennedy.

05:23:15  18                 MR. KENNEDY:  Thank you.

05:23:24  19                 THE WITNESS:  Jason Smith with Santoro Whitmire,

05:24:07  20      also on behalf of Amarin.

05:24:08  21                 THE COURT:  All right.  Good afternoon,

05:24:13  22      Mr. Smith.

05:24:16  23                 MS. HUTTNER:  This is Connie Huttner,

05:24:31  24      representing the defendants, from Budd Larner.

05:25:57  25                 THE COURT:  Good afternoon, Ms. Huttner.

3

| | | |
|---|---|---|
| 05:26:06 | 1 | MS. HUTTNER:  Good afternoon, Your Honor. |
| 05:26:18 | 2 | MS. SUN:  Caroline Sun from Budd Larner, also |
| 05:26:26 | 3 | representing Dr. Reddy's Lab. |
| 05:27:56 | 4 | THE COURT:  Thank you.  Good afternoon, |
| 05:27:59 | 5 | Ms. Sun. |
| 05:28:25 | 6 | MR. ROUNDS:  Michael Rounds from Brownstein |
| 05:28:47 | 7 | Hyatt, Your Honor, representing the Dr. Reddy's defendants. |
| 05:29:02 | 8 | Good afternoon to you. |
| 05:29:04 | 9 | THE COURT:  All right.  Good afternoon, |
| 05:29:09 | 10 | Mr. Rounds. |
| 05:29:49 | 11 | MR. CLEMENT:  Alan Clement from the Law Firm of |
| 05:30:54 | 12 | Locke Lord on behalf of Hikma West-Ward. |
| 05:33:15 | 13 | THE COURT:  Thank you.  Good afternoon, |
| 05:33:18 | 14 | Mr. Clement. |
| 05:33:32 | 15 | MR. REIG-PLESSIS:  Eimeric Reig of Winston & |
| 05:34:35 | 16 | Strong, also for defendants Hikma and West-Ward. |
| 05:36:33 | 17 | THE COURT:  All right.  Good afternoon, |
| 05:36:36 | 18 | Mr. Reig. |
| 05:36:37 | 19 | I think that's everyone. |
| 05:36:40 | 20 | Is that correct? |
| 05:37:03 | 21 | MR. SHAFFER:  One more, Your Honor. |
| 05:37:08 | 22 | THE COURT:  Sorry. |
| 05:37:10 | 23 | MR. SHAFFER:  This is Wayne Shaffer, also on |
| 05:37:23 | 24 | behalf of Hikma, Laxalt & Nomura. |
| 05:38:32 | 25 | THE COURT:  All right.  Mr. Shaffer, good |

4

05:38:35  1    afternoon.  I didn't mean to leave you out.

05:38:38  2         All right.  So, we're here today on two motions:

05:39:00  3    The defendant's Emergency Motion to Modify the Scheduling

05:39:06  4    Order, which is docket number 165; as well as the plaintiff's

05:39:13  5    Motion to Amend the Preliminary Validity Contentions, docket

05:40:00  6    number 168.

05:40:01  7         The Court is aware that the parties wanted to

05:40:11  8    discuss the first motion at this hearing, but, really, they're

05:40:22  9    kind of intertwined with each other, so if the parties want to

05:40:29  10   argue both of them, we can address both of them today.

05:40:37  11        MR. SIPES:  We're happy to do so, Your Honor.

05:40:40  12   This is Christopher Sipes.

05:40:59  13        THE COURT:  All right.  So let's start with the

05:41:04  14   motion to amend preliminary validity contentions.  And,

05:41:14  15   plaintiffs, that's your motion.

05:41:19  16        MR. SIPES:  Your Honor, so what we had flagged

05:41:23  17   in our original validity contentions back in July of 2017, the

05:41:28  18   fact that we would be relying on the results of an ongoing

05:41:33  19   clinical outcome trial, which was the cardiovascular effects

05:41:52  20   of the drug product for Vascepa when is read out.  The product

05:43:26  21   read out this fall and the first publication of the results

05:44:41  22   was on November 10th.  It was announced at the American Heart

05:44:52  23   Association conference in Chicago and published online in

05:45:03  24   the New England Journal of Medicine.  That was after the

05:45:13  25   close of fact discovery, so we then put together supplemental

5

05:45:19  1   contentions and reached out to the defendants on December 7,

05:45:32  2   raising the idea of supplementing at that time and we provided

05:45:36  3   them, three days later, with the proposed supplement to our

05:45:47  4   validity contentions.

