# EXHIBIT 1

Excerpts from the Deposition of
Jay W. Heinecke, M.D.
Dated July 17, 2019

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

_____

AMARIN PHARMA, INC., et al.,          )
                                      )
                                      )
                                      )
            Plaintiffs,               )  Case No.:
                                      )  2:16-cv-02525-MMD-NJK
              vs.                     )
                                      )  Consolidated with:
                                      )  2:16-cv-02562-MMD-NJK
HIKMA PHARMACEUTICALS USA INC.,       )
et al.,                               )
                                      )
                                      )
                                      )
            Defendants.               )
_____)


VIDEOTAPED DEPOSITION OF

JAY W. HEINECKE, M.D.

San Francisco, California

Wednesday, July 17, 2019


Reported by Stenographer
MARY J. GOFF
CSR No. 13427
Job No. 162979

Page 2

         Videotaped Deposition of
JAY W. HEINECKE, M.D., Volume I, taken on behalf of
Plaintiffs, at Winston & Strawn LLP, 101 California
Street, San Francisco, California 94111, beginning
at 8:04 a.m. and ending at 4:12 p.m., on July 17,
2019, before MARY J. GOFF, California
Certified Shorthand Reporter No. 13427.

Page 3

APPEARANCES:

For Plaintiffs
  COVINGTON & BURLING
  BY:  CHRISTOPHER SIPES, ESQ.
       ERIC SONNENSCHEIN, ESQ.
  One City Center
  850 Tenth Street, NW
  Washington, DC 20001

For Defendants
  Winston & Strawn
  BY:  EIMERIC REIG-PLESSIS, ESQ.
  101 California Street
  San Francisco, California 94111

Page 4

APPEARANCES CONTINUED:

For Dr. Reddy's Laboratories Defendants
  Windells Marx Lane & Mittendorf
  BY:  CONSTANCE HUTTNER, ESQ.
  Attorney at Law
  One Giralda Farms
  Madison, New Jersey 07940
  (appeared via phone)

ALSO PRESENT:  Joseph T. Kennedy, Amarin EVP, GC
Videographer:
  Marcus Majers

Page 5

                INDEX
WITNESS                         EXAMINATION
JAY W. HEINECKE, M.D.
Volume I

     BY MR. SIPES              9
     BY MR. REIG-PLESSIS       --


NUMBER        DESCRIPTION              PAGE
Exhibit 1  Opening Expert Report of Jay W.    12
           Heinecke, M.D. on Invalidity of the
           Asserted Claims of the Patents-in-Suit

Exhibit 2  Rebuttal Expert Report of Jay W.   12
           Heinecke, M.D. on Invalidity of the
           Asserted Claims of the Patents-in-Suit

Exhibit 3  Reply Report of Jay W. Heinecke, M.D. 12
           on Invalidity of the
           Asserted Claims of the Patents-in-Suit

Exhibit 4  Application No. 21-656             48
           Approved Labeling
           AMRN-PEXP-0001915-932

Exhibit 5  PDR, 62 Edition, 2008              113
           AMRN00290591-94

Page 6

| | | |
|---|---|---|
| 1 | EXHIBITS CONTINUED: | PAGE |
| 2 | Exhibit 6  NIASPAN niacin extended-release tablets | 115 |
| 3 | AMRN-PEXP-0001692-712 | |
| 5 | Exhibit 7  Atherosclerosis, 26 (1977)603-609 | 122 |
| | AMRN-PEXP-0008180-186 | |
| 6 | Lars Carson article, On the Rise... | |
| 8 | Exhibit 8  Article from the Journal of Clinical Lipidology, Pilot Study... | 134 |
| 9 | AMRN00621043-49 | |
| 11 | Exhibit 9  Regulator Rebuffs Merck's Cholesterol Drug article | 160 |
| 12 | Peter Mitchell 28 May | |
| | AMRN-PEXP-0009429-431 | |
| 14 | Exhibit 10 Tredaptive, Pelzont, and Trevaclyn suspended across the UE | 171 |
| 15 | AMRN-PEXP-0009110-112 | |
| 16 | Exhibit 11 When Good Cholesterol Turns Bad | 185 |
| | Oram and Heinecke | |
| 18 | Exhibit 12 Purified eicosapentaenoic and docosahexaenoic acids... | 215 |
| 19 | ICOSAPENT-DFNDTS00006520-29 | |
| 20 | Exhibit 13 A Review of Omega-3 Ethyl Esters for Cardiovascular Prevention and | 236 |
| 21 | Treatment of Increased Blood Triglyceride Levels by | |
| 22 | Clemens von Schacky | |

Page 7

| | | |
|---|---|---|
| 1 | EXHIBITS CONTINUED: | PAGE |
| 2 | Exhibit 14 Current Therapeutic Research Clinical and Experimental, Vol 56 | 242 |
| 3 | No. 1, 1995 | |
| | ICOSAPENT_DFNDTS00006159-68 | |
| 5 | Exhibit 15 Eicosapentaenoic Acid Effect on Hyperlipidemia in Menopausal | 263 |
| 6 | Japanese Women by Kurabayashi, et al. | |
| | ICOSAPENT_DFNDTS00006237-44 | |
| 8 | Exhibit 16 US Patent 8,293,728 | 276 |
| | AMRN-PEXP-000000122 | |
| 10 | Exhibit 17 Methods of Treating and/or Preventing Cardiovascular Diseases | 288 |
| 11 | and Disorder | |
| 12 | Exhibit 18 Effects of Eicosapentaenoic Acid on Major Coronary Events in | 304 |
| 13 | Hypercholesterolaemic Patients (JELIS) Yokoyama, et al. | |
| 14 | AMRN03151311-319 | |
| 15 | Exhibit 19 Epadel Capsules 300, Approval | 316 |
| | ICOSAPENT_DFNTS00008961-69 | |
| 17 | Exhibit 20 Publication No. WO 2008/004900 A1 | 329 |
| | ICOSAPENT_DFNTS00007108-150 | |

Page 8

```
 1          San Francisco, California      10:20
 2          July 17, 2019                  10:20
 3             8:04 a.m.                   10:20
 4                                         10:20
 5        THE VIDEOGRAPHER:  Good morning.  This is    08:02
 6   the start of media labeled No. 1 of the video    08:02
 7   recorded deposition of Dr. Jay W. Heinecke, in the    08:02
 8   matter of Amarin Pharma, Inc., et al, versus Hikma    08:03
 9   Pharmaceuticals USA Inc., et al., in the United    08:03
10   States District Court, District of Nevada,    08:03
11   Case No.: 2:16-cv-02525-MMD-NJK; Consolidated    08:03
12   with: 2:16-cv-02562-MMD-NJK.    08:03
13        This deposition is being held at Winston &    08:03
14   Strawn, 101 California Street, San Francisco,    08:03
15   California, on July 17, 2019, at approximately    08:03
16   8:04 a.m.    08:03
17        My name is Marcus Majers.  I'm the legal    08:03
18   video specialist from TSG Reporting, Inc.,    08:03
19   headquartered at 747 Third Avenue, New York,    08:03
20   New York.  The court reporter is Mary Goff, in    08:03
21   association with TSG Reporting.    08:03
22        Will all counsel present please introduce    08:04
23   themselves.    08:04
24        MR. SIPES:  Christopher Sipes of Covington    08:04
25   & Burling LLP, on behalf of the Plaintiff.    08:04
```

