# EXHIBIT A

Excerpts from the transcript of the July 17, 2019 deposition of
Jay W. Heinecke, M.D

Page 1

1

2

3            UNITED STATES DISTRICT COURT

4              DISTRICT OF NEVADA

5    _____

6    AMARIN PHARMA, INC., et al.,          )

                                           )

7                                          )

                                           )

8              Plaintiffs,                 )  Case No.:

                                           )  2:16-cv-02525-MMD-NJK

9              vs.                         )

                                           )  Consolidated with:

10                                         )  2:16-cv-02562-MMD-NJK

     HIKMA PHARMACEUTICALS USA INC.,       )

11   et al.,                               )

                                           )

12                                         )

                                           )

13             Defendants.                 )

     _____)

14

15

16

17             VIDEOTAPED DEPOSITION OF

18              JAY W. HEINECKE, M.D.

19             San Francisco, California

20             Wednesday, July 17, 2019

21

22

23   Reported by Stenographer

     MARY J. GOFF

24   CSR No. 13427

     Job No. 162979

25

Page 2

```
 1
 2
 3
 4           Videotaped Deposition of
 5   JAY W. HEINECKE, M.D., Volume I, taken on behalf of
 6   Plaintiffs, at Winston & Strawn LLP, 101 California
 7   Street, San Francisco, California 94111, beginning
 8   at 8:04 a.m. and ending at 4:12 p.m., on July 17,
 9   2019, before MARY J. GOFF, California
10   Certified Shorthand Reporter No. 13427.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiffs
 4        COVINGTON & BURLING
 5        BY:  CHRISTOPHER SIPES, ESQ.
 6           ERIC SONNENSCHEIN, ESQ.
 7        One City Center
 8        850 Tenth Street, NW
 9        Washington, DC 20001
10
11
12
13
14   For Defendants
15        Winston & Strawn
16        BY:  EIMERIC REIG-PLESSIS, ESQ.
17        101 California Street
18        San Francisco, California 94111
19
20
21
22
23
24
25
```

Page 4

```
 1   APPEARANCES CONTINUED:
 2
 3   For Dr. Reddy's Laboratories Defendants
 4        Windells Marx Lane & Mittendorf
 5        BY:  CONSTANCE HUTTNER, ESQ.
 6        Attorney at Law
 7        One Giralda Farms
 8        Madison, New Jersey 07940
 9        (appeared via phone)
10
11
12
13
14   ALSO PRESENT:  Joseph T. Kennedy, Amarin EVP, GC
15   Videographer:
16        Marcus Majers
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                   INDEX
 2   WITNESS                    EXAMINATION
 3   JAY W. HEINECKE, M.D.
 4   Volume I
 5
 6        BY MR. SIPES           9
 7        BY MR. REIG-PLESSIS    --
 8
 9
10   NUMBER       DESCRIPTION           PAGE
11   Exhibit 1  Opening Expert Report of Jay W.    12
            Heinecke, M.D. on Invalidity of the
12          Asserted Claims of the Patents-in-Suit
13
14   Exhibit 2  Rebuttal Expert Report of Jay W.   12
            Heinecke, M.D. on Invalidity of the
15          Asserted Claims of the Patents-in-Suit
16
17   Exhibit 3  Reply Report of Jay W. Heinecke, M.D. 12
            on Invalidity of the
18          Asserted Claims of the Patents-in-Suit
19
20   Exhibit 4  Application No. 21-656         48
            Approved Labeling
21          AMRN-PEXP-0001915-932
22
23   Exhibit 5  PDR, 62 Edition, 2008         113
            AMRN00290591-94
24
25
```

Page 6

EXHIBITS CONTINUED:                                    PAGE

1  
2  Exhibit 6  NIASPAN niacin extended-release      115
      tablets
3       AMRN-PEXP-0001692-712
4  
5  Exhibit 7  Atherosclerosis, 26 (1977)603-609    122
       AMRN-PEXP-0008180-186
6       Lars Carson article, On the Rise...
7  
8  Exhibit 8  Article from the Journal of Clinical 134
      Lipidology, Pilot Study...
9       AMRN00621043-49
10  
11  Exhibit 9  Regulator Rebuffs Merck's           160
      Cholesterol Drug article
12      Peter Mitchell 28 May
      AMRN-PEXP-0009429-431
13  
14  Exhibit 10 Tredaptive, Pelzont, and Trevaclyn  171
      suspended across the UE
15      AMRN-PEXP-000910-112
16  Exhibit 11 When Good Cholesterol Turns Bad     185
      Oram and Heinecke
17  
18  Exhibit 12 Purified eicosapentaenoic and       215
      docosahexaenoic acids...
19      ICOSAPENT-DFNDTS00006520-29
20  Exhibit 13 A Review of Omega-3 Ethyl Esters    236
      for Cardiovascular Prevention and
21      Treatment of Increased Blood
      Triglyceride Levels by
22      Clemens von Schacky
23  
24  
25  

Page 7

EXHIBITS CONTINUED:                                    PAGE

1  
2  Exhibit 14  Current Therapeutic Research        242
      Clinical and Experimental, Vol 56
3      No. 1, 1995
      ICOSAPENT_DFNDTS00006159-68
4  
5  Exhibit 15  Eicosapentaenoic Acid Effect on     263
      Hyperlipidemia in Menopausal
6      Japanese Women by Kurabayashi, et al.
      ICOSAPENT_DFNDTS00006237-44
7  
8  Exhibit 16  US Patent 8,293,728                 276
      AMRN-PEXP-000000122
9  
10  Exhibit 17  Methods of Treating and/or         288
      Preventing Cardiovascular Diseases
11      and Disorder
12  Exhibit 18  Effects of Eicosapentaenoic Acid    304
      on Major Coronary Events in
13      Hypercholesterolaemic Patients
      (JELIS) Yokoyama, et al.
14      AMRN03151311-319
15  Exhibit 19  Epadel Capsules 300, Approval       316
      ICOSAPENT_DFNTS00008961-69
16  
17  Exhibit 20  Publication No. WO 2008/004900 A1  329
      ICOSAPENT_DFNTS00007108-150
18  
19  
20  
21  
22  
23  
24  
25  