05:46:21  5         The parties have known that REDUCE-IT was a part

05:46:42  6   of this case since our contentions, and they deposed one of

05:46:49  7   our 30(b)(6) witnesses, Dr. Ketchum on October 24th on the

05:46:57  8   REDUCE-IT results.  The top line results were announced, as I

05:48:58  9   understand it, the data collection, the database, so to speak,

05:49:08 10   was locked in September, was analyzed.  The topline results

05:49:22 11   were announced by the company in September 24.  That was what

05:49:29 12   they had then.  They were then analyzing the results they

05:49:58 13   were working with, you know, the outside researchers such as

05:53:56 14   (unintelligible).  And the first availability of the full

05:54:17 15   analysis in the New England Journal was November 10, and there

05:54:43 16   had been some follow-on publications that are also referenced

05:55:01 17   in our supplemental contentions.

05:55:05 18         So, we believe we acted diligently.  We flagged in

05:55:17 19   our original contentions.  There's no question defendants were

05:55:32 20   aware of our reliance on REDUCE-IT.  And pretty promptly upon

05:55:55 21   the availability of the full analysis, we moved to supplement.

05:56:00 22   We reached out to defendants to do so.  We met and conferred

05:56:04 23   with them.  We provided them with our supplement.  So, they

05:56:09 24   had notice of our intent to supplement since December 7th.

05:56:28 25   They've had the actual proposed supplement since

05:56:32  1   December 10th.  And as they acknowledge in their own papers,

05:56:38  2   they don't need to respond to this in their expert reports

05:56:43  3   until March 11th in their second round.

05:56:47  4            So, I believe we've been diligent.  We've shown good

05:56:53  5   cause.  REDUCE-IT is plainly relevant to this case.  In fact

05:57:06  6   during litigation, there own expert, you know, in pointing to

05:57:17  7   the claims at issue in the case, which are for, among other

05:57:36  8   things, to various affects on lipid parameters, said wall.

06:06:42  9   For lipid parameters, you need the outcome evidence.  Well,

06:06:50  10  now, we have the outcome evidence, so we see this as plainly

06:06:59  11  relevant, important to the case, and we've done everything we

06:07:05  12  can to be diligent.

06:07:11  13           THE COURT:  All right.

06:07:47  14           Defendants, whomever is --

06:07:52  15           MS. HUTTNER:  Yes.  It's Connie Huttner, Your

06:07:59  16  Honor.

06:07:59  17           THE COURT:  All right.

06:08:00  18           MS. HUTTNER:  Let me, let me first address

06:08:19  19  the motion to supplement.  This study -- and just so you

06:08:26  20  understand, this is a multi-year study involving -- I think

06:08:46  21  it went on for seven years, involving thousands of patients.

06:08:52  22  And it's been ongoing, I think, since 2011 or 2012.  So, yes,

06:09:04  23  they did put a placeholder in their, their original validity

06:09:24  24  contentions, but the topline results of the study is of, uh --

06:10:12  25  plaintiff's counsel conceded, were announced in September --

06:10:34 1    they were actually learned by the company, according to what

06:10:40 2    counsel has told us, in mid September.  We did attempt to

06:10:45 3    depose their 30(b)(6) designee on the results of the study.

06:10:51 4    We were told that the study had not been analyzed yet.  And

06:10:57 5    I understand that, at that point in time, the statistical

06:11:11 6    analysis of the study results was ongoing.

06:11:28 7          They prepared an article for the New England Journal

06:11:33 8    of Medicine, which was published on November 10th, but which

06:11:37 9    had to, under the publication rules of that journal, had to

06:11:45 10   have been submitted to them, probably, but late September or

06:11:52 11   the first week in November at the latest.  They could have a

06:12:29 12   process of a topline results and produce the data in September

06:12:35 13   prior to the close of discovery.  They did not do that.