Page 9

```
 1   With me is my colleague, Eric    08:04
 2   Sonnenschein; and Joe Kennedy of Amarin    08:04
 3   Pharmaceuticals.    08:04
 4        MR. REIG-PLESSIS:  I'm Eimeric Reig of    08:04
 5   Winston & Strawn, on behalf of the Hikma Defendants    08:04
 6   and the witness.    08:04
 7        THE VIDEOGRAPHER:  And has anyone joined    08:04
 8   on the phone yet?    08:04
 9        MR. REIG-PLESSIS:  I don't think so.    08:04
10        MR. SIPES:  Okay.  Great.    08:04
11        JAY W. HEINECKE, M.D.,    08:04
12   being first duly sworn or affirmed to testify to the    08:04
13   truth, the whole truth, and nothing but the truth,    08:04
14   was examined and testified as follows:    08:04
15              EXAMINATION    08:04
16   BY MR. SIPES:    08:04
17   Q   Good morning.  Thank you for coming in    08:04
18   this morning.    08:04
19        Could you please state your name and spell    08:04
20   it for the record?    08:04
21   A   Yes.  My name is Jay Walter Heinecke,    08:04
22   H E I N E C K E; J A Y; Walter, W A L T E R.    08:04
23   Q   And where do you reside?    08:04
24   A   I reside in Seattle, Washington.    08:04
25   Q   And you are currently employed?    08:04
```

Page 10

1    A  I'm currently provide by the University of    08:04
2  Washington.                                         08:04
3    Q  And what is your work address?                 08:04
4    A  My work address would be the University of    08:05
5  Washington, 850 Republican Street, Seattle 98109.   08:05
6    Q  Okay.  Have you been deposed before?           08:05
7    A  I have never been deposed as an expert        08:05
8  witness.                                            08:05
9    Q  You have been deposed as a fact witness?       08:05
10   A  As a what?                                     08:05
11   Q  Have you been deposed as a fact witness?       08:05
12 Have you ever been deposed in any capacity?         08:05
13   A  I have.                                        08:05
14   Q  Okay.  How many times?                         08:05
15   A  One time.                                      08:05
16   Q  Okay.  I will go through the rules.  I         08:05
17 suspect you -- you know them, having been through   08:05
18 it.                                                 08:05
19      But first, you understand that you are         08:05
20 under oath today and are required to answer my      08:05
21 questions truthfully?                               08:05
22   A  Yes.                                           08:05
23   Q  If you don't understand a question, please    08:05
24 let me know and I will attempt to clarify it.       08:05
25 Otherwise, I will assume that you understood it; is 08:05

Page 11

1  that fair?                                          08:05
2    A  Yes.                                           08:05
3    Q  This is not an endurance test.  If at some    08:05
4  time you need a break, let me know and we'll try to 08:05
5  endeavor to find a good breaking point for you.     08:05
6    A  Okay.                                          08:05
7    Q  You understand that the court reporter is     08:05
8  taking down a transcript, so you'll need to answer  08:05
9  audibly with verbal responses?                      08:05
10   A  I do.                                          08:06
11   Q  Also, you -- your counsel may from time to    08:06
12 time object, but you'll need to answer the          08:06
13 questions, if you understand them, unless you're    08:06
14 instructed not to answer by counsel.                08:06
15      Do you understand?                             08:06
16   A  I understand.                                  08:06
17   Q  Is there any reason why you cannot give       08:06
18 complete and truthful testimony today?              08:06
19   A  No, not that I'm aware after.                  08:06
20   Q  Okay.  And as far as you're -- you don't      08:06
21 have any medical condition or medications that might 08:06
22 interfere with your ability to answer truthfully?   08:06
23   A  No.                                            08:06
24   Q  Let me hand to you three documents that       08:06
25 have been marked as Exhibits 1, 2, and 3 in the     08:06

Page 12

1  case.                                               08:06
2       (Exhibit 1 was marked for identification      08:06
3  and is attached to the transcript.)                 08:06
4       (Exhibit 2 was marked for identification      08:06
5  and is attached to the transcript.)                 08:06
6       (Exhibit 3 was marked for identification      08:06
7  and is attached to the transcript.)                 08:06
8    A  Okay.                                          08:06
9    Q  (BY MR. SIPES) Do you recognize               08:06
10 Exhibits 1, 2, and 3 as the reports that you        08:06
11 prepared in this case?  Since you have Exhibit 1 in 08:06
12 your hands, if you would turn to page 241 of        08:07
13 Exhibit 1, if you're looking for your signature.    08:07
14   A  Thank you.                                     08:07
15   Q  That -- that is your signature --             08:07
16   A  Yes --                                         08:07
17   Q  -- on page 241 of Exhibit 1?                   08:07
18   A  -- that's my signature on --                   08:07
19   Q  And you -- why don't we deal with             08:07
20 Exhibit 1.                                          08:07
21   A  You --                                         08:07
22   Q  You have got it in front of you.               08:07
23   A  Yeah.  Yeah.                                   08:07
24      Do I need to look at the signatures on the    08:07
25 other ones as well?                                 08:07

Page 13

1    Q  We can go through them one at a time, I --   08:07
2    A  Okay.                                          08:07
3    Q  -- think is easiest.                           08:07
4    A  Fine.                                          08:07
5    Q  And Exhibit 1 is the -- your opening          08:07
6  report --                                           08:07
7    A  Yes.                                           08:07
8    Q  -- in this case, correct?                      08:07
9       And you have signed it on or about            08:07
10 March 11 of 2019?                                   08:07
11   A  Yes.                                           08:07
12   Q  And you understand that you -- you signed    08:07
13 your expert report under penalty of perjury?        08:07
14   A  Yes.                                           08:07
15   Q  And did you endeavor to make what you        08:07
16 stated in your opening report -- and first of all,  08:08
17 is it all right if we refer to your -- Exhibit 1 as 08:08
18 your opening report?                                08:08
19   A  That's fine.                                   08:08
20   Q  And did you endeavor to -- to make your     08:08
21 statements in Exhibit 1 to be as truthful and       08:08
22 accurate as possible?                               08:08
23   A  I endeavored to make the statements as       08:08
24 truthful and accurate as possible.                  08:08
25   Q  Are you aware of any errors or corrections  08:08

Page 90

1    Q   (BY MR. SIPES) In -- in your opening    09:35
2  report where you opined on the obviousness of the   09:35
3  invention, did you rely on EPANOVA in forming your   09:35
4  opinions?    09:35
5    A   Since I can't remember the specific date,   09:35
6  I would have to do further research on that question   09:35
7  to answer that.    09:35
8    Q   Okay. And similarly, sitting here today,   09:35
9  is it your opinion that Omtryg is prior art?   09:35
10   A   Again, I don't remember the specific date   09:35
11 for that, and so I would have to research that   09:35
12 further in order to answer the question.    09:35
13   Q   All right. And do you understand that   09:35
14 Omtryg is neither Lovaza, nor Epadel?   09:35
15   A   Yes.    09:35
16   Q   And you -- sitting here today, you're not   09:35
17 prepared to answer one way or the other as to   09:35
18 whether or not, in your opinions of obviousness   09:35
19 expressed in your opening report, you rely upon   09:35
20 Omtryg?    09:35
21     MR. REIG-PLESSIS: Objection to form.   09:35
22   A   Could you be more specific about exactly   09:35
23 what you are referring to?    09:35
24   Q   (BY MR. SIPES) You -- you recall in your   09:35
25 opening report, putting together opinions on   09:35