Page 8

```
1            San Francisco, California        10:20
2            July 17, 2019                    10:20
3            8:04 a.m.                        10:20
4                                             10:20
5            THE VIDEOGRAPHER: Good morning. This is  08:02
6   the start of media labeled No. 1 of the video     08:02
7   recorded deposition of Dr. Jay W. Heinecke, in the 08:02
8   matter of Amarin Pharma, Inc., et al, versus Hikma 08:03
9   Pharmaceuticals USA Inc., et al., in the United    08:03
10  States District Court, District of Nevada,         08:03
11  Case No.: 2:16-cv-02525-MMD-NJK; Consolidated 08:03
12  with: 2:16-cv-02562-MMD-NJK.                  08:03
13           This deposition is being held at Winston &  08:03
14  Strawn, 101 California Street, San Francisco,      08:03
15  California, on July 17, 2019, at approximately     08:03
16  8:04 a.m.                             08:03
17           My name is Marcus Majers. I'm the legal  08:03
18  video specialist from TSG Reporting, Inc.,         08:03
19  headquartered at 747 Third Avenue, New York,       08:03
20  New York. The court reporter is Mary Goff, in      08:03
21  association with TSG Reporting.               08:03
22           Will all counsel present please introduce  08:04
23  themselves.                              08:04
24           MR. SIPES: Christopher Sipes of Covington 08:04
25  & Burling LLP, on behalf of the Plaintiff.         08:04
```

Page 9

```
1            With me is my colleague, Eric       08:04
2   Sonnenschein; and Joe Kennedy of Amarin      08:04
3   Pharmaceuticals.                         08:04
4            MR. REIG-PLESSIS: I'm Eimeric Reig of 08:04
5   Winston & Strawn, on behalf of the Hikma Defendants 08:04
6   and the witness.                         08:04
7            THE VIDEOGRAPHER: And has anyone joined 08:04
8   on the phone yet?                        08:04
9            MR. REIG-PLESSIS: I don't think so.  08:04
10           MR. SIPES: Okay. Great.           08:04
11           JAY W. HEINECKE, M.D.,            08:04
12  being first duly sworn or affirmed to testify to the 08:04
13  truth, the whole truth, and nothing but the truth,  08:04
14  was examined and testified as follows:        08:04
15           EXAMINATION                    08:04
16  BY MR. SIPES:                           08:04
17  Q   Good morning. Thank you for coming in    08:04
18  this morning.                           08:04
19       Could you please state your name and spell 08:04
20  it for the record?                       08:04
21  A   Yes. My name is Jay Walter Heinecke,      08:04
22  H E I N E C K E; J A Y; Walter, W A L T E R.   08:04
23  Q   And where do you reside?             08:04
24  A   I reside in Seattle, Washington.        08:04
25  Q   And you are currently employed?        08:04
```

Page 10

```
1        A   I'm currently provide by the University of    08:04
2    Washington.                                           08:04
3        Q   And what is your work address?               08:04
4        A   My work address would be the University of   08:05
5    Washington, 850 Republican Street, Seattle 98109.     08:05
6        Q   Okay.  Have you been deposed before?          08:05
7        A   I have never been deposed as an expert        08:05
8    witness.                                              08:05
9        Q   You have been deposed as a fact witness?      08:05
10       A   As a what?                                    08:05
11       Q   Have you been deposed as a fact witness?      08:05
12   Have you ever been deposed in any capacity?           08:05
13       A   I have.                                       08:05
14       Q   Okay.  How many times?                        08:05
15       A   One time.                                     08:05
16       Q   Okay.  I will go through the rules.  I        08:05
17   suspect you -- you know them, having been through     08:05
18   it.                                                   08:05
19           But first, you understand that you are       08:05
20   under oath today and are required to answer my        08:05
21   questions truthfully?                                 08:05
22       A   Yes.                                          08:05
23       Q   If you don't understand a question, please   08:05
24   let me know and I will attempt to clarify it.         08:05
25   Otherwise, I will assume that you understood it; is   08:05
```

Page 11

```
1    that fair?                                            08:05
2        A   Yes.                                          08:05
3        Q   This is not an endurance test.  If at some   08:05
4    time you need a break, let me know and we'll try to   08:05
5    endeavor to find a good breaking point for you.       08:05
6        A   Okay.                                         08:05
7        Q   You understand that the court reporter is    08:05
8    taking down a transcript, so you'll need to answer    08:05
9    audibly with verbal responses?                        08:05
10       A   I do.                                         08:06
11       Q   Also, you -- your counsel may from time to   08:06
12   time object, but you'll need to answer the            08:06
13   questions, if you understand them, unless you're      08:06
14   instructed not to answer by counsel.                  08:06
15           Do you understand?                            08:06
16       A   I understand.                                 08:06
17       Q   Is there any reason why you cannot give      08:06
18   complete and truthful testimony today?                08:06
19       A   No, not that I'm aware after.                 08:06
20       Q   Okay.  And as far as you're -- you don't     08:06
21   have any medical condition or medications that might  08:06
22   interfere with your ability to answer truthfully?     08:06
23       A   No.                                           08:06
24       Q   Let me hand to you three documents that      08:06
25   have been marked as Exhibits 1, 2, and 3 in the       08:06
```

Page 12

```
1    case.                                                 08:06
2           (Exhibit 1 was marked for identification      08:06
3    and is attached to the transcript.)                   08:06
4           (Exhibit 2 was marked for identification      08:06
5    and is attached to the transcript.)                   08:06
6           (Exhibit 3 was marked for identification      08:06
7    and is attached to the transcript.)                   08:06
8        A   Okay.                                         08:06
9        Q   (BY MR. SIPES) Do you recognize              08:06
10   Exhibits 1, 2, and 3 as the reports that you          08:06
11   prepared in this case?  Since you have Exhibit 1 in   08:06
12   your hands, if you would turn to page 241 of          08:07
13   Exhibit 1, if you're looking for your signature.      08:07
14       A   Thank you.                                    08:07
15       Q   That -- that is your signature --            08:07
16       A   Yes --                                        08:07
17       Q   -- on page 241 of Exhibit 1?                 08:07
18       A   -- that's my signature on --                 08:07
19       Q   And you -- why don't we deal with            08:07
20   Exhibit 1.                                            08:07
21       A   You --                                        08:07
22       Q   You have got it in front of you.             08:07
23       A   Yeah.  Yeah.                                  08:07
24           Do I need to look at the signatures on the   08:07
25   other ones as well?                                   08:07
```

Page 13

```
1        Q   We can go through them one at a time, I --   08:07
2        A   Okay.                                         08:07
3        Q   -- think is easiest.                          08:07
4        A   Fine.                                         08:07
5        Q   And Exhibit 1 is the -- your opening         08:07
6    report --                                             08:07
7        A   Yes.                                          08:07
8        Q   -- in this case, correct?                    08:07
9           And you have signed it on or about            08:07
10   March 11 of 2019?                                     08:07
11       A   Yes.                                          08:07
12       Q   And you understand that you -- you signed    08:07
13   your expert report under penalty of perjury?          08:07
14       A   Yes.                                          08:07
15       Q   And did you endeavor to make what you        08:07
16   stated in your opening report -- and first of all,    08:08
17   is it all right if we refer to your -- Exhibit 1 as   08:08
18   your opening report?                                  08:08
19       A   That's fine.                                  08:08
20       Q   And did you endeavor to -- to make your      08:08
21   statements in Exhibit 1 to be as truthful and         08:08
22   accurate as possible?                                 08:08
23       A   I endeavored to make the statements as       08:08
24   truthful and accurate as possible.                    08:08
25       Q   Are you aware of any errors or corrections   08:08
```