06:12:41 14         Similarly, they did not elect to provide us with

06:12:44 15   any data or any New England Journal of Medicine article, or

06:12:58 16   inform us that that article was going to be published until,

06:13:03 17   uh, you know, we were contacted on December 7th, to see if we

06:13:11 18   would consent to the supplementation.  I believe the journal

06:13:54 19   article, as it was published, was originally only available

06:14:07 20   to subscribers of the journal.  So it's not something, uh,

06:14:13 21   that necessarily came to our attention.

06:14:15 22         In any event, Your Honor, the New England Journal of

06:14:58 23   Medicine article only includes a small subset of data from the

06:15:03 24   study.  We had been told by plaintiff's counsel that the final

06:15:38 25   study report, which will contain information that our experts

06:15:56   1   tell us they need to analyze, will study and determine whether

06:16:01   2   it shows what it purports to show, will not be available

06:16:07   3   until, according to what they told us, the end of the first

06:16:10   4   quarter of this year; so, the end of March.  And under the

06:16:16   5   current schedule that we have, that would mean not only would

06:16:26   6   we not see what they were prior submitting in their opening

06:16:52   7   expert reports, but we would not see a final studying report

06:17:03   8   prior to submitting our response to the expert reports, which

06:17:21   9   is when, you know, they're saying that we need to deal with

06:17:26  10   this data.

06:17:27  11        So, you know, what we're asking for here, Your

06:17:30  12   Honor, is, really, fundamental fairness.  They took almost two

06:17:36  13   months to analyze the data to determine whether or not they

06:17:39  14   even wanted to rely on it.  It seems to us that we ought to be

06:17:44  15   getting at least equal time to analyze the data on the other

06:17:49  16   side, particularly since we don't have access, as they do, to

06:17:54  17   investigators who were involved in this study.  And one of

06:18:01  18   their experts was one of the principal investigators in this

06:18:13  19   study.

06:18:14  20        So, our experts are going to need a chance to

06:18:19  21   analyze the data.  And in order to do that, they need either

06:18:24  22   the data itself, or a copy of the final study report; or, if

06:18:43  23   there's a reasonably complete draft, you know, that could be

06:19:05  24   provided along the way.  But without that, you know, we're

06:19:15  25   pretty much just shooting in the dark because, as I said, the

06:19:25  1   <u>New England Journal of Medicine</u> article contains a small

06:20:02  2   subset.  It does not contain all of the analyses that I

06:20:07  3   understand that they're planning to include in the final

06:20:12  4   study report, or even some of the analyses that they've done

06:20:21  5   since the publication date of <u>New England Journal of Medicine</u>

06:20:40  6   article.  And not ought we to get that material, Your Honor,

06:21:15  7   but we ought to be able to depose someone, you know, to make

06:21:19  8   sure that we have a complete understanding of what's been

06:21:22  9   produced, just as we would have done, had they provided this

06:21:35  10  information during the discovery period.

06:21:38  11        We took discovery on all of the so-called objective

06:21:48  12  evidence, obviously, that they identified.  As I said, we did

06:22:26  13  try to take discovery on the REDUCE-IT study as well, but we

06:23:04  14  were frustrated and weren't able to do that because the study

06:23:20  15  results weren't yet available.  So that's what we're asking

06:23:31  16  for.

06:23:31  17        I don't believe they were diligent in amending their

06:23:37  18  contentions.  As we pointed out in our responsive brief, you

06:23:54  19  know, they had issued, I think, a total of eight patents.

06:24:12  20  The results of the REDUCE-IT study, those patents were filed

06:24:16  21  and prosecuted and issued before the study was complete, so,

06:24:32  22  obviously, we anticipated what the results of the study would

06:24:49  23  be.  They could have included a similar disclosure in their

06:24:52  24  original validity contentions.  They can amend it at anytime

06:25:34  25  since filing the validity contentions to include what they

06:25:38  1    anticipated what those results would be, based on whatever

06:25:56  2    (unintelligible) issue that they had during the study.