Page 91

1  obviousness?    09:36
2    A   Yes.    09:36
3    Q   Okay. Do you -- okay.    09:36
4     Do you recall sitting here today whether   09:36
5  or not, in forming your opinion of obviousness that   09:36
6  you expressed in your opening report, you relied on   09:36
7  Omtryg as part of the prior art?    09:36
8    A   You would have to refer me to the specific   09:36
9  point where I do that.    09:36
10   Q   Okay. I -- I don't find it in your   09:36
11 opening report. But I'm not the master of your   09:36
12 opinions, which --    09:36
13   A   Yeah.    09:36
14   Q   -- is why I asked.    09:36
15   A   Okay.    09:36
16   Q   So I take it sitting here today, you do   09:36
17 not recall relying on Omtryg in forming your   09:36
18 opinions of obviousness that you expressed in your   09:36
19 opening report?    09:36
20   A   I do not recall that.    09:36
21   Q   Okay. So let's turn to your opening   09:36
22 report, paragraph 18.    09:36
23   A   Paragraph 18.    09:36
24   Q   18, yeah. You state, I have been asked by   09:36
25 counsel to offer my opinions regarding the   09:37

Page 92

1  obviousness of the asserted claims from the point of   09:37
2  view of a person of ordinary skill in the art.   09:37
3     Do you see that?    09:37
4    A   Yes.    09:37
5    Q   And the counsel you referred to there   09:37
6  is -- is defendants' counsel, I take it, correct?   09:37
7    A   Yes.    09:37
8    Q   And as you note in paragraph 25, you are   09:37
9  not a lawyer, correct?    09:37
10   A   Correct.    09:37
11   Q   So you relied upon defendants' counsel's   09:37
12 instructions regarding the legal standards for   09:37
13 obviousness, correct?    09:37
14   A   Yes, in consultation with the lawyers.   09:37
15   Q   Right. And the -- the legal standards   09:37
16 that you applied in formulating your opinions on   09:37
17 obviousness are set forth in paragraphs 26 to 31 of   09:37
18 your opening report, correct?    09:37
19   A   Yes.    09:37
20   Q   And the legal standard you used is the   09:37
21 legal standard that you set forth from counsel; you   09:37
22 didn't rely on your own independent understanding of   09:37
23 obviousness, correct?    09:38
24   A   I -- I consulted with counsel, taking   09:38
25 advantage of their expertise, to provide my   09:38

Page 93

1  understanding of what these concepts meant.   09:38
2    Q   You -- in your opening report, you do not   09:38
3  express any opinions concerning the legal defense of   09:38
4  "anticipation," correct?    09:38
5    A   I don't know what that means. Could you   09:38
6  redefine that question, please?    09:38
7    Q   I -- you are -- do you have an   09:38
8  understanding of the legal defense of   09:38
9  "anticipation"?    09:38
10   A   Of anticipation? I'm not recalling   09:38
11 anything about anticipation.    09:38
12   Q   Okay. So --    09:38
13   A   I would have to do further research on --   09:38
14   Q   Okay.    09:38
15   A   -- that point.    09:38
16   Q   So to the best of your recollection, you   09:38
17 are not offering an opinion that the asserted claims   09:38
18 are invalid for anticipation, correct?    09:38
19   A   Could you define what you mean by "for   09:38
20 anticipation"?    09:38
21   Q   Well, I would like to ask the question   09:38
22 here. And if you don't understand anticipation,   09:39
23 that's fine.    09:39
24     Do you find that you can't answer the   09:39
25 question, whether or not you're offering an opinion   09:39

Page 94

1  as to whether the claims are invalid for        09:39
2  anticipation?                                   09:39
3     A   Could you define what "anticipation" means  09:39
4  for me?                                         09:39
5     Q   Anticipation in the patent law refers to  09:39
6  invalid under Section 102 of the patent code.   09:39
7       Are you -- do you -- do you believe that   09:39
8  you have offered an opinion that the claims are  09:39
9  invalid for anticipation?                       09:39
10       MR. REIG-PLESSIS: I object to foundation  09:39
11  to this line of questions.                     09:39
12    A   I -- I would have to have more information  09:39
13  about exactly what that particular piece of    09:39
14  information was.                               09:39
15    Q   (BY MR. SIPES) All right. So to the best  09:39
16  of your recollection, you did not rely on legal  09:39
17  standards for anticipation in forming your opinions  09:39
18  in this case?                                  09:39
19    A   I -- I can't answer that question, because  09:39
20  I don't know what the definition of legal -- of  09:39
21  "anticipation" is.                             09:39
22    Q   Do you offer an opinion that the asserted  09:40
23  claims -- are -- are you familiar with the legal  09:40
24  concept of "lacking novelty"?                  09:40
25    A   Yes.                                     09:40

Page 95

1    Q   Okay. Was your understanding of lacking    09:40
2  novelty?                                         09:40
3       MR. REIG-PLESSIS: Objection to form.       09:40
4    A   I would go with what is stated in the     09:40
5  opening report. Could you refer specifically to  09:40
6  that?                                            09:40
7    Q   (BY MR. SIPES) Where in your opening      09:40
8  report do you discuss novelty?                  09:40
9    A   I would have to research through here to  09:40
10  find those --                                  09:40
11    Q   Okay.                                    09:40
12    A   -- examples.                             09:40
13    Q   Okay. Do you understand how novelty      09:40
14  differs from nonobvious -- from obviousness?   09:40
15       MR. REIG-PLESSIS: Objection to form and  09:40
16  foundation.                                    09:40
17       MR. SIPES: Counsel, we're -- we're just  09:40
18  wondering what the scope of his opinions are. 09:40
19       MR. REIG-PLESSIS: I can represent that   09:40
20  it's not about anticipation.                   09:40
21       MR. SIPES: All right. Thank you.         09:40
22    Q   (BY MR. SIPES) Now, if you'll turn to   09:40
23  paragraph 409 --                               09:40
24    A   409. In the opening report?             09:40
25    Q   -- in the opening report --             09:41

Page 96

1    A   Okay. Thank you.                          09:41
2    Q   -- you refer to -- in paragraph 409,     09:41
3  to "Claim 18B, indefinite because of uncertainty  09:41
4  about the reference to second subject.         09:41
5       Do you see that?                           09:41
6    A   I'm sorry. Which -- which paragraph is   09:41
7  that again?                                    09:41
8    Q   409.                                     09:41
9       Do you see, It is my understanding from  09:41
10  counsel, that defendants also contend that second  09:41
11  subject is not being defined in Claim 17 -- not  09:41
12  being defined in Claim 17, renders Claim 18   09:41
13  indefinite to the person of ordinary skill in the  09:41
14  art as not understanding who the second subject is  09:41
15  in Claim 18?                                  09:41
16    A   As I state here, and as you said, in   09:41
17  concert with counsel, this is what I understand.  09:41
18    Q   Okay. Aside from this issue with       09:41
19  Claim 18, you do not express an opinion that any  09:42
20  other claim is invalid as indefinite. Do you recall  09:42
21  forming any opinions about the definiteness of the  09:42
22  claims?                                       09:42
23    A   I would have to research this further. I  09:42
24  don't recall those specific --                09:42
25    Q   Okay.                                   09:42