## Page 82

```
1      Q   But the -- the not significant increase    09:13
2   was 2.5 percent --                                09:13
3      A   Yes.                       09:13
4      Q   -- over placebo in the high triglyceride   09:13
5   group, correct; and it was 49.2 percent?          09:14
6      A   Yes.                       09:14
7      Q   So it was many times larger in the very    09:14
8   high triglyceride group, correct?                 09:14
9      A   Correct.                   09:14
10     Q   Okay.  So a person of ordinary skill in    09:14
11  the art is going to recognize that the fibrates   09:14
12  produced a -- much larger and statistically       09:14
13  significant increase in LDL cholesterol in the very 09:14
14  high triglyceride patient population and did not   09:14
15  show even a statistically significant change in the 09:14
16  high triglyceride pop -- patient population,       09:14
17  correct?                          09:14
18     A   In this particular study, correct.        09:14
19     Q   Okay.  And the clinical study in the      09:14
20  TRICOR labeling would have been a clinical study   09:14
21  that was --                       09:14
22     A   Yes.                       09:14
23     Q   -- reviewed by FDA --      09:14
24     A   Yes.                       09:14
25     Q   -- correct?                09:14
```

## Page 83

```
1      THE COURT REPORTER:  Wait.        09:14
2      A   Excuse me.  Yes.           09:14
3      Q   (BY MR. SIPES) Okay.  And -- now, the     09:14
4   patients -- a person of ordinary skill in the art 09:14
5   would also recognize --            09:15
6      THE COURT REPORTER:  I'm sorry?  The --  09:15
7   what?                             09:15
8      Q   (BY MR. SIPES) Let me -- a person of      09:15
9   ordinary skill in the art in 2008 would also       09:15
10  recognize that patients who had high triglycerides, 09:15
11  but also had high LDL-C, actually saw a decrease in 09:15
12  LDL-C that was statistically significant relative to 09:15
13  placebo from fibrates, correct?   09:15
14     MR. REIG-PLESSIS:  Objection to form.       09:15
15     A   Yeah, can you restate that, please?       09:15
16     Q   (BY MR. SIPES) A person of -- a person of 09:15
17  ordinary skill in the art in 2008 would understand 09:15
18  from the 2004 TRICOR labeling that patients that had 09:15
19  high triglycerides, but also had high LDL-C        09:15
20  cholesterol, saw a decrease in LDL-C from TRICOR,  09:15
21  correct?                          09:15
22     A   Yes.                       09:15
23     Q   So a person of ordinary skill in March of 09:15
24  2008 would recognize that the effects of TRICOR can 09:15
25  vary depending on both the patient's LDL-C level and 09:15
```

## Page 84

```
1   its triglyceride level, correct?   09:16
2      MR. REIG-PLESSIS:  Objection to form.       09:16
3      A   Yeah, that's very specific.  I think there 09:16
4   could be a number of other factors that could     09:16
5   influence that conclusion.         09:16
6      Q   (BY MR. SIPES) And what other factors     09:16
7   might influence that conclusion?   09:16
8      A   Well, the underlying genetic disorder, for 09:16
9   example.                          09:16
10     Q   And would a person of ordinary skill in   09:16
11  the art believe that the patients with mixed      09:16
12  dyslipidemia likely had a different underlying     09:16
13  disorder than the patients with high triglycerides? 09:16
14     A   Yes, that would be likely.  09:16
15     Q   Okay.  And similarly, would a person of   09:16
16  ordinary skill in the art in 2008 understand that  09:16
17  patients with very high triglycerides likely had a 09:16
18  different underlying disorder than patients with   09:16
19  mixed dyslipidemia?               09:16
20     A   Yes, I believe that's correct.            09:16
21     Q   Okay.                      09:16
22     THE DEPONENET:  Can we take a restroom      09:16
23  break soon?                       09:16
24     MR. SIPES:  Why don't we take a break.      09:16
25     A   That sounds good.  Thank you.             09:16
```

## Page 85

```
1      THE VIDEOGRAPHER:  This marks the end of    09:16
2   media file labeled No. 1.  Off the record at      09:16
3   9:18 a.m.                         09:17
4      (A break was taken from 9:18 a.m. to        09:17
5   9:30 a.m.)                        09:17
6      THE VIDEOGRAPHER:  This marks the          09:29
7   beginning of media file labeled No. 2.  Back on the 09:29
8   record at 9:30 a.m.               09:29
9      Q   (BY MR. SIPES) Dr. Heinecke, let me ask   09:29
10  you to turn to paragraph 137 of your rebuttal      09:29
11  report.                           09:29
12     MR. REIG-PLESSIS:  That's Exhibit 2.       09:29
13     A   Yes.                       09:29
14     Q   (BY MR. SIPES) In paragraph 137, you      09:29
15  state, Fibrates, niacin, Lovaza, EPANOVA, and Omtryg 09:29
16  were (and still are) all FDA approved to reduce    09:29
17  triglycerides, including in the claimed patient    09:30
18  population with baseline levels of 500 milligrams  09:30
19  per deciliter or higher, correct? 09:30
20     A   Yes.                       09:30
21     Q   And that list of fibrates, niacin, Lovaza, 09:30
22  EPANOVA, and Omtryg, along with VASCEPA, is the full 09:30
23  list of drugs approved by FDA presently to treat   09:30
24  very high triglycerides, correct? 09:30
25     A   I -- I don't know the answer to that.     09:30
```

Page 86

1    Q   Okay.  Are you aware of any drug approved   09:30
2  by FDA to treat very high triglycerides, other than   09:30
3  fibrates, niacin, Lovaza -- Lovaza, EPANOVA, Omtryg   09:30
4  and VASCEPA?   09:30
5    A   No.   09:30
6    Q   Now, you state that those -- that,   09:30
7  Fibrates, niacin, Lovaza, EPANOVA, and Omtryg were   09:30
8  all FDA approved to reduce triglycerides, including   09:30
9  in the claimed patient population with baseline   09:30
10  levels of 500 milligrams per deciliter or higher.   09:30
11    Do you see that?   09:31
12    A   Yes.   09:31
13    Q   When you say "were," what time frame are   09:31
14  you talking about?   09:31
15    A   I know that during my time of taking care   09:31
16  of patients with high triglycerides, that niacin was   09:31
17  approved for that, and fibrates (phonetic) were   09:31
18  approved.   09:31
19    I don't know the exact dates for the other   09:31
20  drugs.   09:31
21    Q   Okay.  Is it your --   09:31
22    A   You mentioned --   09:31
23    Q   -- I'm sorry.  I didn't want to cut you   09:31
24  off.  Would --   09:31
25    A   Yeah.  No.  Excuse me.   09:31