06:26:07  3            Now, obviously, that was a situation to enable them

06:26:50  4    apply for patents.  They could have, they could have apprised

06:27:01  5    us of that and give us a chance to take discovery on that.

06:27:05  6    And, they could have provided us with the results as they

06:27:14  7    obtained them.  But now where we are, and, you know, we're

06:27:29  8    being asked to -- in fact, you know, for them to have an

06:28:00  9    (unintelligible), you know they can take two months to analyze

06:28:39  10   the study and results to see if it benefits their side, but

06:28:59  11   they don't want to give us any time or change the current

06:29:06  12   schedule to allow us, you know, to look at it from the

06:29:11  13   defense's point of view.

06:29:14  14           The only prejudice that they've identified is the

06:29:18  15   possibility that the Court will not be able to decide this

06:29:21  16   case prior to the expiration of there's an automatic

06:29:45  17   (unintelligible) stay here that expires in January of 2020.

06:30:02  18   I'm -- you know, I would submit two things, Your Honor.  One,

06:30:13  19   under the current schedule, summary judgment motions are due

06:30:19  20   in June.  And to the extent that summary judgment motions

06:30:31  21   are filed, the Court's schedule indicates that no trial date

06:30:37  22   will be set until after the Court decides those motions and,

06:30:44  23   obviously, you know, there's no guarantee that the Court will

06:30:48  24   decide those motions prior to January; or, even if it does,

06:31:50  25   that it will be able to set trial and then decide the case

| | | |
|---|---|---|
| 06:31:54 | 1 | prior to January, even if there were no change in the |
| 06:31:57 | 2 | schedule.  Neither defendant has an FDA approval at this |
| 06:32:03 | 3 | point.  You know, there's nothing -- I mean, it's completely |
| 06:32:37 | 4 | speculative at this point as to what impact, if any, you know, |
| 06:32:48 | 5 | extending the trial out a brief two months would, as far as |
| 06:32:54 | 6 | setting -- extending the schedule by two months would have any |
| 06:33:06 | 7 | impact.  And, you know, I don't think that's enough prejudice |
| 06:33:11 | 8 | to basically say you're not entitled to the time to look at |
| 06:33:17 | 9 | this data and analyze it with their experts and take |
| 06:33:20 | 10 | discovery. |
| 06:33:29 | 11 | THE COURT:  All right. |
| 06:33:32 | 12 | All right.  And regarding that motion to extend the |
| 06:33:38 | 13 | discovery deadlines, what is the plaintiff's position? |
| 06:33:42 | 14 | MR. SIPES:  Yes, Your Honor.  This is |
| 06:33:44 | 15 | Christopher Sipes again. |
| 06:33:46 | 16 | So, there's two points.  One is the delay and then |
| 06:33:50 | 17 | the other is the information they want.  Let me start with the |
| 06:34:00 | 18 | information, uh, they want, and then we can talk about the |
| 06:34:06 | 19 | delay. |
| 06:34:09 | 20 | (Unintelligible) one, there is an acknowledgement |
| 06:34:43 | 21 | that they say themselves when they deposed Dr. Ketchum |
| 06:34:55 | 22 | October 24th, the analysis was not even then complete.  So, |
| 06:35:20 | 23 | clearly, the REDUCE-IT results were not available until very |
| 06:35:32 | 24 | close to November 10th publication date. |
| 06:35:46 | 25 | In terms of the data, they have the publication, |

06:35:53   1   meaning journal publication.  We've, in addition, offered

06:36:14   2   them the near final draft of the body of the clinical study

06:36:29   3   report, which is the data and analysis being submitted, as I

06:36:35   4   understand it, to FDA when its ultimately submitted to FDA,

06:37:17   5   when the agency reopens, but also when all the final data is

06:37:22   6   applied.  And we've offered to give them that by the end of

06:37:27   7   the month.