Page 97

1    A   -- details.                               09:42
2    Q   And are you familiar with -- sitting here  09:42
3  today, do you recall being instructed on the defense  09:42
4  of lack of written description?                09:42
5    A   I would have to go back and look at the  09:42
6  document.                                      09:42
7    Q   But to the best of your recollection    09:42
8  sitting here today, you did not offer opinions in  09:42
9  your opening report concerning the defense of lack  09:42
10  of written description, correct?              09:43
11    A   To the best of my knowledge right now, but  09:43
12  I would have to research that further in order to  09:43
13  answer the question.                          09:43
14    Q   Now, if you'll turn to your discussion of  09:43
15  the claim construction order in the case. That's in  09:43
16  paragraph 32 of your opening report.          09:43
17    A   Okay.                                   09:43
18    Q   You state, It is my understanding that the  09:43
19  court entered a claim construction order in this  09:43
20  case on August 10, 2018, which define the following  09:43
21  claim terms to have the meanings set forth below.  09:43
22       Do you see that?                         09:43
23    A   Yes.                                    09:43
24    Q   And the understanding you refer to is an  09:43
25  understanding that came from discussions with  09:43

Page 98

1  defendants' counsel?
2  A  Yes.
3  Q  And so the -- the definitions that were
4  set forth in the Court's claim construction order,
5  those were provided to you by counsel?
6  A  Yes, they were.
7  Q  And did you apply, in forming your
8  opinions, the constructions that are set forth in
9  paragraph 32 of your report?
10 A  I did, to the best of my ability.
11 Q  Okay.  And with regard to Subsection C of
12 paragraph 32, you refer to "claim limitations
13 involving LDL-C."
14    Do you see that?
15 A  Yes, I do.
16 Q  And one of the constructions for some of
17 the terms is "without a clinically meaningful
18 increase in LDL-C"?
19 A  Yes.
20 Q  And did you -- is that the meaning that
21 you applied in forming your opinions in the case?
22 A  I think it depends on the particular
23 circumstances of the claims.  There are many, many
24 claims in this particular set of documents and many
25 different arguments, and so I believe different

Page 99

1  combinations of these terms are used at different
2  times throughout the document.
3  Q  But in forming your opinions, you
4  endeavored to apply the Court's claim construction,
5  correct?
6  A  I did.  Correct.
7  Q  And do you believe that you applied the
8  claims -- the Court's claim construction in forming
9  your opinions?
10 A  To the best of my ability.
11 Q  Okay.  Now, in -- in Subsection C, you
12 state that the "claim terms concern -- concerning
13 LDL-C are not indefinite."
14    Do you see that?
15 A  I do.
16 Q  That an understanding that came to you
17 from defendants' counsel?
18 A  It is.
19 Q  And you don't dis -- you don't dispute
20 that in your report, correct?
21 A  Well, I might need more specific examples
22 for what you are referring to.  But in general, I
23 try to adhere to this definition, as advised by my
24 counsel.
25 Q  All right.  Thank you.  Did you review --

Page 100

1  scratch that.
2     Let me ask you to turn to your reply
3  report.
4  A  Is this 2 or 3?
5     MR. REIG-PLESSIS:  It's 3.
6  Q  (BY MR. SIPES) It's 3.  So for clarity, I
7  have tried to use --
8  A  I know.
9  Q  -- the terms that you used --
10 A  I know.
11 Q  -- so that -- Exhibit 2 is your rebuttal
12 report, and Exhibit 3 is your reply --
13 A  Yeah.
14 Q  -- report?  Is that consistent with your
15 understanding?
16 A  Yes.
17 Q  Okay.  All right.  Paragraph 57.
18 A  Yes.
19 Q  In paragraph 57, you cite a paper by Bill
20 Harris that was published in 2006.
21    Do you see --
22 A  Yeah, you --
23 Q  -- that?
24 A  -- gave me the wrong thing here.
25    MR. REIG-PLESSIS:  Exhibit 3.

Page 101

1  A  57.
2     MR. REIG-PLESSIS:  That's on page 20.
3  A  Yes.  Okay.  Repeat the question, please.
4  Q  (BY MR. SIPES) In paragraph 57, you cite
5  to a paper by Bill Harris --
6  A  Yes.
7  Q  -- from 2006.
8     Do you see that?
9  A  Yes.
10 Q  Okay.  Do you know Bill Harris?
11 A  I do not.
12 Q  Okay.  And you quote that the 2006 Harris
13 paper is stating, The mechanism by which n-3 [i.e.
14 omega-3] fatty acids reduced triglyceride levels in
15 humans remains speculative and "an unanswered
16 question."
17    Do you see that?
18 A  Yes.
19 Q  And when you refer to "n-3" -- that is,
20 omega-3 fatty acids -- you include in there DHA and
21 EPA, correct?
22 A  Yes.
23 Q  And you would include both their ethyl
24 esters and the free fatty acids, correct?
25 A  Yes.

Page 142

1  Q   The -- do you have a list of -- of         10:41
2  products to -- to -- that are FDA approved to treat   10:41
3  very high triglycerides?                      10:41
4  A   Yes.                                       10:41
5  Q   And that's fibrates, niacin, Lovaza,       10:41
6  EPANOVA, and Omtryg.                           10:41
7      Do you see that?                           10:41
8  A   Yes, I do.                                 10:41
9  Q   And of course, VASCEPA is also approved to   10:41
10 treat very high triglycerides?                10:41
11 A   Yes.                                       10:41
12 Q   Statins are not approved to treat very     10:41
13 high triglycerides, correct?                  10:41
14 A   Correct.                                   10:41
15 Q   And the reason for that is the TG-lowering   10:41
16 effect of statins is -- is very modest, correct?   10:41
17 A   I -- I don't think that's quite correct.   10:41
18 Q   Okay.                                      10:41
19 A   Actually, statins will lower triglycerides   10:41
20 by up to 50 percent in people with high       10:41
21 triglycerides or very high triglyceride levels.   10:41
22 Q   Do you understand why statins are not      10:41
23 approved to treat very high triglycerides?    10:41
24     MR. REIG-PLESSIS:  Objection to form.      10:41
25 A   I am not aware of the reason why.          10:42

Page 143

1  Q   (BY MR. SIPES) All right.  In terms of the   10:42
2  list of products that are approved to treat very   10:42
3  high triglycerides, the only product that has been   10:42
4  shown to reduce triglycerides in very high    10:42
5  triglyceride patients without raising LDL-C is   10:42
6  VASCEPA, correct?                             10:42
7      MR. REIG-PLESSIS:  Objection to form.      10:42
8  A   Can you restate the question so you're --  10:42
9  Q   (BY MR. SIPES) There -- you have -- the    10:42
10 list of products which have been approved to reduce   10:42
11 triglycerides in very high triglyceride patients is   10:42
12 fibrates, niacin, Lovaza, EPANOVA, Omtryg, and   10:42
13 VASCEPA, correct?                             10:42
14 A   Yes.                                       10:42
15 Q   Of those products, the only product that   10:42
16 has been shown to reduce triglycerides in patients   10:42
17 with very high triglycerides without raising LDL-C   10:42
18 is VASCEPA, correct?                          10:42
19     MR. REIG-PLESSIS:  Objection to form.      10:42
20 A   Okay.  And I -- I would -- I would add --  10:42
21 again, we're talking about median changes typically   10:42
22 in these clinical studies.                    10:43
23     But oftentimes there are many patients who   10:43
24 do not get these benefits.  And you can actually see   10:43
25 an increase in LDL-C cholesterol, for example, in   10:43