Page 87

1    Q   Is it your understanding that EPANOVA was   09:31
2  approved by March of 2008?   09:31
3    MR. REIG-PLESSIS:  Objection to form.   09:31
4    A   I can't answer that question.   09:31
5    Q   (BY MR. SIPES)  Now, it's not your   09:31
6  testimony sitting here today that EPANOVA is part of   09:31
7  the prior art, correct?   09:31
8    A   Could you -- could you define what you   09:31
9  mean by "part of the prior art"?   09:31
10    Q   Okay.  Why don't we -- in your opening   09:32
11  report --   09:32
12    A   Yes.   09:32
13    Q   -- on paragraph 18 --   09:32
14    MR. REIG-PLESSIS:  It's Exhibit 1.   09:32
15    A   Yes.   09:32
16    Q   (BY MR. SIPES) -- Exhibit 1 --   09:32
17    A   Yes.  Thank you.   09:32
18    Q   -- you note that you have been informed by   09:32
19  counsel that March of 2008 is the date claimed for   09:32
20  conception of the claimed inventions, correct?   09:32
21    A   Where is that written --   09:32
22    Q   It's --   09:32
23    A   -- again?   09:32
24    Q   -- actually at the top of page 8.  It's   09:32
25  the one sentence in -- in paragraph 18 of your   09:32

Page 88

1  opening report.  Paragraph 18.   09:32
2    A   18.  Okay.  Yes.   09:32
3    Q   So you understand -- and you don't dispute   09:32
4  the March of 2008 conception date for the inventions   09:32
5  at issue in this case, correct?   09:32
6    A   I do not.   09:33
7    Q   All right.  So is it your understanding   09:33
8  that for purposes of evaluating prior art, the   09:33
9  critical date is March 2008?   09:33
10    A   Yes, it is.   09:33
11    Q   Okay.  So going back to the list of   09:33
12  medications for very high triglycerides that you   09:33
13  have in your rebuttal report --   09:33
14    A   Yes.   09:33
15    Q   -- in paragraph 137, it is not your   09:33
16  testimony -- is it your testimony that EPANOVA was   09:33
17  known in the art prior to March of 2008?   09:33
18    A   I can't recall the specific date that that   09:33
19  was approved.   09:33
20    Q   Okay.  So --   09:33
21    A   I would have to do further research --   09:33
22    Q   Okay.   09:33
23    A   -- on that point.   09:33
24    Q   So sitting here today, you're not prepared   09:33
25  to -- to testify that EPANOVA was known in the art   09:33

Page 89

1  prior to March of 2008?   09:33
2    A   I'm trying to remember here.  Well, since   09:33
3  I can't claim that I know the exact date, I would   09:34
4  have to agree with that.   09:34
5    Q   And you do not rely on EPANOVA for   09:34
6  purposes of your opinions on obviousness in this   09:34
7  case, correct?   09:34
8    A   If I knew the specific date of approval   09:34
9  for the EPANOVA, I could answer that correctly.   09:34
10    Q   Well, do you recall that you -- you used   09:34
11  two different obviousness combinations in your   09:34
12  opinions?   09:34
13    A   Yes.   09:34
14    Q   And one involved the drug Lovaza?   09:34
15    A   Yes.   09:34
16    Q   And the other involved the drug Epadel?   09:34
17    A   Yes.   09:34
18    Q   And EPANOVA is neither Epadel, nor Lovaza,   09:34
19  correct?   09:34
20    A   Correct.   09:34
21    Q   Okay.  So to the best of your   09:34
22  recollection, are you relying on EPANOVA in your   09:34
23  obviousness opinions in this case?   09:34
24    MR. REIG-PLESSIS:  Objection to form.  Do   09:34
25  you mean objective indicia or premium fascia?   09:34

## Page 90

```
 1       Q   (BY MR. SIPES) In -- in your opening     09:35
 2   report where you opined on the obviousness of the  09:35
 3   invention, did you rely on EPANOVA in forming your  09:35
 4   opinions?                                09:35
 5       A   Since I can't remember the specific date,  09:35
 6   I would have to do further research on that question  09:35
 7   to answer that.                          09:35
 8       Q   Okay.  And similarly, sitting here today,  09:35
 9   is it your opinion that Omtryg is prior art?   09:35
10       A   Again, I don't remember the specific date  09:35
11   for that, and so I would have to research that  09:35
12   further in order to answer the question.       09:35
13       Q   All right.  And do you understand that  09:35
14   Omtryg is neither Lovaza, nor Epadel?          09:35
15       A   Yes.                          09:35
16       Q   And you -- sitting here today, you're not  09:35
17   prepared to answer one way or the other as to   09:35
18   whether or not, in your opinions of obviousness  09:35
19   expressed in your opening report, you rely upon  09:35
20   Omtryg?                              09:35
21       MR. REIG-PLESSIS:  Objection to form.    09:35
22       A   Could you be more specific about exactly  09:35
23   what you are referring to?                 09:35
24       Q   (BY MR. SIPES) You -- you recall in your  09:35
25   opening report, putting together opinions on   09:35
```

## Page 91

```
 1   obviousness?                             09:36
 2       A   Yes.                          09:36
 3       Q   Okay.  Do you -- okay.             09:36
 4       Do you recall sitting here today whether  09:36
 5   or not, in forming your opinion of obviousness that  09:36
 6   you expressed in your opening report, you relied on  09:36
 7   Omtryg as part of the prior art?            09:36
 8       A   You would have to refer me to the specific  09:36
 9   point where I do that.                     09:36
10       Q   Okay.  I -- I don't find it in your   09:36
11   opening report.  But I'm not the master of your  09:36
12   opinions, which --                        09:36
13       A   Yeah.                         09:36
14       Q   -- is why I asked.                09:36
15       A   Okay.                         09:36
16       Q   So I take it sitting here today, you do  09:36
17   not recall relying on Omtryg in forming your   09:36
18   opinions of obviousness that you expressed in your  09:36
19   opening report?                          09:36
20       A   I do not recall that.             09:36
21       Q   Okay.  So let's turn to your opening   09:36
22   report, paragraph 18.                      09:36
23       A   Paragraph 18.                   09:36
24       Q   18, yeah.  You state, I have been asked by  09:36
25   counsel to offer my opinions regarding the    09:37
```