06:37:29   8        What they seem to now be asking is not even for

06:37:34   9   that, but for all of the individual patient data, which they

06:37:42   10   even disclaimed originally that in their papers.  They said

06:38:02   11   they would be fine with summaries or tabular data; that is,

06:38:30   12   which should be the body of the report.  So, it would be

06:38:41   13   unbelievably burdensome.  This is a more than 8,000 patient

06:39:07   14   study over five years, so the database of individual patient

06:39:28   15   data is enormous.  And as you can imagine, there are a lot

06:39:47   16   of issues with individual patient data, making it part of

06:39:51   17   litigation.  We don't understand in their papers that they're

06:40:05   18   continuing to ask for that because they said themselves in

06:40:14   19   their reply paper, uh, Document 173, that they would be fine

06:40:20   20   with summaries or tabular data.  So the body of the clinical

06:40:26   21   study report, a draft that's available, then should satisfy

06:40:46   22   any need for additional data.

06:40:49   23        I should point out here, Your Honor, that in general

06:40:59   24   in these patent cases, people rely on publications.  And here,

06:41:04   25   we're talking about the New England Journal of Medicine, which

06:41:17  1   is, clearly, a reliable publication.  You know, they're

06:41:29  2   relying on lots of clinical trials where they just rely on

06:41:37  3   the publication.  They're not providing underlying study

06:41:42  4   data; for example, what the JELIS study did.  And it would be

06:42:22  5   unbelievably burdensome to give them the database as enormous

06:43:04  6   as the REDUCE-IT database.

06:43:13  7         And so in terms of the data and analysis that goes

06:43:22  8   beyond the New England Journal, we can give them the draft of

06:44:50  9   the clinical study report by the end of the month.

06:44:54  10         In terms of -- we've tried to meet and confer --

06:45:07  11   your colleagues have cut that off -- to work out something,

06:45:12  12   including potentially giving them extra time, but then this is

06:45:33  13   not a case where it's going to be disposed upon dispositive

06:45:39  14   motions.  It's a bench trial case.  We can respond to the

06:46:05  15   delay that they're asking for by, at the back-end, you know,

06:46:10  16   not having dispositive motions.  The problem is, as they push

06:46:16  17   it further and further back, all the risk is on our side

06:46:21  18   because the stay on approval is in January of next year, 2020,

06:46:37  19   and we need to get the case tried before then, you know,

06:46:44  20   resolved before then, so that we can vindicate our patent

06:48:14  21   rights before they can get final approval and potentially

06:48:18  22   launch their product in derogation of our patent rights.  We

06:48:34  23   feel that they're asking for delay when they don't need it and

06:48:42  24   the risk is all on our side.  And they've acknowledged --

06:48:56  25   their response on the REDUCE-IT is in the second line reports.

| | | |
|---|---|---|
| 06:49:08 | 1 | Even now, that's not due until March 11th. |
| 06:49:13 | 2 | So, yeah, we'll give them the clinical study report |
| 06:49:24 | 3 | by at the end of the month and they'll have, you know, a |
| 06:49:27 | 4 | month-and-a-half to analyze that for their second round |
| 06:49:32 | 5 | reports. |
| 06:49:37 | 6 | MS. HUTTNER:  Your Honor, if I may -- |
| 06:49:40 | 7 | THE COURT:  Yes. |
| 06:49:42 | 8 | MS. HUTTNER:  -- respond briefly. |
| 06:49:44 | 9 | THE COURT:  You may. |
| 06:49:50 | 10 | MS. HUTTNER:  The offer to provide a near final |
| 06:49:55 | 11 | draft, as Mr. Sipes put it, of the final study report was |
| 06:50:12 | 12 | contingent on us agreeing to drop any right to move for |
| 06:50:17 | 13 | summary judgment on the current schedule.  So, you know, |
| 06:50:23 | 14 | from our perspective, that was a non-offer.  And the reason |
| 06:51:08 | 15 | why it was a non-offer, from our perspective, is because |
| 06:51:12 | 16 | there are, right now, a considerable number of claims that |
| 06:51:22 | 17 | are being asserted by plaintiffs, but we do not believe that |
| 06:51:38 | 18 | we infringed, and that those can be resolved on motion.  It |
| 06:51:59 | 19 | may be that plaintiffs drop some of those claims, or drop all |
| 06:52:06 | 20 | of those claims.  I don't know what they're going to do.  But |
| 06:52:16 | 21 | at the present time, it would be, you know, irresponsible for |
| 06:52:28 | 22 | us to agree to give up the right to move for summary judgment, |
| 06:54:49 | 23 | and certainly not as a condition of getting discovery that we |
| 06:54:53 | 24 | should get as a matter of course.  So, you know, that's where |
| 06:54:58 | 25 | that went. |