Page 144

1  patients, even though the overall means go down or   10:43
2  medians.  So I think you have to interpret in   10:43
3  this -- in that context.                      10:43
4  Q   (BY MR. SIPES) But focus then on -- on     10:43
5  medians.  What happens to median patients?    10:43
6      The only product approved for treatment of   10:43
7  very high triglycerides that has been shown to   10:43
8  reduce triglycerides without raising LDL-C is   10:43
9  VASCEPA, correct?                             10:43
10 A   Yes.                                       10:43
11     MR. REIG-PLESSIS:  Objection to form.      10:43
12 Q   (BY MR. SIPES) And the study that          10:43
13 demonstrated that is the MARINE trial, correct?   10:43
14     MR. REIG-PLESSIS:  Same objection.         10:43
15 A   That's post the 2008 date that we're       10:43
16 talking about here for the patents, are we -- is it   10:43
17 not?                                          10:43
18 Q   (BY MR. SIPES) That -- do you know when    10:43
19 MARINE published?                             10:43
20 A   I think it was in 2004 or 2014.  Sometime   10:43
21 around there.                                 10:43
22 Q   It may be around 2010-2011 --              10:43
23 A   Yeah.                                      10:43
24 Q   -- but --                                  10:43
25 A   Yeah.  Yeah.                               10:43

Page 145

1  Q   -- it is after 2008?                       10:44
2  A   Yes.                                       10:44
3  Q   The MARINE trial demonstrated that VASCEPA   10:44
4  reduced triglycerides in very high triglyceride   10:44
5  patients without raising LDL-C, correct?      10:44
6      MR. REIG-PLESSIS:  Objection to form.      10:44
7  A   It demonstrated that certain specific      10:44
8  doses of VASCEPA, if I recall correctly, had that   10:44
9  effect.                                       10:44
10 Q   (BY MR. SIPES) The dose was 4 grams per    10:44
11 day, correct?                                 10:44
12 A   Yes.                                       10:44
13     THE COURT REPORTER:  4 grams?              10:44
14     MR. SIPES:  4 grams.  Why don't we take a  10:44
15 break.                                        10:44
16     MR. REIG-PLESSIS:  Yeah, I was about to    10:44
17 say --                                        10:44
18     THE VIDEOGRAPHER:  This marks the end of   10:44
19 media file labeled numbered 2.  Off the record at   10:44
20 10:45 a.m.                                    10:44
21     (A break was taken from 10:45 a.m. to      10:44
22 10:59 a.m.)                                   10:44
23     THE VIDEOGRAPHER:  This marks the          10:52
24 beginning of media file labeled No. 3.  Back on the   10:57
25 record at 10:59 a.m.                          10:58

Page 146

1  Q  (BY MR. SIPES) Let me ask you to turn to  10:58
2  your rebuttal report -- report. That would be  10:58
3  Exhibit 2.  10:58
4      Paragraph 35, you -- you quote Amarin as  10:58
5  saying that JELIS supports VASCEPA being clinically  10:58
6  distinct from fibrates or niacin and being uniquely  10:58
7  positioned to plausibly provide CV benefit to  10:58
8  patients at high CV risk due to their atherogenic  10:58
9  lipid profile, specifically elevated TG despite  10:58
10 therapy -- statin therapy.  10:58
11     Do you see that?  10:58
12 A  Yes.  10:58
13     MR. SIPES: And -- and just for the sake  10:58
14 of the court reporter, JELIS is all caps, J E L I S.  10:58
15 Q  (BY MR. SIPES) Do you agree with this  10:58
16 statement that you quote from Amarin?  10:59
17 A  I believe that JELIS was the first study  10:59
18 to provide convincing evidence that EPA, as  10:59
19 monotherapy on top of a statin, would lower  10:59
20 cardiovascular risk.  10:59
21 Q  And do you think that the showing in JELIS  10:59
22 supports VASCEPA being clinically distinct from  10:59
23 fibrates or niacin on its basis of being able to  10:59
24 reduce cardiovascular risk on top of a statin?  10:59
25 A  I believe that JELIS provided the  10:59

Page 147

1  groundbreaking evidence and that VASCEPA builds on  10:59
2  that evidence.  10:59
3  Q  And fibrates and niacin have not been  10:59
4  shown to reduce cardiovascular risk on top of a  10:59
5  statin, correct?  10:59
6  A  That's correct.  11:00
7  Q  So VASCEPA is the only agent approved for  11:00
8  treatment of very high triglycerides that has also  11:00
9  been shown to provide cardiovascular benefit to  11:00
10 patients on statin, correct?  11:00
11 A  It's correct to state that it's the only  11:00
12 agent approved by the FDA based on very stringent  11:00
13 clinical -- clinical data, yes.  11:00
14 Q  Okay. And if you turn to -- to  11:00
15 paragraph 65 of your rebuttal report -- you quote  11:00
16 Dr. Toth as saying, The fact that VASCEPA avoids  11:01
17 substantial LDL-C -- LDL-C increases in persons with  11:01
18 very high triglycerides gives the doctor the  11:01
19 flexibility to treat such patients in stepwise  11:01
20 fashion to start first with VASCEPA as monotherapy  11:01
21 to address pancreatitis risk; and then once TGs are  11:01
22 lowered below 500 milligrams per deciliter, to add a  11:01
23 statin, in combination with VASCEPA, to lower  11:01
24 cardiovascular risk.  11:01
25     Do you see that?  11:01

Page 148

1  A  Yes.  11:01
2  Q  Do you agree with Dr. Toth that VASCEPA  11:01
3  avoids substantial LDL-C increases in persons with  11:01
4  very high triglycerides and gives doctors the  11:01
5  flexibility to treat such patients in stepwise  11:01
6  fashion?  11:01
7  A  It provides one option for doctors to do  11:02
8  that. Although, there can be other options  11:02
9  available as well, such as combining omega-3 fatty  11:02
10 acids with a statin therapy, for example.  11:02
11 Q  The -- the difference would be with  11:02
12 Lovaza, the statin would be added initially in order  11:02
13 to counteract the rising LDL-C seen with Lovaza,  11:02
14 correct?  11:02
15 A  Well, I think -- I think the situation is  11:02
16 a little bit more complicated than that. First of  11:02
17 all, there's no evidence that -- I prefer to call it  11:02
18 EPA, since JELIS also showed the same thing.  11:02
19     There's no evidence that the benefits of  11:02
20 EPA in reducing cardiovascular risk in these  11:02
21 patients relates to changes in LDL cholesterol or  11:02
22 triglycerides.  11:02
23     And so I think that the idea that it's  11:02
24 working because it's avoiding the increase in LDL-C  11:02
25 is not substantiated by the clinical data here.  11:02