## Page 92

```
 1   obviousness of the asserted claims from the point of  09:37
 2   view of a person of ordinary skill in the art.  09:37
 3       Do you see that?                     09:37
 4       A   Yes.                          09:37
 5       Q   And the counsel you referred to there   09:37
 6   is -- is defendants' counsel, I take it, correct?  09:37
 7       A   Yes.                          09:37
 8       Q   And as you note in paragraph 25, you are  09:37
 9   not a lawyer, correct?                     09:37
10       A   Correct.                      09:37
11       Q   So you relied upon defendants' counsel's  09:37
12   instructions regarding the legal standards for  09:37
13   obviousness, correct?                      09:37
14       A   Yes, in consultation with the lawyers.  09:37
15       Q   Right.  And the -- the legal standards  09:37
16   that you applied in formulating your opinions on  09:37
17   obviousness are set forth in paragraphs 26 to 31 of  09:37
18   your opening report, correct?               09:37
19       A   Yes.                          09:37
20       Q   And the legal standard you used is the  09:37
21   legal standard that you set forth from counsel; you  09:37
22   didn't rely on your own independent understanding of  09:37
23   obviousness, correct?                      09:38
24       A   I -- I consulted with counsel, taking   09:38
25   advantage of their expertise, to provide my   09:38
```

## Page 93

```
 1   understanding of what these concepts meant.     09:38
 2       Q   You -- in your opening report, you do not  09:38
 3   express any opinions concerning the legal defense of  09:38
 4   "anticipation," correct?                   09:38
 5       A   I don't know what that means.  Could you  09:38
 6   redefine that question, please?             09:38
 7       Q   I -- you are -- do you have an        09:38
 8   understanding of the legal defense of         09:38
 9   "anticipation"?                          09:38
10       A   Of anticipation?  I'm not recalling   09:38
11   anything about anticipation.               09:38
12       Q   Okay.  So --                   09:38
13       A   I would have to do further research on --  09:38
14       Q   Okay.                         09:38
15       A   -- that point.                  09:38
16       Q   So to the best of your recollection, you  09:38
17   are not offering an opinion that the asserted claims  09:38
18   are invalid for anticipation, correct?        09:38
19       A   Could you define what you mean by "for  09:38
20   anticipation"?                           09:38
21       Q   Well, I would like to ask the question  09:38
22   here.  And if you don't understand anticipation,  09:39
23   that's fine.                             09:39
24       Do you find that you can't answer the    09:39
25   question, whether or not you're offering an opinion  09:39
```

Page 270

1    Q   (BY MR. SIPES) Can --                02:04
2    A   Do you --                 02:04
3    Q   How would a person of ordinary skill in   02:04
4    the art determine the effect of EPA alone on LDL   02:04
5    cholesterol, given the results in Kurabayashi?   02:04
6    A   Well, what you can conclude in this study   02:04
7    is that in a patient treated with estriol, that EPA   02:04
8    intervention lowers the LDL cholesterol relative to   02:04
9    a person who is taking estriol that didn't get the   02:04
10   EPA.                        02:04
11       So in other words, this is -- for this   02:04
12   specific population where both groups were treated   02:04
13   with estriol, EPA lowers the LDL cholesterol in   02:04
14   that -- in that particular --             02:04
15   Q   And --                     02:04
16   A   -- group.                   02:04
17   Q   -- and that's what I'm trying       02:04
18   to understand -- so -- and I don't understand -- is   02:04
19   it your testimony that the data in Kurabayashi   02:04
20   suggests that the group that received EPA on top of   02:04
21   estriol, saw greater reductions in LDL-C than the   02:04
22   patients who only received estriol?       02:05
23       MR. REIG-PLESSIS:   Objection to form;   02:05
24   mischaracterizes.                02:05
25   A   Yeah, I'm sorry.  You're going to have to   02:05

Page 271

1    say that again.                   02:05
2    Q   (BY MR. SIPES) Is it your testimony that   02:05
3    from Kurabayashi, the patients who received EPA on   02:05
4    top of estriol, saw greater reductions in LDL-C than   02:05
5    the control group that received estriol alone?   02:05
6        MR. REIG-PLESSIS:   Same objection.   02:05
7    A   I think what we can conclude is that both   02:05
8    groups saw a significant decrease in LDL   02:05
9    cholesterol.                    02:05
10   Q   (BY MR. SIPES) And would the conclusion be   02:05
11   from that that the estriol was decreasing the LDL   02:05
12   cholesterol?                    02:05
13   A   Not necessarily.  And I have noticed in   02:05
14   reviewing the papers for this that a lot of the   02:05
15   studies, the LDL cholesterol levels tend to go down   02:05
16   over time.                     02:05
17       That was observed in JELIS as well.  And I   02:05
18   have noticed that in many of the other studies.  So   02:05
19   there's -- there are other factors that can be   02:05
20   affecting LDL cholesterol in this study.     02:06
21   Q   But -- but it's fair to say from the   02:06
22   results presented in Kurabayashi that EPA did not,   02:06
23   in a statistically significant way, reduce LDL-C   02:06
24   cholesterol compared to control?         02:06
25   A   Okay.  I'm having to look at the figure   02:06

Page 272

1    legend here, because I think this is a fairly   02:06
2    technical point.                  02:06
3        Yes, okay, I think that's reasonable   02:06
4    conclusion.  It looks like there were similar   02:06
5    reductions in LDL cholesterol in both groups.   02:06
6    Q   Right.  Numerically, estriol alone reduced   02:06
7    LDL-C to a greater extent than estriol plus EPA,   02:06
8    correct?                       02:07
9    A   Well --                    02:07
10       MR. REIG-PLESSIS:   Objection to form.   02:07
11   A   -- I think the correct interpretation is   02:07
12   there's no statistical difference between the two   02:07
13   groups.                       02:07
14   Q   (BY MR. SIPES) Right.  The -- which is to   02:07
15   say the addition of EPA to estriol did not make any   02:07
16   statistically significant difference on LDL-C?   02:07
17   A   I think it would be correct to say that in   02:07
18   this particular study in these patients, yes.   02:07
19   Q   And the baseline triglycerides in the   02:07
20   Kurabayashi study --               02:07
21   A   I just want to -- some of these studies   02:07
22   were in a subset, I believe.  Is that correct or is   02:07
23   that -- let me just look -- may I look at the   02:07
24   text --                        02:07
25   Q   Sure.                     02:07