06:55:00    1          Mr. Sipes seems to be suggesting that he's willing
06:55:12    2   to give it to us now and we would be happy to have whatever
06:55:27    3   they want to produce as soon as they can produce it, but the
06:55:49    4   point is that, you know, we need an opportunity to analyze
06:56:01    5   what's written.
06:56:02    6          As far as the study data itself, I'm not sure why,
06:56:21    7   you know, this is being perpetuated here.  We've made it very
06:56:28    8   clear we have no interest in patient HIPAA nor HIPAA sensitive
06:57:07    9   data.  We don't care about the identity of the patients.
06:57:18   10   We're more than happy to work with them to try to narrow our
06:57:24   11   request, but we've been unable to get from them even an index
06:57:31   12   to what they anticipate having in what they call appendices to
06:57:49   13   the study, which is, you know, where the actual data is going
06:57:58   14   to be lodged, I gathered.  But, we don't even have a list of
06:58:08   15   what they claim to include to be able to say, you know, we
06:58:19   16   need this or we want this or we don't want that or to work
06:58:24   17   with them.  You know, we've also told them we're happy to
06:58:38   18   work with them, you know, to obtain information in tabular
06:58:47   19   format because, frankly, we have no interest in getting a
06:58:55   20   morass of data that, um, you know, is difficult and expensive
06:59:10   21   to analyze.  So for farther down the road, you know,
06:59:46   22   they're doing an analysis that they're doing anyway to
07:00:42   23   (unintelligible) for us, which is why we would like to get
07:00:50   24   a copy of the final study report before we have to respond to
07:00:55   25   whatever it is they're going to say about the REDUCE-IT study.

-16-

| | |
|---|---|
| 07:01:12 | 1 |
| 07:01:23 | 2 |
| 07:01:33 | 3 |
| 07:01:40 | 4 |
| 07:01:48 | 5 |
| 07:02:12 | 6 |
| 07:02:42 | 7 |
| 07:02:54 | 8 |
| 07:03:00 | 9 |
| 07:03:12 | 10 |
| 07:03:37 | 11 |
| 07:03:53 | 12 |
| 07:04:06 | 13 |
| 07:04:25 | 14 |
| 07:04:29 | 15 |
| 07:04:48 | 16 |
| 07:04:53 | 17 |
| 07:04:58 | 18 |
| 07:05:13 | 19 |
| 07:05:50 | 20 |
| 07:06:08 | 21 |
| 07:06:28 | 22 |
| 07:06:32 | 23 |
| 07:06:36 | 24 |
| 07:06:47 | 25 |

1    So, you know, that's really, you know, what's
2 critical here.  I mean, I -- they say that all the risk is on
3 them, I'm not even sure what that means.  I mean, we cannot
4 launch without getting FDA approval.  We don't have FDA
5 approval.  They will, you know, undoubtedly, win on the FDA
6 approval, you know, when and if we even get it, at whatever
7 point that is.  They'll have ample opportunity, if we're not
8 able to work something out, they'll have ample opportunity,
9 you know, to move for injunctive relief, if need be, which
10 it may never be needed because timing of (unintelligible)
11 timing here is uncertain.  The timing of the judge's review
12 of summary judgment motions, assuming they're filed, is
13 uncertain.  And the timing of any trial date, even if the
14 judge resolves the summary judgment motions is uncertain.
15 And I think, you know, with the current schedule, I think the
16 odds are probably against the judge deciding summary judgment
17 motions, scheduling the trial, and deciding the trial before
18 the, you know, the 30-month stay expires in January.  But
19 I don't want to leave you with the impression that once the
20 30-month stay expires, that we're, you know, that we're on the
21 market, you know, immediately.  I mean, they'll be -- this
22 will all get sorted out as, you know, we get closer to that
23 point in time, both in terms of whether there's going to be
24 summary judgment motions, what the Court's schedule is, and,
25 you know, what the regulatory time frame is.