Page 149

1  Q  With respect to -- VASCEPA can be  11:02
2  administered to very high triglyceride patients  11:02
3  without raising LDL-C, correct?  11:02
4  A  Yes.  11:03
5  Q  And Lovaza will typically increase LDL-C  11:03
6  in patients with very high triglycerides, correct?  11:03
7      MR. REIG-PLESSIS: Objection to form.  11:03
8  A  Can you restate that question, please?  11:03
9  Q  (BY MR. SIPES) The -- the prescribing  11:03
10 information for Lovaza reports that LDL-C goes up  11:03
11 when administered to patients with very high  11:03
12 triglycerides, correct?  11:03
13     MR. REIG-PLESSIS: Objection to form.  11:03
14 A  Actually, it shows that in some patients,  11:03
15 it goes up with omega-3 fatty acids, so in no way do  11:03
16 all patients treated with omega-3 fatty acids have  11:03
17 an increase in LDL cholesterol.  11:03
18 Q  (BY MR. SIPES) Is Lovaza, when  11:03
19 administered to very high triglyceride patients,  11:03
20 typically prescribed in combination with a statin to  11:03
21 guard against a rise in LDL-C?  11:03
22 A  Say -- I'm sorry. Say it again.  11:03
23 Q  Is Lovaza, when administered to very high  11:03
24 triglyceride patients, typically coadministered with  11:03
25 a statin in order to guard against a rise in LDL-C?  11:03

Page 270

1  Q  (BY MR. SIPES) Can --                        02:04
2  A  Do you --                                    02:04
3  Q  How would a person of ordinary skill in      02:04
4  the art determine the effect of EPA alone on LDL  02:04
5  cholesterol, given the results in Kurabayashi?  02:04
6  A  Well, what you can conclude in this study   02:04
7  is that in a patient treated with estriol, that EPA  02:04
8  intervention lowers the LDL cholesterol relative to  02:04
9  a person who is taking estriol that didn't get the  02:04
10  EPA.                                            02:04
11      So in other words, this is -- for this     02:04
12  specific population where both groups were treated  02:04
13  with estriol, EPA lowers the LDL cholesterol in   02:04
14  that -- in that particular --                   02:04
15  Q  And --                                       02:04
16  A  -- group.                                    02:04
17  Q  -- and that's what I'm trying               02:04
18  to understand -- so -- and I don't understand -- is  02:04
19  it your testimony that the data in Kurabayashi   02:04
20  suggests that the group that received EPA on top of  02:04
21  estriol, saw greater reductions in LDL-C than the  02:04
22  patients who only received estriol?             02:05
23      MR. REIG-PLESSIS:  Objection to form;      02:05
24  mischaracterizes.                               02:05
25  A  Yeah, I'm sorry.  You're going to have to   02:05

Page 271

1  say that again.                                 02:05
2  Q  (BY MR. SIPES) Is it your testimony that    02:05
3  from Kurabayashi, the patients who received EPA on  02:05
4  top of estriol, saw greater reductions in LDL-C than  02:05
5  the control group that received estriol alone?  02:05
6      MR. REIG-PLESSIS:  Same objection.          02:05
7  A  I think what we can conclude is that both   02:05
8  groups saw a significant decrease in LDL        02:05
9  cholesterol.                                    02:05
10  Q  (BY MR. SIPES) And would the conclusion be 02:05
11  from that that the estriol was decreasing the LDL  02:05
12  cholesterol?                                    02:05
13  A  Not necessarily.  And I have noticed in    02:05
14  reviewing the papers for this that a lot of the   02:05
15  studies, the LDL cholesterol levels tend to go down  02:05
16  over time.                                      02:05
17      That was observed in JELIS as well.  And I 02:05
18  have noticed that in many of the other studies.  So  02:05
19  there's -- there are other factors that can be  02:05
20  affecting LDL cholesterol in this study.        02:06
21  Q  But -- but it's fair to say from the       02:06
22  results presented in Kurabayashi that EPA did not,  02:06
23  in a statistically significant way, reduce LDL-C  02:06
24  cholesterol compared to control?                02:06
25  A  Okay.  I'm having to look at the figure    02:06

Page 272

1  legend here, because I think this is a fairly   02:06
2  technical point.                                02:06
3      Yes, okay, I think that's reasonable       02:06
4  conclusion.  It looks like there were similar   02:06
5  reductions in LDL cholesterol in both groups.   02:06
6  Q  Right.  Numerically, estriol alone reduced  02:06
7  LDL-C to a greater extent than estriol plus EPA,  02:06
8  correct?                                        02:07
9  A  Well --                                     02:07
10      MR. REIG-PLESSIS:  Objection to form.      02:07
11  A  -- I think the correct interpretation is   02:07
12  there's no statistical difference between the two  02:07
13  groups.                                         02:07
14  Q  (BY MR. SIPES) Right.  The -- which is to  02:07
15  say the addition of EPA to estriol did not make any  02:07
16  statistically significant difference on LDL-C?  02:07
17  A  I think it would be correct to say that in  02:07
18  this particular study in these patients, yes.   02:07
19  Q  And the baseline triglycerides in the      02:07
20  Kurabayashi study --                            02:07
21  A  I just want to -- some of these studies    02:07
22  were in a subset, I believe.  Is that correct or is  02:07
23  that -- let me just look -- may I look at the   02:07
24  text --                                         02:07
25  Q  Sure.                                       02:07

Page 273

1  A  -- for a minute?  Okay.                     02:07
2      This is the overall population, I believe,  02:08
3  in this particular study.                       02:08
4  Q  The -- the baseline triglycerides in       02:08
5  Kurabayashi was 135.6 milligrams per deciliter for  02:08
6  the EPA group, correct?                         02:08
7  A  Yes.                                        02:08
8  Q  So those are normal triglyceride levels?   02:08
9  A  They're less than 150 milligrams per       02:08
10  deciliter.                                      02:08
11  Q  So Kurabayashi was not conducted in a     02:08
12  hypertriglyceridemic patient population?        02:08
13  A  No.                                         02:08
14  Q  If you'll turn to page 523, the right-hand 02:08
15  column --                                       02:09
16  A  Yes.                                        02:09
17  Q  -- there's a sentence that says, The      02:09
18  proportion of cases showing improvement of      02:09
19  triglyceride levels was 10 percent, 2 of 20, and  02:09
20  55 percent of 11 of 20 respectively.            02:09
21      Do you see that?                           02:09
22  A  Boy, they -- they keep saying the same --  02:09
23  it's -- it's going to take me a minute because they  02:09
24  keep repeating the same phraseology all the way  02:09
25  through here.  Can you repeat that one more time --  02:09

Page 274

1   Q   Yes.   02:09
2   A   -- for me?   02:09
3   Q   There's a reference to, The proportion of   02:09
4   cases showing improvement of triglyceride levels was   02:09
5   10 percent, 2 of 20, and 55 percent, 11 of, 20   02:09
6   respectively.   02:09
7   A   Okay. Let me just review this. Yes.   02:09
8   Q   So at least for those patients that   02:10
9   continued to the end of the study, 45 percent of   02:10
10   them that were on EPA plus estriol did not see   02:10
11   improvements in triglyceride levels, correct?   02:10
12   A   According to the criteria, they don't   02:10
13   really define here what they mean by "improvement in   02:10
14   triglyceride levels," and so I think that makes that   02:10
15   statement somewhat ambiguous.   02:10
16   Q   So would a person of ordinary skill in the   02:10
17   art in 2008 be able to understand that statement?   02:10
18   A   I think they would say there's -- appears   02:10
19   to be a difference between the two groups, but we   02:10
20   don't know exactly what that means because they   02:10
21   don't define what they're talking about.   02:10
22   Q   For purposes of developing a treatment for   02:10
23   very high triglycerides, what response rate would be   02:10
24   desirable in the TG-lowering agent --   02:10
25   MR. REIG-PLESSIS: Objection to form.   02:10