Page 273

1    A   -- for a minute?  Okay.           02:07
2        This is the overall population, I believe,   02:08
3    in this particular study.             02:08
4    Q   The -- the baseline triglycerides in   02:08
5    Kurabayashi was 135.6 milligrams per deciliter for   02:08
6    the EPA group, correct?               02:08
7    A   Yes.                      02:08
8    Q   So those are normal triglyceride levels?   02:08
9    A   They're less than 150 milligrams per   02:08
10   deciliter.                      02:08
11   Q   So Kurabayashi was not conducted in a   02:08
12   hypertriglyceridemic patient population?   02:08
13   A   No.                       02:08
14   Q   If you'll turn to page 523, the right-hand   02:08
15   column --                      02:09
16   A   Yes.                      02:09
17   Q   -- there's a sentence that says, The   02:09
18   proportion of cases showing improvement of   02:09
19   triglyceride levels was 10 percent, 2 of 20, and   02:09
20   55 percent of 11 of 20 respectively.       02:09
21       Do you see that?              02:09
22   A   Boy, they -- they keep saying the same --   02:09
23   it's -- it's going to take me a minute because they   02:09
24   keep repeating the same phraseology all the way   02:09
25   through here.  Can you repeat that one more time --   02:09

Page 274

1    Q   Yes.                              02:09
2    A   -- for me?                        02:09
3    Q   There's a reference to, The proportion of   02:09
4    cases showing improvement of triglyceride levels was   02:09
5    10 percent, 2 of 20, and 55 percent, 11 of, 20   02:09
6    respectively.                         02:09
7    A   Okay.  Let me just review this.  Yes.   02:09
8    Q   So at least for those patients that   02:10
9    continued to the end of the study, 45 percent of   02:10
10   them that were on EPA plus estriol did not see   02:10
11   improvements in triglyceride levels, correct?   02:10
12   A   According to the criteria, they don't   02:10
13   really define here what they mean by "improvement in   02:10
14   triglyceride levels," and so I think that makes that   02:10
15   statement somewhat ambiguous.         02:10
16   Q   So would a person of ordinary skill in the   02:10
17   art in 2008 be able to understand that statement?   02:10
18   A   I think they would say there's -- appears   02:10
19   to be a difference between the two groups, but we   02:10
20   don't know exactly what that means because they   02:10
21   don't define what they're talking about.   02:10
22   Q   For purposes of developing a treatment for   02:10
23   very high triglycerides, what response rate would be   02:10
24   desirable in the TG-lowering agent --   02:10
25       MR. REIG-PLESSIS:  Objection to form.   02:10

Page 275

1    Q   (BY MR. SIPES) -- or what -- what response   02:10
2    would be considered acceptable?       02:10
3        MR. REIG-PLESSIS:  Same objection.   02:10
4    A   I think, again, it's a very broad   02:11
5    question.  And I think that you would have to define   02:11
6    more carefully what the clinical population was.   02:11
7        You would have to give me additional   02:11
8    information about what exact circumstances you're   02:11
9    talking about.  Are these diabetics?  Nondiabetics?   02:11
10   People with heart disease?  People without heart   02:11
11   disease?                              02:11
12       I think there's a lot of variables in that   02:11
13   equation.                             02:11
14       MR. SIPES:  I think this would be a good   02:11
15   time for, among other things, a break.   02:11
16       THE VIDEOGRAPHER:  This marks the end of   02:11
17   media file labeled No. 5.  Off the record at   02:11
18   2:12 p.m.                             02:11
19       (A break was taken from 2:12 p.m. to   02:11
20   2:27 p.m.)                            02:11
21       THE VIDEOGRAPHER:  This marks the   02:25
22   beginning of media file labeled No. 6.  Back on the   02:25
23   record 2:27 p.m.                      02:25
24   Q   (BY MR. SIPES) I'm going to hand you   02:26
25   Exhibit 16.                           02:26

Page 276

1        (Exhibit 16 was marked for identification   02:26
2    and is attached to the transcript.)   02:26
3    Q   (BY MR. SIPES) Do you recognize Exhibit 16   02:26
4    as U.S. Patent 8,293,728 that is at issue in this   02:26
5    case?                                 02:26
6    A   Yes.                              02:26
7    Q   And are you familiar with the practice of   02:26
8    referring to a patent by its last three numbers?   02:26
9    A   I am.                             02:26
10   Q   So would it be all right if we refer to   02:26
11   Exhibit 16 at the '728 Patent?        02:26
12   A   Yes.                              02:26
13   Q   Now, I want you to look at your reply   02:26
14   report, Exhibit 3, paragraph 25.      02:26
15   A   So where am I looking now?        02:26
16   Q   Your reply report, paragraph 25.  It's on   02:26
17   page 7.                               02:26
18   A   I'm trying to move the paper away from   02:27
19   myself.  Okay.  Yes.                  02:27
20   Q   In the first sentence of paragraph 25, you   02:27
21   state, To be clear, under my definition, a POSA   02:27
22   would have had a high level of skill relevant to the   02:27
23   asserted patents.                     02:27
24       Do you see that?                  02:27
25   A   Yes.                              02:27

Page 277

1    Q   Why, in your opinion, would a person of   02:27
2    ordinary skill in the art, for purposes of the   02:27
3    asserted patents in this case, have had a high level   02:27
4    of skill?                             02:27
5    A   Well, I think evaluating whether or not   02:27
6    something is actually significantly different -- in   02:27
7    other words, if something really is a new invention   02:27
8    versus what was present in the art before requires a   02:27
9    fairly sophisticated knowledge of biochemistry and   02:27
10   physiology.                           02:27
11   Q   Do you think it would require a   02:27
12   sophisticated knowledge of biochemistry and   02:27
13   physiology --                         02:27
14   A   Not --                            02:27
15   Q   -- okay.  Let's --                02:28
16   A   -- I'm stopping.  I'm stopping.   02:28
17   Q   Did you develop your -- your definition   02:28
18   of a person of ordinary skill in the art based on what   02:28
19   would be required to evaluate the patentability of   02:28
20   the invention claimed in the asserted patents?   02:28
21       MR. REIG-PLESSIS:  Objection to form.   02:28
22   A   I think it would be required to evaluate   02:28
23   the totality of the evidence that's supporting   02:28
24   the -- the claims of the patent, would be my   02:28
25   evaluation.                           02:28

Page 278

1    Q   (BY MR. SIPES) All right.  And what sort    02:28
2  of knowledge would be required to evaluate the    02:28
3  evidence supporting the claims of the patents?    02:28
4    A   Well, I think we outline it here.  I would    02:28
5  probably pretty much stick with what the definition    02:28
6  here is, as --                                   02:28
7    Q   And --                                     02:28
8    A   -- as outlined in paragraph 25.            02:28
9    Q   Okay.  So that would require a knowledge    02:28
10 of -- of lipid biochemistry, correct?            02:29
11    MR. REIG-PLESSIS:  Objection to form;          02:29
12 mischaracterizes.
13    A   Yeah, I -- I think the way this is meant    02:29
14 to explain it is -- is there could be different    02:29
15 areas within this context -- in this definition.    02:29
16 You wouldn't necessarily have to have every single    02:29
17 one of these things.                             02:29
18    Q   (BY MR. SIPES) Do you believe that you    02:29
19 would need a medical degree?                     02:29
20    A   I do not.                                  02:29
21    Q   Okay.  If -- if a person didn't have a    02:29
22 medical degree, what would they need to evaluate the    02:29
23 evidence in the patent?                          02:29
24    A   I think they would have to have extensive    02:29
25 experience in the lipid field, practical experience.    02:29