07:06:51  1          So, you know, there's no risk to them here.  You

07:06:54  2   know, I don't, I don't really see -- I mean, normally, the

07:07:40  3   brand is the one that wants to extend things out as long as

07:07:44  4   possible and, certainly, there have been many instances in the

07:08:00  5   past where cases have been decided after the 30-month stay had

07:08:05  6   ended, whether by agreement or because there was a regulatory

07:08:18  7   approval or otherwise.  And so there's nothing unusual or

07:08:26  8   surprising there.

07:08:30  9               THE COURT:  All right.

07:08:31 10               MR. SIPES:  Your Honor, if I could just briefly.

07:08:40 11   This is Christopher Sipes.

07:08:45 12               THE COURT:  All right.

07:08:47 13               MR. SIPES:  To be -- one, I'm not entirely sure

07:08:57 14   now what data they're asking for, you know, whether they're

07:09:02 15   fine with, you know, the summaries that are in the draft

07:09:19 16   clinical study report, or whether they want individual patient

07:09:27 17   data, which is more than 8,000 patients over five years is an

07:09:39 18   enormous database.  So, that, I just don't understand.  If

07:09:49 19   they're willing to have the summaries, then I think the draft

07:09:59 20   clinical study report should be fine.

07:10:16 21          In terms of timing, it's true that there are cases

07:10:20 22   that go on beyond the 30-month stay.  In my experience, when

07:10:25 23   that happens, the defendants agree not to launch without

07:10:35 24   30 days notice, so that there's an opportunity for a

07:10:39 25   preliminary injunction practice.  What is otherwise being

—18—

07:10:47  1    suggested is that we're at risk with having to come in with a

07:10:59  2    TRO if they suddenly get final approval.  We don't think

07:11:09  3    that's fair to us.  We don't think that's fair to the Court.

07:11:15  4    And we should have an opportunity to have an orderly process

07:11:19  5    if the delay here means we're going to go beyond the 30-month

07:11:25  6    stay.

07:11:32  7              MS. HUTTNER:  And, Your Honor, I think that

07:11:34  8    that's a discussion that we can have down the road.  But, at

07:11:40  9    the moment, you know, they have no guarantee that the case is

07:11:52  10   going to get decided before the 30-month stay ends anyway.

07:11:57  11   So, you know, as we get closer to that, to January 2020, when

07:12:04  12   the stay expires, we can have all those discussions, if

07:12:14  13   they're appropriate, at that time.  But, right now, I think

07:12:28  14   the issue is whether they're going to suffer some sort of

07:12:36  15   prejudice if they schedule these out two months in order to

07:12:53  16   give the time to review, you know, the final study results

07:13:14  17   before we have to comment on them.  You know, you're asking

07:13:21  18   experts to put in an opinion, you know, whose professional

07:13:30  19   opinion analyzing that study, and I don't think it's

07:13:34  20   appropriate to do that with incomplete data.  I reiterate

07:13:46  21   again we're not looking for individual patient data, or would

07:13:54  22   be -- you know, we had a long discussion.  There was a call

07:14:05  23   that we had to try to resolve this.  I don't remember if it

07:14:12  24   was last week or the week before.  But, you know, we had a

07:14:22  25   discussion at great length at that time trying to narrow

07:14:29  1  down -- you know, we explained to them what we were interested

07:14:40  2  in and, uh, I don't know whether the draft that they're

07:14:45  3  talking about includes that or not, but it's something that

07:14:48  4  they were going to check on.  And the response was, you know,

07:14:56  5  that they sent back was equivocal as to what's going to be in

07:15:10  6  the final study report.

07:15:13  7          So, you know, I'm happy to have a dialogue with

07:15:17  8  them, you know, to try to narrow what we want.  We're not

07:15:25  9  interested in getting a lot of data that would take us, you

07:15:29  10  know, a lot of time and money to analyze.  You know, so, you

07:15:36  11  know, this is not a situation -- we're not looking, certainly

07:15:53  12  not looking to invade anybody's HIPAA privacy.  You know,

07:16:05  13  we're not looking to get personal data.  We're not looking to

07:16:10  14  violate HIPAA here.  We're just looking for the data that our

07:16:15  15  experts are telling us that they need to analyze whether the

07:16:21  16  results of the study in fact purport to show what they say it

07:16:28  17  shows, and to analyze the nexus issue, uh, which, you know, as

07:16:44  18  we explained in our reply brief, you know, we think that

07:16:52  19  doesn't exist here.  But, you know, that's really -- this, I

07:16:57  20  think is a Red Herring that we're looking for individual

07:17:07  21  patient data.  We're not.