Page 275

1   Q   (BY MR. SIPES) -- or what -- what response   02:10
2   would be considered acceptable?   02:10
3   MR. REIG-PLESSIS: Same objection.   02:10
4   A   I think, again, it's a very broad   02:11
5   question. And I think that you would have to define   02:11
6   more carefully what the clinical population was.   02:11
7   You would have to give me additional   02:11
8   information about what exact circumstances you're   02:11
9   talking about. Are these diabetics? Nondiabetics?   02:11
10   People with heart disease? People without heart   02:11
11   disease?   02:11
12   I think there's a lot of variables in that   02:11
13   equation.   02:11
14   MR. SIPES: I think this would be a good   02:11
15   time for, among other things, a break.   02:11
16   THE VIDEOGRAPHER: This marks the end of   02:11
17   media file labeled No. 5. Off the record at   02:11
18   2:12 p.m.   02:11
19   (A break was taken from 2:12 p.m. to   02:11
20   2:27 p.m.)   02:11
21   THE VIDEOGRAPHER: This marks the   02:25
22   beginning of media file labeled No. 6. Back on the   02:25
23   record 2:27 p.m.   02:25
24   Q   (BY MR. SIPES) I'm going to hand you   02:26
25   Exhibit 16.   02:26

Page 276

1   (Exhibit 16 was marked for identification   02:26
2   and is attached to the transcript.)   02:26
3   Q   (BY MR. SIPES) Do you recognize Exhibit 16   02:26
4   as U.S. Patent 8,293,728 that is at issue in this   02:26
5   case?   02:26
6   A   Yes.   02:26
7   Q   And are you familiar with the practice of   02:26
8   referring to a patent by its last three numbers?   02:26
9   A   I am.   02:26
10   Q   So would it be all right if we refer to   02:26
11   Exhibit 16 at the '728 Patent?   02:26
12   A   Yes.   02:26
13   Q   Now, I want you to look at your reply   02:26
14   report, Exhibit 3, paragraph 25.   02:26
15   A   So where am I looking now?   02:26
16   Q   Your reply report, paragraph 25. It's on   02:26
17   page 7.   02:27
18   A   I'm trying to move the paper away from   02:27
19   myself. Okay. Yes.   02:27
20   Q   In the first sentence of paragraph 25, you   02:27
21   state, To be clear, under my definition, a POSA   02:27
22   would have had a high level of skill relevant to the   02:27
23   asserted patents.   02:27
24   Do you see that?   02:27
25   A   Yes.   02:27

Page 277

1   Q   Why, in your opinion, would a person of   02:27
2   ordinary skill in the art, for purposes of the   02:27
3   asserted patents in this case, have had a high level   02:27
4   of skill?   02:27
5   A   Well, I think evaluating whether or not   02:27
6   something is actually significantly different -- in   02:27
7   other words, if something really is a new invention   02:27
8   versus what was present in the art before requires a   02:27
9   fairly sophisticated knowledge of biochemistry and   02:27
10   physiology.   02:27
11   Q   Do you think it would require a   02:27
12   sophisticated knowledge of biochemistry and   02:27
13   physiology --   02:27
14   A   Not --   02:27
15   Q   -- okay. Let's --   02:28
16   A   -- I'm stopping. I'm stopping.   02:28
17   Q   Did you develop your -- your definition of   02:28
18   a person of ordinary skill in the art based on what   02:28
19   would be required to evaluate the patentability of   02:28
20   the invention claimed in the asserted patents?   02:28
21   MR. REIG-PLESSIS: Objection to form.   02:28
22   A   I think it would be required to evaluate   02:28
23   the totality of the evidence that's supporting   02:28
24   the -- the claims of the patent, would be my   02:28
25   evaluation.   02:28

Page 278

1  Q  (BY MR. SIPES) All right. And what sort
2  of knowledge would be required to evaluate the
3  evidence supporting the claims of the patents?
4  A  Well, I think we outline it here. I would
5  probably pretty much stick with what the definition
6  here is, as --
7  Q  And --
8  A  -- as outlined in paragraph 25.
9  Q  Okay. So that would require a knowledge
10 of -- of lipid biochemistry, correct?
11     MR. REIG-PLESSIS: Objection to form;
12 mischaracterizes.
13 A  Yeah, I -- I think the way this is meant
14 to explain it is -- is there could be different
15 areas within this context -- in this definition.
16 You wouldn't necessarily have to have every single
17 one of these things.
18 Q  (BY MR. SIPES) Do you believe that you
19 would need a medical degree?
20 A  I do not.
21 Q  Okay. If -- if a person didn't have a
22 medical degree, what would they need to evaluate the
23 evidence in the patent?
24 A  I think they would have to have extensive
25 experience in the lipid field, practical experience.

Page 279

1  They would have to have a detailed familiarity with
2  the literature, and they would have to have some
3  basic knowledge of pharmacology and biochemistry.
4  Q  And when you say to have "practical
5  experience in the field," what -- if somebody wasn't
6  a medical doctor, that experience would not involve
7  treating patients, correct?
8  A  Well, that would not involve prescribing
9  treatment for patients.
10 Q  Okay.
11 A  So for example, let's just imagine a Ph.D.
12 They might not be able to write a prescription for
13 treating a patient, but I know Ph.D.s in the field
14 who are extremely knowledgeable about many, many
15 different aspects of -- of this area and would be
16 capable of making a very well-informed judgment.
17 Q  And would a person with a Ph.D. evaluating
18 the evidence supporting the invention, consult with
19 a physician or other medical doctor?
20 A  Not necessarily. I think, again, it
21 depends on your experience.
22     And as I'm learning in this -- this
23 session right here with you guys, as well as my
24 interactions with my team, lawyers can have a very
25 good knowledge of what's going on in this area

Page 280

1  because they're extremely familiar with the
2  literature and they know a lot of the wrinkles
3  relevant to it.
4     So I think it's really a matter of what
5  exactly their knowledge is.
6  Q  Okay. But -- but you're not suggesting a
7  person of ordinary skill in the art would need
8  excess to a lawyer, I take it?
9  A  No. No.
10 Q  Yeah. Okay. You don't include within the
11 skill set of the -- of the team to which a person of
12 skill would have access, a biostatistician, I take
13 it?
14     MR. REIG-PLESSIS: Objection to form.
15 A  I think that would depend on the
16 particular circumstances. And I -- really trying to
17 specify every single thing that you need to
18 understand these things depends on the precise
19 circumstances of what's being evaluated and what's
20 involved.
21     So in some circumstances you -- you might
22 need to have a very detailed evaluation of
23 biostatistics. And for example, in my area -- one
24 my areas of research, we do very large numbers of
25 protein measurements in lipoproteins.