Page 279

1  They would have to have a detailed familiarity with    02:29
2  the literature, and they would have to have some    02:29
3  basic knowledge of pharmacology and biochemistry.    02:29
4    Q   And when you say to have "practical    02:29
5  experience in the field," what -- if somebody wasn't    02:29
6  a medical doctor, that experience would not involve    02:29
7  treating patients, correct?                      02:30
8    A   Well, that would not involve prescribing    02:30
9  treatment for patients.                          02:30
10    Q   Okay.                                      02:30
11    A   So for example, let's just imagine a Ph.D.    02:30
12 They might not be able to write a prescription for    02:30
13 treating a patient, but I know Ph.D.s in the field    02:30
14 who are extremely knowledgeable about many, many    02:30
15 different aspects of -- of this area and would be    02:30
16 capable of making a very well-informed judgment.    02:30
17    Q   And would a person with a Ph.D. evaluating    02:30
18 the evidence supporting the invention, consult with    02:30
19 a physician or other medical doctor?             02:30
20    A   Not necessarily.  I think, again, it    02:30
21 depends on your experience.                      02:30
22    And as I'm learning in this -- this    02:30
23 session right here with you guys, as well as my    02:30
24 interactions with my team, lawyers can have a very    02:30
25 good knowledge of what's going on in this area    02:30

Page 280

1  because they're extremely familiar with the    02:30
2  literature and they know a lot of the wrinkles    02:31
3  relevant to it.                                  02:31
4    So I think it's really a matter of what    02:31
5  exactly their knowledge is.                      02:31
6    Q   Okay.  But -- but you're not suggesting a    02:31
7  person of ordinary skill in the art would need    02:31
8  excess to a lawyer, I take it?                   02:31
9    A   No.  No.                                   02:31
10    Q   Yeah.  Okay.  You don't include within the    02:31
11 skill set of the -- of the team to which a person of    02:31
12 skill would have access, a biostatistician, I take    02:31
13 it?                                              02:31
14    MR. REIG-PLESSIS:  Objection to form.          02:31
15    A   I think that would depend on the    02:31
16 particular circumstances.  And I -- really trying to    02:31
17 specify every single thing that you need to    02:31
18 understand these things depends on the precise    02:31
19 circumstances of what's being evaluated and what's    02:31
20 involved.                                        02:31
21    So in some circumstances you -- you might    02:31
22 need to have a very detailed evaluation of    02:31
23 biostatistics.  And for example, in my area -- one    02:31
24 my areas of research, we do very large numbers of    02:31
25 protein measurements in lipoproteins.            02:32

Page 281

1    And since we're measuring so many    02:32
2  different things in so many different people, trying    02:32
3  to interpret that data would require someone with    02:32
4  biostatistical expertise.  And for example, we get    02:32
5  that kind of expertise when we need it.          02:32
6    On the other hand, if you're trying to    02:32
7  interpret many clinical studies, I think that you    02:32
8  don't necessarily need a strong biostatistical    02:32
9  background.  And even just taking it at more or less    02:32
10 face value, the p-values.  And assuming that they    02:32
11 have a reasonable understanding of -- of statistics,    02:32
12 what a p-value test is, what a -- what some of the    02:32
13 standard tests are, that might be adequate.  So it    02:32
14 very much depends on the exact -- on the exact    02:32
15 nature of what it is you are trying to -- to do.    02:32
16    Q   Okay.                                      02:32
17    A   I think it's a -- it's a complicated area.    02:32
18    Q   The patent describes a -- a clinical study    02:32
19 of 4 grams of EPA, correct, in Column 13 --       02:32
20    MR. REIG-PLESSIS:  Objection to form.          02:32
21    Q   (BY MR. SIPES) -- the -- the patent -- the    02:32
22 '728 Patent?                                     02:32
23    A   I'm sorry?  Where is that?                 02:32
24    Q   It's Exhibit --                           02:32
25    A   Oh --                                      02:33

Page 282

```
1     Q   -- 16.                              02:33
2     A   -- right in front of me.  And correct me   02:33
3  if I'm wrong here, but that would be under the    02:33
4  claims?                                      02:33
5     Q   No.  No.  No.  Column 13, the example.   02:33
6     A   Okay.  Please restate the question.   02:33
7     Q   The -- the example describes a          02:33
8  placebo-controlled, randomized, double-blind 12-week   02:33
9  study with open-label extension conducted on EPA,   02:33
10 correct?                                     02:33
11    MR. REIG-PLESSIS:  Objection to form;     02:33
12 mischaracterizes.                            02:33
13    A   I -- I think I would have to go with what   02:33
14 the text says.  It says a placebo -- a multicenter   02:33
15 placebo -- it says what it says.  I would go with   02:33
16 the --                                       02:33
17    Q   (BY MR. SIPES) Right.                  02:33
18    A   -- text there.                        02:33
19    Q   And "AMR101," do you understand the    02:33
20 reference to "AMR101 in '728 Patent?         02:33
21    A   I do.                                 02:33
22    Q   And what is AMR101?                    02:33
23    A   EPA --                                02:33
24    Q   That -- that's --                     02:33
25    A   -- ester --                           02:33
```

Page 283

```
1     Q   -- pure ester?                        02:33
2     A   -- yeah, pure.  9 -- greater than       02:34
3  96 percent pure EPA and ester of that form of the --   02:34
4  the --                                       02:34
5     Q   And that --                           02:34
6     A   -- fatty acid.                        02:34
7     Q   -- and the -- and what the patent is   02:34
8  describing in the example is the administration of   02:34
9  pure EPA to patients with fasting triglyceride   02:34
10 levels of 500 and above, correct --          02:34
11    MR. REIG-PLESSIS:  Objection to form.     02:34
12    Q   (BY MR. SIPES) -- 500 milligrams per   02:34
13 deciliter above, correct?                    02:34
14    MR. REIG-PLESSIS:  Same objection.        02:34
15    A   Well, I can quote what it says, With   02:34
16 fasting triglyceride levels of greater than or equal   02:34
17 to 500 milligrams per deciliter and less than or   02:34
18 equal to 1,500 milligrams per deciliter with   02:34
19 definitions provided as well in millimoles per   02:34
20 liter.                                       02:34
21    Q   (BY MR. SIPES) So would a person of    02:34
22 ordinary skill in the art in light of the study   02:34
23 described there, do you believe that would require   02:34
24 consultation with a biostatistician to interpret the   02:34
25 results of that study?                       02:34
```