07:17:09  22          THE COURT:  All right.

07:17:11  23          All right.  The Court finds that -- I'm going to

07:17:19  24  start with the later motion, the Motion to Amend the Validity

07:17:24  25  Contentions.  It's docket number 168.  The Court finds that

| | | |
|---|---|---|
| 07:17:43 | 1 | the plaintiffs have been diligent and that there is good cause |
| 07:17:49 | 2 | to amend those validity contention, so the Court is going to |
| 07:17:54 | 3 | grant that motion. |
| 07:18:08 | 4 | The Court also finds, however, that granting that |
| 07:18:14 | 5 | motion without providing an extension of the discovery |
| 07:18:20 | 6 | deadlines to defendants would be prejudicial to the |
| 07:18:27 | 7 | defendants.  So, the Court is going to grant the Motion to |
| 07:18:31 | 8 | Modify the Scheduling Order at docket number 165, and is |
| 07:18:39 | 9 | going to -- there are proposed modification dates set forth |
| 07:18:46 | 10 | on page 6 of that motion.  The Court is going to order that |
| 07:20:09 | 11 | those are the new deadlines. |
| 07:20:12 | 12 | Regarding the information about the patient data, |
| 07:20:18 | 13 | whether it's summaries or what the discovery should be, first |
| 07:20:26 | 14 | of all, that's not really briefed before the Court at this |
| 07:20:34 | 15 | point.  And secondly, it sounds as if the parties are, |
| 07:20:42 | 16 | essentially, if not on the same page, very close to the same |
| 07:20:47 | 17 | page regarding that information.  So, the Court is going to |
| 07:20:52 | 18 | defer ruling on that issue at this time.  If the parties, of |
| 07:20:59 | 19 | course, cannot agree, after meeting and conferring about this |
| 07:21:03 | 20 | issue, then either or both of the parties can bring that issue |
| 07:21:09 | 21 | before the Court. |
| 07:21:11 | 22 | Is there anything else on this -- oh, the second |
| 07:21:17 | 23 | motion was docket number 165. |
| 07:21:24 | 24 | Is there any -- |
| 07:21:27 | 25 | MR. CLEMENT:  Your Honor, Alan Clement on behalf |

07:21:30  1    of West-Ward Hikma.

07:21:39  2                    THE COURT:  Yes.

07:21:40  3                    MR. CLEMENT:  Just taking in conjunction with --

07:22:42  4    when we set those dates out there, we were also asking for one

07:22:52  5    7-hour deposition or, you know, depo or less, should we now

07:23:12  6    need it, to take a deposition limited to the new information

07:23:16  7    that plaintiffs provide.

07:23:19  8                    THE COURT:  Right.  That request is granted as

07:23:21  9    well.

07:23:23  10                    MR. CLEMENT:  Great.  Thank you, Your Honor.

07:23:25  11                    THE COURT:  All right.  Is there anything else

07:23:27  12   on either of these matters.

07:23:30  13                    MS. HUTTNER:  Not from defendants, Your Honor.

07:23:32  14                    MR. SIPES:  No, Your Honor.

07:23:33  15                    THE COURT:  All right.  Thank you, everyone.

07:23:36  16                    MS. HUTTNER:  Thank you.

07:23:39  17                    MR. SIPES:  Yes.

          18

          19                    (Court Adjourned.)

          20

          21

          22

          23

          24

          25

1                                    -o0o-

2

3          I certify that the foregoing is a correct
           transcript from the record of proceedings
4          in the above-entitled matter.

5     \s\ Kathryn M. French                January 16, 2019
      _____    _____
6
           KATHRYN M. FRENCH, RPR, CCR              DATE
7          Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25