Page 281

1     And since we're measuring so many
2  different things in so many different people, trying
3  to interpret that data would require someone with
4  biostatistical expertise. And for example, we get
5  that kind of expertise when we need it.
6     On the other hand, if you're trying to
7  interpret many clinical studies, I think that you
8  don't necessarily need a strong biostatistical
9  background. And even just taking it at more or less
10 face value, the p-values. And assuming that they
11 have a reasonable understanding of -- of statistics,
12 what a p-value test is, what a -- what some of the
13 standard tests are, that might be adequate. So it
14 very much depends on the exact -- on the exact
15 nature of what it is you are trying to -- to do.
16 Q  Okay.
17 A  I think it's a -- it's a complicated area.
18 Q  The patent describes a -- a clinical study
19 of 4 grams of EPA, correct, in Column 13 --
20     MR. REIG-PLESSIS: Objection to form.
21 Q  (BY MR. SIPES) -- the -- the patent -- the
22 '728 Patent?
23 A  I'm sorry? Where is that?
24 Q  It's Exhibit --
25 A  Oh --

Page 282

```
1    Q    -- 16.                                  02:33
2    A    -- right in front of me.  And correct me   02:33
3  if I'm wrong here, but that would be under the    02:33
4  claims?                                           02:33
5    Q    No.  No.  No.  Column 13, the example.    02:33
6    A    Okay.  Please restate the question.       02:33
7    Q    The -- the example describes a            02:33
8  placebo-controlled, randomized, double-blind 12-week  02:33
9  study with open-label extension conducted on EPA,    02:33
10 correct?                                         02:33
11       MR. REIG-PLESSIS:  Objection to form;      02:33
12 mischaracterizes.                                02:33
13   A    I -- I think I would have to go with what    02:33
14 the text says.  It says a placebo -- a multicenter   02:33
15 placebo -- it says what it says.  I would go with    02:33
16 the --                                           02:33
17   Q    (BY MR. SIPES)  Right.                    02:33
18   A    -- text there.                            02:33
19   Q    And "AMR101," do you understand the       02:33
20 reference to "AMR101 in '728 Patent?             02:33
21   A    I do.                                     02:33
22   Q    And what is AMR101?                       02:33
23   A    EPA --                                    02:33
24   Q    That -- that's --                         02:33
25   A    -- ester --                               02:33
```

Page 283

```
1    Q    -- pure ester?                           02:33
2    A    -- yeah, pure.  9 -- greater than        02:34
3  96 percent pure EPA and ester of that form of the --   02:34
4  the --                                          02:34
5    Q    And that --                              02:34
6    A    -- fatty acid.                           02:34
7    Q    -- and the -- and what the patent is     02:34
8  describing in the example is the administration of   02:34
9  pure EPA to patients with fasting triglyceride   02:34
10 levels of 500 and above, correct --             02:34
11       MR. REIG-PLESSIS:  Objection to form.     02:34
12   Q    (BY MR. SIPES) -- 500 milligrams per     02:34
13 deciliter above, correct?                       02:34
14       MR. REIG-PLESSIS:  Same objection.        02:34
15   A    Well, I can quote what it says, With     02:34
16 fasting triglyceride levels of greater than or equal   02:34
17 to 500 milligrams per deciliter and less than or   02:34
18 equal to 1,500 milligrams per deciliter with    02:34
19 definitions provided as well in millimoles per   02:34
20 liter.                                          02:34
21   Q    (BY MR. SIPES) So would a person of      02:34
22 ordinary skill in the art in light of the study   02:34
23 described there, do you believe that would require   02:34
24 consultation with a biostatistician to interpret the   02:34
25 results of that study?                          02:34
```

Page 284

```
1        MR. REIG-PLESSIS:  Objection to form and    02:34
2  as to "results."                                 02:34
3    A    I mean, there's a lot of things that are   02:35
4  missing from this particular statement.  So again,   02:35
5  you're making some very broad statements.       02:35
6        You don't specify what the number of     02:35
7  subjects studied is going to be.  You don't discuss   02:35
8  what your power calculations are.  You don't specify   02:35
9  what you're going to consider significant and   02:35
10 nonsignificant.  So this is -- I mean, this is sort   02:35
11 of a very bare-bones description of what -- what you   02:35
12 would really need to do to evaluate that.       02:35
13   Q    So when you were defining your person of   02:35
14 ordinary skill in the art, were you taking into   02:35
15 account the skill that would be necessary to    02:35
16 evaluate the results?                           02:35
17   A    Yes.                                     02:35
18   Q    Okay.  And in your view, that would      02:35
19 require a high level of skill?                  02:35
20   A    No.  In my view, it would require more   02:35
21 information and an adequate technical background.    02:35
22       It -- and again, you're making very broad   02:35
23 statements here, and I think the issue very much   02:35
24 depends on the particulars.                     02:35
25       And I'll also add that just achieving    02:35
```

Page 285

```
1  statistical significance does not necessarily mean   02:36
2  it's clinically significant.  Right.            02:36
3        So I think, again, that requires judgment   02:36
4  about what the overall context in the field is and   02:36
5  what a significant improvement would be.        02:36
6    Q    And would -- judgments about the clinical   02:36
7  significance of the results, that would require a   02:36
8  medical degree?                                 02:36
9    A    Not necessarily.  I think -- I know      02:36
10 Ph.D.s.  I have worked with Ph.D.s that I felt were   02:36
11 qualified to make that kind of a judgment.      02:36
12   Q    And --                                   02:36
13   A    And I will mention in passing:  I know   02:36
14 M.D.s that are not qualified to make that kind of a   02:36
15 judgment, so I don't think it's really whether you   02:36
16 have a Ph.D. or an M.D.  Yeah.                  02:36
17   Q    Did you, in -- in determining what the   02:36
18 skill level is "of a person of ordinary skill,"   02:36
19 evaluate the level of skill of the inventors named   02:36
20 on the patent?                                  02:36
21   A    I did not.                               02:36
22   Q    Okay.  Do you know the skill level of the   02:37
23 inventors named on the patent?                  02:37
24   A    I do not.                                02:37
25   Q    Okay.  At this time in March of 2008, do   02:37
```

Page 354

1  at 4:12 p.m.                               04:11
2                                             04:11
3       (TIME NOTED:  4:12 p.m.)

Page 355

4       I, JAY W. HEINECKE, M.D., do hereby declare
5  under penalty of perjury that I have read the
6  foregoing transcript; that I have made any
7  corrections as appear noted, in ink, initialed by
8  me, or attached hereto; that my testimony as
9  contained herein, as corrected, is true and correct.
10      EXECUTED this_____ day of_____,
11  20____, at_____, _____.
           (City)         (State)

15                JAY W. HEINECKE, M.D.

Page 356

1       I, MARY J. GOFF, CSR No. 13427, Certified
2  Shorthand Reporter of the State of California,
3  certify;
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness declared under penalty of
7  perjury; that the testimony of the witness and all
8  objections made at the time of the examination were
9  recorded stenographically by me and were thereafter
10 transcribed under my direction and supervision; that
11 the foregoing is a full, true, and correct
12 transcript of my shorthand notes so taken and of the
13 testimony so given;
14      That before completion of the deposition,
15 review of the transcript (XX) was (  ) was not
16 requested:   (  ) that the witness has failed or
17 refused to approve the transcript.
18      I further certify that I am not financially
19 interested in the action, and I am not a relative or
20 employee of any attorney of the parties, nor of any
21 of the parties.
22      I declare under penalty of perjury under the
23 laws of California that the foregoing is true and
24 correct, dated this 30th day of July, 2019.

25                MARY GOFF

Page 357

2  DATE OF DEPOSITION:
3  NAME OF WITNESS:
4  Reason Codes:
5     1. To clarify the record.
6     2. To conform to the facts.
7     3. To correct transcription errors.
8  Page _____ Line _____ Reason _____
9  From _____ to _____
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____

25        _____