Page 284

```
1     MR. REIG-PLESSIS:  Objection to form and   02:34
2  as to "results."                             02:34
3     A   I mean, there's a lot of things that are   02:35
4  missing from this particular statement.  So again,   02:35
5  you're making some very broad statements.    02:35
6     You don't specify what the number of       02:35
7  subjects studied is going to be.  You don't discuss   02:35
8  what your power calculations are.  You don't specify   02:35
9  what you're going to consider significant and   02:35
10 nonsignificant.  So this is -- I mean, this is sort   02:35
11 of a very bare-bones description of what -- what you   02:35
12 would really need to do to evaluate that.    02:35
13    Q   So when you were defining your person of   02:35
14 ordinary skill in the art, were you taking into   02:35
15 account the skill that would be necessary to   02:35
16 evaluate the results?                        02:35
17    A   Yes.                                  02:35
18    Q   Okay.  And in your view, that would     02:35
19 require a high level of skill?               02:35
20    A   No.  In my view, it would require more   02:35
21 information and an adequate technical background.   02:35
22    It -- and again, you're making very broad   02:35
23 statements here, and I think the issue very much   02:35
24 depends on the particulars.                  02:35
25    And I'll also add that just achieving      02:35
```

Page 285

```
1  statistical significance does not necessarily mean   02:36
2  it's clinically significant.  Right.         02:36
3     So I think, again, that requires judgment   02:36
4  about what the overall context in the field is and   02:36
5  what a significant improvement would be.     02:36
6     Q   And would -- judgments about the clinical   02:36
7  significance of the results, that would require a   02:36
8  medical degree?                              02:36
9     A   Not necessarily.  I think -- I know     02:36
10 Ph.D.s.  I have worked with Ph.D.s that I felt were   02:36
11 qualified to make that kind of a judgment.   02:36
12    Q   And --                                02:36
13    A   And I will mention in passing:  I know   02:36
14 M.D.s that are not qualified to make that kind of a   02:36
15 judgment, so I don't think it's really whether you   02:36
16 have a Ph.D. or an M.D.  Yeah.              02:36
17    Q   Did you, in -- in determining what the   02:36
18 skill level is "of a person of ordinary skill,"   02:36
19 evaluate the level of skill of the inventors named   02:36
20 on the patent?                               02:36
21    A   I did not.                            02:36
22    Q   Okay.  Do you know the skill level of the   02:37
23 inventors named on the patent?              02:37
24    A   I do not.                             02:37
25    Q   Okay.  At this time in March of 2008, do   02:37
```

Page 355

1

2

3

4      I, JAY W. HEINECKE, M.D., do hereby declare

5  under penalty of perjury that I have read the

6  foregoing transcript; that I have made any

7  corrections as appear noted, in ink, initialed by

8  me, or attached hereto; that my testimony as

9  contained herein, as corrected, is true and correct.

10      EXECUTED this_____ day of_____,

11  20_____, at_____, _____.

            (City)                    (State)

12

13

14              _____

15              JAY W. HEINECKE, M.D.

16

17

18

19

20

21

22

23

24

25

1      I, MARY J. GOFF, CSR No. 13427, Certified

2    Shorthand Reporter of the State of California,

3    certify;

4      That the foregoing proceedings were taken

5    before me at the time and place herein set forth, at

6    which time the witness declared under penalty of

7    perjury; that the testimony of the witness and all

8    objections made at the time of the examination were

9    recorded stenographically by me and were thereafter

10   transcribed under my direction and supervision; that

11   the foregoing is a full, true, and correct

12   transcript of my shorthand notes so taken and of the

13   testimony so given;

14      That before completion of the deposition,

15   review of the transcript (XX) was (  ) was not

16   requested:   (   ) that the witness has failed or

17   refused to approve the transcript.

18      I further certify that I am not financially

19   interested in the action, and I am not a relative or

20   employee of any attorney of the parties, nor of any

21   of the parties.

22      I declare under penalty of perjury under the

23   laws of California that the foregoing is true and

24   correct, dated this 30th day of July, 2019.

_____  *Mary J. Goff*  _____

25                    MARY GOFF

*Amarin Pharma Inc. et al. v. Hikma Pharmaceuticals USA Inc. et al.*, No. 2:16-cv-02525-MMD-NJK (D. Nev.)

Deposition of Jay W. Heinecke, M.D., July 17, 2019

I wish to make the following changes, for the following reasons:

| PAGE:LINE | CHANGE FROM | CHANGE TO | REASON |
|-----------|-------------|-----------|--------|
| 10:1 | I'm currently provide by the | I'm currently a professor at the | Transcription error |
| 17:4 | somebody at Bud Barner | somebody at Budd Larner | Transcription error |
| 48:19 | biochemists in the n-3 (indiscernible) positions in the medical | biochemists and the omega-3 in the medical | Transcription error |
| 68:19-20 | It's manifested by the lack of protein particles | It's manifested by the lack of lipoprotein particles | Transcription error |
| 114:15 | For raising LDL-C cholesterol | For raising LDL-C cholesterol? | Transcription error |
| 114:25 | deflecting IDL and LDL. | affecting IDL and LDL. | Transcription error |
| 190:11 | there was a whole nother contingent | there was a whole other contingent | Transcription error |
| 193:2 | forward as for -- as -- as well | forward [delete for – as – as] as well. | Transcription error |
| 197:13-14 | study as a | study has a | Transcription error |
| 215:9 | buying a gen -- | buying a generic | Transcription error |
| 227:1 | certainly an HDL -- | certainly an HDL expert, | Transcription error |
| 229:2-3 | at hand here, whereas DHA did not. | at hand here, whereas EPA did not. | Transcription error |
| 252:8 | has a value of 233 with | has a value of 300 with | Conform to facts |
| 261:25 | and what you should synch. | and what you should use. | Transcription error |
| 287:22 | B R U N N E L [sic] | B R U N Z Z E L | Transcription error |
| 296:9 | for example, is plat -- | for example, is plasmapheresis | Transcription error |
| 297:14 | get erupted xanthomas | get eruptive xanthomas | Transcription error |
| 333:9 | of "whoa" where | of woes where | Transcription error |

1

**014**

| PAGE:LINE | CHANGE FROM | CHANGE TO | REASON |
|---|---|---|---|
| 343:21 | synth -- synth statin-treated patients | simvastatin-treated patients | Transcription error |
| 347:8 | increase LD -- actually | increase LDL-cholesterol actually | Transcription error |

I, Jay W. Heinecke, do hereby certify that I have read the transcript of my deposition and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance noted above.

Dated: _Aug 14, 2019_                    _____
                                          Jay W. Heinecke

2

015