```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
 2        BEFORE THE HONORABLE MIRANDA DU, DISTRICT JUDGE
                        ---o0o---
 3

 4   AMARIN PHARMA, INC., and      :
     AMARIN PHARMACEUTICALS        :
 5   IRELAND LIMITED,              :
                                   : No.  2:16-cv-02525-MMD-NJK
 6             Plaintiffs,         :
                                   : January 21, 2020
 7          -vs-                   :
                                   : Reno, Nevada
 8   HIKMA PHARMACEUTICALS USA     :
     INC., et al.,                 : Volume 5
 9                                 :
               Defendants.         :
10   _____:

11

12                   TRANSCRIPT OF BENCH TRIAL

13   APPEARANCES:

14   FOR THE PLAINTIFFS:      MEAGAN P. KEANE, CHRISTOPHER N.
                              SIPES, MICHAEL KENNEDY, JEFFREY
15                            ELIKAN, JOSEPH KENNEDY, ELAINA M.
                              WHITT, BARBARA KURYS, HAN PARK,
16                            DANIEL J. FARNOLY and ERIC R.
                              SONNENSCHEIN
17                            Attorneys at Law,
                              Washington, D.C.
18

19   FOR DEFENDANT HIKMA:     CHARLES B. KLEIN and
                              CLAIRE A. FUNDAKOWSKI,
20                            Attorneys at Law
                              Washington, D.C.
21

22   Reported by:             Kathyrn M. French, CCR #392, RPR
                              Official Reporter
23                            U.S. District Court
                              Reno, Nevada
24

25   (Appearances continue on next page.)
```

(Appearances continue on next page.)

```
 1    APPEARANCES CONTINUED:

 2


 3    FOR DEFENDANT HIKMA:        ALISON M. HEYDORN
                                 Attorney at Law
 4                               Chicago, Illinois

 5                               EIMERIC REIG-PLESSIS
                                 Attorney at Law
 6                               San Francisco, California

 7                               W. WEST ALLEN
                                 Attorney at Law
 8                               Las Vegas, Nevada

 9

10    FOR DEFENDANT DR.          CONSTANCE S. HUTTNER and
      REDDY'S LABORATORIES:      JAMES BARABAS
11                               Attorneys at Law
                                 Madison, New Jersey
12
                                 MICHAEL D. ROUNDS
13                               Attorney at Law
                                 Reno, Nevada
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                RENO, NEVADA, TUESDAY, JANUARY 21, 2020, 8:31 A.M.

 2                            ---o0o---

 3

 4                THE COURT:  Good morning.  Please be seated.

 5                All right.  Defendants' counsel ready to

 6   proceed?

 7                MR. BARABAS:  Yes, Your Honor.

 8                Your Honor, as our next witness defendants call

 9   Mr. Ivan Hofmann.

10                And, Your Honor, may we approach with binders?

11                THE COURT:  Yes.

12                MR. BARABAS:  Thank you.

13                        IVAN T. HOFMANN,
                   called as a witness on behalf of the Defendants,
14                   was sworn and testified as follows:

15                THE CLERK:  Please be seated.

16                Please state your full name and spell both your

17   first and last name for the record.

18                THE WITNESS:  My name is Ivan T. Hofmann,

19   I-v-a-n, then Hofmann is H-o-f-m-a-n-n.

20                MR. BARABAS:  May I proceed, Your Honor?

21                THE COURT:  Yes.

22                        DIRECT EXAMINATION

23   BY MR. BARABAS:

24   Q    Okay.  Mr. Hofmann, where are you currently employed?

25   A    I'm a vice-president and managing director at Gleason,
```

08:32:49   1   which is an economic finance and accounting consulting firm.

08:32:53   2   And I'm the leader of the intellectual property practice.

08:32:57   3   Q    Would you please briefly summarize your education.

08:33:00   4   A    Sure.  I graduated magna cum laude from the University of

08:33:09   5   Notre Dame with majors in both economics and accounting.

08:33:11   6   Q    What is the nature of your work in the area of

08:33:13   7   pharmaceutical products?

08:33:15   8   A    So sometimes -- well, I'm regularly consulting in the

08:33:21   9   area of pharmaceutical economics and specifically issues

08:33:25   10  involving intellectual property.

08:33:27   11         Sometimes it's in a dispute setting like this where

08:33:30   12  I'm addressing issues like commercial success and nexus and

08:33:34   13  other secondary considerations of nonobviousness.  Sometimes

08:33:39   14  it relates to things like damages, irreparable harm, et

08:33:44   15  cetera.

08:33:44   16         Then outside of the dispute setting, I regularly

08:33:47   17  assist companies in the life sciences industry, including

08:33:51   18  pharmaceutical companies, on things like valuation of

08:33:55   19  intellectual property, monetization of intellectual property,

08:33:59   20  licensing intellectual property, as well as product pipeline

08:34:04   21  consulting, pricing, promotion agreements, et cetera.

08:34:09   22  Q    How many pharmaceutical and biologic products have you

08:34:12   23  analyzed?

08:34:13   24  A    Oh, over the last few decades, it's been certainly more

08:34:17   25  than hundred covering virtually every major therapeutic class

08:34:22  1    of drugs.

08:34:22  2    Q    Have you worked on products that are used to reduce

08:34:26  3    triglyceride levels in adult patients with severe

08:34:31  4    hypertriglyceridemia?

08:34:31  5    A    I have, and I think we heard about some of those drugs

08:34:36  6    last week, both in and out of a dispute setting.  I've studied

08:34:42  7    the markets and provided consulting services on the

08:34:49  8    fenofibrate products, Niaspan, and obviously the omega-3s.

08:34:54  9    Q    Have you been engaged by the United States Patent and

08:34:58  10   Trademark Office to analyze issues involving intellectual

08:35:00  11   property?

08:35:00  12   A    I have.  On numerous occasions I've been hired by USPTO

08:35:07  13   and the Office of the Solicitor to analyze economic issues

08:35:12  14   involving intellectual property, and I've testified in Court

08:35:15  15   on behalf of the U.S. Government in regards to those issues

08:35:19  16   specifically involving commercial success and nexus.

08:35:23  17             MR. BARABAS:  Mr. Gross, if we could put up

08:35:26  18   DX 2223.

08:35:26  19   BY MR. BARABAS:

08:35:27  20   Q    Mr. Hofmann, would you please identify this document.

08:35:30  21   A    Yes, this is my summary curriculum vitae or CV.

08:35:37  22             MR. BARABAS:  And, Your Honor, if we could enter

08:35:40  23   DX 2223 into evidence.

08:35:43  24             THE COURT:  Any objection?

08:35:44  25             MR. M. KENNEDY:  No objection, Your Honor.

-1221-

08:35:45  1          THE COURT:  DX 2223 is admitted.

08:35:45  2                    (Defendants' Exhibit 2223 received in
08:35:45                        evidence.)
08:35:45  3  BY MR. BARABAS:

08:35:51  4  Q    Mr. Hofmann, have you previously been designated as an

08:35:54  5  expert by a court?

08:35:55  6  A    I have.  I've been designated as an expert in federal and

08:35:59  7  state court, before the United States International Trade

08:36:03  8  Commission, before the Patent Trial and Appeal Board, and

08:36:06  9  before various domestic and international arbitration panels.

08:36:11  10          Specifically, I've been recognized as an expert in

08:36:15  11  pharmaceutical economics by many federal courts throughout the

08:36:15  12  country.

08:36:22  13                    MR. BARABAS:  Your Honor, defendants' offer

08:36:24  14  Mr. Hofmann as expert witness in pharmaceutical economics.

08:36:29  15                    MR. M. KENNEDY:  No objection, Your Honor.

08:36:30  16                    THE COURT:  The Court will certify Mr. Hofmann

08:36:34  17  as an expert in pharmaceutical economics.

08:36:34  18  BY MR. BARABAS:

08:36:35  19  Q    Mr. Hofmann, what were you asked to do on this matter?

08:36:38  20  A    I was asked to review and respond to the claims of

08:36:41  21  commercial success and nexus advanced by plaintiffs' witness,

08:36:47  22  Dr. Nicholson.

08:36:49  23  Q    Have you prepared slides to assist the Court in your

08:36:53  24  testimony today?

08:36:53  25  A    I have.

08:36:54  1   Q    And you mentioned commercial success.  What is your

08:36:58  2   understanding of what that means in the context of your

08:37:00  3   analysis?

08:37:01  4    A    So I have a little summary slide here.

08:37:05  5            Essentially it's my understanding that commercial

08:37:08  6   success is a legal construct that's been established through

08:37:11  7   case law but is grounded in economics.

08:37:15  8            The main premise is that -- is this concept that if

08:37:20  9   a product is economically successful or experiences

08:37:25  10  marketplace success, that may provide objective evidence of

08:37:29  11  nonobviousness in an invalidity patent case under certain

08:37:34  12  circumstances.

08:37:35  13           And what one does is one analyzes various economic

08:37:41  14  metrics, both quantitatively and qualitatively, things like

08:37:47  15  profitability, market share, revenue, et cetera, and then

08:37:50  16  looks at whether that marketplace performance is attributable

08:37:54  17  to the claims of the patented invention, or whether there's

08:37:59  18  nexus between that marketplace performance and the claims of

08:38:03  19  the patents-in-suit.

08:38:05  20   Q    All right.  You mentioned nexus.  So what is your

08:38:08  21  understanding of nexus?

08:38:10  22   A    Yeah.  So I think we've heard a couple of technical

08:38:14  23  experts last week talk about nexus in the context of other

08:38:19  24  secondary considerations of nonobviousness, and it's a

08:38:22  25  common -- you know, it's the same concept.

08:38:24  1          Basically, though, when we look at it from economic

08:38:28  2   perspective, we're looking at the marketplace performance of

08:38:32  3   the product and whether that marketplace performance is driven

08:38:36  4   by and attributable to the alleged novelty of the claimed

08:38:41  5   invention and not by other factors unrelated to the alleged

08:38:45  6   novelty of the claimed invention.

08:38:48  7          Said differently, the plaintiffs, in order to

08:38:51  8   establish commercial success, have to show that there's a

08:38:54  9   causal correlation between the marketplace performance of the

08:39:00  10  product and the claims of the patents-in-suit, the unique

08:39:05  11  merits of the patents-in-suit.

08:39:07  12         This is called nexus.  And if they do not establish

08:39:11  13  that nexus or causal correlation between the marketplace

08:39:15  14  performance and the claims of the patents-in-suit, there's no

08:39:19  15  nexus and there's no ability to find commercial success as

08:39:22  16  potential objective indicia of nonobviousness.

08:39:27  17  Q    Okay.  If we could turn to the next slide, DDX 8.4, and

08:39:32  18  if we could take your opinions of commercial success and nexus

08:39:38  19  one at a time.  What is your first opinion?

08:39:40  20  A    So, the first and most central opinion, even before you

08:39:44  21  get to nexus, is that the marketplace performance of Vascepa

08:39:47  22  is not indicative of a product that's been a commercial

08:39:51  23  success or a marketplace success.

08:39:54  24         As I'll explain in more detail, Vascepa has not been

08:39:58  25  able to generate annual profits in any year and has been

08:40:02  1   massively unprofitable on a cumulative basis.  So that's

08:40:07  2   looking at it in absolute terms.

08:40:09  3              And then on a relative basis, the market share of

08:40:13  4   Vascepa relative to other triglyceride-lowering drugs has been

08:40:18  5   very small, it's in a low single digit percentage.

08:40:21  6   Q    What is your second opinion with respect to commercial

08:40:24  7   success and nexus?

08:40:25  8   A    Well, I think, you know, like I said, I'm here to respond

08:40:29  9   to Dr. Nicholson, but I'm going on before him.

08:40:32  10             And so I think we're going to hear from

08:40:35  11  Dr. Nicholson that he believes that we can look at forecasts

08:40:39  12  of potential future performance and look at those as potential

08:40:44  13  economic evidence of commercial success.

08:40:47  14             But I reject both the methodology that he's used,

08:40:53  15  the Net Present Value calculation that I think he's going to

08:40:56  16  advance, and, in any event, everything that he's advancing in

08:41:02  17  terms of future performance is tied to things that lack nexus.

08:41:07  18  They relate to the REDUCE-IT trial and things unrelated, as I

08:41:11  19  understand it, to the claims of the patents-in-suit.

08:41:13  20  Q    All right.  If we could turn to the next slide DDX 8.5,

08:41:19  21  Mr. Hofmann, what is your third opinion with respect to

08:41:19  22  commercial success and Nexus?

08:41:27  23  A    Sure.  So the first two opinions is there's no evidence

08:41:27  24  of marketplace success.  If Your Honor concludes that there is

08:41:31  25  no evidence of marketplace success, you don't even need get

08:41:34  1  into nexus because you don't have the economic criteria to

08:41:39  2  even get to commercial success.

08:41:41  3      But if one considers marketplace performance, one

08:41:46  4  has to look at nexus, and the marketplace performance of

08:41:51  5  Vascepa simply lacks nexus to the claims of the

08:41:56  6  patents-in-suit.

08:41:57  7      What I'll explain in a little more detail is I think

08:42:00  8  it's undisputed that the vast majority of all sales of Vascepa

08:42:05  9  don't fall under the method claims covered by the

08:42:09  10  patents-in-suit that are at issue from a validity perspective

08:42:14  11  that we're addressing here in court, and I have both

08:42:25  12  quantitative and qualitative evidence that explains that.

08:42:25  13      In addition to the fact that the vast majority of

08:42:29  14  the prescriptions are unrelated to the patents-in-suit,

08:42:32  15  there's also extrinsic factors that drive the sales of Vascepa

08:42:37  16  that also do not have a nexus to the claims of the

08:42:42  17  patents-in-suit and explain the marketplace performance, and

08:42:46  18  these are marketing and promotion as well as discounts,

08:42:50  19  rebates, and other incentives.

08:42:52  20  Q    All right.  You've mentioned the patents-in-suit.  What

08:42:55  21  is your understanding of the patents-in-suit?

08:42:58  22  A    Well, I think we heard from witnesses last week that

08:43:01  23  these are method patents that are directed to patients that

08:43:05  24  present with very high triglycerides, which I understand means

08:43:09  25  patients with greater than 500 milligrams per deciliter in

1226

08:43:13   1   their system, and the method of treating that condition with

08:43:19   2   icosapent ethyl.

08:43:20   3   Q   Okay.  So you've testified earlier that profitability is

08:43:23   4   one the economics metrics important to the consideration of

08:43:28   5   potential commercial success.  Would you please explain why.

08:43:31   6   A   Sure.  So this goes back to the framework of why I'm even

08:43:40   7   here and why we're potentially looking at the marketplace

08:43:44   8   performance of Vascepa.

08:43:46   9          What we're look at is what would have motivated

08:43:49   10  another company or a person of ordinary skill in the art to

08:43:52   11  conceive of the alleged invention as of the priority date, and

08:43:57   12  what courts look to is, in some situations, this, you know,

08:44:02   13  marketplace performance.

08:44:04   14         And marketplace performance, from an economic

08:44:10   15  perspective, it's very critical to look at profitability

08:44:14   16  because, from an economic perspective, what players, you know,

08:44:19   17  potential competitors, or persons of ordinary skill in the art

08:44:23   18  are looking to do is make profits to generate a return on

08:44:27   19  dollars invested, and that would be the type of -- one of the

08:44:29   20  types of economic motivation that could theoretically have

08:44:34   21  caused someone to conceive of the alleged infringement.

08:44:36   22  Q   Did you review any profit and loss statements for

08:44:40   23  Vascepa?

08:44:40   24  A   I did.

08:44:44   25  Q   And what profit and loss statements did you analyze?

08:44:47   1   A   So, I think I prepared a summary slide that Amarin

08:44:50   2   produced what are called product P and L, or product profit

08:44:56   3   and loss statements from 2008 through 2018, and in order to

08:45:01   4   make it easier to look at them, I summarized them on this

08:45:06   5   slide.

08:45:06   6   Q   Let me stop you there.   What did you find in your

08:45:09   7   analysis of Amarin's operating performance for Vascepa?

08:45:13   8   A   So, I mean, basically what a product profit and loss

08:45:18   9   statement shows is the net sales less cost of goods sold less

08:45:23   10   some of the significant operating expenses like selling

08:45:26   11   general and administrative expenses and research and

08:45:29   12   development expenses.

08:45:31   13           And the bottom line in terms of the operating loss

08:45:35   14   I've highlighted in yellow, and what we see is that before

08:45:39   15   Vascepa launched, Amarin incurred pretty significant losses of

08:45:46   16   $267,000,000.   These related to the R&D which was used to

08:45:54   17   develop the product and then the administration and general

08:45:59   18   expenses that predate the launch of the product.

08:46:03   19           Then starting in 2013 through 2018, the period of

08:46:07   20   time for which data is -- was produced by Amarin and available

08:46:12   21   to me, we can see that they've generated tens of millions of

08:46:18   22   dollars a year in losses, if not hundreds of millions of

08:46:22   23   dollars a year in losses, for each and every year for the six

08:46:25   24   years that data was available and Amarin's been on the market.

08:46:29   25           And so the bottom line one gets to in the far right

08:46:34   1   bottom corner is that Amarin has generated $863 million,

08:46:40   2   nearly a billion dollars, in total losses through 2018 related

08:46:45   3   to the sales of Vascepa.

08:46:47   4   Q    And so bottom line, what have you concluded regarding the

08:46:50   5   lack of profitability of Vascepa?

08:46:53   6   A    Well, this -- you know, from an economic perspective,

08:46:58   7   this is a very strong indication that this product has not

08:47:01   8   exhibited marketplace success.  In fact, it indicates that it

08:47:06   9   has generated significant losses.

08:47:09   10        And what's important about these numbers is these

08:47:11   11   are actual numbers.  This is the objective performance of the

08:47:16   12   product in the marketplace.  These aren't forecast, these

08:47:21   13   aren't hopes and dreams, these are what has happened in the

08:47:24   14   marketplace over the course of a lengthy period that the

08:47:27   15   product has been on the market and generated massive losses.

08:47:30   16   Q    Okay.  Mr. Hofmann, on the bottom left of the slide is

08:47:34   17   PX 590, and what is that document?

08:47:36   18   A    That was the underlying source documents that Amarin

08:47:41   19   product P and Ls prepared in the normal course of business.

08:47:44   20   Q    And that's a document that you relied upon in preparing

08:47:49   21   this demonstrative?

08:47:50   22   A    It is.

08:47:51   23        MR. BARABAS:  And, Your Honor, I'd like to move

08:47:52   24   that into evidence, but before I do, I spoke to Mr. Kennedy,

08:47:57   25   and plaintiffs I believe would just like the chance to review

08:48:00  1    this and other documents as they may contain third-party

08:48:04  2    confidential information before they're on the public record.

08:48:07  3              MR. M. KENNEDY:  Well, Your Honor, just more

08:48:08  4    specifically, we don't believe the courtroom needs to sealed

08:48:11  5    today for purposes of what is going to discussed in court.

08:48:14  6              But some of the underlying exhibits are quite

08:48:16  7    voluminous, and just so, in an abundance of caution, we would

08:48:20  8    like the opportunity to review the underlying exhibits before

08:48:24  9    they hit the public docket, similar to what we did last week

08:48:24  10   with Dr. Ketchum.

08:48:25  11             THE COURT:  And this is with respect to PX 590?

08:48:29  12             MR. M. KENNEDY:  Yes, and there will be some

08:48:30  13   other exhibits coming up, and I'm happy to individually

08:48:33  14   identify them if necessary.  But for purposes of what's going

08:48:36  15   to be in court today, I don't think we need to seal the

08:48:39  16   courtroom.

08:48:40  17             THE COURT:  All right.  So Exhibit 590 is

08:48:43  18   admitted subject to some potential redaction.

08:48:47  19             MR. M. KENNEDY:  Thank you, Your Honor.

08:48:48  20             MR. BARABAS:  Thank you, Your Honor.

08:48:50  21             And, then, Your Honor, defendants' would also

08:48:52  22   move to admit DDX 8.6 as a summary exhibit.

08:48:56  23             MR. M. KENNEDY:  No objection, Your Honor.

08:48:57  24             THE COURT:  Have you shown 3.6 yet?

08:49:00  25             MR. BARABAS:  I'm sorry, I meant to say 8.6.  If

| 08:49:04 | 1 | said 3.6, it's the exhibit on the screen. |
| 08:49:04 | 2 | THE COURT:  8.6.  I think I misunderstood. |
| 08:49:07 | 3 | MR. BARABAS:  I'm sorry. |
| 08:49:07 | 4 | THE COURT:  Yes, that request is granted. |
| | 5 | THE DEFENDANT:  Thank you, Your Honor. |
| | 6 | (Plaintiffs' Exhibit 590 received in evidence.) |
| | 7 | (Defendants' Exhibit 8.6 received in evidence.) |
| | 8 | BY MR. BARABAS: |
| 08:49:12 | 9 | Q    Mr. Hofmann, in your review of Amarin's financial |
| 08:49:15 | 10 | statements, would you please describe the sales performance of |
| 08:49:18 | 11 | Vascepa. |
| 08:49:18 | 12 | A    Sure.  And that's -- that's shown on the top line, the |
| 08:49:23 | 13 | net product sales line item. |
| 08:49:25 | 14 | I mean, what we can see is that, yes, Vascepa has |
| 08:49:30 | 15 | generated some level of growing sales, getting up to about 228 |
| 08:49:37 | 16 | million in 2018, but those growing sales have come at a great |
| 08:49:44 | 17 | cost, and those are the selling and administrative expenses |
| 08:49:47 | 18 | that we see, as well as some of the R&D expenses. |
| 08:49:51 | 19 | So what we see is that while there has been some |
| 08:49:54 | 20 | level of growth in sales, they've generated massive losses |
| 08:49:59 | 21 | every year and on a cumulative basis for Vascepa. |
| 08:50:04 | 22 | Q    So why did you discuss profitability rather than just |
| 08:50:07 | 23 | sales earlier? |
| 08:50:08 | 24 | A    Well, I think that if one just looks at sales and one |
| 08:50:14 | 25 | just looks at sales on an absolute basis or sales growth, it's |

08:50:20   1    an incomplete picture and I think is economically unsound.

08:50:27   2            You know, you have to look at the costs associated

08:50:30   3    with generating those sales in order to get the true economic

08:50:35   4    picture.

08:50:35   5            Again, we're trying to analyze whether there was an

08:50:38   6    economic motivation for others to have conceived of the

08:50:42   7    alleged invention by studying what's happened since the launch

08:50:46   8    of the product, and what we see since the launch of the

08:50:50   9    product is massive annual and cumulative losses.

08:50:54   10   Q   Mr. Hofmann, you stated in your summary of opinions that

08:50:57   11   the market share of Vascepa does not demonstrate marketplace

08:51:01   12   success.  Would you please explain what you mean by that.

08:51:04   13   A   Sure.  So what we're looking at on this slide was the

08:51:08   14   absolute performance or kind of the performance of Vascepa in

08:51:12   15   a vacuum.

08:51:13   16           As I understand it, it's important and it makes

08:51:17   17   economic sense to also look at the relative performance of

08:51:21   18   Vascepa in the marketplace compared to other TG-lowering

08:51:25   19   products to see how it's performed on a relative basis, which,

08:51:30   20   again, is a measure or metric to consider on whether the

08:51:34   21   product has been a marketplace success.

08:51:37   22   Q   How would you define the relevant market in which to look

08:51:42   23   at?

08:51:42   24   A   Well, I think we've heard about a lot of the products in

08:51:46   25   court last week.  I think Dr. Nicholson and I use the same

08:51:53  1  market which includes prescription, triglyceride-lowering

08:51:58  2  drugs, which are like the fenofibrates and Niaspan and

08:52:05  3  gemfibrozil and other omega-3s, I guess, Lovaza.

08:52:10  4          MR. BARABAS:  If we could turn to DDX 8.7.

08:52:10  5  BY MR. BARABAS:

08:52:13  6  Q    Mr. Hofmann, how did you evaluate Vascepa's market share

08:52:17  7  in the triglyceride reducing market with reference to the

08:52:21  8  demonstrative?

08:52:22  9  A    Yes.  So I actually prepared a few graphs to cut the data

08:52:26  10  a few different ways, and when I say the data, what I'm

08:52:31  11  referring to is IQVIA data.

08:52:35  12          IQVIA is a data aggregator, a service provider, it

08:52:41  13  used to be known as IMS Health, and it's a widely-recognized

08:52:47  14  data aggregator with respect to pharmaceutical information.

08:52:52  15          It's regularly used by pharmaceutical companies, and

08:52:57  16  regularly used by people like myself in a dispute setting and

08:53:03  17  in a consulting setting to look at the market dynamics.

08:53:09  18          So taking that data, I prepared this stacking graph

08:53:14  19  that we see on screen.

08:53:16  20  Q    And looking at the stacking graph, what did you determine

08:53:19  21  from your analysis?

08:53:21  22  A    Sure.  So what this stacking graph does is it takes total

08:53:28  23  prescriptions, and IQVIA uses the abbreviation TRX for

08:53:34  24  prescriptions.

08:53:35  25          And what a stacking graph does, if you look at the

08:53:37  1    vertical access on the far left side, is, as of 2013, there

08:53:41  2    were a total of about $32 million -- not dollars, sorry --

08:53:47  3    prescriptions that were prescribed according to IQVIA for

08:53:55  4    triglyceride-lowering products.  So that's the total market.

08:53:58  5             And then what the different layers within the

08:54:01  6    stacking graph represent are the portion of those total

08:54:05  7    prescriptions related to each of the different product

08:54:09  8    category classes.

08:54:11  9             So the largest blue one is the fenofibrate products,

08:54:15  10   and then you have Niacin, Lovaza, gemfibrozil, and that tiny

08:54:23  11   red sliver there at the top is Vascepa's share of the market.

08:54:29  12            And then what I did is we can see that the market

08:54:32  13   has been declining since 2013, and we can see that Vascepa has

08:54:36  14   only been able to garner on a cumulative basis about 4.5

08:54:43  15   million prescriptions compared to the other

08:54:46  16   triglyceride-lowering products which have totaled more than

08:54:49  17   $161 million -- or, I'm sorry, prescriptions.

08:54:53  18            So it really dwarfs the prescriptions that Vascepa

08:55:00  19   has been able to attain which isn't indicative of a product

08:55:03  20   that's been a marketplace success.

08:55:03  21   Q    Okay.  So looking at the bottom left of the slide,

08:55:05  22   there's a reference to PX 391 which I believe is entitled

08:55:05  23   Prescription View.  Is that a document you relied upon in

08:55:14  24   preparing this stacking graph?

08:55:14  25   A    It is, it's the underlying IQVIA data on prescriptions.

08:55:22  1             MR. BARABAS:  And, Your Honor, subject to any

08:55:24  2   redactions by plaintiffs, defendants would seek to enter

08:55:29  3   PX 391 into evidence.

08:55:31  4             MR. M. KENNEDY:  No objection, with the

08:55:32  5   opportunity for reductions.

08:55:33  6             THE COURT:  Thank you.  391 admitted.

08:55:36  7             MR. BARABAS:  And defendants also seek to admit

08:55:37  8   DDX 8.7 as a summary exhibit.

08:55:40  9             MR. M. KENNEDY:  No objection, Your Honor.

08:55:42  10             THE COURT:  8.7 is admitted as a demonstrative.

          11                     (Plaintiffs' Exhibit 391 received in
                                  evidence.)
          12                     (Defendants' Exhibit 8.7 received in
                                  evidence.)
          13   BY MR. BARABAS:

08:55:47  14   Q   Okay.  If we could turn to the next demonstrative,

08:55:52  15   DDX 8.8, and this demonstrative is entitled Prescription Share

08:55:56  16   Analysis 2013 through November 2018.

08:55:59  17             Mr. Hofmann, with reference to this demonstrative,

08:56:02  18   what can you conclude?

08:56:04  19   A   Yes.  So this is the same dataset that we saw in the

08:56:07  20   stacking graph I just explained, but it's a different way to

08:56:10  21   cut the data and look at the data.

08:56:12  22             This takes that same period, from 2013 to 2018, the

08:56:21  23   period of time that Vascepa has been on the market, and looks

08:56:24  24   at, expressed as a percentage, how much the prescription share

08:56:29  25   has been for Vascepa relative to other triglyceride-lowering

08:56:33  1   drugs.

08:56:33  2          And what we can see with the red circle there is

08:56:37  3   they've only been able to garner a small single digit

08:56:40  4   percentage of about 3 percent in the marketplace.

08:56:45  5          And this is the entire amount of prescriptions.

08:56:49  6   This doesn't even get into the fact that most of these

08:56:53  7   prescriptions are written for patients that aren't covered by

08:56:57  8   the patents-in-suit.

08:56:59  9          So this shows that comparted to the fenofibrates and

08:57:04  10  gemfibrozil and even other omega-3s, Vascepa has not been able

08:57:08  11  to garner significant market share, and, from economic

08:57:12  12  perspective, is not supportive of Vascepa being a marketplace

08:57:17  13  success.

08:57:18  14          MR. BARABAS:  And defendants would move to admit

08:57:20  15  DDX 8.8 as a summary exhibit.

08:57:23  16          MR. M. KENNEDY:  No objection, Your Honor.

08:57:24  17          THE COURT:  DDX 8.8 is admitted as a

08:57:27  18  demonstrative.

08:57:27  19                  (Defendants' Exhibit 8.8 received in
08:57:27                       evidence.)
08:57:27  20  BY MR. BARABAS:

08:57:31  21  Q    Okay.  Mr. Hofmann, if we can turn to your next opinion.

08:57:33  22          You indicated that forecasted potential future

08:57:37  23  performance does not provide objective economic evidence of

08:57:42  24  commercial success.  Please explain what you mean by that.

08:57:45  25  A    Well, like said, I think we might hear from Dr. Nicholson

08:57:48  1    that -- I don't think he disagrees that the product has lost a

08:57:53  2    significant amount of money so far and has failed to generate

08:57:57  3    profits, but attempts to look at potential forecasts as what

08:58:04  4    he claims are potential evidence of objective economic

08:58:09  5    performance, and I just fundamentally reject that.

08:58:13  6            I think that looking at future hopes and aspirations

08:58:18  7    of what may or may not unfold in a very complex and dynamic

08:58:24  8    pharmaceutical marketplace does not represent objective

08:58:30  9    evidence of the product's performance in the marketplace, and,

08:58:34  10   if one does so, you know, one has really speculated on the

08:58:38  11   future performance which doesn't provide reliable evidence or

08:58:42  12   objective evidence of marketplace performance.

08:58:46  13   Q    Is it meaningful that a company has hopes and aspirations

08:58:51  14   for future sales?

08:58:52  15   A    Oh, I think it's very common that both companies and

08:58:56  16   analysts will undertake, you know, some amount of forecasting,

08:59:00  17   and I think, you know, they do so in good faith and do so with

08:59:05  18   the hopes that the forecasts will materialize.

08:59:10  19           But, of course, there is a long history of examples

08:59:16  20   of companies that -- and analysts that have made forecasts

08:59:20  21   that simply don't materialize.

08:59:22  22           And so it's really not, I think, objective evidence

08:59:26  23   on which one should rely in an economically sound way in order

08:59:31  24   to potentially establish objective evidence of nonobviousness

08:59:39  25   in the form of commercial success.

08:59:39  1    Q    What is the relationship between actual financial results

08:59:43  2    and forecasts?

08:59:44  3    A    Yeah.  So, I mean, one thing that we can do objectively

08:59:49  4    is we can look at forecasts that maybe were made several years

08:59:56  5    ago and then compare those to the actual forecasts.

08:59:59  6         And I think what we find is, you know, oftentimes

09:00:03  7    the actual results can vary greatly from the forecasts that

09:00:09  8    were made, and that's a way to kind of test the reasonableness

09:00:13  9    or reliability of the forecasts.

09:00:15  10         Of course, forecasting way out into the future, we

09:00:19  11   just don't know.  We're speculating on whether or not those

09:00:24  12   forecasts are going to materialize.

09:00:25  13   Q    So who prepares forecasts?

09:00:28  14   A    Well, I think commonly companies do internally for

09:00:33  15   budgeting purposes, for planning purposes, for project

09:00:36  16   approval purposes, and then we know that analysts that follow

09:00:40  17   companies and investing companies will commonly prepare

09:00:43  18   forecasts.

09:00:44  19   Q    Is it generally true that different analysts will have

09:00:47  20   the same forecast for a product or company?

09:00:49  21   A    No.  I think what we see generally is that analysts make

09:00:55  22   different assumptions.  They make different predictions about

09:01:00  23   what's going to happen.

09:01:01  24         And, in the pharma space, whether or not products

09:01:04  25   are going to be approved, whether or not different indications

09:01:08  1   are going to become on label, there's a long, you know,

09:01:13  2   regulatory pathway, and there's also lot of uncertainty in the

09:01:17  3   dynamics of a competitive prescription pharmaceutical product.

09:01:22  4        So what we see is that -- particularly in the

09:01:24  5   pharmaceutical industry, a lot of disparity among analysts on

09:01:28  6   future forecasts.  There's also differences in how far out

09:01:33  7   analysts will forecast, and so you can have temporal issues as

09:01:38  8   well.

09:01:38  9   Q    All right.  Mr. Hofmann, your next opinion is that

09:01:42  10  Dr. Nicholson's Net Present Value calculation is flawed and

09:01:46  11  unreliable.  Please explain your basis for this opinion.

09:01:54  12  A    Well, I think what we see and what Dr. Nicholson advanced

09:01:58  13  in a Net Present Value calculation is he's taken a number of

09:02:02  14  analyst's reports, some of which only go out to 2020, two of

09:02:07  15  which go out to 20 -- one goes out to 2027, and one goes out

09:02:12  16  to 2029.

09:02:13  17       He's made some assumptions to project the ones out

09:02:17  18  that only go out for a short period, and he's assumed that

09:02:20  19  these forecasts and assumptions that he's made will come to

09:02:24  20  fruition.

09:02:25  21       He's taken an average of those and then applied a

09:02:30  22  discount rate, and then, you know, determined a Net Present

09:02:35  23  Value.

09:02:36  24       All of that is based on a series of speculative

09:02:39  25  assumptions, and assumptions that it's appropriate to average

09:02:45   1   these analyst's reports, and that somehow it's appropriate to

09:02:49   2   assume that these future projections for the next ten years

09:02:54   3   will materialize, and I just find that speculative and

09:02:58   4   unreliable.

09:02:59   5   Q    Is a Net Present Value analysis a reliable economic

09:03:07   6   measurement for commercial success?

09:03:07   7   A    Oh, in certain settings Net Present Value is a commonly

09:03:11   8   used tool, and I think in certain settings, you know, like

09:03:15   9   with project approval or, you know, different analysts may

09:03:21   10  look at net present value.

09:03:23   11          But, again, what we're here today to talk about, I

09:03:27   12  think, is objective evidence of marketplace performance and

09:03:31   13  whether that has a nexus to the claims of the patents-in-suit.

09:03:35   14          And I just don't think that net present value, when

09:03:38   15  you're speculating out for the next decade on what's going to

09:03:43   16  happen in the marketplace, is a reliable, objective measure of

09:03:48   17  marketplace performance, especially when we have, you know,

09:03:52   18  six years of actual marketplace activity that shows massive

09:03:58   19  hemorrhaging losses for Vascepa.

09:04:00   20  Q    From your analysis, did Dr. Nicholson assess a

09:04:03   21  reasonableness of the forecasts on which he relies for his net

09:04:08   22  present value calculation?

09:04:09   23  A    Well, that's another problem I have with the NPV analysis

09:04:15   24  that he advances is he takes these analysts' forecasts but

09:04:19   25  doesn't do anything to test the accuracy of them, and what

09:04:24   1   we -- what we can see is that some of the forecasts have been

09:04:28   2   very inaccurate.

09:04:29   3   Q    Did Dr. Nicholson analyze the historical accuracy of the

09:04:35   4   industry analysts' projections?

09:04:37   5   A    No, he didn't, and I think a good example of that is

09:04:42   6   H. C. WainWright.

09:04:43   7   Q    Okay.  And if we could turn to your own analysis.  Did

09:04:48   8   you analyze the historical accuracy of the industry analysts'

09:04:52   9   projections referenced in Dr. Nicholson net present value

09:04:57   10  calculation?

09:04:57   11  A    I did.

09:04:58   12  Q    And what did you conclude?

09:04:59   13  A    That they've been historically inaccurate for the periods

09:05:03   14  of time that we do have the ability to test the actual results

09:05:10   15  compared to the forecasts, and that really calls into question

09:05:14   16  the future forecasts and their reliability.

09:05:18   17  Q    And I think you had mentioned H. C. WainWright.  If we

09:05:21   18  could put up DDX 8.9.  With reference to this demonstrative,

09:05:26   19  what conclusion did you draw from your analysis of H.C.

09:05:30   20  WainWright & Company's projections?

09:05:32   21  A    Sure.  So just to orient us to this slide, what I did was

09:05:38   22  I analyzed the forecasts or the predictions of two key

09:05:42   23  metrics, net revenue and operating income or loss.

09:05:47   24          And what I have in the top table is H.C. WainWright

09:05:52   25  published predictions or forecasts of net revenue for 2018.

09:05:59   1   So these are the predictions of what the revenues were going

09:06:02   2   to be in 2018 in a report published in 2015, a report

09:06:07   3   published in 2016, and a report published in 2017.

09:06:12   4           So these are all reports after commercialization and

09:06:15   5   approval of Vascepa, and they consistently predicted revenues

09:06:22   6   to be on the order of $385 million.

09:06:25   7           And then what we see for 2018 is, in fact, actual

09:06:30   8   results were only 228 million for a variance of roughly

09:06:36   9   $157 million.  That's a huge dollar difference, as well as a

09:06:42  10   huge percentage difference, in what they had forecast revenues

09:06:46  11   to be versus what revenues actually were.

09:06:49  12           And then, importantly, I also looked at operating

09:06:54  13   income and loss from those same analysts' reports.

09:06:58  14           Now, H.C. WainWright did reduce their predicted

09:07:02  15   operating income.  In all periods they predicted positive

09:07:07  16   operating income of at least 77 million, and then that was in

09:07:13  17   2017, but then for 2016, they predicted 85 million, in 2015,

09:07:18  18   they predicted 128 million all related to what they thought

09:07:23  19   operating income would be in 2018.

09:07:25  20           We now have actual results for 2018, and not only

09:07:30  21   were they wrong, but they were wrong in that Amarin didn't

09:07:36  22   even generate income, they generated more than hundred million

09:07:39  23   dollars in losses.  So they had $108 million in losses.

09:07:44  24           And so those variances on the right represent the

09:07:47  25   delta or the difference between the operating income that

09:07:52   1   WainWright initially projected compared to the huge losses

09:07:57   2   that Amarin actually experienced, and we're talking about

09:08:00   3   hundreds of millions of dollars.

09:08:03   4   Q    Okay.   Turning again to Dr. Nicholson's NPV calculation,

09:08:09   5   would Dr. Nicholson's Net Present Value calculation change if

09:08:12   6   an analyst's forecast was added or removed from his

09:08:15   7   calculation?

09:08:16   8   A    Yes, it definitely would.

09:08:23   9        I did want to mention, too, that I got these

09:08:26   10   documents -- or these numbers from various analysts' reports

09:08:31   11   that are listed on the bottom left of the slide at 8.9.   I

09:08:36   12   don't know that we covered that, but --

09:08:37   13   Q    Yeah.   And thank you for that.

09:08:39   14        On bottom left of the slide there are four documents

09:08:44   15   mentioned, there's DX 2061, DX 2065, DX 2066 and DX 2054, and

09:08:52   16   are these the underlying financial data you used to prepare

09:08:57   17   this demonstrative?

09:08:58   18   A    They are.

09:08:59   19              MR. BARABAS:   Your Honor, with the same caveats

09:09:01   20   about chance for redactions, defendants would seek to move

09:09:05   21   these exhibits into evidence.

09:09:06   22              And I should also mention for the record the pin

09:09:09   23   cite of DX 2061 is page 4, the pin cite of 2065 is page 4, the

09:09:17   24   pin cite of page -- of document 2066 is page 2, and the pin

09:09:21   25   cite of DX 2054 is page 72.

09:09:25    1            MR. M. KENNEDY:  No objection, Your Honor.

09:09:26    2            THE COURT:  All right.  DX 2061, 2065, 2066, and

09:09:32    3   2054 are admitted.

09:09:32    4              (Defendants' Exhibits 2061, 2065, 2066
09:09:35                 and 2054 received in evidence.)
09:09:35    5            MR. BARABAS:  Okay.  And defendants also seek to

09:09:38    6   admit DDX 8.9 as a demonstrative exhibit.

09:09:43    7            MR. M. KENNEDY:  No objection, Your Honor.

09:09:43    8            THE COURT:  8.9 is admitted as demonstrative.

09:09:43    9              (Defendants' Exhibit 8.9 received in
09:09:49                 evidence.)
09:09:49   10            MR. BARABAS:  Thank you, Your Honor.

09:09:49   11   BY MR. BARABAS:

09:09:50   12   Q    Turning back to Dr. Nicholson's Net Present Value

09:09:53   13   calculation, I'm going to ask you, Mr. Hofmann, would that

09:09:57   14   calculation change if an analyst's forecast was added or

09:09:59   15   removed from his calculations?

09:10:03   16   A    Yes.  One of the things that happened was Dr. Nicholson

09:10:06   17   issued a report, I responded and pointed out what an outlier

09:10:11   18   the H.C. WainWright analyst's report was, and so he revised

09:10:17   19   his NPV calculation in his reply report.

09:10:20   20        And what we can see is simply removing one analyst's

09:10:24   21   report has massive -- has a massive impact and shows the

09:10:28   22   volatility and unreliability of the use of these analysts'

09:10:33   23   reports in his NPV calculation.

09:10:35   24   Q    So if we could turn to DDX 8.10.  And, Mr. Hofmann, with

09:10:40   25   reference to this demonstrative, would you please explain the

| 09:10:43 | 1 | results of the two Net Present Value models. |

09:10:43   1   results of the two Net Present Value models.

09:10:46   2   A   Sure.   And this is kind of a busy graph so I'll try and

09:10:52   3   orient everyone.

09:10:55   4         So what we have starting on the left -- and the

09:10:58   5   horizontal axis is just a timeline, and then on the vertical

09:11:02   6   axis we have the values associated with Vascepa according to

09:11:11   7   the Net Present Value calculations undertaken by

09:11:15   8   Dr. Nicholson.

09:11:15   9         Now, there's a line at 2019, and to the left of that

09:11:20   10   line is the historical actuals which we know are actual

09:11:28   11   deepening losses for Vascepa since launch.

09:11:32   12         So starting in 2008, the orange line that you see

09:11:36   13   going down and down and down to 2019 is where we are as of

09:11:41   14   today, massive losses.

09:11:43   15         Then what Dr. Nicholson did in his opening report is

09:11:46   16   he forecasts future growth in Vascepa based on both the

09:11:54   17   analysts' reports as well as some assumptions that he's made

09:11:58   18   and a discount rate that he's applied.

09:12:01   19         And in his initial report he concluded, as the blue

09:12:06   20   line indicates, a steep growth in future Vascepa sales

09:12:10   21   resulting in a Net Present Value of $1.9 billion.

09:12:15   22         Now, after I issued my report, it said, look, this

09:12:19   23   includes an H.C. WainWright analyst's report that is a clear

09:12:24   24   outlier and doesn't make economic sense.   He removed that in

09:12:30   25   his reply report and recalculated his Net Present Value, and

09:12:35  1   that's the orange line labeled as scenario 2.

09:12:39  2         And what you can see is just by removing H.C.

09:12:43  3   WainWright, one analyst, his NPV calculation dropped by $1.52

09:12:50  4   billion, or 80 percent the value he claimed was there on his

09:12:56  5   first report based on these forecasts going out about ten

09:13:00  6   years, evaporates.

09:13:01  7         I think it's also important to note that even under

09:13:05  8   Dr. Nicholson's theories, this product -- we're again trying

09:13:12  9   to evaluate the economic motivation of a person of ordinary

09:13:17  10  skill in the art or a competitor as of the priority date.  So

09:13:21  11  we're looking way back to the far left of this graph.

09:13:24  12        Even according to Dr. Nicholson, it isn't until

09:13:27  13  maybe 2023 or 2027 that this product would break even.  It's

09:13:34  14  simply not indicative, even if this comes to pass, which, you

09:13:38  15  know, I think we just don't know, it's a highly speculative

09:13:44  16  theory to advance that there is economic motivations for

09:13:50  17  others in the field to have conceived of the alleged invention

09:13:55  18  based on this economic picture.

09:13:57  19  Q    Okay.  And then, Mr. Hofmann, looking at the bottom left

09:14:00  20  of the summary exhibit, you see PX 1091 and PX 1102.  Are

09:14:07  21  those the Nicholson exhibits that you used to prepare your

09:14:09  22  summary exhibit?

09:14:10  23  A    They are.

09:14:12  24             MR. BARABAS:  And, Your Honor, defendants seek

09:14:13  25  to move -- or seek to move DDX 8.10 into evidence as a summary

09:14:20    1    exhibit.

09:14:22    2                    MR. M. KENNEDY:  No objection, Your Honor.

09:14:24    3                    THE COURT:  8.10 is admitted as summary exhibit.

09:14:24    4                         (Defendants' Exhibit 8.10 received in
09:14:24
09:14:28    5                          evidence.)

            BY MR. BARABAS:

09:14:28    6    Q    Then, Mr. Hofmann, if we could turn to the next slide,

09:14:32    7    DDX 8.11.  Did you identify any other examples which confirm

09:14:36    8    your conclusion regarding the subjective nature of the using

09:14:41    9    analysts' forecasts?

09:14:42   10    A    Yes.  So this is an exhibit from the Nicholson reply

09:14:46   11    report, and I thought it just highlights the hazard, from an

09:14:51   12    economic perspective, in relying on the analysts' reports that

09:14:57   13    Dr. Nicholson does in arriving at Net Present Value.

09:15:01   14            So he's identified here his estimated cumulative

09:15:05   15    income from 2008 to 2029 associated with five different

09:15:11   16    analysts.

09:15:12   17            Now, these numbers are not entirely put fourth by

09:15:15   18    those analysts.  Like I said, a number of these analysts only

09:15:20   19    predicted out to 2020, and Dr. Nicholson made his own

09:15:24   20    assumptions about future performance based on those analysts'

09:15:29   21    reports.

09:15:29   22            But what we can see is that, you know, in one

09:15:33   23    extreme you have Jefferies who is predicting cumulative losses

09:15:38   24    of $589,000,000, and, at the other extreme, H.C. WainWright

09:15:45   25    predicting $7.9 billion in future income.  That's a swing of

09:15:52  1  $8.5 billion.  I mean, that's just -- that shows the disparity

09:15:57  2  and unreliability of looking at these forecasts.

09:16:00  3          And then you have a few other analysts, Cantor

09:16:05  4  Fitzgerald and Citi and SunTrust.  Cantor, you know, hows 746

09:16:10  5  million, Citi shows 523 million, and SunTrust shows nine

09:16:14  6  ninety-two.

09:16:15  7          Now, the Citi and the SunTrust are all -- or the

09:16:17  8  vast majority -- Nicholson assumptions, not their actual

09:16:22  9  predictions.

09:16:22  10         But, in any event, you have variances among these

09:16:25  11  analysts of hundreds and hundreds of millions of dollars, and

09:16:30  12  from economic perspective, this just doesn't provide objective

09:16:34  13  evidence of actual marketplace performance and what is

09:16:39  14  reasonably relied upon in assessing the economic performance

09:16:43  15  of a product in the marketplace.

09:16:45  16  Q   So how does this chart impact your critique of

09:16:49  17  Dr. Nicholson's Net Present Value calculations?

09:16:51  18  A   Well, it's the combination of this, as well as the last

09:16:54  19  graph, as well as the H.C. WainWright example.

09:16:58  20         Simply, from a methodological perspective, I think

09:17:04  21  it's unsound to look at speculative long-term assumptions with

09:17:10  22  respect to future marketplace performance as purported

09:17:14  23  objective evidence of marketplace performance.  It just

09:17:19  24  doesn't provide evidence of marketplace success for the

09:17:22  25  purposes of commercial success.

09:17:23   1    Q    Okay.  So, Mr. Hofmann, you've heard a lot about

09:17:27   2    REDUCE-IT since you've been at this trial, and with that in

09:17:30   3    mind, do you have any other disagreements with Dr. Nicholson's

09:17:33   4    use of the Net Present Value of Vascepa as evidence of

09:17:36   5    commercial success?

09:17:37   6    A    Well, that's another huge, huge issue with the

09:17:41   7    methodology and the theory advanced with respect to the NPV

09:17:48   8    calculation.

09:17:48   9          I think we've heard a lot of testimony last week

09:17:53   10   about the REDUCE-IT trial and the additional indication being

09:17:56   11   added to the label for Vascepa.

09:17:59   12         And I think even if, somehow, these future sales and

09:18:04   13   future projections do come to pass, it's pretty clearly

09:18:09   14   evident that any of the future upside is really tied to the

09:18:13   15   REDUCE-IT trial and to patients who present with less than

09:18:18   16   500 milligrams per deciliter and not covered by the claims of

09:18:24   17   the patents-in-suit.

09:18:25   18         So even if that future growth and upside does come

09:18:29   19   to pass, it lacks a nexus to the claims of the

09:18:33   20   patents-at-suit.

09:18:33   21   Q    All right.  You mentioned nexus.  Would you please remind

09:18:36   22   us of your understanding of nexus.

09:18:39   23   A    Yeah, so I think at the outset I explained that one has

09:18:43   24   to look at marketplace performance, but then one also has to

09:18:47   25   make sure that the marketplace performance is tied to the

09:18:52  1    alleged novelty of the claims of the patents-in-suit in order

09:18:56  2    to establish nexus to potentially look at commercial success.

09:19:00  3              And if one doesn't have a nexus, if the sales or

09:19:04  4    marketplace performance, whether you're looking at historical

09:19:08  5    or future, are tied to things that aren't covered by the

09:19:12  6    patents-in-suit, then there's no nexus and no commercial

09:19:16  7    success.

09:19:16  8    Q    Please explain what you mean when you testified earlier

09:19:19  9    that the performance of Vascepa lacks nexus to the asserted

09:19:23  10   claims of the patents-in-suit.

09:19:25  11   A    Well, I think what I was explaining is that based on the

09:19:29  12   historical data, both qualitatively and quantitatively, as

09:19:34  13   well as some forward-looking statements by analysts, it's very

09:19:40  14   clear that the vast majority of historic prescriptions relate

09:19:45  15   to patients that aren't covered by the claims of the

09:19:49  16   patents-in-suit, and that's only going to be exacerbated into

09:19:52  17   the future in that future prescriptions, now that REDUCE-IT

09:20:00  18   has come to pass and has been added to the label, I think

09:20:04  19   we're going to see an even greater proportion of prescriptions

09:20:08  20   being not covered by the patents-in-suit and lacking nexus.

09:20:12  21   Q    And then are there any other factors that are unrelated

09:20:15  22   to the assert claims in the patents-in-suit that you would

09:20:18  23   like to discuss or address?

09:20:20  24   A    Yeah.  So in addition to the lack of nexus associated

09:20:23  25   with the prescribing behavior or prescriptions, there are

09:20:28  1   those extrinsic factors I touched on at the outset, marketing

09:20:32  2   and promotion, as well as discounts, rebates and other

09:20:36  3   incentives.

09:20:37  4   Q    All right.  So we can take either each of those one at a

09:20:40  5   time.  But first, again, what is your understanding of the

09:20:43  6   patents-in-suit?

09:20:43  7   A    That it relates to a method of using icosapent ethyl for

09:20:46  8   patients who present with very high triglycerides being

09:20:50  9   defined as greater than 500 milligrams per deciliter.

09:20:54  10  Q    Did you perform an analysis to estimate the number of

09:20:57  11  sales in prescriptions that potentially may not be covered by

09:21:01  12  the asserted claims of the patents-in-suit?

09:21:04  13  A    I did.

09:21:04  14  Q    And what did that analysis show?  Actually, let me

09:21:08  15  rephrase that.  What was that analysis based on?

09:21:12  16  A    Yeah, so I had mentioned this data aggregator, IQVIA,

09:21:16  17  which is again commonly used in the pharmaceutical industry.

09:21:21  18         They prepare a dataset referred to as NDTI data, and

09:21:28  19  what that dataset does is it breaks out the diagnosis or the

09:21:33  20  reasons for which a patient is prescribed a particular

09:21:37  21  product.

09:21:40  22         And so I analyzed that data in order to figure out

09:21:43  23  the frequency of prescriptions related to patients that

09:21:48  24  present with very high triglycerides versus patients that fall

09:21:53  25  into other categories.

09:21:55  1          MR. BARABAS:  Okay.  If we could turn,

09:21:57  2  Mr. Gross, to slide DDX 8.12.

09:21:57  3  BY MR. BARABAS:

09:22:01  4   Q   And, Mr. Hofmann, this slide is entitled Triglyceride

09:22:07  5  Levels.  Would you please explain what is included in the data

09:22:10  6  here related to use of Vascepa.

09:22:13  7   A   Sure.  And we've seen slides similar to this last week.

09:22:16  8  You know, essentially this provides the categories that the

09:22:20  9  NDTI data tracks, the patient prescription usage.

09:22:25  10          The top category, the greater than 500 milligrams

09:22:30  11  per deciliter, that's my understanding of what the severe or

09:22:33  12  very high triglyceride levels are that may be covered by the

09:22:40  13  claims in the patents-in-suit.

09:22:42  14          The other categories would not be covered by the

09:22:40  15  claims of the patents-in-suit.

09:22:44  16   Q   Okay.  Then DX 2039 at page 3, is that the underlying

09:22:53  17  data that you used to prepare this summary exhibit?

09:22:56  18   A   It is.

09:22:57  19          MR. BARABAS:  And defendants seek to move

09:23:01  20  DDX 8.12 into evidence as a summary exhibit.

09:23:05  21          MR. M. KENNEDY:  No objection, Your Honor.

09:23:06  22          THE COURT:  8.12 is admitted as a summary

09:23:10  23  exhibit.

09:23:10  24              (Defendants' Exhibit 8.12 received in
09:23:10                     evidence.)
09:23:11  25          MR. BARABAS:  And, Mr. Gross, if now if we could

09:23:14  1  turn to DDX 8.13.

09:23:14  2  BY MR. BARABAS:

09:23:16  3  Q    Mr. Hofmann, with reference to this exhibit, would you

09:23:21  4  please describe your analysis of the NDTI data.

09:23:27  5  A    Sure.  So NDTI, again using those categories we just

09:23:31  6  looked at, tracks what they call drug appearances, which is,

09:23:36  7  you know, based on survey data how prescribers identify what

09:23:43  8  their patients are presenting with in terms of why they're

09:23:46  9  prescribing Vascepa.

09:23:47  10           And so what I did on the left graph is by year I

09:23:54  11  tracked in blue the number of -- or the percentage of

09:24:00  12  prescriptions that were written for patients that presented

09:24:03  13  with the very high triglyceride levels of greater than

09:24:09  14  500 milligrams per deciliter.

09:24:11  15           And then by year in red I tracked those that were

09:24:15  16  off-label that were less than 500 milligrams per deciliter.

09:24:20  17           And what you can see when you look at it on an

09:24:23  18  annual basis is that each and every year the vast majority of

09:24:27  19  drug appearances or patients that are prescribed Vascepa are

09:24:32  20  receiving it for triglyceride levels lower than 500, and only

09:24:40  21  the minority would fit into the greater than 500 on-label

09:24:46  22  category.

09:24:49  23           Then what I did is I took that same data from the

09:24:53  24  bar chart and put it into a pie chart in the right.  The pie

09:24:57  25  chart basically takes that entire period so not on an annual

09:25:00  1    basis but looking at 2013 to 2018 and what we see is that

09:25:05  2    about three-quarters of the prescriptions are off-label or

09:25:11  3    would not be covered by the claims of the patents-in-suit, and

09:25:15  4    only about a quarter of the prescriptions during the period

09:25:19  5    that Vascepa has been on the market would fall under the

09:25:24  6    patents-in-suit potentially.

09:25:27  7            I should just mention real quick, there was category

09:25:31  8    on the prior slide called NA.  I did re-run these numbers

09:25:35  9    excluding the NA category, and they were still pretty

09:25:38  10   consistent on the order of, I think, 70-30 instead of 74-26.

09:25:46  11   But what we can see is that the vast majority of prescriptions

09:25:51  12   quantitatively aren't covered by the claims of the

09:25:55  13   patents-in-suit and therefore lack nexus.

09:26:44  14   Q    Okay.  And what overall conclusions did you draw from

09:26:44  15   your analysis of this historical Vascepa prescriptions based

09:26:44  16   on the NDTI data?

09:26:44  17   A    Well, think that the ability to analyze this quantitative

09:26:44  18   NDTI data gives us very strong evidence that the marketplace

09:26:44  19   performance of Vascepa is not due to the claims in the

09:26:44  20   patents-in-suit.  I mean, we already covered the fact that it

09:26:44  21   hasn't performed well.

09:26:44  22            But even looking at the performance, only a fraction

09:26:44  23   of it, about 25 percent, would potentially even be covered.

09:26:44  24   So that lack of nexus, combined with the poor marketplace

09:26:44  25   performance, is not indicative of commercial success.

09:26:44  1   Q    And then in terms of the amount of on-label versus

09:26:44  2   off-label sales -- you've been in court for every trial day,

09:26:48  3   correct?

09:26:48  4   A    I have.

09:26:48  5   Q    And you heard Dr. Budoff's estimation of the on-label and

09:26:54  6   off-label sales?

09:26:54  7   A    I did, yeah.  He, I think last week, said that he thought

09:26:59  8   it was more like 85 percent off-label to 15 percent

09:27:04  9   potentially being covered by the patents-in-suit.

09:27:07  10         And, you know, that's -- that may be his experience,

09:27:10  11  and that certainly is going to be the experience going forward

09:27:13  12  with REDUCE-IT and the additional labeled indication for

09:27:16  13  people with lower than 500 milligrams per deciliter.

09:27:28  14  Q    Mr. Hofmann, did you review any information concerning

09:27:29  15  clinical trials related to treatment of patients with

09:27:30  16  triglyceride levels below 500 milligrams per deciliter?

09:27:35  17  A    I did, certainly not in any clinical way, but I think we

09:27:38  18  heard from a number of witnesses last week about the ANCHOR

09:27:45  19  trial as well as the REDUCE-IT trial, both of which are

09:27:49  20  directed to patients under 500 milligrams per deciliter.

09:27:54  21         MR. BARABAS:  Then, I'm sorry, if we could go

09:27:56  22  back to DDX 8.13.  I'm sorry, I don't believe I moved this

09:28:02  23  into evidence as a summary exhibit.  So defendants would

09:28:07  24  request that DDX 8.13 be moved into evidence as a summary

09:28:11  25  exhibit.

09:28:12  1          MR. M. KENNEDY:  No objection, Your Honor.

09:28:12  2   BY MR. BARABAS:

09:28:14  3   Q    And then there are two documents listed at the bottom,

09:28:18  4   DX 2067 and DX 1607.  Mr. Hofmann, are these the documents you

09:28:24  5   relied on to prepare these summary exhibits?

09:28:26  6   A    Yes, that's the NDTI data.

09:28:29  7          MR. BARABAS:  And subject to plaintiffs' having

09:28:31  8   a chance to redact those documents, defendants request that

09:28:34  9   those documents also be moved into evidence.

09:28:37  10         MR. M. KENNEDY:  No objection, Your Honor.

09:28:37  11         THE COURT:  All right.  8.13 is admitted as a

09:28:41  12  demonstrative, and DX 2067 and 1607 are admitted.

09:28:46  13         I don't recall you moving to admit DX 2039 which

09:28:51  14  was the supporting -- I assume the data -- I've seen this

09:28:56  15  chart many times, but I assume the underlying data came from

09:29:00  16  it 2039.  Did you want to move that in?

09:29:03  17         MR. BARABAS:  Yes.  Thank you, Your Honor.  We

09:29:03  18  would like to move DX 2039.

09:29:04  19         And, Your Honor, to the extent there's any

09:29:05  20  difference between -- in the demonstratives and summary

09:29:09  21  exhibits, I would like to clarify that all the slides we'd

09:29:13  22  move into evidence, would like moved into evidence as summary

09:29:17  23  exhibits pursuant to Rule 1006 of the Federal Rules of

09:29:21  24  Evidence.

09:29:21  25         THE COURT:  Any objection, Mr. Kennedy?

09:29:22  1          MR. M. KENNEDY:  No objection.

09:29:24  2          THE COURT:  All right.  That request is granted.

09:29:25  3          And, to be clear, 2039 is also admitted.

09:29:25  4              (Defendants' Exhibits 8.13, 2067, 1607
09:29:30                and 2039 received in evidence.)
09:29:30  5          MR. BARABAS:  Thank you Your Honor.

09:29:30  6  BY MR. BARABAS:

09:29:32  7  Q    Okay.  So I believe, Mr. Hofmann, we have been

09:29:35  8  discussing -- you had just mentioned the ANCHOR trial and the

09:29:38  9  REDUCE-IT trial.

09:29:39  10         Is Amarin able to promote Vascepa based on the

09:29:43  11 ANCHOR trial and the REDUCE-IT trial?

09:29:45  12 A    Yeah.  So I think we heard, again, a little bit last week

09:29:53  13 about the ANCHOR trial specifically, that it was not approved

09:29:57  14 in terms of a labeled indication, that only the MARINE trial

09:30:02  15 was approved in 2013 for patients with very high

09:30:09  16 triglycerides.

09:30:11  17         But -- and years ago that would mean that you could

09:30:15  18 not promote off-label indications.  Certainly, physicians

09:30:18  19 always have their discretion on what they choose to prescribe

09:30:23  20 to their patients, but there were restrictions on what you can

09:30:28  21 promote to physicians that had to be tied to the labelled

09:30:32  22 indication.

09:30:33  23         Amarin undertook the step to fight FDA in court to

09:30:41  24 get permission to promote the ANCHOR trial with certain

09:30:47  25 restrictions, but even though the ANCHOR trial was off-label,

09:30:52   1   they were -- they successfully got permission to promote the

09:30:56   2   ANCHOR trial, which means that they were able to generate, you

09:31:02   3   know, prescriptions associated with promoting the ANCHOR

09:31:06   4   trial, which is evident in the data that we saw, that the vast

09:31:11   5   majority of sales relate to patients under 500 milligrams.

09:31:15   6   Q    How does Vascepa's new indication based on the REDUCE-IT

09:31:18   7   trial impact your nexus analysis?

09:31:21   8   A    Well, like I said, they -- they've been able to promote

09:31:25   9   the ANCHOR trial with restrictions, but now they have the

09:31:30  10   ability to promote the REDUCE-IT results, and they obtained

09:31:36  11   the labeled indication, and I think we heard from various

09:31:39  12   clinicians last week that that's really going to expand and

09:31:43  13   broaden the use of REDUCE-IT -- or, I'm sorry, the use of

09:31:48  14   Vascepa for patients below 500 milligrams per dose.

09:31:52  15   Q    And I think we've heard about H.C. WainWright a bit in

09:31:56  16   your testimony.  Did H.C. WainWright comment on the importance

09:32:00  17   of the REDUCE-IT trial?

09:32:00  18   A    They did.  In one of their analyst reports.  H.C.

09:32:06  19   WainWright said that the REDUCE-IT trial and getting the

09:32:09  20   labeled indication was the sole determinate -- those are their

09:32:12  21   words -- of the future value of Amarin.

09:32:14  22   Q    Is that important to your analysis?

09:32:17  23   A    It definitely does fit into everything else I've studied

09:32:21  24   in terms of the lack of nexus, and certainly undermines what I

09:32:27  25   think we might hear from Dr. Nicholson in terms of future

09:32:31  1   performance.

09:32:32  2          What analysts are saying and even Amarin internally

09:32:35  3   is saying is the REDUCE-IT trial is what's driving the future

09:32:39  4   value of this company, and, as we've heard, the REDUCE-IT

09:32:43  5   trial relates to patients that aren't covered by the claims in

09:32:46  6   the patents-in-suit and therefore lack nexus, therefore no

09:32:50  7   commercial success.

09:32:51  8   Q   You stated earlier that Dr. Nicholson doesn't dispute

09:32:55  9   that two thirds of Vascepa prescriptions are being prescribed

09:32:59  10  off-label.  How does this impact Dr. Nicholson's discussion of

09:33:04  11  nexus?

09:33:05  12  A   Well, I mean, I think the NDTI data that I studied he

09:33:09  13  studied as well, and, I think, came to similar conclusions

09:33:13  14  that, based on historical data, two thirds of historical use,

09:33:18  15  if not more, are unrelated to the claims of the

09:33:26  16  patents-in-suit.

09:33:26  17          However, I think he has some discussion that

09:33:28  18  conflates the concept of nexus in a commercial success setting

09:33:31  19  with FDA approval.

09:33:33  20  Q   So how does initial FDA approval of a drug relate to

09:33:37  21  nexus and commercial success?

09:33:39  22  A   Well, I think what we might hear from Dr. Nicholson is

09:33:44  23  that, you know, because the first labeled indication was for

09:33:49  24  patients with greater than 500 milligrams per deciliter, that

09:33:55  25  he can somehow take credit for all future sales of Vascepa,

09:34:00   1   and that -- that's -- again, that conflates FDA approval with

09:34:07   2   looking at nexus.

09:34:08   3          From an economic perspective, nexus is tying the

09:34:12   4   claims of the patents-in-suit to the marketplace performance.

09:34:17   5   If it were the standard that you could just look at initial

09:34:20   6   approval and then take all future indications, all future

09:34:24   7   sales, all future performance of a product, you would have a

09:34:28   8   really economically unsound result because you would be taking

09:34:34   9   credit for actual and future sales that aren't tied to the

09:34:39   10  patents that you're studying and don't show a nexus to the

09:34:43   11  patents that you're studying.

09:34:44   12  Q    Okay.  Mr. Hofmann, you mentioned earlier that the

09:34:46   13  limited performance of Vascepa is driven by extrinsic factors

09:34:50   14  unrelated to the asserted claims of the patents-in-suit.  What

09:34:54   15  are the extrinsic factors to which you were referring?

09:34:59   16  A    There's two main categories, marketing and promotion, as

09:35:03   17  well as discounts, rebates, and other incentives.

09:35:05   18  Q    Please briefly explain Amarin's marketing and promotional

09:35:09   19  efforts for Vascepa.

09:35:10   20  A    So Amarin has undertaken a very extensive and intense

09:35:14   21  marketing campaign with respect to Vascepa.  They've used

09:35:21   22  things like direct consumer advertising, detailing, sampling,

09:35:25   23  co-promotion agreements, and we can even study how intense

09:35:30   24  it's been through a measure called Share of Voice.

09:35:33   25  Q    Then, Mr. Hofmann, you mentioned earlier that the

09:35:36   1   marketplace performance of Vascepa is driven by the marketing

09:35:39   2   and promotional efforts of Amarin; is that right?

09:35:42   3   A   Correct.

09:35:42   4   Q   Have you seen evidence that discusses the importance of

09:35:45   5   marketing to the performance of Vascepa?

09:35:47   6   A   Yes.  So I studied the marketing intensity and importance

09:35:54   7   of marketing both on an qualitative basis based on statements

09:35:58   8   they've made to the public, as well as on a quantitative

09:36:01   9   basis.

09:36:01   10   Q   Okay.  Now, if we could turn to DDX 8.14, and this slide

09:36:09   11   is entitled "The Importance of Marketing and Promotion to

09:36:12   12   Vascepa."  And if we could take those quotes one at a time,

09:36:16   13   Mr. Hofmann.

09:36:17   14         The first quote is,

09:36:19   15           "Our current level of sales and marketing

09:36:24   16       activities for Vascepa is significant."

09:36:27   17         How does that impact your analysis?

09:36:29   18   A   This is just a high level quote that is, again, senior

09:36:33   19   management at Amarin telling the investing public how

09:36:38   20   important sales and marketing is for Vascepa, how significant

09:36:41   21   it is.

09:36:42   22        MR. BARABAS:  And this quote is found at

09:36:45   23   DX 2057, pin cite 3, and defendants' move DX 2057 into

09:36:51   24   evidence.

09:36:51   25

09:36:51  1   BY MR. BARABAS:

09:36:58  2   Q    Okay.  The second quote --

09:36:58  3                THE COURT:  I'm sorry, Mr. Kennedy, do you have

09:37:00  4   any objection to DX 2057 being admitted, which apparently

09:37:04  5   supports the first quote on this demonstrative?

09:37:09  6                MR. M. KENNEDY:  Yeah, I guess the only

09:37:09  7   difficulty I have, I don't know offhand what it is.  It's a

09:37:13  8   little hard to not object if it's just a quote on a

09:37:15  9   demonstrative.  I mean, maybe if we could lay a little more

09:37:18  10  foundation of how it supports his opinion.

09:37:18  11  BY MR. BARABAS:

09:37:22  12  Q    So DX 2057, according to my notes, is the Amarin

09:37:25  13  Corporation PLC fourth quarter 2018 earnings call transcripts.

09:37:30  14       Mr. Hofmann, did you review the Amarin earnings call

09:37:35  15  transcripts?

09:37:35  16  A    I did.

09:37:36  17  Q    And it's your understanding that this quote is taken from

09:37:41  18  the earnings call transcripts?

09:37:42  19  A    Yeah.  I think it's in the binder and it's on screen.

09:37:46  20  That's where this quote comes from, is every quarter senior

09:37:49  21  management at Amarin has a call with analysts and talks to

09:37:54  22  them about their performance.

09:37:57  23       And in this earnings call they communicated to the

09:38:03  24  investing community about the importance of the significance

09:38:06  25  of marketing, and that's what I've summarized in the

09:38:08  1  demonstrative.

09:38:09  2                    THE COURT:  Mr. Kennedy?

09:38:10  3                    MR. M. KENNEDY:  No objection.

09:38:11  4              THE COURT:  2057 is admitted.

09:38:11  5                    (Defendants' Exhibit 2057 received in
09:38:11                          evidence.)
09:38:11  6  BY MR. BARABAS:

09:38:15  7  Q    Okay.  And the second quote on DDX 8.14 is that,

09:38:19  8              "Our ability to succeed lies in the strength

09:38:22  9         of the Vascepa clinical profile and aggressive

09:38:25  10        targeted sales and marketing efforts."

09:38:28  11             And how does that quote impact your analysis,

09:38:32  12 Mr. Hofmann?

09:38:32  13 A    Yeah.  So I think this one comes from like an internal

09:38:37  14 Amarin e-mail where management within Amarin are talking about

09:38:42  15 their aggressive and targeted sales and marketing efforts.

09:38:46  16             And, again, this is consistent with what I see

09:38:50  17 qualitatively and quantitatively on the importance of

09:38:53  18 marketing.

09:38:54  19             MR. BARABAS:  And then so DX -- excuse me,

09:38:57  20 DX 1762, according to my notes, is an e-mail forwarded from

09:38:57  21 Mr. Berg to Mr. Thero regarding generic Lovaza, perception

09:39:07  22 versus reality, and defendants seek to move DX 1762 into

09:39:09  23 evidence.

09:39:10  24             MR. M. KENNEDY:  No objection.

09:39:10  25             THE COURT:  1762 is admitted.

09:39:10  1                    (Defendants' Exhibit 1762 received in
09:39:10                             evidence.)
09:39:10  2    BY MR. BARABAS:

09:39:15  3    Q    Okay.  The third quote we have on DDX 8.14 is, quote,

09:39:20  4              "Samples and co-pay cards have a considerable

09:39:22  5         impact on physicians' prescribing of Vascepa."

09:39:27  6              How does that quote impact your analysis

09:39:29  7    Mr. Hofmann?

09:39:30  8    A    Yes.  So this -- this was an internal Amarin document

09:39:33  9    that talks about their kind of commercial planning and

09:39:36  10   strategy.

09:39:37  11            And what they are specifically addressing is the

09:39:44  12   importance of, again, two tools, I think, sampling and co-pay

09:39:52  13   cards, which is a form of patient assistance, and so these are

09:39:57  14   specific tools, and the importance of those tools from a

09:40:00  15   marketing perspective which drive the sales of Vascepa.

09:40:04  16            MR. BARABAS:  Okay.  That quote is found

09:40:07  17   DX 1773, pin cite 9, and DX 1773 is a document entitled

09:40:11  18   "Amarin Commercial Update."  Defendants' seek to move DX 1773

09:40:16  19   into evidence.

09:40:17  20            MR. M. KENNEDY:  No objection, Your Honor.

09:40:18  21            THE COURT:  1773 is admitted.

09:40:18  22                    (Defendants' Exhibit 1773 received in
09:40:21                             evidence.)
09:40:21  23            MR. BARABAS:  Thank you, Your Honor.

09:40:21  24   BY MR. BARABAS:

09:40:22  25   Q    The fourth quote is,

09:40:23  1          "Elevate Vascepa value with a strong

09:40:26  2      celebrity messenger on national TV and print vehicles

09:40:31  3      - including their social media channels."

09:40:34  4              How does this quote impact your analysis,

09:40:37  5  Mr. Hofmann?

09:40:38  6  A    Well, like I said, Amarin has used all the tools in the

09:40:42  7  tool box in terms of marketing, and one of the tools is

09:40:45  8  direct-to-consumer advertising.  I think we've all seen

09:40:50  9  pharmaceutical companies advertise on TV.

09:40:52  10          And, specifically, at one point Amarin got a

09:40:55  11  television celebrity to be in TV ads as well as in some of

09:41:02  12  their print vehicles.  What that refers to is flyers and stuff

09:41:06  13  that they leave with physicians when detailing or in the

09:41:09  14  offices.

09:41:10  15          And then social media channels, that relates to

09:41:13  16  things like banner ads or FaceBook that target patients to --

09:41:19  17  and they incorporated the celebrity into their outreach.

09:41:26  18              MR. BARABAS:  So DX 1772 is entitled "Vascepa

09:41:30  19  Celebrity Brand Campaign," and defendants seek to move DX 1772

09:41:35  20  into evidence.

09:41:36  21              MR. M. KENNEDY:  No objection, Your Honor.

09:41:38  22              THE COURT:  1772 is admitted.

09:41:38  23                  (Defendants' Exhibit 1772 received in
09:41:41                          evidence.)
09:41:41  24              MR. BARABAS:  Thank you, Your Honor.

09:41:42  25              If we could turn now, Mr. Gross, to DDX 8.15.

09:41:42   1   BY MR. BARABAS:

09:41:47   2   Q    This slide is entitled "Amarin Marketing Spend for

09:41:53   3   Vascepa."

09:41:54   4        And, Mr. Hofmann, with reference to this summary

09:41:58   5   exhibit, did you analyze Amarin's total marketing spend for

09:42:03   6   Vascepa?

09:42:04   7   A    Yeah.  So, in addition to the qualitative kind of

09:42:09   8   exemplary quotes we just looked at on the last slide, I looked

09:42:12   9   at the numbers, and, based on the product profit and loss

09:42:16   10  statements, was able to analyze how much Amarin spent on

09:42:19   11  marketing and sales related to Vascepa.

09:42:25   12        And in summing those amounts up, it comes to $575

09:42:30   13  million, more than half a billion dollars, on marketing, and I

09:42:36   14  compared that to what they were able to generate in sales

09:42:39   15  during that same period, which works out to about

09:42:43   16  $698 million.

09:42:44   17        And then I calculated the percentage of marketing

09:42:48   18  expenses relative to sales, and you can see that 82 cents of

09:42:54   19  every dollar has essentially been spent on sales and

09:42:59   20  marketing, and what this tells me is they've invested very

09:43:02   21  heavily in marketing associated with Vascepa.

09:43:06   22  Q    Okay.  Mr. Hofmann, on the bottom left of this summary

09:43:10   23  exhibit is a reference to DX 2050, which is entitled

09:43:15   24  "Quarterly Financial Summary Q-1 2013, Q-4 2014."

09:43:20   25        Is that a document you relied upon in preparing this

09:43:23    1    summary exhibit?

09:43:24    2     A    It is.

09:43:26    3                    MR. BARABAS:  Defendants move to admit DX 2050

09:43:31    4    as a -- into evidence.

09:43:33    5                    MR. M. KENNEDY:  No objection, Your Honor.

09:43:35    6                    MR. BARABAS:  And defendants --

09:43:35    7                    THE COURT:  2050 is admitted.

09:43:35    8                    MR. BARABAS:  Thank you, Your Honor.

09:43:39    9                    And defendants' also move to admit DDX 8.15 into

09:43:42   10    evidence as a summary exhibit.

09:43:44   11                    MR. M. KENNEDY:  No objection, Your Honor.

09:43:46   12                    THE COURT:  8.15 is also admitted as a

09:43:46   13    demonstrative.

09:43:46   14                        (Defendants' Exhibits 2050 and 8.15
09:43:50                             received in evidence.)
09:43:50   15                    MR. M. KENNEDY:  Your Honor, if I could just

09:43:51   16    note with 20150, we would like the opportunity to redact.

09:43:54   17                    THE COURT:  Yes.

09:43:56   18                    MR. BARABAS:  And, Your Honor, to the extent

09:44:00   19    there's any distinction, we would seek to admit DDX 8.15 as a

09:44:02   20    summary exhibit.

09:44:03   21                    THE COURT:  I'm sorry, you're also moving

09:44:06   22    DDX 8.15 as a summary?

09:44:08   23                    MR. BARABAS:  Yeah, as opposed to a

09:44:09   24    demonstrative to the extent there's any difference for your

09:44:12   25    purposes.

09:44:13    1              THE COURT:  Well, it's a summary exhibit that's

09:44:15    2   admitted as a demonstrative exhibit, right?

09:44:18    3              MR. BARABAS:  Okay.  Thank you.

09:44:18    4   BY MR. BARABAS:

09:44:21    5   Q    So, Mr. Hofmann, earlier in your testimony you also

09:44:24    6   mentioned detailing.  Please explain briefly what detailing of

09:44:28    7   pharmaceutical products is.

09:44:29    8   A    Sure.  So detailing is a technique, a marketing

09:44:34    9   technique, that is sometimes undertaken by brand sponsors of

09:44:38   10   drugs.

09:44:39   11              What they do is they have sales representatives that

09:44:42   12   will typically physically visit physicians, potential

09:44:47   13   prescribing physicians, provide information about the drug,

09:44:51   14   provide samples to give to patients, provide coupons and

09:44:56   15   patient assistant cards, as well as materials to be left in

09:45:00   16   the office for use of prescribers and patients.

09:45:04   17              It's a -- it's a technique used to drive

09:45:09   18   prescriptions of the product at issue.

09:45:11   19   Q    So you mentioned sales representatives.  How large is the

09:45:14   20   Amarin sales force for Vascepa?

09:45:16   21   A    It's varied over time.  I think it started at 275 reps.

09:45:24   22   It's gone down a little bit, then back up.

09:45:27   23              And I think in 2019, they expanded it significantly

09:45:33   24   in anticipation of the REDUCE-IT trial results and additional

09:45:38   25   labelled indication.

09:45:39   1   Q    Did Amarin perform all of its own promotional activities?

09:45:43   2   A    No.   In addition to their internal sales reps, they

09:45:47   3   entered into a co-promotion agreement with a Japanese

09:45:52   4   pharmaceutical company called Kowa, K-o-w-a, Pharmaceuticals.

09:45:57   5   Q    Did you see evidence of the importance of the

09:46:00   6   co-promotion agreement to Amarin for Vascepa?

09:46:02   7   A    Yes.   There was a number of documents in Amarin's files

09:46:06   8   that were produced that talk about the importance of Kowa.

09:46:10   9                MR. BARABAS:  So, Mr. Gross, if we could turn to

09:46:12  10   DDX 8.16.

09:46:12  11   BY MR. BARABAS:

09:46:14  12   Q    And, Mr. Hofmann, if we could take these quotes one at a

09:46:17  13   time.   This exhibit is entitled "The Importance of the

09:46:22  14   Co-Promotion Agreement With Kowa."

09:46:26  15           And the first quote is that,

09:46:28  16             "Kowa's co-promotion efforts are planned to

09:46:31  17         significantly expand our target physician subscriber

09:46:35  18         base and more than double current sales detail

09:46:39  19         frequency, including resumption of details to

09:46:42  20         physicians not currently targeted by Amarin's sales

09:46:45  21         representatives."

09:46:47  22                How does this quote impact your analysis?

09:46:50  23   A    So this quote comes from one of those quarterly earnings

09:46:54  24   calls I mentioned, or we discussed a little while ago, where

09:46:57  25   senior management of Amarin is telling the investment

09:47:00   1    community that they've entered into this agreement with Kowa

09:47:04   2    and that they expect the agreement with Kowa to significantly

09:47:08   3    expand their outreach, their ability to detail to prescribers,

09:47:13   4    which they hope that that additional marketing and

09:47:15   5    co-promotion will generate additional prescriptions for

09:47:19   6    Vascepa.

09:47:20   7              MR. BARABAS:  Okay.  And this quote actually

09:47:22   8    comes from DX 2079, pin cite at page 2, which is the Amarin

09:47:28   9    Corporation PLC first quarter 2014 earnings call transcript.

09:47:33   10   Defendants' move to admit DX 2079 into evidence.

09:47:38   11              MR. M. KENNEDY:  No objection.

09:47:39   12              THE COURT:  DX 2079 is admitted.

09:47:39   13                  (Defendants' Exhibit 2079 received in
09:47:42                          evidence.)
09:47:42   14              MR. BARABAS:  Thank you.

09:47:43   15   BY MR. BARABAS:

09:47:43   16   Q    The second quote on DDX 8.16 is that, quote,

09:47:47   17              "As a result, Kowa is very similar with the

09:47:52   18        therapeutic category and have established

09:47:54   19        relationships with many of the high-decile omega-3

09:47:58   20        prescribers.  With expect this dynamic to complement

09:48:05   21        the Amarin sales team efforts and result in

09:48:07   22        accelerated Vascepa prescription growth with initial

09:48:11   23        evidence of their contributions beginning to be

09:48:14   24        visible in the second half of 2014."

09:48:17   25              Mr. Hofmann, typos aside, how does that quote

09:48:20  1    impact your analysis?

09:48:21  2     A    Well, this I think is from the same earnings call, and

09:48:24  3    what senior management is explaining is the rationale, the

09:48:28  4    synergistic benefit of why they partnered with Kowa.

09:48:33  5              Kowa, I think at the time, had been promoting Livalo

09:48:37  6    which is a statin, and I think we heard last week that it's

09:48:40  7    pretty common that patients that present with high

09:48:44  8    triglycerides may also be on a statin, and certainly the

09:48:47  9    prescribers that might prescribe an omega-3 are going to be

09:48:52  10   the same prescribers that are likely to be prescribing a

09:48:56  11   statin.

09:48:56  12             And so senior management is telling the public the

09:49:00  13   importance of -- and synergy of the agreement with Kowa should

09:49:04  14   lead to, you know, the ability to leverage off the existing

09:49:08  15   sales force and relationships that Kowa has with various

09:49:11  16   prescribing physicians.

09:49:13  17             MR. BARABAS:  So, Mr. Gross, if we could turn to

09:49:15  18   the next slide DDX 8.17, and this slide is entitled "Market/

09:49:22  19   Performance Co-Promote Target Type."

09:49:22  20   BY MR. BARABAS:

09:49:25  21    Q    And, Mr. Hofmann, please describe what is shown on this

09:49:28  22   slide.

09:49:29  23    A    Sure.  This isn't the slide I necessarily prepared, this

09:49:33  24   is something from Amarin internal documents.  This was

09:49:36  25   something that I thought was worth pointing out in terms of --

09:49:41  1  the last slide was more about the announcement of the

09:49:44  2  agreement with Kowa.  This slide shows how they were

09:49:48  3  internally assessing the effectiveness of that co-promotion

09:49:53  4  agreement.

09:49:54  5         And so the oval there, and the call-out box, if you

09:49:58  6  will, is Amarin looking at new prescriptions and total

09:50:04  7  prescriptions, in particular, for the situations where Kowa

09:50:09  8  has been involved, and what we can see is pretty high double

09:50:13  9  digit growth in prescriptions since the relationship with

09:50:19  10  Kowa, the co-promotion agreement with Kowa began.

09:50:23  11         MR. BARABAS:  Okay.  And, for the record, on the

09:50:24  12  bottom left of that slide there, it's DX 1776, which is the

09:50:28  13  Amarin sales and marketing update that I believe has been

09:50:33  14  already admitted into evidence, and that's pin cite 21.

09:50:38  15         THE CLERK:  It is not.

09:50:40  16         MR. BARABAS:  Thank you.

09:50:40  17         THE CLERK:  I don't show it being in evidence.

09:50:42  18         THE COURT:  I don't see it as being admitted.

09:50:45  19  Is there any objection to its admission?

09:50:46  20         MR. M. KENNEDY:  No objection, Your Honor.

09:50:46  21         THE COURT:  All right.  1776, to the extent it

09:50:48  22  hasn't been admitted, is admitted.

09:50:48  23               (Defendants' Exhibit 1776 received in
09:50:53                     evidence.)
09:50:53  24         MR. BARABAS:  Thank you, Your Honor.

09:50:53  25

09:50:53   1   BY MR. BARABAS:

09:50:55   2   Q   Mr. Hofmann, you mentioned that another form of marketing

09:50:57   3   and promotion for Vascepa is Share a Voice.  What is Share a

09:51:02   4   Voice?

09:51:02   5   A   Well, Share a Voice is a way to measure marketing

09:51:06   6   intensity.

09:51:07   7         What it represents is a way of looking at the amount

09:51:10   8   of dollars spent by a company on a particular product relative

09:51:16   9   to the amount spent by other products with which it completes

09:51:21  10   and then expressing that as a percentage.

09:51:23  11         It basically measures how intense or how much more

09:51:28  12   is being spent on one product versus others in the

09:51:32  13   marketplace, how much shouting there is on those products.

09:51:35  14             MR. BARABAS:  And, Mr. Gross, if we could turn

09:51:36  15   to DDX 8.18, and this slide is entitled "Promotional Dollar

09:51:43  16   ($) Spend 2013 to 2017."

09:51:43  17   BY MR. BARABAS:

09:51:45  18   Q   And, Mr. Hofmann, please explain your analysis of Share a

09:51:50  19   Voice with reference to this demonstrative.

09:51:52  20   A   So, once again, I went to IQVIA.  IQVIA is the data

09:52:00  21   aggregator that's regularly used in the pharmaceutical

09:52:04  22   industry.

09:52:04  23         And they, in addition to the other things that they

09:52:07  24   track that we've analyzed, they will also track marketing

09:52:11  25   spending by product, and the data that was available was from

09:52:15   1   2013 to 2017, so that's from Vascepa launch until 2017, and

09:52:22   2   it's expressed in dollars.

09:52:24   3          It collects information on direct-to-consumer

09:52:29   4   advertising, on detailing, on sampling, on journal

09:52:33   5   advertising.

09:52:34   6          And then I took those dollars, the amounts that were

09:52:38   7   spent to Vascepa, compared those to Lovaza and some of the

09:52:41   8   other triglyceride-lowering products that were on the market,

09:52:44   9   and expressed as a percentage how much the Share a Voice was

09:52:49  10   for Vascepa in a pay chart relative to others.

09:52:53  11          And what you can see is that Vascepa spent more.

09:52:57  12   They -- 37 percent of the Share a Voice is with Vascepa, which

09:53:02  13   is more than any other products by more than double digits.

09:53:06  14   Q    And what did you determine from this Share a Voice

09:53:10  15   analysis?

09:53:11  16   A    Well, I mean, this shows that Vascepa was outspending,

09:53:14  17   out-promoting, out-shouting, out-marketing everybody else in

09:53:19  18   the marketplace.

09:53:20  19          Now, to put this in context, when we look at their

09:53:23  20   market share, which we looked at a little while ago in the

09:53:27  21   data, their prescription share is about three percent, and so

09:53:32  22   they're significantly outsized in their marketing and

09:53:37  23   promotion to the tune of 37 percent, when, for the same

09:53:40  24   period, they've been only able to get three percent market

09:53:44  25   share.

09:53:44  1          So this shows the significant role as a different

09:53:47  2   way to measure the significant investment by Vascepa on a

09:53:53  3   relative basis -- or by Amarin on a relative basis related to

09:53:57  4   Vascepa versus competitors.

09:53:59  5   Q    And, Mr. Hofmann, on the bottom left of this summary

09:54:02  6   exhibit is reference to DX 2088 which is entitled "Total

09:54:06  7   Promotional Dollars."  Is that a document you relied upon to

09:54:09  8   prepare this summary exhibit?

09:54:10  9   A    Yeah, that's the IQVIA marketing data that is the basis

09:54:15 10   for this.

09:54:16 11          MR. BARABAS:  And, Your Honor, defendants

09:54:17 12   request to more DX 2088 into evidence.

09:54:20 13          MR. M. KENNEDY:  No objection, although, again,

09:54:21 14   we would like the opportunity to redact the underlying

09:54:25 15   exhibit.

09:54:26 16          MR. BARABAS:  And defendants also request that

09:54:28 17   DDX 8.18 be admitted into evidence as a summary exhibit.

09:54:33 18          MR. M. KENNEDY:  No objection, Your Honor.

09:54:34 19          THE COURT:  All right.  DX 2088 is admitted and

09:54:39 20   DDX 8.18 is admitted as summary evidence.

09:54:47 21          And I want to clarify that I agree all the

09:54:49 22   summary evidence that I've admitted so far I admitted under

09:54:52 23   Federal Rules of Evidence 1006.

09:54:55 24          MR. BARABAS:  Thank you, Your Honor.

09:54:55 25

09:54:55  1          (Defendants' Exhibit 2088 and 8.18
09:54:55                  received in evidence.)
09:54:55  2   BY MR. BARABAS:

09:54:57  3   Q    Mr. Hofmann, you also mentioned sampling as another

09:55:00  4   marketing and promotional measure used by Amarin; is that

09:55:04  5   right?

09:55:04  6   A    That's correct.

09:55:04  7   Q    What is sampling?

09:55:06  8   A    So in prescription pharmaceutical products, sometimes the

09:55:13  9   brand sponsor will, through detailing, provide samples to

09:55:18  10  physicians to give to patients when they write a prescription.

09:55:23  11          So those samples are actual product, so it will be

09:55:27  12  actual Vascepa.  It may be a 7-day pack or a 30-day pack that

09:55:31  13  they then write a prescription alongside.

09:55:35  14          And the idea is that if a patient, you know, leaves

09:55:39  15  the office with a sample in hand, and they can, for free,

09:55:43  16  start to try the product, then they're much more likely to

09:55:48  17  fill the prescription is the rationale, that patient

09:55:53  18  fulfillment is enhanced, and then prescribers are typically

09:55:57  19  appreciative of having samples, and that really does encourage

09:56:01  20  both prescribing behavior and patient fulfillment.

09:56:04  21          MR. BARABAS:  Okay.  If we could turn to

09:56:07  22  DDX 8.19, Mr. Gross, and this slide is entitled "The

09:56:13  23  Importance of Vascepa Sampling."

09:56:13  24  BY MR. BARABAS:

09:56:16  25  Q    Now, Mr. Hofmann, with reference to this slide, taking

09:56:21  1   these quotes one at a time, did you see evidence of the

09:56:24  2   importance of Vascepa's sampling program?

09:56:26  3    A    Yeah.  So I think this quote is another one of those

09:56:29  4   quarterly earnings calls where senior management of Amarin is

09:56:35  5   telling the investing public that samples have always been

09:56:38  6   important for them.  So it's consistent with what I was seeing

09:56:43  7   elsewhere.

09:56:44  8              MR. BARABAS:  And so this first quote is found

09:56:45  9   at DDX -- I'm sorry, excuse me, DX 2085, pin cite page 11,

09:56:52  10  that's the Amarin Corporation PLC, first quarter 2013 earnings

09:56:56  11  call transcript, pin cite page 11.

09:56:59  12             Defendants move to admit DX 2085 into evidence.

09:57:03  13             MR. M. KENNEDY:  No objection, Your Honor.

09:57:04  14             THE COURT:  2085 is admitted.

09:57:04  15                  (Defendants' Exhibit 2085 received in
09:57:04
09:57:04  16  BY MR. BARABAS:          evidence.)

09:57:08  17   Q    And then the second quote we have here, Mr. Hofmann, is

09:57:12  18  also from DX 2085, and that states,

09:57:15  19             "I expect we will continue to see very robust

09:57:17  20        returns from our samples.  To date it's been very,

09:57:20  21        very positive with those doctors who are using

09:57:23  22        samples and accessing samples."

09:57:26  23             How does that quote impact your analysis?

09:57:28  24   A    Well, is, I think, a very clear example of what I was

09:57:33  25  describing generally, that they give away the samples for free

09:57:37  1   with the idea that they hopefully they will get the

09:57:39  2   prescriptions filled, and then that will translate into

09:57:44  3   revenue for Amarin.

09:57:45  4           And what they're saying is we're seeing positive

09:57:47  5   returns on that, that basically it's worth giving away samples

09:57:51  6   because that encourages prescribing behavior and patient

09:57:54  7   fulfillment.

09:57:56  8   Q   Mr. Hofmann, would you please summarize your opinions on

09:57:58  9   the marketing and promotion of Vascepa.

09:58:02  10  A   Well, I think we've seen a lot of qualitative and

09:58:05  11  quantitative examples that Amarin, since the launch of

09:58:09  12  Vascepa, has invested heavily in every front, and has told the

09:58:14  13  community and used detailing and direct-to-consumer and

09:58:18  14  samples to drive the marketplace performance of Vascepa, which

09:58:23  15  really is unrelated to the claims of the patents-in-suit and

09:58:28  16  undermines the claims of nexus.

09:58:30  17  Q   Okay.  Mr. Hofmann, I'd next like to discuss discounts,

09:58:34  18  rebates, and other incentives.  How, if at all, do these

09:58:40  19  factors drive Vascepa's marketplace performance?

09:58:43  20  A   So on top of the dollars and all the stuff we just talked

09:58:47  21  about on marketing, there are financial incentives that Amarin

09:58:50  22  has undertaken in the form of discounts, rebates, and I say

09:58:55  23  other incentives, but it's really patient assistance type

09:58:58  24  incentives, that add an additional layer of what's really

09:59:04  25  hundreds of millions of dollars to drive the sales of Vascepa.

09:59:09　1　　Q　　And are these tools related to the patents-in-suit?

09:59:14　2　　A　　No, I mean, these are -- these are simply tricks of the

09:59:19　3　　trade, if you will, that help encourage prescribing behavior

09:59:24　4　　and patient fulfillment by using financial tools that have

09:59:27　5　　nothing to do with the claims of the patents-in-suit.

09:59:30　6　　　　　　　　MR. BARABAS:  So, Mr. Gross, if we could turn to

09:59:32　7　　DDX 8.20, and this slide is appropriately entitled "Discounts,

09:59:38　8　　Rebates, and Other Incentives."

09:59:38　9　　BY MR. BARABAS:

09:59:40　10　　Q　　And, Mr. Hofmann, with reference to this demonstrative,

09:59:46　11　　please explain your analysis of discounts, rebates and other

09:59:49　12　　incentives.

09:59:50　13　　A　　Yeah.  So this information comes from, I think, that

09:59:54　14　　quarterly spreadsheet that we've talked before, and I

09:59:58　15　　summarized it by year here, and this focuses on gross sales

10:00:03　16　　with deductions to get to net sales.

10:00:06　17　　　　　　　Those deductions are the types of rebates and

10:00:12　18　　discounts and other incentives primarily that are being used

10:00:16　19　　to drive the sales of Vascepa.

10:00:20　20　　　　　　　What we see is they've increased every year and in

10:00:24　21　　dollars, which is highlighted in yellow, they go from 10

10:00:28　22　　million in the year of launch to about a quarter of a billion

10:00:32　23　　dollars in 2018, for an grand total of $631,000,000, which is

10:00:39　24　　about half of the total cumulative sales of Vascepa.

10:00:45　25　　　　　　　　MR. BARABAS:  And then on the bottom left of

10:00:46   1   this summary exhibit is a reference to DX 2050, which is

10:00:51   2   entitled Quarterly Financial Summary Q1 2013 to Q4 2018.

10:00:58   3           If I haven't already sought to admit this into

10:01:00   4   evidence, defendants seek to admit DX 2050 into evidence.

10:01:04   5           MR. M. KENNEDY:  No objection, Your Honor.

10:01:05   6           THE COURT:  All right.  DX 2050 is admitted and

10:01:08   7   DDX 8.20 is also admitted as a summary exhibit.

10:01:08   8                   (Defendants' Exhibit 8.20 received in
10:01:12                       evidence.)
10:01:13   9           MR. BARABAS:  Thank you Your Honor.

10:01:16  10           If we could turn to the next slide, Mr. Gross,

10:01:21  11   DDX 8.21, and this slide is entitled Discounts, Rebates and

10:01:26  12   Other Incentives As Percentage of Gross Sales.

10:01:26  13   BY MR. BARABAS:

10:01:29  14   Q   And, Mr. Hofmann, what have you shown in this summary

10:01:35  15   exhibit?

10:01:35  16   A   So this takes the data from the last slide which was in

10:01:38  17   dollars, and it expresses it as a line graph in percentages.

10:01:43  18           And I think there's a couple of important take-aways

10:01:46  19   from this slide.  We can see that in every year discounts,

10:01:51  20   rebates, and other incentives have grown.

10:01:54  21           They've always been relatively high, 29 percent in

10:01:58  22   year one.  Starting in 2017, it got to 50 percent.  Now in

10:02:03  23   2018, we're at 53 percent.  So that means essentially, 53

10:02:08  24   cents of every dollar that's being sold is being given away in

10:02:13  25   discounts, rebates and other incentives.

10:02:17   1            And, again, this is all on top of the significant

10:02:19   2    expenditures that we saw on marketing and promotion.

10:02:25   3                    MR. BARABAS:  Your Honor, defendants move to

10:02:28   4    admit DDX 8.21 as summary exhibit.

10:02:32   5                    THE COURT:  I think --

10:02:33   6                    MR. M. KENNEDY:  No objection, Your Honor.

10:02:34   7                    THE COURT:  Didn't I already admit this?

10:02:37   8                    MR. BARABAS:  You admitted DDX 8.20.  I don't

10:02:40   9    know if you admitted DDX 2 --

10:02:40  10                    THE COURT:  I'm sorry, I put it incorrectly in

10:02:42  11    my notes.  Any objection?

10:02:45  12                    MR. M. KENNEDY:  No objection, Your Honor.

10:02:45  13                    THE COURT:  All right.  DDX 8.20 -- 21 is

10:02:49  14    admitted.

10:02:49  15                        (Defendants' Exhibit 8.21 received in
10:02:50
                                    evidence.)
10:02:50  16            MR. BARABAS:  Thank you, Your Honor.

10:02:50  17    BY MR. BARABAS:

10:02:53  18    Q   Mr. Hofmann, what is the co-pay program that Amarin

10:02:56  19    offers for patients?

10:02:58  20    A   Sure.  So within these other incentives category would be

10:03:02  21    what are often referred to as co-pay or patient assistance

10:03:06  22    programs.

10:03:07  23            I think probably most of us have had to go to the

10:03:10  24    pharmacy to fill a prescription, and you're asked to pay a

10:03:13  25    co-pay, which is a portion of the cost of the drug, and

10:03:19  1   depending on your insurance coverage and depending on the

10:03:23  2   formulary replacement in the drug, the co-pay amount is going

10:03:27  3   to vary.

10:03:30  4             And what Amarin has done in order to, again, improve

10:03:35  5   patient fulfillment and prescribing behaviors, they subsidize

10:03:40  6   that co-pay cost where basically if the co-pay was going to be

10:03:46  7   $75 they may pay a portion of that, and so the patient only

10:03:50  8   has to pay a fraction of the actual co-pay, and so you really

10:03:53  9   insulate the patient from the actual cost of the product.

10:03:58  10  Q   So if you could please describe the specific co-payment

10:04:01  11  programs that Amarin has offered for Vascepa.

10:04:04  12  A   Yeah.   I think it's varied over time, but from what I saw

10:04:08  13  in the Amarin documents, and looking at their website today,

10:04:12  14  it started out at, you know, I think, $75 per month that

10:04:18  15  Amarin would use to subsidize the co-pay to really insulate

10:04:24  16  the patient from the cost in the product.

10:04:28  17            And then at one point they changed to a

10:04:31  18  pay-no-more-than program, which means rather than a fixed

10:04:34  19  amount, that they would subsidize the patient pays no more

10:04:38  20  than $9 per month, which is almost on par with

10:04:44  21  over-the-counter fish oil.

10:04:46  22            And, you know, it's subject to certain restrictions

10:04:48  23  and caps, but those, those have been the general trend in the

10:04:52  24  co-pay assistance programs.

10:04:54  25  Q   What is your overall conclusion based on analyzing

10:04:57  1   discounts, rebates, and other incentives for Vascepa?

10:05:01  2   A    Well, I think when you look at the significance of the

10:05:04  3   discounts, rebates and other incentives, and consider them

10:05:07  4   alongside the marketing and promotion, and the fact that there

10:05:12  5   is not -- most of the prescriptions are being written for

10:05:18  6   patients that aren't even covered by the patents, these are

10:05:21  7   strong, strong indicators of a lack of nexus between the

10:05:24  8   marketplace performance of Vascepa, which isn't even all that

10:05:30  9   good, but shows a lack of nexus to that marketplace

10:05:34  10  performance in the claims in the patents-in-suit.

10:05:37  11  Q    Mr. Hofmann, I would like to change topics and discuss

10:05:41  12  apportionment.  Do you have any other disagreements with

10:05:45  13  Dr. Nicholson's analysis of Vascepa's marketplace performance?

10:05:48  14  A    Yeah.  I think -- I think one additional point of dispute

10:05:53  15  I have with Dr. Nicholson is he did nothing to address

10:05:56  16  apportionment or the patent landscape with respect to Vascepa.

10:06:01  17  Q    And what do you mean by that?

10:06:02  18  A    Well, I mean, if you think about it, when we're looking

10:06:06  19  at marketplace performance, and we have a product that's

10:06:11  20  covered by multiple patents, only some of which are at issue,

10:06:16  21  it's economically unsound not to analyze or apportion value to

10:06:22  22  the patents that aren't at issue and to ascribe, you know, the

10:06:26  23  entire value to the patents when -- when there are other

10:06:31  24  patents that aren't at issue.

10:06:33  25              MR. BARABAS:  All right.  Mr. Gross, if we could

| | | |
|---|---|---|
| 10:06:35 | 1 | turn to DDX 8.22. |
| 10:06:35 | 2 | BY MR. BARABAS: |
| 10:06:40 | 3 | Q    And, Mr. Hofmann, I believe you've been in court every |
| 10:06:43 | 4 | day, and this was a demonstrative that came up maybe on the |
| 10:06:48 | 5 | first day, and looking at DDX 2.22, roughly how many patents |
| 10:06:55 | 6 | cover Vascepa? |
| 10:06:56 | 7 | MR. M. KENNEDY:  Your Honor, objection. |
| 10:06:57 | 8 | Mr. Hofmann didn't consider any of these patents in his expert |
| 10:07:00 | 9 | report.  These were all listed quite recently.  So I don't |
| 10:07:03 | 10 | think there's really any basis for him to conduct a purported |
| 10:07:07 | 11 | apportionment analysis with respect to these patents. |
| 10:07:11 | 12 | MR. BARABAS:  Your Honor, I'm not asking |
| 10:07:12 | 13 | Mr. Hofmann to conduct an apportionment analysis. |
| 10:07:16 | 14 | He did have the list of Orange Book patents in |
| 10:07:20 | 15 | his expert report.  At the time Mr. Hofmann prepared his |
| 10:07:24 | 16 | expert report, the list of patents was not nearly as large as |
| 10:07:28 | 17 | the current list. |
| 10:07:29 | 18 | But I could direct you to the page and the |
| 10:07:32 | 19 | paragraph of the expert report, and it's paragraph 14, where |
| 10:07:37 | 20 | it states that the following patents are currently listed in |
| 10:07:40 | 21 | the FDA's approved drug products with therapeutic equivalents, |
| 10:07:45 | 22 | evaluations, orange book as allegedly covering Vascepa. |
| 10:07:50 | 23 | THE COURT:  Do you have the report? |
| 10:07:52 | 24 | MR. BARABAS:  Yes, I do. |
| 10:07:53 | 25 | MR. M. KENNEDY:  Again, I would point out that a |

10:07:54   1   lot of these patents listed now weren't listed at time of his

10:07:58   2   report.

10:07:58   3            So I agree he analyzed the patents that were --

10:08:02   4   or he considered the patents that were listed as of mid '19,

10:08:06   5   but a bunch of these were listed just a couple weeks ago so

10:08:09   6   that's the basis of the objection.

10:08:11   7            MR. BARABAS:  And so, Your Honor, my question

10:08:12   8   was, you know, how many patents allegedly cover Vascepa.

10:08:16   9            Obviously, I don't think there's any dispute

10:08:18   10  with Mr. Kennedy that the number of patents that cover Vascepa

10:08:21   11  today is larger than the number that cover Vascepa in 2019.

10:08:26   12  So --

10:08:26   13            THE COURT:  So what's your follow-up question

10:08:28   14  then?

10:08:29   15            MR. BARABAS:  My question --

10:08:29   16            THE COURT:  Because the parties can stipulate to

10:08:31   17  that, that the number of patents now are greater than the

10:08:36   18  number of patents that were identified or available, disclosed

10:08:41   19  in mid 2019.  There's no objection to that?

10:08:45   20            MR. M. KENNEDY:  Yeah, I mean, this exhibit is

10:08:46   21  in evidence.  The Orange Book listing is what it is.

10:08:49   22            I think the issue is if he goes beyond just

10:08:52   23  saying these are the patents that are currently listed.  I

10:08:54   24  think that would constitute a new opinion.

10:08:56   25            But if that's all he's going to do, then I --

10:08:58   1          MR. BARABAS:  I think that's right, Your Honor.

10:09:00   2   I think that we've established that Mr. Hofmann is an

10:09:02   3   accountant and economist, he's not a scientist, he's not a

10:09:05   4   medical expert, he's not offering any technical opinion

10:09:09   5   regarding the patents-in-suit, so I don't think we have a

10:09:12   6   dispute here.

10:09:13   7          THE COURT:  So I don't understand what you are

10:09:15   8   asking.

10:09:16   9          MR. BARABAS:  Well, my initial question I think

10:09:18   10  led to the objection is how many patents allegedly cover

10:09:21   11  Vascepa, which I think is an arithmetic exercise.

10:09:27   12         THE COURT:  But my point is you don't even need

10:09:29   13  to ask that question if there's a stipulation that the patents

10:09:32   14  listed on this exhibit are what they are.

10:09:36   15         But the objection is to the extent you asked

10:09:40   16  Mr. Hofmann additional questions about patents that were not

10:09:44   17  listed in his report.

10:09:47   18         MR. BARABAS:  Okay.

10:09:48   19         THE COURT:  So do you plan to do that?  If you

10:09:50   20  plan to do that, then I'll need to rule on the objection.

10:09:53   21         MR. BARABAS:  I simply -- I guess, my follow-up

10:09:56   22  question is simply there was another exhibit that was shown in

10:09:59   23  court the first day, and we simply -- I simply would like to

10:10:03   24  ask Mr. Hofmann about the five or so -- I guess it's six

10:10:07   25  patents currently in suit, and there's a vast number of

10:10:10  1   additional patents which are listed as covering Vascepa, to

10:10:14  2   make the point that, you know, one group is very small subset

10:10:19  3   of overall the group of patents.  That's all I plan to do.

10:10:23  4               MR. M. KENNEDY:  I mean, without conceding

10:10:25  5   that's a legally relevant analysis, if that's all he plans to

10:10:29  6   do, I think we can withdraw the objection.

10:10:31  7               THE COURT:  So you don't object to him being

10:10:33  8   asked those two questions?

10:10:35  9               MR. M. KENNEDY:  No, if he asks how many patents

10:10:38  10  there are and --

10:10:39  11              THE COURT:  Well, my point is it's not even

10:10:40  12  necessary if there's a stipulation.  Is there a stipulation?

10:10:44  13              MR. M. KENNEDY:  I mean, I think the -- I

10:10:45  14  believe DX 2267, which is current Orange Book listing for

10:10:52  15  Vascepa, is in evidence, so if that's --

10:10:54  16              MR. BARABAS:  And, actually, Your Honor, I guess

10:10:56  17  we're jumping a bit.  When we get to the next exhibit we're

10:10:59  18  going to -- I think the parties have reached agreement and

10:11:02  19  we're going to move that exhibit into evidence as well.

10:11:04  20              THE COURT:  All right.  So, let me -- let's --

10:11:08  21  would you go back to -- I think it's 2267.

10:11:11  22              You know what, let's make this easy.  Since

10:11:15  23  there's no objection, you can ask those two questions.

10:11:18  24              MR. BARABAS:  Thank you, Your Honor.

10:11:18  25

| | |
|---|---|
| 10:11:18 | 1 |

BY MR. BARABAS:

10:11:19   2   Q    So, Mr. Hofmann, with reference to DDX 2.22, roughly, I'm

10:11:26   3   not asking you to count all of them, how many patents cover

10:11:31   4   Vascepa?

10:11:31   5   A    Well, there are dozens.  This is the Orange Book listing

10:11:34   6   which I think we heard a little bit about last week, where

10:11:38   7   Amarin has reported to FDA these are the number of patents

10:11:42   8   that they believe cover Vascepa.

10:11:44   9            MR. BARABAS:  And then if we could turn now,

10:11:46  10   Mr. Gross, to DDX 2.23, and I guess before I go further, if we

10:11:55  11   haven't already officially done this, Your Honor, would move

10:11:58  12   to admit DX 2299 into evidence.

10:12:02  13            MR. M. KENNEDY:  No objection, Your Honor.

10:12:03  14            THE COURT:  2229 is admitted.

10:12:03  15                    (Defendants' Exhibit 2299 received in
10:12:03
10:12:03  16                     evidence.)

BY MR. BARABAS:

10:12:11  17   Q    And then, Mr. Hofmann, you were in court the other day

10:12:11  18   when this ven diagram that's entitled "The REDUCE-IT Patents

10:12:20  19   versus Asserted Patents Summary" was put into evidence?  And

10:12:20  20   how does this ven diagram relate to your analysis?

10:12:24  21   A    Yes, this goes back to the question of apportionment.

10:12:27  22            Essentially what Dr. Nicholson has done is

10:12:30  23   attributed the entire sales and marketplace performance of

10:12:36  24   Vascepa to the six patents that are at issue in this case,

10:12:40  25   those that are represented in the blue circle.

10:12:44   1        He's not done anything to analyze, apportion or

10:12:50   2   study any economic value to be assigned to the patents listed

10:12:55   3   in the green box, those patents that are not at issue in this

10:13:00   4   case.

10:13:00   5   Q    Okay.  And why is the existence of multiple Orange Book

10:13:05   6   listed patents for Vascepa relevant to an analysis of

10:13:08   7   commercial success and nexus?

10:13:10   8   A    Well, from an economic perspective, essentially by taking

10:13:14   9   credit for the entirety of the marketplace performance of

10:13:18   10  Vascepa and tying that or claiming it to these six patents

10:13:24   11  that are at issue here, without ascribing any value or even

10:13:28   12  considering all these other patents that Amarin has told FDA

10:13:33   13  and told the world that they believe cover the product, you

10:13:38   14  get an economically unsound result where you could

10:13:42   15  theoretically take credit for a hundred percent of the sales

10:13:45   16  for the patents-in-suit here, and then take credit for those

10:13:49   17  same sales associated with patents that aren't even involved

10:13:53   18  in this case.

10:13:53   19  Q    Okay.  Mr. Hofmann, earlier you testified that no more

10:13:56   20  than one-third of Vascepa prescriptions are covered by the

10:13:59   21  asserted claims of the patents-in-suit.  So how is

10:14:04   22  apportionment different from the nexus analysis?

10:14:07   23  A    I mean, conceptually there's some overlap.

10:14:10   24        What I had talked about before was based on the NDTI

10:14:14   25  and clinical data that is driven by, you know, how patients

10:14:17  1  present and what their conditions are and whether those are

10:14:20  2  covered by the claims of the patents-in-suit.

10:14:23  3      The idea of apportionment from an economic

10:14:26  4  perspective is more so driven by the patent landscape and how

10:14:32  5  I think it's incomplete and unreliable to not study the patent

10:14:38  6  landscape and simply just assume or take credit for the

10:14:43  7  entirety of sales to the patents-in-suit when we have

10:14:46  8  self-reported evidence by Amarin that they believe they have

10:14:50  9  dozens of other patents that cover the same product.

10:14:53  10  Q   What value does -- or I should say, excuse me, what

10:14:57  11  value, if any, does Dr. Nicholson attribute to the other

10:15:01  12  Orange Book listed patents that are not asserted in this

10:15:04  13  matter?

10:15:05  14  A   None.

10:15:05  15  Q   Okay.  All right.  Mr. Hofmann, if we could turn now just

10:15:08  16  to your summary of opinions and specifically to DDX 8.24, and

10:15:14  17  taking your three opinions just one at a time.

10:15:16  18      What is your first opinion with respect to

10:15:18  19  commercial success and nexus?

10:15:21  20  A   So now I've been able to unpack these a little bit from

10:15:24  21  where we started, and I think we can see it's very clear that

10:15:28  22  the historic marketplace performance of Vascepa is not a

10:15:34  23  marketplace success and it's certainly not indicative of

10:15:37  24  commercial success.

10:15:38  25      They've lost money each and every year the product

10:15:41    1   has been on the market and have nearly a billion dollars in

10:15:46    2   cumulative losses.

10:15:47    3           We can also see on a relative basis they've only

10:15:50    4   been able to garner a small 3 percent market share versus

10:15:53    5   other triglyceride-lowering prescription products, also not

10:15:57    6   indicative of commercial success.

10:15:59    7   Q    And what is your second opinion with respect to

10:16:01    8   commercial success and nexus?

10:16:03    9   A    It's directed to the issue of, I think, Dr. Nicholson's

10:16:07   10   reliance on future marketplace performance and the hazards in

10:16:11   11   doing so.

10:16:12   12           I think that we can see from the documents and

10:16:15   13   information that I showed that the information is wildly

10:16:22   14   disparate and unreliable and speculative.

10:16:25   15           And the Net Present Value calculation that he's

10:16:27   16   undertaken that relies on this unreliable data and speculative

10:16:31   17   data only results in flawed and unreliable information that I

10:16:36   18   don't think provides a reasonable objective basis to determine

10:16:40   19   marketplace success.

10:16:42   20                MR. BARABAS:   And now if we could turn,

10:16:43   21   Mr. Gross, to DDX 8.25.

10:16:43   22   BY MR. BARABAS:

10:16:46   23   Q    Mr. Hofmann, what is your third opinion with respect to

10:16:49   24   commercial success and nexus?

10:16:51   25   A    So, in any event, even though the weak marketplace

10:16:57  1   performance of Vascepa, when one studies nexus, one sees that

10:17:02  2   the vast majority of sales that have happened and

10:17:05  3   prescriptions that have happened are unrelated to the claims

10:17:09  4   of the patents-in-suit and lack nexus, and that's only going

10:17:13  5   to increase the terms of the lack of nexus as REDUCE-IT and

10:17:18  6   the new label indication carry forward.

10:17:21  7             And then getting past that issue, one further sees

10:17:25  8   the extrinsic factors, the very significant and intense role

10:17:30  9   that marketing and promotion have played, and that discounts,

10:17:33  10  rebates, and other incentives have played, all of which shows

10:17:37  11  a lack of nexus with are respect to the marketplace

10:17:41  12  performance of Vascepa and the claims of the patents-in-suit.

10:17:45  13  So from my perspective there's no evidence of commercial

10:17:48  14  success in this case.

10:17:50  15             MR. BARABAS:  Thank you, Mr. Hofmann.

10:17:53  16             Your Honor, I have no further questions at this

10:17:56  17  time.

10:17:58  18             THE COURT:  Mr. Kennedy, I think this may be a

10:18:00  19  good time for us to take our morning break while we transition

10:18:04  20  to your cross-examination.  Why don't we take our morning

10:18:07  21  break at this time.

10:18:07
10:18:07  22                   (A recess was taken.)

10:37:57  23             THE COURT:  Please be seated.

10:38:01  24             MR. M. KENNEDY:  Your Honor, may I proceed?

10:38:03  25             THE COURT:  Yes, please.

| | |
|---|---|
| 10:38:05 | 1 |
| 10:38:06 | 2 |
| 10:38:10 | 3 |
| 10:38:14 | 4 |
| 10:38:16 | 5 |
| 10:38:21 | 6 |
| 10:38:21 | 7 |
| 10:38:21 | 8 |
| 10:38:25 | 9 |
| 10:38:26 | 10 |
| 10:38:29 | 11 |
| 10:38:33 | 12 |
| 10:38:34 | 13 |
| 10:38:35 | 14 |
| 10:38:39 | 15 |
| 10:38:42 | 16 |
| 10:38:44 | 17 |
| 10:38:47 | 18 |
| 10:38:49 | 19 |
| 10:38:52 | 20 |
| 10:38:56 | 21 |
| 10:38:58 | 22 |
| 10:39:01 | 23 |
| 10:39:05 | 24 |
| 10:39:08 | 25 |

1  MR. M. KENNEDY:  Good morning, Mr. Hofmann.  We

2  met last summer at your deposition, but just to remind you, my

3  name is Mike Kennedy.  I'll be asking you a few questions

4  today on behalf of Amarin.

5  Mr. Brooks, can we start with Mr. Hofmann's

6  slide DDX 8-3.

7  CROSS-EXAMINATION

8  BY MR. M. KENNEDY:

9  Q    And, Mr. Hofmann, you testified this morning that, in

10  your words on the slide, there must be a causal correlation

11  between the unique merit of the claimed invention and the

12  performance of the product, right?

13  A    I did.

14  Q    Now, just to clarify, you'll agree with me that in order

15  to establish a nexus, the patentee doesn't have to show that

16  the patented feature is the sole cause of the commercial

17  success as opposed to other factors, right?

18  A    Yeah, other factors can play a role.

19  Q    Yeah.  And by "other factors" you understand I mean

20  things like marketing, other patents, features in the prior

21  art, and so forth, right?

22  A    Right.  But you have to study the significance of the

23  claims of the patents-in-suit versus those other factors.

24  Q    Yeah.  And just to be clear you haven't offered any

25  opinion concerning how much of a given products' success needs

10:39:11  1   to be caused by the patented feature as opposed to those other

10:39:15  2   or extrinsic factors, correct?

10:39:18  3   A    Not in a quantitative percentage way, no, but I think the

10:39:22  4   totality of the evidence, it's pretty clear.

10:39:25  5   Q    But you haven't made -- you haven't drawn any lines or

10:39:28  6   done that analysis in a quantitative way or otherwise,

10:39:31  7   correct?

10:39:31  8   A    I don't think there is a bright line threshold.

10:39:34  9   Q    Just to clarify a few things about your background, you

10:39:37  10  don't have any training in medicine, do you?

10:39:39  11  A    No, sir.

10:39:40  12  Q    And you have no experience in lipidology, do you?

10:39:44  13  A    I don't.

10:39:44  14  Q    And no experience in medicinal or pharmaceutical

10:39:48  15  chemistry, correct?

10:39:49  16  A    No, sir.

10:39:50  17  Q    And you're not person of ordinary skill in the art for

10:39:52  18  purposes of this case, right?

10:39:53  19  A    I don't believe so.

10:39:55  20  Q    And you've offered no opinions on the prima facie

10:39:59  21  obviousness of the patents-in-suit, correct?

10:40:01  22  A    Correct.

10:40:02  23  Q    And you have no opinions regarding the existence of any

10:40:04  24  objective indicia of nonobviousness aside from commercial

10:40:09  25  success, correct?



1294

10:40:09  1    A    Yeah, like I said at my deposition, my focus is on

10:40:14  2    commercial success.   Whether it has implications to other

10:40:17  3    secondary indicia I'll leave to the lawyers.

10:40:20  4    Q    Now, one thing, you do a lot of litigation consulting as

10:40:24  5    I think you testified this morning.   In fact, in the four

10:40:27  6    years ending in May, when you submitted your expert report,

10:40:31  7    you've testified in deposition, trial, or hearing more than 90

10:40:35  8    times, right?

10:40:35  9    A    I don't have it in front of me but that certainly

10:40:39  10   wouldn't surprise me.

10:40:40  11   Q    I'll represent to you that you've disclosed 94 instances

10:40:43  12   in the last four years leading up to May 2019.   Does that

10:40:46  13   sound about right to you?

10:40:47  14   A    Well, I think some of those are duplicative.   But --

10:40:50  15   they're not all separate matters, but --

10:40:53  16   Q    But you've testified a lot, right?

10:40:55  17   A    I have.

10:40:55  18   Q    We can quibble about the number, but you do a lot of

10:40:58  19   testifying.

10:40:58  20   A    People draw on my knowledge and expertise regularly, yes.

10:41:03  21   Q    Now, another thing you do in your job is you consult on

10:41:06  22   valuation and product pipelines for pharmaceutical companies,

10:41:10  23   right?

10:41:10  24   A    As well as other industries, but, yes.

10:41:13  25   Q    And -- and those functions can sometimes involve making



10:41:17   1   Net Present Value calculations, right?

10:41:20   2   A   I would agree.

10:41:21   3   Q   And, in fact, you've reviewed Net Present Value

10:41:23   4   calculations your clients prepared for your feedback and input

10:41:26   5   as part of your valuation and product pipeline consulting

10:41:30   6   work, correct?

10:41:31   7   A   I have.

10:41:31   8   Q   So just to clarify, your dispute with Dr. Nicholson is

10:41:35   9   not that he invented the concept of measuring the commercial

10:41:38  10   value of a pharmaceutical product by Net Present Value, right?

10:41:42  11   That's not your dispute?

10:41:43  12   A   Yeah.  I mean, I think I said on direct Net Present Value

10:41:47  13   is a measure that is used in certain settings, I just don't

10:41:51  14   find it appropriate here as objective evidence of commercial

10:41:51  15   success.

10:41:56  16   Q   So your dispute with Dr. Nicholson is you don't think

10:41:58  17   it's appropriate -- you don't think it's appropriate to use

10:41:59  18   NPV in this particular context, right?

10:42:02  19   A   For a variety of reasons, yes.

10:42:06  20   Q   Because your view is the commercial success analysis

10:42:08  21   should be entirely backward-looking, right?

10:42:11  22   A   Well, I don't know that I would say that.  But in this --

10:42:14  23   these facts and circumstances, when we have six years of

10:42:17  24   actual commercial results, and, you know, the way that he's

10:42:22  25   forecast out very long, speculative periods, I don't think

10:42:26   1   it's appropriate.

10:42:27   2   Q   Well, in fact, your analysis was entirely confined to

10:42:30   3   Vascepa profit and loss calculations only through 2018,

10:42:34   4   correct?

10:42:35   5   A   I had to use the information and data that was available,

10:42:38   6   and that was the information and data that was available.

10:42:42   7           But it wasn't confined to that.  I certainly studied

10:42:45   8   and criticized the forward-looking stuff that Dr. Nicholson

10:42:48   9   used, and, then, of course, there's all the opinions that I

10:42:51   10   expressed on lack of nexus.

10:42:53   11   Q   But just to be clear, one of your criticisms of

10:42:57   12   Dr. Nicholson is that he used forward-looking stuff, as you

10:43:01   13   put it, at all, that you don't think you should be using

10:43:03   14   forward-looking stuff.  All of your information in your

10:43:06   15   analysis was backward-looking, right?

10:43:08   16   A   Well, I think, from a marketplace success perspective,

10:43:13   17   yes.  I think that the six years and more of actual data we

10:43:17   18   have is the best objective evidence that we have to reach a

10:43:23   19   conclusion, and there's a real hazard in looking at what he's

10:43:27   20   done forward looking.

10:43:27   21   Q   So --

10:43:28   22   A   In these facts and circumstances.

10:43:30   23           MR. M. KENNEDY:  So, Mr. Brooks, can we have

10:43:32   24   DDX 8.7, please.

10:43:32   25

10:43:32  1    BY MR. M. KENNEDY:

10:43:36  2    Q    And, Mr. Hofmann, I just had a quick question about this

10:43:41  3    slide.  The prescription data that you've captured on this

10:43:44  4    slide is covering both prescriptions that NDTI coded for the

10:43:50  5    over 500 population, as well as under 500?

10:43:57  6    A    Yes, sir.

10:43:58  7    Q    Now, let's talk about the analysts' reports for a second.

10:44:01  8    You understand that Dr. Nicholson relied on several analysts'

10:44:04  9    reports in performing his NPV calculation, right?

10:44:08  10   A    Yeah, I think there were five.

10:44:10  11   Q    Yeah.  And your testimony focused almost entirely on the

10:44:13  12   report by WainWright, correct?

10:44:15  13   A    Well, I think that was such an egregious outlier, I used

10:44:20  14   that as example, but I discussed the others as well in his

10:44:23  15   Exhibit 2.

10:44:23  16   Q    Now, but, in any event, all the analysts' reports that

10:44:26  17   Dr. Nicholson looked at and that you reviewed as well, those

10:44:29  18   all came out earlier than December 2019, right?

10:44:32  19   A    Yeah, that's correct.

10:44:34  20   Q    And since you've been in court for most or all the trial,

10:44:38  21   you understand that in December of 2019, Amarin gained a new

10:44:42  22   indication for Vascepa, what we've been calling the REDUCE-IT

10:44:45  23   indication, right?

10:44:46  24   A    Yeah.  They were certainly anticipating and hoping for

10:44:49  25   that, but, yes, that's when it was officially approved and

10:44:55  1  added to the label.

10:44:56  2  Q    So at time that you and Dr. Nicholson both did your

10:44:58  3  expert reports, the REDUCE-IT trial had read out, but Amarin

10:45:02  4  did not yet have the REDUCE-IT indication, correct?

10:45:04  5  A    That's correct.  But the analysts' reports discussed

10:45:06  6  REDUCE-IT extensively.

10:45:08  7  Q    Yes.  But, in your view, the use of market projections

10:45:11  8  for an indication that has not been FDA approved does not

10:45:15  9  provide evidence of marketplace success as any such reliance

10:45:19  10  on projections is inherently speculative and unreliable,

10:45:23  11  correct?

10:45:23  12  A    I mean, I think you have to study each and every

10:45:26  13  situation, but I certainly agree that in this situation that

10:45:32  14  the way that he's relied upon these future projections and

10:45:38  15  done his own projections is speculative.

10:45:41  16          But, in any event, all that value as discussed in

10:45:43  17  the analysts' reports he relies on is related to REDUCE-IT and

10:45:48  18  nonpatented -- things that aren't covered by the

10:45:52  19  patents-in-suit.

10:45:53  20  Q    So, Mr. Hofmann, do you understand the question I just

10:45:56  21  asked you was right out of your expert report from the summer

10:46:00  22  2019?

10:46:00  23  A    I dont have it in front of me.

10:46:02  24          MR. M. KENNEDY:  Okay.  So, Mr. Brooks, can we

10:46:05  25  just have DX 1606, page 25, paragraph 48.

| | | |
|---|---|---|
| 10:46:05 | 1 | BY MR. M. KENNEDY: |
| 10:46:18 | 2 | Q    And so here, this is the expert report you served in the |
| 10:46:22 | 3 | summer of 2019, right?  I think it was May 2019. |
| 10:46:27 | 4 | A    It looks to be, yeah.  I didn't -- I didn't see the cover |
| 10:46:30 | 5 | or -- but it looks to be, yeah. |
| 10:46:33 | 6 | Q    I mean, I could show it to you if you want. |
| 10:46:33 | 7 | A    Sure. |
| 10:46:33 | 8 | Q    It's your expert report. |
| 10:46:35 | 9 | A    No, that's fine, let's move it along, yeah. |
| 10:46:38 | 10 | Q    And it says here your opinion was, and one of your |
| 10:46:42 | 11 | criticisms of Dr. Nicholson was that he was relying on expert |
| 10:46:46 | 12 | reports -- or, I'm sorry, analysts' reports at a time where |
| 10:46:49 | 13 | the REDUCE-IT indication had not yet been granted by FDA. |
| 10:46:54 | 14 | Do you remember that? |
| 10:46:55 | 15 | A    I do remember that. |
| 10:46:58 | 16 | Q    And one of the things you said, if you look at the last |
| 10:47:01 | 17 | five lines of paragraph 48, |
| 10:47:03 | 18 | "The use of market projections for an |
| 10:47:06 | 19 | indication that has not yet been FDA approved does |
| 10:47:09 | 20 | not provide evidence of marketplace success as any |
| 10:47:13 | 21 | such reliance on projections is inherently |
| 10:47:16 | 22 | speculative and unreliable." |
| 10:47:19 | 23 | Do you see that? |
| 10:47:19 | 24 | A    In the context of the whole paragraph, sure. |
| 10:47:22 | 25 | Q    So you would agree with me that now we're in 2020, Amarin |

10:47:26   1   does have the REDUCE-IT FDA approval, does that change your

10:47:30   2   opinions concerning commercial success?

10:47:33   3   A    Not at all.  I mean, I think that -- to put it in

10:47:37   4   context, we know that they tried to get the ANCHOR indication

10:47:40   5   on-label and were unsuccessful.

10:47:42   6          So in May, when I wrote my report, although people

10:47:45   7   were very bullish and hopeful that REDUCE-IT would get

10:47:49   8   approved, we don't know until it happens.  But I think the

10:47:55   9   analysts were definitely counting on REDUCE-IT in the reports

10:47:58  10   he relied on.

10:47:58  11   Q    So let's talk about the forecast a little bit more.  And

10:48:01  12   I think you referred to some of these analysts' forecasts

10:48:04  13   as -- I think you called them hopes, dreams, or aspirations;

10:48:08  14   is that right?

10:48:09  15   A    Correct.

10:48:09  16   Q    And one of the reasons you don't think Dr. Nicholson

10:48:16  17   should have relied on them is that these forward-looking

10:48:18  18   forecasts are nothing more than aspirations?  Is that a fair

10:48:22  19   summary of your direct testimony?

10:48:24  20   A    I mean, we don't need to bog down on adjectives, but I

10:48:27  21   wouldn't saying nothing more than aspirations.

10:48:31  22          Like I said, on direct, people are in good faith

10:48:33  23   doing their best to predict the future, but we know that the

10:48:37  24   market can be very complex and dynamic and so often times they

10:48:43  25   don't come to pass.

10:48:44  1    Q    Would it surprise you to learn that Hikma, one of

10:48:49  2    companies on whose behalf you're testifying, has very recently

10:48:52  3    expressed an aspiration about the market size of Vascepa going

10:48:57  4    forward?

10:48:57  5    A    That wouldn't surprise me, no.

10:48:59  6              MR. M. KENNEDY:  Mr. Brooks, let's look at

10:49:02  7    PX 1218, please.

10:49:02  8    BY MR. M. KENNEDY:

10:49:05  9    Q    And, Mr. Hofmann, I'll represent to you this is a

10:49:11  10   document on Hikma -- is on Hikma's website from January 2020,

10:49:14  11   and you work in the life sciences industry.  Have you heard of

10:49:18  12   the JP Morgan Conference?

10:49:20  13   A    I have.

10:49:20  14   Q    And so you understand that's a big investor conference in

10:49:25  15   San Francisco every January?

10:49:26  16   A    I do.

10:49:26  17              MR. M. KENNEDY:  And let's go, Mr. Brooks, to

10:49:36  18   page 12 of this exhibit.

10:49:36  19   BY MR. M. KENNEDY:

10:49:36  20   Q    And this is where Hikma is telling the marketplace that

10:49:39  21   they're developing a pipeline of complex products to drive

10:49:44  22   future growth.

10:49:45  23         Do you see that?

10:49:45  24   A    I do.

10:49:46  25   Q    And do you see the product that's listed number four on

10:49:49  1   their list of their generic paragraph 4 pipeline?

10:49:51  2   A   I do.

10:49:51  3   Q   And do you happen to notice that Hikma is telling the

10:49:55  4   marketplace that Vascepa has a current U.S. market size of

10:50:00  5   $752,000,000?

10:50:02  6   A   Yeah, I think I saw this over the weekend.

10:50:08  7           And what -- it seems to me they're doing what is

10:50:09  8   often done by generics is they're identifying -- you know, you

10:50:14  9   can see there's footnote that says IQVIA U.S. that's

10:50:20  10   essentially the trailing 12 months for October 2019.

10:50:24  11           That's gross sales so that doesn't reflect any of

10:50:27  12   the discounts, rebates, or other incentives, and they're just

10:50:30  13   simply summarizing at a high level the market size according

10:50:33  14   to the data aggregator IQVIA on a gross basis.

10:50:38  15   Q   So you're not saying that Hikma is putting out

10:50:40  16   misinformation into the marketplace though are you?

10:50:42  17   A   No, but they're not -- I mean, this isn't designed to

10:50:49  18   look at how much of the sales relate to which indication or

10:50:50  19   anything.  It's just simply total gross sales according to

10:50:54  20   IQVIA that doesn't reflect all the discounts and other things

10:50:59  21   that I talked about on direct.

10:51:00  22   Q   But I think a minute ago you said that the analysts'

10:51:02  23   reports that we've looked at were, you know, people in good

10:51:06  24   faith trying to arrive at the best estimate they could, right?

10:51:09  25   A   Yeah.  I think there's -- I hope that's what they're

10:51:13  1   doing, sure.

10:51:13  2   Q    And just like you hope that the company on whose behalf

10:51:16  3   you're testifying is making a good faith estimate of the size

10:51:19  4   of the Vascepa market as of this month.

10:51:21  5   A    They're just creating awareness of the data that's out

10:51:25  6   there on total market size.

10:51:27  7                    MR. M. KENNEDY:   Mr. Brooks, can we have

10:51:30  8   DDX 821, please.

10:51:30  9   BY MR. M. KENNEDY:

10:51:34  10  Q    So, Mr. Hofmann, this is where you were talking about

10:51:36  11  discounts, rebates, and other incentives.  Do you remember

10:51:39  12  that testimony from direct?

10:51:41  13  A    I do.

10:51:41  14  Q    And I take it that your opinion is that this is too much

10:51:45  15  to support a finding of commercial success, a rate of 29 to

10:51:50  16  53 percent?

10:51:50  17  A    I don't think I said it that way.  I said that this

10:51:54  18  extrinsic financial factor, alongside the marketing and

10:51:59  19  alongside the fact that the vast majority of sales aren't

10:52:03  20  covered by the patents-in-suit really undermines any potential

10:52:08  21  claim of nexus.

10:52:09  22  Q    But you'll agree with me the level of discounts, rebates,

10:52:12  23  and other incentives as a percentage of gross sales could be

10:52:15  24  higher than zero consistent with a pharmaceutical product

10:52:18  25  being a commercial success, right?

10:52:21  1   A   Yeah, I would not expect discounts, rebates, and other

10:52:26  2   incentives to be zero in pharma.

10:52:26  3   Q   So you think a commercially successful product could have

10:52:27  4   more than zero discounts, rebates and other incentives, right?

10:52:32  5   A   I don't -- I don't disagree with that no.

10:52:36  6   Q   But 29 to 53 percent over a period years, in your view,

10:52:41  7   that's too high?

10:52:42  8   A   Well, again, I think I'm looking at this alongside the

10:52:45  9   other extrinsic factors and the lack of prescriptions being

10:52:50  10  written for claims in the patents-in-suit.

10:52:52  11          These are growing, they're significant, and, you

10:52:56  12  know, I'm not making that opinion in a vacuum, I'm looking at

10:53:01  13  alongside the Amarin documents.

10:53:04  14          MR. M. KENNEDY:  Let's go, Mr. Brooks, to

10:53:07  15  DDX 8-6, please.

10:53:07  16  BY MR. M. KENNEDY:

10:53:12  17  Q   And, Mr. Hofmann, this is your calculation or your

10:53:14  18  depiction, anyway, of various financial metrics for Vascepa,

10:53:18  19  and I would like to direct your attention to the net product

10:53:22  20  sales.

10:53:22  21          Now, when we say net product sales, that backs out

10:53:25  22  the discounts, rebates, and other incentives, right?

10:53:28  23  A   That's correct.  That's after those.

10:53:29  24  Q   And you probably don't agree with me that the sales are

10:53:33  25  significant, but you'll at least agree that Vascepa's net

10:53:37  1  product sales have been growing from 2013 to 2018, correct?

10:53:41  2  A    They have, but at a great cost.

10:53:43  3  Q    But they're growing.  And, in fact, if you do the math,

10:53:48  4  Vascepa's net product sales have increased -- the annual net

10:53:51  5  product sales have increased about eight fold from 2013 to

10:53:55  6  2018, correct?

10:53:56  7  A    Roughly, sure.

10:54:00  8  Q    Yeah.  Just a few general questions about the branded

10:54:05  9  versus generic pharmaceutical industry.

10:54:09  10         Branded pharmaceutical companies have different cost

10:54:12  11  structures compared to generic companies, right?

10:54:16  12  A    They do.

10:54:16  13  Q    And in general branded pharmaceutical products have

10:54:16  14  higher selling prices compared to generic pharmaceutical

10:54:16  15  products, right?

10:54:22  16  A    Yes, they actively market where generics --

10:54:24  17  Q    And branded products, not just Vascepa, also have higher

10:54:28  18  associated costs, right?

10:54:30  19  A    Which costs are you talking about?

10:54:32  20  Q    Well, I could ask you which costs you're talking about,

10:54:36  21  because I'm looking at paragraph 42 of your expert report.

10:54:39  22  A    Okay.  So --

10:54:40  23  Q    I'm just asking a high level question.  In general,

10:54:42  24  branded products have higher associated costs than generic --

10:54:47  25  A    Yeah, sales, marketing, and R&D is going to be greater

10:54:50   1   for brands.

10:54:51   2   Q    And branded pharmaceutical companies typically incur

10:55:01   3   significant costs to develop -- I very much apologize.

10:55:01   4        Branded pharmaceutical companies typically incur

10:55:03   5   significant costs to develop and establish the market for a

10:55:05   6   product, right?

10:55:06   7   A    Typically, yes.

10:55:07   8   Q    And generic companies typically don't incur such costs,

10:55:13   9   right?

10:55:13  10   A    No, they rely on automatic substitution.

10:55:19  11   Q    Now, you're generally familiar with the concept of a

10:55:23  12   lifecycle for a pharmaceutical product, right?

10:55:26  13   A    Certainly varies for every product, but, yes.

10:55:29  14   Q    And a product can be marketed to varying degrees at

10:55:33  15   different points of it's lifecycle, correct?

10:55:36  16   A    Yes.

10:55:36  17   Q    And at the beginning of a products' lifecycle when it's

10:55:39  18   first launched, there may be a high level of marketing

10:55:43  19   activity for that product, right?

10:55:44  20   A    I think that can be the case, depends on whether it's

10:55:46  21   follow-on product or something like that.

10:55:49  22   Q    And at the beginning of a product's lifecycle when it's

10:55:52  23   launched, you don't disagree that there's more of a need for

10:55:55  24   marketing activity because doctors need to be educated about

10:55:58  25   the product's attributes, right?



10:56:01   1   A    Again, it's highly facts-and-circumstances based, but

10:56:03   2   that can be so sure.

10:56:05   3   Q    And by attributes, you understand I mean the clinical

10:56:09   4   profile of the branded product that's been brought to market,

10:56:11   5   correct?

10:56:12   6   A    Among other things, sure.

10:56:14   7   Q    Like its clinical data, its safety profile, and so forth,

10:56:18   8   correct?

10:56:18   9   A    As well as, you know, the availability of samples, the

10:56:24  10   availably of coupons, patient assistance, I mean, they're

10:56:29  11   sharing -- all the stuff they're sharing.

10:56:31  12   Q    And once a branded product faces generic competition, the

10:56:34  13   branded company will typically cease or curtail significantly

10:56:39  14   any further marketing support, right?

10:56:41  15   A    Yeah, I think in more recent years we've seen examples

10:56:44  16   where they will try and continue, but, by and large, I agree

10:56:47  17   with you.

10:56:47  18   Q    And you understand that Lovaza was launched as Omacor in

10:56:52  19   2005, right?

10:56:53  20   A    Yes.

10:56:53  21   Q    And Lovaza went generic in 2014, right?

10:56:57  22   A    That's current.

10:56:57  23   Q    And when I say the term "went generic," you understand

10:57:00  24   that I mean that generic versions substitutable versions of

10:57:05  25   Lovaza were launched in 2014, correct?

| | | |
|---|---|---|
| 10:57:08 | 1 | A    Starting in 2014, yeah. |
| 10:57:10 | 2 | Q    And so it's fair to say that in 2013, Lovaza was towards |
| 10:57:13 | 3 | the end of its lifecycle, correct? |
| 10:57:15 | 4 | A    I mean -- I guess, sure.  In terms of years, I just don't |
| 10:57:21 | 5 | remember the months, but, yeah. |
| 10:57:22 | 6 | Q    And -- but you'll agree with me as to 2013, right?  2013 |
| 10:57:27 | 7 | was towards the end of Lovaza's product lifecycle? |
| 10:57:30 | 8 | A    Yes. |
| 10:57:30 | 9 | Q    And in 2013, as we know, Vascepa had just been launched, |
| 10:57:34 | 10 | correct? |
| 10:57:34 | 11 | A    It was. |
| 10:57:35 | 12 | MR. M. KENNEDY:  Mr. Brooks, let's go to |
| 10:57:39 | 13 | DDX 8-18. |
| 10:57:41 | 14 | And while we do that, Your Honor, I would also |
| 10:57:43 | 15 | like to move PX 1218 into evidence.  That was the Hikma |
| 10:57:47 | 16 | presentation I looked at with Mr. Hofmann. |
| 10:57:50 | 17 | MR. BARABAS:  No objection, Your Honor. |
| 10:57:51 | 18 | THE COURT:  1218 is admitted. |
| 10:57:51 10:57:51 | 19 | (Plaintiffs' Exhibit 1218 received in evidence.) |
| 10:57:51 | 20 | BY MR. M. KENNEDY: |
| 10:57:55 | 21 | Q    So, Mr. Hofmann, this is your pie chart showing the |
| 10:57:58 | 22 | promotional dollar spend from 2013 to 2017; is that right? |
| 10:58:02 | 23 | A    Correct. |
| 10:58:03 | 24 | Q    And we just agreed that in 2013 Vascepa had just been |
| 10:58:06 | 25 | launched, so in 2013, it was at the very beginning of its |

10:58:10   1    lifecycle, correct?

10:58:11   2    A    It was.

10:58:12   3    Q    And we've also just agreed that in 2013 Lovaza was

10:58:15   4    towards the end of its lifecycle, correct?

10:58:18   5    A    Yes.

10:58:20   6    Q    So in your pie chart, DDX 18, you're comparing marketing

10:58:25   7    spend of Vascepa at the beginning of its lifecycle and a

10:58:28   8    branded product, to Lovaza at the end of its lifecycle,

10:58:32   9    correct?

10:58:33   10   A    Well, that's -- that's the market dynamic that existed.

10:58:37   11         What I'm showing in this pie chart is that during

10:58:40   12   the entire time Vascepa has been on the market, they've

10:58:45   13   outspent and outshout every other market on the market.

10:58:48   14         It's true that Lovaza curtailed marketing in 2014.

10:58:52   15   But this means that prescribers were hearing more from Amarin

10:58:55   16   than anybody else, yet they were only able to garner 3 percent

10:59:00   17   share.

10:59:00   18   Q    Now, you understand on your pie chart most of these other

10:59:03   19   products fall under the general category of fenofibrates,

10:59:07   20   correct?

10:59:07   21   A    I would agree.

10:59:08   22   Q    And you were here last week, you probably remember some

10:59:20   23   discussion that fenofibrates are other types of TG lowering

10:59:22   24   agents?

10:59:22   25   A    That's my understanding, yes.

10:59:22   1    Q    And Tricor, Trilipix, and the other branded fenofibrates

10:59:26   2    all lost exclusivity between 2009 and 2013, correct?

10:59:32   3    A    That sounds right.

10:59:33   4    Q    So by 2013, the fenofibrate drugs were also at the end of

10:59:38   5    their lifecycle, correct?

10:59:38   6    A    Right.  They were obviously still doing some marketing

10:59:41   7    because it shows up in the data, but, yeah, I would agree with

10:59:44   8    that.

10:59:44   9    Q    They were certainly doing some marketing.  In fact, if

10:59:46   10   you total up all the fenofibrate drugs on this chart, it adds

10:59:51   11   up to 34 percent, almost as much as Vascepa, correct?

10:59:55   12   A    I haven't -- I haven't looked at it that way, but I'll

11:00:00   13   take your word for it.  But there are different, you know,

11:00:04   14   products and different sponsors.

11:00:05   15   Q    Sure.  But even though they'd gone generic, they're still

11:00:09   16   spending a lot of money on marketing, right?

11:00:12   17   A    I mean, there's still some money being spent.  They

11:00:16   18   haven't -- I'm sure curtailed the marketing, but there is

11:00:20   19   still some money being sent.

11:00:22   20              MR. M. KENNEDY:  Mr. Hofmann, thank you very

11:00:24   21   much.  I have no further questions.

11:00:26   22              MR. BARABAS:  Your Honor, defendants have no

11:00:27   23   redirect and no further witnesses at this time, but we're

11:00:31   24   keeping our case open because we reserve the right to call

11:00:35   25   Amarin's witnesses.

|          |    |                                                                |
|----------|----|----------------------------------------------------------------|
| 11:00:36 | 1  | THE COURT:  All right. |
| 11:00:38 | 2  | MR. BARABAS:  And we also reserve the right to |
| 11:00:40 | 3  | make designations. |
| 11:00:41 | 4  | THE COURT:  Thank you. |
| 11:00:42 | 5  | Mr. Hofmann, you may step down. |
| 11:00:45 | 6  | THE WITNESS:  Thank you, Your Honor. |
| 11:01:20 | 7  | (The witness was excused.) |
| 11:01:20 | 8  | THE COURT:  Mr. Sipes and your colleagues, are |
| 11:01:22 | 9  | you ready to move into Plaintiffs' rebuttal case on invalidity |
| 11:01:27 | 10 | and infringement? |
| 11:01:28 | 11 | MR. SIPES:  Yes, we are, Your Honor.  I defer to |
| 11:01:30 | 12 | my colleague, Mr. Kennedy. |
| 11:01:32 | 13 | MR. M. KENNEDY:  Your Honor, plaintiffs call |
| 11:01:34 | 14 | Dr. Carl Peck. |
| 11:01:36 | 15 | And, Your Honor, may we approach to distribute |
| 11:01:39 | 16 | witness binders? |
| 11:01:40 | 17 | THE COURT:  Yes, you may. |
| 11:01:42 | 18 | MR. M. KENNEDY:  And I believe we have some |
| 11:01:44 | 19 | slides as well. |
| 11:01:45 | 20 | THE COURT:  Thank you. |
| 11:01:45 |    |  |
| 11:01:45 | 21 | CARL PECK, M.D., |
| 11:01:45 |    | called as a witness on behalf of the Plaintiffs, |
| 11:01:45 | 22 | was sworn and testified as follows: |
| 11:02:14 |    |  |
| 11:02:14 | 23 | THE CLERK:  Please state for the record your |
| 11:02:17 | 24 | full name, spell both your first name and your last name. |
| 11:02:24 | 25 | THE WITNESS:  I'm sorry, did you ask me a |

| | | |
|---|---|---|
| 11:02:26 | 1 | question? |
| 11:02:27 | 2 | THE CLERK:  Yes, sir.  Please state for the |
| 11:02:28 | 3 | record your full name, spell both your first name and your |
| 11:02:31 | 4 | last name. |
| 11:02:32 | 5 | THE WITNESS:  My name is Carl Peck, spelled |
| 11:02:35 | 6 | C-a-r-l, P-e-c-k. |
| 11:02:39 | 7 | MR. M. KENNEDY:  Your Honor, may I proceed? |
| 11:02:40 | 8 | THE COURT:  Yes. |
| 11:02:40 | 9 | DIRECT EXAMINATION |
| 11:02:40 | 10 | BY MR. M. KENNEDY: |
| 11:02:42 | 11 | Q    Good morning, Dr. Peck.  Are you currently employed, sir? |
| 11:02:47 | 12 | A    I am. |
| 11:02:47 | 13 | Q    Where are you currently employed? |
| 11:02:48 | 14 | A    I'm employed by a consulting company that I founded |
| 11:02:53 | 15 | called NDA Partners. |
| 11:02:54 | 16 | Q    What does NDA Partners do? |
| 11:02:57 | 17 | A    NDA Partners is a consulting firm that provides advice to |
| 11:03:03 | 18 | early stage biotechs concerning their drug development |
| 11:03:08 | 19 | programs, that advises in the domain of regulatory |
| 11:03:12 | 20 | requirements, regulations, and clinical trial designs and |
| 11:03:17 | 21 | statistical analyses. |
| 11:03:19 | 22 | Q    Do you have any other positions at the moment? |
| 11:03:21 | 23 | A    I hold the position of adjunct professor at the |
| 11:03:27 | 24 | University of California in San Francisco. |
| 11:03:29 | 25 | Q    What kinds of classes do you teach? |

11:03:32   1   A    I teach a course that I founded almost ten years ago

11:03:36   2   called the American Course in Drug Development and Regulatory

11:03:40   3   Science.   It is a master's level -- executive master's level

11:03:47   4   course in drug development and regulation.

11:03:49   5   Q    Have you ever worked at FDA?

11:03:52   6   A    I have, yes.

11:03:53   7   Q    What position did you hold at FDA?

11:03:55   8   A    During 1987 to 1993, I was center director of the Center

11:04:02   9   For Drug Evaluation and Research.

11:04:04  10   Q    We'll talk about that a little more in a minute, but for

11:04:08  11   purposes of today is it okay if I refer to the Center For Drug

11:04:12  12   Evaluation and Research as CDER?

11:04:15  13   A    Yes, that would be a rough pronunciation of the

11:04:21  14   abbreviation CDER.

11:04:21  15   Q    Have you been retained as an expert in this case?

11:04:24  16   A    I have.

11:04:24  17   Q    By which party?

11:04:26  18   A    By Covington Burling on behalf of Amarin.

11:04:29  19   Q    Have you ever worked for Amarin in any capacity prior to

11:04:33  20   this case?

11:04:33  21   A    No.

11:04:33  22   Q    Generally speaking, can you identify your area of

11:04:36  23   expertise.

11:04:38  24   A    I believe I'm expert in drug regulation and clinical

11:04:44  25   pharmacology, clinical trials.

```
11:04:48    1              MR. M. KENNEDY:  Mr. Brooks, can we please have
11:04:51    2    PX 1109.
11:04:51    3    BY MR. M. KENNEDY:
11:04:55    4    Q   Dr. Peck, do you recognize this document?
11:04:56    5    A   I do.
11:04:57    6    Q   What is it?
11:04:58    7    A   This is the front page of my curriculum vitae.
11:05:02    8    Q   And I see your curriculum vitae is dated April 30th,
11:05:08    9    2019.  Is PX 1109 substantially current?
11:05:12   10    A   Yes, it is.
11:05:12   11    Q   Does PX 1109 accurately reflect your education, training,
11:05:19   12    and experience?
11:05:19   13    A   Yes, it does.
11:05:20   14              MR. M. KENNEDY:  Your Honor, Amarin moves to
11:05:23   15    admit PX 1109.
11:05:25   16              MR. KLEIN:  No objection.
11:05:25   17              THE COURT:  1109 is admitted.
11:05:25   18                    (Plaintiffs' Exhibit 1109 received in
11:05:25
11:05:25   19                     evidence.)
           19    BY MR. M. KENNEDY:
11:05:29   20    Q   Dr. Peck, have you worked with us to prepare slides to
11:05:32   21    illustrate your testimony today?
11:05:34   22    A   Yes, I have.
11:05:35   23              MR. M. KENNEDY:  Mr. Brooks, could we have
11:05:39   24    PDX 4-2.
11:05:39   25
```

11:05:39  1  BY MR. M. KENNEDY:

11:05:40  2  Q    Dr. Peck, can you briefly describe your educational

11:05:43  3  background.

11:05:43  4  A    I have an undergraduate degree in mathematics and

11:05:46  5  chemistry.  After my three years in undergraduate training I

11:05:51  6  took the Fulbright Scholarship and studied physical chemistry

11:05:58  7  at the Technische Hochschule in Germany.

11:06:01  8          I returned in 1964 and undertook a four-year

11:06:07  9  education in medicine and graduated in 1968 from University of

11:06:12  10  Kansas Medical School.

11:06:13  11  Q    Did you subsequently practice medicine?

11:06:16  12  A    I did.

11:06:17  13  Q    Can you briefly describe your medical practice.

11:06:24  14  A    During my internship and residency I was in full-time

11:06:28  15  practice taking care of patients, inpatients in a hospital and

11:06:31  16  in clinics.

11:06:32  17          Subsequent to my internal medicine residency, I

11:06:37  18  began to engage in a research career, but during the 20 years

11:06:42  19  that followed, I always spent time with patients, mostly in a

11:06:47  20  clinic, an oncology clinic at Letterman Army Medical Center in

11:06:54  21  the 1970s.

11:06:55  22          And during 1980 to '87, before I went to FDA, I was

11:07:01  23  in Washington, DC, at the Uniformed Services University, I was

11:07:07  24  army colonel at that time, and I attended on the medicine

11:07:12  25  services at Walter Reed Army Medical Center and the Naval

11:07:19   1   National Medical Center one month each year.

11:07:21   2   Q    Dr. Peck, have you engaged in medical research?

11:07:24   3   A    Yes.

11:07:25   4               MR. M. KENNEDY:  Mr. Brooks, can we have

11:07:28   5   PDX 4-4.

11:07:28   6   BY MR. M. KENNEDY:

11:07:31   7   Q    And, Dr. Peck, are these examples of the medical research

11:07:36   8   activities or clinical research activities you've undertaken?

11:07:40   9   A    Well, these would be the assignments, the posts that I

11:07:43  10   held.

11:07:44  11   Q    Did your research focus on any particular field?

11:07:48  12   A    Well, after my internal medicine training I became --

11:07:53  13   well, during it, I became very interested in drugs, the action

11:07:56  14   of drugs in humans, therapeutic drugs, and so I was privileged

11:08:01  15   to take a two-year research fellowship at the University of

11:08:04  16   California in San Francisco where I learned versus techniques

11:08:11  17   of designing and analyzing clinical trials.

11:08:13  18               Subsequent to that, the Army assigned me to the

11:08:18  19   Letterman Army Institute of Research in San Francisco where I

11:08:22  20   joined a team in the blood preservation and research program.

11:08:28  21               That lasted until 1980 when I was reassigned to the

11:08:34  22   Uniformed Services University of the Health Sciences in

11:08:38  23   Washington, D.C.

11:08:41  24               During that seven years before I went to FDA, I

11:08:44  25   continued my research.  Much of it was concerning

1317

| | | |
|---|---|---|
| 11:08:47 | 1 | pharmacokinetics and predicting blood levels of drugs in |
| 11:08:51 | 2 | humans, designing clinical trials, and analyzing them. |
| 11:08:56 | 3 | Q    You mentioned the phrase drug action in humans.  Is that |
| 11:09:01 | 4 | called clinical pharmacology? |
| 11:09:03 | 5 | A    Yes, clinical pharmacology is a discipline, a research |
| 11:09:07 | 6 | discipline, that focuses on investigations of what drugs do to |
| 11:09:12 | 7 | humans and what humans do to drugs. |
| 11:09:15 | 8 | Q    Why is it important for people to study clinical |
| 11:09:18 | 9 | pharmacology? |
| 11:09:19 | 10 | A    Well, in order to understand whether a drug can be used |
| 11:09:23 | 11 | safely and effectively, good science has to be applied to |
| 11:09:29 | 12 | evaluate what the actions of such a drug are in humans. |
| 11:09:34 | 13 |      It's important to understand what the dose -- you |
| 11:09:36 | 14 | know, what doses are safe and effective and how long they |
| 11:09:43 | 15 | last, how long to use them. |
| 11:09:51 | 16 |      And so while there are some animal studies |
| 11:09:51 | 17 | associated with this discipline, it's primarily a discipline |
| 11:09:51 | 18 | that investigates and clinical studies what drugs do to |
| 11:09:56 | 19 | humans. |
| 11:09:56 | 20 | Q    I think you mentioned you've been involved in some |
| 11:09:58 | 21 | clinical studies.  Approximately how many clinical studies |
| 11:10:02 | 22 | have you been involved in? |
| 11:10:04 | 23 | A    Well, that would be hard to estimate, but I would say |
| 11:10:07 | 24 | hundreds. |
| 11:10:07 | 25 | Q    Can you think of one you're particularly proud of the |

11:10:11   1   work that you did?

11:10:12   2   A    I think the multicenter national clinical trial of a new

11:10:21   3   blood preservation research system that we evaluated in the

11:10:27   4   1970s when I was at Letterman Army Institute of Research was

11:10:33   5   probably the most impactful.

11:10:36   6   Q    Why?

11:10:36   7   A    Well, at the time we started this research, the storage

11:10:42   8   duration of bank blood was about two weeks.

11:10:46   9         Being in the military, we were concerned about the

11:10:49  10   useful life of blood in blood bags once they reached the

11:10:56  11   field, and so at the time only two or three days were left of

11:11:01  12   viable red blood cells in blood bags.

11:11:05  13         But our research -- we basically invented a new

11:11:09  14   blood preservation system that extended the shelf life of red

11:11:13  15   cells from two weeks to six weeks which was a major increment

11:11:18  16   in the availability of drugs both for the military and for the

11:11:23  17   civilian community.

11:11:25  18   Q    Have you had teaching experience?

11:11:28  19   A    I have.

11:11:29  20         MR. M. KENNEDY:   Mr. Brooks, could we please

11:11:31  21   have PDX 4-5.

11:11:31  22   BY MR. M. KENNEDY:

11:11:37  23   Q    Dr. Peck, does PDX 4-5 summarize your teaching positions?

11:11:42  24   A    Yes, it does.

11:11:43  25   Q    What is the Uniform Services University of the Health

11:11:49  1   Sciences?

11:11:49  2   A    It's a military medical school located in Washington, DC,

11:11:55  3   across from the National Institutes of Health.  It was

11:11:59  4   established in the 1970s to ensure a steady supply of

11:12:04  5   well-trained physicians, career military physicians, be it

11:12:09  6   Army, Air Force, Navy, of service who would be able to serve

11:12:15  7   the medical needs of service members and their families and

11:12:22  8   retirees.

11:12:22  9   Q    What subjects did you teach at USUHS?

11:12:27  10  A    Well, I established a division of clinical pharmacology

11:12:31  11  and, in addition to a research program, I had the duty of

11:12:36  12  teaching clinical pharmacology to medical students.  We had a

11:12:40  13  second year medical course in which I taught the principles of

11:12:45  14  therapeutic decisionmaking.

11:12:46  15  Q    What is therapeutic decisionmaking?

11:12:49  16  A    When a physician engages with a patient and understands

11:12:56  17  the list or the issues relating to their health, a decision

11:13:04  18  has to be made about how to benefit the patient.

11:13:07  19       When it comes to drugs, there is a structured

11:13:11  20  approach, which I taught, to making the decision about whether

11:13:15  21  or not to treat with a drug, which drug to treat, which dose

11:13:20  22  to use, what duration, what frequency, what to monitor after

11:13:25  23  the patient has begun to take the drug.

11:13:30  24  Q    What information as does a physician consult when

11:13:33  25  engaging in therapeutic decisionmaking?

11:13:39  1    A    Well, the physician draw upon his medical education and

11:13:42  2    experience, but the primary source is the FDA-approved drug

11:13:45  3    label.

11:13:47  4          In my view, this is the single most reliable source

11:13:53  5    of information about the action of the drugs, of drugs in

11:13:58  6    humans, and it provides a critical resource for making

11:14:04  7    decisions about the drug and how to use it.

11:14:10  8    Q    And the drug label is approved by FDA?

11:14:13  9    A    Yes, it is.

11:14:13  10   Q    So let's come back to your tenure at FDA.

11:14:18  11         Mr. Brooks, could I have PDX 4-6.

11:14:18  12   BY MR. M. KENNEDY:

11:14:22  13   Q    And I think you already mentioned that from 1987 to 1993,

11:14:25  14   you were the director of CDER.  Can you explain what is CDER.

11:14:29  15   How does it relate to the overall FDA structure?

11:14:33  16   A    Well, FDA regulates 25 cents on the consumer dollar, the

11:14:39  17   products that it regulates are drugs, biologics, medical

11:14:44  18   devices, and so forth.

11:14:45  19         The Center For Drugs, so CDER, was at this time and

11:14:49  20   remains the largest of five to seven centers -- there was five

11:14:57  21   when I was there, now there's seven, and its responsibility is

11:15:00  22   the regulation of the research on new drugs, the review and

11:15:05  23   approval of new drugs, and that would include prescription

11:15:10  24   drugs, over-the-counter drugs, generic drugs, and the

11:15:16  25   postmarketing monitoring and surveillance of safety issues

—1321—

11:15:20   1   relating to the drugs it has approved.

11:15:22   2   Q    What were your responsibilities as director of CDER?

11:15:26   3   A    I was responsible for all of the activities of the center

11:15:32   4   which included many of the things that I just mentioned.

11:15:38   5            I hired staff.  I made -- I made decisions about

11:15:45   6   budget and organization.  I represented the FDA, the Center

11:15:51   7   For Drugs before the Congress and before the public when

11:15:55   8   issues arose that needed explaining.

11:16:00   9   Q    Did you review and comment on the sufficiency of new drug

11:16:04   10  applications, INDs, and ANDAs?

11:16:11   11           I'm sorry, as part your duties at CDER did you

11:16:14   12  review and comment on the sufficiency of studies supporting

11:16:17   13  NDAs, ANDAs, and INDs?

11:16:20   14  A    Yes, I did.  I supervised the physicians and the FDA

11:16:28   15  scientists who were reviewing this information, but on many

11:16:30   16  occasions I inserted myself and undertook the reviews

11:16:35   17  alongside of them and provided input from my areas of

11:16:38   18  expertise.

11:16:39   19  Q    As director of CDER, did your responsibilities include

11:16:43   20  anything related to prescription drug labeling?

11:16:47   21  A    Well, yes, on a daily basis.

11:16:50   22  Q    Can you describe those responsibilities.

11:16:52   23  A    I can.  First of all, one of my -- one of the divisions

11:16:57   24  that I was responsible for was a division of prescription drug

11:17:06   25  labeling, but then every division who was evaluating new drugs

11:17:10   1   and evaluating them for approval were involved in activities

11:17:17   2   relating to guidance to manufactures who were drafting the

11:17:21   3   labels and to reviewing and editing and setting standards for

11:17:25   4   the format and content.

11:17:27   5   Q   Approximately how many proposed prescription drug labels

11:17:33   6   did you review at CDER?

11:17:34   7   A   Well, that would be hard to estimate; hundreds for sure.

11:17:39   8   Q   Do you still work with prescription labeling today?

11:17:42   9   A   Yes.

11:17:43   10  Q   In what way?

11:17:44   11  A   When we consult with biotech companies who are developing

11:17:51   12  a new drug, we teach that a good blueprint for the development

11:17:55   13  of a new drug is to begin to draft the drug label because that

11:18:01   14  will, that will reflect the information that they gain from

11:18:06   15  their clinical trials to inform the drug label on the safety

11:18:11   16  and effectiveness and various ways of using the drug.

11:18:17   17          So in our consultations we often look the at first

11:18:24   18  draft, we make comments, we make suggestions.  We refer them

11:18:27   19  to the FDA guidances.  And we just work with drug labels all

11:18:34   20  the time.

11:18:34   21  Q   And this is work that you perform as part of your NDA

11:18:39   22  partner's organization?

11:18:40   23  A   That's correct.

11:18:41   24  Q   Now, as part of your work since leaving FDA, have you

11:18:44   25  stayed abreast of developments in FDA's regulation of

11:18:49  1    prescription drug labeling?

11:18:50  2    A    Yes, I have.

11:18:51  3    Q    How do you go about doing that?

11:18:53  4    A    Well, being aware that -- that the standards for content

11:19:02  5    and format are an FDA responsibility, I download guidances

11:19:11  6    from the internet from FDA's website.  And I review them, of

11:19:17  7    course, and then I explain them to the -- to, you know, our

11:19:20  8    clients.

11:19:20  9    Q    And how often do you do that?

11:19:23  10   A    Well, of course I check for updates.  Most of them are

11:19:30  11   downloaded already so I simply consult them.

11:19:35  12          But basically, it's important to stay abreast of

11:19:39  13   FDA's guidances because they are.  They are sometimes

11:19:44  14   updated -- I should say often updated, and there are many of

11:19:48  15   them.

11:19:50  16                MR. M. KENNEDY:  Your Honor, Amarin offers

11:19:52  17   Dr. Peck as an expert in FDA regulation of new and generic

11:19:56  18   drugs including prescription drug labeling.

11:19:59  19                MR. KLEIN:  No objection.

11:20:01  20                THE COURT:  The request is granted.  The Court

11:20:03  21   will certify Dr. Peck as FDA -- as an expert in FDA

11:20:09  22   regulations of new and generic drugs including new drug

11:20:13  23   labels.

11:20:15  24                MR. M. KENNEDY:  Thank you, Your Honor.

11:20:15  25

11:20:15  1   BY MR. M. KENNEDY:

11:20:16  2   Q    So, Dr. Peck, let's start at the beginning.  What is a

11:20:19  3   prescription drug label?

11:20:21  4   A    A prescription drug label is a document that, at the end

11:20:27  5   of drug development and FDA approval, contains the information

11:20:33  6   that FDA considers to be essential for a licensed physician to

11:20:39  7   make a decision about a drug and how to use that drug.

11:20:43  8   Q    And by information essential, do you mean safety and

11:20:46  9   efficacy data?

11:20:47  10  A    It would include safety and efficacy data as well as

11:20:50  11  advice on dosage and which condition it would be treating, so

11:20:57  12  forth.

11:20:57  13  Q    Dr. Peck, is the label sometimes referred to as a package

11:21:01  14  insert or prescribing information?

11:21:03  15  A    Yes, it is.

11:21:04  16  Q    Is it okay if -- if I use those three terms

11:21:07  17  interchangeably today?

11:21:08  18  A    Yes.

11:21:09  19  Q    So who is the intended audience of prescribing

11:21:13  20  information?

11:21:13  21  A    The -- primarily it is the -- a licensed practitioner who

11:21:21  22  is licensed to write a prescription or make an order for a

11:21:27  23  drug in a patient.

11:21:28  24  Q    Does the FDA regulate the practice of medicine?

11:21:32  25  A    No, it does not.

| | | |
|---|---|---|
| 11:21:33 | 1 | Q    So what do FDA regulate? |
| 11:21:35 | 2 | A    FDA regulates manufacturers. |
| 11:21:41 | 3 | Q    Pharmaceutical companies? |
| 11:21:41 | 4 | A    Pharmaceutical companies. |
| 11:21:44 | 5 | Q    Does FDA intend for approved drug labels to impact |
| 11:21:48 | 6 | physicians' prescribing decisions? |
| 11:21:51 | 7 | A    Yes. |
| 11:21:52 | 8 | Q    What rule does FDA play generally speaking in the |
| 11:21:57 | 9 | creation of approved prescribing information? |
| 11:21:57 | 10 | A    Well, by regulation, FDA has set the standards for the |
| 11:22:04 | 11 | format and content.  So this information is publically |
| 11:22:09 | 12 | available through guidances.  FDA also explains them in |
| 11:22:16 | 13 | presentations, and I would say that would be the main avenues |
| 11:22:26 | 14 | of how FDA executes its responsibility. |
| 11:22:31 | 15 | Q    Does FDA interact with a new drug applicant in the |
| 11:22:35 | 16 | context of reviewing a particular NDA that includes a |
| 11:22:38 | 17 | particular proposed label? |
| 11:22:40 | 18 | A    Yes, numerous times. |
| 11:22:43 | 19 | Q    And could you just very -- at a high level describe that |
| 11:22:48 | 20 | process. |
| 11:22:48 | 21 | A    Well, the drug development process involves discovery and |
| 11:22:56 | 22 | then new -- you know, animal studies and so forth. |
| 11:23:01 | 23 | Q    Oh, the let me clarify my unclear question. |
| 11:23:05 | 24 | Does FDA work with the new drug applicant in the |
| 11:23:08 | 25 | context of commenting, revising and arriving at the approved |

11:23:15  1   prescribing information for a given NDA?

11:23:17  2   A    Well, yes, it does, many times.

11:23:20  3   Q    Could you describe that process of working with an

11:23:23  4   applicant on the prescribing information.

11:23:26  5   A    Well, I was giving a longer answer than you need, but

11:23:31  6   when an applicant, even before it begins to study in humans,

11:23:35  7   has a draft label.  They may discuss that with the FDA in the

11:23:41  8   pre IND meeting to get advice on how they might be able to

11:23:46  9   reach the -- or how -- achieve the elements of that.

11:23:53  10           Throughout the drug development progress there are

11:23:54  11   numerous communications and meetings with FDA between a

11:23:58  12   company, and the drug label or the elements of the drug label

11:24:02  13   are often a principal element of the dialogue.

11:24:07  14           When the applicant considers that it's time, they

11:24:13  15   will file a new drug application, and part of that new drug

11:24:19  16   application will be a draft label.

11:24:22  17           FDA will review that, edit it, require changes.

11:24:29  18   But, in the end, FDA will approve that drug label according to

11:24:36  19   its standards and its agreement that the words in that label

11:24:40  20   represent truthful and adequate and scientifically sound

11:24:49  21   information that will assist the physician or, you know,

11:24:51  22   encourage the physician to use the drug in a safe and

11:24:55  23   effective manner.

11:24:56  24   Q    Does FDA require that an approved drug label follow any

11:25:02  25   prescribed structure?

11:25:03  1    A    Yes, there is by regulation, and then explained through

11:25:09  2    guidances, a standardized format and content of the -- of the

11:25:15  3    drug label.

11:25:17  4    Q    Are there particular parts of a drug label?

11:25:20  5    A    Well, the format comprises roughly 18 sections that each

11:25:28  6    are intended to be concisely written to communicate to the

11:25:34  7    prescriber the essential information needed to prescribe the

11:25:43  8    patient -- the drug to the patient in a safe and effective

11:25:47  9    manner.

11:25:47  10   Q    Does the full prescribing information also include a

11:25:50  11   summary of its contents?

11:25:52  12   A    Yes, it does.

11:25:52  13   Q    Is that called anything?

11:25:55  14   A    Well, the front page of the drug label I think is called

11:26:02  15   highlights, and so it will include very brief statements

11:26:10  16   reflecting key information from each of the sections, although

11:26:20  17   there is a -- there is a statement at the top of this page

11:26:25  18   that reminds the physician that the full prescribing

11:26:30  19   information, everything in the label, is important and is not

11:26:34  20   limited to the highlights page.

11:26:37  21   Q    So you mentioned there's 18 sections in a prescribing

11:26:41  22   information.  Which of those sections does FDA consider

11:26:44  23   relevant to a clinician's prescribing decision?

11:26:47  24   A    Every single one.

11:26:48  25   Q    Does FDA provide any guidance to pharmaceutical companies

| | | |
|---|---|---|
| 11:26:53 | 1 | on how to prepare their labeling? |
| 11:26:55 | 2 | A    It publishes written guidances for almost every section |
| 11:27:00 | 3 | of the drug label. |
| 11:27:03 | 4 | Q    Are these guidance documents available to the public? |
| 11:27:06 | 5 | A    Yes, they are. |
| 11:27:07 | 6 | MR. M. KENNEDY:  Mr. Brooks, can we please have |
| 11:27:08 | 7 | PX 573. |
| 11:27:08 | 8 | BY MR. M. KENNEDY: |
| 11:27:16 | 9 | Q    Dr. Peck, do you recognize this document? |
| 11:27:18 | 10 | A    I do. |
| 11:27:18 | 11 | Q    What is it? |
| 11:27:19 | 12 | A    This is a guidance, a typical guidance. |
| 11:27:21 | 13 | Q    Uh -- |
| 11:27:21 | 14 | A    This one specifically identifies what FDA requires in |
| 11:27:28 | 15 | terms of format and content for the indications and usage |
| 11:27:32 | 16 | section of the label. |
| 11:27:34 | 17 | Q    And just to recap, what is the indications and usage |
| 11:27:38 | 18 | section of the label? |
| 11:27:39 | 19 | A    This is a section that concisely describes the condition |
| 11:27:45 | 20 | or disease that the drug is intended to benefit. |
| 11:27:49 | 21 | Q    Did you rely on PX 573 in forming your opinions in this |
| 11:27:54 | 22 | case? |
| 11:27:54 | 23 | A    I did. |
| 11:27:56 | 24 | MR. M. KENNEDY:  Your Honor, Amarin moves to |
| 11:27:58 | 25 | admit PX 573. |

11:28:00   1          MR. KLEIN:  No objection.

11:28:00   2          THE COURT:  573 is admitted.

11:28:00   3                  (Plaintiffs' Exhibit 573 received in
11:28:00                          evidence.)
11:28:00   4   BY MR. M. KENNEDY:

11:28:04   5   Q   So, Dr. Peck, I notice that PX 573 says it's draft

11:28:10   6   guidance.  Should pharmaceutical companies rely on draft

11:28:14   7   guidance?

11:28:14   8   A   Yes.

11:28:14   9   Q   Why?

11:28:15   10  A   Well, as I noted before, FDA's guidance changes slowly

11:28:25   11  over the years, and so whether a guidance has the word draft

11:28:28   12  on or it whether it's absent, the guidance represents FDA's

11:28:34   13  current thinking about the issues related -- you know,

11:28:36   14  described in the guidance.

11:28:39   15          MR. M. KENNEDY:  Mr. Brooks, will you please

11:28:41   16  scroll down to where it says July 2018.

11:28:41   17  BY MR. M. KENNEDY:

11:28:45   18  Q   Dr. Peck, to your knowledge, is PX 573 the latest version

11:28:49   19  of the guidance issued by FDA concerning the content and

11:28:53   20  format of the indications and usage section?

11:28:56   21  A   Yes, I believe it is.

11:28:57   22  Q   To your knowledge, does this still reflect FDA's current

11:29:02   23  thinking on this subject?

11:29:02   24  A   Yes.

11:29:03   25          MR. M. KENNEDY:  Mr. Brooks, could we turn to

11:29:05  1   page 5 of PX 573.

11:29:05  2   BY MR. M. KENNEDY:

11:29:08  3   Q   And, Dr. Peck, I'd like to ask you about the passage that

11:29:11  4   is labeled General Principles.  In particular, I would like to

11:29:16  5   ask you about the sentence that begins "Other sections of

11:29:19  6   labeling," and this section this sentence reads as follows,

11:29:23  7   quote,

11:29:23  8          "Other sections of the labeling, e.g., dosage

11:29:27  9       and administration, contraindications, warnings and

11:29:31  10      precautions, use in specific populations, as

11:29:35  11      applicable, also provide essential details that

11:29:39  12      enable safe and effective use of a drug, and labeling

11:29:42  13      should be considered in its entirety for individual

11:29:45  14      prescribing decisions."

11:29:52  15          Dr. Peck, is that an accurate statement of FDA's

11:29:54  16  current thinking on the indications and usage section and the

11:29:56  17  other sections of the labeling?

11:29:57  18  A   Yes, it is.

11:29:57  19  Q   So the passage I just read lists some examples of

11:30:01  20  sections in the prescribing information that provide essential

11:30:04  21  details to enable safe and effective use of the drug.  Does

11:30:08  22  the Clinical Study section also provide such essential

11:30:12  23  details?

11:30:13  24  A   Well, yes, it does.  As reflected in this highlighted

11:30:16  25  statement, FDA advises that the entire label in all sections

11:30:24  1   should be taken into account.

11:30:26  2   Q    Why doesn't FDA want companies to put all these essential

11:30:30  3   details in the indications and usage section?

11:30:33  4   A    Well, one of the principles that FDA requires is that the

11:30:41  5   label be readable, readily readable, and truly useful to a

11:30:46  6   busy prescriber.

11:30:48  7            So it intends that each of the sections be concise.

11:30:55  8            Throwing everything into the indications and usage

11:30:57  9   section would lead to, you know, a lengthy document that would

11:31:05  10  be very hard to grasp during the busy practice of a

11:31:09  11  prescriber.

11:31:11  12  Q    Does FDA require that labeling be drafted with the

11:31:16  13  intention that clinicians consider the labeling in its

11:31:20  14  entirety for their individual prescribing decisions?

11:31:23  15  A    Yes.

11:31:24  16            MR. M. KENNEDY:  Mr. Brooks, could we have

11:31:27  17  PX 776.

11:31:27  18  BY MR. M. KENNEDY:

11:31:28  19  Q    Now, Dr. Peck, do you recognize this document?

11:31:30  20  A    Yes, I do.

11:31:31  21  Q    What is it?

11:31:32  22  A    Well, this is another guidance pertaining to the format

11:31:39  23  and content of the label, and, in this case, it is specific

11:31:42  24  for the clinical studies section of the label.

11:31:45  25  Q    I see that towards the bottom that there's a date,

11:31:50   1   January 2006.  To your knowledge, is PX 776 the most recent

11:31:56   2   FDA guidance concerning the clinical studies section?

11:31:59   3   A    Yes.

11:32:00   4   Q    Did you rely on PX 776 in forming your opinions in this

11:32:04   5   case?

11:32:04   6   A    I did.

11:32:06   7           MR. M. KENNEDY:  Your Honor, Amarin moves to

11:32:07   8   admit PX 776.

11:32:08   9           MR. KLEIN:  No objection.

11:32:09   10           THE COURT:  PX 776 is admitted.

11:32:09   11               (Plaintiffs' Exhibit 776 received in
11:32:09
11:32:09   12                 evidence.)

12   BY MR. M. KENNEDY:

11:32:14   13   Q    At a high level, Dr. Peck, what's the purpose of the

11:32:16   14   clinical studies section of prescribing information?

11:32:19   15   A    Its purpose is to provide to the prescriber an

11:32:26   16   understanding of how the drug can be used and how it was used

11:32:31   17   in the clinical trial or clinical trials that formed the basis

11:32:35   18   for approval.

11:32:38   19           MR. M. KENNEDY:  Mr. Brooks, can we turn to

11:32:39   20   page 5 of this document, the section entitled "Identifying

11:32:43   21   Studies For Inclusion in the clinical studies Section."

11:32:43   22   BY MR. M. KENNEDY:

11:32:47   23   Q    And in particular, Dr. Peck, I would like to ask you

11:32:50   24   about the first sentence of this passage which reads, quote,

11:32:54   25               "The clinical studies section of labeling

11:32:56   1            must discuss those clinical studies that facilitate

11:33:00   2            an understanding of how to use the drug safely and

11:33:03   3            effectively."

11:33:05   4                 Dr. Peck, is this consistent with FDA's current

11:33:08   5    view of the purpose of the clinical studies section of a

11:33:11   6    label?

11:33:11   7    A    This is FDA's current view.

11:33:14   8    Q    And I would like to ask you now about the second sentence

11:33:16   9    which reads, quote,

11:33:19   10           "This is usually accomplished by providing

11:33:22   11           concise, accurate summaries of information from

11:33:26   12           studies concerning a drug's effectiveness and

11:33:29   13           sometimes safety that practitioners consider

11:33:32   14           important to clinical decision-making."

11:33:35   15                I'd like to ask you couple things about that

11:33:38   16    passage.  In FDA's view, why is it important for the clinical

11:33:43   17    studies section to be concise.

11:33:46   18    A    As explained, busy practitioners need to have a ready

11:33:51   19    source of information that provides essential information that

11:33:55   20    is most relevant to a physician's prescription or order to

11:34:01   21    benefit that patient.

11:34:03   22    Q    Now, this passage in the guidance also talks about

11:34:07   23    information that practitioners consider important to clinical

11:34:10   24    decision-making.  What does that mean by "important to

11:34:17   25    clinical decision-making"?

11:34:17   1   A    A physician when he considers that -- I should say she as

11:34:27   2   well, there are more lady practitioners than men in medical

11:34:31   3   schools these days.

11:34:33   4          It's important to match up the drug with the

11:34:35   5   patient, and it's also important to make a decision about

11:34:42   6   alternate therapies.

11:34:43   7          So the indications and usage section is very brief.

11:34:48   8   It only identifies the condition to be treated.  The physician

11:34:53   9   needs additional information to inform and to encourage the

11:35:00   10  proper use of a medicine.

11:35:04   11  Q    Now, in forming your opinions in this case, which label

11:35:08   12  did you review?

11:35:10   13  A    I reviewed the Vascepa label.

11:35:12   14  Q    Do the opinions you'll express today, and you have

11:35:16   15  expressed, apply equally to Defendants' proposed labeling?

11:35:20   16  A    Yes, I believe they do.

11:35:21   17  Q    And can you briefly explain why.

11:35:23   18  A    Well, a side-by-side comparison of the two, you know,

11:35:28   19  leads to a conclusion that they are essentially the same.

11:35:31   20  Q    So you were in court last week when Dr. Sheinberg

11:35:35   21  testified; is that correct?

11:35:36   22  A    I was.

11:35:36   23  Q    And, in particular, were you present in court when

11:35:40   24  Dr. Sheinberg testified that in his opinion the Vascepa label

11:35:44   25  is completely silent with respect to the duration of therapy?

11:35:47   1    A    I did hear that.

11:35:49   2    Q    Do you agree with Dr. Sheinberg's opinion?

11:35:51   3    A    No, I do not.

11:35:52   4    Q    So, in your view, if the label isn't silent, which

11:35:57   5    sections of the Vascepa label are relevant to the duration of

11:36:00   6    use of the approved therapy?

11:36:02   7    A    Well, there are at least three of them, and those would

11:36:05   8    be the indications and usage, dosage and administration, and

11:36:11   9    the clinical studies section.

11:36:13   10             MR. M. KENNEDY:  Mr. Brooks, can we go back to

11:36:16   11   PX 573.  And this is the FDA guidance we looked at a few

11:36:22   12   minutes ago concerning the indications and usage section.

11:36:25   13             Mr. Brooks, can we go to page 14, subsection 1,

11:36:30   14   and this subsection is entitled "Situations in Which

11:36:33   15   Limitations of Use Would Be Appropriate."

11:36:33   16   BY MR. M. KENNEDY:

11:36:37   17   Q    In this context, Dr. Peck, what is a limitation of use?

11:36:41   18   A    Well, a limitation of use would be a -- a communication

11:36:48   19   to the prescriber with respect to some aspect of the use that

11:36:55   20   should be -- should be limited.

11:36:58   21   Q    Are such limitations provided from time to time with

11:37:01   22   respect to the duration of use of the drug?

11:37:03   23   A    Yes, they are.

11:37:04   24   Q    In what circumstances?

11:37:06   25   A    Well, when continued therapy provides no more benefit, so

11:37:13  1   let's say the condition is an acute condition, and after a

11:37:16  2   certain amount of time that the condition is cured, or

11:37:22  3   sufficiently benefitted.

11:37:27  4         Another instance is if continued use of a drug

11:37:32  5   causes a safety issue, then there would be a limitation

11:37:37  6   indicated there as well.

11:37:39  7   Q   What's the purpose, in general of this subsection of the

11:37:43  8   FDA guidance about the indications and usage section?

11:37:47  9   A   Well, it's to list those critical limitations that FDA

11:37:52  10  considers crucial for safe and effective therapy in the

11:37:57  11  patient.

11:37:58  12        MR. M. KENNEDY:  Can we go now, Mr. Brooks, to

11:38:00  13  subsection C, starting on page 15 and going to 16.

11:38:04  14        And the heading of subsection C is "Drugs With

11:38:08  15  Dose Duration Or Long-Term Use Considerations."

11:38:08  16  BY MR. M. KENNEDY:

11:38:12  17  Q   And, Dr. Peck, am I correct that this is still part of

11:38:15  18  the limitation of use portion of the FDA guidance?

11:38:17  19  A   Yes, it is.

11:38:19  20  Q   I'd like to ask you couple questions about the first

11:38:21  21  sentence here which reads, quote,

11:38:24  22        "If information on limitations of use or

11:38:27  23        uncertainty about anticipated benefits is relevant to

11:38:31  24        the recommended dosing intervals to appropriate

11:38:35  25        treatment duration when treatment should be limited,

1337

11:38:37  1      or to any dosage modification, the indications and

11:38:42  2      usage section must include a concise description of

11:38:45  3      the information with a reference to the more detailed

11:38:48  4      information in the dosage and administration

11:38:50  5      section."  Unquote.

11:38:52  6           Dr. Peck, does this reflect FDA's current

11:38:57  7  thinking on when the indications and usage section of a label

11:39:01  8  must limit the duration of use of a drug?

11:39:04  9  A    Yes.

11:39:04  10  Q    When FDA has determined that there's a safety or efficacy

11:39:08  11  reason to limit the duration of use of a drug, must that

11:39:11  12  information be included in the indications and usage section?

11:39:14  13  A    Yes.

11:39:14  14  Q    I would also like to ask you about the next sentence, and

11:39:21  15  this sentence reads as follows:

11:39:23  16      "Under these circumstances, information about

11:39:26  17      important dose or duration considerations, such as

11:39:30  18      how long a drug can safely be used or uncertainty

11:39:34  19      about the risks and benefits of treatment beyond a

11:39:37  20      certain period, e.g., long-term cumulative toxicity,

11:39:42  21      should be included as a limitation of use."

11:39:44  22           Does this also represent FDA's current thinking?

11:39:47  23  A    Yes, it does.

11:39:48  24  Q    If FDA had concerns with how long a drug can be safely

11:39:52  25  used, should that be reflected in a limitation of use in the

| | | |
|---|---|---|
| 11:39:56 | 1 | indications and usage section? |
| 11:39:58 | 2 | A    It must be. |
| 11:39:59 | 3 | Q    And if FDA had concerns about the uncertainty of the |
| 11:40:02 | 4 | risks and benefits of treatment beyond a certain period, |
| 11:40:06 | 5 | should that be reflected in a limitation of use -- |
| 11:40:08 | 6 | A    Yes. |
| 11:40:09 | 7 | Q    -- in the indications and usage section? |
| 11:40:11 | 8 |     Now, do you recall Dr. Sheinberg testifying that in |
| 11:40:14 | 9 | his opinion Vascepa is approved only to get TGs below |
| 11:40:20 | 10 | 500 milligrams per deciliter, and that using Vascepa to |
| 11:40:23 | 11 | maintain TGs' below 500 milligrams per deciliter would be an |
| 11:40:27 | 12 | off-label use.  Do you remember that testimony? |
| 11:40:30 | 13 | A    Yes, I do. |
| 11:40:30 | 14 | Q    Do you agree with Dr. Sheinberg? |
| 11:40:32 | 15 | A    I do not. |
| 11:40:33 | 16 | Q    Now, if Dr. Sheinberg were correct that FDA approved |
| 11:40:37 | 17 | Vascepa only to get TGs below 500 and not to maintain them |
| 11:40:42 | 18 | below 500, would there be a duration of use specified in the |
| 11:40:46 | 19 | indication and usage section? |
| 11:40:47 | 20 | A    Yes, there would be. |
| 11:40:48 | 21 | Q    Now, on the other hand, if FDA approved Vascepa to reduce |
| 11:40:53 | 22 | triglycerides and maintain that reduction for the long-term, |
| 11:40:57 | 23 | would there be a duration of use specified in the indications |
| 11:41:00 | 24 | and usage section of the Vascepa label? |
| 11:41:02 | 25 | A    No. |

11:41:03  1    Q    Now, does the indications and usage section of the

11:41:06  2    Vascepa label limit the duration of use of Vascepa?

11:41:09  3    A    No, it does not.

11:41:10  4    Q    In your opinion, is Vascepa approved by FDA for long-term

11:41:14  5    use?

11:41:14  6    A    Yes.

11:41:15  7                    MR. M. KENNEDY:  Mr. Brooks, could we go to

11:41:17  8    page 16, please.

11:41:17  9    BY MR. M. KENNEDY:

11:41:19  10   Q    And I'm looking at the first full paragraph, and I would

11:41:22  11   like to ask you a couple of questions about the first sentence

11:41:25  12   here which reads, quote,

11:41:27  13           "It is generally not necessary to limit

11:41:30  14        duration of use in the indications and usage section

11:41:34  15        unless such a limited duration is essential to ensure

11:41:37  16        the safe and effective use of the drug," unquote.

11:41:41  17           Is this sentence consistent with your

11:41:43  18   understanding of FDA's current thinking?

11:41:46  19   A    Yes.

11:41:46  20   Q    Now, I would like to ask you about the next passage, and

11:41:54  21   this passage reads as follows, quote,

11:41:57  22           "If clinical trials evaluated the

11:42:00  23        effectiveness of a drug for a chronic condition only

11:42:03  24        in short-term trials of sufficient duration to

11:42:06  25        support such an approval, e.g., drugs for major

| | | |
|---|---|---|
| 11:42:10 | 1 | depressive disorder or hypertension, but the drug is |
| 11:42:13 | 2 | indicated for long-term use due to the chronic nature |
| 11:42:17 | 3 | of the condition, and because there's no known or |
| 11:42:20 | 4 | anticipated safety or efficacy concern from continued |
| 11:42:23 | 5 | use, a description of the duration of use from the |
| 11:42:27 | 6 | clinical trials or information about the lack of |
| 11:42:30 | 7 | longer term data generally should not be included in |
| 11:42:33 | 8 | the indications and usage section.  Information on |
| 11:42:36 | 9 | the length of the clinical trials should instead be |
| 11:42:40 | 10 | discussed in detail in the clinical studies section |
| 11:42:43 | 11 | of the labeling," unquote. |
| 11:42:46 | 12 | Dr. Peck, is this passage consistent with your |
| 11:42:50 | 13 | understanding of current FDA thinking on the matter? |
| 11:42:52 | 14 | A   Yes. |
| 11:42:52 | 15 | Q   Now, if a drug is approved for a chronic duration based |
| 11:42:56 | 16 | on a short-term trial, is it FDA's position that the clinical |
| 11:43:00 | 17 | studies section should reference the length of that trial? |
| 11:43:05 | 18 | A   Would you repeat that, please? |
| 11:43:06 | 19 | Q   Sure.  Now, in view of this guidance that we've been |
| 11:43:09 | 20 | looking at, if a drug is approved for a chronic indication |
| 11:43:13 | 21 | based on a short-term trial, is it FDA's position that the |
| 11:43:18 | 22 | clinical studies section should reference the length of that |
| 11:43:21 | 23 | trial?  The clinical study section -- |
| 11:43:23 | 24 | A   The clinical study section, yes. |
| 11:43:26 | 25 | Q   Is this how the Vascepa label is written? |

1341

11:43:28    1    A    Yes, it is.

11:43:30    2              MR. M. KENNEDY:  Mr. Brooks, can we go to

11:43:35    3    PX 572.

11:43:35    4    BY MR. M. KENNEDY:

11:43:36    5    Q    Dr. Peck, do you recognize PX 572?

11:43:40    6    A    Yes.

11:43:40    7    Q    What is it?

11:43:41    8    A    It as another guidance or -- unless we've seen this

11:43:46    9    before.  This is the dosage and administration section

11:43:50   10    guidance for the label.

11:43:52   11    Q    And what -- at a very high level, what is the purpose of

11:43:56   12    the dosage and administration section of an approved label?

11:43:59   13    A    Its purpose is to provide a concise information to the

11:44:09   14    physician, encouraging a particular dosage, perhaps a

11:44:14   15    frequency of dosage, duration of dosage when appropriate, and

11:44:20   16    any other -- any limitations with respect to dosage.

11:44:24   17    Q    And what's the purpose of this particular guidance?

11:44:27   18    A    Well, it's to inform manufacturers on how to write or

11:44:35   19    draft this section of the label.

11:44:37   20    Q    Did you rely on PX 572 in forming your opinions in this

11:44:41   21    case?

11:44:41   22    A    I did.

11:44:42   23              MR. M. KENNEDY:  Your Honor, Amarin offers

11:44:44   24    PX 572 into evidence.

11:44:45   25              MR. KLEIN:  No objection.

11:44:46  1          THE COURT:  572 is admitted.

11:44:46  2                    (Plaintiffs' Exhibit 572 received in
11:44:49                   evidence.)
11:44:50  3          MR. M. KENNEDY:  Mr. Brooks, can we have page 5

11:44:53  4    of PX 572, please.  There should be a section entitled Basic

11:44:57  5    Dosing Information, if you'd just blow that up.

11:44:57  6    BY MR. M. KENNEDY:

11:45:00  7    Q    Dr. Peck, what is the purpose of this portion of the FDA

11:45:03  8    guidance on dosage information?

11:45:06  9    A    It's to guide the manufacturer on what specific

11:45:11  10   information regarding dosage should be included.

11:45:15  11   Q    Well, it says the section must include the following

11:45:18  12   information.  In this context, is there a difference between

11:45:21  13   must and should?

11:45:22  14   A    In my view, yes.  This is a requirement.

11:45:26  15   Q    If we could scroll down to the final paragraph of this

11:45:30  16   section.  And I would like to ask you a couple questions about

11:45:37  17   the first sentence of this paragraph which reads as follows:

11:45:41  18              "In describing the dosage range and duration,

11:45:44  19          if it is known that a drug provides no additional

11:45:48  20          benefit above a certain dose or beyond a certain

11:45:51  21          duration of use, that dose or duration must be

11:45:54  22          identified."

11:45:55  23              Is what I just read consistent with FDA's

11:45:59  24   current thinking about the dosage and administration section?

11:46:03  25   A    Yes.

1343

11:46:03  1    Q    So if it's known that the drug provides no benefit past a

11:46:09  2    certain duration, would the dosage and administration section

11:46:09  3    of the label have to identify that duration?

11:46:11  4    A    Yes.

11:46:11  5    Q    And if the dosage and administration section does not

11:46:15  6    identify a duration of use, does that mean that the drug's

11:46:20  7    benefit is not thought to cease after a particular time

11:46:24  8    period?

11:46:25  9    A    In my view, yes.

11:46:26  10   Q    Now, Dr. Peck, can you explain the -- let's highlight --

11:46:32  11   withdraw that.  Let's go to this next sentence of this

11:46:36  12   paragraph.  And I'd like to ask -- and let me read it.

11:46:42  13            Quote,

11:46:42  14            "In addition if it is known that above a

11:46:45  15        certain dose or beyond a certain duration of use

11:46:49  16        toxicity is increased to an extent that the risk

11:46:52  17        exceeds the benefit, that dose or duration must be

11:46:55  18        identified."

11:46:56  19            Is this consistent with FDA's current

11:46:59  20   understanding?

11:47:00  21   A    Yes, it is.

11:47:00  22   Q    Can you explain what FDA means by this here.

11:47:06  23   A    Some drugs, if you give them for a long period of time,

11:47:10  24   can be -- can be risky.  Even if there is some little

11:47:15  25   continued benefit, if the risk outweighs the benefit, FDA

11:47:22  1   considers it necessary to include a limitation on the duration

11:47:25  2   of use in this section.

11:47:27  3   Q    Now, if the treatment benefit FDA approved for Vascepa

11:47:32  4   had simply been to get TGs below 500 milligrams per deciliter

11:47:37  5   and not to maintain TGs below 500 milligrams per deciliter, in

11:47:43  6   your opinion, would there be a duration of use limitation in

11:47:45  7   the dosage and administration section of the Vascepa label?

11:47:47  8   A    Yes, there would be.

11:47:48  9   Q    And on the other hand, if the treatment benefit FDA

11:47:51  10  identified had been to reduce triglycerides and maintain that

11:47:56  11  reduction in triglycerides over the long term, would the

11:47:59  12  dosage and administration section of the Vascepa label have a

11:48:03  13  limit on duration?

11:48:04  14  A    No, it would not.

11:48:05  15  Q    And does the dosage and limitation section of the Vascepa

11:48:09  16  label in fact limit the duration of use for Vascepa?

11:48:13  17  A    No, it goes not.

11:48:13  18  Q    Now, in your opinion, based on the Vascepa labeling, did

11:48:16  19  FDA approve Vascepa label for long-term use including for 12

11:48:21  20  weeks or longer?

11:48:21  21  A    Yes.

11:48:23  22  Q    In your opinion, based on the labeling, did FDA determine

11:48:25  23  that Vascepa is safe and effective to reduce triglycerides in

11:48:29  24  adult patients with severe hypertriglyceridemia when

11:48:33  25  administered for 12 or more weeks?

11:48:36  1    A    Yes.

11:48:37  2              MR. M. KENNEDY:  So I would like to switch gears

11:48:39  3    to a few other issues here.

11:48:41  4              Mr. Brooks, can we have PX 1186.

11:48:41  5    BY MR. M. KENNEDY:

11:48:45  6    Q    And, Dr. Peck, I assume you recognize document if you've

11:48:49  7    been in court, but what is it?

11:48:50  8    A    This is the Vascepa label.  And -- well, it's the Vascepa

11:48:58  9    label, the most recent one.

11:49:01  10             MR. M. KENNEDY:  Mr. Brooks, can we turn to the

11:49:03  11   clinical studies section on page 11 and focus on Table 2 and

11:49:07  12   the material under Table 2.

11:49:10  13             And, in particular, Dr. Peck, I would like to

11:49:15  14   ask you about the data here concerning LDL-C.

11:49:19  15             In your opinion, based on the approved labeling,

11:49:22  16   did FDA determine that Vascepa was safe and effective to

11:49:26  17   reduce triglycerides in adult patients with severe

11:49:30  18   hypertriglyceridemia without raising LDL-C.

11:49:32  19   A    Yes.

11:49:33  20   Q    Is FDA's judgment in this regard reflected in the Vascepa

11:49:38  21   labeling?

11:49:38  22   A    It is.

11:49:40  23   Q    In which sections?

11:49:41  24   A    Well, definitely in this section, the clinical studies'

11:49:47  25   section.

11:49:48   1    Q    So what portions of the clinical study section speak to

11:49:54   2    Vascepa's effect on LDL-C?

11:49:56   3    A    Well, first of all, in the table, and you've conveniently

11:50:01   4    highlighted this, in the left-hand column, the second row,

11:50:05   5    LDL-C, and if you go over to the far right column, you can see

11:50:10   6    that the median percent change relative to placebo was minus

11:50:19   7    two percent, meaning that there was -- there was on the median

11:50:27   8    no increase during the 12-week therapy with Vascepa.

11:50:32   9    Q    Now, is it common to report median effects in drug

11:50:36   10   labeling?

11:50:37   11   A    Would you repeat that?

11:50:38   12   Q    I'm sorry.  Is it common to report median effects in drug

11:50:44   13   labeling?

11:50:44   14   A    It is.

11:50:45   15   Q    Does that mean every that patient who takes Vascepa

11:50:48   16   according to the prescribing information will experience the

11:50:50   17   exact effects shown in Table 2?

11:50:53   18   A    No.

11:50:53   19   Q    Based on the data in the clinical studies section, what

11:50:58   20   percentage of patients can physicians expect to experience a

11:51:03   21   reduction in triglycerides without an increase in LDL-C?

11:51:07   22   A    More than 50 percent.

11:51:08   23   Q    I would like to ask you about the material underneath

11:51:11   24   Table 2 which says, quote,

11:51:13   25                "Vascepa 4 grams per day reduced median TG,

11:51:21  1       VLDL-C, and apo B levels from baseline relative to
11:51:27  2       placebo.  The reduction in TG observed with Vascepa
11:51:30  3       was not associated with elevations in LDL-C relative
11:51:34  4       to placebo."
11:51:35  5            In your experience, what is FDA hoping to
11:51:38  6   achieve by putting this additional information below the table
11:51:41  7   in the clinical study section of a label?
11:51:44  8   A   Well, I think it's calling out to the prescriber that
11:51:52  9   these particular observations on other lipids did not go up
11:52:01  10  during the treatment with Vascepa, and, in fact, the apo B
11:52:08  11  levels actually went down.
11:52:10  12  Q   Does FDA intend prescribers to take into account the
11:52:14  13  verbiage below the table as well as the actual results?
11:52:17  14  A   Yes.
11:52:18  15  Q   Dr. Peck, are you familiar with the terms on-label and
11:52:21  16  off-label promotion?
11:52:23  17  A   I am.
11:52:24  18  Q   Is the term off-label promotion used by FDA in evaluating
11:52:30  19  drug promotion?
11:52:32  20  A   Yes, it's a term of art, and it's a criterion against
11:52:36  21  which they regulate drug advertising.
11:52:40  22  Q   What does off-label promotion mean in this context?
11:52:44  23  A   Well, FDA requires that no statements be made in
11:52:50  24  advertisements that cannot be supported by verbiage or data in
11:52:55  25  the drug label.

—1348—

11:52:56  1        So any deviation from statements in an advertisement

11:53:02  2   that are not supported by the data the representations in the

11:53:07  3   drug label are considered off-label and illegal.

11:53:11  4   Q    And at a very high level in general, what happens if a

11:53:15  5   pharmaceutical company nonetheless engages in off-label

11:53:20  6   promotion?

11:53:20  7   A    Well, FDA monitors such.  It -- actually often companies

11:53:26  8   will approach FDA with a draft advertisement and ask for their

11:53:30  9   input.

11:53:31  10       So the safe way to do is to present this to FDA

11:53:37  11  before the advertisement is used.  But if the unwise company

11:53:43  12  publishes an advertisement that goes beyond the information in

11:53:47  13  the label, FDA's authority permits it to -- to penalize the

11:53:59  14  manufacturer and require it to remove the drug advertisement

11:54:05  15  from -- from the public.

11:54:07  16  Q    Can a drug manufacturer promote a drug for use only if

11:54:11  17  FDA has determined that it has shown to have been found to be

11:54:14  18  safe and effective based on the approved labeling?

11:54:17  19  A    Yes.

11:54:18  20  Q    Now, in evaluating whether a use has been found safe and

11:54:18  21  effective according to the labeling, can that evaluation

11:54:26  22  include the data in the clinical study section?

11:54:28  23  A    Yes, it can.

11:54:29  24  Q    Can a drug manufacturer use data in the clinical study

11:54:33  25  section of an FDA-approved drug label when promoting a drug?

11:54:38  1    A    Would repeat that, please?

11:54:39  2    Q    I'm sorry.  Can a drug manufacturer -- strike that.

11:54:42  3         Can a drug manufacturer legally use data in the

11:54:46  4    clinical study section of an FDA-approved drug when promoting

11:54:50  5    that drug?

11:54:51  6    A    Yes, it can, as long as it's emphasizing that the primary

11:54:57  7    indication is the one that's listed in the label.

11:55:00  8    Q    Dr. Peck, do you know whether Amarin has, in fact,

11:55:03  9    promoted Vascepa by referencing that Vascepa can reduce

11:55:07  10   triglycerides without raising LDL-C?

11:55:10  11   A    Yes, I am aware.

11:55:12  12             MR. M. KENNEDY:  And, Mr. Brooks, if we could

11:55:14  13   pull up PX 287 which is a document already in evidence.

11:55:14  14   BY MR. M. KENNEDY:

11:55:21  15   Q    Dr. Peck, do you recognize this document?

11:55:23  16   A    Yes, I do.

11:55:24  17   Q    What is it?

11:55:25  18   A    This is an advertisement for Vascepa.

11:55:28  19   Q    Is this a document you relied on in forming your opinions

11:55:31  20   in this case?

11:55:32  21   A    Yes, it is.

11:55:33  22   Q    Does this advertisement reference Vascepa's effects on

11:55:37  23   LDL-C?

11:55:38  24   A    Yes, it does, in the context of reducing

11:55:44  25   hypertriglyceridemia.

11:55:46  1          MR. M. KENNEDY:  Mr. Brooks, if we could blow up
11:55:47  2   on the top right.
11:55:47  3   BY MR. M. KENNEDY:
11:55:50  4   Q    And I would like to focus on the second blurb here which
11:55:55  5   reads, quote,
11:55:57  6          "Vascepa, along with diet, is clinically
11:56:00  7       proven to lower very high triglycerides by 33 percent
11:56:04  8       in adults without raising bad cholesterol."
11:56:08  9          Do you see that?
11:56:08  10  A    Yes.
11:56:09  11  Q    Now, do you understand bad cholesterol to be a reference
11:56:12  12  to LDL-C?
11:56:13  13  A    I do.  And, in fact, there's a footnote that confirms
11:56:18  14  that.
11:56:19  15  Q    Now, in your opinion, could Amarin legally promote
11:56:22  16  Vascepa based on its ability to reduce triglycerides without
11:56:26  17  raising LDL-C, if that were an off-label use?
11:56:30  18  A    No, it could not.
11:56:31  19  Q    In your opinion, could Amarin promote Vascepa based on
11:56:35  20  its ability to reduce TGs without raising LDL-C if the
11:56:40  21  approved labeling did not demonstrate that FDA had determined
11:56:45  22  that Vascepa was safe and effective for that use?
11:56:48  23  A    No.
11:56:49  24          MR. M. KENNEDY:  So, Mr. Brooks, let's go back
11:56:50  25  to PX 1186.

BY MR. M. KENNEDY:

Q    And I would like to once again look at the Table 2 and the material below it.

And, Dr. Peck, looking at the material below Table 2, what does this say about Vascepa's effects on TG, VLDL-C, and apo B?

A    Well, it basically states that when treating hypertriglyceridemia, the physician can expect that TG, VLDL-C, and apo B are likely to go down in many of his patients.

Q    Would the analysis we just walked through with respect to LDL-C apply equally to Vascepa's effects on TG, VLDL-C, and apo B?

A    Yes.

Q    Do these statements in the approved labeling establish that FDA determined that Vascepa is safe and effective to reduce triglycerides in adult patients with severe hypertriglyceridemia while also lowering apo B?

A    Yes.

Q    So, Dr. Peck, do you recall when Dr. Sheinberg testified that Vascepa's label is completely silent as to whether Vascepa should be administered without concurrent lipid altering therapy?  Do you remember that testimony?

A    Yes, I do.

Q    Do you agree with Dr. Sheinberg?

| | | |
|---|---|---|
| 11:58:19 | 1 | A   No, I do not. |
| 11:58:20 | 2 | Q   First of all, for purposes of this line of questions, can |
| 11:58:23 | 3 | we use the term monotherapy to refer to the administration of |
| 11:58:27 | 4 | Vascepa as an adjunct to diet without concurrent |
| 11:58:30 | 5 | administration of any other lipid-altering medication? |
| 11:58:35 | 6 | A   Yes, that would be an appropriate term or use of the word |
| 11:58:39 | 7 | monotherapy in this context. |
| 11:58:40 | 8 | Q   In your opinion, did FDA determine that Vascepa is safe |
| 11:58:44 | 9 | and effective as a monotherapy to reduce triglycerides in |
| 11:58:48 | 10 | adult patients with severe hypertriglyceridemia? |
| 11:58:53 | 11 | A   Yes. |
| 11:58:54 | 12 | Q   In your opinion, is FDA's determination in this regard |
| 11:58:56 | 13 | reflected in the approved Vascepa labeling? |
| 11:58:57 | 14 | A   Yes, it is. |
| 11:58:58 | 15 | Q   Are there particular sections of the Vascepa labeling |
| 11:59:01 | 16 | reflect FDA's determination? |
| 11:59:03 | 17 | A   There are at least three. |
| 11:59:04 | 18 | Q   Which are? |
| 11:59:05 | 19 | A   Those would be the indications and usage, dosage and |
| 11:59:10 | 20 | administration, and the clinical trial sections. |
| 11:59:13 | 21 |         MR. M. KENNEDY:  Can we go back to PX 572.  And |
| 11:59:16 | 22 | this is the FDA guidance regarding the dosage and |
| 11:59:20 | 23 | administration section, and I would like to go to page 8 under |
| 11:59:30 | 24 | Concomitant Medication. |
| 11:59:30 | 25 | |

11:59:30  1   BY MR. M. KENNEDY:

11:59:33  2   Q    And, Dr. Peck, in general, what is the purpose of this

11:59:36  3   portion of the FDA guidance on the dosage and administration

11:59:40  4   section of the labeling?

11:59:41  5   A    It's to advise manufactures to include, or not,

11:59:46  6   information about any additional medication that should be

11:59:52  7   used in conjunction with the drug -- with the -- in this case,

11:59:57  8   Vascepa, in order to achieve adequate effectiveness or to

12:00:04  9   mitigate a safety issue.

12:00:07  10  Q    I would like to ask you a couple questions about the

12:00:10  11  first sentence of this passage which reads, quote,

12:00:15  12              "This section should identify and describe

12:00:18  13       any recommended concomitant medications intended to

12:00:22  14       minimize toxicity, e.g., anti-emetics administered

12:00:28  15       with chemotherapy, or enhance effectiveness, e.g.,

12:00:33  16       heparin administered with antithrombotics or

12:00:36  17       thrombolytics in acute coronary syndrome," unquote.

12:00:41  18              Is what I just read consistent with, in your

12:00:41  19  view, FDA's current thinking on when the dosage and

12:00:44  20  administration section should identify concomitant

12:00:47  21  medications?

12:00:47  22  A    Yes.

12:00:48  23  Q    According to this passage, if FDA intends to recommend

12:00:52  24  that concomitant medication be used to minimize a drug's

12:00:52  25  toxicity or enhance its effectiveness, would that

12:00:52  1   recommendation have to appear in the dosage and administration

12:01:04  2   section?

12:01:04  3   A   Yes.

12:01:05  4   Q   Let me ask you a couple of questions about the second

12:01:07  5   sentence, and this reads as follows, quote,

12:01:11  6           "If the drug had been demonstrated to be

12:01:13  7       effective only in combination with another therapy,

12:01:16  8       e.g., an add-on epilepsy therapy, the section should

12:01:21  9       identify the therapy and cross-reference the

12:01:23  10      discussion of combination therapy in the indication

12:01:26  11      and usage section."

12:01:28  12          Is what I just read consistent with your

12:01:31  13  understanding of FDA's current thinking?

12:01:34  14  A   Yes.

12:01:35  15  Q   According to this guidance, if FDA has determined that a

12:01:37  16  drug is effective only in combination with another therapy,

12:01:40  17  would the dosage and administration section of the label have

12:01:43  18  to identify that therapy?

12:01:44  19  A   Yes.

12:01:45  20  Q   Based on your understanding of this guidance, if FDA had

12:01:49  21  determined that Vascepa was safe and effective only when used

12:01:53  22  with a concurrent lipid-altering medication, would the dosage

12:01:58  23  and administration section of Vascepa labeling identify that

12:02:00  24  therapy?

12:02:01  25  A   Yes.

```
12:02:02   1   Q    Does the dosage and administration section of the Vascepa
12:02:05   2   label include any recommendation -- strike that.
12:02:08   3        Does the dosage and administration section of the
12:02:12   4   Vascepa label include a limitation recommending administration
12:02:16   5   of a concurrent lipid-altering therapy?
12:02:19   6   A    No, it does not.
12:02:20   7   Q    In your opinion, did FDA approve Vascepa as a monotherapy
12:02:24   8   to reduce triglycerides in adult patients with severe
12:02:26   9   hypertriglyceridemia?
12:02:27  10   A    Yes.
12:02:28  11              MR. M. KENNEDY:  Dr. Peck, Thank you very much.
12:02:30  12   I have no further questions at this time.
12:02:35  13              Your Honor, it's about noon.  May I suggest, if
12:02:37  14   it's okay with Your Honor, if we take our lunch at this point?
12:02:41  15              THE COURT:  Well, Mr. Klein, would you prefer to
12:02:43  16   begin your cross-examination now?
12:02:45  17              MR. KLEIN:  I'm fine with taking a lunch break.
12:02:48  18              THE COURT:  How long do you think your
12:02:50  19   cross-examination will be?
12:02:52  20              MR. KLEIN:  Roughly an hour, maybe less.
12:02:57  21              THE COURT:  If you had said 30 minutes, I would
12:02:58  22   say let's resume, let's continue, but, is there a particular
12:03:03  23   reason why, Mr. Kennedy, you suggest lunch now?
12:03:06  24              MR. M. KENNEDY:  Just that it's noon.
12:03:10  25              MR. KLEIN:  I could start --
```

12:03:11  1                  MR. M. KENNEDY:  I didn't eat breakfast today.

12:03:14  2                  THE COURT:  I think that's a good reason to take

12:03:16  3    a lunch break.  All right.  We'll take our lunch break.

12:03:20  4                  MR. M. KENNEDY:  Thank you very much, Your

          5    Honor.

          6                       (The noon recess was taken.)

          7                            --o0o--

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 12:37:29 | 4 |
| 12:37:34 | 5 |
| 12:37:36 | 6 |
| 12:37:40 | 7 |
| 12:37:42 | 8 |
| 12:37:47 | 9 |
| 12:37:49 | 10 |
| 12:37:52 | 11 |
| 12:37:38 | 12 |
| 12:37:38 | 13 |
| 12:37:57 | 14 |
| 12:38:00 | 15 |
| 12:38:05 | 16 |
| 12:38:09 | 17 |
| 12:38:15 | 18 |
| 12:38:20 | 19 |
| 12:38:23 | 20 |
| 12:38:26 | 21 |
| 12:38:29 | 22 |
| 12:38:30 | 23 |
| 12:38:34 | 24 |
| 12:38:40 | 25 |

1    RENO, NEVADA, TUESDAY, JANUARY 21, 2020, 12:37

2                        ---o0o---

3

4              THE COURT:  Please be seated.

5              Mr. Klein, are you ready to proceed?

6              MR. KLEIN:  I am.  Thank you, Your Honor.

7         Good afternoon, Dr. Peck.

8              THE WITNESS:  Good afternoon, Mr. Klein.

9              MR. KLEIN:  We obviously met at your deposition,

10   but, for the record, I'm Charles Klein.  I'll ask you a few

11   questions on behalf of the defendants.

12                        CROSS-EXAMINATION

13   BY MR. KLEIN:

14   Q    I want to start off by making sure you understand what is

15   and is not disputed in this case.  Do you understand that

16   there is no dispute that the scope of the Vascepa label

17   includes long-term use of the drug?

18   A    If you say so.

19   Q    Okay.  Do you understand -- and I'm asking these

20   questions based on some of the testimony you gave during your

21   direct, so I just want to make sure you understand what is

22   disputed and what is not.

23            Do you understand that there's no dispute that the

24   Vascepa label includes situations where Vascepa reduces

25   triglycerides below 500 and the patient needs to continue to

12:38:46   1    take Vascepa to maintain levels below 500?

12:38:50   2    A    Yes.

12:38:51   3    Q    And do you understand that Dr. Sheinberg agreed that the

12:38:54   4    label includes those types of situations?

12:38:57   5    A    Well, he seemed to argue it both ways, actually.

12:39:02   6    Q    Okay.  Well, you understand that there's no dispute that

12:39:06   7    some patients have genetic issues that cause triglycerides way

12:39:13   8    above 500 regardless of whether the patient is on an

12:39:17   9    appropriate diet and exercises, right?

12:39:19   10   A    Yes, I understand that.

12:39:21   11   Q    Okay.  And those patients have a chronic condition?

12:39:23   12   A    Yes.

12:39:24   13   Q    Okay.  And there's no dispute that the label includes

12:39:27   14   those types of patients.  Do you understand that?

12:39:29   15   A    Yes.

12:39:29   16   Q    And -- but there's a large number of patients who have

12:39:33   17   triglycerides above 500 due to lifestyle choices.  Do you

12:39:39   18   understand that?

12:39:39   19   A    I don't have any actual personal knowledge about that.

12:39:44   20   That's an epidemiological matter.  I haven't studied that.

12:39:47   21   Q    Okay.  But you heard testimony along those lines during

12:39:51   22   the trial?

12:39:51   23   A    I heard varied testimony on that issue, yes.

12:39:54   24   Q    Okay.  And you heard testimony that there are patients

12:39:58   25   who can take a short-term course of Vascepa to drop their

| | | |
|---|---|---|
| 12:40:04 | 1 | triglycerides below 500, but maintain levels below 500 with |
| 12:40:10 | 2 | diet and exercise alone, right? |
| 12:40:13 | 3 | A    I did hear that, yes. |
| 12:40:13 | 4 | Q    And the label includes those types of patients as well, |
| 12:40:17 | 5 | right? |
| 12:40:17 | 6 | A    There is a small fraction of patients in the placebo |
| 12:40:22 | 7 | group who achieved that on -- you know, without Vascepa. |
| 12:40:28 | 8 | Q    Okay.  And I'll get back to that. |
| 12:40:31 | 9 |         And you heard testimony that sometimes severe |
| 12:40:36 | 10 | hypertriglyceridemia has acute causes? |
| 12:40:38 | 11 | A    Yes. |
| 12:40:38 | 12 | Q    Okay.  And do you understand that a core issue in this |
| 12:40:44 | 13 | case is whether the Vascepa labelling requires elimination of |
| 12:40:47 | 14 | these acute causes before initiating Vascepa? |
| 12:40:50 | 15 | A    Yes. |
| 12:40:51 | 16 | Q    And do you understand that Amarin's position in this case |
| 12:40:55 | 17 | is that the indicated use of Vascepa is limited to chronic |
| 12:41:00 | 18 | use, that is, the patients who have a chronic condition |
| 12:41:03 | 19 | requiring long-term therapy? |
| 12:41:06 | 20 | A    I understand their position to be that the label |
| 12:41:10 | 21 | encourages the -- the use in this condition. |
| 12:41:16 | 22 | Q    Okay.  And so you don't understand that Amarin's position |
| 12:41:21 | 23 | is that the indicated use of Vascepa is limited to chronic |
| 12:41:24 | 24 | use?  Is that an understanding you have? |
| 12:41:26 | 25 | A    So, I wasn't here for the opening statement, and so |

12:41:30  1   you'll have to represent to me what you think Amarin's

12:41:33  2   position is.

12:41:33  3   Q   Okay.  No.  I mean, Amarin is perfectly able to represent

12:41:38  4   its own positions.  I just wanted to understand what your

12:41:43  5   understanding was.

12:41:45  6                MR. KLEIN:  Mr. Gross, can we go to DDX 1.15.

12:41:45  7   BY MR. KLEIN:

12:41:51  8   Q   Now, Dr. Peck, you just said you weren't here for opening

12:41:54  9   statements, right?

12:41:55  10  A   Repeat that, please?

12:41:56  11  Q   You were not here for opening statements?

12:41:58  12  A   No, I was not.

12:41:59  13  Q   Were you here for Dr. Budoff's testimony?

12:42:01  14  A   Yes, I was, yes.

12:42:02  15  Q   Okay.  And you were obviously here for Dr. Sheinberg's

12:42:05  16  testimony.

12:42:05  17  A   Yes, I was, yeah.

12:42:07  18  Q   So and you saw this slide before, DDX 1.15?

12:42:10  19  A   Yes, I did.

12:42:11  20  Q   Okay.  And this slide relates a Q and A from the

12:42:17  21  deposition where I asked you, "And is the indicated use of

12:42:20  22  Vascepa limited to chronic use," and you said, "No, I don't

12:42:23  23  think so."

12:42:24  24          That's what you've said at the deposition, right?

12:42:27  25  A   Right.  That's what I said.  And you asked about a

12:42:29  1   limitation.  There is no limitation with respect to chronic

12:42:35  2   use.

12:42:39  3   Q   Okay.  Just -- well, you understand -- you were here when

12:42:43  4   Dr. Sheinberg agreed with your deposition testimony, right?

12:42:45  5   A   Yes.

12:42:45  6   Q   And you're not changing your testimony today, right?

12:42:48  7   A   No.

12:42:51  8   Q   Okay.  So just to be clear, the MARINE indication in the

12:42:55  9   Vascepa label, and the indicated use of icosapent in

12:43:00  10  defendants' labels, is not limited to chronic use, correct?

12:43:03  11  A   Yes.

12:43:08  12              MR. KLEIN:  Mr. Gross, can we go to DDX 7.2.

12:43:08  13  BY MR. KLEIN:

12:43:19  14  Q   And, Dr. Peck, you've seen the new Vascepa label; is that

12:43:22  15  correct?

12:43:23  16  A   Repeat that, please?

12:43:25  17  Q   Have you seen the new Vascepa label?

12:43:27  18  A   Oh, yes.  Yes, of course.

12:43:29  19  Q   Okay.  I just want to ask you a few questions to clarify

12:43:33  20  what has changed between the two labels, okay, just so

12:43:37  21  everyone is on the same page.

12:43:39  22              Now, on the screen, DDX 7.2, is DX 1698, page 2.  Do

12:43:46  23  you recognize that as the 2017 Vascepa indication?

12:43:50  24  A   Yes.

12:43:52  25  Q   Okay.

12:43:52  1    A    Well, it's -- it's -- yes, that's the indication.

12:43:56  2    Q    Okay.  There are parts in the indication -- like there

12:43:59  3    were limitations of use.

12:44:00  4    A    Right.

12:44:00  5    Q    But that's not in this slide.

12:44:02  6    A    Right.

12:44:02  7    Q    Is that why you hesitated?

12:44:04  8    A    Yes, it is.

12:44:05  9    Q    Okay.  Then on the bottom is DX 2248, page 2, and do you

12:44:10  10   recognize that as the current MARINE indication for Vascepa?

12:44:16  11   A    Yes.

12:44:16  12   Q    All right.  Now, the old MARINE indication -- actually

12:44:23  13   the only old indication, had a usage considerations section,

12:44:28  14   right?

12:44:33  15   A    I think so, yes.

12:44:34  16   Q    Yeah.  And it said,

12:44:37  17             "Patients should be placed on an appropriate

12:44:39  18        lipid lowering diet and exercise regimen before

12:44:43  19        receiving Vascepa, and should continue this diet and

12:44:46  20        exercise regimen with Vascepa."

12:44:48  21             Do you see that on the screen?

12:44:49  22   A    Yes, I do.  Yes.

12:44:50  23   Q    Okay.  And you understand that that usage consideration

12:44:54  24   statement has been removed from the current Vascepa

12:44:58  25   indication.

12:45:00   1   A    Yes.

12:45:01   2   Q    Okay.  And so, as a result, you understand that

12:45:04   3   defendants' labeling, their current labels, do not include

12:45:08   4   this usage consideration statement from the 2017 Vascepa

12:45:14   5   label?

12:45:14   6   A    Yes.

12:45:15   7   Q    And -- but just to be clear, when you gave the testimony

12:45:23   8   that the indicated use is not limited to chronic use, that

12:45:31   9   testimony related to the 2017 indication that included this

12:45:35  10   usage consideration language, correct?

12:45:38  11   A    No, it applies to the 2019 as well.

12:45:41  12   Q    No, I understand.  When you gave the testimony that was

12:45:44  13   on the screen that the indicated use is not limited to chronic

12:45:52  14   use, at the time the indication you were referring to was the

12:45:55  15   2017 Vascepa indication that had this usage considerations

12:46:00  16   language, right?

12:46:01  17   A    Yes.

12:46:02  18   Q    Yeah.  Because the new Vascepa label just came out a few

12:46:07  19   weeks ago.

12:46:08  20   A    That's correct.

12:46:10  21             MR. KLEIN:  Right.

12:46:12  22             Let's go to DDX 7.3.  Okay.  Here, I am

12:46:22  23   comparing the two labels, the February 2017 Vascepa label to

12:46:27  24   the new Vascepa label, and, again, it's DX 1689 -- 1698 and

12:46:40  25   2248.

12:46:40  1   BY MR. KLEIN:

12:46:41  2   Q    And there's a sentence that appears in both labels that

12:46:45  3   says,

12:46:45  4           "Patients should engage in appropriate

12:46:48  5       nutritional intake and physical activity before

12:46:51  6       receiving Vascepa which should continue during

12:46:55  7       treatment with Vascepa."

12:46:57  8           Do you see that?

12:46:57  9   A    Yes, I do.

12:46:58  10  Q    Okay.  So that phrase has not changed in the old and new

12:47:01  11  label, right?

12:47:02  12  A    Uh-huh, yes.

12:47:03  13  Q    Okay.  So to be clear, FDA did not move the usage

12:47:11  14  considerations statement from the old indication into the

12:47:14  15  dosage and administration section, it just eliminated that

12:47:20  16  statement, correct?

12:47:20  17  A    That's correct.

12:47:26  18           MR. KLEIN:  Can we go to DDX 7.1, please.

12:47:26  19  BY MR. KLEIN:

12:47:30  20  Q    Okay.  I want to focus on the indication, and I think you

12:47:34  21  said this on direct, but the MARINE indication in the current

12:47:41  22  Vascepa label is materially identical to the indications in

12:47:45  23  Hikma's and DRL's respective proposed labels, correct?

12:47:51  24  A    Yes.

12:47:51  25  Q    Okay.  And, in general,

| | | |
|---|---|---|
| 12:47:52 | 1 | "The indications and usage section must list |
| 12:47:56 | 2 | important aspects of the approved indication such as |
| 12:47:58 | 3 | whether the drug is approved for selected patient |
| 12:48:02 | 4 | subgroups," correct? |
| 12:48:03 | 5 | A   Repeat that, please? |
| 12:48:07 | 6 | Q   Sure. |
| 12:48:08 | 7 | "The indications and usage section must list |
| 12:48:11 | 8 | important aspects of the approved indication such as |
| 12:48:15 | 9 | whether the drug is approved for selected patient |
| 12:48:18 | 10 | subgroups," correct? |
| 12:48:19 | 11 | A   And you're reading from what? |
| 12:48:21 | 12 | Q   I'm actually reading from your reply report, and I can |
| 12:48:25 | 13 | put it up if that's helpful. |
| 12:48:27 | 14 | A   So what was my reply a reply to? |
| 12:48:32 | 15 | Q   No, your expert report. |
| 12:48:34 | 16 | A   I understand that.  But you just expressed a phrase that |
| 12:48:40 | 17 | you ascribed to me in my report, and I would like to know what |
| 12:48:45 | 18 | section that was in so I can get the context. |
| 12:48:48 | 19 | MR. KLEIN:   Sure.  Can we put up DDX 7.4. |
| 12:48:48 | 20 | BY MR. KLEIN: |
| 12:48:55 | 21 | Q   All right.  This is paragraph 129 from your reply report, |
| 12:48:58 | 22 | and here you're describing the indications and usage section, |
| 12:49:02 | 23 | and I'll read it.  You say, |
| 12:49:03 | 24 | "To this end, the indications and usage |
| 12:49:06 | 25 | section concisely comprises the indication, and, as |

12:49:10    1       appropriate, any identified limitations of use.  This

12:49:14    2       section must identify the disease, condition, or

12:49:17    3       symptom for which the drug is approved, and list

12:49:20    4       other important aspects of the approved indication

12:49:23    5       such as whether the drug is approved for selected

12:49:26    6       patient subgroups."

12:49:28    7                So all -- this is general statement.  Is that an

12:49:31    8   accurate statement with regard to the indications and usage?

12:49:34    9   A    Yes.  Yes, I believe it is.

12:49:36   10   Q    And the only limitations in the MARINE indication refer

12:49:44   11   to age, referring to an adult patient, and medical condition,

12:49:48   12   referring to severe hypertriglyceridemia, correct?

12:49:51   13   A    Sir, I'm not sure what you mean by MARINE indication.  I

12:49:56   14   mean, the indication is in the label.  MARINE was a clinical

12:50:00   15   study that had end points and particular conditions.

12:50:02   16           But what do you mean by the MARINE indication?

12:50:05   17   Q    Okay.  So, Dr. Peck, we've been using this litigation

12:50:09   18   shorthand MARINE indication for the Vascepa -- now that there

12:50:12   19   are two Vascepa indications, we've been calling the original

12:50:16   20   Vascepa indication the MARINE indication.

12:50:19   21           I totally understand your comment which is that, you

12:50:22   22   know, the label doesn't even mention MARINE.  It's really

12:50:26   23   shorthand for this litigation, but I can rephrase.

12:50:30   24           The only limitation in the indication for severe

12:50:34   25   hypertriglyceridemia, the only limitations refer to age, the

12:50:41  1   patient has to be an adult, and medical condition, the patient

12:50:45  2   has to have severe hypertriglyceridemia, correct?

12:50:47  3   A    Yes, I can agree to that.  Yes.

12:50:50  4   Q    Okay.  And the FDA-approved indication -- I'm sorry, the

12:50:55  5   FDA-approved labeling for the severe hypertriglyceridemia

12:50:59  6   indication does not limit a patient population for whom

12:51:05  7   Vascepa is approved based on a prior diet, correct?

12:51:10  8   A    Based on what?

12:51:11  9   Q    A prior diet.

12:51:13  10  A    I'm not sure I understand your question.

12:51:23  11              MR. KLEIN:  Okay.  Can we go to DDX 7.6.

12:51:23  12  BY MR. KLEIN:

12:51:29  13  Q    So we're looking now at PX 183, which is your reply

12:51:33  14  expert report, paragraph 241.

12:51:36  15          And in this paragraph you said,

12:51:38  16          "The FDA-approved labeling does not limit the

12:51:42  17      patient population for whom Vascepa is approved based

12:51:45  18      on prior diet."

12:51:47  19              Do you see that?

12:51:47  20  A    I do.  Yeah.

12:51:49  21  Q    And that's a true fact?

12:51:49  22  A    So now I see the context, yes.

12:51:53  23  Q    Okay.  And if FDA intended to limit the indication for

12:52:01  24  severe hypertriglyceridemia to patients who previously tried a

12:52:06  25  diet, FDA would have so stated in the indications and usage

12:52:11  1   section, correct?

12:52:13  2   A    I think if FDA considered that to be a crucial condition

12:52:22  3   which deserved attention and encouragement in the indications

12:52:29  4   and usage section -- FDA uses its best judgment.  FDA

12:52:34  5   reviewers are -- many of them are physicians, they understand

12:52:39  6   clinical situations and the challenge of writing

12:52:43  7   prescriptions.  So I don't think I can entirely agree with

12:52:46  8   what you just said.

12:52:47  9   Q    Okay.  Let's go to DDX 7.7, which is this same paragraph,

12:52:53  10  paragraph 241, and I'm just highlighting a different sentence.

12:52:57  11          And here, in this same paragraph, you said,

12:53:00  12          "If FDA had intended to limit Vascepa's

12:53:04  13      approval to patients who previously consumed a

12:53:07  14      particular diet, it would have so stated in the

12:53:10  15      indications and usage section," and then you cited

12:53:13  16      FDA guidance.

12:53:14  17          Do you see that?

12:53:15  18  A    Yes.

12:53:15  19  Q    Okay.  So is that an accurate statement, that if FDA had

12:53:19  20  intended to limit Vascepa's approval to patients who

12:53:25  21  previously consumed a particular diet, it would have so stated

12:53:28  22  in the indications and usage section?

12:53:30  23  A    Well, there's -- see, what FDA additionally said is

12:53:34  24  additional or qualifiers that are critical.

12:53:37  25          So that's a judgment matter by FDA reviewers with

12:53:41  1    respect to the criticality of a particular additional

12:53:47  2    descriptor.

12:53:48  3    Q   Okay.  And we'll take a look at the guidance in a moment

12:53:51  4    but I want to focus on your words first.

12:53:52  5              You said in your expert report,

12:53:54  6                  "If FDA had intended to limit Vascepa's

12:53:57  7              approval to patients who previously consumed a

12:54:00  8              particular diet, it would have so stated in the

12:54:03  9              indications and usage section."

12:54:05  10                 Are you standing by that statement that you

12:54:08  11   wrote in your report?

12:54:10  12   A   Yes, as referenced in FDA's guidance.

12:54:14  13   Q   Okay.  Let's take a look at the guidance, DDX 7.8, and I

12:54:27  14   believe -- this is PX 573, and I believe this is now in

12:54:32  15   evidence, right?  I believe this is one of the documents you

12:54:35  16   used?

12:54:35  17   A   Yes, we discussed that earlier.

12:54:37  18   Q   Okay.  All right.  So in this snapshot, what I did is I

12:54:44  19   tried to take what was in your footnote, okay, and this is

12:54:48  20   under the heading Indication, you see that?

12:54:50  21   A   Yes.

12:54:50  22   Q   Then there's a sub-bullet 2, "Other Information Necessary

12:54:56  23   to Describe Approved Indication," right?

12:54:59  24   A   Yes.

12:54:59  25   Q   And then it says -- there's sub-bullet A, "Selected

—1370—

| | |
|---|---|
| 12:55:03 | 1 |
| 12:55:08 | 2 |
| 12:55:09 | 3 |
| 12:55:10 | 4 |
| 12:55:12 | 5 |
| 12:55:17 | 6 |
| 12:55:20 | 7 |
| 12:55:23 | 8 |
| 12:55:25 | 9 |
| 12:55:26 | 10 |
| 12:55:27 | 11 |
| 12:55:31 | 12 |
| 12:55:37 | 13 |
| 12:55:40 | 14 |
| 12:55:43 | 15 |
| 12:55:44 | 16 |
| 12:55:45 | 17 |
| 12:55:53 | 18 |
| 12:55:56 | 19 |
| 12:56:03 | 20 |
| 12:56:09 | 21 |
| 12:56:21 | 22 |
| 12:56:24 | 23 |
| 12:56:28 | 24 |
| 12:56:29 | 25 |

1  Patient Subgroups Or Disease Subpopulations For Whom the Drug

2  is Approved."  Do you see that?

3  A    Yes.

4  Q    Okay.  And then the guidelines say,

5           "In some cases additional descriptors or

6       qualifiers are critical to include as part of the

7       indication to clearly identify the patient population

8       for whom the drug is approved."

9           Do you see that?

10  A    Yes, I do.

11  Q    And so if there are select patient subgroups or disease

12  subpopulations, the indications should include additional

13  descriptions, descriptors or qualifiers that are critical to

14  clearly identify the patient population for whom the drug is

15  approved, right?

16  A    Yes, that's what it says.

17  Q    And just for the record, this is page 11, it's not on the

18  slide, of PX 573.

19           And those additional descriptors or qualifiers would

20  be required if, for example, as the guidance says, "The

21  indication" -- wait.  Where am I?

22           "The indication is limited to using a drug

23       for patients previously treated with other

24       therapies."

25           It's at the end of the highlight.  Do you see

12:56:31  1  that?

12:56:31  2   A   Yes, I do.

12:56:33  3                 MR. KLEIN:   Okay.   All right.

12:56:34  4                 THE COURT:   Mr. Klein, you indicated this was

12:56:36  5   from -- I can pull up the document, too.   You indicated this

12:56:40  6   is from page 11, but on top it says P08.   So is it on 11 or 8?

12:56:53  7                 MR. KLEIN:   It's page 8 of the guidance, but

12:56:56  8   it's page 11 in the PX page number.

12:57:01  9                 THE COURT:   Okay.   Thank you.

12:57:04  10                 MR. KLEIN:   And just to be clear, the indication

12:57:06  11   at the top is from an earlier page, but that's indicated by

12:57:10  12   the break.

12:57:10  13   BY MR. KLEIN:

12:57:13  14   Q   All right.   So just to circle back to where we were a

12:57:17  15   moment ago,

12:57:18  16               "The additional descriptors or qualifiers

12:57:21  17         would be required in the indication if, for example,

12:57:24  18         the indication is to be limited to using a drug for

12:57:28  19         patients who were previously treated with other

12:57:32  20         therapies," right?

12:57:32  21   A   Yes.

12:57:33  22   Q   Okay.   And,

12:57:34  23               "The absence of any limitation in defendants'

12:57:39  24         labels and the Vascepa label concerning a particular

12:57:43  25         diet in defendants" --

—1372—

| | | |
|---|---|---|
| 12:57:47 | 1 | Strike that.  Let me start again. |
| 12:57:48 | 2 | "The absence of any limitation concerning a |
| 12:57:52 | 3 | particular diet in defendants' indication conveys to |
| 12:57:54 | 4 | physicians that the approved patient population is |
| 12:57:57 | 5 | bounded by only two characteristics, age and disease |
| 12:58:01 | 6 | condition," correct? |
| 12:58:06 | 7 | A    Well, in the -- I mean -- |
| 12:58:11 | 8 | Q    In defendants' labels. |
| 12:58:13 | 9 | A    Pull up the label so we can examine it, just your |
| 12:58:18 | 10 | assertion. |
| 12:58:19 | 11 | MR. KLEIN:  Let's go back to DDX 7.1.  Okay. |
| 12:58:24 | 12 | I'll repeat the question. |
| 12:58:24 | 13 | BY MR. KLEIN: |
| 12:58:25 | 14 | Q    "The absence of any limitation concerning a |
| 12:58:28 | 15 | particular diet in defendants' indication conveys to |
| 12:58:32 | 16 | physicians that the approved patient population is |
| 12:58:36 | 17 | bounded by only two characteristics, age and disease |
| 12:58:39 | 18 | condition," correct? |
| 12:58:42 | 19 | A    Well, the phrase adjunct to diet is an indicator of what |
| 12:58:49 | 20 | FDA intends to encourage the prescriber to employ. |
| 12:58:56 | 21 | Q    Okay. |
| 12:58:57 | 22 | A    So I think you're sort of overlooking that. |
| 12:59:01 | 23 | Q    Let's go to DDX 7.9.  This is the same paragraph we've |
| 12:59:08 | 24 | been looking at from your expert report, paragraph 241 from |
| 12:59:13 | 25 | PX 183, and I'll read the last two sentences from this |

paragraph.

    "If FDA had intended to limit Vascepa's

approval to patients who previously consumed a

particular diet, it would have so stated in the

indications and usage section.  The absence of any

such limitation thus conveys to physicians that the

approved patient population is bounded by only two

characteristics, age and disease condition."

    Do you stand by those statements in your expert

report?

A Well, yeah.  I think that's a true statement.

Q Okay.  And defendants' proposed indication -- I'm

focusing on the indication for now, I'll get to other sections

in a bit.  But defendants' proposed indication does not

encourage doctors to use icosapent for any particular

duration, correct?

A Well, I think it encourages a physician to use it

indefinitely, as long as necessary.

Q But it doesn't -- there's no statement in the indication

with regard to duration of therapy in the indication, correct?

A Well, as you know, by regulation and by guidance, it

shouldn't be there if FDA considered this to be a chronic

condition --

Q Okay.  Defendants --

A -- that requires long-term therapy.  So its absence is

1374

01:00:43  1   deliberate.

01:00:44  2   Q    So,

01:00:53  3        "The concise indication in defendants' labels

01:00:56  4   does not include any limitation, and the usage does

01:01:00  5   not include any limitation with respect to duration

01:01:03  6   of therapy," correct?

01:01:04  7   A    Are you reading from a document?

01:01:07  8   Q    I'm reading from your deposition.

01:01:09  9   A    Okay.  What question was I answering in that deposition?

01:01:15  10  Q    Okay.  The question -- and I can play it if you would

01:01:18  11  like, but the question I asked during the deposition, this is

01:01:22  12  139 -- page 139, 21, to page 140, line 2,

01:01:27  13       "And so the Vascepa indication is silent as

01:01:30  14  to duration of treatment, correct?"

01:01:33  15       There was an objection to form, and you

01:01:35  16  answered, "The concise indication does not include

01:01:38  17  any limitation, and the usage does not include any

01:01:42  18  limitation with respect to duration of therapy.  "

01:01:45  19       Do you stand by that testimony?

01:01:46  20  A    Yes, I do.  Yes.

01:01:48  21  Q    Okay.  Now, let's go to DDX 7.1.  Again, these -- this is

01:01:59  22  the indication we've been talking about, right?

01:02:03  23  A    Yes.

01:02:04  24  Q    And as you pointed out a moment ago, you said the

01:02:07  25  indication is for use as an adjunct to diet, right?

1375

01:02:11   1    A    Yes.

01:02:11   2    Q    Okay.  And in your view,

01:02:13   3              "The term adjunct in this context means that

01:02:16   4         doctors should use their best efforts to convince

01:02:20   5         patients to engage in appropriate diet and exercise,"

01:02:23   6         correct?

01:02:24   7    A    I agree with that.  I assume you're quoting something

01:02:26   8    again.

01:02:27   9    Q    Yes.

01:02:27  10    A    Sounds like me.

01:02:29  11    Q    Okay.  But to be clear, defendants' indication doesn't

01:02:33  12    preclude icosapent from being used in a patient who is unable

01:02:37  13    or unwilling to engage in appropriate diet and exercise.

01:02:41  14              Do you agree with that?

01:02:42  15    A    I agree with that.

01:02:43  16    Q    And when defendants' indication says Vascepa is indicated

01:02:50  17    as an adjunct to diet, this recommends that Vascepa and diet

01:02:55  18    be used in tandem, right?

01:02:58  19    A    Optimally, yes.

01:02:59  20    Q    But the indication does not suggest that Vascepa should

01:03:02  21    be withheld until a patient has successfully effected a change

01:03:08  22    in diet, correct?

01:03:09  23    A    No, it does not say that specifically.  I think many

01:03:14  24    practitioners would actually employ that procedure.

01:03:20  25    Q    Let me -- let's go to DDX 7.10 to make sure you and I are

01:03:32   1    on the same page.

01:03:33   2              So here's another paragraph from your expert report,

01:03:37   3    PX 183, and in the first two sentences you said,

01:03:41   4              "The labeling allows physicians to exercise

01:03:44   5         their discretion as to both the timing and content of

01:03:48   6         any diet counseling.  To start, the labeling provides

01:03:52   7         physicians with discretion as to timing.  Vascepa is

01:03:56   8         indicated as an adjunct to diet which recommends that

01:04:00   9         Vascepa and diet be used in tandem, but does not

01:04:03   10        suggest that Vascepa should be withheld until a

01:04:06   11        patient has successfully effected a change in diet."

01:04:11   12             Do you stand by those two sentences in your

01:04:13   13   report?

01:04:13   14   A    Yes.  Yes, I do.

01:04:15   15   Q    All right.  Let's go DDX 7.11.  I now want to focus on

01:04:27   16   the dosage and administration section.

01:04:30   17             And just for the record, this is the dosage and

01:04:35   18   administration section from Hikma's label, DX 2256, but

01:04:40   19   understand that this section is materially identical in

01:04:44   20   Dr. Reddy's label as well?

01:04:48   21   A    Yes.

01:04:48   22   Q    Okay.  And like the indications and usage section, the

01:04:55   23   dosage and administration section does not specify any

01:04:59   24   duration of treatment, correct?

01:05:00   25   A    Well, there is no specific statement in there.  But as

1377

01:05:09   1   I -- as I developed in my direct, there is no reason to limit.

01:05:20   2   FDA intends there to be no limitation listed here.

01:05:24   3   Q    Okay.   Yeah.   And I'm not asking about the guidance or

01:05:28   4   the regulations.   It's just clear that when you look at the

01:05:33   5   dosage and administration section of defendants' labels, it

01:05:36   6   doesn't specify any specific duration of treatment, correct?

01:05:40   7   A    That's correct.

01:05:41   8   Q    And, in fact, neither the indication nor the dosage and

01:05:49   9   administration sections of defendants' labels in any way

01:05:53   10   limits the duration of treatment, correct?

01:05:57   11   A    No -- I mean, yes, that's correct.

01:06:00   12   Q    Okay.   All right.   The only statement as to timing in the

01:06:04   13   dosage and administration section is the second bullet under

01:06:09   14   2.1, which says,

01:06:10   15          "Patient should engage in appropriate

01:06:13   16      nutritional intake and physical activity before

01:06:16   17      receiving icosapent ethyl which should continue

01:06:21   18      during treatment with icosapent ethyl," correct?

01:06:23   19   A    Yes.

01:06:23   20   Q    And let's focus on the term should, where it says

01:06:27   21   "patient should engage."   The term "should" implies a

01:06:30   22   recommendation to the doctor, but it doesn't limit the doctor

01:06:34   23   to a particular action, correct?

01:06:36   24   A    Yes.

01:06:39   25   Q    And so when FDA uses the term "should" in the dosage and

01:06:44    1    administration section, this is simply a suggestion leaving

01:06:48    2    actions to the wide discretion of the physician, correct?

01:06:51    3    A    I think it's stronger than that.  I think it's

01:06:55    4    affirmative.  I think it's encouraging.

01:06:59    5    Q    All right.  Let me ask the question again to make sure

01:07:04    6    you understand the question.

01:07:05    7             When FDA uses the term "should" in a pharmaceutical

01:07:09    8    label, it is leaving certain actions to the wide discretion of

01:07:14    9    the physician; is that correct?

01:07:16   10    A    The physician always has the discretion with respect to

01:07:19   11    any element of the label to use it as he sees fit in the best

01:07:25   12    interest of the patient.

01:07:27   13             Nonetheless, the label encourages many good

01:07:31   14    practices, and so when I see the word "should" in an FDA

01:07:38   15    label, I think that's a pretty strong encouragement.

01:07:41   16                    MR. KLEIN:   Okay.  Mr. Gross, can you play

01:07:45   17    page 99 of the deposition, lines 2 through 9.

01:07:48   18                        (Deposition video recording played.)

01:08:41   19    BY MR. KLEIN:

01:08:42   20    Q    And so was it your testimony that when FDA uses the term

01:08:50   21    "should" in a pharmaceutical label, it is leaving certain

01:08:53   22    actions to the wide discretion of the physician?

01:08:56   23    A    I think that's consistent with what I just said.

01:09:01   24    Q    Okay.  And that's what you said in the deposition.

01:09:03   25    A    That's what I said.  And, you know, a physician would

01:09:05   1   understand reading this that that's an encouragement.

01:09:08   2   Q    Okay.  But you -- again, you're not disputing your

01:09:13   3   deposition testimony --

01:09:14   4   A    No, I'm not.

01:09:15   5   Q    Okay.  And the term appropriate -- so appropriate

01:09:20   6   nutritional intake, do you see that?

01:09:22   7   A    Yes, I do.

01:09:23   8   Q    Is actually a signal to the physician that it is up to

01:09:26   9   his or her discretion as to what is appropriate, correct?

01:09:30   10  A    Yes.  But, of course, physicians are trained in diets,

01:09:38   11  and given this condition, this would have a deeper meaning

01:09:44   12  "appropriate."

01:09:45   13  Q    Well, right.  But the label isn't telling doctors what

01:09:49   14  FDA thinks is appropriate.  The label is leaving the

01:09:53   15  nutritional intake and physical activity for a particular

01:09:57   16  patient up to the discretion of the doctor, correct?

01:10:00   17  A    I think so.  I would have to reread the label to be sure

01:10:03   18  that the clinical study section doesn't have some additional

01:10:08   19  information about the type of diet that the patients were,

01:10:11   20  were -- I think lipid-lowering, you know, is listed in the

01:10:18   21  clinical study section.

01:10:20   22          So reading the label as a whole, I think there's a

01:10:23   23  little bit more information about what means appropriate.

01:10:28   24  Q    Okay.  And to be clear, the statement,

01:10:40   25          "Patients should engage if appropriate

01:10:41  1       nutritional intake and physical activity before

01:10:45  2       receiving icosapent,"

01:10:48  3   does not state how long diet and exercise should precede the

01:10:53  4   prescription, correct?

01:10:55  5   A    No, it doesn't.   It leaves that up to the physician's

01:10:59  6   education and experience and knowledge.

01:11:02  7   Q    Exactly.   So this statement that,

01:11:06  8            "Patients should engage in appropriate

01:11:09  9       nutritional intake and physical activity before

01:11:11 10       receiving icosapent ethyl,"

01:11:12 11   is not a requirement, it leaves the doctor with wide

01:11:16 12   discretion as to timing.   Do you agree with that?

01:11:20 13   A    Well, yes.   And, as I said before, the physician always

01:11:24 14   has the discretion to use the drug in any way that he thinks

01:11:29 15   is in the best interest of the patient.

01:11:32 16   Q    Right.   And the point of this second bullet in

01:11:35 17   section 2.1 is really to emphasize that Vascepa is not

01:11:39 18   supposed to replace an appropriate diet and exercise regimen,

01:11:43 19   correct?

01:11:44 20   A    I think that's overreach.

01:11:46 21   Q    You think that's an overreach?

01:11:49 22   A    Overreach, yeah, I wouldn't interpret it that way.

01:11:52 23   Q    Okay.   Well, the dosage and administration section does

01:11:55 24   not prevent physicians from, consistent with established

01:11:59 25   clinical practice, discussing diet changes and prescribing

01:12:03   1   Vascepa in the same visit.  Do you agree with that?

01:12:06   2   A    I agree with that.

01:12:10   3   Q    Let's go DDX 7.14.

01:12:16   4            Okay.  I'll explain this demonstrative so it's in

01:12:21   5   the record.  We're looking at Hikma's proposed label,

01:12:25   6   section 2, and in particular section 2.1, and in the second

01:12:29   7   bullet I added a phrase, "and fail to maintain TGs below

01:12:35   8   500 milligrams per deciliter" after the phrase "patients

01:12:41   9   should engage in appropriate nutritional intake and physical

01:12:46  10   activity."

01:12:46  11            Do you see that?

01:12:47  12   A    I do.

01:12:48  13   Q    Okay.  To be clear, the dosage and administration section

01:12:52  14   of defendants' labels does not require doctors to wait and see

01:12:56  15   if patients fail to maintain triglycerides below

01:13:01  16   500 milligrams per deciliter with diet and exercise before

01:13:04  17   prescribing icosapent.  Do you agree with that?

01:13:08  18   A    I agree with that.

01:13:09  19   Q    And if FDA had determined that safety or efficacy

01:13:15  20   concerns required pretreatment diet changes or stabilization

01:13:18  21   prior to icosapent administration for a particular period of

01:13:22  22   time, it would have so stated in the labeling, correct?

01:13:27  23   A    Well, it didn't.  Are you telling me that Hikma's label

01:13:32  24   is going to modify the indication?

01:13:34  25   Q    No, I'm not saying that.  I'm just asking you -- well,

01:13:42   1   let's just leave the testimony as it is.  But I will represent

01:13:45   2   to you that this is not a proposed modification of the label.

01:13:48   3   A    Okay.  That would certainly take it out of the generic

01:13:53   4   drug domain and put it into the 505(b)(2) or another

01:13:58   5   regulatory pathway.

01:13:59   6   Q    Right.  Let me ask the last question again because I

01:14:02   7   think we got distracted.

01:14:03   8        If FDA had determined that safety or efficacy

01:14:08   9   concerns required pretreatment diet changes or stabilization

01:14:12   10   prior to icosapent administration for a particular period of

01:14:15   11   time, it would have so stated in the labeling, correct?

01:14:19   12   A    If the clinical trials had been structured in such a way

01:14:26   13   as to demonstrate that failure, or not failure, reached a

01:14:33   14   statistical difference, then FDA may -- would have been moved,

01:14:39   15   I assume, to engage with the sponsor with respect to a

01:14:43   16   modification of the label in this respect.

01:14:46   17        But I'm not sure why this -- what this hypothetical

01:14:49   18   has to do with our topic.

01:14:52   19   Q    Okay.  Well, let's go to DDX 7.15, and this is paragraph

01:14:59   20   249 from your expert report which is PX 183, and I'll just

01:15:04   21   read the first two sentences.

01:15:07   22        "Indeed, the labeling does not suggest in any

01:15:09   23        section that the drug should not be used, e.g., for

01:15:12   24        safety reasons, unless a patient has been placed

01:15:16   25        successfully on a diet for a specific amount of time.

01:15:20  1      If FDA had determined that safety or efficacy

01:15:23  2      concerns required pretreatment diet changes or

01:15:28  3      stabilization prior for a particular period of time,

01:15:32  4      it would have so stated in the labeling."

01:15:35  5          Do you stand by those two sentences from your

01:15:37  6  expert report?

01:15:38  7  A   Yeah.  Yes, I do.  And I think the conditions under which

01:15:41  8  it would have occurred would be the ones that I described.

01:15:45  9          Of course, that's a hypothetical.  It didn't -- this

01:15:49  10  isn't the case.  We're not talking about the approved Vascepa

01:15:53  11  label, we're talking about hypotheticals.

01:15:56  12  Q   So you're -- are you saying that paragraph 249 is a

01:16:10  13  hypothetical and not pertaining to the Vascepa label?

01:16:13  14  A   Well, the first two sentences are sort of a general

01:16:16  15  hypothetical, yes.

01:16:19  16  Q   Do you have the report in front of you?

01:16:29  17  A   I don't think I do.

01:16:30  18  Q   Why don't we pull it up.  Let's go to PX 183, paragraph

01:16:39  19  248, the paragraph before this one.

01:16:43  20          Okay.  And do you see here -- and actually I think

01:17:00  21  we read this earlier -- but you're referring specifically to

01:17:05  22  the Vascepa label.  Do you see that in paragraph 248?

01:17:08  23  A   Yes.

01:17:09  24  Q   Okay.  And then, if we go to the top of the next page so

01:17:18  25  we can see how the paragraph continues.

01:17:23   1          Okay.  All right.  So here -- can you put the whole

01:17:29   2   paragraph in one slide?

01:17:33   3          Okay.  So in paragraph 248, and I won't read the

01:17:57   4   whole thing because we talked about some of this already --

01:18:00   5   you talked about how the Vascepa indication does not suggest

01:18:07   6   that Vascepa should be withheld until a patient has

01:18:10   7   successfully effected a change of diet.  Do you see that?

01:18:14   8   A    Yes.

01:18:14   9   Q    Okay, and then you said,

01:18:16  10          "The only indication of timing is that the

01:18:19  11          usage considerations heading in the indications and

01:18:23  12          usage section and the dosage and administration

01:18:27  13          section recommend that a patient should be placed on

01:18:30  14          a diet before receiving Vascepa."

01:18:33  15          We talked about earlier, right?

01:18:35  16   A    Yes.

01:18:36  17   Q    Okay.  But that's obviously referring to the specific

01:18:39  18   language in the Vascepa label, right?

01:18:43  19   A    Yes, yes.

01:18:43  20   Q    Then you say,

01:18:45  21          "But this is not a requirement.  The use of

01:18:48  22          should leaves discretion, and it does not state how

01:18:51  23          long diet should precede prescription.  As a result,

01:18:55  24          the labeling does not prevent physicians from,

01:18:57  25          consistent with established clinical practice,

| | | |
|---|---|---|
| 01:19:00 | 1 | discussing diet changes and prescribing Vascepa in |
| 01:19:04 | 2 | the same visit." |
| 01:19:07 | 3 | That's what you said in your report, right? |
| 01:19:08 | 4 | A Yes. |
| 01:19:09 | 5 | Q And then we go to paragraph 249, which is what we were |
| 01:19:13 | 6 | looking at before, and you start off by saying, "Indeed," |
| 01:19:18 | 7 | you're referring to the labeling still, correct? |
| 01:19:21 | 8 | A Yeah. |
| 01:19:22 | 9 | Q The Vascepa labeling, that is, right? |
| 01:19:24 | 10 | A Well, I think the first -- I think the first and second |
| 01:19:34 | 11 | sentence really are a more general statement. |
| 01:19:37 | 12 | Q Well, let's take a look at it. |
| 01:19:39 | 13 | You say, "Indeed, the labeling," after you were just |
| 01:19:43 | 14 | talking about the Vascepa label, "does not suggest in any |
| 01:19:47 | 15 | section," you're talking about any section of the Vascepa |
| 01:19:50 | 16 | label, right? |
| 01:19:51 | 17 | A I think so, yes. |
| 01:19:52 | 18 | Q Yeah. |
| 01:19:52 | 19 | "That the drug should not be used, e.g., for |
| 01:19:55 | 20 | safety reasons unless a patient has been placed |
| 01:19:59 | 21 | successfully on a diet for a specific amount of |
| 01:20:02 | 22 | time," right? |
| 01:20:03 | 23 | A Yes. |
| 01:20:03 | 24 | Q Okay.  And then you said, |
| 01:20:05 | 25 | "If FDA had determined that safety or |

1386

| | | |
|---|---|---|
| 01:20:07 | 1 | efficacy concerns required pretreatment diet changes |
| 01:20:11 | 2 | or stabilization prior for a particular period of |
| 01:20:15 | 3 | time, it would have so stated in the labeling," |
| 01:20:18 | 4 | right? |
| 01:20:18 | 5 | You said that too -- |
| 01:20:18 | 6 | A   Yes. |
| 01:20:18 | 7 | Q   -- in your report? |
| 01:20:22 | 8 | A   Yes, I did. |
| 01:20:22 | 9 | Q   And then you went on to give an example.  Right?  You |
| 01:20:22 | 10 | say, |
| 01:20:25 | 11 | "For example, the dosage and administration |
| 01:20:27 | 12 | section of the labeling for Alimta instructs that |
| 01:20:31 | 13 | physicians must initiate folic acid pretreatment for |
| 01:20:35 | 14 | a full seven days before the first dose of Alimta to |
| 01:20:40 | 15 | avoid increased risk of myelosuppression, i.e., bone |
| 01:20:45 | 16 | marrow suppression," correct. |
| 01:20:47 | 17 | A   Yes. |
| 01:20:47 | 18 | Q   Okay.  And you stand by those sentences from your report? |
| 01:20:50 | 19 | A   Well, I do, but what I'm trying to contrast was the -- |
| 01:20:58 | 20 | was the motivation for establishing such a limitation is |
| 01:21:04 | 21 | highly dependent upon the condition being treated and the |
| 01:21:08 | 22 | drug. |
| 01:21:08 | 23 | In the case of my example, we have a |
| 01:21:11 | 24 | life-threatening condition that requires a -- generally a |
| 01:21:21 | 25 | chemotherapeutic agent, and in order to safely give that, the |

01:21:26   1    folic acid is necessary as pretreatment.

01:21:29   2             So as I stated earlier if for safety reason or for

01:21:35   3    efficacy reasons it's required to be there, it should be

01:21:38   4    there.

01:21:39   5    Q   Right.  If there's -- if there's a reason to narrow the

01:21:42   6    patient population until after some initial treatment by a

01:21:49   7    different treatment, the label would say that, correct?

01:21:52   8    A   Yes.

01:21:52   9    Q   That's the point you're making.

01:21:54   10   A   Again, there's -- it's a judgment that FDA makes.  And in

01:22:03   11   the Alimta, I guess is the way you pronounce that, is an

01:22:08   12   extreme case, but it's a common one in which that kind of

01:22:11   13   limitation or advisory would be included in the label.

01:22:14   14   Q   Right.  It's common -- if FDA wants to limit a patient

01:22:18   15   population, it will explain how to limit the patient

01:22:21   16   population, such as, for example, treating the patient with a

01:22:26   17   different agent for a particular period of time before taking

01:22:29   18   the drug at issue, correct?

01:22:30   19   A   Yes.  Well said.

01:22:32   20   Q   Okay.  And let's take look at DDX 7.16 just to close this

01:22:41   21   out.

01:22:42   22             This is -- do you recognize PX 763 as the Alimta

01:22:51   23   label you were just referring to?

01:22:52   24   A   Yes.

01:22:53   25             MR. KLEIN:  All right.  I'll move into evidence

01:22:55  1    PX 763.

01:22:59  2              MR. M. KENNEDY:  No objection, Your Honor.

01:23:00  3              THE COURT:  763 is admitted.

01:23:00  4                  (Plaintiffs' Exhibit 763 received in
01:23:02                       evidence.)
01:23:02  5    BY MR. KLEIN:

01:23:03  6    Q    And this -- the highlighted bullet is what you were

01:23:05  7    referring to earlier in your testimony, in the dosage and

01:23:08  8    administration section of Alimta, the label says initiate

01:23:13  9    folic acid beginning seven days prior to the first dose of the

01:23:17  10   drug, right?

01:23:18  11   A    Yes.

01:23:18  12   Q    Okay.  And the Alimta label supports your opinion that if

01:23:24  13   FDA had determined safety or efficacy concerns, require

01:23:30  14   pretreatment diet changes, or stabilization prior to icosapent

01:23:35  15   use for a particular period of time, FDA would have so stated

01:23:39  16   in labeling, correct?

01:23:41  17   A    Yes, if it's truly a critical matter.

01:23:44  18   Q    Okay.  Now, other sections of the labeling, we talked

01:23:50  19   about the -- well, let's back up.

01:23:53  20              Just to wrap this up, the indications and usage

01:23:56  21   section and the dosage and administration section, neither

01:24:01  22   section specifies any specific treatment duration, correct?

01:24:05  23   A    There is not a specific statement with respect -- to that

01:24:11  24   effect.

01:24:11  25   Q    And other sections of the labeling cannot imply or

1389

01:24:15   1    suggest alternative dosing regimens not stated in the dosage

01:24:19   2    and administration section, correct?

01:24:23   3    A    That's correct.

01:24:24   4    Q    Now, on direct, you testified that doctors read the

01:24:34   5    labeling as a whole, right?

01:24:35   6    A    That's true.

01:24:36   7    Q    And reading defendants' labels as a whole allows

01:24:41   8    physicians to exercise their discretion as to both the timing

01:24:45   9    and content of any diet counseling.

01:24:47   10             Do you agree with that?

01:24:48   11   A    I agree with that.

01:24:49   12   Q    And there's no minimum or maximum therapy duration

01:24:53   13   anywhere in defendants' labels, correct?

01:24:55   14   A    That's correct.

01:24:56   15   Q    And so your opinion is simply that defendants' labels

01:25:01   16   implicitly instruct doctors that icosapent can be used

01:25:06   17   long-term, right?

01:25:08   18   A    I'm not sure I'd say the label is instructing, you know

01:25:13   19   as sort of such a strong -- but it certainly encourages that,

01:25:17   20   yes.

01:25:17   21   Q    Okay.  So let me rephrase the question.

01:25:19   22             Your opinion is that defendants' labels are

01:25:22   23   implicitly encouraging doctors and informing them that

01:25:29   24   icosapent can be used long-term, correct?

01:25:32   25   A    Yes.

01:25:32  1   Q    But to be clear, there's no statement anywhere in

01:25:35  2  defendants' labels requiring doctors to use icosapent for at

01:25:40  3  least 12 weeks, correct?

01:25:43  4   A    The word requirement is not included in the label.

01:25:47  5   Q    Okay.  And there's no explicit statement anywhere in the

01:25:51  6  label teaching doctors that they should use Vascepa long-term.

01:25:56  7  You're just saying that is implied, correct?

01:25:58  8   A    Well, it's implied, and the audience would know that, you

01:26:03  9  know, the prescriber would know that in advance of reading the

01:26:08 10  label.

01:26:09 11   Q    Okay.  But just to be clear, your opinion is that it's

01:26:18 12  implied by the various sections of the label that doctors can

01:26:25 13  use Vascepa long-term, correct?

01:26:29 14   A    Yes.  I mean, implied -- I'm not sure that's the right

01:26:33 15  word, but according to the FDA's rules for labeling, if the

01:26:38 16  drug -- if there is no safety or efficacy reason for limiting

01:26:41 17  the duration, it should not be included in the label, and

01:26:44 18  that's meant to encourage the physician to use it as long as

01:26:48 19  they feel it's important for the patient.

01:26:50 20   Q    Exactly.  We'll get back to that testimony, but before we

01:26:54 21  do, just to be clear, defendants' labels never say that

01:26:58 22  icosapent is safe and effective only if administered for at

01:27:02 23  least 12 weeks, correct?

01:27:04 24   A    I would agree with that.

01:27:06 25   Q    Okay.  And defendants' labels never mention a genetic

01:27:11  1   component associated with severe hypertriglyceridemia,

01:27:15  2   correct?

01:27:15  3    A    I don't think so.

01:27:18  4    Q    Let me rephrase the question because -- you're agreeing

01:27:21  5   with me, right?

01:27:22  6    A    I'm agreeing with you, yes.

01:27:24  7    Q    Okay.  All right.

01:27:25  8           Instead, defendants' labels leave it entirely up to

01:27:29  9   doctors' discretion to decide how long to use icosapent,

01:27:34  10  correct?

01:27:35  11   A    The label encourages at least 12 weeks, I believe, but

01:27:43  12  the physician can make his or her own decision.

01:27:48  13   Q    You agree that the Vascepa label leaves it up to the

01:27:52  14  discretion of the doctor to determine the duration of

01:27:55  15  treatment, correct?

01:27:56  16   A    I think I just explained what my view is.

01:27:59  17             MR. KLEIN:  Okay.  Let's play page 141, 25, to

01:28:05  18  142, line 3, please.

01:28:08  19                 (Deposition video recording played.)

01:28:19  20  BY MR. KLEIN:

01:28:19  21   Q    And just so the record is clear, you testified at

01:28:22  22  deposition that you agreed that the Vascepa label leaves it up

01:28:25  23  to the discretion of the doctor to determine the duration of

01:28:29  24  treatment, correct?

01:28:29  25   A    So maybe we should look at the record again and see what

01:28:33     1    preceded that and what followed that because --

01:28:35     2    Q    Doctor, all I asked you --

01:28:36     3    A    -- it's possible that I qualified that just as I've been

01:28:40     4    qualifying it to you.

01:28:41     5    Q    Okay.  And, if so, your counsel can redirect.  But all I

01:28:43     6    asked you is did you give that testimony at the deposition.

01:28:47     7    A    Well, we heard the same thing I think.  My hearing aids

01:28:49     8    may not be perfect, but it comes in louder than I want.

01:28:53     9    Q    So that was your testimony, correct?

01:28:55    10    A    Yes.

01:28:57    11    Q    And the Vascepa labeling encourages physicians to

01:29:01    12    exercise their wide clinical discretion regarding not only the

01:29:05    13    content, but also the timing of any dietary recommendations,

01:29:10    14    correct?

01:29:10    15    A    Yes.  But it just doesn't leave it.  It -- you know,

01:29:17    16    there's -- you have to take the label as a whole and interpret

01:29:22    17    it that way.

01:29:23    18    Q    I'm sorry, I didn't catch --

01:29:25    19    A    I said a physician should make decisions on the basis of

01:29:31    20    the label as a whole.  So you continue to cite sort of single

01:29:36    21    sentences, and I think there's qualifications that relate to

01:29:39    22    many of these.

01:29:41    23    Q    All right.  Let's go to DDX 7.21, and this is paragraph

01:29:53    24    69 of your report PX 183, it's page 27.

01:30:00    25             And in this paragraph, you're responding to

| | | |
|---|---|---|
| 01:30:04 | 1 | Mr. Mathers in the middle of it, and you say, |
| 01:30:07 | 2 | "The Vascepa labeling encourages physicians |
| 01:30:10 | 3 | to exercise their wide clinical discretion regarding |
| 01:30:14 | 4 | the timing and content of any dietary |
| 01:30:18 | 5 | recommendations." |
| 01:30:19 | 6 | Do you see that in your report? |
| 01:30:20 | 7 | A    Yes, I do. |
| 01:30:21 | 8 | Q    Okay.  When you say the Vascepa labeling, you were not |
| 01:30:24 | 9 | limiting it to any specific portion of the Vascepa label, |
| 01:30:28 | 10 | correct? |
| 01:30:28 | 11 | A    Well, I mean, we were actually talking about a particular |
| 01:30:31 | 12 | kind of diet at the time, the questioned diet, and then the |
| 01:30:36 | 13 | words that follow, I think I qualify what I think the label is |
| 01:30:42 | 14 | trying to convey, and, that is, it encourages administration |
| 01:30:46 | 15 | of the drug when a patient who remained on or reverted to a |
| 01:30:51 | 16 | diet during treatment. |
| 01:30:52 | 17 | Q    Okay.  But when you said, |
| 01:30:53 | 18 | "The Vascepa labeling encourages physicians |
| 01:30:57 | 19 | to exercise their wide clinical discretion regarding |
| 01:31:00 | 20 | the timing and content of any dietary |
| 01:31:04 | 21 | recommendations," |
| 01:31:04 | 22 | you were referring to the Vascepa labeling as a whole, |
| 01:31:07 | 23 | correct? |
| 01:31:07 | 24 | A    Yes. |
| 01:31:08 | 25 | Q    Okay.  And so whether a physician prescribes Vascepa for |

01:31:13    1    12 weeks, 24 weeks, or even just three weeks, any of those

01:31:17    2    uses would fall within the scope of FDA's approval.  You agree

01:31:21    3    with that, right?

01:31:22    4     A    Do you know the approval was actually based upon a

01:31:29    5    12-week clinical trial which demonstrated that patients with

01:31:34    6    hypertriglyceridemia had a 33 percent or greater decrease.

01:31:42    7              The 12-week trial was no accident.  FDA felt that

01:31:48    8    12 weeks -- or agreed with the sponsor that 12 weeks was

01:31:53    9    sufficiently long to ascertain the benefit of the drug.

01:31:57   10              So, you know, despite the interpretation of the

01:32:07   11    label that it is permissive, nonetheless, when a physician

01:32:17   12    reads a label, the physician has to make a decision in writing

01:32:22   13    a prescription how long to treat.

01:32:23   14              What other guidance would the physician have if they

01:32:23   15    didn't go to the clinical study section and look and see what

01:32:32   16    the clinical trial showed.

01:32:32   17     Q    Okay.  Let's go --

01:32:33   18     A    So I think there's encouragement to treat for at least 12

01:32:37   19    weeks.

01:32:37   20     Q    Okay.  And you used the worth permissive in your answer.

01:32:40   21    What did you mean by that?

01:32:42   22     A    I think we've discussed this before.  The physician reads

01:32:45   23    the label and draws from the label what's relevant to the

01:32:48   24    physician.

01:32:49   25              The FDA guides the label to encourage best

01:32:53  1  practices.  So since FDA does not regulate the practice of

01:33:01  2  medicine, doesn't regulate doctors, the label is a -- is a

01:33:09  3  reference that encourages good practice.  But if you want to

01:33:14  4  say it's permissive, that's fine with me.

01:33:18  5  Q   And let's go to DDX 7.22.  This is paragraph 191 from

01:33:27  6  your expert report, which is PX 183, pages 82 and 83.

01:33:35  7          And if you go to the third sentence which I

01:33:41  8  highlighted, you said,

01:33:42  9          "Vascepa is approved for an indication and

01:33:45  10         dosing regimen that is not limited in duration.

01:33:50  11         Thus, whether a physician prescribes Vascepa for 12

01:33:53  12         weeks, 24 weeks, or even just three weeks, any such

01:33:57  13         use would be within the scope of FDA's approval, in

01:34:01  14         other words, because FDA approved Vascepa without

01:34:04  15         specifying any minimum or maximum duration of use,

01:34:08  16         use for any period of time is consistent with the

01:34:11  17         labeling."

01:34:11  18          That's an accurate statement, correct?

01:34:13  19  A   Yes, and I agree with that statement.

01:34:22  20  Q   And so defendants' indication covers or includes

01:34:25  21  short-term use of Vascepa, correct?

01:34:28  22  A   Well, there's no information in the drug label that would

01:34:34  23  encourage that.

01:34:35  24  Q   Well, that's not my question.  The scope of the FDA

01:34:40  25  approval includes short-term use of Vascepa, correct?



01:34:43    1    A    I think FDA's approval was based upon the 12-week -- the

01:34:48    2    demonstration of the safety and effectiveness in that 12-week

01:34:52    3    clinical trial.

01:34:52    4    Q    Okay.  Let --

01:34:53    5    A    The label does not provide any additional information

01:34:57    6    with respect to shorter or longer periods of time, but it's

01:35:04    7    certainly not restrictive with respect to treating beyond

01:35:08    8    12 weeks.

01:35:08    9    Q    Okay.  It's not restrictive with regard to treating for

01:35:12   10    less than 12 weeks either, correct?

01:35:14   11    A    No.  It would not -- well, there's nothing in the label

01:35:17   12    that would -- that would encourage that.

01:35:19   13    Q    Okay.  But you agree that FDA put no limitation on the

01:35:23   14    duration of use, correct?

01:35:26   15    A    You know, there's no limitations of use in the

01:35:33   16    indications and usage section or elsewhere that would do that.

01:35:37   17    Yes, I agree with that.

01:35:38   18    Q    Okay.  And the label expresses no preference for any

01:35:42   19    particular treatment duration, correct?

01:35:44   20    A    Well, it -- you know, it -- it may be in the eyes of the

01:35:49   21    beholder.  But, as I said, the fact that the drug was used for

01:35:55   22    12 weeks in a clinical trial and demonstrated effectiveness,

01:35:59   23    and that was FDA's basis for approval, and a physician reading

01:36:03   24    that would know that treating for at least 12 weeks would --

01:36:06   25    would accomplish the intent of treating hypertriglyceridemia.

01:36:12  1    Q    All right.  Just to be clear, the labeling is telling

01:36:16  2    doctors that they can use the drug for 12 weeks or longer if

01:36:20  3    they want, but it's not saying that they should.  The label is

01:36:23  4    leaving it up to the discretion of the doctor as to the

01:36:26  5    duration for a particular patient, correct?

01:36:29  6    A    I agree with that.

01:36:31  7    Q    And so a doctor could prescribe icosapent for only ten

01:36:40  8    weeks, stop the treatment, have the patient maintain levels

01:36:44  9    below 500 with diet and exercise alone, and that would fall

01:36:49  10   within the scope of the FDA's approval correct?

01:36:54  11   A    Well, FDA did not observe of that set of the data so it

01:36:59  12   didn't approve it on that basis.

01:37:01  13   Q    Well, I didn't ask whether they approved it on that

01:37:04  14   basis, but that type of scenario where a doctor tells a

01:37:08  15   patient take Vascepa for ten weeks, improve your lifestyle

01:37:11  16   changes, and if you're below 500 in ten weeks, you can stop

01:37:15  17   the medication, but you need to keep the diet and exercise to

01:37:19  18   stay below 500, that type of activity by a doctor would be

01:37:25  19   consistent with the Vascepa labeling, correct?

01:37:27  20   A    Well, in the practice of medicine that would be a

01:37:30  21   permitted practice.

01:37:31  22   Q    But it would be consistent with the Vascepa labeling as

01:37:34  23   well, correct?

01:37:35  24   A    I don't think the Vascepa labelling is sufficiently

01:37:40  25   informative to endorse that.

01:37:42    1    Q    But it would be within the scope of what FDA-approved.

01:37:45    2    That would not be an off-label use, to use your terminology

01:37:50    3    from direct, correct?

01:37:51    4    A    Sir, I never used the term off-label use.  I used the

01:37:55    5    word off-label advertising.

01:37:58    6    Q    Okay.  All right.

01:37:59    7         If a doctor gave a patient Vascepa for ten weeks,

01:38:03    8    told them -- after ten weeks lipids are below 500, the doctor

01:38:08    9    said you can stop taking four pills a day, but you need to

01:38:12   10    keep dieting and exercising to maintain levels below 500, that

01:38:16   11    type of instruction from the doctor to the patient would be

01:38:19   12    consistent with the scope of FDA's approval for Vascepa,

01:38:24   13    correct?

01:38:24   14    A    You know, when you say scope of FDA's approval, as a

01:38:29   15    regulatory expert, FDA approves a drug on the basis of the

01:38:33   16    evidence presented in the clinical trial that it accepts.

01:38:37   17         So the particular scenario you just described is not

01:38:42   18    an endpoint in that trial.  It's not, you know, to my reading

01:38:47   19    of the clinical study group section of the FDA review, an

01:38:53   20    endpoint that FDA focused on.

01:38:56   21         So if you want to say that the physician has the

01:39:00   22    discretion to do that, despite encouragement in the label that

01:39:05   23    12 weeks would be a good time to evaluate the outcome of

01:39:08   24    therapy, I can accept that.

01:39:10   25    Q    Okay.  In fact, I can name a thousand different

01:39:13   1   durations, and they would all be decisions that the physician

01:39:17   2   could make for whatever reason that would not be inconsistent

01:39:20   3   with the label, correct?

01:39:22   4    A    Well, those are decisions that the physician could make,

01:39:27   5   yes.

01:39:27   6    Q    Okay.

01:39:28   7    A    Consistency with the label seems to me that's a pretty

01:39:33   8   strong sort of linkage that you're trying to establish there,

01:39:36   9   and so absent information about anything outside of 12 weeks

01:39:41  10   or longer, it's -- it's an arguable point.

01:39:48  11                MR. KLEIN:  All right.  Okay.  Mr. Gross, can

01:39:49  12   you play page 143, lines 13 to 22, please.

01:39:54  13                     (Deposition video recording played.)

01:40:23  14   BY MR. KLEIN:

01:40:30  15    Q    Doctor, did you give that testimony?

01:40:31  16    A    I did.

01:40:34  17                MR. KLEIN:  Okay.  Your Honor, can I pause for

01:40:36  18   one second to raise a housekeeping issue.  I've noticed that

01:40:40  19   in the transcript when we play the videos there's no

01:40:43  20   transcription of the actual Q and A from the transcript and

01:40:47  21   I've seen this before.  What we typically do is attach the

01:40:51  22   relevant portions of the transcript to -- the deposition

01:40:54  23   transcript to the trial transcript, and if that's acceptable,

01:40:59  24   I won't read the question and answer again to make sure it's

01:41:02  25   in the record.

01:41:06   1            THE COURT:  So where the transcript is played,

01:41:09   2    the court reporter will not transcribe what's being played.

01:41:13   3            MR. KLEIN:  Right.

01:41:15   4            THE COURT:  So I'm trying to understand your

01:41:17   5    issue.  Some parts of the deposition video that's been played

01:41:20   6    I can see the transcription written out.  But that

01:41:24   7    transcription is not part of the record either.

01:41:25   8            MR. KLEIN:  Right.  But it's a prior statement

01:41:27   9    under oath so it comes into evidence, and if it's not in the

01:41:32  10    trial transcript, then the deposition testimony isn't in the

01:41:37  11    record.

01:41:38  12            And so what I've done in the past is we've

01:41:41  13    attached the relevant portions of the deposition transcript

01:41:44  14    that were played to the end of the trial transcript to make it

01:41:49  15    clear what was played.

01:42:44  16            THE COURT:  I think I understand the issue, and

01:42:46  17    I think we have a solution.

01:42:47  18            Mr. Klein, your concern, and I think this has

01:42:51  19    been throughout, is that where deposition testimony has been

01:42:55  20    played to either impeach as a prior inconsistent statement

01:43:00  21    or -- well, it's mostly that, not to refresh recollection,

01:43:03  22    that you want the record to reflect what that is for the

01:43:06  23    purposes of appellate review; is that right?

01:43:09  24            MR. KLEIN:  Correct.  Right.

01:43:09  25            THE COURT:  So I'm told that you -- we can do

01:43:13   1   this at the end of the trial where you lodge the actual

01:43:16   2   deposition transcript as part of the record so that it's

01:43:19   3   available for appellate review.

01:43:22   4           So I want counsel to confer with Peggie at the

01:43:26   5   end the trial for the process of doing that.  If you have an

01:43:29   6   issue, then I'll intervene, but otherwise this is how we would

01:43:32   7   handle it.

01:43:33   8           I'm not too familiar with what the court of

01:43:36   9   appeals does when it looks at our record, I'm told that the

01:43:40   10  transcript is lodged for them and made available for appellate

01:43:43   11  review.

01:43:43   12          MR. KLEIN:  Okay.  And just to be -- it's more

01:43:44   13  than appellate review, it's for your review as well because it

01:43:48   14  becomes evidence, the testimony becomes evidence that you can

01:43:50   15  rely on as well.

01:43:52   16          And I'm sorry to interrupt the

01:43:54   17  cross-examination, but otherwise I would have to play it and

01:43:57   18  then actually read it into the record.

01:43:58   19          THE COURT:  I understand.  Thank you.

01:44:00   20          MR. KLEIN:  Okay.

01:44:01   21          THE WITNESS:  Would you mind replaying that?  I

01:44:04   22  just want to be sure that in the end the statement was scope

01:44:10   23  of approval or scope of label?

01:44:16   24          THE COURT:  Well, Mr. Klein, why don't we do

01:44:18   25  this, if you have the deposition transcript that you want to

01:44:24  1   show Dr. Peck, that might help.

01:44:24  2   BY MR. KLEIN:

01:44:28  3   Q    You should have a copy of the transcript, but the

01:44:32  4   testimony is what it is, and I'm not asking you to clarify the

01:44:39  5   testimony.

01:44:39  6           All I asked you is whether -- all I asked you was

01:44:43  7   whether you gave that testimony at the deposition, and if your

01:44:46  8   counsel wants to follow up they're free to follow up on

01:44:48  9   redirect.

01:44:50  10  A    Well I'm just concerned that there's a difference between

01:44:53  11  scope of approval and scope of the label.

01:44:56  12          THE COURT:  So, Dr. Peck, did you want to see

01:44:58  13  your answer?  Is that issue?

01:44:58  14          THE WITNESS:  Yes.

01:44:59  15          MR. KLEIN:  Okay.

01:44:59  16          THE COURT:  Let him see the answer.

01:45:02  17          MR. KLEIN:  Do you have the transcript?  Do you

01:45:02  18  have the deposition there?  Well, we can play it again.  Why

01:45:06  19  don't we play it again.

01:45:07  20              (Deposition video recording played.)

01:45:43  21          THE WITNESS:  Okay.  Just to clarify, I was

01:45:45  22  answering before --

01:45:46  23          MR. KLEIN:  Well --

01:45:47  24          THE COURT:  Hang on, Dr. Peck.  There's no

01:45:49  25  question pending.

01:45:50   1          Would you identify for me again what page and

01:45:53   2   line number?

01:45:54   3          MR. KLEIN:  Sure.  It is page 143, lines 13 to

01:45:58   4   22.

01:45:58   5          THE COURT:  All right.  Dr. Peck, wait for the

01:46:01   6   question.

01:46:01   7   BY MR. KLEIN:

01:46:06   8   Q   Okay.  With regard to the answer you just gave, and maybe

01:46:10   9   you can answer my -- I know you want to say something, and

01:46:14   10   maybe your statement will be responsive to this question,

01:46:18   11   maybe not, but you said a doctor could even prescribe

01:46:22   12   icosapent for only three weeks and it would not be

01:46:25   13   inconsistent with the label, correct?

01:46:27   14   A   That's correct.

01:46:28   15   Q   And even with just three weeks, there can be many reasons

01:46:31   16   for a doctor to prescribe icosapent for only three weeks,

01:46:35   17   right?

01:46:35   18   A   I don't know if there are many reasons.  There could be.

01:46:40   19   I'm not testifying as a clinician experienced with this

01:46:43   20   condition.

01:46:44   21   Q   But three weeks would not be a bad time to check whether

01:46:48   22   the drug was working or not, correct?

01:46:51   23   A   I don't think the label encourages that.

01:46:55   24          MR. M. KENNEDY:  Objection, this is getting

01:46:57   25   outside of the scope of his proffer as an FDA expert.

01:47:01  1          THE COURT:  And Dr. Peck did just clarify that

01:47:04  2   he's not here to testify as a clinician.

01:47:06  3          MR. KLEIN:  All right.  I'll move on then.

01:47:08  4   BY MR. KLEIN:

01:47:11  5   Q   Let's turn to the clinical study section.  You talked

01:47:14  6   about that on direct, right?

01:47:16  7   A   Yes.

01:47:16  8   Q   Let's go to DDX 7.24.

01:47:27  9          So DDX 7.24.  Okay.  On the screen are two FDA

01:47:40  10   regulations, 21 CFR section 201.57(c)(2), and 21 CFR

01:47:49  11   section 201.57(c)(15).

01:47:53  12          You're familiar with these two regulations, right?

01:47:56  13   A   In general, yes.

01:47:58  14   Q   And generally speaking, these regulations say that

01:48:02  15   indications or uses must not be implied or suggested in other

01:48:07  16   sections of the labeling if not included in this section.

01:48:11  17   That's 57(c)(2) for indications, right?

01:48:16  18   A   Yes.

01:48:17  19   Q   And for the clinical studies regulation, which is

01:48:22  20   (c)(15), it similarly says that you shouldn't imply -- you

01:48:29  21   must not imply or suggest indications or uses or dosing

01:48:33  22   regimens not stated in the indications and usage or dosage and

01:48:37  23   administration section from the clinical study section,

01:48:41  24   correct?

01:48:42  25   A   Correct.

01:48:43   1              MR. KLEIN:  And let's go to DDX 7.25.

01:48:43   2   BY MR. KLEIN:

01:48:49   3   Q   All right.  So this is -- on the top I have the

01:48:54   4   regulation (c)(2)(4) which we just looked at which says

01:48:59   5   indications or uses must not be implied or suggested in other

01:49:03   6   sections of the labeling if not included in this section.

01:49:06   7              And on the bottom, I have the clinical study section

01:49:11   8   from Hikma's proposed label which is DX 2256.

01:49:15   9              Do you see that?

01:49:15  10   A   Yes.  It's incomplete.

01:49:18  11   Q   Right.  Understood.  And we'll talk about the other

01:49:22  12   portions of the clinical study section, but I just want to

01:49:27  13   focus for now on the statement that says patients were

01:49:30  14   enrolled in the study for 12 weeks.

01:49:33  15              Do you see that?  It's highlighted.

01:49:37  16   A   Give me a minute here.

01:49:39  17   Q   Yeah.

01:49:42  18   A   Yes, I do.

01:49:43  19   Q   Okay.  And so to be clear, the length of a clinical study

01:49:48  20   reported in the clinical study section is not supposed to

01:49:52  21   imply or suggest a particular dosing regimen that's not stated

01:49:56  22   in the dosage and administration section, correct?

01:49:59  23   A   Yes.

01:50:00  24   Q   And so what defendants' labels are doing in section 14.2

01:50:09  25   are describing the MARINE study which lasted 12 weeks, right?

01:50:14   1    A    Yes.

01:50:15   2    Q    And this 12-week study description is not implying that

01:50:21   3    doctors should prescribe icosapent for only 12 weeks, right?

01:50:26   4    A    Well, I think it encourages to treat for at least

01:50:32   5    12 weeks or more.

01:50:33   6    Q    Okay.  But it's certainly not -- you can't reasonably

01:50:39   7    read 14.2 of defendants' label as saying, okay, the study was

01:50:44   8    12 weeks, therefore doctors should prescribe the drug for 12

01:50:48   9    weeks, no less, no more, correct?

01:50:50   10   A    I would agree with that.

01:50:51   11   Q    Okay.  And the clinical study section, the fact that it

01:50:56   12   lasts -- that the clinical study discussed in the clinical

01:51:00   13   study section lasted for 12 weeks is informing doctors that

01:51:04   14   icosapent can be used for at least 12 weeks, right?

01:51:09   15   A    Yes.

01:51:09   16   Q    Okay.  But a doctor would know from the label as a whole

01:51:12   17   that icosapent also can be used for shorter or longer

01:51:17   18   durations, correct?

01:51:18   19   A    The doctor has the discretion to use the drug for as long

01:51:29   20   as he thinks is in the best interest of the patient absent a

01:51:34   21   limitation or any other advisory apart from the 12 weeks.  I

01:51:40   22   agree with what you just said.

01:51:45   23   Q    Now, let's go to DDX 7.34.  And I want to focus on -- I'm

01:51:55   24   changing topics little bit.  On direct you talked about apo B,

01:52:00   25   do you remember that?

01:52:01   1   A    I do.

01:52:01   2   Q    Okay.  I've highlighted the apo B line in Table 2 of

01:52:04   3   Hikma's label which is DX 2256, pages 7 and 8.  And I also

01:52:12   4   highlighted the relevant portion of the statement below the

01:52:15   5   chart that says,

01:52:16   6            "Icosapent ethyl 4 grams per day reduced

01:52:19   7        median apo B levels from baseline relative to

01:52:24   8        placebo."

01:52:25   9            Do you see that?

01:52:25  10   A    Yes.

01:52:25  11   Q    Okay.  Just to be clear, FDA did not approve the Vascepa

01:52:30  12   indication to reduce apo B, correct?

01:52:33  13   A    It approved Vascepa for the treatment of

01:52:37  14   hypertriglyceridemia while reducing apo B.  This is clear in

01:52:42  15   the label.

01:52:42  16   Q    The indicated use for Vascepa doesn't talk about apo B at

01:52:48  17   all, correct?

01:52:49  18   A    I'm talking about the approved label and the approved

01:52:53  19   drug.

01:52:53  20   Q    But -- well, let me rephrase the question.

01:52:55  21            FDA did not approve an indication for Vascepa that

01:53:00  22   has anything to do with apo B, correct?

01:53:02  23   A    I don't agree with that at all.

01:53:05  24   Q    Let's go to DDX 7.35.  And, again, I want to refer back

01:53:13  25   to the regulation we looked at, 21 CFR 201.57(c)(2).

01:53:22  1        You agree the indication doesn't mention, doesn't

01:53:26  2   use the term apo B, correct?

01:53:28  3   A   That's correct.

01:53:29  4   Q   Okay.  And you agree that indications or uses must not be

01:53:34  5   implied or suggested in other sections of the labeling if not

01:53:39  6   included in the indications section, correct?

01:53:44  7   A   Right.  But the meaning of this is that indications

01:53:46  8   independent of the main indication, or the one that was proven

01:53:51  9   under a -- a well-controlled trial, are not to be implied.

01:53:55  10        But when FDA considers it to be important to call

01:53:59  11   out, as it did in this case, that the apo B is significantly

01:54:03  12   reduced, it did so.

01:54:05  13        And so it would not be inappropriate to consider

01:54:10  14   this label as a whole to be approved for the use of treatment

01:54:14  15   of hypertriglyceridemia while reducing apo B.

01:54:18  16   Q   And, Doctor, just to be clear, you're not offering

01:54:21  17   testimony that reducing apo B is in any way relevant to

01:54:28  18   addressing the severe hypertriglyceridemia condition, correct?

01:54:32  19   A   So FDA did exactly that.  It interpreted this information

01:54:40  20   and it called out that decrease.  And so FDA approved this

01:54:48  21   label, it approved this drug for the treatment of

01:54:51  22   hypertriglyceridemia while reducing apo B.

01:54:57  23   Q   Do you understand, Doctor, that reducing apo B is

01:55:01  24   something that persons of ordinary skill in the art will focus

01:55:06  25   on to address cardiovascular issues and not severe

01:55:09   1   hypertriglyceridemia?

01:55:11   2               MR. M. KENNEDY:  Objection, outside the scope of

01:55:13   3   his direct and his proffer.

01:55:14   4               MR. KLEIN:  Well, I actually want to establish

01:55:16   5   that he's not offering any opinion one way or the another on

01:55:19   6   that issue.  So that's -- I agree with the objection --

01:55:21   7               MR. M. KENNEDY:  That's where it's going --

01:55:21   8   BY MR. KLEIN:

01:55:23   9   Q    To the extent that there's no -- you're not offering any

01:55:26   10   opinions on whether reducing apo B is relevant to treating

01:55:31   11   severe hypertriglyceridemia, correct?

01:55:33   12   A    Only that --

01:55:33   13               THE COURT:  Mr. Kennedy -- I'm sorry, Dr. Peck.

01:55:35   14   Mr. Kennedy, do you agree with that?

01:55:37   15               MR. M. KENNEDY:  The second version of the

01:55:39   16   question is fine.  The first version I thought was stated a

01:55:43   17   little more affirmatively.  But if the only point is to

01:55:47   18   address that he's not offering those opinions, then I would

01:55:49   19   withdraw the objection.

01:55:49   20   BY MR. KLEIN:

01:55:50   21   Q    Yeah.  Do you want me to rephrase the question?

01:55:53   22   A    Please.

01:55:53   23   Q    You're not offering any opinion in this case that

01:55:56   24   reducing apo B relates to treating severe

01:56:01   25   hypertriglyceridemia, correct?

01:56:01  1   A   My opinion is that FDA considered this to be an important

01:56:05  2   element to call out.

01:56:09  3            Now, FDA has physicians, it has lipidologists that

01:56:13  4   work there, so, you know, by implication, for some reason,

01:56:16  5   they thought this was an important call-out associated with

01:56:19  6   the reduction of severe hypertriglyceridemia.  But, I

01:56:22  7   personally am simply interpreting what FDA did.

01:56:29  8   Q   Okay.  So I'm not sure you directly answered my question.

01:56:33  9            You're not offering any opinion in this case that

01:56:37  10  reducing apo B relates to treating severe

01:56:41  11  hypertriglyceridemia, correct?

01:56:41  12  A   I don't know.

01:56:47  13  Q   I think counsel stipulated to that so --

01:56:50  14  A   I don't know.  I'm --

01:56:51  15            THE COURT:  So, Dr. Peck, to be fair, you're

01:56:53  16  only offering testimony with respect to the FDA's labeling

01:56:58  17  process and the label.  You're not an expert in the other

01:57:00  18  areas; is that right?

01:57:01  19            THE WITNESS:  That's correct.  But I can notice

01:57:03  20  what FDA thought was important.

01:57:06  21            THE COURT:  That's a different issue though, I

01:57:08  22  think.

01:57:08  23            MR. KLEIN:  That's a different --

01:57:10  24            THE COURT:  So why don't you listen to

01:57:13  25  Mr. Klein's question.  He's not asking you what you think the

01:57:16   1    FDA is noticing, he's asking a broader question.  Would you

01:57:19   2    answer his question.

01:57:20   3    BY MR. KLEIN:

01:57:20   4    Q    The indication is limited to treating severe

01:57:24   5    hypertriglyceridemia, correct?

01:57:25   6    A    In the indications --

01:57:27   7    Q    In the indications section.

01:57:29   8    A    Right.  Right.  Right.  No, I wouldn't say it's limited.

01:57:33   9    That is the indication.

01:57:35   10   Q    Okay.  The indication is for treating patients with

01:57:38   11   severe hypertriglyceridemia, correct?

01:57:40   12   A    Right.

01:57:40   13   Q    And you're not offering any opinion in this case that

01:57:44   14   treating severe hypertriglyceridemia is relevant to reducing

01:57:49   15   apo B levels, correct?

01:57:52   16   A    I suppose not.

01:57:54   17   Q    Okay.  Let me get to the last topic.  You talked about

01:57:59   18   there's some claim limitations addressing concurrent lipid

01:58:05   19   altering medications.  Do you remember that?

01:58:06   20   A    Yes, I do.

01:58:07   21   Q    All right.  And defendants' labels do not specifically

01:58:10   22   encourage doctors and patients to use icosapent either with or

01:58:14   23   without a concurrent lipid-altering therapy, right?

01:58:17   24   A    Would you repeat the question, please?

01:58:19   25   Q    Sure.  Defendants' labels do not specifically encourage

| | | |
|---|---|---|
| 01:58:24 | 1 | defendants -- I'm sorry.  Defendants' labels do not |
| 01:58:27 | 2 | specifically encourage doctors and patients to use icosapent |
| 01:58:31 | 3 | either with or without a concurrent lipid-altering therapy, |
| 01:58:35 | 4 | correct? |
| 01:58:36 | 5 | A   There's no specific statement to that effect, but I |
| 01:58:39 | 6 | believe it encourages monotherapy. |
| 01:58:41 | 7 | Q   Okay.  But defendants' labels don't express any |
| 01:58:44 | 8 | preference for taking icosapent with or without a statin, for |
| 01:58:48 | 9 | example, right? |
| 01:58:49 | 10 | A   There is no explicit statement of a preference. |
| 01:58:55 | 11 | Q   Okay.  And the label as a whole is saying that Vascepa is |
| 01:59:03 | 12 | effective to reduce triglyceride levels in adult patients with |
| 01:59:07 | 13 | severe hypertriglyceridemia regardless of whether it's taken |
| 01:59:10 | 14 | with or without a statin, correct? |
| 01:59:13 | 15 | A   The data supports that, but I believe it encourages |
| 01:59:18 | 16 | monotherapy. |
| 01:59:19 | 17 |             MR. KLEIN:  All right.  Let's play 109, |
| 01:59:22 | 18 | page 109, line 17 to 22. |
| 01:59:27 | 19 |                   (Deposition video recording played.) |
| 01:59:47 | 20 | BY MR. KLEIN: |
| 01:59:48 | 21 | Q   Was that your testimony at the deposition? |
| 01:59:49 | 22 | A   Yes. |
| 01:59:50 | 23 | Q   Okay.  And there's no language in defendants' labeling -- |
| 01:59:54 | 24 | labels identifying any benefit to taking icosapent without a |
| 01:59:58 | 25 | statin, right? |

02:00:01   1   A   I disagree with that statement.

02:00:08   2        MR. KLEIN:   Okay.   Let's pay 112, line 24 to

02:00:13   3   113, line 7.

02:00:13   4         (Deposition video recording played.)

02:00:16   5   BY MR. KLEIN:

02:00:40   6   Q   Did you give that testimony at the deposition?

02:00:42   7   A   Yes, I did.

02:00:43   8   Q   Okay.   So just to be clear, the label as a whole,

02:00:46   9   defendants' labels as a whole, teach that physicians should

02:00:49   10   use their discretion with respect to using a statin with

02:00:54   11   icosapent, correct?

02:00:55   12   A   The label doesn't say anything about discretion.   The

02:01:00   13   label as a whole places no limitation on use or nonuse.

02:01:08   14        But a physician reading the clinical study section

02:01:11   15   would recognize that because 75 percent of the patients in the

02:01:14   16   trial were not on a statin, this drug is effective for

02:01:19   17   monotherapy, and monotherapy is always preferred over

02:01:24   18   polytherapy.

02:01:26   19        MR. KLEIN:   Let's play page 102, lines 14

02:01:31   20   through 19.

02:01:32   21         (Deposition video recording played.)

02:01:37   22   BY MR. KLEIN:

02:01:54   23   Q   You gave that testimony at the deposition, right?

02:01:56   24   A   Yes.

02:01:56   25        MR. KLEIN:   Thank you.   I have no further

02:01:58   1    questions at this time.

02:01:59   2              MR. M. KENNEDY:  Your Honor, I just have a

02:02:01   3    little bit of redirect.

02:02:01   4                      REDIRECT EXAMINATION

02:02:01   5    BY MR. M. KENNEDY:

02:02:21   6    Q    So, Dr. Peck, do you recall Mr. Klein asking you about

02:02:25   7    patient subgroups who may or may not be identified in the

02:02:28   8    indications and usage section?

02:02:30   9    A    Yes.

02:02:30   10   Q    In general, what is a patient subgroup?

02:02:34   11   A    Well, it would be a group of patients who shared a common

02:02:40   12   factor or a common feature that differentiated them from

02:02:47   13   everyone else in the larger group of patients who were

02:02:51   14   included in the clinical study.

02:02:53   15             MR. M. KENNEDY:  Would it be possible to get

02:02:55   16   cross-demonstrative DDX 78 back on the screen?  I'm not sure

02:03:03   17   who I should ask.

02:03:04   18             Ah.  Yes.

02:03:04   19   BY MR. M. KENNEDY:

02:03:06   20   Q    So, Dr. Peck, do you remember this demonstrative from

02:03:09   21   Mr. Klein's discussion?

02:03:11   22   A    Yes.

02:03:12   23   Q    And you see there's a discussion in this document about

02:03:15   24   selected patient subgroups are diseased subpopulations for

02:03:22   25   whom the drug is approved?  Do you see that?

02:03:22   1    A    Yes.

02:03:23   2    Q    And, you know, for example, the last three lines, it

02:03:29   3    says,

02:03:29   4              "For example, if a drug is for use only in

02:03:32   5         patients with a history of coronary disease events,

02:03:36   6         i.e., a secondary prevention, the indication should

02:03:40   7         clearly convey the patient population for which the

02:03:43   8         drug is approved."

02:03:44   9              Do you see that?

02:03:44  10    A    Yes.

02:03:45  11    Q    Is a diet a patient is on before he or she develops very

02:03:50  12    high triglycerides or severe hypertriglyceridemia, does that

02:03:53  13    define a patient's subgroup?

02:03:57  14    A    It wouldn't in my mind, in part because you wouldn't

02:04:05  15    know -- you wouldn't know that in advance.  I mean, I think

02:04:08  16    this -- identification of a subgroup, you know, like age group

02:04:16  17    or gender, or, in this case, patients that had a history of

02:04:22  18    coronary, that's clearly something you can identify in advance

02:04:27  19    and then apply this, this limitation.

02:04:31  20              But I think it stretches the point that whether or

02:04:36  21    not you can stay on a diet can be predicted in advance or

02:04:40  22    really is a clear patient subgroup.

02:04:44  23              MR. M. KENNEDY:  Could I have PX 1186, the

02:04:47  24    current Vascepa label.

02:04:49  25              THE CLERK:  Switching it to Plaintiffs'

02:04:54   1   (inaudible).

02:04:54   2               MR. M. KENNEDY:   Thank you.   Mr. Brooks, could

02:04:56   3   you blow up -- would it be possible to blow up sections 1 and

02:05:01   4   2 in the full prescribing information?

02:05:01   5   BY MR. M. KENNEDY:

02:05:05   6   Q    So, Dr. Peck, do you remember some discussion with

02:05:08   7   Mr. Klein about whether the indication of Vascepa is limited

02:05:12   8   to patients based on the diet that they're on when they get

02:05:16   9   severe hypertriglyceridemia?   Do you remember that testimony?

02:05:19  10   A    Yes, I did, I do.

02:05:21  11   Q    Is the indication limited to any particular diet for the

02:05:25  12   patient who has severe hypertriglyceridemia?

02:05:30  13   A    Well, I don't think I see a clear limitation.   There's an

02:05:44  14   encouragement to use an appropriate diet.

02:05:48  15   Q    Well, let me direct you to the Dosage and Administration

02:05:52  16   Section, section 2.1.

02:05:55  17           And, Dr. Peck, in the context of this label, what

02:05:59  18   does it mean when the label says "prior to initiation of

02:06:03  19   Vascepa"?

02:06:05  20   A    Well, I think it would mean --

02:06:14  21   Q    What does prior --

02:06:16  22   A    It would be a date or period of time in advance of

02:06:18  23   initiating Vascepa therapy.

02:06:21  24   Q    And am I correct that according to 2.1, the label is

02:06:28  25   instructing that patients should engage in appropriate

02:06:31  1  nutritional intake and physical activity before receiving

02:06:34  2  Vascepa?

02:06:35  3   A    Yes.

02:06:37  4               MR. M. KENNEDY:  Your Honor, could I have

02:06:38  5  indulgence to consult with my colleagues for just a second?

02:06:42  6               THE COURT:  Yes.

02:06:48  7                    (Discussion held off the record.)

02:06:48  8               MR. M. KENNEDY:  Your Honor, nothing further.

02:06:51  9               MR. KLEIN:  Nothing further from me.

02:06:53  10              THE COURT:  Thank you, Dr. Peck.  You may step

02:06:56  11  down.

02:07:21  12                    (The witness was excused.)

02:07:21  13              MR. M. KENNEDY:  Your Honor, Plaintiffs' next

02:07:23  14  call Dr. Sean Nicholson.  And, again, may we approach to

02:07:28  15  distribute binders and slides?

02:07:30  16              THE COURT:  Yes.  Thank you.
02:07:30
02:07:30  17                         SEAN NICHOLSON
02:07:30             called as a witness on behalf of the Plaintiffs,
02:07:30  18              was sworn and testified as follows:

02:07:57  19              THE CLERK:  Please be seated.

02:07:58  20              Please state your name and spell both your first

02:08:02  21  name and last name for the record.

02:08:04  22              THE WITNESS:  Sean Nicholson; S-e-a-n,

02:08:35  23  N-i-c-h-o-l-s-o-n.

02:08:39  24              MR. M. KENNEDY:  Your Honor, may I proceed?

02:08:41  25              THE COURT:  Yes.

**DIRECT EXAMINATION**

BY MR. M. KENNEDY:

Q    Good afternoon, Dr. Nicholson.  Are you currently
employed?

A    Yes, I am.

Q    Where are you currently employed?

A    Cornell University.

Q    What is your position at Cornell?

A    I'm a professor in the Department of Policy Analysis and
Management.

Q    What does that position involve at a high level?

A    So I conduct research.  I also teach, and I direct one of
our graduate programs.

Q    How long have you held -- how long have you been at
Cornell?

A    For 15 years.

Q    Do you currently hold any other positions?

A    Yes.  I'm a research associate at the National Bureau of
Economic Research, and I'm also an Associate Editor at a
journal called *Health Economics*.

Q    Could you describe your educational background.

A    Yes.  I graduated from Dartmouth College magna cum laude
with a degree in economics, and then received a masters and a
Ph.D. in economics from the University of Wisconsin at
Madison.

02:09:46   1   Q    When did you receive your Ph.D.?

02:09:47   2   A    1997.

02:09:49   3   Q    How would you describe your research and teaching

02:09:53   4   specialty?

02:09:53   5   A    I focus on the economics of healthcare and even more

02:09:57   6   specifically on economics of the biotech and pharmaceutical

02:10:01   7   industries.

02:10:02   8   Q    How long have you specialized in this field?

02:10:05   9   A    For over 25 years.

02:10:06  10   Q    Could you go into a little more detail about the aspects

02:10:09  11   of the healthcare industry you specialize in in your research.

02:10:13  12   A    Yes, I specialize in analyzing pharmaceutical

02:10:18  13   competition, pricing, and innovation.

02:10:20  14   Q    And can you give an example of the type of project you've

02:10:23  15   handled in this area?

02:10:25  16   A    Yes.  Examples would include examining what types of

02:10:30  17   companies are most effective at getting their drugs approved

02:10:33  18   by the Food and Drug Administration, or why sometimes two or

02:10:36  19   more companies develop drugs together, or whether new

02:10:40  20   medicines which tend to be relatively expensive are worth it,

02:10:44  21   the value of new medicines.

02:10:46  22   Q    Generally who funds your research?

02:10:48  23   A    My research has been funded by agencies, including the

02:10:53  24   Robert Wood Johnson Foundation, the Centers For Disease

02:10:57  25   Control and Prevention, and also the Agency For Healthcare

-1420-

02:11:02  1    Research and Quality.

02:11:03  2    Q    Do you also teach students?

02:11:04  3    A    I do.  I'm currently teaching three courses.  I teach an

02:11:08  4    undergraduate course, which is overview of the U.S. healthcare

02:11:11  5    system, and then I teach two graduate level courses, one on

02:11:15  6    healthcare finance and another on the pharmaceutical industry,

02:11:19  7    specifically pharmaceutical policy and management.

02:11:22  8    Q    Do you publish?

02:11:23  9    A    I do.  I've published over 50 articles in peer review

02:11:28  10   journals and also have published some book chapters and was a

02:11:33  11   coeditor of the Handbook on the Economics of the

02:11:37  12   Biopharmaceutical Industry.

02:11:39  13   Q    And when was that handbook published?

02:11:42  14   A    That was 2012.

02:11:43  15              MR. M. KENNEDY:  Mr. Brooks, can we please have

02:11:45  16   PX 1098.

02:11:45  17   BY MR. M. KENNEDY:

02:11:51  18   Q    Dr. Nicholson, do you recognize this document?

02:11:53  19   A    Yes, this is copy of my curriculum vitae or CV.

02:11:58  20   Q    The CV is dated May 2019.  Is this CV substantially

02:12:03  21   current as of today?

02:12:03  22   A    Yes.

02:12:04  23   Q    Does PX 1098 accurately reflect your educational and

02:12:08  24   professional experience?

02:12:09  25   A    Yes, it does.

02:12:11    1              MR. M. KENNEDY:  Your Honor, Amarin offers

02:12:13    2    PX 1098 into evidence.

02:12:17    3              MR. ROUNDS:  No objection, Your Honor.

02:12:18    4              THE COURT:  PX 1098 is admitted.

02:12:18    5                   (Plaintiffs' Exhibit 1098 received in
02:12:21                          evidence.)
02:12:21    6              MR. M. KENNEDY:  And, Your Honor, we also offer

02:12:23    7    Dr. Nicholson as expert in the economics of the pharmaceutical

02:12:27    8    industry.

02:12:28    9              MR. ROUNDS:  No objection, Your Honor.

02:12:29   10              THE COURT:  The Court will certify Dr. Nicholson

02:12:32   11    as an expert on the economics of the pharmaceutical industry.

02:12:37   12              MR. M. KENNEDY:  Mr. Brooks, can we please have

02:12:40   13    PDX 5-3.

02:12:40   14    BY MR. M. KENNEDY:

02:12:42   15    Q    Dr. Nicholson, at a high level, what were you asked to do

02:12:45   16    in this case?

02:12:46   17    A    My assignment was to assess whether Vascepa has been a

02:12:49   18    commercial success and whether there is a nexus between the

02:12:54   19    commercial success, if any, and the patented features there in

02:12:58   20    suit.

02:12:58   21    Q    What's your understanding of Vascepa's indication?

02:13:03   22    A    Initially, in 2012, Vascepa received an indication as a

02:13:08   23    method of reducing triglycerides or TG amongst patients with

02:13:13   24    severe hypertriglyceridemia, or very high TGs.

02:13:18   25              And then, in December of 2019, Vascepa received a

02:13:20  1    second indication of reducing major cardiovascular events

02:13:25  2    amongst patients with TG levels of 150 or above.  So that

02:13:29  3    would include high and also very high TG patients.

02:13:34  4    Q    Now, there's some discussion -- were you in the courtroom

02:13:36  5    this morning when Mr. Hofmann testified?

02:13:38  6    A    Yes, I was.

02:13:39  7    Q    And you recall there was some discussion about Vascepa's

02:13:43  8    current indication with Mr. Hofmann?

02:13:45  9    A    Yes.

02:13:45  10   Q    Does the new indication granted in December 2019 change

02:13:49  11   your opinions in any way?

02:13:51  12   A    It strengthens my opinion.  It doesn't change it.  My

02:13:57  13   opinion is that Vascepa is commercially successful and that

02:14:00  14   was based on reports that I filed through, I believe, May

02:14:05  15   of 2019.  The second indication would just strengthen that

02:14:08  16   opinion.

02:14:09  17   Q    Now, for purposes of the opinions you developed, what's

02:14:12  18   your understanding of the patented feature?

02:14:15  19   A    My understanding is that the patents practice a method of

02:14:21  20   reducing TG levels without increasing LDL-C or bad

02:14:25  21   cholesterol.

02:14:26  22   Q    And where did you get that understanding from?

02:14:28  23   A    From counsel.

02:14:29  24   Q    And just to be clear, do you have any technical

02:14:32  25   background in lipid science, treatment of lipid diseases, or

02:14:36   1   treating severe hypertriglyceridemia?

02:14:38   2   A   No, I do not.

02:14:39   3   Q   So, in brief, why did you conclude that Vascepa is a

02:14:44   4   commercial success?

02:14:46   5   A   So I examined Vascepa's performance in the marketplace,

02:14:51   6   and, more specifically, I looked at the number of

02:14:54   7   prescriptions that have been filled for Vascepa and the trend

02:14:57   8   in the number of prescriptions, also the amount of sales that

02:15:01   9   Amarin has collected for Vascepa and the trend in sales.

02:15:04   10         I looked at the market share of Vascepa so what

02:15:07   11   percentage of patients in different drug categories are taking

02:15:11   12   Vascepa relative to the other drugs, and the trend in market

02:15:15   13   share.

02:15:15   14         And then, finally, I conducted a lifecycle analysis

02:15:19   15   of Vascepa's profits.

02:15:21   16   Q   And what's your understanding of what we mean by nexus in

02:15:24   17   the context of patent law and the commercial success analysis?

02:15:29   18   A   My understanding is there's a nexus if the commercial

02:15:33   19   success is driven in part, is due in part to the patented

02:15:38   20   features.

02:15:39   21   Q   And, at a high level, what did you conclude with respect

02:15:41   22   to nexus?

02:15:42   23   A   I concluded that the Vascepa is commercially successful

02:15:46   24   and there a nexus between it's commercial success and the

02:15:50   25   patented features and that the success is not significantly

1424

02:15:53   1   due to other factors such as promotion or marketing or

02:15:56   2   pricing.

02:15:57   3                MR. M. KENNEDY:  Mr. Brooks, may we please have

02:15:59   4   PDX 5-4.

02:15:59   5   BY MR. M. KENNEDY:

02:16:02   6   Q    So in the context of patent law, what's your

02:16:06   7   understanding of why a product's commercial success is

02:16:09   8   relevant to whether or not an invention is obvious at the time

02:16:12   9   it was made?

02:16:14   10  A    Based on economics, you would expect inventions that have

02:16:18   11  commercial value, that are commercially successful to be

02:16:22   12  developed.  So if we observe a situation where companies are

02:16:26   13  foregoing an opportunity to develop something that has

02:16:29   14  commercial value, then that provides evidence that the patents

02:16:32   15  aren't obvious.

02:16:33   16  Q    And what sort of factors do you look at in analyzing

02:16:37   17  commercial success for purposes of a patent case?

02:16:40   18  A    It depends on the case.  In this particular case, as I

02:16:44   19  mentioned, what I looked at was prescriptions and trends in

02:16:48   20  prescriptions, sales, trends in sales of Vascepa, also market

02:16:53   21  share and trends in market share, and the Net Present Value or

02:16:56   22  the lifecycle profits analysis.

02:16:59   23                MR. M. KENNEDY:  Mr. Brooks, can we have

02:17:02   24  PDX 5-5.

02:17:02   25

02:17:02   1   BY MR. M. KENNEDY:

02:17:04   2   Q    And, Dr. Nicholson, is this a slide that you worked with

02:17:06   3   us to create to illustrate your opinions today?

02:17:09   4   A    Yes, it is.

02:17:10   5   Q    What are you showing on this slide?

02:17:12   6   A    What I'm showing on the horizontal axis is the years

02:17:17   7   between 2008 and 2018, and then on the vertical axis is the

02:17:22   8   research and development spending that Amarin conducted for

02:17:27   9   Vascepa in millions of dollars.

02:17:30   10         So you can see the R&D costs or spending ranges from

02:17:33   11   eight million in 2008, all the way through 56 million in 2018.

02:17:38   12   Q    And what's your understanding of when Amarin started

02:17:41   13   developing Vascepa?

02:17:43   14   A    So the initial R&D expenditures were in 2008, and then

02:17:48   15   between 2009 and 2011, Amarin conducted two clinical trials,

02:17:55   16   the MARINE trial which focused on patients with very high TG

02:17:59   17   to see if Vascepa reduced TG in that patient population.  The

02:18:03   18   ANCHOR trial -- that was the MARINE trial.

02:18:05   19         The ANCHOR trial focused on patients with high TG

02:18:09   20   levels to see whether Vascepa reduced TG in that patient

02:18:13   21   population, and those trials began in 2009 and concluded in

02:18:17   22   2011.

02:18:19   23   Q    Does this slide PDX -- strike that.

02:18:22   24         What are the sources you used to put together PDX

02:18:27   25   slide 5-5?

02:18:28  1   A    So this figure was produced with data from financial

02:18:31  2   statements that Amarin filed with the SEC, specifically the

02:18:34  3   documents that are enumerated at the bottom.

02:18:38  4                   MR. M. KENNEDY:  Your Honor, we would like to

02:18:39  5   offer PDX 5-5 as a summary exhibit pursuant to FRE 1006.

02:18:48  6                   MR. ROUNDS:  No objection, Your Honor.

02:18:49  7                   THE COURT:  Are you also moving to admit the

02:18:51  8   underlying documents which is PX 590 and 632?

02:18:58  9                   MR. M. KENNEDY:  I can.  I don't believe there's

02:19:00  10  an objection, so I would also move PX 590 and PX 632.

02:19:05  11                   THE COURT:  Any objection?

02:19:06  12                   MR. ROUNDS:  No objection, Your Honor.

02:19:07  13                   THE COURT:  All right.  All three documents are

02:19:08  14  admitted.

02:19:08  15                       (Plaintiffs' Exhibits 5-5 and 632
02:19:08                              received in evidence.)
02:19:08  16  BY MR. M. KENNEDY:

02:19:11  17  Q    So, Dr. Nicholson, how much did Amarin spend on R&D

02:19:15  18  between 2008 and 2018?

02:19:17  19  A    So Amarin spent almost half a billion dollars, so

02:19:22  20  465,000,000, and I should point out that between 2011 and 2018

02:19:28  21  Amarin was conducting the REDUCE-IT trial so that trial

02:19:32  22  followed about 8,000 patients with high TG levels to determine

02:19:37  23  whether or not Vascepa would reduce the probability of major

02:19:43  24  cardiovascular events.

02:19:44  25  Q    And this slide, PDX 5-5 doesn't include Amarin's R&D

02:19:49   1   spending for 2019 or later; is that right?

02:19:51   2   A    That's correct, it's just through 2018.

02:19:54   3   Q    Is all the R&D spending reflected on PDX 5-5 attributable

02:20:01   4   to Vascepa?

02:20:02   5   A    Yes, it is.

02:20:04   6                MR. M. KENNEDY:   Mr. Brooks, can we have

02:20:07   7   PDX 5-6.

02:20:07   8   BY MR. M. KENNEDY:

02:20:08   9   Q    Dr. Nicholson, what's depicted on this slide?

02:20:10  10   A    This slide is showing between 2013 and 2018 the number of

02:20:15  11   Vascepa prescriptions that were filled, and what it shows is

02:20:20  12   that -- in thousands, so the vertical axis is in thousands.

02:20:24  13        So it shows Vascepa filled -- there are 174,000

02:20:29  14   prescriptions of Vascepa filled in 2013, and that increased up

02:20:33  15   to 1.3 million prescriptions in 2018 which is about a

02:20:38  16   50 percent average annual increase, so pretty substantial

02:20:42  17   increase over time.

02:20:42  18   Q    Is that increase relevant to your commercial success

02:20:47  19   analysis?

02:20:48  20   A    It is, because it's demonstrating that Vascepa is

02:20:51  21   providing value in the marketplace, and it's providing an

02:20:54  22   increasing amount of value over time.

02:20:56  23        It's important to note that the most comparable drug

02:21:01  24   to Vascepa in the sense that it has the same indication,

02:21:04  25   Lovaza, was on the market and had a generic version in 2014.

02:21:10  1   So the generic Lovaza is much less expensive than Vascepa, and

02:21:15  2   so this indicates that patients and health insurers are

02:21:19  3   willing to pay a premium for the features of Vascepa.

02:21:21  4   Q    Where did you get the data that went into creating

02:21:27  5   PDX 5-6?

02:21:27  6   A    These data come from a company called IQVIA.

02:21:32  7   Q    And I think Mr. Hofmann mentioned IQVIA this morning, but

02:21:36  8   what is IQVIA?

02:21:37  9   A    IQVIA is a company which collects data and also produces

02:21:41  10  reports for the pharmaceutical industry, and they obtain

02:21:45  11  information from the pharmacies that indicates what drug is

02:21:48  12  dispensed, and they aggregate that up nationally.

02:21:53  13              MR. M. KENNEDY:  Your Honor, I would like to

02:21:54  14  offer PDX 5-6 as summary exhibit under FRE 1006.

02:22:02  15              MR. ROUNDS:  No objection, Your Honor.

02:22:03  16              THE COURT:  5-6 is admitted.

02:22:07  17              MR. M. KENNEDY:  And I'd also like to move the

02:22:08  18  underlying documents PX 644 and PX 659.  However, I again

02:22:14  19  would request the opportunity to redact those exhibits before

02:22:17  20  they appear on the public docket.

02:22:20  21              MR. ROUNDS:  No objection.

02:22:21  22              THE COURT:  They're admitted.

02:22:21  23                   (Plaintiffs' Exhibit 5-6, 644 and 659
02:22:21                       received in evidence.)
02:22:25  24              MR. M. KENNEDY:  Mr. Brooks, could we please

02:22:26  25  have PDX 5-7.

02:22:26    1    BY MR. M. KENNEDY:

02:22:31    2    Q    And, Dr. Nicholson, what are you showing on this slide?

02:22:35    3    A    This figure is depicting for the same six years, 2013

02:22:39    4    through 2018, the amount of net sales that Amarin collected

02:22:43    5    for selling Vascepa in millions of dollars on the vertical

02:22:49    6    axis.

02:22:50    7            So Amarin received $26 million in net sales for

02:22:53    8    Vascepa in 2013, and that increased to $228 million in 2018

02:23:00    9    which is a 54 percent average annual increase year over year.

02:23:05   10    Q    Is that upward trend relevant to your commercial success

02:23:08   11    opinion?

02:23:08   12    A    It is, because, as with prescriptions, it indicates that

02:23:12   13    this product is providing value in the market, and patients

02:23:15   14    and health insurers are willing to pay a premium for the

02:23:19   15    features of Vascepa.

02:23:20   16    Q    Now, you use the term net sales.  What do you mean by net

02:23:24   17    sales?

02:23:24   18    A    Net sales are gross sales minus items such as any

02:23:29   19    returns, but, importantly, any co-pay cards or patient support

02:23:34   20    programs or any discounts or rebates that Amarin might be

02:23:38   21    offering to health insurers.

02:23:41   22    Q    Now, you heard Mr. Hofmann's testimony this morning about

02:23:44   23    discounts, rebates, and so forth?

02:23:46   24    A    Yes, I did.

02:23:47   25    Q    Does your calculation of net sales back out all of those

02:23:51  1    discounts and rebates and other deductions from gross sales

02:23:57  2    that Mr. Hofmann discussed today?

02:23:59  3    A    Yes.  What's being depicted here is net sales, and so all

02:24:04  4    of those items have already been subtracted out before being

02:24:07  5    displayed on this figure.

02:24:08  6    Q    Where did you get the information to make slide PDX 5-7?

02:24:14  7    A    This figure was produced from a document internal to

02:24:18  8    Amarin.  Amarin collected much of that information from --

02:24:21  9    from financial statements.

02:24:22  10   Q    And, again, this graph only goes to 2018.  It doesn't

02:24:26  11   reflect Amarin's sales for 2019 or 2020; is that right?

02:24:30  12   A    Yes, that's right.

02:24:33  13                 MR. M. KENNEDY:  Your Honor, I would like to

02:24:34  14   offer PDX 5-7 as a summary exhibit under FRE 1006.

02:24:41  15                 MR. ROUNDS:  No objection, Your Honor.

02:24:43  16                 MR. M. KENNEDY:  And --

02:24:43  17                 THE COURT:  Go ahead.

02:24:44  18                 MR. M. KENNEDY:  And I would also like to offer

02:24:46  19   the underlying Exhibit PX 589 with the request that we be

02:24:50  20   permitted to review it for redactions.

02:24:53  21                 MR. ROUNDS:  No objection.

02:24:53  22                 THE COURT:  All right.  Both requests are

02:24:55  23   granted.

02:24:55  24                       (Plaintiffs' Exhibits 5-7 and 589
02:24:55                            received in evidence.)
02:24:57  25                 MR. M. KENNEDY:  Mr. Brooks, could I have

02:24:59   1   DDX 8-21.  This is one of Mr. Hofmann's slides.

02:24:59   2   BY MR. M. KENNEDY:

02:25:04   3   Q   And I think I already covered a lot of this, but do you

02:25:07   4   agree with Mr. Hofmann's testimony that the commercial

02:25:11   5   performance of Vascepa has been driven by discounts, rebates,

02:25:16   6   and other incentives?

02:25:18   7   A   I do disagree with that.  In my opinion -- well, first of

02:25:23   8   all, as I said, I'm subtracting rebates and discounts out from

02:25:27   9   net sales both when I'm displaying the trend but also in the

02:25:31  10   net present value analysis that we'll show.  So I've already

02:25:35  11   subtracted and accounted for discounts and rebates.

02:25:37  12       But discounts and rebates are quite common.  It's

02:25:40  13   quite common for pharmaceutical firms to offer such discounts

02:25:44  14   and rebates to health insurers these days.

02:25:48  15       MR. M. KENNEDY:  Mr. Brooks, can we have PX 746.

02:25:48  16   BY MR. M. KENNEDY:

02:25:53  17   Q   Dr. Nicholson, do you recognize this document?

02:25:55  18   A   I do.

02:25:55  19   Q   What is it?

02:25:56  20   A   This is a report that IQVIA, the company that we've

02:26:01  21   discussed before, produced in 2016 to look at the prevalence

02:26:06  22   and the magnitude of discounts and rebates that manufacturers,

02:26:10  23   pharmaceutical firms, were offering to part D health insurance

02:26:15  24   plans.

02:26:16  25   Q   Just to define a couple terms, what is part D?



02:26:19  1   A    Part D is the prescription drug benefit for Medi-Care

02:26:25  2   beneficiaries, so the elderly and some disabled.

02:26:28  3   Q    What kind of role does Medi-Care part D play in the

02:26:31  4   overall healthcare economy?

02:26:33  5   A    Medi-Care patients are important.  The elderly tend to

02:26:37  6   use more medical services, including prescription drugs, than

02:26:40  7   the young.

02:26:40  8        But Medi-Care part D is administered by private

02:26:43  9   health insurers, the same -- generally the same private health

02:26:46  10  insurers that are offering insurance benefits to the non

02:26:51  11  elderly, the people who receive insurance through their

02:26:53  12  employer.

02:26:54  13  Q    You mentioned IQVIA.  Did IQVIA used to be known as

02:26:58  14  Quintiles IMS?

02:26:59  15  A    Yes, that's correct.

02:27:00  16  Q    Did you rely on PX 746 in forming your opinions in this

02:27:08  17  case?

02:27:08  18  A    Yes, I did.

02:27:10  19            MR. M. KENNEDY:  Your Honor, Amarin offers

02:27:13  20  PX 746 into evidence.

02:27:14  21            MR. ROUNDS:  No objection, Your Honor.

02:27:14  22            THE COURT:  746 is admitted.

02:27:14  23                (Plaintiffs' Exhibit 746 received in
02:27:16                     evidence.)
02:27:17  24            MR. M. KENNEDY:  Mr. Brooks, can we go to page 5

02:27:20  25  of PX 746.

02:27:20  1   BY MR. M. KENNEDY:

02:27:23  2   Q    And I would like to -- Dr. Nicholson, what does the graph

02:27:26  3   on this page show?

02:27:28  4   A    What this shows, if you compare the green bar there in

02:27:33  5   the middle to the blue bar, what it shows is that

02:27:39  6   manufacturers on average in Medi-Care part D, pharmaceutical

02:27:45  7   firms, pharmaceutical firms are receiving on average 62

02:27:47  8   percent of the price.

02:27:48  9           In other words, they're giving discounts and rebates

02:27:51  10  on average of 38 percent to private health insurers.

02:27:55  11          So this is part of my opinion that discounts and

02:27:59  12  rebates are common and they sometimes are quite sizeable.

02:28:03  13              MR. M. KENNEDY:   Mr. Brooks, could we go to

02:28:06  14  PDX 5-8.

02:28:06  15  BY MR. M. KENNEDY:

02:28:12  16  Q    Dr. Nicholson, what does this slide show?

02:28:15  17  A    This slide shows the determinants of the two comparison

02:28:22  18  groups that I formed for purposes of calculating Vascepa's

02:28:26  19  market share.

02:28:27  20          So I formed two comparison groups.  I think the most

02:28:31  21  relevant comparison group for Vascepa would include the drugs

02:28:34  22  in the first two rows of this chart.

02:28:37  23          So, Vascepa and Lovaza are both indicated for

02:28:41  24  reducing TG levels amongst patients with very high TG, and

02:28:48  25  they are also both omega-3 fatty acids derivatives.

02:28:51   1          So one comparison group would consist of Vascepa,

02:28:54   2    Lovaza, and generic Lovaza, and I'll show market share of

02:28:58   3    Vascepa in that group.

02:29:00   4          I also consider a broader group of drugs that are

02:29:04   5    indicated to reduce TG levels, so that would include the drugs

02:29:08   6    that are on all five of the rows that are on this including

02:29:12   7    the fenofibrates, gemfibrozil and niacin.

02:29:18   8    Q    Why is market share relevant to a commercial success

02:29:21   9    analysis?

02:29:21   10   A    When you look at a drug's market share, you can see what

02:29:25   11   percentage of the patients are taking that drug versus other

02:29:29   12   drugs that ostensibly similar or potentially similar.  You can

02:29:33   13   also see if that's trending up over time.

02:29:35   14          And as I mentioned, because all of the drugs that

02:29:38   15   are in this figure other than Vascepa have a generic version

02:29:42   16   on the market, if it's the case that Vascepa's market share is

02:29:47   17   growing over time then it means that it's capturing share from

02:29:51   18   less expensive products, in other words, the physicians, the

02:29:54   19   patients, and the health insurers are willing to prescribe or

02:29:57   20   pay for a higher priced drug Vascepa because of the features

02:30:02   21   that it has.

02:30:03   22   Q    So generic drugs tend to be less expensive than branded

02:30:07   23   drugs?

02:30:07   24   A    Yes, and usually quite a bit less expensive.

02:30:10   25          MR. M. KENNEDY:  Mr. Brooks, can we have

02:30:12  1    PDX 5-9, please.

02:30:12  2    BY MR. M. KENNEDY:

02:30:16  3    Q   And, Dr. Nicholson, what does this slide depict?

02:30:19  4    A   This shows for 2013 through 2018 the market share of

02:30:25  5    Vascepa using those two different comparison groups that I

02:30:28  6    just described on the prior page.

02:30:31  7            So you're going to test my color.  I think the

02:30:34  8    bluish green bar that's on the higher side, that would be the

02:30:37  9    market share of Vascepa in the omega-3 fatty acid comparison

02:30:42  10   group, the most relevant one in my opinion.

02:30:43  11   Q   Perhaps we should have picked different colors for the

02:30:47  12   comparison.

02:30:49  13           Where did -- I'm sorry, go ahead.

02:30:49  14   A   I was just going to say the share amongst the omega-3

02:30:54  15   fatty acids for Vascepa goes from four percent in 2013 up to

02:30:57  16   32 percent market share in 2018.

02:31:00  17   Q   How does that impact your opinion on commercial success?

02:31:03  18   A   This provides strong evidence that Vascepa is capturing

02:31:11  19   share from other drugs.  It's pulling patients who otherwise

02:31:15  20   would take another product and instead they're deciding to

02:31:19  21   take Vascepa.  So that's a strong indicator of value and of

02:31:23  22   increasing value over time.

02:31:25  23   Q   And the products against whom Vascepa is competing tend

02:31:28  24   to be lower priced because they're generic; is that right?

02:31:32  25   A   Yes, correct, both for the omega-3 fatty acid comparison

02:31:36  1   and for the lighter blue, which is the broader set of TG

02:31:40  2   reducing drugs where Vascepa's share rises over time to six

02:31:44  3   percent in that broader category in 2018.

02:31:47  4   Q    And where did you get the data that went into this slide,

02:31:51  5   PDX 5-9?

02:31:53  6   A    These data come from IQVIA.

02:31:57  7               MR. M. KENNEDY:  Your Honor, Amarin offers

02:32:01  8   PDX 5-9 as a summary exhibit under FRE 1006.

02:32:07  9               MR. ROUNDS:  No objection, Your Honor.

02:32:07  10              THE COURT:  It's admitted.

02:32:07
02:32:10  11                   (Plaintiffs' Exhibit 5-9 received in
                                 evidence.)
02:32:10  12              MR. M. KENNEDY:  And I think the underlying

02:32:12  13  documents have already been admitted, 644 and 659.

02:32:17  14              THE COURT:  I believe so.  It sounds familiar.

02:32:23  15  Yes, both are admitted.

02:32:25  16              MR. M. KENNEDY:  Okay.  Mr. Brooks, can we have

02:32:28  17  PDX 5-10, please.

02:32:28  18  BY MR. M. KENNEDY:

02:32:31  19  Q    Dr. Nicholson, what you showing on this slide?

02:32:34  20  A    Here I'm showing a little bit more detail on the market

02:32:37  21  share trend over time for the omega-3 fatty acid group.

02:32:41  22         So let me begin -- just reminding everyone, this is

02:32:46  23  the same years, 2013 through 2018.  The vertical axis is

02:32:50  24  market share.

02:32:51  25         The blue line is showing the same date I showed

02:32:54   1   before, that Vascepa's market share in the omega-3 fatty acid

02:32:57   2   category goes to four percent in 2013 to 32 percent in 2018.

02:33:02   3         What you can see with the orange line, that's

02:33:05   4   branded Lovaza, so its market share goes from approximately

02:33:10   5   96 percent in 2013 and then it falls substantially when

02:33:15   6   generic Lovaza enters in 2014, and currently branded Lovaza's

02:33:20   7   market share is in the single digits, under five percent.

02:33:25   8   Q   Is this typical of what happens when a generic substitute

02:33:29   9   enters the market?

02:33:30   10   A   It is.  It's very common for 95 percent of the patients

02:33:33   11   who were taking a branded drug to shift to the generic version

02:33:38   12   or to other products.

02:33:39   13   Q   And, Dr. Nicholson, did you create this slide based on

02:33:42   14   the IQVIA data we've discussed earlier?

02:33:45   15   A   Yes, I did.

02:33:46   16             MR. M. KENNEDY:  Your Honor, Amarin would like

02:33:48   17   to admit PDX 5-10 as a summary exhibit under FRE 1006.

02:33:56   18             MR. ROUNDS:  No objection, Your Honor.

02:33:57   19             THE COURT:  5-10 is admitted.

02:33:57   20                 (Plaintiffs' Exhibit 5-10 received in
02:34:00                       evidence.)
02:34:00   21             MR. M. KENNEDY:  Mr. Brooks, can we have

02:34:03   22   DDX 8-7.  This it one of Mr. Hofmann's slides from this

02:34:06   23   morning.

02:34:06   24   BY MR. M. KENNEDY:

02:34:08   25   Q   And, Dr. Nicholson, were you in the courtroom when

02:34:10  1   Mr. Hofmann discussed this slide?

02:34:12  2   A   Yes, I was.

02:34:13  3   Q   And in particular when Mr. Hofmann discussed the

02:34:17  4   declining prescriptions for the TG lowering segment as a

02:34:21  5   whole?

02:34:21  6   A   Yes.

02:34:23  7   Q   Do you agree with his opinion that this slide shows that

02:34:27  8   Vascepa has not been performing well in the market?

02:34:31  9   A   No.  I have a very different interpretation of this.  I

02:34:34  10  think if every single drug's prescriptions are decreasing, and

02:34:39  11  there's one that's bucking that trend and its prescriptions

02:34:43  12  are increasing, I think that speaks very highly of its

02:34:46  13  positive performance in the market.

02:34:48  14  Q   And does Vascepa meet the description from your previous

02:34:51  15  answer?

02:34:52  16  A   Yes.  It's the only of these products whose prescriptions

02:34:56  17  are increasing, including in most recent years, generic

02:35:01  18  Lovaza's prescriptions are decreasing.

02:35:03  19               MR. M. KENNEDY:  Mr. Brooks, can we have

02:35:08  20  DDX 8.8.

02:35:08  21  BY MR. M. KENNEDY:

02:35:08  22  Q   So, Dr. Nicholson, did you see Mr. Hofmann present this

02:35:12  23  prescription share analysis this morning?

02:35:16  24  A   Yes, I did.

02:35:16  25  Q   Do you agree with Mr. Hofmann that this prescription

02:35:21  1   share analysis on DDX 8.8 shows that Vascepa has not performed

02:35:27  2   well commercially?

02:35:29  3   A    I do disagree.  I don't think this is the appropriate way

02:35:33  4   to look at market share in the pharmaceutical market where

02:35:37  5   it's very common for a new product on the market to experience

02:35:41  6   growing sales and growing market share over time as more

02:35:45  7   prescribers become aware of the products, more patients become

02:35:49  8   aware of it, and more prescribers become aware of the

02:35:52  9   attributes.

02:35:53  10        So, in my opinion, it's very important to look at

02:35:55  11  the lifecycle trend in market share which I've done in the

02:35:59  12  previous figures, to look at the initial and subsequent market

02:36:03  13  share, rather than collapsing it into a six-year figure as

02:36:06  14  Mr. Hofmann did.

02:36:07  15  Q    So this figure that Mr. Hofmann gave is simply for the

02:36:10  16  entire six-year period from 2013 to 2018?

02:36:15  17  A    That's correct, whereas the figures I showed are year by

02:36:19  18  year.

02:36:19  19             MR. M. KENNEDY:  Mr. Brooks, can we have

02:36:23  20  PDX 5-11.

02:36:23  21  BY MR. M. KENNEDY:

02:36:26  22  Q    And, Dr. Nicholson, you heard some discussion about your

02:36:28  23  Net Present Value analysis from Mr. Hofmann this morning.  Do

02:36:33  24  you remember that testimony?

02:36:34  25  A    Yes, I do.

—1440—

02:36:35  1    Q    So what is Net Present Value?

02:36:39  2    A    Net Present Value is, by far, the most common method that

02:36:44  3    businesses use, not just pharmaceutical firms, but all

02:36:47  4    businesses use to try to determine whether to launch a new

02:36:52  5    product, whether to launch a new service, whether to build a

02:36:55  6    new factory.

02:36:56  7         And it's also a way for businesses to track whether

02:37:00  8    a product or service is successful or not.  At essentially a

02:37:03  9    high level, what it consists of is for each year that a

02:37:08  10   product is being developed around the market, you identify

02:37:12  11   initially what the losses are, in the case of Vascepa, the

02:37:18  12   losses associated with performing research and development and

02:37:21  13   launching the drug, and then there's a series of years where

02:37:24  14   the profits are positive either currently or expected to be

02:37:29  15   positive.

02:37:30  16        So you identify the cash flows for every single year

02:37:34  17   of the lifecycle of the drug.  So it would be a series of

02:37:38  18   negative losses and then a series of positive profits.

02:37:42  19        The second thing is to then acknowledge that

02:37:45  20   investors, the investors who gave a company like Amarin the

02:37:49  21   funds to develop the drug, are expecting a return.  So you

02:37:53  22   need to account for the return that they expect.

02:37:56  23        So if a project or a product has a Net Present Value

02:38:01  24   of zero, that means it's going to precisely recoup the R&D

02:38:06  25   costs so the investors will get their average return and no

02:38:11  1   more than that.

02:38:12  2         A project with a positive Net Present Value is one

02:38:16  3   that's delivering an above average return to investors for

02:38:21  4   similar products, products developed by small pharmaceutical

02:38:25  5   firms.

02:38:26  6   Q    What's the significance when a net present value turns

02:38:28  7   from negative to positive?

02:38:30  8   A    So when it goes from negative to positive, when it

02:38:35  9   becomes positive, it has recouped the R&D costs in the sense

02:38:40  10  of investors have received a return that's average for the

02:38:43  11  industry.

02:38:44  12        When it becomes positive, then they're receiving a

02:38:47  13  return that exceeds the average for similar products in the

02:38:51  14  industry.

02:38:52  15  Q    So you heard Mr. Hofmann took issue with your decision to

02:38:56  16  use the net present value analysis to assess Vascepa's

02:38:59  17  commercial success in this case.  Why do you think net present

02:39:03  18  value is the appropriate methodology here?

02:39:07  19  A    It's what's used in this industry, and for good reason,

02:39:11  20  that pharmaceutical products have very long lives, patents run

02:39:15  21  for 20 years.

02:39:16  22        So when a company is considering developing a

02:39:19  23  product, they're looking at a series of very substantial

02:39:22  24  losses, in the case of Amarin, the 465 million of R&D that was

02:39:27  25  required.

02:39:28   1            Then they're going to be looking at the full set of

02:39:31   2   profits that they're going to obtain from that, not just over

02:39:35   3   the first six years, but over all the years at which they have

02:39:38   4   market exclusivity which generally in this industry is 10 to

02:39:44   5   15 years without a company like Amarin having to compete with

02:39:47   6   generics that are selling a bioequivalent version of the

02:39:51   7   product.

02:39:52   8   Q    You've touched on this, but how do companies use Net

02:39:56   9   Present Value in the real world?

02:39:58  10   A    Well, they do, I believe, what I'm doing which is to

02:40:01  11   consider the cash flows, and that's just really a way of

02:40:06  12   saying either losses or profits, the cash flows over the

02:40:09  13   entire period of time that product is expected to be viable in

02:40:15  14   the market, that is, not facing generic competition.

02:40:19  15            MR. M. KENNEDY:  Mr. Brooks, can we have PX 602.

02:40:19  16   BY MR. M. KENNEDY:

02:40:26  17   Q    Dr. Nicholson, do you recognize this document?

02:40:29  18   A    This is the cover of a book called Principles of

02:40:34  19   Corporate Finance which is authored by Brealey and Myers.

02:40:39  20   Q    And other than principles of corporate finance, can you

02:40:45  21   briefly explain what this book covers.

02:40:47  22   A    This is a book I use in my healthcare finance class, and

02:40:51  23   I used it when I taught finance at Wharton.  I think it's one

02:40:55  24   of the most common finance textbooks used in business programs

02:40:57  25   and graduate programs.

02:40:58  1        But it essentially teaches how companies make

02:41:03  2   investment decisions, and the Net Present Value method is

02:41:06  3   really at the core of this entire book.

02:41:08  4   Q   Did you rely on PX 602 in forming your opinions in this

02:41:12  5   case?

02:41:13  6   A   Yes, I did.

02:41:15  7               MR. M. KENNEDY:  Your Honor, Amarin offers

02:41:18  8   PX 602 into evidence.

02:41:20  9               MR. ROUNDS:  No objection.

02:41:21  10              THE COURT:  Is PX 602 a copy of the book?

02:41:26  11              MR. M. KENNEDY:  I believe it's a copy of a

02:41:28  12  chapter.

02:41:28  13              THE COURT:  All right.  PX 602 is admitted.

02:41:28  14                  (Plaintiffs' Exhibit 602 received in
02:41:31                      evidence.)
02:41:32  15              MR. M. KENNEDY:  Mr. Brooks, may we have page 5

02:41:35  16  of PX 602.

02:41:35  17  BY MR. M. KENNEDY:

02:41:36  18  Q   And, Dr. Nicholson, what is the topic of this chapter?

02:41:40  19  A   This chapter, it's called Present Value and the

02:41:44  20  Opportunity Costs of Capital, but it's introducing to students

02:41:48  21  the Net Present Value model.

02:41:51  22              Opportunity costs of capital is another way of

02:41:53  23  explaining the investors' expected rate of return or the

02:41:57  24  discount rate that I mentioned in the prior slide.

02:42:00  25              MR. M. KENNEDY:  Mr. Brooks, could we go to

02:42:02 1  page 10 and blow up the first full paragraph.

02:42:02 2  BY MR. M. KENNEDY:

02:42:08 3  Q   And starting at the fifth line where it says "remember

02:42:12 4  this," Dr. Nicholson, what does this show about how NPV is

02:42:18 5  used?

02:42:20 6  A   So what this is indicating is -- first, it's introducing

02:42:25 7  the notion of the discount rate or the opportunity costs of

02:42:29 8  capital.  That's the investors' expected rate of return that

02:42:33 9  I've described earlier.

02:42:35 10           But it goes on to say,

02:42:36 11           "When you discount the project's expected

02:42:44 12      cash flow at its opportunity costs of capital, the

02:42:44 13      resulting present value is the amount investors would

02:42:48 14      be willing it pay for the project.  Any time you find

02:42:52 15      and launch a positive NPV project, a project with

02:42:56 16      present value exceeding its required cash outlay, you

02:43:00 17      have made your company's stockholders better off."

02:43:03 18           So, in other words, it's basically outlining why

02:43:09 19  Net Present Value -- why companies pursuing positive Net

02:43:12 20  Present Value projects are providing higher than average

02:43:14 21  returns for their investors.

02:43:16 22  Q   In what context have you personally use the Net Present

02:43:19 23  Value analysis?

02:43:21 24  A   I teach it in my healthcare finance class, particularly

02:43:25 25  cases involving valuing drugs in development, and I've also

02:43:30   1   used it in my research as well.

02:43:32   2                   MR. M. KENNEDY:  Mr. Brooks, can we have PX 600.

02:43:32   3   BY MR. M. KENNEDY:

02:43:36   4    Q    Dr. Nicholson, do you recognize that document?

02:43:41   5    A    Yes, this is an article published in 2015 in a journal

02:43:46   6   called *Health Affairs* published by Ernie Berndt and

02:43:51   7   co-authors.

02:43:51   8    Q    Is this a document you relied on in forming your opinions

02:43:55   9   in this case?

02:43:56  10    A    Yes, it is.

02:43:56  11                   MR. M. KENNEDY:  Your Honor, we offer PX 600

02:43:59  12   into evidence.

02:44:02  13                   MR. ROUNDS:  NO objection, Your Honor.

02:44:03  14                   I do wonder whether these are going to helpful

02:44:05  15   to the Court, and whether the Court is actually going to have

02:44:07  16   the opportunity to read these, but if they want to keep doing

02:44:10  17   this, no objection.

02:44:11  18                   MR. M. KENNEDY:  I mean, I will leave to the

02:44:13  19   Court what it helpful and not helpful.  I wouldn't presume

02:44:17  20   opine on that.

02:44:19  21                   THE COURT:  PX 600 is admitted.

02:44:19  22                         (Plaintiffs' Exhibit 600 received in
02:44:22                                evidence.)
02:44:23  23                   MR. M. KENNEDY:  Dr. Nicholson can we move to --

02:44:24  24   or, Mr. Brooks, can we move to page 2.

02:44:24  25

02:44:24    1   BY MR. M. KENNEDY:

02:44:27    2    Q    And I would like to ask you, starting at the seventh line

02:44:30    3   of the methods paragraph, what -- what concept is being

02:44:37    4   discussed here?

02:44:41    5    A    So I think this will become clear shortly.  One of the

02:44:45    6   things this article is doing is it's looking at drugs that

02:44:48    7   were launched in the U.S. between 2005 and 2009, and at the

02:44:52    8   time of the article, many of those drugs had not experienced

02:44:56    9   generic entry.  They were still in their market exclusivity

02:45:01   10   period.

02:45:02   11          And so, as part of the methods, they're doing the

02:45:04   12   same thing that I do, and that is to calculate the lifetime

02:45:07   13   sales for drugs whose lifetime had not concluded, we modeled

02:45:13   14   subsequent sales applying different methods for small

02:45:16   15   molecules and biologics.

02:45:18   16          In other words, rather than looking, in Vascepa's

02:45:21   17   case, at just the first six years, what these authors do with

02:45:24   18   drugs that haven't experienced generic entry, is they forecast

02:45:28   19   sales up until generics are expected to enter.

02:45:33   20                MR. M. KENNEDY:  Mr. Brooks, could we go to

02:45:35   21   page 5, and could we blow up Exhibit 3, the graph at the

02:45:38   22   bottom of the page.

02:45:38   23   BY MR. M. KENNEDY:

02:45:42   24    Q    Dr. Nicholson, what's being shown here?

02:45:45   25    A    I'll focus on the two vertical bars to the far right.

02:45:51  1        First of all, the title, I think, is useful in

02:45:54  2  indicating that the authors are also using the present value

02:45:58  3  method to look at whether drugs are recouping their R&D, but

02:46:03  4  what you can see here for 2005 to 2009 is, across all the

02:46:07  5  drugs that were launched in the U.S. in that five-year time

02:46:11  6  period, they're concluding that the average net present value

02:46:14  7  is going to be negative.

02:46:16  8        And you can see that because the bar all the way to

02:46:21  9  the right with the four segments, that's the present value of

02:46:24  10  the costs associated with those drugs, and it exceeds the

02:46:27  11  present value of the revenue.

02:46:29  12        So the difference would be negative, meaning across

02:46:31  13  that whole set of drugs, they're concluding the average Net

02:46:35  14  Present Value is negative.

02:46:36  15  Q  So how does that feed into your overall opinion

02:46:41  16  concerning Vascepa?

02:46:42  17  A  I think it supports my use of NPV, but I think it also --

02:46:45  18  as I'm going to show, Vascepa has a positive Net Present

02:46:49  19  Value, and I think here you can see that that's, at least for

02:46:51  20  recent drugs, again, bucking the trend.  It's somewhat

02:46:56  21  unusual.

02:46:56  22        Some of these have positive NPV, but across all of

02:46:59  23  them it's negative, so Vascepa stands out in that sense.

02:47:02  24        MR. M. KENNEDY:  Mr. Brooks, can we have

02:47:05  25  PDX 5-12, please.

02:47:05  1   BY MR. M. KENNEDY:

02:47:08  2   Q    And, Dr. Nicholson, what -- could you explain the

02:47:12  3   elements you considered in forming your NPV analysis for

02:47:17  4   Vascepa.

02:47:18  5   A    Yes.  So I began with the actual research and development

02:47:23  6   spending that Amarin incurred for -- to develop Vascepa.  So

02:47:27  7   those are actual R&D costs over this 11-year time period.

02:47:32  8        I then incorporated the actual sales from 2013

02:47:37  9   through 2018, and then as just referenced, because Vascepa's

02:47:44  10  lifecycle is not done, there's still market exclusivity

02:47:48  11  remaining, I used five analysts' reports to form an average

02:47:54  12  forecasted sales for Vascepa from 2019 through 2029.

02:48:01  13  Q    A couple of follow-up questions.  Why do you assume

02:48:04  14  generic entry in August 2029?

02:48:09  15  A    So as indicated in the second to bottom row, according to

02:48:13  16  a publically announced settlement agreement, I'm assuming that

02:48:19  17  Teva will enter with a generic product in August of 2029, and

02:48:23  18  then I conservatively assumed that Vascepa's sales will be

02:48:27  19  zero after that generic entry.

02:48:28  20  Q    What's a discount rate?

02:48:29  21  A    So the discount rate here of 8.6 percent is the

02:48:35  22  investors' expected rate of return for investing in small

02:48:40  23  pharmaceutical firms, or it's the cost of capital, or it's the

02:48:43  24  discount rate.  Those three are really interchangeable.

02:48:47  25       MR. M. KENNEDY:  Mr. Brooks could we have

02:48:49  1    PDX 5-13.

02:48:49  2    BY MR. M. KENNEDY:

02:48:52  3    Q    Dr. Nicholson, so what does this slide show?

02:48:55  4    A    So this shows from 2018 to 2029 on the horizontal axis,

02:49:02  5    either actual sales or forecasted sales in millions of dollars

02:49:06  6    for Vascepa.

02:49:07  7             So if you begin all the way in the left with 2018,

02:49:10  8    that's an actual $228 million of sales that Amarin collected

02:49:15  9    for Vascepa.

02:49:17  10            Then in 2019, it's kind of hard to see, but there's

02:49:21  11   five different sales forecasts that were provided by the five

02:49:26  12   Wall Street analysts whose reports are indicated in the upper

02:49:30  13   left of this figure.

02:49:34  14            Let me just take -- say that the green line on the

02:49:37  15   bottom, the Cantor analyst, the solid line would be years when

02:49:43  16   that particular analyst provided a specific sales forecast

02:49:49  17   estimate for Vascepa for that year.

02:49:51  18            So you can see that that analyst forecasted Vascepa

02:49:55  19   sales through 2027 and forecasted that those would be growing

02:50:00  20   year after year.

02:50:02  21            Likewise you can see the H.C. WainWright analyst

02:50:04  22   forecast sales through 2028, the solid line.

02:50:09  23            Then the orange line in the middle, you can see

02:50:12  24   SunTrust, that analyst forecasts sales through 2022.

02:50:16  25   Q    So all these analyst reports, am I correct, they date

02:50:20  1    from early 2019?

02:50:21  2    A    Yes, it would be between January 6th and late February of

02:50:25  3    2019.

02:50:26  4    Q    And am I correct that these are the latest reports you

02:50:28  5    had available when you prepared your expert report?

02:50:31  6    A    That's correct.  These were reports where the analyst had

02:50:35  7    forecasted Vascepa sales and operating margins by reputable

02:50:41  8    firms, and I collected all five of them.

02:50:43  9    Q    So am I correct these numbers don't reflect more recent

02:50:47  10   Amarin actual sales, nor do they reflect approval of the

02:50:50  11   REDUCE-IT indication?

02:50:51  12   A    That's correct.

02:50:53  13   Q    And how would the -- how would the December 19 approval

02:50:57  14   of the REDUCE-IT indication affect the forecast just at a high

02:51:01  15   level?

02:51:01  16              MR. ROUNDS:  Your Honor, I'm going to object to

02:51:03  17   that, that's beyond the scope of the report.

02:51:06  18              MR. M. KENNEDY:  Well, I think Mr. Hofmann got

02:51:08  19   into the effect of the REDUCE-IT indication.

02:51:10  20              I'm not asking for a detailed update to the

02:51:13  21   analysis, just directionally would having the approval

02:51:17  22   granted, you know, affect his analysis positively or

02:51:22  23   negatively.  I think that's in line with what Mr. Hofmann

02:51:24  24   testified this morning.

02:51:25  25              THE COURT:  Mr. Rounds?

02:51:26   1            MR. ROUNDS:  Yeah, Your Honor, I think he's

02:51:28   2    trying to corroborate numbers that he has in his report with

02:51:30   3    information that we have not had access to and that we can't

02:51:34   4    cross-examine.  It's improper.

02:51:35   5            THE COURT:  Well, Mr. Hofmann, did he testify --

02:51:37   6    I thought it was on cross-examination that the REDUCE-IT

02:51:41   7    indication would affect it one direction.  Is that what you're

02:51:45   8    getting at, Mr. Kennedy?

02:51:47   9            MR. M. KENNEDY:  Partly, but also on direct he

02:51:49   10   brought up the REDUCE-IT indication and -- as a way to dismiss

02:51:52   11   its importance on his view that there's no nexus, but he did

02:51:56   12   testify substantively about it.

02:51:58   13           And I'm not going to get into numbers that are

02:52:01   14   postdating his expert report, all I was trying to elicit is

02:52:06   15   just as a general matter, an approval that was pending at the

02:52:10   16   time of Dr. Nicholson's opinions, now it's not pending

02:52:13   17   anymore, is that good or bad for the certainty of the

02:52:16   18   certainty of the analysts' assessments.

02:52:17   19           I think at that high level, that's fair given

02:52:20   20   the testimony today.

02:52:21   21           THE COURT:  But it does exceed the scope of his

02:52:23   22   report.

02:52:24   23           MR. M. KENNEDY:  Well, that's correct --

02:52:25   24           THE COURT:  Because at the time he testified,

02:52:26   25   Amarin was going through the approval process, but he wasn't

02:52:29  1  asked if the REDUCE-IT indication was approved, what would

02:52:33  2  happen.

02:52:33  3                    MR. M. KENNEDY:  That's correct.

02:52:34  4                    THE COURT:  The objection is overruled, and I

02:52:36  5  think the answer is obvious as well.  The objection -- I'm

02:52:37  6  sorry, the objection is sustained, otherwise I would say that

02:52:40  7  I think the answer is obvious.

02:52:42  8                    MR. M. KENNEDY:  Thank you.  I'll move on, Your

02:52:42  9  Honor.

02:52:42  10  BY MR. M. KENNEDY:

02:52:43  11  Q    So I think you just mentioned this, but what is your view

02:52:46  12  of the reputation in the marketplace of the five analysts'

02:52:51  13  reports you reviewed?

02:52:53  14  A    In my opinion, these are reputable firms, and, as

02:52:59  15  Mr. Hofmann said, they're using all of the information

02:53:02  16  available to them to make the most accurate estimates

02:53:06  17  possible.

02:53:06  18           And I would just go on to add that, you know, the

02:53:11  19  information that analysts provided in general is often pivotal

02:53:15  20  for directing millions if not billions of dollars of

02:53:19  21  investments.  So these analysts' reports are generated with

02:53:23  22  care, and they try to be as accurate as possible.

02:53:26  23  Q    What's the benefit of using all five of these reports?

02:53:29  24  A    Well, the benefit is you get a more accurate forecast.

02:53:36  25           If you have one analyst that is slightly

02:53:40   1   overestimating in ex post, overestimating in Vascepa sales,

02:53:46   2   that's going to be then offset with an analyst who might be

02:53:51   3   subtly underestimating.

02:53:51   4          So by having multiple, in this case five, you

02:53:53   5   increase the precision of the forecast.

02:53:56   6          And if I can just say, I just want to make sure I

02:53:58   7   explain the dotted lines just in case that's not obvious.

02:54:04   8          Not all of the analysts forecast sales of Vascepa

02:54:06   9   all the way through the projected end of market exclusivity.

02:54:12   10  The dotted lines would be my linear extrapolations which I

02:54:16   11  believe is conservative because whenever the analysts are

02:54:21   12  reporting specific sales figures, you can see that they're

02:54:24   13  increasing.

02:54:25   14         So I'm linearly increasing those, and it's

02:54:28   15  conservative because it implies a decreasing growth rate in

02:54:33   16  the sales over time.

02:54:34   17  Q   Are the analysts' reports relied on informing your NPV

02:54:39   18  analysis cited at the bottom of PDX 5-13?

02:54:43   19  A   Yes, they are.

02:54:44   20         MR. M. KENNEDY:  Your Honor, we would like to

02:54:45   21  offer PDX 5-13 as a summary exhibit under FRE 1006.

02:54:51   22         MR. ROUNDS:  No objection.

02:54:52   23         THE COURT:  5-13 is admitted.

02:54:52   24             (Plaintiffs' Exhibit 5-13 received in
02:54:55                   evidence.)
02:54:55   25         MR. M. KENNEDY:  And we'd also like to admit the

| | | |
|---|---|---|
| 02:54:57 | 1 | underlying analysts' reports which listed on the slide, |
| 02:55:06 | 2 | PX 657, PX 658, PX 661, PX 663 and PX 711. |
| 02:55:16 | 3 | THE COURT:  Any objection, Mr. Rounds? |
| 02:55:18 | 4 | MR. ROUNDS:  None, Your Honor. |
| 02:55:20 | 5 | THE COURT:  The underlying five analysts' |
| 02:55:22 | 6 | reports are also admitted. |
| 02:55:02 02:55:13 | 7 | (Plaintiffs' Exhibits 590, 657, 658, 661, 663 and 711 received in evidence.) |
| 02:55:25 | 8 | THE COURT:  Miss Clerk, do you need that to be |
| 02:55:26 | 9 | read again? |
| 02:55:27 | 10 | THE CLERK:  No. |
| 02:55:28 | 11 | THE COURT:  Okay.  Thank you. |
| 02:55:34 | 12 | Would this be a good time for us to take our |
| 02:55:36 | 13 | afternoon recess, or are you almost -- |
| 02:55:39 | 14 | MR. M. KENNEDY:  We probably should. |
| 02:55:40 | 15 | THE COURT:  All right.  We'll take our afternoon |
| 02:55:42 | 16 | recess. |
| 02:55:42 | 17 | (A recess was taken.) |
| 03:18:01 | 18 | THE COURT:  Please be seated. |
| 03:18:08 | 19 | MR. M. KENNEDY:  Your Honor, may I proceed? |
| 03:18:10 | 20 | THE COURT:  Yes. |
| 03:18:11 | 21 | MR. M. KENNEDY:  Mr. Brooks, let's have |
| 03:18:13 | 22 | PDX 5-42, please. |
| 03:18:13 | 23 | BY MR. M. KENNEDY: |
| 03:18:17 | 24 | Q   Dr. Nicholson, what are you showing on this slide? |
| 03:18:19 | 25 | A   So this shows the same years that were on the prior |

03:18:22  1   slide.  The prior slide looked at actual sales and forecasted

03:18:26  2   sales from the five analysts' reports.

03:18:28  3         Here, what I'm showing is the actual profit margin

03:18:32  4   of Vascepa, and then forecasted profit margin of Vascepa from

03:18:39  5   2018 through 2029.

03:18:41  6   Q   How does the profit margin relate to your NPV analysis?

03:18:45  7   A   It's an important input into the analysis because the

03:18:49  8   profit margin indicates what is the profit to Amarin after all

03:18:52  9   expenses.

03:18:53  10        So it would be revenues or sales, minus production

03:18:58  11  costs, minus R&D, minus selling general and administrative

03:19:02  12  costs, and then divided by sales.  So, it's the profit as a

03:19:05  13  percentage of sales.

03:19:06  14  Q   As of February 19, what was the consensus between these

03:19:10  15  five analysts as to when Amarin would become profitable?

03:19:15  16  A   So, all five of the analysts forecasted that in 2020

03:19:19  17  Vascepa would be profitable.  So all five of those dots are

03:19:23  18  above the zero percent horizontal line.

03:19:26  19        And then it's the same pattern here, the solid lines

03:19:30  20  indicate years when an analyst provided a specific operating

03:19:35  21  margin forecast.

03:19:36  22        The dotted lines would be where I very

03:19:39  23  conservatively assumed that the operating margin for that

03:19:42  24  analyst remained constant over the forecast window.

03:19:46  25  Q   Why did you make that assumption?

03:19:50  1  A   Well, I wanted to be conservative, and the reason it's

03:19:54  2  conservative is that all of the operating margines were

03:19:57  3  forecast to increase over the period where the analysts were

03:20:01  4  providing specific figures.

03:20:02  5            So you can see, for example, the Cantor analyst is

03:20:07  6  predicting rising operating margins all the way through 2027,

03:20:12  7  generally as the marketing expenditures start to decrease and

03:20:17  8  the R&D costs are no longer there.

03:20:18  9            So rather than assuming that when an analyst didn't

03:20:23  10  provide a forecast, rather than assuming it would rise, I very

03:20:27  11  conservatively assumed that it would just stay at that

03:20:30  12  constant level.

03:20:31  13  Q   And to prepare PDX 5-14, you used the same analyst

03:20:36  14  reports that we looked at on the previous slide?

03:20:38  15  A   That's correct, the same five reports.

03:20:41  16            MR. M. KENNEDY:  Your Honor, we offer PX 5-14 as

03:20:43  17  a summary exhibit under FRE 1006.

03:20:48  18            MR. ROUNDS:  No objection.

03:20:49  19            THE COURT:  5-14 is admitted.

03:20:49  20                 (Plaintiffs' Exhibit 5-14 received in
03:20:49                      evidence.)
03:20:52  21            MR. M. KENNEDY:  Mr. Brooks, let's have

03:20:55  22  PDX 5-15.

03:20:55  23  BY MR. M. KENNEDY:

03:20:56  24  Q   Dr. Nicholson, what are you showing on this slide?

03:21:00  25  A   Here, I'm showing over Vascepa's entire lifecycle the

03:21:05    1   discounted cash flow year-by-year.  So, again, cash flow is

03:21:10    2   either going to be a loss when costs are greater than revenue,

03:21:13    3   so everything from 2008 through 2019, and then it will be a

03:21:18    4   positive profit from 2020 through 2029.

03:21:22    5           And I should just note that I'm taking an average of

03:21:25    6   the profit across those five analysts' reports for 2019

03:21:29    7   through 2020.

03:21:30    8           So this is the year-by-year profit or loss already

03:21:34    9   discounted, meaning already taking into account the expected

03:21:39   10   return that investors would have for giving a company like

03:21:42   11   Amarin funds to develop a drug.

03:21:44   12   Q   And what is discounted cash flow?

03:21:47   13   A   So it's, it's a way of putting each year of profit or

03:21:52   14   loss on equal footing.  It's to acknowledge that investors

03:21:56   15   would give money to a company such as Amarin with an

03:22:00   16   expectation that they would get a return on that.  So, it

03:22:03   17   takes future values and it reduced them to account for that.

03:22:07   18   Q   And, again, you're relying on the same analysts' reports

03:22:10   19   we've already looked at on other slides?

03:22:12   20   A   Yes, that's correct.

03:22:14   21               MR. M. KENNEDY:  Your Honor, we offer PDX 5-15

03:22:17   22   as summary exhibit under FRE 1006.

03:22:20   23               MR. ROUNDS:  No objection, Your Honor.

03:22:21   24               THE COURT:  5-15 is admitted.

03:22:21   25

03:22:21  1          (Plaintiffs' Exhibit 5-15 received in
03:22:21                    evidence.)
03:22:26  2          MR. M. KENNEDY:  Mr. Brooks, can we have

03:22:28  3  PDX 5-16.

03:22:28  4  BY MR. M. KENNEDY:

03:22:30  5  Q    And, Dr. Nicholson, what are you showing here?

03:22:32  6  A    So this is a cumulative version of the prior figure.

03:22:36  7          So the prior figure showed the year-by-year losses

03:22:39  8  or profits for Vascepa.  This is now accumulating those year

03:22:46  9  after year, so just add the -- that cash flow to the prior

03:22:51  10  year's cash flows.

03:22:53  11          And what this shows is, as Amarin's incurring losses

03:22:56  12  when they're developing and launching Vascepa, the cumulative

03:23:00  13  NPV line is getting more and more negative, and then it begins

03:23:05  14  to turn upward in 2020 when the profits are forecast to be

03:23:09  15  positive.

03:23:10  16          And then the NPV line intersects the X axis in 2024.

03:23:19  17  So that indicates that I'm forecasting that Vascepa's Net

03:23:23  18  Present Value will be zero in 2024.  In other words, that's

03:23:27  19  the year when investors will have recouped their investment

03:23:31  20  and received the average return, the 8.6 percent return.

03:23:36  21          Thereafter, the NPV continues to increase up to

03:23:41  22  1.7 billion in 2028, and then 1.9 billion in 2029.

03:23:47  23  Q    So 1.9 billion is the dot with 2029 that we didn't put a

03:23:52  24  legend on?

03:23:52  25  A    That's right.  And that indicates that over its entire

03:23:57  1   lifecycle, Vascepa is expected to have a positive Net Present

03:24:01  2   Value at 1.9 billion or, in other words, deliver a return to

03:24:05  3   investors that exceeds the average return for the industry by

03:24:09  4   $1.9 billion.

03:24:11  5   Q   And what does this analysis tell you about whether

03:24:13  6   Vascepa is a commercial success?

03:24:16  7   A   This indicates that Vascepa is a commercial success.

03:24:20  8   It's delivering above average returns to investors in the

03:24:23  9   industry.

03:24:25  10  Q   And, again, you relied on the same analysts' reports and

03:24:28  11  financial information as with the previous few slides?

03:24:32  12  A   Yes, that's correct.

03:24:34  13                MR. M. KENNEDY:  Your Honor, we offer PDX 5-16

03:24:38  14  as a summary exhibit under FRE 1006.

03:24:42  15                MR. ROUNDS:  No objection, Your Honor.

03:24:43  16                THE COURT:  5-16 is admitted.

03:24:43  17                    (Plaintiffs' Exhibit 5-16 received in
03:24:43                        evidence.)
03:24:46  18                MR. M. KENNEDY:  Mr. Brooks, can we have

03:24:49  19  DDX 8.9.

03:24:49  20  BY MR. M. KENNEDY:

03:24:49  21  Q   Dr. Nicholson, were you in the courtroom this morning

03:24:52  22  when Mr. Hofmann discussed some of the H.C. WainWright

03:24:55  23  projections?

03:24:56  24  A   Yes, I was.

03:24:57  25  Q   What is your understanding of the point

03:24:59  1  Mr. Hofmann was trying to make with this particular slide?

03:25:03  2   A   Well, my understanding is that Mr. Hofmann identified one

03:25:09  3  year, 2018, where one of the analysts overestimated the sales

03:25:15  4  that Vascepa actually collected for 2018.

03:25:18  5           So in 2015, '16, '17, when forecasting for the same

03:25:23  6  year 2018, one of the analysts of the five that I'm using

03:25:28  7  estimated sales that ended up being higher than what were

03:25:31  8  actually realized.

03:25:34  9   Q   So do you agree with Mr. Hofmann that this calls into

03:25:37  10  question whether you should have relied on H.C. WainWright as

03:25:41  11  part of your analysis?

03:25:43  12   A   No.  This, to me, reinforces the importance of using all

03:25:46  13  of the analysts' reports that were available that were

03:25:49  14  providing the forecasts that I needed.

03:25:51  15           It's what you would expect.  Sometimes an analyst

03:25:54  16  making a forecast will make a prediction that's quite accurate

03:25:59  17  in retrospect, sometimes a little high, sometimes a little

03:26:04  18  low.  But by including all five of the analysts' reports, and

03:26:06  19  taking an average, you have the opportunity to have a forecast

03:26:10  20  that's overly optimistic, offsetting one that might be overly

03:26:17  21  pessimistic.

03:26:18  22           MR. M. KENNEDY:  Mr. Brooks, can we have

03:26:20  23  PDX 5-17.

03:26:20  24  BY MR. M. KENNEDY:

03:26:21  25   Q   Dr. Nicholson, what are you showing on this slide?

03:26:24  1    A    What I show here is that if you look at a couple of other

03:26:28  2  instances, it's the case that H.C. WainWright was forecasting

03:26:32  3  sales that ended up being too low.  The Vascepa sales exceeded

03:26:36  4  what the H.C. WainWright analysts predicted.

03:26:40  5           So on the left, in early 2017, the H.C. WainWright

03:26:45  6  analysts forecast that for the full calendar year 2017, they

03:26:49  7  forecast Vascepa sales of 165.5 million.  If you look on the

03:26:55  8  right, that's the actual 2017 sales for Vascepa,

03:27:01  9  179.8 million.

03:27:01  10           So this is an instance where H.C. WainWright was too

03:27:06  11  low in forecasting, and not to high.

03:27:09  12           And at the bottom, you can see something similar.

03:27:12  13  The analyst WainWright was forecasting operating losses of

03:27:18  14  46.6 million, and the losses ended up being smaller, less

03:27:23  15  negative than what the analyst forecast.

03:27:25  16    Q    And at the bottom of this slide, you cite the H.C.

03:27:29  17  WainWright analysis for March 1st, 2017, and that's PX 752?

03:27:35  18    A    Yes, that's correct.

03:27:36  19    Q    Is that a document you relied on in forming your opinions

03:27:39  20  in this case?

03:27:40  21    A    Yes.

03:27:42  22           MR. M. KENNEDY:  Your Honor, we would like to

03:27:43  23  enter PX 752 into evidence.

03:27:46  24           THE COURT:  Any objection?

03:27:48  25           MR. ROUNDS:  No objection, Your Honor.

```
03:27:49   1              THE COURT:  PX 752 is admitted.

03:27:49   2                        (Plaintiffs' Exhibit 752 received in
03:27:49                             evidence.)
03:27:49   3   BY MR. M. KENNEDY:

03:27:53   4    Q    And, Dr. Nicholson, you compared that H.C. WainWright

03:27:56   5   projection from that year to Amarin's 10-K for fiscal year

03:27:58   6   ending December 31st, 2017, PX 637.  Is that a document you

03:28:03   7   relied on in forming your opinions in this case?

03:28:06   8    A    Yes.

03:28:07   9                   MR. M. KENNEDY:  Your Honor, Amarin moves to

03:28:09  10   admit PX 637.

03:28:14  11                   MR. ROUNDS:  No objection.

03:28:14  12                   THE COURT:   637 is also admitted.

03:28:14  13                        (Plaintiffs' Exhibit 637 received in
03:28:14                             evidence.)
03:28:18  14                   MR. M. KENNEDY:  And, Mr. Brooks, can we go to

03:28:21  15   PDX 5-18, please.

03:28:21  16   BY MR. M. KENNEDY:

03:28:23  17    Q    Dr. Nicholson, what does this slide show?

03:28:25  18    A    This is another instance where H.C. WainWright

03:28:31  19   underestimated the actual sales for Vascepa, so, contrary to

03:28:34  20   the example that Mr. Hofmann provided this morning.

03:28:38  21           Specifically, on the left, you can see that in the

03:28:41  22   first quarter 2019 -- this is from the same analysts' report

03:28:44  23   that I used in the Net Present Value analysis -- the H.C.

03:28:48  24   WainWright analysts were forecasting that for the first

03:28:51  25   quarter, once it completed, the Vascepa would have sales of
```

03:28:55  1   65.7 million.

03:28:57  2          If you look at the right, from the financial

03:28:59  3   statement, Vascepa ended up having 72.7 million of sales.  So

03:29:04  4   this is an instance where H.C. WainWright was too pessimistic.

03:29:09  5   They under-forecast the sales.

03:29:11  6          And at the bottom you can see something similar, in

03:29:14  7   the directional sense.  The analysts were forecasting

03:29:17  8   operating losses for Amarin of 47.6 million for the first

03:29:22  9   quarter 2019.  In the bottom right, you can see it ended up

03:29:27  10  being about half of that, so a much smaller loss in reality

03:29:31  11  than what was forecast.

03:29:32  12  Q    The citation at the bottom of this slide, the H.C.

03:29:36  13  WainWright report from February 2019 is PX 658.  Did you rely

03:29:41  14  on that analyst's report in forming your opinions in this

03:29:43  15  case?

03:29:44  16  A    Yes.

03:29:45  17          MR. M. KENNEDY:  Your Honor, we would like to

03:29:47  18  offer PX 658 into evidence.

03:29:50  19          MR. ROUNDS:  No objection.

03:29:51  20          THE COURT:  658 is admitted.

03:29:54  21  BY MR. M. KENNEDY:

03:29:54  22  Q    And you compared that projection to Amarin's 10-Q for

03:29:59  23  quarterly period ending March 31st, 2019, and that's PX 724.

03:30:02  24  Did you rely on that 10-Q in forming your opinions in this

03:30:06  25  case?

| | | |
|---|---|---|
| 03:30:06 | 1 | A    Yes. |
| 03:30:07 | 2 | MR. M. KENNEDY:  Amarin would like to move |
| 03:30:11 | 3 | PX 724 into evidence. |
| 03:30:12 | 4 | MR. ROUNDS:  No objection. |
| 03:30:12 | 5 | THE COURT:  724 is admitted. |
| 03:30:12 | 6 | (Plaintiffs' Exhibit 724 received in |
| 03:30:12 | | evidence.) |
| 03:30:12 | 7 | BY MR. M. KENNEDY: |
| 03:30:15 | 8 | Q    So, Dr. Nicholson, I assume you heard that |
| 03:30:18 | 9 | Mr. Hofmann took issue with how you did your Net Present Value |
| 03:30:23 | 10 | calculation, and particularly your inclusion of the WainWright |
| 03:30:27 | 11 | analysis.  Do you remember that testimony? |
| 03:30:27 | 12 | A    Yes. |
| 03:30:28 | 13 | MR. M. KENNEDY:  Mr. Brooks, let's have DDX 810. |
| 03:30:28 | 14 | BY MR. M. KENNEDY: |
| 03:30:35 | 15 | Q    And, Dr. Nicholson, do you understand the point |
| 03:30:37 | 16 | Mr. Hofmann was trying to make this morning with this slide? |
| 03:30:41 | 17 | A    I think so. |
| 03:30:42 | 18 | Q    What is your understanding of his argument? |
| 03:30:44 | 19 | A    Well, my understanding is that his conclusion was that |
| 03:30:50 | 20 | because in one of those instances H.C. WainWright |
| 03:30:54 | 21 | overestimated what Vascepa's actual sales were, that that was |
| 03:30:58 | 22 | reason to remove that analyst report from the Net Present |
| 03:31:03 | 23 | Value. |
| 03:31:03 | 24 | I just showed two instances where WainWright |
| 03:31:06 | 25 | underestimated sales, and so I strongly believe that all five |

03:31:12  1  analyst reports should be included because that increases the

03:31:16  2  accuracy of the Net Present Value analysis.

03:31:19  3  Q   Well, let's say we did exclude the H.C. WainWright

03:31:23  4  report, would that change your opinion as to whether Vascepa

03:31:25  5  is a commercial success?

03:31:28  6  A   No, and I don't think it's appropriate to omit H.C.

03:31:32  7  WainWright.  But even if one were to do that, Vascepa would

03:31:36  8  still have a positive Net Present Value.  It would be smaller

03:31:39  9  than the one that I believe is appropriate, but I would still

03:31:42  10  conclude that Vascepa is a commercial success.

03:31:45  11          MR. M. KENNEDY:  Can we have PX 607.

03:31:45  12  BY MR. M. KENNEDY:

03:31:50  13  Q   And, Dr. Nicholson, do you recognize that document?

03:31:54  14  A   Yes.  This is a title page of a book that I co-edited in

03:31:58  15  2012.  It's called *The Economics of the Biopharmaceutical*

03:32:03  16  *Industry*.

03:32:04  17  Q   Is this a document you relied on in forming your opinions

03:32:07  18  in this case?

03:32:07  19  A   Yes.

03:32:09  20          MR. M. KENNEDY:  Your Honor, we offer PX 607.  I

03:32:12  21  believe it's a chapter from this book.

03:32:14  22          MR. ROUNDS:  Your Honor, I think we require a

03:32:16  23  little more foundation to show that this is a learned treatise

03:32:19  24  within the industry, just to pass the hearsay objection.

03:32:25  25          MR. M. KENNEDY:  Sure.

03:32:25  1   BY MR. M. KENNEDY:

03:32:26  2   Q    Dr. Nicholson, who edited *The Economics of the*

03:32:28  3   *Biopharmaceutical Industry*?

03:32:30  4   A    I edited it along with my former colleague, Patricia

03:32:35  5   Danzon at the Wharton School of Penn.  The Oxford publishers

03:32:40  6   approached us and asked us if we would be willing to assemble

03:32:44  7   a group of academics to publish a study on economics of the

03:32:49  8   industry.

03:32:49  9   Q    And do you consider yourself an expert in the economics

03:32:51  10  of the biopharmaceutical industry?

03:32:55  11  A    I do.

03:32:55  12  Q    Is Ms. Danzon an expert in the economics of the

03:32:59  13  biopharmaceutical industry?

03:32:59  14  A    She is, in my opinion, yes.

03:33:03  15  Q    I don't want you to be immodest, but is this book used in

03:33:07  16  the field to teach about the economics of the

03:33:09  17  biopharmaceutical industry?

03:33:12  18  A    I believe it is.  I don't keep track, but I believe it

03:33:15  19  is, yes.

03:33:15  20  Q    Generally, what kinds of topics are covered in this

03:33:19  21  handbook?

03:33:20  22  A    This book was intending to really span the major issues

03:33:26  23  that biotech and pharmaceutical firms face over the course of

03:33:31  24  their -- the lifecycle of a drug.

03:33:33  25            So it looked as things such as patents, and where

03:33:36  1    companies raise their research and development money, how they

03:33:40  2    price their products, the role of marketing, mergers and

03:33:45  3    acquisitions, and licensing deals.

03:33:47  4         So it really tried to span both issues that come up

03:33:50  5    before a drug gets approved, and then also issues about

03:33:55  6    managing a drug once it's on the market.

03:33:57  7    Q    Why is this handbook relevant to your opinions today?

03:34:02  8    A    Well, this contains some -- it summarizes and describes

03:34:08  9    some of the studies that I think are pivotal in terms of

03:34:12  10   understanding the economics of the industry.

03:34:16  11        And, in particular, you know, how do academics treat

03:34:21  12   the lifecycle of a pharmaceutical product, or how often are

03:34:26  13   drugs actually commercially successful, how often do they

03:34:29  14   actually have a positive Net Present Value, things that are

03:34:33  15   important when companies decide whether or not to pursue

03:34:36  16   projects.

03:34:37  17        MR. M. KENNEDY:  Your Honor, Amarin offers

03:34:40  18   PX 607 into evidence.

03:34:41  19        MR. ROUNDS:  Same objection, Your Honor.

03:34:43  20   There's no evidence about how widely circulated, how widely

03:34:46  21   read, how widely used this is in the industry.

03:34:50  22        We maintain the objection.

03:34:51  23        MR. M. KENNEDY:  I would just note this was

03:34:53  24   disclosed to defendants two days ago, and this is an objection

03:34:56  25   they could have raised in advance.

03:34:57   1            But, in any event, I believe I've laid adequate

03:35:00   2    foundation with an expert in the field on those topics.

03:35:03   3            THE COURT:  I agree.  And, Mr. Nicholson,

03:35:08   4    testified that he relied on the information in this chapter as

03:35:14   5    well in his report.  I'm going to overrule the objection, and

03:35:18   6    we'll admit Exhibit 607.

03:35:18   7                    (Plaintiffs' Exhibit 607 received in
03:35:18                         evidence.)
03:35:24   8            MR. M. KENNEDY:  Mr. Brooks, let's have page 20

03:35:28   9    of PX 607.

03:35:28   10   BY MR. M. KENNEDY:

03:35:29   11   Q    And with reference to the graph on the top half of this

03:35:32   12   page, in your view, why is it appropriate to look at the

03:35:36   13   entire lifecycle of a drug in analyzing commercial success?

03:35:39   14   A    Because drugs have very long lifecycles.  They generally

03:35:47   15   exhibit a period of extended growth of sales once they reach

03:35:51   16   the market because it takes a while for physicians and

03:35:54   17   patients to become aware of a drug and to understand the

03:35:58   18   attributes of the drug.

03:35:59   19            If you look at the top figure, that's the sales

03:36:03   20   profile for the highest selling drugs that were launched in

03:36:10   21   the U.S. between 1990 and 1994, and what you can see is that

03:36:14   22   line increases for about 12 years.  In other words, the sales

03:36:17   23   of the drugs continue increasing over an extended period.

03:36:21   24            So if one were to just truncate this at six years,

03:36:24   25   you would miss a lot of the important and higher sales period

03:36:29   1    of a drug's life.

03:36:30   2    Q    Is this how the pharmaceutical industry, in general,

03:36:35   3    looks at these matters?

03:36:37   4    A    Yes, it is.

03:36:37   5                    MR. M. KENNEDY:  Mr. Brooks, can we have PX 612.

03:36:37   6    BY MR. M. KENNEDY:

03:36:43   7    Q    Now, Dr. Nicholson, what is this document?

03:36:45   8    A    This is an article in a journal called *Nature Reviews*

03:36:52   9    *Drug Discovery* published in 2008 by Henry Grabowski.

03:36:57   10   Q    And did you rely on this document in forming your

03:36:59   11   opinions in this case?

03:37:00   12   A    I did.

03:37:04   13                   MR. M. KENNEDY:  Your Honor, we offer PX 612

03:37:05   14   into evidence.

03:37:07   15                   MR. ROUNDS:  No objection, Your Honor.

03:37:08   16                   THE COURT:  612 is admitted.

03:37:08   17                        (Plaintiffs' Exhibit 612 received in
03:37:08                               evidence.)
03:37:10   18                   MR. M. KENNEDY:  Mr. Brooks, let's have page 6.

03:37:10   19   BY MR. M. KENNEDY:

03:37:13   20   Q    And with reference to Figure 3, what is Figure 3 showing?

03:37:17   21   A    So Figure 3 shows that, on average, when Henry Grabowski

03:37:26   22   looked at drugs that launched in the U.S. between 1980 and

03:37:30   23   1984, on average, it took those drugs 16 years to reach Net

03:37:35   24   Present Value of zero.

03:37:36   25                   And what he's showing is the R&D costs as that

03:37:40   1    horizontal purple line, and then the present value of cash

03:37:45   2    flows, or profits, year by year.  So it's more evidence that

03:37:50   3    present value was commonly used.

03:37:52   4            But, importantly, in my analysis, I'm estimating

03:37:56   5    that Vascepa's Net Present Value will turn positive in its

03:38:00   6    twelfth year in market, and that will be four years faster

03:38:04   7    than average, according to this study.

03:38:06   8            MR. M. KENNEDY:  Let's turn to the nexus

03:38:08   9    analysis.  Mr. Brooks, let's have PDX 5-19.

03:38:08  10    BY MR. M. KENNEDY:

03:38:13  11    Q    And, Dr. Nicholson, how did you go about performing your

03:38:17  12    nexus analysis?

03:38:19  13    A    So I first looked at whether there was any evidence that

03:38:25  14    the commercial success of Vascepa was being driven by factors

03:38:29  15    other than the patented features in a substantial way,

03:38:33  16    specifically was it the case that Amarin was marketing or

03:38:37  17    promoting Vascepa more than average in the industry, and,

03:38:42  18    also, what was the nature of the marketing, so what were the

03:38:45  19    messages or the features that were being featured in the

03:38:48  20    marketing.

03:38:49  21            And then I also examined the role of price.  So, was

03:38:54  22    there any evidence that the commercial success was importantly

03:38:57  23    being driven by the price of Vascepa.

03:38:59  24            And then finally looked at some of the marketing

03:39:03  25    documents and some analysis of physicians' perceptions of

03:39:07  1    Vascepa to see whether there was evidence that the patented

03:39:10  2    features were driving the awareness and the use of the

03:39:15  3    product.

03:39:16  4                    MR. M. KENNEDY:  Mr. Brooks, can we have

03:39:19  5    PDX 5-20.

03:39:19  6    BY MR. M. KENNEDY:

03:39:21  7    Q    And, Dr. Nicholson, what does this slide show?

03:39:26  8    A    So this shows for Lovaza at the top, and Vascepa at the

03:39:32  9    bottom, the marketing expenditures that were incurred for the

03:39:39  10   first six years of each of these drugs' life on the market.

03:39:43  11        So for Lovaza, that's 2005 to 2011.  That's the

03:39:47  12   first six years when it was on the market, and Vascepa would

03:39:51  13   be 2013 through 2018.

03:39:53  14        So, that's what the numbers at the bottom refer to,

03:39:56  15   how many years since the drug launched.

03:39:59  16   Q    Why did you choose that comparison?

03:40:01  17   A    Well, Lovaza because it's -- it has a similar indication,

03:40:06  18   the same indication as Vascepa's initial indication.

03:40:10  19        But, I'm looking at the first six years because

03:40:15  20   marketing tends to be front-loaded.  Pharmaceutical firms find

03:40:19  21   it most valuable to market their drug when it first launches

03:40:24  22   because information is more valuable at that point.

03:40:27  23        Some physicians aren't aware of the drug, or some

03:40:30  24   physicians might not be aware of how well the drug performed

03:40:33  25   in clinical trials.  So, the marketing spending tends to be

03:40:37   1   higher early in a drug's lifecycle relative to later.

03:40:41   2   Q    And where did you get the data to perform this

03:40:43   3   comparison?

03:40:44   4   A    These data come from IQVIA.

03:40:46   5   Q    And what kinds of marketing expenditures does IQVIA

03:40:52   6   collect for this type of comparison?

03:40:55   7   A    IQVIA captures four different types of marketing

03:40:59   8   activities.  So, money spent on the sales reps or the

03:41:03   9   detailing; the samples that are sometimes distributed to

03:41:08  10   physicians; advertisements in journals that physicians read;

03:41:12  11   and then finally, direct-to-consumer advertising.

03:41:16  12   Q    And so the PX 642 and 647 are the data sources you used

03:41:23  13   for this slide?

03:41:24  14   A    Yes, that's correct.

03:41:25  15        And if I could just speak to what the slide is

03:41:29  16   showing.  What you can see is that the spending on Vascepa was

03:41:34  17   substantially lower in terms of marketing spending relative to

03:41:38  18   Lovaza at the same point in each of the two drugs' lifecycles.

03:41:42  19        So the spending on Vascepa's marketing ranged from

03:41:46  20   20 to 45 million per year.  For Lovaza, it's more like 70 to

03:41:52  21   120 -- or 140 million.

03:41:54  22   Q    So what significance do you ascribe to that disparity?

03:41:57  23   A    Well, to me, this provides evidence that Amarin wasn't

03:42:03  24   marketing Vascepa more intensively than another similar

03:42:09  25   product, once you look at the same parts of their lifecycle.

03:42:13   1            MR. M. KENNEDY:  Your Honor, we would like to

03:42:14   2   enter -- we'd move to enter PDX 5-20 as a summary exhibit

03:42:18   3   under FRE 1006.

03:42:21   4            MR. ROUNDS:  No objection, Your Honor.

03:42:23   5            THE COURT:  5-20 is admitted.

03:42:26   6            MR. M. KENNEDY:  And I'd also like to move

03:42:30   7   PX 642 and 647, to the extent they're not already admitted,

03:42:33   8   and Amarin would like a chance to review those for redactions

03:42:36   9   for publishing.

03:42:38  10            MR. ROUNDS:  No objection.

03:42:39  11            THE COURT:  All right.  To the extent they

03:42:41  12   haven't been admitted, 642 and 647 are admitted.

03:42:41  13                      (Plaintiffs' Exhibit 5-20, 647 and 642
03:42:41                          received in evidence.)
03:42:50  14            MR. M. KENNEDY:  Mr. Brooks, can we have 5-21,

03:42:53  15   please.

03:42:53  16   BY MR. M. KENNEDY:

03:42:56  17   Q   And, Dr. Nicholson, what are you showing on this slide?

03:43:00  18   A   So I'm showing another way to look at the marketing

03:43:03  19   intensity of Vascepa versus Lovaza.  So the same six years

03:43:09  20   post-launch are being displayed on the horizontal axis.  The

03:43:13  21   vertical axis is now the marketing to sales ratio.  So, it's

03:43:17  22   the marketing spending in dollars, divided by the sales in

03:43:21  23   dollars.

03:43:23  24            And what you can see is those two lines, Vascepa and

03:43:26  25   Lovaza, are quite similar; or, in other words, when you take

03:43:29  1    an alternative way at measuring marketing, there's additional

03:43:33  2    evidence that Vascepa is not being marketed in an excessive

03:43:37  3    way relative to Lovaza.

03:43:39  4    Q    And, again, you're relying on IQVIA data for these

03:43:47  5    comparisons?

03:43:48  6    A    Yes.

03:43:49  7                MR. M. KENNEDY:  Your Honor, we'd like to enter

03:43:50  8    PDX 5-21 as a summary exhibit under FRE 1006.

03:43:55  9                MR. ROUNDS:  No objection, Your Honor.

03:43:56  10               THE COURT:  5-21 is admitted.

03:43:59  11               MR. M. KENNEDY:  And I would also like to enter

03:44:01  12   PX 643 and PX 645.  And again, we would ask for the

03:44:07  13   opportunity to review for redactions.

03:44:10  14               THE COURT:  Any objection?

03:44:12  15               MR. ROUNDS:  No objection, Your Honor.

03:44:12  16               THE COURT:  All right.  They're admitted.

03:44:12  17                     (Plaintiffs' Exhibit 5-21, 643 and 645
03:44:12
03:44:12  18   BY MR. M. KENNEDY:                received in evidence.)

03:44:17  19   Q    So, Dr. Nicholson, what is your overall conclusion as to

03:44:21  20   whether marketing expenditure is responsible for Vascepa's

03:44:21  21   commercial success?

03:44:23  22   A    My conclusion is that it is not the driver of the

03:44:30  23   commercial success, that Amarin is not marketing Vascepa in a

03:44:33  24   more intensive way relative to the rest the industry, or

03:44:37  25   relative to a comparable product, Lovaza.

03:44:40    1             MR. M. KENNEDY:  Mr. Brooks, can we have

03:44:43    2    DDX 8.18.

03:44:43    3    BY MR. M. KENNEDY:

03:44:45    4    Q    And, Dr. Nicholson, do you remember this graph or pie

03:44:48    5    chart that Mr. Hofmann showed this morning?

03:44:51    6    A    Yes.

03:44:52    7    Q    Do you believe that this is an appropriate way to

03:44:55    8    evaluate promotional dollar spend from 2013 to 2017 for the

03:45:03    9    listed drugs?

03:45:04   10    A    No, I don't believe so.  This figure is collapsing five

03:45:08   11    years of data into a single figure.

03:45:11   12             And so I -- I mentioned it's important to look at

03:45:15   13    marketing spending according to where a drug is in its

03:45:20   14    lifecycle, because firms have strong incentives to market

03:45:24   15    early when there's relatively little known about the drug.

03:45:28   16             And here the other drugs all have -- so that's one

03:45:33   17    point, that rather than collapsing this into five years, the

03:45:36   18    appropriate thing would be to look year by year.

03:45:39   19             The other point is that all these other drugs,

03:45:41   20    except for Vascepa, had a generic version at some point in

03:45:45   21    this time period, and as was discussed this morning, generally

03:45:49   22    branded firms cease their marketing when they lose market

03:45:54   23    exclusivity, when a generic enters.

03:45:57   24    Q    Now, you said -- do generic drugs and drugs that have

03:46:02   25    been in a given market longer tend to have comparative -- or a

03:46:06  1  competitive advantage of new entrants?

03:46:06  2  A   In general, yes.  All else equal, yes, because drugs that

03:46:12  3  have been established in the market are well-known by

03:46:15  4  prescribers and patients, and so they're able to establish a

03:46:20  5  reputation and get some sort of a first mover advantage.

03:46:25  6           But also, once there are generics available, those

03:46:29  7  products end up being much less expensive, and so they are

03:46:33  8  well-known, established, and often much less expensive.

03:46:37  9  Q   Now, a new drug like Vascepa coming into a market that,

03:46:41  10 as we've seen, was largely genericized, how was it able to

03:46:46  11 gain a foothold in that market?

03:46:50  12 A   Well, in part, it needs to differentiate itself.  It

03:46:58  13 needs to provide information to health insurers, to patients,

03:47:01  14 to physicians, what are the attributes of this drug, is this

03:47:06  15 drug different from other drugs, and, if so, how is it

03:47:08  16 different as a way of try to carve out a set of patients who

03:47:11  17 are willing to take it.

03:47:12  18 Q   And in terms of a differentiator, are you referring to

03:47:15  19 clinical data?

03:47:17  20 A   Certainly that would be an important differentiator, yes.

03:47:21  21 Q   Have you reviewed how Amarin marketed its product to

03:47:25  22 physicians?

03:47:26  23 A   Yes, I have.

03:47:27  24 Q   What was the message that we asked you to analyze for

03:47:31  25 purposes of evaluating Amarin's marketing efforts?

03:47:35   1   A    Well, I was asked to examine whether, and to what extent,

03:47:41   2   Amarin was featuring the patented features in its marketing;

03:47:46   3   specifically, the ability of Vascepa to reduce TG levels

03:47:52   4   without increasing LDL-C, and was that message resonating with

03:47:57   5   physicians, and was it important for their use of the product.

03:48:01   6                    MR. M. KENNEDY:  Mr. Brooks, can we have PX 580,

03:48:04   7   please.

03:48:04   8   BY MR. M. KENNEDY:

03:48:08   9   Q    Dr. Nicholson, do you recognize this document?

03:48:11   10   A    Yes.  This is a study that a company called ZS Associates

03:48:16   11   produced for Amarin in August of 2014.

03:48:20   12   Q    What is your understanding of the purpose of this report?

03:48:24   13   A    My understanding is that Amarin was interested in

03:48:28   14   understanding are physicians aware of Vascepa, and, more

03:48:34   15   specifically, are they aware of specific attributes of

03:48:39   16   Vascepa, and does that attribute knowledge affect their use of

03:48:44   17   Vascepa.

03:48:45   18   Q    Is this sort of the market research a typical thing that

03:48:48   19   pharmaceutical companies do to evaluate their marketing

03:48:52   20   messages?

03:48:53   21   A    It is.  Companies want to understand whether their

03:48:56   22   messages are resonating and whether decision-makers are

03:49:02   23   knowledgeable about the product.

03:49:03   24   Q    Did you rely on PX 580 in forming your opinions in this

03:49:07   25   case?

03:49:07  1   A   Yes.

03:49:09  2                   MR. M. KENNEDY:  Your Honor, we offer PX 580

03:49:12  3   into evidence.

03:49:13  4                   MR. ROUNDS:  No objection.

03:49:14  5                   THE COURT:  PX 580 is admitted.

03:49:14  6                       (Plaintiffs' Exhibit 580 received in
03:49:14                            evidence.)

03:49:18  7                   MR. M. KENNEDY:  Mr. Brooks, can we have page 6

03:49:20  8   of PX 580.

03:49:20  9   BY MR. M. KENNEDY:

03:49:23  10  Q   And so, Dr. Nicholson, what were the take-away points

03:49:26  11  from this market survey in terms of Amarin's marketing?

03:49:31  12  A   I'll focus on the bullet point about half-way in the

03:49:37  13  slide in the Marketing Effort section that says,

03:49:40  14                  ""A majority of the physicians (approximately

03:49:43  15       80 percent) recall Vascepa's LDL-C message."

03:49:47  16                  That is, that it doesn't increase LDL-C bad

03:49:51  17  cholesterol.

03:49:52  18                  And then below that, the physicians who are

03:49:54  19  prescribing Vascepa, who are using it, are more aware of that

03:50:00  20  attribute than physicians who are not currently prescribing

03:50:05  21  Vascepa.

03:50:05  22                  So when a physician becomes aware of the ability

03:50:08  23  of Vascepa not to increase LDL-C, that increases their

03:50:11  24  probability of prescribing it.

03:50:14  25                   MR. M. KENNEDY:  Mr. Brooks, can we have

03:50:15   1   page 28, please.

03:50:15   2   BY MR. M. KENNEDY:

03:50:18   3   Q    And there's a term on this page called "message recall."

03:50:22   4   What is message recall in this context?

03:50:25   5   A    This is -- message recall is whether physicians were able

03:50:29   6   to identify a message that Amarin might be marketing to

03:50:37   7   physicians.

03:50:38   8            So Amarin's sales force might have talking points,

03:50:42   9   and the question is to what extent are physicians processing

03:50:47  10   that, understanding that.

03:50:48  11   Q    And what did this data show in terms of what messages

03:50:53  12   physicians are recalling regarding Vascepa?

03:50:56  13   A    Well, here, if I could focus on the first set of those

03:51:01  14   three bars towards the left.

03:51:03  15            MR. M. KENNEDY:   Yeah.   Mr. Brooks, if you could

03:51:06  16   blow those up a little bit.

03:51:11  17            THE WITNESS:   In the messages section towards

03:51:14  18   the bottom, it says,

03:51:15  19        "Vascepa significantly reduced TG levels and

03:51:18  20      improved multiple lipid parameters without increasing

03:51:22  21      LDL-C."

03:51:23  22            So, those are two of the patented features.

03:51:26  23            And what the bars show you is -- the bar on the

03:51:29  24   left is that all of the physicians who are heavy users -- so

03:51:33  25   they're prescribing a relatively large number of Vascepa

                                                                    1480

03:51:37    1    prescriptions, all of those physicians were aware of those

03:51:40    2    attributes for Vascepa.  Whereas the nonusers, that's the

03:51:46    3    73 percent, only 73 percent of the nonusers were aware of

03:51:49    4    that.

03:51:50    5                So in other words, the -- when physicians became

03:51:53    6    aware of those patented features, it increased the probability

03:51:57    7    that they were using Vascepa, or using it relatively heavily.

03:52:01    8                MR. M. KENNEDY:  Mr. Brooks, can we have

03:52:08    9    page 57.

03:52:08   10    BY MR. M. KENNEDY:

03:52:09   11    Q    And what did the survey conclude in terms of physicians'

03:52:13   12    intention to increase their Vascepa prescriptions?

03:52:17   13    A    So the ZS analysis identified a group of physicians who

03:52:22   14    stated that they intend to increase their use of Vascepa.

03:52:25   15                And when asked why they intend to increase their use

03:52:29   16    of Vascepa, the two most common answers is, one, the attribute

03:52:36   17    that's in the dotted rectangle there.

03:52:38   18                The most common response was, you know, the

03:52:41   19    physician plans to increase the use because they understand

03:52:45   20    that Vascepa doesn't increase LDL-C.

03:52:48   21                The second most common is, you know, two down from

03:52:52   22    that, physicians highlighted that Vascepa is effective at

03:52:56   23    lowering TG levels, again, two of the patented features that

03:53:01   24    are involved in the lawsuit.

03:53:02   25                MR. M. KENNEDY:  Mr. Brooks, can we have PX 581.

03:53:02  1   BY MR. M. KENNEDY:

03:53:09  2    Q    Dr. Nicholson, do you recognize this document?

03:53:11  3    A    Yes.  This was a summary of a study that a company called

03:53:16  4   AplusA assembled and presented to Amarin in January of 2016.

03:53:23  5    Q    Is this a survey similar to the one we just looked at,

03:53:26  6   just later in time?

03:53:28  7    A    Yes, it is, in the sense of trying to understand are

03:53:32  8   physicians aware of Vascepa, and, more specifically, how

03:53:36  9   knowledgeable are they about the attributes.

03:53:39  10   Q    Did they rely on PX 581 in forming your opinions in this

03:53:43  11  case?

03:53:44  12   A    Yes.

03:53:45  13            MR. M. KENNEDY:  Your Honor, we offer PX 581

03:53:48  14  into evidence.

03:53:49  15            MR. ROUNDS:  No objection.

03:53:49  16            THE COURT:  581 is admitted.

03:53:49  17               (Plaintiffs' Exhibit 581 received in
03:53:49                      evidence.)
03:53:53  18            MR. M. KENNEDY:  Mr. Brooks, can we have page 8,

03:53:56  19  please.

03:53:56  20  BY MR. M. KENNEDY:

03:53:56  21   Q    And I would like to focus, in particular, on the

03:53:59  22  left-hand side, the person lifting weights.

03:54:02  23            And with reference to that, Dr. Nicholson, what did

03:54:05  24  this survey find in terms of Vascepa's strengths in the

03:54:08  25  marketplace?

1482

03:54:09  1   A    So one conclusion is that, from the physician's

03:54:14  2   perspective, when studied, they indicate that some of the

03:54:17  3   strengths of Vascepa are that it's effective in lowering TG

03:54:22  4   levels and it doesn't increase LDL-C.

03:54:25  5   Q    So similar to what we just looked at from 2014?

03:54:30  6   A    Yes.  Two of the patented features arising and resonated

03:54:37  7   with physicians.

03:54:38  8               MR. M. KENNEDY:  Mr. Brooks, could we have

03:54:41  9   PX 577.

03:54:41  10  BY MR. M. KENNEDY:

03:54:45  11  Q    And, Dr. Nicholson, do you recognize this document?

03:54:48  12  A    Yes.  This is a study conducted by the same company for

03:54:52  13  Amarin a little over a year after the one that we just looked

03:54:57  14  at.

03:54:57  15  Q    Did you rely on PX 577 in forming your opinions in this

03:55:01  16  case?

03:55:01  17  A    Yes.

03:55:03  18               MR. M. KENNEDY:  Your Honor, Amarin offers

03:55:06  19  PX 577 into evidence.

03:55:07  20               MR. ROUNDS:  No objection.

03:55:08  21               THE COURT:  577 is in admitted.

03:55:08  22                       (Plaintiffs' Exhibit 577 received in
03:55:08                          evidence.)
03:55:12  23               MR. M. KENNEDY:  Mr. Brooks, can we have page 11

03:55:15  24  of this document.

03:55:15  25

03:55:15  1  BY MR. M. KENNEDY:

03:55:15  2  Q    And, again, what did this survey find in terms of the key

03:55:20  3  strengths of the Vascepa brand as of 2017?

03:55:25  4  A    So similar to the prior study, again, at the top, the key

03:55:29  5  strengths -- among the key strengths were efficacious in

03:55:33  6  lowering TG levels and does not increase LDL-C or bad

03:55:37  7  cholesterol.

03:55:38  8           MR. M. KENNEDY:   Mr. Brooks, can we have PX 719.

03:55:38  9  BY MR. M. KENNEDY:

03:55:46  10  Q    Dr. Nicholson, do you recognize PX 719?

03:55:50  11  A    Yes.   What this shows is if a patient or prospective

03:55:56  12  patient had gone to the Vascepa consumer part of the website

03:56:00  13  prior to the second indication, prior to December 2019, this

03:56:05  14  is what they would have seen.

03:56:07  15           And in the lower right, you can see that Amarin was

03:56:10  16  marketing the patented features; namely, Vascepa is proven to

03:56:15  17  lower very high TG levels in adults without raising bad

03:56:20  18  cholesterol.

03:56:21  19  Q    Is PX 719 a document you relied on in forming your

03:56:25  20  opinions in this case?

03:56:26  21  A    Yes.

03:56:27  22           MR. M. KENNEDY:   Your Honor, Amarin seeks to

03:56:29  23  enter PX 719 into evidence.

03:56:33  24           MR. ROUNDS:   No objection.

03:56:33  25

03:56:33   1          (Plaintiffs' Exhibit 719 received in
03:56:33                evidence.)
03:56:33   2   BY MR. M. KENNEDY:

03:56:39   3   Q    Now, what is your conclusion in how Amarin has promoted

03:56:43   4   Vascepa to physicians?

03:56:44   5   A    My conclusion is that from a quantity or an intensity

03:56:51   6   perspective, they're marketing it with a similar intensity to

03:56:54   7   the industry and to other products.

03:56:56   8          That they're featuring the messages that are at

03:57:00   9   issue in the patent -- the patents that are issue in suit, and

03:57:03  10   that those patented features are resonating with physicians,

03:57:08  11   and physicians are often mentioning those as reasons for

03:57:12  12   either using the product, or for planning to increase their

03:57:15  13   use of the product.

03:57:16  14          So I don't find that the marketing is the driver of

03:57:21  15   the commercial success.

03:57:24  16          MR. M. KENNEDY:   Mr. Brooks, can we please have

03:57:26  17   PDX 5-22.

03:57:26  18   BY MR. M. KENNEDY:

03:57:29  19   Q    So, Dr. Nicholson, moving on to another topic, what does

03:57:33  20   this slide show in terms of pricing for Vascepa versus Lovaza?

03:57:39  21   A    So this shows between 2013 and 2018, what's the gross

03:57:47  22   price per monthly prescription for Vascepa versus branded

03:57:51  23   Lovaza versus generic Lovaza.

03:57:54  24          So the vertical axis is the price of a prescription,

03:57:58  25   the gross price of a prescription, and what you can see, if

03:58:02   1    you focus on 2018, is that the gross price for a prescription

03:58:08   2    of Vascepa is about $320, and that's substantially higher than

03:58:13   3    the gross price of generic Lovaza, which is about $60.

03:58:19   4              Now, the reason I'm showing this is, in theory, you

03:58:23   5    know, another possible driver of commercial success would be

03:58:27   6    that Vascepa is offering its product -- or Amarin is offering

03:58:32   7    Vascepa at a very low price, and that's what's explaining the

03:58:35   8    numbers of prescriptions that are filled or the growth in

03:58:39   9    prescriptions.  But, Vascepa's price is substantially higher

03:58:43   10   than generic Lovaza's price.

03:58:45   11   Q    Now, where are you getting the data that appears in

03:58:49   12   PDX 5-22?

03:58:50   13   A    These data come from IQVIA.

03:58:54   14              MR. M. KENNEDY:  Your Honor, we would like to

03:58:55   15   admit PDX 5-22 as a summary exhibit under FRE 1006.

03:59:01   16              MR. ROUNDS:  No objection, Your Honor.

03:59:02   17              THE COURT:  5-22 is admitted.

03:59:02   18                   (Plaintiffs' Exhibit 5-22 received in
03:59:02                          evidence.)
03:59:02   19   BY MR. M. KENNEDY:

03:59:07   20   Q    Now, there was some discussion earlier about net sales --

03:59:10   21   or net price versus gross price, and net sales versus gross

03:59:14   22   sales.  Does PDX 5-22 take into account rebates and discounts

03:59:19   23   and the like?

03:59:20   24   A    No.  This just takes into account what's called

03:59:25   25   "on-invoice adjustments," but it wouldn't capture rebates and

discounts.

If you take, say, the 53 percent rebate figure that Mr. Hofmann presented for 2018, and if one were to apply that to the Vascepa gross price, it would still be the case that Vascepa's priced two-and-a-half to three times higher than generic Lovaza.  So that still wouldn't be a situation where people are filling Vascepa because it's a way for them to save money relative to generic Lovaza.

In other words, patients and insurers are paying a premium for the features of Vascepa relative to generic Lovaza.

MR. M. KENNEDY:  And Your Honor, I would like to move admission of the underlying data for PDX 5-22, which is PX 644, PX 655, PX 659, and PX 660.  And, again, we would like the opportunity to redact before they are published.

MR. ROUNDS:  No objection, Your Honor.

THE COURT:  All four exhibits are admitted.

(Plaintiffs' Exhibit 655 and 660 received in evidence.)

MR. M. KENNEDY:  And, Mr. Brooks, if we go back to 5-15 very briefly.

BY MR. M. KENNEDY:

Q   And this is your slide regarding cash flow?

A   Yes.

Q   What -- where do you get the data underlying PDX 5-15?

A   These data came from a number of documents that are

| | | |
|---|---|---|
| 04:00:59 | 1 | enumerated at the bottom including financial statements |
| 04:01:03 | 2 | submitted to the SEC, and also the analyst reports, among |
| 04:01:07 | 3 | others. |
| 04:01:08 | 4 | MR. M. KENNEDY:  Your Honor, I would like to |
| 04:01:09 | 5 | admit the ones that haven't been admitted yet from this slide, |
| 04:01:12 | 6 | and those are PX 628, 629, 630, 631, 633, 634, 635, 636, 645, |
| 04:01:28 | 7 | and 664. |
| 04:01:32 | 8 | MR. ROUNDS:  No objection. |
| 04:01:35 | 9 | THE COURT:  Those exhibits are admitted. |
| 04:01:35 04:01:35 | 10 | (Plaintiffs' Exhibit 628, 629, 230, 633, 634, 635, 636 and 645 received in |
| 04:01:35 | 11 | evidence.) |
| 04:01:40 | 12 | MR. M. KENNEDY:  And, Your Honor, if we can go |
| 04:01:42 | 13 | to PDX 5-22 again. |
| 04:01:46 | 14 | And, I'm sorry, I'm told I misspoke.  I meant to |
| 04:01:50 | 15 | move admission of PX 645, not 655. |
| 04:01:57 | 16 | THE COURT:  I admitted 645. |
| 04:02:01 | 17 | MR. M. KENNEDY:  Okay.  Maybe I didn't misspeak. |
| 04:02:03 | 18 | THE COURT:  Either that or it was admitted |
| 04:02:04 | 19 | earlier, I can't recall. |
| 04:02:07 | 20 | MR. M. KENNEDY:  Sounds like I got the right |
| 04:02:09 | 21 | exhibit into evidence.  Thank you. |
| 04:02:12 | 22 | Mr. Brooks, can we have exhibit PDX 5-23, |
| 04:02:17 | 23 | please. |
| 04:02:17 | 24 | BY MR. M. KENNEDY: |
| 04:02:17 | 25 | Q    And, Dr. Nicholson, what does this slide show? |

04:02:21  1    A    This slide shows, for Lovaza, from 2008 to 2012, the

04:02:30  2    percentage of patients of different TG levels who were

04:02:34  3    receiving a prescription for Lovaza.

04:02:36  4              So, these data come from a dataset within IQVIA,

04:02:41  5    which is called NDTI, the National Disease and Therapeutic

04:02:46  6    Index.

04:02:47  7    Q    And how, if at all, does this slide, PDX 5-23, support

04:02:52  8    your opinion?

04:02:53  9    A    So when I showed earlier the net sales of Vascepa and the

04:02:59  10   trend in those sales, and when I used sales in the Net Present

04:03:04  11   Value analysis, I used all of the sales, the sales to patients

04:03:08  12   with very high TG levels, as well as the sales to patients

04:03:13  13   with high or normal and borderline high.

04:03:16  14   Q    Well, why did you do that if the patents in this case are

04:03:19  15   limited to treating patients with very high triglycerides or

04:03:24  16   above 500 milligrams per deciliter?

04:03:27  17   A    For several reasons.  First, and, very importantly, for

04:03:31  18   purposes of commercial success and nonobviousness, it's

04:03:34  19   important to think about a situation where a company like

04:03:38  20   Amarin, in 2008, was considering developing a product like

04:03:44  21   Vascepa, and what would have been available to them is

04:03:47  22   information on the way in which Lovaza was being used at this

04:03:52  23   time in 2008.

04:03:53  24              And what you can see is in 2008 is a majority --

04:04:00  25   many of the prescriptions that were being filled by patients

04:04:03   1   for Lovaza were being filled by patients with high or normal

04:04:08   2   or borderline high.

04:04:10   3          So a company like Amarin considering developing a

04:04:13   4   drug like Vascepa, would have expected that if they could get

04:04:16   5   an indication for very high, it would give physicians an

04:04:20   6   opportunity to use their medical discretion to use Vascepa on

04:04:26   7   patients with high, normal, and borderline high.

04:04:30   8   Q    Now, the sales that were enabled with the approval of the

04:04:34   9   MARINE indication, where did that money go?  What did Amarin

04:04:38   10   do with that money?

04:04:39   11   A    So that got, for the most part, invested in research and

04:04:43   12   development for the REDUCE-IT trial.  So that's another

04:04:48   13   important reason for including all of the sales, not just the

04:04:52   14   sales of Vascepa to very high patients.

04:04:55   15          The indication that Amarin received in 2012, and the

04:04:59   16   launch of Vascepa in 2013, generated revenue or sales that

04:05:04   17   Amarin could use to finance the very expensive REDUCE-IT

04:05:09   18   trial.

04:05:09   19   Q    And just to clean up a couple things, PDX 5-23, where did

04:05:15   20   you get the data that went into this slide?

04:05:19   21   A    So these data come from IQVIA, but, more specifically,

04:05:24   22   the National Disease and Therapeutic Index dataset within

04:05:29   23   IQVIA.

04:05:30   24          MR. M. KENNEDY:  Your Honor, we would like to

04:05:32   25   enter PDX 5-23 as a summary exhibit, and I would also like to

04:05:38    1    enter PX 641, with the reservation that we would like a chance

04:05:42    2    to review for redactions.

04:05:45    3                    MR. ROUNDS:  No objection.

04:05:46    4                    THE COURT:  All right.  That request is granted.

04:05:46    5                        (Plaintiffs' Exhibit 5-23 and 641
04:05:46                                received in evidence.)
04:05:49    6                    MR. M. KENNEDY:  And if we could briefly look at

04:05:51    7    PDX 5-24.

04:05:51    8    BY MR. M. KENNEDY:

04:05:55    9    Q    And then, Dr. Nicholson, what does this slide show?

04:05:59   10    A    This is a similar slide.  The setup is similar to the one

04:06:02   11    that we just looked at, but now this is for Vascepa rather

04:06:05   12    than Lovaza, and the years are different.  It's the first six

04:06:10   13    years that Vascepa was on the market.

04:06:12   14             The dark blue at the bottom is the percentage of

04:06:17   15    patients whose TG levels are known that were taking Vascepa

04:06:22   16    and had very high TG.

04:06:25   17             And you can see that it's -- that the dark blue here

04:06:28   18    is substantially higher than the very high component of the

04:06:32   19    Lovaza patient population.

04:06:35   20             But you can also see that a substantial percentage

04:06:39   21    of the patients who are using Vascepa do have high and normal

04:06:44   22    and borderline high, just as was the case with Lovaza.

04:06:49   23    Q    Finally, were you in the courtroom this morning when

04:06:53   24    Dr. Hof -- or Mr. Hofmann testified about his calculation of

04:06:56   25    Vascepa net sales potentially covered by the asserted claims

04:07:00  1    of the patents-in-suit?

04:07:02  2    A    Yes.

04:07:02  3    Q    What's your understanding of how he made that

04:07:05  4    calculation?

04:07:08  5    A    My understanding is he essentially took the percentages

04:07:12  6    of the dark blue segments here at the bottom and multiplied

04:07:18  7    that by the Vascepa sales for the corresponding years --

04:07:22  8    Q    Uh --

04:07:23  9    A    Sorry -- to get the estimated sales coming from the very

04:07:27  10   high patients.

04:07:28  11   Q    And what's your understanding of what the Vascepa net

04:07:31  12   sales would look like if we just looked at those drug

04:07:34  13   appearances 500 and above?

04:07:38  14   A    You would still see a substantial growth over time in the

04:07:43  15   sales, the estimated sales to the very high patients.  I think

04:07:47  16   it's a six-fold increase over time in those sales.

04:07:50  17   Q    How would that affect your conclusions concerning the

04:07:53  18   commercial success of Vascepa, if we just limited ourselves to

04:07:57  19   Mr. Hofmann's calculation concerning drug appearances above

04:08:01  20   500?

04:08:02  21   A    It supports my conclusion that Vascepa is a commercial

04:08:07  22   success because it would show in a subset of patients that the

04:08:10  23   product is delivering value and that value is increasing over

04:08:15  24   time.

04:08:16  25            MR. M. KENNEDY:  Thank you very much,

| | |
|---|---|
| 04:08:16 | 1 |
| 04:08:19 | 2 |
| 04:08:22 | 3 |
| 04:08:25 | 4 |
| 04:08:26 | 5 |
| 04:08:31 | 6 |
| 04:08:36 | 7 |
| 04:08:38 | 8 |
| 04:08:40 | 9 |
| 04:08:41 | 10 |
| 04:08:41 | 11 |
| 04:08:43 | |
| 04:08:43 | 12 |
| 04:09:14 | 13 |
| 04:09:16 | 14 |
| 04:09:26 | 15 |
| 04:09:27 | 16 |
| 04:09:27 | 17 |
| 04:09:27 | 18 |
| 04:09:30 | 19 |
| 04:09:34 | 20 |
| 04:09:36 | 21 |
| 04:09:41 | 22 |
| 04:09:46 | 23 |
| 04:09:50 | 24 |
| 04:09:51 | 25 |

1  Dr. Nicholson.  I have no further questions at this time.

2            THE COURT:  Did you want to move to admit

3  Exhibit 5-24 as summary evidence?

4            MR. M. KENNEDY:  Yes.  Thank you, Your Honor.  I

5  apologize.  I would like to admit PDX 5-24, as well as the

6  underlying documents, PX 646 and 662, again, subject to the

7  opportunity to redact.

8            THE COURT:  Any objection, Mr. Rounds?

9            MR. ROUNDS:  No, Your Honor.

10           THE COURT:  All right.  That request is granted.

11                 (Plaintiffs' Exhibit 5-24, 646 and 662
                    received in evidence.)

12           MR. M. KENNEDY:  Thank you, Your Honor.

13           MR. ROUNDS:  Dr. Nicholson, good afternoon.

14           THE WITNESS:  Good afternoon.

15           MR. ROUNDS:  My name is a Michael Rounds.  I'll

16  be asking you questions on behalf of the defendants.

17                  CROSS-EXAMINATION

18  BY MR. ROUNDS:

19  Q   I would like to begin with, just briefly, discussing your

20  disclosures in your report.

21           Isn't it true that you have testified or provided

22  reports in approximately 23 cases in the last four years?

23  A   I can't remember the precise number, but that sounds

24  about right.

25  Q   Okay.  And in a substantial portion of those cases, you

04:09:54  1   provided testimony on behalf of the branded pharmaceutical

04:09:57  2   companies; is that correct?

04:09:58  3   A   A majority.  Certainly, not all of them.  I've had

04:10:05  4   generic clients.

04:10:06  5   Q   Okay.  So you understand that Amarin is asserting six

04:10:08  6   Orange Book listed patents against the defendants, correct?

04:10:12  7   A   Yes, that's my understanding.

04:10:24  8             MR. ROUNDS:  Okay.  Can you pull up slide

04:10:28  9   PDX 5-3.

04:10:28  10  BY MR. ROUNDS:

04:10:34  11  Q   Now, you were asked some questions by Mr. Kennedy about

04:10:37  12  this slide, do you recall that?

04:10:39  13  A   Yes.

04:10:40  14  Q   I just want to make sure that we're on the same page as

04:10:43  15  to what the claimed invention is in this case.

04:10:47  16             Everything you learned about what the claims covered

04:10:49  17  came from Amarin's counsel; is that right?

04:10:52  18  A   Yes, that's correct.

04:10:54  19  Q   Okay.  And you understand from Amarin's counsel is that

04:10:58  20  the asserted patents are method of use patents; is that right?

04:11:03  21  A   Yes.

04:11:03  22  Q   Your understanding is that the patents do not cover the

04:11:08  23  EPA compound itself, is that correct?

04:11:11  24  A   Yes, that's my understanding.

04:11:14  25  Q   And your understanding is, is that in order to practice

04:11:17  1  the claims a patient has to have triglyceride levels of 500 or

04:11:23  2  more milligrams per deciliter, correct?

04:11:25  3  A   I'm not a scientist.  I don't understand that from a

04:11:30  4  scientific or legal perspective, but I do understand that the

04:11:34  5  patents refer to very high TG.

04:11:37  6  Q   Okay.  You understand that with respect to these patents

04:11:40  7  that a treated patient has to have triglyceride levels of 500

04:11:44  8  or more milligrams per deciliter, correct?

04:11:49  9  A   My understanding is physicians have discretion to use

04:11:53  10  drugs in the way they think will benefit the patients.

04:11:56  11  Q   Yeah, but I'm asking you with respect to the claims and

04:11:59  12  your understanding.

04:12:00  13          Is it your understanding that in order to practice

04:12:02  14  the claims, the patient has to have triglyceride levels of 500

04:12:08  15  or more milligrams per deciliter?

04:12:10  16  A   I'm an economist.  I didn't, as part of my assignment,

04:12:14  17  look at that question from a legal or scientific or medical

04:12:17  18  perspective.

04:12:19  19              MR. ROUNDS:  If you can pull up deposition

04:12:22  20  transcript 52, lines 8 to 23, please.

04:12:22  21  BY MR. ROUNDS:

04:13:00  22  Q   Do you see that?

04:13:01  23  A   Yes.

04:13:01  24  Q   So you were asked, beginning at line 8,

          25          "I think we established earlier that you

1        hadn't reviewed the patents-in-suit, and thus you

2        hadn't reviewed the asserted claims of the

3        patents-in-suit, but if you could describe for me

4        your understanding of what is generally claimed in

5        the asserted claims of the patents-in-suit."

6           Do you see that?

7  A   Yes.

8  Q   And could you read your answer beginning at line 15.

9  A      "My understanding is that the patents cover a

10  method of reducing triglyceride levels in patients

11  with severe hypertriglyceridemia without increasing

12  LDL-C."

13  Q   Okay.  And you understood and you understand that severe

14  hypertriglyceridemia is 500 milligrams or more of

15  triglycerides; is that fair?

16  A   Yes.

17  Q   Okay.  So, back to my question.

18      You understand that the claimed invention includes

19  and requires a patient having triglyceride levels of 500 or

20  more milligrams per deciliter; is that fair?

21  A   My understanding of the patents from counsel is that it's

22  a method of reducing TG levels, most patients with very high

23  TG, without increasing LDL-C.

24  Q   Right.

25  A   From a legal perspective, I don't know what constitutes

04:14:07    1    practicing or not practicing it.

04:14:09    2    Q    Fair enough.

04:14:09    3            And with respect to the very high that you just

04:14:13    4    mentioned, that's 500 or more triglycerides per deciliter; is

04:14:16    5    that fair?

04:14:17    6    A    Yes.

04:14:20    7    Q    Next thing I want to cover with you is the patented

04:14:23    8    features.  Do you see that?

04:14:25    9    A    Yes.

04:14:29   10    Q    Okay.  And did you understand in performing your analysis

04:14:32   11    that the patented features included lowering triglycerides

04:14:36   12    amongst patients with very high triglyceride levels, without

04:14:40   13    increasing LDLs.

04:14:42   14    A    Yes.

04:14:43   15    Q    And, again, when you use the term "very high" there, you

04:14:47   16    mean 500 or more milligrams of triglycerides; is that fair?

04:14:53   17    A    Yes.

04:15:04   18    Q    Now, you reviewed and relied upon NDTI data in your

04:15:12   19    report; is that right?

04:15:12   20    A    Yes.

04:15:13   21    Q    And that stands for National Disease and Therapeutic

04:15:18   22    Index; is that correct?

04:15:19   23    A    Yes, correct.

04:15:20   24    Q    And that is sourced from IQVIA; is that right?

04:15:25   25    A    Yes, IQVIA.

04:15:28  1    Q   And you've relied upon that data in your report; is that

04:15:31  2    right?

04:15:31  3    A   Yes, I have.

04:15:32  4    Q   Okay.  And the NDTI data showed you that approximately

04:15:42  5    one-third of the sales of Vascepa, from 2013 to 2018, related

04:15:47  6    to patients with severe hypertriglyceridemia; is that correct?

04:15:53  7    A   Yes.  That's approximately correct.  Yes.

04:16:00  8               MR. ROUNDS:  Can you pull up PDX 5-24.

04:16:00  9    BY MR. ROUNDS:

04:16:10  10   Q   Do you recall being asked questions about PDX 5-24?

04:16:15  11   A   Yes, I do.

04:16:16  12   Q   Okay.  So if we take a look at year 2018, for example,

04:16:24  13   approximately 25 percent of the sales relate to patients that

04:16:32  14   have triglyceride levels of 500 milligrams or more per

04:16:37  15   deciliter; is that fair?

04:16:38  16   A   Yes.  So, they have a diagnosis of having very high TG,

04:16:45  17   yes.

04:16:46  18   Q   And I believe you testified at your deposition that you

04:16:52  19   understood that this data indicated that approximately

04:16:58  20   25 percent of the sales of Vascepa related to patients that

04:17:03  21   have TG levels of 500 or more; is that fair?

04:17:06  22   A   Yeah.  Or perhaps more correctly, they have a diagnosis

04:17:12  23   of a very high TG, yes.

04:17:15  24   Q   And they were treated with Vascepa; is that right?

04:17:21  25   A   Yes.  That's what this figure shows, yes.



04:17:25  1    Q    These are prescriptions that were provided for Vascepa

04:17:28  2    for this patient class; is that correct?

04:17:30  3    A    By "patient class," you mean patients who have a

04:17:37  4    diagnosis of very high TG level?

04:17:40  5    Q    That's correct.

04:17:41  6    A    Yes.

04:17:42  7    Q    So despite the fact that only approximately 33 percent of

04:17:50  8    the sales of Vascepa are covered by the claims, as you

04:17:53  9    understand them, you did not perform an NPV or other

04:17:58  10   profitability analysis related to this patient population; is

04:18:03  11   that right?

04:18:03  12   A    I didn't because it wouldn't be appropriate.

04:18:05  13   Q    Now, let's talk for a bit about profitability.  You agree

04:18:29  14   that Amarin has not been profitable through at least 2018; is

04:18:34  15   that correct?

04:18:34  16   A    As a company, yes, I would agree.

04:18:37  17   Q    And the historical Amarin financial data you analyzed was

04:18:41  18   through 2018, correct?

04:18:42  19   A    Yes.  In some of the slides I'm looking at first quarter

04:18:50  20   of 2019, but in most of my analysis I'm using data through

04:18:57  21   2018.

04:18:57  22   Q    And you relied on Amarin's SEC 10-K filings in your

04:19:02  23   opinions; is that correct?

04:19:04  24   A    Those were some of my data sources, yes.

04:19:06  25   Q    And in its SEC 10-K filings, Amarin states that Vascepa

04:19:13  1   may never be profitable; is that right?

04:19:16  2   A    Amarin, like many publicly traded companies has what I

04:19:20  3   think is boilerplate language that just cautions investors

04:19:26  4   that there's uncertainties in their business model.

04:19:30  5   Q    Do you think the SEC would consider that language to be

04:19:34  6   boilerplate?

04:19:35  7   A    Probably not.  But, that type of language appears in

04:19:38  8   almost every publicly traded company's SEC statements.

04:19:42  9                  MR. ROUNDS:  Could you pull up PX 655, page 3.

04:19:42  10  BY MR. ROUNDS:

04:19:53  11  Q    I will represent to you that PX 655 is the 2018 10-K for

04:19:58  12  Amarin.  If I could direct your attention to page 3, the third

04:20:05  13  paragraph.

04:20:08  14  A    Okay.

04:20:12  15                  MR. ROUNDS:  And if you can highlight the last

04:20:14  16  two sentences for the record.

04:20:14  17  BY MR. ROUNDS:

04:20:26  18  Q    Do you have that in front of you?

04:20:28  19  A    Yes.

04:20:28  20  Q    So it indicates,

04:20:29  21              "In addition, projections, assumptions, and

04:20:32  22          estimates of our future performance are necessarily

04:20:35  23          subject to a high degree of uncertainty and risk due

04:20:38  24          to a variety of factors, including those described in

04:20:42  25          risk factors in item 1A of part 1 of this annual

04:20:46    1          report on form 10-K."

04:20:48    2                  Do you see that?

04:20:48    3     A    Yes, I do.

04:20:49    4     Q    So Amarin is representing to the public in its 10-K, that

04:20:55    5     its future projections are subject to a high degree of

04:20:58    6     uncertainty and risk; is that right?

04:21:00    7     A    Yes.  As I said, you know, companies as a common practice

04:21:06    8     do this, and I think they're just reminding investors that

04:21:10    9     prior performance is no guarantee of future performance.

04:21:13   10     Q    But that's your experience with pharmaceutical companies

04:21:18   11     in general, isn't it, that they can be subject to a high

04:21:21   12     degree of risk?

04:21:23   13     A    Yes, but it doesn't prevent them from very carefully

04:21:27   14     forecasting, to the best of their ability, the future

04:21:30   15     performance of their drug.

04:21:31   16                  This is an industry that spends 50- to $60 billion a

04:21:36   17     year, and you don't spend that amount of money without doing

04:21:39   18     the best you can at forecasting.

04:21:41   19     Q    So Amarin's 10-K filings are signed by its officers; is

04:21:45   20     that right?

04:21:45   21     A    I believe so, yes.

04:21:47   22     Q    Including the president, Mr. Thero, whom you spoke with

04:21:51   23     about your opinions in this case; is that right?

04:21:53   24     A    Yes.

04:21:54   25     Q    You never spoke with anybody else from Amarin, did you,

04:21:58   1   other than Mr. Thero?

04:22:00   2   A   Correct, not prior to submitting the reports, yes.

04:22:03   3   Q   So you never spoke to Mr. Berg prior to submitting your

04:22:08   4   reports?

04:22:08   5   A   I don't believe so, no.

04:22:10   6   Q   Okay.  Do you think his input on how Vascepa was being

04:22:13   7   marketed and sold would be important to your opinions in this

04:22:15   8   case?

04:22:16   9   A   I didn't.  No, I didn't think it would be germane.  I

04:22:21  10   wanted to look at the actual documents.

04:22:23  11   Q   Okay.  In any event, you agree with Amarin's officers,

04:22:26  12   don't you, that future projections for Vascepa are subject to

04:22:30  13   a high degree of uncertainty and risk?

04:22:33  14   A   I mean, personally, I'm not sure I would use the "high

04:22:36  15   degree" adjective.

04:22:38  16           I think, you know, I don't know that they're subject

04:22:41  17   to any more uncertainty than other companies in this space,

04:22:45  18   but I do agree that there is uncertainty when you're

04:22:49  19   forecasting.

04:22:52  20           MR. ROUNDS:  So can you pull up PDX 5-16.

04:22:52  21   BY MR. ROUNDS:

04:23:06  22   Q   Do you have 5-16 in front of you?

04:23:08  23   A   Yes, I'm sorry.

04:23:11  24   Q   So the information on the left-hand side of this, as I

04:23:15  25   understand it, is based upon Amarin's historical financial

1502

04:23:22  1   data; is that right?

04:23:23  2   A    Yes, through the 2018 part of that line.

04:23:28  3   Q    Okay.  And those numbers are reflected in 2019 dollars;

04:23:32  4   is that right?

04:23:33  5   A    Yes.  From a discounting perspective, yes.

04:23:36  6   Q    So through 2018, under your calculations Amarin shows a

04:23:41  7   net income loss of approximately 1.2 billion; is that right?

04:23:45  8   A    Yes, I think that's the cumulative figure.  Yes.

04:23:48  9   Q    Okay.  So let's switch gears here for a second.

04:23:51  10          You agree that the markets for pharmaceutical

04:23:53  11  products can change over time; is that correct?

04:23:56  12  A    Yes, they can become more favorable or less favorable.

04:24:01  13  Q    Is it fair to say that the uncertainty associated with a

04:24:05  14  forecast is significantly more than the uncertainty associated

04:24:09  15  with the actual historical results of a pharmaceutical

04:24:12  16  product?

04:24:13  17  A    I think that's true in any industry, that the future

04:24:16  18  forecasts are always less certain than the past reality.

04:24:20  19  Q    You also agree that future projections or forecasts for

04:24:26  20  pharmaceutical companies can be lower than expected; is that

04:24:29  21  right?

04:24:29  22  A    They can be lower, and, as I showed, they can be higher.

04:24:32  23  Q    And that the longer period -- strike that.

04:24:35  24          And that the longer the period of the forecast, the

04:24:38  25  less reliable it is; is that fair?



04:24:41  1    A    That's generally what economists believe, that it's

04:24:44  2    easier to forecast closer in the horizon than further out.

04:24:49  3    Q    Okay.  You would agree that generally speaking all

04:24:51  4    companies hope that the products they develop and launch are

04:24:54  5    going to be economically successful, correct?

04:24:57  6    A    Well, I certainly believe that there's a chief financial

04:25:03  7    officer whose job is to carefully shepherd the company's

04:25:08  8    money.

04:25:09  9         And so if, for example, a scientist has some

04:25:11  10   aspiration, it's not the case in my experience that the CFO

04:25:16  11   will say, you know, here's a blank check.

04:25:20  12   Q    I guess the point is, is that everybody has hopes and

04:25:25  13   wishes when they're forecasting and trying to get a company

04:25:28  14   going; is that right?

04:25:29  15   A    Yes, but we're talking about real money.  When investors

04:25:33  16   give a company real money, they expect a return.  And there

04:25:36  17   are consequences if they don't get a return.

04:25:38  18   Q    We'll talk about the real money in a minute.  Okay?

04:25:41  19        Also, generally speaking, you would agree that

04:25:45  20   companies will often produce forecasts of expected sales that

04:25:49  21   may or may not ever occur, right?

04:25:51  22   A    Yeah.  You know, I think I believe, like most economists,

04:25:57  23   that forecasts can some -- they're as accurate as people can

04:25:59  24   make them with the available information.  Sometimes they're

04:26:02  25   high, sometimes they're low, sometimes they're spot on.

04:26:05   1   Q   So let's go to your NPV calculations in this matter.

04:26:12   2           You did two different models, right, one with the

04:26:16   3   H.C. WainWright forecast and one without?

04:26:19   4   A   No, I have one model, the model with the $1.9 billion Net

04:26:23   5   Present Value.

04:26:23   6   Q   But you did an alternative one that excluded the H.C.

04:26:27   7   WainWright; is that right?

04:26:28   8   A   I wouldn't call -- that's not a revised model.  I was

04:26:32   9   making the point that all five analysts' reports should be

04:26:37  10   included to maximize the accuracy of the forecast.

04:26:41  11           If one mistakenly omitted one of them -- which I

04:26:47  12   don't adhere to -- it would still be a positive Net Present

04:26:51  13   Value conclusion.

04:26:51  14           So, I wasn't revising my model, I was just

04:26:56  15   highlighting that it would still be a positive Net Present

04:26:58  16   Value.

04:26:59  17   Q   Okay.  Well, we'll get back to that.

04:27:00  18           In each of your NPV calculations you assumed that

04:27:09  19   Vascepa had market exclusivity until 2029 when Teva could

04:27:15  20   enter the market with a generic version of Vascepa, correct?

04:27:19  21   A   Yes.

04:27:19  22   Q   But if a generic were to enter the market three to

04:27:23  23   five months from now, you would agree that Vascepa is not

04:27:25  24   commercially successful through today's date; is that right?

04:27:29  25   A   Yeah.  In that hypothetical -- which I didn't consider --



04:27:32   1   yes.  The prior losses would still prevail -- would prevail.

04:27:38   2   Q    Yeah.  In fact, under your NPV calculation, the company

04:27:43   3   would be in the hole about $1.2 billion, right?

04:27:47   4   A    I think that that's why we're here in this court, but I'm

04:27:52   5   modeling this with the information of there's a public

04:27:56   6   announcement about when Teva is able to enter, and that's the

04:28:01   7   period that's defining the end of the lifecycle in my model.

04:28:05   8   Q    Now, I think, as you've testified, your Net Present Value

04:28:11   9   model is based on the financial forecasts of, I think, five

04:28:14   10  industry analysts; is that right?

04:28:16   11  A    Yes.

04:28:17   12  Q    And you did not check the credentials of any of the

04:28:21   13  specific industry analysts who wrote the reports; is that

04:28:25   14  right?

04:28:25   15  A    I'm familiar with the company names.  I'm familiar with

04:28:29   16  them, and I believe they are reputable.  And in my reply

04:28:32   17  report, in responding to Mr. Hofmann, I did show that the

04:28:37   18  forecast errors can go both ways.

04:28:40   19  Q    Back to my question.  You didn't check the credentials of

04:28:47   20  any of the industry analysts who actually wrote these reports;

04:28:50   21  is that right?

04:28:52   22  A    Well, I -- I think highly of the firms, and I know that

04:28:56   23  this is a profession that's regulated.  One can become a

04:29:01   24  Certified Financial Analyst, and there are organizations that

04:29:05   25  try to uphold the standards of that profession.

04:29:08    1    Q    So, Dr. Nicholson, please focus on my question.

04:29:11    2              Did you contact any of these analysts to discuss

04:29:14    3    these projections with them?

04:29:16    4    A    No, I didn't reach out or didn't do any independent

04:29:20    5    evaluation of their credentials.

04:29:22    6    Q    Okay.  Fair enough.

04:29:23    7              You just took their word for what they were

04:29:28    8    projecting; is that right?

04:29:30    9    A    Well, I've studied this industry for a while.  I know

04:29:35   10    that these analysts are trying very hard to be accurate

04:29:38   11    because that's what makes -- gives the firm a reputation and

04:29:46   12    gives investors a reason to listen to what they're saying.

04:29:50   13              So if they do a poor job, they will pay consequences

04:29:54   14    in terms of their revenue.  So this is something that they

04:29:57   15    take, in my experience, very seriously.

04:30:00   16    Q    At least one of the analysts, Citi Research, said that

04:30:04   17    Amarin was a high risk stock; is that right?

04:30:07   18    A    I can't -- I can't recall that now.

04:30:10   19              MR. ROUNDS:  Can you pull up PX 657, and go to

04:30:18   20    page 7711.

04:30:18   21    BY MR. ROUNDS:

04:30:35   22    Q    Do you have that exhibit in front of you?

04:30:37   23    A    Yes, I do.

04:30:38   24    Q    And do you see that under Risks, it indicates,

04:30:41   25              "We rate Amarin high risk, given the

04:30:43    1          historical and anticipated volatility in stock price

04:30:48    2          that is common for biotech stocks"?

04:30:50    3   A    Yes.

04:30:51    4   Q    And you would agree with that, right?

04:30:53    5   A    I would agree that pharmaceutical and biotech companies

04:31:00    6   that have a relatively small number of drugs either in

04:31:02    7   development or in the market will be more volatile than

04:31:07    8   pharmaceutical firms that have a very large portfolio of

04:31:11    9   drugs.  So, yes, I would agree with that.

04:31:12   10   Q    Okay.  My question is a little more specific.

04:31:15   11          Would you agree with Citi, who you're relying upon

04:31:18   12   in your report, that the Amarin stock is a high risk stock?

04:31:23   13   A    I'm not disagreeing.  There's a difference between the

04:31:28   14   volatility of the stock price and sales forecast.  I mean,

04:31:31   15   they're somewhat related, but one is looking at the company's

04:31:35   16   value, and one is looking at the future performance of a

04:31:39   17   product.

04:31:39   18   Q    Well, stock price is typically driven by sales and sales

04:31:44   19   forecasts; is that right?

04:31:45   20   A    As a general matter, changes in stock price are driven

04:31:50   21   by -- well, stock price is based on expectations.  Changes is

04:31:55   22   based on what actually occurs relative to those expectations.

04:32:02   23   Q    In any event, did you work into your analysis that Citi

04:32:09   24   had indicated that Amarin was a high risk stock?

04:32:15   25   A    Well, I did in the sense of trying to seek out as many

04:32:23   1   analysts' reports as I could that were forecasting sales and

04:32:27   2   operating margin of Vascepa in order to try to get a -- as

04:32:30   3   accurate as possible, and as, you know, stable rather than

04:32:33   4   volatile as possible forecast.

04:32:36   5   Q   Let me direct your attention, if I could, to DDX 8.9.

04:32:48   6       I believe that we had discussed this earlier.  This

04:32:52   7   was a slide that had been created by Mr. Hofmann.  Do you

04:32:56   8   recall that?

04:32:56   9   A   Yes.

04:32:57   10  Q   And you can see that with respect to net revenue, that

04:33:03   11  the variance that it projected, had been projected by

04:33:08   12  WainWright for 2018, was about 156 million; is that right?

04:33:12   13  A   Yes, for 2018, yes.

04:33:14   14  Q   And I believe you testified in your direct testimony that

04:33:19   15  sometimes these analysts can be a little high and a little

04:33:23   16  low; is that right?

04:33:24   17  A   Yes.

04:33:24   18  Q   Okay.  So would you call a $156 million variance a little

04:33:33   19  low?

04:33:35   20  A   Well, it's -- I mean, it's a percentage.  It's a pretty

04:33:39   21  big number.  So I think, yes, there's uncertainty.

04:33:42   22       I think each of these five analysts is using all the

04:33:46   23  available information to try to do as well as they can.

04:33:49   24       I did show that sometimes the variance is positive

04:33:54   25  in the sense that this analyst is, in a couple of cases,

04:34:00  1   underestimating rather than overestimating.

04:34:02  2          But, no, I would characterize that as a fairly large

04:34:05  3   percentage difference.

04:34:06  4   Q    Okay.  They weren't just a little wrong, isn't that

04:34:12  5   right?

04:34:14  6   A    Well, it's hard to define a little and a lot.  I don't

04:34:18  7   know what the -- I didn't look at a benchmark to see what the

04:34:22  8   common variance is.

04:34:23  9   Q    Well, you would agree that a $156 million swing for a

04:34:28  10  company the size of Amarin is not a small number; is that

04:34:32  11  fair?

04:34:33  12  A    It's possible.  But I think, you know, there's two

04:34:37  13  benefits of using a large, in a sense of a five-analyst sample

04:34:41  14  as opposed to, say, one or two.

04:34:42  15  Q    That's not the question, sir.  Let's just focus on what

04:34:46  16  we're focused on right here.

04:34:48  17         Is a variance of $157 million for a company the size

04:34:52  18  of Amarin a big number?  It is, isn't it?

04:34:57  19  A    Well, you know, I think the market cap of Amarin now is

04:35:01  20  in the billions.  So, in that sense, you know, it's not large

04:35:04  21  when you think about a $7 billion market cap.

04:35:08  22         But, again, my -- my sense is the WainWright analyst

04:35:12  23  was doing as well as possible.

04:35:14  24         The variance of the forecast is going to go down

04:35:17  25  when I'm using more that just one analyst report.  That's

04:35:21   1   another of the benefits of using many.  You get a more precise
04:35:25   2   mean estimate and a smaller variance.
04:35:27   3   Q    Okay.  The market cap of billions that you're referring
04:35:31   4   to is a result of the recent change of the indication on the
04:35:35   5   label as a result of the REDUCE-IT study; is that right?
04:35:39   6   A    I didn't do an analysis to decompose that market cap.
04:35:44   7   Q    Okay.  But as of the time that you did your report, the
04:35:49   8   $156 million swing that we're looking at in DDX 8.9 was a big
04:35:55   9   number as it compared to the size of the company in its sales,
04:35:59  10   right?
04:35:59  11   A    It may or may not have been.  You know, keep in mind that
04:36:03  12   I'm not using -- you know, I wasn't using the WainWright
04:36:07  13   forecast for 2018.  For 2018, I'm using the actual sales.
04:36:12  14         So, you know, this, this variance doesn't enter into
04:36:17  15   my NPV model.  I'm using the 228.4 that was actually received.
04:36:24  16   So, my NPV model is not skewed by this variance.
04:36:28  17   Q    Right.  But you understand our point, right, that the
04:36:31  18   credibility of WainWright with respect to these particular
04:36:34  19   projections is not real good given this big swing.  You get
04:36:40  20   that, right?
04:36:40  21   A    No.  I mean, I think I showed -- you know, what's built
04:36:43  22   into my NPV are a couple of periods when WainWright was overly
04:36:48  23   pessimistic, and also, for that matter, I'll concede that
04:36:51  24   WainWright was pretty darn close on some of those operating
04:36:56  25   margins.  They were within a million dollars.

04:36:58  1    Q    Let me ask you this question.  Why didn't you do your own

04:37:02  2    NPV analysis instead of relying upon what you consider to be

04:37:06  3    experts that are doing projections in the industry?

04:37:10  4    A    It is my NPV analysis.  I'm using as inputs some

04:37:14  5    information from analysts.

04:37:15  6              I think if I were up here and I did my NPV analysis

04:37:20  7    and I just wrote down what I thought the sales would be, I

04:37:23  8    could imagine that someone would say, well, you know, you've

04:37:26  9    been hired by Amarin, you'll just put any sort of sales down.

04:37:30  10             Here I'm looking at people's whose livelihood, whose

04:37:35  11   profession depends on their accuracy.  To me, that's a more

04:37:38  12   objective approach.  I'm incorporating it into my model.

04:37:40  13             But I'm using things that were created in the course

04:37:43  14   of business for people who have incentive to be as accurate as

04:37:47  15   possible.

04:37:48  16   Q    Yeah, but the point is that you're relying upon these

04:37:50  17   industry analysts that you believe are experts instead of

04:37:55  18   doing your own analysis to determine what you think the

04:37:58  19   projections might be until 2029; isn't that true?

04:38:04  20   A    I identified a set of analysts that I believe are

04:38:08  21   reputable.  I understand that, you know, they have rewards for

04:38:14  22   being as accurate as possible.  I think if they just wrote

04:38:17  23   down a number, they wouldn't last very long in the profession.

04:38:21  24   Q    Well, let's take a look, just quickly, back at DDX 8.9.

04:38:27  25             Do you see the second graph in which there's a

-1512-

04:38:33   1   representation that WainWright was wrong as well with respect

04:38:36   2   to operating income?

04:38:40   3   A     Yes, I see that.

04:38:42   4   Q     Okay.  And the variances there were 237 million, 192

04:38:47   5   million, and 185 million; is that right?

04:38:49   6   A     Yes.  For the three separate times when those forecasts

04:38:54   7   were made, yes.

04:38:55   8   Q     Right.  So we can agree, can't we, that those aren't

04:38:58   9   little differences, right?

04:39:00   10   A     Well, again, I'm using the actual figure for 2018 in my

04:39:05   11   NPV.  Again, I showed an instance where WainWright almost got

04:39:11   12   spot-on the operating income.  It was still a little bit too

04:39:15   13   pessimistic.

04:39:16   14          And, you know, the two instances where they were

04:39:19   15   overly pessimistic, those are built into my NPV.  So, those

04:39:24   16   would be pulling the numbers down.

04:39:26   17   Q     But you used the actual as opposed to the forecast

04:39:29   18   because that's the better way to do it, right?

04:39:32   19   A     Well, when one has actual data, it clearly is the

04:39:37   20   appropriate -- in most cases, the appropriate thing to use.

04:39:40   21          But I absolutely believe you need to analyze a drug

04:39:44   22   through its entire lifecycle.  So just ceasing the analysis at

04:39:50   23   2018 is absolutely not appropriate given the way that this

04:39:53   24   industry works.

04:40:06   25                 MR. ROUNDS:  Can you pull up DX 1684, and go

| | | |
|---|---|---|
| 04:40:10 | 1 | to -- well, just pull that up initially. |
| 04:40:12 | 2 | I'm going to show you what's been marked as |
| 04:40:19 | 3 | DX 1684 which is your reply expert report? |
| 04:40:22 | 4 | A   Yes. |
| 04:40:23 | 5 | Q   Do you see that? |
| 04:40:24 | 6 | A   Yes. |
| 04:40:34 | 7 | MR. ROUNDS:  And can you go to page 56.  Can you |
| 04:40:41 | 8 | pull that up? |
| 04:40:41 | 9 | BY MR. ROUNDS: |
| 04:40:43 | 10 | Q   I believe that you were shown this previously by your |
| 04:40:46 | 11 | counsel? |
| 04:40:47 | 12 | A   I think it came up in Mr. Hofmann's testimony. |
| 04:40:51 | 13 | Q   Okay.  You don't think you saw this today during your |
| 04:40:55 | 14 | testimony? |
| 04:40:57 | 15 | A   Not this -- I don't remember seeing this specific -- |
| 04:41:00 | 16 | Q   Okay.  Fair enough. |
| 04:41:01 | 17 | A   Yes.  This is in my report.  I'm not disowning it. |
| 04:41:04 | 18 | Q   That's okay.  I thought this had been shown to you |
| 04:41:06 | 19 | previously.  If I'm mistaken, that's on me. |
| 04:41:08 | 20 | So let's take a look at the Net Present Value by |
| 04:41:12 | 21 | analyst, 2008 to 2029.  It's Exhibit 2 to your reply report. |
| 04:41:18 | 22 | Do you see that? |
| 04:41:19 | 23 | A   Yes. |
| 04:41:19 | 24 | Q   And in this forecast, if you will, WainWright was looking |
| 04:41:32 | 25 | at about $7.9 billion for a Net Present Value; is that |

04:41:39  1   correct?

04:41:39  2   A    Yes.  Or, if I were to just use the WainWright data in my

04:41:45  3   model, that would be the Net Present Value.  Yes.

04:41:50  4   Q    Right.  And Jefferies was about 600 million in the

04:41:53  5   negative; is that right?

04:41:54  6   A    Yes.  Again, using their forecasts, just their forecasts

04:42:01  7   in the model, that's what would be the associated NPV.

04:42:04  8   Q    So why didn't the difference of $7.3 billion between

04:42:09  9   these two analysts, give you any concern with respect to your

04:42:13  10  projections in this case?

04:42:15  11  A    Now, some of it is due to my conservative decisions.  I

04:42:21  12  mean, by taking the operating margin and assuming that it's

04:42:24  13  going to be constant beyond the analyst forecast window, I

04:42:30  14  mean, that's one explanation for why you get some of this

04:42:33  15  variance.  So some of this is from my being conservative.

04:42:37  16         The median NPV is positive.  That's another way to

04:42:41  17  address variation and variance.  And, importantly, the mean,

04:42:45  18  which is what I use in my model, is positive across these.

04:42:49  19  Q    Back to my question.

04:42:51  20         You weren't concerned at all, looking at a

04:42:56  21  $7.2 billion difference, between WainWright and Jefferies,

04:43:01  22  that there could be some problems with your projections in

04:43:04  23  this case?

04:43:06  24  A    No.  I'm using reputable reports that are providing

04:43:12  25  important information to investors for them to invest millions

04:43:17   1   or billions of dollars, I'm doing it in an objective way, and,

04:43:22   2   I'm using all five to improve the accuracy, acknowledging that

04:43:25   3   there are going to be instances where analysts will be too

04:43:29   4   high and too low, and that's the point of averaging.

04:43:33   5   Q   Right.  But the truth is you don't really know what the

04:43:35   6   deal is going to be in 2029, right?

04:43:39   7   A   I believe I've constructed a valid and accurate model

04:43:46   8   that's consistent with the way this industry analyzes the

04:43:50   9   lifecycle profits of a drug.

04:43:54   10                  THE COURT:  Mr. Rounds, I don't know if you've

04:43:57   11   identified the exhibit for -- where this document comes from.

04:44:02   12                  MR. ROUNDS:  Yeah, it's his reply report, Your

04:44:04   13   Honor.

04:44:04   14                  THE COURT:  Was it -- has it been marked as an

04:44:05   15   exhibit?

04:44:06   16                  THE CLERK:  1684, Your Honor.

04:44:07   17                  THE COURT:  1684?

04:44:09   18                  THE CLERK:  Yes.

04:44:10   19                  THE COURT:  Thank you.

04:44:12   20                  MR. M. KENNEDY:  We object to entering his

04:44:14   21   expert report as an exhibit, if that's --

04:44:16   22                  THE COURT:  I'm not, I just wanted to reference

04:44:18   23   it for identification.  Thank you.

04:44:23   24                  MR. ROUNDS:  Well, Your Honor, if this has not

04:44:25   25   been entered into evidence, I would like to enter Exhibit 2 of

04:44:29   1   his reply report.

04:44:30   2              THE COURT:  Any objection to just admitting

04:44:33   3   Exhibit 2?

04:44:34   4              MR. M. KENNEDY:  No objection, Your Honor.

04:44:35   5              THE COURT:  All right.  So --

04:44:47   6              THE CLERK:  The last marked exhibit is 2299.

04:44:51   7   Shall we mark it 2300?

04:44:58   8              THE COURT:  You think we should mark it as 2300?

04:45:01   9              All right.  We'll mark this -- so I know that

04:45:04  10   Exhibit 2 comes from an exhibit that's marked at 1684.  What

04:45:10  11   I'll do is I will have a copy of Exhibit 2 separately admitted

04:45:15  12   as Exhibit 2300.

04:45:22  13              Any objection to that approach?

04:45:24  14              MR. M. KENNEDY:  No objection, Your Honor.

04:45:26  15              MR. ROUNDS:  No, Your Honor.

04:45:27  16              MR. SIPES:  Your Honor, I believe if it would

04:45:28  17   help the Court, we could submit, you know, an excerpt exhibit

04:45:31  18   that would then have a separate number to it that would be

04:45:34  19   just the Exhibit 2.  You know, the number may be A or

04:45:37  20   something, so there's no confusion, if that would be best

04:45:41  21   thing.

04:45:41  22              THE COURT:  Well, sometimes what I do is I mark

04:45:45  23   and admit the exhibit as part of a document as -- for example,

04:45:50  24   this one would be -- one option is 1684-1.

04:45:54  25              MR. SIPES:  That's fine.  That sounds perfect,

-1517-

04:45:57  1   Your Honor.

04:45:57  2              THE COURT:  That may be easier.

04:45:59  3              So, I'll admit Exhibit 2 as 1684-1 -- or did we

04:46:07  4   do that dash A?  Have I started that process yet?

04:46:16  5              (Discussion held off the record.)

04:46:16  6              THE COURT:  All right.  This will be 1685-A, as

04:46:27  7   in apple.

04:46:27  8              (Defendants' Exhibit 1685-A received in
04:46:27                   evidence.)

04:46:34  9              THE COURT:  All right.  Sorry, Mr. Rounds, you

04:46:35  10  may resume.

04:46:37  11             MR. ROUNDS:  Thank you, Your Honor.

04:46:37  12  BY MR. ROUNDS:

04:46:39  13  Q    Now, not all of the analysts that you relied upon

04:46:42  14  projected potential future revenues for the ten-year period

04:46:46  15  out to 2029; is that right?

04:46:48  16  A    Yes, that's correct.

04:46:49  17  Q    Okay.  In fact, two of the five analysts provided

04:46:52  18  projections from only 2019 to 2020; is that right?

04:46:57  19  A    Yes.  I believe that's correct, yes.

04:47:02  20  Q    Okay.  And that was Citi and Jefferies; is that correct?

04:47:04  21  A    You know, I can't remember which ones they were.

04:47:08  22  Q    So, in any event, with respect to these two analysts, you

04:47:15  23  did your own calculations of their projections from 2021

04:47:21  24  through 2029; is that right?

04:47:23  25  A    Yeah.  I extended, or extrapolated, in what I believed to

04:47:29  1   be a conservative fashion to create consistency across the

04:47:34  2   five.

04:47:35  3              MR. ROUNDS:  Could you pull up PX 657.

04:47:35  4   BY MR. ROUNDS:

04:47:43  5   Q   Do you recognize PX 657 as the Citi analyst's report that

04:47:51  6   you relied upon?

04:47:53  7   A   Yes.

04:47:58  8              MR. ROUNDS:  Can you go to page 2.

04:47:58  9   BY MR. ROUNDS:

04:48:04  10  Q   And do you see at the very top there's a projected sales

04:48:09  11  revenue of approximately 542 million for 2020?

04:48:18  12  A   Yes.

04:48:19  13  Q   In your extrapolation of Citi's forecast, you assumed

04:48:25  14  Vascepa sales of approximately $2 billion in 2028; is that

04:48:30  15  correct?

04:48:30  16  A   I can't remember the -- you mean for this analyst?  Are

04:48:38  17  you saying for this analyst --

04:48:38  18  Q   Yes.

04:48:40  19  A   -- or the average across the five?  I can't remember what

04:48:42  20  it is precisely.

04:48:44  21  Q   Does that sound right to you?

04:48:46  22  A   You know, I don't know that that's wrong.  I just can't

04:48:51  23  remember the figure for 2028.

04:48:53  24  Q   Okay.  You would agree, wouldn't you, that 20 billion is

04:48:57  25  roughly 3.7 times greater than Citi's actual forecast of 541

04:49:04   1   million for 2020?

04:49:05   2   A    I think you said 20 billion.   Do you mean 2.8 billion

04:49:10   3   or --

04:49:10   4   Q    Let me ask it again.

04:49:13   5            Assume, if you will, that your projection says that

04:49:17   6   through 2028 Citi forecasts Vascepa sales of approximately 2

04:49:24   7   billion.   That appears in your report.   I'm making that

04:49:27   8   representation to you.

04:49:29   9            You would agree that 2 billion is roughly at least

04:49:34   10   3.7 times greater than the forecast Citi did of 541 million in

04:49:40   11   2020; is that right?

04:49:41   12   A    Yeah.   So what I did is I took the change between 350.5,

04:49:50   13   the forecast for 2019, and the forecast for 2020, so that's --

04:49:55   14   you know, let's just call it 190 million, and then assumed

04:49:59   15   that the sales forecast would increase by that 190 million

04:50:03   16   thereafter, which is associated with a declining growth rate

04:50:07   17   when measured as a percentage because the base is getting

04:50:10   18   bigger, that's the conservative nature of it.

04:50:13   19            But, yes, if you run that out, 190 million a year

04:50:17   20   for eight years, it becomes something that I'll accept your

04:50:23   21   characterization as 2 billion.

04:50:25   22   Q    But you have no idea as you sit here whether the analysts

04:50:30   23   would agree with you in terms of the way you've run their

04:50:33   24   numbers from 2020 and equated them with your final result in

04:50:38   25   2028, isn't that true?

04:50:41  1    A    That's right.  I've used as inputs the analysts' data as

04:50:46  2  it was constructed, and I've made decisions that I believe

04:50:50  3  produce a model that's accurate and consistent and represents

04:50:55  4  how companies value drugs and how they evaluate commercial

04:51:02  5  success.

04:51:03  6    Q    So just so we all understand here, after you applied the

04:51:13  7  discount rate, you essentially averaged the five forecasts of

04:51:18  8  projected income for the years 2019 to 2029 as part of your

04:51:22  9  NPV calculation; is that fair?

04:51:25  10   A    Yes.  I'm averaging the profits, the cash flows, and then

04:51:30  11  applying the discount rate, yes.

04:51:32  12   Q    So you did no analysis on your own to determine which of

04:51:38  13  these analysts you deemed to be the most accurate with respect

04:51:43  14  to their projections; is that fair?

04:51:45  15   A    Correct.  I treated each of them equally in the sense of

04:51:49  16  I'm using a straight average across the five.  I'm not

04:51:53  17  applying a weight, which would be different than 20 percent

04:52:02  18  for each.

04:52:07  19             MR. ROUNDS:  Can you pull up 1684 again, his

04:52:12  20  reply report, and go to page 55.

04:52:12  21  BY MR. ROUNDS:

04:52:38  22   Q    Do you recall that in Exhibit 1 of your reply report that

04:52:43  23  you had done a forecasting model that excluded the WainWright

04:52:52  24  forecast?

04:52:53  25   A    Yes.  As we discussed, I have one model, but I was making

-1521-

04:52:56   1   the point that even if one were to -- inappropriately, in my

04:52:59   2   opinion -- omit, exclude H.C. WainWright, there's still a

04:53:04   3   positive NPV.  You get a break-even point that occurs a little

04:53:09   4   bit later, but it doesn't change my conclusion, but, it's not

04:53:12   5   the model that I -- that I adopt.

04:53:19   6   Q    So by excluding WainWright, your claimed Net Present

04:53:24   7   Value decreased by approximately 1.52 billion; is that right?

04:53:29   8   A    Yeah.  I think that's the figure that came up this

04:53:32   9   morning.

04:53:32   10          Again, I'm not revising my model.  My model is the

04:53:36   11   model from my original report.  I'm just making the point that

04:53:40   12   there's benefit of having all five, and that's what I stick

04:53:44   13   to.

04:53:45   14          But even if one were to inappropriately omit one

04:53:48   15   analyst, it doesn't change the NPV conclusion.  It changes the

04:53:53   16   break-even year and the NPV amount, but it's still positive.

04:53:58   17   Amarin would still be delivering a return to investors that

04:54:01   18   exceeds the industry average.

04:54:03   19   Q    Okay.  But, in any event, you would agree that by simply

04:54:06   20   removing just this one analyst, that the calculated Net

04:54:13   21   Present Value decreased by about 80 percent; is that correct?

04:54:16   22   A    Yeah, that percentage sounds about right.

04:54:19   23   Q    And when you include WainWright in your Net Present Value

04:54:26   24   model, you determined a break-even point of, I think, 2024; is

04:54:31   25   that right?

04:54:32  1   A   Yes.

04:54:32  2   Q   And when you exclude WainWright in your NPV model, you

04:54:38  3   end up in 2027; is that right?

04:54:40  4   A   Yes, its 15th year on the market.

04:54:44  5   Q   Now, each of the analysts' financial forecasts

04:54:49  6   substantially relied upon Vascepa results from the REDUCE-IT

04:54:54  7   trial, correct?

04:54:56  8   A   Well, what was known at the time was the readout of the

04:55:00  9   data, I think in September of 2018.  That was in the

04:55:04  10  information set for the analysts.

04:55:06  11  Q   Right.  But they were all anticipating that ultimately

04:55:10  12  Vascepa was going to get another label indication; is that

04:55:13  13  right?

04:55:14  14  A   Well, I mean, several of them have what they call

04:55:18  15  scenarios, so they had, like, a base case, an upside, a

04:55:22  16  downside scenario.

04:55:23  17          But certainly, it would be -- you know, 90 percent

04:55:26  18  of new drug applications, and even higher of supplemental new

04:55:33  19  drug applications, get approved.  So, they certainly could be

04:55:36  20  applying sort of an industry-wide, historical probability.

04:55:40  21  Q   Okay.  The Court can read these for herself, but the

04:55:43  22  bottom line is that you understand that in each of these

04:55:47  23  forecasts, all of the forecasts referred to the REDUCE-IT

04:55:52  24  results and built that into their forecasts; is that fair?

04:55:56  25  A   Yes.  That's clearly a part of the information set.

04:56:04    1    Q    But you understand, don't you, that the REDUCE-IT trial

04:56:07    2    was directed toward patients with triglyceride levels below

04:56:13    3    500 milligrams per deciliter, right?

04:56:15    4    A    I understand that the enrolled patients had those

04:56:18    5    characteristics.

04:56:19    6         My understanding of the label is that it's indicated

04:56:23    7    for reducing cardiovascular events for patients above 150.  So

04:56:29    8    that would at least include the very high.

04:56:35    9    Q    But as you testified earlier, right, your understanding

04:56:37   10    is that the claims do require a patient with 500 milligrams of

04:56:45   11    triglycerides or more, right?

04:56:46   12    A    Yes.  Without a legal background or clinical background,

04:56:51   13    that's my understanding, yes.

04:56:52   14    Q    So you would agree, based upon your understanding, that

04:56:57   15    the REDUCE-IT trial is not related at all to the patient

04:57:04   16    population of 500 milligrams or more with respect to

04:57:07   17    triglycerides; is that right?

04:57:11   18              MR. M. KENNEDY:  Objection.  I think at this

04:57:12   19    point we're outside his proffer of what's related to what in

04:57:15   20    terms of clinical trials.  I think he's stated the assumptions

04:57:19   21    behind his economic opinion.

04:57:21   22              THE COURT:  Mr. Kennedy, you keep cutting in and

04:57:23   23    out.  Why don't you remain seated and tell me your objection.

04:57:26   24              MR. M. KENNEDY:  Oh.  I apologize, Your Honor.

04:57:27   25              The objection is I think the question as posed

04:57:30   1   gets outside the realm of economics and into, sort of, a

04:57:34   2   scientific assessment of what trial is related to what, and so

04:57:38   3   I think that's outside of what Dr. Nicholson has been

04:57:41   4   proffered for.

04:57:42   5               THE COURT:  Mr. Rounds?

04:57:44   6               MR. ROUNDS:  Well, he certainly has proffered an

04:57:46   7   opinion as to nexus.  And with respect to the assumptions that

04:57:49   8   he's made, I think I'm entitled to certainly ask questions

04:57:52   9   about whether or not REDUCE-IT falls within the scope of the

04:57:56   10   claims as he understands them.

04:58:00   11               THE COURT:  Well, I'll allow it with that

04:58:02   12   limitation.

04:58:03   13               I understand the reason you're asking these

04:58:05   14   questions, but I do understand that Mr. Nicholson is not an

04:58:09   15   expert in the area of infringement and what the claims cover.

04:58:14   16   With that, I'll give his testimony the weight that I think is

04:58:18   17   appropriate.

04:58:20   18               MR. ROUNDS:  Fair enough.  I'll just ask one

04:58:21   19   follow-up question, Your Honor.

04:58:21   20   BY MR. ROUNDS:

04:58:23   21   Q   You understand, don't you, that the patient population

04:58:26   22   for REDUCE-IT did not include patients with 500 milligrams or

04:58:31   23   more of triglycerides, right?

04:58:33   24   A   That's -- you know, I didn't study that as part of my

04:58:39   25   assignment.  That's my understanding of the patients who were

| | | |
|---|---|---|
| 04:58:41 | 1 | enrolled. |
| 04:58:51 | 2 | MR. ROUNDS:  All right.  Can you pull up |
| 04:59:06 | 3 | DDX 8.15. |
| 04:59:06 | 4 | BY MR. ROUNDS: |
| 04:59:18 | 5 | Q  I believe you were shown this slide earlier in your |
| 04:59:22 | 6 | testimony.  Do you recall this? |
| 04:59:24 | 7 | A  I wasn't shown this, but this came up in Mr. Hofmann's |
| 04:59:28 | 8 | testimony. |
| 04:59:28 | 9 | Q  Okay.  And do you have any reason to dispute his numbers |
| 04:59:31 | 10 | with respect to marketing and sales expense of 575 million, |
| 04:59:37 | 11 | and cumulative net sales of 698 million through 2018? |
| 04:59:42 | 12 | A  No, I believe those come from the financial statements. |
| 04:59:46 | 13 | Q  And you -- |
| 04:59:47 | 14 | A  I'm sorry, I don't dispute them. |
| 04:59:49 | 15 | Q  Okay.  You would also not disagree that the marketing and |
| 04:59:53 | 16 | sales expense, as a percentage of net sales, was 82 percent; |
| 04:59:58 | 17 | is that right? |
| 04:59:58 | 18 | A  Correct. |
| 04:59:59 | 19 | Q  It's not your opinion, is it, that the $575 million that |
| 05:00:14 | 20 | was spent through 2018 on marketing and sales is unrelated to |
| 05:00:19 | 21 | the success of the product; is it? |
| 05:00:24 | 22 | A  Well, I mean, first, I just want to point out that the |
| 05:00:29 | 23 | data that I showed on marketing from IQVIA are gross sales, |
| 05:00:35 | 24 | you know, gross sales numbers and not net sales number. |
| 05:00:39 | 25 | But, no, I think -- you know, I understand from |

05:00:42  1    studying this industry that when there's a new product on the

05:00:46  2    market, and physicians and health insurers and patients don't

05:00:50  3    know much about that market, it behooves a firm to make sure

05:00:53  4    that they provide information to key stakeholders and

05:00:58  5    decision-makers.

05:00:59  6             So -- but when I looked at the marketing message,

05:01:03  7    much of that content covers the patents that are being

05:01:07  8    asserted here.  So, in that sense, if there is some causal

05:01:11  9    relation, it's -- it can arguably be stemming from the

05:01:15  10   patented features, marketing as the delivery mechanism to the

05:01:20  11   decision-makers.

05:01:21  12   Q    Okay.  Your testimony isn't that all of the marketing

05:01:24  13   that was done related to Vascepa related to the patented

05:01:31  14   features, is it?

05:01:33  15   A    No.  But certainly, you know, a substantial amount that I

05:01:37  16   observed was.

05:01:41  17   Q    You understand that in approximately 2015 that Amarin

05:01:46  18   began promoting Vascepa to physicians based upon the ANCHOR

05:01:51  19   study; is that right?

05:01:52  20   A    Well, my understanding is that the courts gave Amarin

05:01:56  21   permission, if they wanted to, to convey some information,

05:01:59  22   which I didn't study, to prescribers, not to consumers.  But

05:02:04  23   the courts gave Amarin permission to convey some information

05:02:08  24   to prescribers.

05:02:09  25   Q    So you haven't considered any information related to

05:02:14  1  promotional materials, or otherwise, that was used by Amarin

05:02:17  2  to promote the ANCHOR study to physicians?

05:02:21  3  A    I didn't do that as part of my assignment, no.

05:02:28  4  Q    Didn't you ask Amarin's attorneys for all of the

05:02:31  5  marketing information that was related to the promotion of

05:02:34  6  Vascepa?

05:02:37  7  A    I had access to the material that was disclosed, and my

05:02:42  8  assignment was to look at the marketing material for evidence

05:02:48  9  that Amarin was marketing, and physicians were understanding,

05:02:53  10  the patent features that are in suit.  I wasn't tasked with

05:03:00  11  doing a complete analysis of the marketing.

05:03:04  12  Q    You understand, don't you, that there are many more

05:03:21  13  patients that fall within the 200 to 499 level of

05:03:26  14  triglycerides than the 500 or more triglycerides -- well,

05:03:33  15  strike that.  Poor question.

05:03:34  16        You understand that there's a much bigger

05:03:38  17  marketplace for patients that have a triglyceride level of 200

05:03:43  18  to 499, as opposed to patients that have 500 or more; is that

05:03:48  19  right?

05:03:48  20  A    Well, I do from, for example, the NDTI data, but that's

05:03:55  21  conditional on using Lovaza or Vascepa, what is the diagnosis

05:04:00  22  of the patient.

05:04:00  23        I didn't do any independent epidemiologic analysis

05:04:05  24  of the size of the -- potential size of those markets.  In

05:04:08  25  terms of who's using those two drugs currently, yes, I would

05:04:13  1   agree.

05:04:13  2              MR. ROUNDS:  Could you pull up Exhibit 576.

05:04:13  3   BY MR. ROUNDS:

05:04:21  4   Q   You indicated in your report that you had reviewed this

05:04:24  5   document as part of your opinions; is that right?

05:04:27  6   A   Yes.  I believe so.

05:04:33  7              MR. ROUNDS:  Could you go to page 36, please.

05:04:33  8   BY MR. ROUNDS:

05:04:41  9   Q   Do you have page 36 in front of you?

05:04:44  10  A   Yes, I do.

05:04:45  11  Q   And do you see that on the left-hand side there is a

05:04:49  12  description of patients?

05:04:52  13  A   Yes.

05:04:53  14  Q   Okay.  And do you see that there's a reference to MARINE,

05:04:59  15  500 or more milligrams of triglycerides per deciliter?

05:05:04  16  A   Yes.

05:05:05  17  Q   And do you see there's reference to 4 million?

05:05:07  18  A   Yes, I do.

05:05:08  19  Q   Okay.  And do you understand that that's the potential

05:05:11  20  patient population for triglycerides of 500 or more milligrams

05:05:18  21  per deciliter?

05:05:19  22  A   I'm not exactly sure what it's referring to, but I won't

05:05:22  23  dispute that.

05:05:23  24  Q   Okay.  Same question with respect to the ANCHOR

05:05:29  25  triglycerides.  Do you see that?

| | | |
|---|---|---|
| 05:05:30 | 1 | A    Yes, I do. |
| 05:05:31 | 2 | Q    And do you see that's an indication of 200 to 499 |
| 05:05:36 | 3 | milligrams of triglycerides per deciliter? |
| 05:05:39 | 4 | A    Yes. |
| 05:05:41 | 5 | Q    Okay.  And that indicates a patient -- strike that. |
| 05:05:45 | 6 | That indicates a potential patient population of 35 |
| 05:05:50 | 7 | million; is that right? |
| 05:05:51 | 8 | A    Yes. |
| 05:05:51 | 9 | Q    Do you have any reason to dispute that number? |
| 05:05:54 | 10 | A    No, I don't have any reason to dispute it.  I didn't |
| 05:06:00 | 11 | independently verify this, but I don't have any reason to |
| 05:06:02 | 12 | dispute it. |
| 05:06:03 | 13 | Q    Okay.  Given that background, would you agree with me |
| 05:06:06 | 14 | that the potential patients that could become customers of |
| 05:06:10 | 15 | Vascepa is much larger in the 200 to 499 space as opposed to |
| 05:06:16 | 16 | the 500 or more space? |
| 05:06:18 | 17 | A    Yeah, I'll go back to my original conclusions.  The |
| 05:06:23 | 18 | ability to get an FDA-approved indication gave physicians the |
| 05:06:28 | 19 | discretion to prescribe Vascepa for patients who have high, |
| 05:06:34 | 20 | and provided Amarin with funds that they could use to invest |
| 05:06:39 | 21 | into the REDUCE-IT trial. |
| 05:06:42 | 22 | So from a nonobviousness perspective, I believe all |
| 05:06:47 | 23 | of those sales should be included, as I did in my analysis. |
| 05:06:52 | 24 | Q    Okay.  My question was just a little bit more simple, and |
| 05:06:55 | 25 | that is, you don't have any reason to disagree with these |

05:06:58  1  numbers, right?

05:06:59  2  A    No, I don't.

05:07:01  3  Q    Okay.  And you agree with me that the market is much

05:07:04  4  larger for patients that have triglyceride levels of 200 to

05:07:11  5  499, as opposed to patients that have 500 or more; is that

05:07:16  6  fair?

05:07:17  7  A    You know, I think I would want to know more about what

05:07:22  8  assumptions went into that, like, you know, what are the

05:07:25  9  assumptions about the probability that those patients would

05:07:28  10  want to have a prescription.  I just haven't looked at that.

05:07:33  11                MR. ROUNDS:  Your Honor, I would like to move

05:07:36  12  Exhibit 576 into evidence.

05:07:37  13                MR. M. KENNEDY:  No objection, Your Honor.

05:07:38  14                THE COURT:  576 is admitted.

05:07:38  15                        (Defendants' Exhibit 576 received in
05:07:38
05:07:38  16                         evidence.)
             BY MR. ROUNDS:

05:07:44  17  Q    Let me direct your attention, if I could, to page 51 of

05:07:49  18  this exhibit.  Do you see the reference to SWOT, Barriers and

05:07:56  19  Key Issues?

05:07:56  20  A    Yes, I do.

05:07:58  21  Q    Do you know that SWOT stands for Strengths, Weaknesses,

05:08:00  22  Opportunities and Threats?

05:08:01  23  A    Yes.

05:08:07  24                MR. ROUNDS:  Can you go to page 53.

05:08:07  25

BY MR. ROUNDS:

Q    And do you see the reference to "Opportunities" at the top?

A    Yes, I do.

Q    And there's an indication that "JELIS data supports cardiovascular benefit of pure EPA."

        Do you see that?

A    Yes.

Q    Do you have any knowledge or information that Amarin was promoting Vascepa based upon the findings of a study called JELIS?

A    Well, my understanding -- and this wasn't part of my assignment, I didn't conduct this analysis -- but my understanding is JELIS is the data that's related to the Court's decision to allow Amarin, perhaps with some restrictions, to provide information to prescribers, potential prescribers; so physician marketing, not consumer marketing.

Q    So fair enough.

        Based upon that knowledge, do you understand that at least with respect to physicians, that Amarin, after the decision in the FDA case, began to market the JELIS findings to their physician population?

A    Well, it wasn't part of my assignment.  My understanding is that that was a decision that the courts made that gave Amarin permission -- again, perhaps with some restrictions --

1532

05:09:30    1    to do such marketing.

05:09:32    2    Q    Do you have any knowledge or information that they did do

05:09:35    3    that marketing to physicians and specifically referenced the

05:09:39    4    JELIS findings?

05:09:40    5    A    I can't recall seeing that in my analysis.

05:10:02    6                    MR. ROUNDS:   Can you go to page 9 of this

05:10:04    7    document.

05:10:04    8    BY MR. ROUNDS:

05:10:10    9    Q    Do you recall in your review in this case whether you

05:10:13   10    looked at this particular page of Exhibit 576?

05:10:18   11    A    I can't recall seeing this.

05:10:21   12    Q    Does this refresh your recollection at all that Amarin

05:10:25   13    was using the results of the JELIS study to promote Vascepa in

05:10:32   14    any way?

05:10:38   15    A    Yeah.   I mean, I will -- I don't see any evidence that

05:10:44   16    they were not using it.   What I looked at in my analysis was

05:10:48   17    evidence that they were marketing the patented features to

05:10:53   18    physicians, and physicians were -- that was resonating with

05:10:57   19    physicians, they remembered it.

05:10:59   20                    And physicians who were more likely to remember the

05:11:02   21    patent features were more likely to be prescribers, and to

05:11:06   22    intend to increase their use.   So, that's what my analysis

05:11:08   23    focused on.

05:11:08   24    Q    But, in any event, nobody provided you with materials

05:11:13   25    that showed that Amarin was promoting Vascepa to physician

05:11:18   1   customers with both the JELIS study and the results of the

05:11:24   2   ANCHOR study.

05:11:25   3    A    Well, as I said, I had access to the documents that

05:11:28   4   were -- that were disclosed, but my assignment was not

05:11:32   5   broadened to include that.

05:11:39   6    Q    Wouldn't you have wanted to know all ways in which Amarin

05:11:43   7   was marketing Vascepa?

05:11:47   8    A    As I said, I -- you know, my assignment was to look for

05:11:53   9   whether there was evidence that Amarin was marketing the

05:11:58  10   ability of Vascepa to reduce TG without increasing LDL-C, two

05:12:04  11   of the patented features that are at issue here, to

05:12:08  12   physicians, and physicians -- and were physicians aware of

05:12:12  13   that, and were those -- was that awareness driving, in some

05:12:16  14   part, the commercial success.

05:12:29  15                MR. ROUNDS:  Can you go back to PDX 5-5.

05:12:29  16   BY MR. ROUNDS:

05:12:43  17    Q    Do you recall this exhibit during your examination?

05:12:47  18    A    Yes, I do.

05:12:47  19    Q    And do you see that in this document that the MARINE and

05:12:58  20   ANCHOR trials ended in the beginning of 2011?

05:13:03  21    A    Yes.  In 2011, yes.

05:13:06  22    Q    And then REDUCE-IT began in about that same time frame;

05:13:10  23   is that right?

05:13:11  24    A    Yes, that's correct.

05:13:13  25    Q    Okay.  So we can agree, can't we, that with respect to

05:13:20   1   R&D development costs, that most of those costs were incurred

05:13:26   2   from 2011 until 2018 for the REDUCE-IT trial?

05:13:33   3   A    I don't have data on how the 22 million of R & D in 2011

05:13:40   4   was apportioned between those three trials, but I would agree

05:13:44   5   that from 2011 to 2018, that those funds were primarily for

05:13:51   6   REDUCE-IT.

05:13:51   7   Q    And my math indicates that in that time frame about

05:13:56   8   $352 million were spent by the company on the REDUCE-IT study,

05:14:00   9   based upon this exhibit.  Does that sound right?

05:14:05   10  A    Yes.  Unless -- it's possible there is some other phase

05:14:09   11  for R&D that I'm not aware of.  But, yes, I wouldn't disagree.

05:14:37   12  Q    Let me direct your attention to PDX 5-25.

05:14:56   13  A    Yes.

05:14:57   14  Q    Is this a document that you pulled from Mr. Hofmann's

05:15:14   15  report and included in your slides for purposes of your

05:15:19   16  examination?

05:15:19   17  A    Yes.

05:15:20   18  Q    And this would include, as you understand it, from 2013

05:15:26   19  to 2018, revenue that was only related to patients that had

05:15:32   20  500 milligrams or more of triglycerides; is that correct?

05:15:36   21  A    Yeah.  These are estimates, and I think Mr. Hofmann

05:15:42   22  acknowledged that those percentages are too low.  But, yes,

05:15:45   23  other than that, I would agree.  The percentage is in the

05:15:52   24  middle.

05:15:53   25  Q    Fair enough.

05:15:54  1          But, in any event, you would agree that if, in fact,
05:16:01  2   the relevant sales at issue here were 178 million through
05:16:08  3   2018, that this company could be in bankruptcy; is that right?
05:16:13  4   A    Well, that's a hypothetical.  It's not --
05:16:18  5   Q    I get to ask those, by the way.  Go ahead.
05:16:21  6   A    But I think that's really not -- I don't know how germane
05:16:27  7   that is.  In that world, there wouldn't be all these
05:16:30  8   substantial R&D costs that Amarin incurred for REDUCE-IT.  So,
05:16:35  9   it doesn't seem to me to be a very informative type of
05:16:40  10  analysis.
05:16:41  11  Q    Right.  But, the REDUCE-IT trial didn't relate to
05:16:44  12  patients that had 500 milligrams or more of triglycerides,
05:16:49  13  isn't that true?
05:16:50  14  A    No.  My point is just -- it's important to be consistent.
05:16:53  15  If you're going --
05:16:53  16  Q    Come back to my question, sir.  Isn't that true?
05:16:57  17  A    Could you repeat your question, please?
05:16:58  18  Q    You understand that the REDUCE-IT trial didn't include
05:17:00  19  patients that had 500 milligrams or more of triglycerides,
05:17:04  20  right?
05:17:06  21          MR. M. KENNEDY:  Objection.  Asked and answered.
05:17:08  22  We've already gone over this.
05:17:09  23          THE COURT:  I agree this question has been asked
05:17:12  24  several times.  I don't think that's in dispute, Mr. Rounds.
05:17:16  25  Do you want to ask him another question?

1536

05:17:20   1              MR. ROUNDS:  Fair enough, Your Honor.  I'll move

05:17:23   2    on.

05:18:14   3              Can you go back to Exhibit 576, please.

05:18:14   4    BY MR. ROUNDS:

05:18:24   5    Q   Do you recall that we discussed this previously in your

05:18:26   6    testimony?

05:18:27   7    A   Yes.

05:18:27   8              MR. ROUNDS:  And can we go back to page 53.

05:18:27   9    BY MR. ROUNDS:

05:18:38   10   Q   And do you see on the right-hand side there is the

05:18:41   11   reference to "threats"?

05:18:45   12   A   Yes.

05:18:45   13   Q   And about the fourth bullet down -- can you highlight

05:18:51   14   that for us?  It says, "Lovaza still entrenched.  Limited

05:19:00   15   appreciation of impact DHA has on LDL-C."

05:19:04   16        Do you see that?

05:19:05   17   A   Yes.

05:19:06   18   Q   Okay.  That's a true statement, right, in 2017?

05:19:12   19   A   Well, I guess I would say that's a true statement of some

05:19:18   20   scenario planning that Amarin was conducting.

05:19:22   21   Q   Well, this indicates that it's a threat, right?

05:19:28   22   A   Yeah, my -- well, I think my interpretation of SWOT

05:19:32   23   analyses is you try to understand the full range of

05:19:36   24   opportunities, threats, and weaknesses.

05:19:39   25        So, yeah, I would agree they're enumerating this as

05:19:42   1   something that merits some further review, at a minimum.

05:19:46   2   Q    Do you have any reason to question that in 2017 Lovaza

05:19:53   3   was still entrenched in the marketplace?

05:19:58   4                  MR. M. KENNEDY:  Objection to the extent this is

05:19:59   5   seeking a scientific opinion.  I'm not sure -- to the extent

05:20:04   6   it's seeking a scientific opinion, I object.

05:20:06   7                  THE COURT:  Mr. Rounds, I also think that what

05:20:10   8   you're asking this expert witness to do is to affirm or

05:20:13   9   endorse a document -- a statement in Amarin's document.  He

05:20:19  10   can only testify as an expert.

05:20:21  11                  So I don't know if it's fair to make him testify

05:20:24  12   as to that inference; that just because it's in Amarin's

05:20:28  13   statement he's going to say he thinks it's true.

05:20:31  14                  Is that what you're trying to get at?

05:20:31  15                  MR. ROUNDS:  No, I mean, he --

05:20:32  16                  THE COURT:  I think it's an unfair question of

05:20:34  17   this expert witness.

05:20:36  18                  MR. ROUNDS:  Well, Your Honor --

05:20:36  19                  THE COURT:  So the objection is sustained unless

05:20:38  20   you have another way of approaching this.

05:21:53  21                  MR. ROUNDS:  Can you go to DDX 2.23.

05:22:05  22                  No, that's not what I'm looking for.

05:22:09  23                  Just give me one moment, Your Honor.

05:22:11  24                  THE COURT:  Yes.

05:22:31  25                  MR. ROUNDS:  All right.  No further questions,

05:22:34   1    Your Honor.

05:22:34   2            MR. M. KENNEDY:  Your Honor, Amarin has no

05:22:36   3    redirect.

05:22:36   4            THE COURT:  All right.  Thank you,

05:22:38   5    Mr. Nicholson.  You may step down.

05:22:38   6              (The witness was excused.)

05:22:48   7            THE COURT:  So I'm going to ask Miss Clerk to

05:22:50   8    tell counsel how much time each side has.

05:22:54   9            THE CLERK:  Give me a second, Your Honor, to

05:22:56  10    calculate.

05:22:57  11            THE COURT:  While she does that, to the extent

05:22:59  12    there's any confusion, because Miss Clerk had told me it

05:23:04  13    wasn't clear that Exhibit 655 has been admitted, I thought I

05:23:08  14    admitted that when Mr. Kennedy directed -- on direct

05:23:13  15    examination, and Mr. Rounds also asked about it.

05:23:16  16            So if there's any confusion, Exhibit 655 is

05:23:18  17    admitted.

05:23:19  18            MR. M. KENNEDY:  All right.  Thank you, Your

05:23:23  19    Honor.

05:23:23  20            THE COURT:  And I'm asking about the time

05:23:30  21    remaining because I'm trying to plan for next week.

05:23:33  22            I'm assuming we will not proceed through the

05:23:35  23    entire week, given that -- I don't think you have that much

05:23:38  24    time left.

05:23:39  25            But, do you anticipate that you would conclude

| | | |
|---|---|---|
| 05:23:42 | 1 | on Wednesday? |
| 05:23:43 | 2 | MR. SIPES:  Your Honor, Mr. Klein and I |
| 05:23:45 | 3 | conferred, and that's our hope and expectation is to conclude |
| 05:23:48 | 4 | by Wednesday. |
| 05:23:48 | 5 | MS. HUTTNER:  Ms. Huttner agrees with that as |
| 05:23:51 | 6 | well, Your Honor. |
| 05:23:51 | 7 | THE COURT:  What's that? |
| 05:23:52 | 8 | MS. HUTTNER:  That we will likely finish the |
| 05:23:55 | 9 | testimony on Wednesday. |
| 05:23:55 | 10 | THE COURT:  On Wednesday. |
| 05:23:56 | 11 | THE CLERK:  Your Honor, the plaintiffs have used |
| 05:23:58 | 12 | 839 minutes and the defendants have used 1,127 minutes. |
| 05:24:15 | 13 | THE COURT:  Well, I'm going to allow some |
| 05:24:18 | 14 | leeway.  I probably will subtract the time used to argue the |
| 05:24:22 | 15 | Rule 62 motion, if that was included.  But, we'll see how it |
| 05:24:27 | 16 | goes.  So, I anticipate -- I'm not going to plan for trial on |
| 05:24:30 | 17 | Thursday and Friday, and I anticipate that we will proceed |
| 05:24:34 | 18 | through Wednesday. |
| 05:24:35 | 19 | Is there anything I need to address before we |
| 05:24:37 | 20 | recess for the rest of the week and resume on Monday? |
| 05:24:42 | 21 | MR. SIPES:  Not that we're aware of, Your Honor. |
| 05:24:44 | 22 | MR. KLEIN:  No. |
| 05:24:45 | 23 | THE COURT:  All right.  Thank you. |
| | 24 | (Court adjourned.) |
| | 25 | -o0o- |

1

2          I certify that the foregoing is a correct
            transcript from the record of proceedings
3           in the above-entitled matter.

4           /s/Kathryn M. French          2/1/2020
            Kathryn M. French, CCR #392, RPR
5           Official Reporter

6

7                          I N D E X

8    Plaintiffs' WITNESSES:                          PAGE:

9      PECK, Carl, M.D.
         Direct Examination by Kennedy              1312
10       Cross-examination by Mr. Klein             1357
         Redirect Examination by Mr. Kennedy        1414
11

12     NICHOLSON, Sean
         Direct Examination by Mr. Kennedy          1418
13       Cross-Examination by Mr. Rounds            1492

14

15   Defendants' WITNESSES:
       HOFMANN, Ivan T.
16       Direct Examination by Mr. Barabas          1218
         Cross-examination by Mr. Kennedy           1292
17

18

19   Plaintiffs' EXHIBITS:                    ID     EVIDENCE

20    230 -                                          1487
      391 -                                          1234
21    572 -                                          1342
      573 -                                          1329
22    577 -                                          1482
      580 -                                          1478
23    581 -                                          1481
      589 -                                          1430
24    590 -                                          1230

25   (Index continued on next page.)

1                    I N D E X  (Continued)

2                                                    PAGE:

3     Plaintiffs' EXHIBITS:                 ID      EVIDENCE

4      600 -                                         1445
       602 -                                         1443
5      607 -                                         1468
       612 -                                         1469
6      628 and 629 -                                 1487
       632 -                                         1426
7      633 through 636 -                             1487
       637 -                                         1462
8      641 -                                         1490
       642 -                                         1473
9      643 -                                         1474
       644 -                                         1428
10     645 -                                         1487
       646 -                                         1492
11     647 -                                         1473
       655 -                                         1486
12     657 and 658 -                                 1454
       659 -                                         1428
13     660 -                                         1486
       661 -                                         1454
14     662 -                                         1492
       663 -                                         1454
15     664 -                                         1487
       711 -                                         1454
16     719 -                                         1484
       724 -                                         1464
17     746 -                                         1432
       752 -                                         1462
18     763 -                                         1388
       776 -                                         1332
19    1098 -                                         1421
      1109 -                                         1314
20    1218 -                                         1308

21    PLAINTIFFS' DEMONSTRATIVE EXHIBITS:

22     5-5                                           1426
       5-6                                           1428
23     5-7                                           1430
       5-9                                           1436
24     5-10                                          1437

25    (Index continued on next page.)

```
 1                         I N D E X

 2

 3                                                   PAGE:

 4    Plaintiffs' DEMONSTRATIVE EXHIBITS:       ID    EVIDENCE

 5    5-13                                                1453
      5-14                                                1447
 6    5-16                                                1459
      5-20                                                1473
 7    5-21                                                1474
      5-22                                                1485
 8    5-23                                                1490
      5-24                                                1492
 9

10    Defendants' EXHIBITS:

11     576 -                                              1530
      1685-A -                                            1517
12    1607 -                                              1256
      1762 -                                              1263
13    1772 -                                              1264
      1773 -                                              1263
14    1776 -                                              1271
      2039 -                                              1256
15    2050 -                                              1266
      2054 -                                              1243
16    2057 -                                              1262
      2061 -                                              1243
17    2065 and 2066 -                                     1243
      2067 -                                              1256
18    2079 -                                              1269
      2085 -                                              1276
19    2088 -                                              1275
      2223 -                                              1221
20    2299 -                                              1287

21    DEFENDANTS' DEMONSTRATIVE EXHIBITS:

22     8.6                                                1230
       8.7                                                1234
23     8.8                                                1235
       8.9                                                1243
24    8.10                                                1246
      8.12                                                1251
25    (Index continued on next page.)
```

1543

| DEFENDANTS' DEMONSTRATIVE EXHIBITS | PAGE: |
|---|---|
| 8.13 | 1256 |
| 8.15 | 1266 |
| 8.18 | 1275 |
| 8.20 | 1279 |
| 8.21 | 1280 |

1

# #

**#392** [2] - 1216:22, 1540:4

# $

**$1.52** [1] - 1245:3
**$108** [1] - 1241:23
**$156** [3] - 1508:18, 1509:9, 1510:8
**$157** [2] - 1241:9, 1509:17
**$161** [1] - 1233:17
**$228** [2] - 1429:8, 1449:8
**$26** [1] - 1429:7
**$267,000,000** [1] - 1227:16
**$32** [1] - 1233:2
**$320** [1] - 1485:2
**$352** [1] - 1534:8
**$385** [1] - 1241:6
**$575** [2] - 1265:12, 1525:19
**$589,000,000** [1] - 1246:24
**$60** [2] - 1485:3, 1500:16
**$631,000,000** [1] - 1278:23
**$698** [1] - 1265:16
**$75** [2] - 1281:7, 1281:14
**$752,000,000** [1] - 1302:5
**$863** [1] - 1228:1

# '

**'16** [1] - 1460:5
**'17** [1] - 1460:5
**'19** [1] - 1284:4
**'87** [1] - 1315:22

# /

**/s/Kathryn** [1] - 1540:4

# 1

**1** [4] - 1335:13, 1416:3, 1499:25, 1520:22
**1,127** [1] - 1539:12
**1.15** [2] - 1360:6, 1360:18
**1.2** [2] - 1502:7, 1505:3
**1.3** [1] - 1427:15
**1.52** [1] - 1521:7
**1.7** [1] - 1458:22
**1.9** [6] - 1244:21, 1458:22, 1458:23, 1459:2, 1459:4, 1504:4
**10** [3] - 1278:21, 1442:4, 1444:1
**10-K** [7] - 1462:5, 1498:22, 1498:25, 1499:11, 1500:1, 1500:4, 1500:19
**10-Q** [2] - 1463:22, 1463:24
**1006** [14] - 1255:23, 1274:23, 1426:5, 1428:14, 1430:14, 1436:8, 1437:17, 1453:21, 1456:17, 1457:22, 1459:14, 1473:3, 1474:8, 1485:15
**102** [1] - 1413:19
**109** [2] - 1412:17, 1412:18
**1091** [1] - 1245:20
**1098** [6] - 1420:16, 1420:23, 1421:2, 1421:4, 1421:5, 1541:19
**11** [8] - 1276:9, 1276:11, 1345:11, 1370:17, 1371:6, 1371:8, 1482:23
**11-year** [1] - 1448:7
**1102** [1] - 1245:20
**1109** [7] - 1314:2, 1314:9, 1314:11, 1314:15, 1314:17, 1314:18, 1541:19
**112** [1] - 1413:2
**113** [1] - 1413:3
**1186** [3] - 1345:4, 1350:25, 1415:23
**12** [29] - 1301:18, 1302:10, 1344:19, 1344:25, 1390:3, 1390:23, 1391:11, 1394:1, 1394:8, 1394:18, 1395:11, 1396:8, 1396:10, 1396:22, 1396:24, 1397:2, 1398:23, 1399:9, 1405:14, 1405:25, 1406:3, 1406:5, 1406:8, 1406:13, 1406:14, 1406:21, 1468:22
**12-week** [6] - 1346:8, 1394:5, 1394:7,
1396:1, 1396:2, 1406:2
**120** [1] - 1472:21
**1218** [6] - 1301:7, 1308:15, 1308:18, 1308:19, 1540:16, 1541:20
**1221** [1] - 1542:19
**1230** [2] - 1540:24, 1542:22
**1234** [2] - 1540:20, 1542:22
**1235** [1] - 1542:23
**1243** [4] - 1542:15, 1542:16, 1542:17, 1542:23
**1246** [1] - 1542:24
**1251** [1] - 1542:24
**1256** [4] - 1542:12, 1542:14, 1542:17, 1543:2
**1262** [1] - 1542:16
**1263** [2] - 1542:12, 1542:13
**1264** [1] - 1542:13
**1266** [2] - 1542:15, 1543:3
**1269** [1] - 1542:18
**1271** [1] - 1542:14
**1275** [2] - 1542:19, 1543:3
**1276** [1] - 1542:18
**1279** [1] - 1543:4
**128** [1] - 1241:18
**1280** [1] - 1543:4
**1287** [1] - 1542:20
**129** [1] - 1365:21
**1292** [1] - 1540:16
**12:37** [1] - 1357:1
**13** [2] - 1399:12, 1403:3
**1308** [1] - 1541:20
**1312** [1] - 1540:9
**1314** [1] - 1541:19
**1329** [1] - 1540:21
**1332** [1] - 1541:18
**1342** [1] - 1540:21
**1357** [1] - 1540:10
**1388** [1] - 1541:18
**139** [2] - 1374:12
**14** [3] - 1283:19, 1335:13, 1413:19
**14.2** [2] - 1405:24, 1406:7
**140** [2] - 1374:12, 1472:21
**141** [1] - 1391:17
**1414** [1] - 1540:10
**1418** [1] - 1540:12
**142** [1] - 1391:18
**1421** [1] - 1541:19
**1426** [2] - 1541:6, 1541:22
**1428** [3] - 1541:9, 1541:12, 1541:22
**143** [2] - 1399:12, 1403:3
**1430** [2] - 1540:23, 1541:23
**1432** [1] - 1541:17
**1436** [1] - 1541:23
**1437** [1] - 1541:24
**1443** [1] - 1541:4
**1445** [1] - 1541:4
**1447** [1] - 1542:5
**1453** [1] - 1542:5
**1454** [3] - 1541:12, 1541:13, 1541:14, 1541:15
**1459** [1] - 1542:6
**1462** [2] - 1541:7, 1541:17
**1464** [1] - 1541:16
**1468** [1] - 1541:5
**1469** [1] - 1541:5
**1473** [3] - 1541:8, 1541:11, 1542:6
**1474** [2] - 1541:9, 1542:7
**1478** [1] - 1540:22
**1481** [1] - 1540:23
**1482** [1] - 1540:22
**1484** [1] - 1541:16
**1485** [1] - 1542:7
**1486** [2] - 1541:11, 1541:13
**1487** [5] - 1540:20, 1541:6, 1541:7, 1541:10, 1541:15
**1490** [2] - 1541:8, 1542:8
**1492** [4] - 1540:13, 1541:10, 1541:14, 1542:8
**15** [5] - 1254:8, 1336:13, 1418:16, 1442:5, 1495:8
**150** [2] - 1422:2, 1523:7
**1517** [1] - 1542:11
**1530** [1] - 1542:11
**156** [1] - 1508:12
**15th** [1] - 1522:4
**16** [3] - 1336:13, 1339:8, 1469:23
**1606** [1] - 1298:25
**1607** [4] - 1255:4, 1255:12, 1256:4, 1542:12
**165.5** [1] - 1461:7
**1684** [6] - 1512:25, 1513:3, 1515:16, 1515:17, 1516:10, 1520:19
**1684-1** [2] - 1516:24, 1517:3
**1685-A** [3] - 1517:6, 1517:8, 1542:11
**1689** [1] - 1363:24
**1698** [2] - 1361:22, 1363:24
**17** [1] - 1412:18
**174,000** [1] - 1427:13
**1762** [5] - 1262:20, 1262:22, 1262:25, 1263:1, 1542:12
**1772** [5] - 1264:18, 1264:19, 1264:22, 1264:23, 1542:13
**1773** [6] - 1263:17, 1263:18, 1263:21, 1263:22, 1542:13
**1776** [4] - 1271:12, 1271:21, 1271:23, 1542:14
**178** [1] - 1535:2
**179.8** [1] - 1461:9
**18** [3] - 1309:6, 1327:5, 1327:21
**183** [7] - 1367:13, 1372:25, 1376:3, 1382:20, 1383:18, 1392:24, 1395:6
**185** [1] - 1512:5
**19** [3] - 1413:20, 1450:13, 1455:14
**190** [3] - 1519:14, 1519:15, 1519:19
**191** [1] - 1395:5
**192** [1] - 1512:4
**1964** [1] - 1315:8
**1968** [1] - 1315:9
**1970s** [3] - 1315:21, 1318:4, 1319:4
**1980** [3] - 1315:22, 1316:21, 1469:22
**1984** [1] - 1469:23
**1987** [2] - 1313:8, 1320:13
**1990** [1] - 1468:21
**1993** [2] - 1313:8, 1320:13
**1994** [1] - 1468:21
**1997** [1] - 1419:2
**1A** [1] - 1499:25
**1st** [1] - 1461:17

2

**2** [32] - 1242:24,
1245:1, 1269:8,
1280:9, 1297:15,
1345:11, 1345:12,
1346:17, 1346:24,
1351:2, 1351:5,
1361:22, 1362:9,
1369:22, 1374:12,
1378:17, 1381:6,
1407:2, 1416:4,
1445:24, 1513:21,
1515:25, 1516:3,
1516:10, 1516:11,
1516:19, 1517:3,
1518:8, 1518:14,
1519:6, 1519:9,
1519:21
**2.1** [5] - 1377:14,
1380:17, 1381:6,
1416:16, 1416:24
**2.22** [2] - 1283:5,
1287:2
**2.23** [2] - 1287:10,
1537:21
**2.8** [1] - 1519:2
**2/1/2020** [1] - 1540:4
**20** [8] - 1238:15,
1315:18, 1441:21,
1468:8, 1472:20,
1518:24, 1519:2,
1520:17
**200** [5] - 1527:13,
1527:17, 1529:2,
1529:15, 1530:4
**2005** [4] - 1307:19,
1446:7, 1447:4,
1471:11
**2006** [1] - 1332:1
**2008** [14] - 1227:3,
1244:12, 1246:15,
1425:7, 1425:11,
1425:14, 1426:18,
1457:3, 1469:9,
1488:1, 1488:20,
1488:23, 1488:24,
1513:21
**2009** [5] - 1310:2,
1425:15, 1425:21,
1446:7, 1447:4
**201.57(c)(15)** [1] -
1404:11
**201.57(c)(2** [1] -
1404:10
**201.57(c)(2)** [1] -
1407:25
**2011** [9] - 1425:15,
1425:22, 1426:20,
1471:11, 1533:20,

1533:21, 1534:2,
1534:3, 1534:5
**2012** [5] - 1420:14,
1421:22, 1465:15,
1488:1, 1489:15
**2013** [41] - 1227:19,
1233:1, 1233:13,
1234:16, 1234:22,
1253:1, 1256:15,
1265:24, 1272:16,
1273:1, 1276:10,
1279:2, 1305:1,
1305:5, 1308:2,
1308:6, 1308:9,
1308:22, 1308:24,
1308:25, 1309:3,
1310:2, 1310:4,
1427:10, 1427:14,
1429:3, 1429:8,
1435:4, 1435:15,
1436:23, 1437:2,
1437:5, 1439:16,
1448:8, 1471:13,
1475:8, 1484:21,
1489:16, 1497:5,
1534:18
**2014** [11] - 1265:24,
1269:9, 1269:24,
1307:21, 1307:25,
1308:1, 1309:14,
1427:25, 1437:6,
1477:11, 1482:5
**2015** [5] - 1241:2,
1241:17, 1445:5,
1460:5, 1526:17
**20150** [1] - 1266:16
**2016** [4] - 1241:3,
1241:17, 1431:21,
1481:4
**2017** [21] - 1241:3,
1241:17, 1272:16,
1273:1, 1279:22,
1308:22, 1361:23,
1363:4, 1363:9,
1363:15, 1363:23,
1461:5, 1461:6,
1461:8, 1461:17,
1462:6, 1475:8,
1483:3, 1536:18,
1537:2
**2018** [68] - 1227:3,
1227:19, 1228:2,
1230:16, 1234:16,
1234:22, 1240:25,
1241:2, 1241:7,
1241:19, 1241:20,
1253:1, 1261:13,
1278:23, 1279:2,
1279:23, 1296:3,
1305:1, 1305:6,

1329:16, 1425:7,
1425:11, 1426:18,
1426:20, 1427:2,
1427:10, 1427:15,
1429:4, 1429:8,
1430:10, 1435:4,
1435:16, 1436:3,
1436:23, 1437:2,
1439:16, 1448:9,
1449:4, 1449:7,
1455:5, 1460:3,
1460:4, 1460:6,
1471:13, 1484:21,
1485:1, 1486:3,
1497:5, 1497:12,
1498:14, 1498:18,
1498:21, 1499:11,
1502:2, 1502:6,
1508:12, 1508:13,
1510:13, 1512:10,
1512:23, 1522:9,
1525:11, 1525:20,
1534:2, 1534:5,
1534:19, 1535:3
**2019** [36] - 1244:9,
1244:13, 1267:23,
1284:11, 1284:19,
1294:12, 1297:18,
1297:21, 1298:22,
1299:3, 1302:10,
1314:9, 1363:11,
1420:20, 1421:25,
1422:10, 1422:15,
1427:1, 1430:11,
1448:12, 1449:10,
1450:1, 1450:3,
1457:3, 1457:6,
1462:22, 1463:9,
1463:13, 1463:23,
1483:13, 1498:20,
1502:3, 1517:18,
1519:13, 1520:8
**2020** [18] - 1216:6,
1218:1, 1238:14,
1246:19, 1299:25,
1301:10, 1357:1,
1430:11, 1455:16,
1457:4, 1457:7,
1458:14, 1517:18,
1518:11, 1519:1,
1519:11, 1519:13,
1519:24
**2021** [1] - 1517:23
**2022** [1] - 1449:24
**2023** [1] - 1245:13
**2024** [3] - 1458:16,
1458:18, 1521:24
**2027** [5] - 1238:15,
1245:13, 1449:19,
1456:6, 1522:3

**2028** [6] - 1449:22,
1458:22, 1518:14,
1518:23, 1519:6,
1519:25
**2029** [17] - 1238:16,
1246:15, 1448:12,
1448:14, 1448:17,
1449:4, 1455:5,
1457:4, 1458:22,
1458:23, 1504:19,
1511:19, 1513:21,
1515:6, 1517:15,
1517:24, 1520:8
**2039** [7] - 1251:16,
1255:13, 1255:16,
1255:18, 1256:3,
1256:4, 1542:14
**2050** [8] - 1265:23,
1266:3, 1266:7,
1266:14, 1279:1,
1279:4, 1279:6,
1542:15
**2054** [5] - 1242:15,
1242:25, 1243:3,
1243:4, 1542:15
**2057** [5] - 1260:23,
1261:4, 1261:12,
1262:4, 1262:5,
1542:16
**2061** [5] - 1242:15,
1242:23, 1243:2,
1243:4, 1542:16
**2065** [5] - 1242:15,
1242:23, 1243:2,
1243:4, 1542:17
**2066** [5] - 1242:15,
1242:24, 1243:2,
1243:4, 1542:17
**2067** [4] - 1255:4,
1255:12, 1256:4,
1542:17
**2079** [5] - 1269:8,
1269:10, 1269:12,
1269:13, 1542:18
**2085** [6] - 1276:9,
1276:12, 1276:14,
1276:15, 1276:18,
1542:18
**2088** [5] - 1274:6,
1274:12, 1274:19,
1275:1, 1542:19
**21** [9] - 1216:6,
1218:1, 1271:14,
1280:13, 1357:1,
1374:12, 1404:10,
1407:25
**22** [4] - 1399:12,
1403:4, 1412:18,
1534:3
**2223** [5] - 1220:18,

1220:23, 1221:1,
1221:2, 1542:19
**2229** [1] - 1287:14
**2248** [2] - 1362:9,
1363:25
**2256** [3] - 1376:18,
1405:8, 1407:3
**2267** [2] - 1286:14,
1286:21
**228** [2] - 1230:15,
1241:8
**228.4** [1] - 1510:15
**2299** [4] - 1287:12,
1287:15, 1516:6,
1542:20
**23** [2] - 1492:22,
1494:20
**230** [2] - 1487:10,
1540:20
**2300** [3] - 1516:7,
1516:8, 1516:12
**237** [1] - 1512:4
**24** [3] - 1394:1,
1395:12, 1413:2
**241** [3] - 1367:14,
1368:10, 1372:24
**248** [3] - 1383:19,
1383:22, 1384:3
**249** [3] - 1382:20,
1383:12, 1385:5
**25** [7] - 1253:23,
1298:25, 1320:16,
1391:17, 1419:9,
1497:13, 1497:20
**27** [1] - 1392:24
**275** [1] - 1267:21
**28** [1] - 1479:1
**287** [1] - 1349:13
**29** [3] - 1279:21,
1303:15, 1304:6
**2:16-cv-02525-MMD-NJK** [1] - 1216:5

3

**3** [12] - 1235:4,
1251:16, 1260:23,
1290:4, 1309:16,
1391:18, 1446:21,
1469:20, 1469:21,
1499:9, 1499:12
**3.6** [2] - 1229:24,
1230:1
**3.7** [2] - 1518:25,
1519:10
**30** [1] - 1355:21
**30-day** [1] - 1275:12
**30th** [1] - 1314:8
**31st** [2] - 1462:6,
1463:23

3

**32** [2] - 1435:16, 1437:2
**33** [3] - 1350:7, 1394:6, 1498:7
**34** [1] - 1310:11
**35** [1] - 1529:6
**350.5** [1] - 1519:12
**36** [2] - 1528:7, 1528:9
**37** [2] - 1273:12, 1273:23
**38** [1] - 1433:10
**391** [5] - 1233:22, 1234:3, 1234:6, 1234:11, 1540:20

## 4

**4** [6] - 1242:23, 1302:1, 1346:25, 1407:6, 1528:17
**4-2** [1] - 1314:24
**4-4** [1] - 1316:5
**4-5** [2] - 1318:21, 1318:23
**4-6** [1] - 1320:11
**4.5** [1] - 1233:14
**42** [1] - 1305:21
**45** [1] - 1472:20
**46.6** [1] - 1461:14
**465** [1] - 1441:24
**465,000,000** [1] - 1426:20
**47.6** [1] - 1463:8
**48** [2] - 1298:25, 1299:17
**499** [5] - 1527:13, 1527:18, 1529:2, 1529:15, 1530:5

## 5

**5** [7] - 1216:8, 1330:1, 1332:20, 1342:3, 1432:24, 1443:15, 1446:21
**5-10** [5] - 1436:17, 1437:17, 1437:19, 1437:20, 1541:24
**5-11** [1] - 1439:20
**5-12** [1] - 1447:25
**5-13** [6] - 1449:1, 1453:18, 1453:21, 1453:23, 1453:24, 1542:5
**5-14** [5] - 1456:13, 1456:16, 1456:19, 1456:20, 1542:5
**5-15** [6] - 1456:22, 1457:21, 1457:24, 1458:1, 1486:20,

1486:24
**5-16** [7] - 1458:3, 1459:13, 1459:16, 1459:17, 1501:20, 1501:22, 1542:6
**5-17** [1] - 1460:23
**5-18** [1] - 1462:15
**5-19** [1] - 1470:9
**5-20** [5] - 1471:5, 1473:2, 1473:5, 1473:13, 1542:6
**5-21** [5] - 1473:14, 1474:8, 1474:10, 1474:17, 1542:7
**5-22** [9] - 1484:17, 1485:12, 1485:15, 1485:17, 1485:18, 1485:22, 1486:13, 1487:13, 1542:7
**5-23** [6] - 1487:22, 1488:7, 1489:19, 1489:25, 1490:5, 1542:8
**5-24** [7] - 1490:7, 1492:3, 1492:5, 1492:11, 1497:8, 1497:10, 1542:8
**5-25** [1] - 1534:12
**5-3** [2] - 1421:13, 1493:9
**5-4** [1] - 1424:4
**5-42** [1] - 1454:22
**5-5** [8] - 1424:24, 1425:25, 1426:5, 1426:15, 1426:25, 1427:3, 1533:15, 1541:22
**5-6** [6] - 1427:7, 1428:5, 1428:14, 1428:16, 1428:23, 1541:22
**5-7** [5] - 1428:25, 1430:6, 1430:14, 1430:24, 1541:23
**5-8** [1] - 1433:14
**5-9** [5] - 1435:1, 1436:5, 1436:8, 1436:11, 1541:23
**50** [5] - 1279:22, 1346:22, 1420:9, 1427:16, 1500:16
**500** [60] - 1225:25, 1248:16, 1250:9, 1251:10, 1252:14, 1252:16, 1252:20, 1252:21, 1254:13, 1254:16, 1254:20, 1257:5, 1257:14, 1258:24, 1297:5, 1338:10, 1338:11,

1338:17, 1338:18, 1344:4, 1344:5, 1357:25, 1358:1, 1358:8, 1358:17, 1359:1, 1381:8, 1381:16, 1397:9, 1397:16, 1397:18, 1398:8, 1398:10, 1488:16, 1491:13, 1491:20, 1494:1, 1494:7, 1494:14, 1495:14, 1495:19, 1496:4, 1496:16, 1497:14, 1497:21, 1523:3, 1523:10, 1523:16, 1524:22, 1527:14, 1527:18, 1528:15, 1528:20, 1529:16, 1530:5, 1534:20, 1535:12, 1535:19
**505(b)(2** [1] - 1382:4
**51** [1] - 1530:17
**52** [1] - 1494:20
**523** [1] - 1247:5
**53** [7] - 1279:23, 1303:16, 1304:6, 1486:2, 1530:24, 1536:8
**54** [1] - 1429:9
**541** [2] - 1518:25, 1519:10
**542** [1] - 1518:11
**55** [1] - 1520:20
**56** [2] - 1425:11, 1513:7
**57** [1] - 1480:9
**57(c)(2** [1] - 1404:17
**572** [9] - 1341:3, 1341:5, 1341:20, 1341:24, 1342:1, 1342:2, 1342:4, 1352:21, 1540:21
**573** [12] - 1328:7, 1328:21, 1328:25, 1329:2, 1329:3, 1329:5, 1329:18, 1330:1, 1335:11, 1369:14, 1370:18, 1540:21
**575** [1] - 1525:10
**576** [7] - 1528:2, 1530:12, 1530:14, 1530:15, 1532:10, 1536:3, 1542:11
**577** [6] - 1482:9, 1482:15, 1482:19, 1482:21, 1482:22, 1540:22
**580** [7] - 1477:6,

1477:24, 1478:2, 1478:5, 1478:6, 1478:8, 1540:22
**581** [6] - 1480:25, 1481:10, 1481:13, 1481:16, 1481:17, 1540:23
**589** [3] - 1430:19, 1430:24, 1540:23
**590** [8] - 1228:17, 1229:11, 1229:17, 1230:6, 1426:8, 1426:10, 1454:7, 1540:24

## 6

**6** [2] - 1469:18, 1478:7
**600** [6] - 1445:2, 1445:11, 1445:21, 1445:22, 1514:4, 1541:4
**602** [8] - 1442:15, 1443:4, 1443:8, 1443:10, 1443:13, 1443:14, 1443:16, 1541:4
**607** [7] - 1465:11, 1465:20, 1467:18, 1468:6, 1468:7, 1468:9, 1541:5
**612** [5] - 1469:5, 1469:13, 1469:16, 1469:17, 1541:5
**62** [2] - 1433:7, 1539:15
**628** [3] - 1487:6, 1487:10, 1541:6
**629** [3] - 1487:6, 1487:10, 1541:6
**630** [1] - 1487:6
**631** [1] - 1487:6
**632** [4] - 1426:8, 1426:10, 1426:15, 1541:6
**633** [3] - 1487:6, 1487:10, 1541:7
**634** [2] - 1487:6, 1487:10
**635** [2] - 1487:6, 1487:10
**636** [3] - 1487:6, 1487:10, 1541:7
**637** [5] - 1462:6, 1462:10, 1462:12, 1462:13, 1541:7
**641** [3] - 1490:1, 1490:5, 1541:8
**642** [5] - 1472:12, 1473:7, 1473:12,

1473:13, 1541:8
**643** [3] - 1474:12, 1474:17, 1541:9
**644** [5] - 1428:18, 1428:23, 1436:13, 1486:14, 1541:9
**645** [7] - 1474:12, 1474:17, 1487:6, 1487:10, 1487:15, 1487:16, 1541:10
**646** [3] - 1492:6, 1492:11, 1541:10
**647** [5] - 1472:12, 1473:7, 1473:12, 1473:13, 1541:11
**65.7** [1] - 1463:1
**655** [8] - 1486:14, 1486:18, 1487:15, 1499:9, 1499:11, 1538:13, 1538:16, 1541:11
**657** [6] - 1454:2, 1454:7, 1506:19, 1518:3, 1518:5, 1541:12
**658** [6] - 1454:2, 1454:7, 1463:13, 1463:18, 1463:20, 1541:12
**659** [5] - 1428:18, 1428:23, 1436:13, 1486:14, 1541:12
**660** [3] - 1486:14, 1486:18, 1541:13
**661** [3] - 1454:2, 1454:7, 1541:13
**662** [3] - 1492:6, 1492:11, 1541:14
**663** [3] - 1454:2, 1454:7, 1541:14
**664** [2] - 1487:7, 1541:15
**69** [1] - 1392:24
**698** [1] - 1525:11
**6th** [1] - 1450:2

## 7

**7** [3] - 1407:3, 1413:3, 1509:21
**7-day** [1] - 1275:12
**7.1** [3] - 1364:18, 1372:11, 1374:21
**7.10** [1] - 1375:25
**7.11** [1] - 1376:15
**7.14** [1] - 1381:3
**7.15** [1] - 1382:19
**7.16** [1] - 1387:20
**7.2** [3] - 1361:12, 1361:22, 1514:21

4

**7.21** [1] - 1392:23
**7.22** [1] - 1395:5
**7.24** [2] - 1404:8, 1404:9
**7.25** [1] - 1405:1
**7.3** [2] - 1363:22, 1514:8
**7.34** [1] - 1406:23
**7.35** [1] - 1407:24
**7.4** [1] - 1365:19
**7.6** [1] - 1367:11
**7.7** [1] - 1368:9
**7.8** [1] - 1369:13
**7.9** [3] - 1246:25, 1372:23, 1513:25
**70** [1] - 1472:20
**70-30** [1] - 1253:10
**711** [3] - 1454:2, 1454:7, 1541:15
**719** [6] - 1483:8, 1483:10, 1483:19, 1483:23, 1484:1, 1541:16
**72** [1] - 1242:25
**72.7** [1] - 1463:3
**724** [5] - 1463:23, 1464:3, 1464:5, 1464:6, 1541:16
**73** [2] - 1480:3
**74-26** [1] - 1253:10
**746** [8] - 1247:4, 1431:15, 1432:16, 1432:20, 1432:22, 1432:23, 1432:25, 1541:17
**75** [1] - 1413:15
**752** [5] - 1461:17, 1461:23, 1462:1, 1462:2, 1541:17
**763** [5] - 1387:22, 1388:1, 1388:3, 1388:4, 1541:18
**77** [1] - 1241:16
**7711** [1] - 1506:20
**776** [7] - 1331:17, 1332:1, 1332:4, 1332:8, 1332:10, 1332:11, 1541:18
**78** [1] - 1414:16

# 8

**8** [7] - 1352:23, 1371:6, 1371:7, 1407:3, 1481:18, 1494:20, 1494:24
**8,000** [1] - 1426:22
**8-18** [1] - 1308:13
**8-21** [1] - 1431:1
**8-3** [1] - 1292:6

**8-6** [1] - 1304:15
**8-7** [1] - 1437:22
**8.10** [5] - 1243:24, 1245:25, 1246:3, 1246:4, 1542:24
**8.11** [1] - 1246:7
**8.12** [5] - 1251:2, 1251:20, 1251:22, 1251:24, 1542:24
**8.13** [6] - 1252:1, 1254:22, 1254:24, 1255:11, 1256:4, 1543:2
**8.14** [3] - 1260:10, 1262:7, 1263:3
**8.15** [8] - 1264:25, 1266:9, 1266:12, 1266:14, 1266:19, 1266:22, 1525:3, 1543:3
**8.16** [2] - 1268:10, 1269:16
**8.17** [1] - 1270:18
**8.18** [6] - 1272:15, 1274:17, 1274:20, 1275:1, 1475:2, 1543:3
**8.19** [1] - 1275:22
**8.20** [6] - 1278:7, 1279:7, 1279:8, 1280:8, 1280:13, 1543:4
**8.21** [4] - 1279:11, 1280:4, 1280:15, 1543:4
**8.22** [1] - 1283:1
**8.24** [1] - 1289:16
**8.25** [1] - 1290:21
**8.4** [1] - 1223:17
**8.5** [2] - 1224:20, 1247:1
**8.6** [7] - 1229:22, 1229:25, 1230:2, 1230:7, 1448:21, 1458:20, 1542:22
**8.7** [6] - 1232:4, 1234:8, 1234:10, 1234:12, 1296:24, 1542:22
**8.8** [7] - 1234:15, 1235:15, 1235:17, 1235:19, 1438:20, 1439:1, 1542:23
**8.9** [10] - 1240:18, 1242:11, 1243:6, 1243:8, 1243:9, 1459:19, 1508:5, 1510:8, 1511:24, 1542:23
**80** [3] - 1245:4,

1478:15, 1521:21
**810** [1] - 1464:13
**82** [3] - 1265:18, 1395:6, 1525:16
**821** [1] - 1303:8
**83** [1] - 1395:6
**839** [1] - 1539:12
**85** [2] - 1241:17, 1254:8
**8:31** [1] - 1218:1

# 9

**9** [4] - 1263:17, 1281:20, 1378:17, 1532:6
**90** [2] - 1294:7, 1522:17
**94** [1] - 1294:11
**95** [1] - 1437:10
**96** [1] - 1437:5
**99** [1] - 1378:17

# A

**A.M** [1] - 1218:1
**abbreviation** [2] - 1232:23, 1313:14
**ability** [14] - 1223:15, 1240:14, 1253:17, 1257:10, 1262:8, 1269:3, 1270:14, 1350:16, 1350:20, 1477:3, 1478:22, 1500:14, 1529:18, 1533:10
**able** [21] - 1223:25, 1233:14, 1233:19, 1235:3, 1235:10, 1256:10, 1257:2, 1257:8, 1265:10, 1265:14, 1273:24, 1289:20, 1290:4, 1309:16, 1319:6, 1326:8, 1360:3, 1476:4, 1476:10, 1479:5, 1505:6
**above-entitled** [1] - 1540:3
**abreast** [1] - 1322:25, 1323:12
**absence** [5] - 1371:23, 1372:2, 1372:14, 1373:5, 1373:25
**absent** [3] - 1329:12, 1399:9, 1406:20
**absolute** [3] - 1224:2, 1226:25, 1231:14
**absolutely** [2] - 1512:21, 1512:23

**abundance** [1] - 1229:7
**academics** [2] - 1466:7, 1467:11
**accelerated** [1] - 1269:22
**accept** [2] - 1398:24, 1519:20
**acceptable** [1] - 1399:23
**accepts** [1] - 1398:16
**access** [4] - 1233:1, 1451:3, 1527:7, 1533:3
**accessing** [1] - 1276:22
**accident** [1] - 1394:7
**accomplish** [1] - 1396:25
**accomplished** [1] - 1333:10
**according** [17] - 1233:3, 1244:6, 1245:12, 1261:12, 1262:20, 1302:13, 1302:19, 1326:18, 1346:16, 1348:21, 1353:23, 1354:15, 1390:15, 1416:24, 1448:15, 1470:7, 1475:13
**account** [7] - 1331:1, 1347:12, 1440:22, 1457:9, 1457:17, 1485:22, 1485:24
**accountant** [1] - 1285:3
**accounted** [1] - 1431:11
**accounting** [2] - 1219:1, 1219:5
**accumulating** [1] - 1458:8
**accuracy** [7] - 1239:25, 1240:3, 1240:8, 1465:2, 1504:10, 1511:11, 1515:2
**accurate** [17] - 1330:15, 1333:11, 1366:8, 1368:19, 1395:18, 1452:16, 1452:22, 1452:24, 1460:16, 1503:23, 1506:10, 1508:3, 1511:14, 1511:22, 1515:7, 1520:3, 1520:13
**accurately** [2] - 1314:11, 1420:23

**achieve** [3] - 1326:9, 1347:6, 1353:8
**achieved** [1] - 1359:7
**acid** [7] - 1386:13, 1387:1, 1388:9, 1435:9, 1435:25, 1436:21, 1437:1
**acids** [2] - 1433:25, 1435:15
**acknowledge** [2] - 1440:19, 1457:14
**acknowledged** [1] - 1534:22
**acknowledging** [1] - 1515:2
**acquisitions** [1] - 1467:3
**action** [4] - 1316:13, 1317:3, 1320:5, 1377:23
**actions** [4] - 1317:12, 1378:2, 1378:8, 1378:22
**actively** [1] - 1305:16
**activities** [7] - 1260:16, 1268:1, 1316:8, 1321:3, 1322:1, 1472:8
**activity** [11] - 1239:18, 1306:19, 1306:24, 1364:5, 1377:16, 1379:15, 1380:1, 1380:9, 1381:10, 1397:18, 1417:1
**actual** [40] - 1228:11, 1237:1, 1237:5, 1237:7, 1239:18, 1240:14, 1241:7, 1241:20, 1244:10, 1247:8, 1247:13, 1259:9, 1275:11, 1275:12, 1281:8, 1281:9, 1295:24, 1296:17, 1347:13, 1358:19, 1399:20, 1401:1, 1448:5, 1448:7, 1448:8, 1449:5, 1449:8, 1450:10, 1455:1, 1455:3, 1461:8, 1462:19, 1464:21, 1501:10, 1502:15, 1510:13, 1512:10, 1512:17, 1512:19, 1518:25
**actuals** [1] - 1244:10
**acute** [4] - 1336:1, 1353:17, 1359:10, 1359:14
**add** [4] - 1277:24,

5

1354:8, 1452:18, 1458:9

**add-on** [1] - 1354:8

**added** [6] - 1242:6, 1243:14, 1248:11, 1249:18, 1298:1, 1381:7

**addition** [8] - 1225:13, 1249:24, 1265:7, 1268:2, 1272:23, 1319:11, 1343:14, 1499:21

**additional** [22] - 1248:10, 1254:12, 1267:24, 1269:4, 1269:5, 1277:24, 1282:14, 1285:16, 1286:1, 1334:9, 1342:19, 1347:6, 1353:6, 1368:24, 1369:1, 1370:5, 1370:12, 1370:19, 1371:16, 1379:18, 1396:5, 1474:1

**additionally** [1] - 1368:23

**address** [6] - 1249:23, 1282:15, 1408:25, 1409:18, 1514:17, 1539:19

**addressing** [5] - 1219:12, 1225:11, 1263:11, 1408:18, 1411:18

**adds** [1] - 1310:10

**adequate** [3] - 1326:20, 1353:8, 1468:1

**adhere** [1] - 1504:12

**adjective** [1] - 1501:15

**adjectives** [1] - 1300:20

**adjourned** [1] - 1539:24

**adjunct** [7] - 1312:23, 1352:4, 1372:19, 1374:25, 1375:3, 1375:17, 1376:8

**adjustments** [1] - 1485:25

**administered** [6] - 1344:25, 1351:22, 1353:14, 1353:16, 1390:22, 1432:8

**Administration** [2] - 1416:15, 1419:18

**administration** [43] - 1227:17, 1330:9, 1335:8, 1337:4, 1341:9, 1341:12,

1342:24, 1343:2, 1343:5, 1344:7, 1344:12, 1352:3, 1352:5, 1352:20, 1352:23, 1353:3, 1353:20, 1354:1, 1354:17, 1354:23, 1355:1, 1355:3, 1355:4, 1364:15, 1376:16, 1376:18, 1376:23, 1377:5, 1377:9, 1377:13, 1378:1, 1380:23, 1381:13, 1381:21, 1382:10, 1384:12, 1386:11, 1388:8, 1388:21, 1389:2, 1393:14, 1404:23, 1405:22

**administrative** [3] - 1227:11, 1230:17, 1455:11

**admission** [3] - 1271:19, 1486:13, 1487:15

**admit** [29] - 1229:22, 1234:7, 1235:14, 1243:6, 1255:13, 1266:3, 1266:9, 1266:19, 1269:10, 1276:12, 1279:3, 1279:4, 1280:4, 1280:7, 1287:12, 1314:15, 1328:25, 1332:8, 1426:7, 1437:17, 1453:25, 1462:10, 1468:6, 1485:15, 1487:5, 1492:2, 1492:5, 1516:23, 1517:3

**admitted** [84] - 1221:1, 1229:18, 1234:6, 1234:10, 1235:17, 1243:3, 1243:8, 1246:3, 1251:22, 1255:11, 1255:12, 1256:3, 1261:4, 1262:4, 1262:25, 1263:21, 1264:22, 1266:7, 1266:12, 1267:2, 1269:12, 1271:14, 1271:18, 1271:22, 1274:17, 1274:19, 1274:20, 1274:22, 1276:14, 1279:6, 1279:7, 1280:8, 1280:9, 1280:14, 1287:14, 1308:18, 1314:17, 1329:2, 1332:10, 1342:1, 1388:3,

1421:4, 1426:14, 1428:16, 1428:22, 1432:22, 1436:10, 1436:13, 1436:15, 1437:19, 1443:13, 1445:21, 1453:23, 1454:6, 1456:19, 1457:24, 1459:16, 1462:1, 1462:12, 1463:20, 1464:5, 1469:16, 1473:5, 1473:7, 1473:12, 1474:10, 1474:16, 1478:5, 1481:16, 1482:21, 1485:17, 1486:17, 1487:5, 1487:9, 1487:16, 1487:18, 1516:11, 1530:14, 1538:13, 1538:14, 1538:17

**admitting** [1] - 1516:2

**adopt** [1] - 1521:5

**ads** [2] - 1264:11, 1264:16

**adult** [9] - 1220:3, 1344:24, 1345:17, 1351:17, 1352:10, 1355:8, 1366:11, 1367:1, 1412:12

**adults** [2] - 1350:8, 1483:17

**advance** [8] - 1224:16, 1245:16, 1390:9, 1415:15, 1415:18, 1415:21, 1416:22, 1467:25

**advanced** [3] - 1221:21, 1238:12, 1248:7

**advances** [1] - 1239:24

**advancing** [1] - 1224:16

**advantage** [2] - 1476:1, 1476:5

**advertise** [1] - 1264:9

**advertisement** [7] - 1348:1, 1348:8, 1348:11, 1348:12, 1348:14, 1349:18, 1349:22

**advertisements** [2] - 1347:24, 1472:10

**advertising** [7] - 1259:22, 1264:8, 1273:4, 1273:5, 1347:21, 1398:5, 1472:11

**advice** [3] - 1312:17, 1324:11, 1326:8

**advise** [1] - 1353:5

**advises** [2] - 1312:19, 1330:25

**advisory** [2] - 1387:13, 1406:21

**Affairs** [1] - 1445:6

**affect** [5] - 1450:14, 1450:22, 1451:7, 1477:16, 1491:17

**affirm** [1] - 1537:8

**affirmatively** [1] - 1409:17

**afternoon** [7] - 1357:7, 1357:8, 1418:3, 1454:13, 1454:15, 1492:13, 1492:14

**age** [6] - 1366:11, 1366:25, 1372:5, 1372:17, 1373:8, 1415:16

**agencies** [1] - 1419:23

**Agency** [1] - 1419:25

**agent** [2] - 1386:25, 1387:17

**agents** [1] - 1309:24

**aggregate** [1] - 1428:12

**aggregator** [5] - 1232:12, 1232:14, 1250:16, 1272:21, 1302:14

**aggressive** [2] - 1262:9, 1262:15

**ago** [12] - 1237:5, 1256:17, 1268:24, 1273:20, 1284:5, 1302:22, 1313:1, 1335:12, 1363:19, 1371:15, 1374:24, 1467:24

**agree** [76] - 1274:21, 1284:3, 1292:14, 1295:2, 1298:13, 1299:25, 1303:22, 1304:24, 1304:25, 1307:16, 1308:6, 1309:21, 1310:7, 1335:2, 1338:14, 1351:25, 1367:3, 1368:7, 1375:7, 1375:14, 1375:15, 1380:12, 1381:1, 1381:2, 1381:17, 1381:18, 1389:10, 1389:11, 1390:24, 1391:13, 1394:2, 1395:19, 1396:13, 1396:17, 1397:6, 1406:10, 1406:22,

1407:23, 1408:1, 1408:4, 1409:6, 1409:14, 1431:4, 1438:7, 1438:25, 1460:9, 1468:3, 1498:13, 1498:16, 1501:11, 1501:18, 1502:10, 1502:19, 1503:3, 1503:19, 1504:23, 1507:4, 1507:5, 1507:9, 1507:11, 1509:9, 1512:8, 1518:24, 1519:9, 1519:23, 1521:19, 1523:14, 1528:1, 1529:13, 1530:3, 1533:25, 1534:4, 1534:23, 1535:1, 1535:23, 1536:25

**agreed** [6] - 1308:24, 1309:3, 1358:3, 1361:4, 1391:22, 1394:8

**agreeing** [2] - 1391:4, 1391:6

**agreement** [11] - 1268:3, 1268:6, 1269:1, 1269:2, 1270:13, 1271:2, 1271:4, 1271:10, 1286:18, 1326:19, 1448:16

**Agreement** [1] - 1268:14

**agreements** [2] - 1219:21, 1259:23

**agrees** [1] - 1539:5

**ahead** [3] - 1430:17, 1435:13, 1535:5

**aids** [1] - 1392:7

**Air** [1] - 1319:6

**al** [1] - 1216:8

**Alimta** [6] - 1386:12, 1386:14, 1387:11, 1387:22, 1388:8, 1388:12

**ALISON** [1] - 1217:3

**alleged** [7] - 1223:4, 1223:5, 1226:11, 1226:21, 1231:7, 1245:17, 1249:1

**allegedly** [3] - 1283:22, 1284:8, 1285:10

**ALLEN** [1] - 1217:7

**allow** [3] - 1524:11, 1531:15, 1539:13

**allows** [2] - 1376:4, 1389:7

6

**almost** [9] - 1281:20, 1297:11, 1310:11, 1313:1, 1328:2, 1426:19, 1454:13, 1499:8, 1512:11

**alone** [2] - 1359:2, 1397:9

**alongside** [7] - 1275:13, 1282:4, 1303:18, 1303:19, 1304:8, 1304:13, 1321:17

**altering** [7] - 1351:23, 1352:5, 1354:22, 1355:5, 1411:19, 1411:23, 1412:3

**alternate** [1] - 1334:6

**alternative** [3] - 1389:1, 1474:1, 1504:6

**Amarin** [155] - 1227:1, 1227:15, 1227:20, 1228:1, 1228:18, 1241:21, 1242:2, 1256:10, 1256:23, 1257:21, 1258:2, 1259:20, 1260:2, 1260:19, 1261:12, 1261:14, 1261:21, 1262:14, 1263:8, 1263:18, 1264:6, 1264:10, 1265:2, 1265:10, 1267:20, 1268:1, 1268:6, 1268:25, 1269:8, 1269:21, 1270:24, 1271:6, 1271:13, 1274:3, 1275:4, 1276:4, 1276:10, 1277:3, 1277:11, 1277:21, 1280:18, 1281:4, 1281:11, 1281:13, 1281:15, 1287:7, 1288:12, 1289:8, 1292:4, 1297:21, 1298:3, 1299:25, 1304:13, 1309:15, 1313:18, 1313:19, 1314:14, 1323:16, 1328:24, 1332:7, 1341:23, 1349:8, 1350:15, 1350:19, 1360:3, 1421:1, 1423:9, 1425:8, 1425:12, 1425:15, 1426:2, 1426:17, 1426:19, 1426:21, 1429:4, 1429:7, 1429:20, 1430:8, 1432:19,

1436:7, 1437:16, 1440:20, 1441:24, 1442:5, 1443:7, 1448:6, 1449:8, 1450:10, 1451:25, 1455:8, 1455:15, 1457:11, 1457:15, 1462:9, 1463:8, 1464:2, 1467:17, 1470:16, 1472:23, 1473:8, 1474:23, 1476:21, 1477:2, 1477:11, 1477:13, 1479:6, 1481:4, 1482:13, 1482:18, 1483:15, 1483:22, 1484:3, 1485:6, 1488:20, 1489:3, 1489:9, 1489:15, 1489:17, 1493:5, 1498:14, 1498:17, 1498:25, 1499:2, 1499:12, 1500:4, 1500:25, 1502:6, 1506:17, 1506:25, 1507:12, 1507:24, 1509:10, 1509:18, 1509:19, 1511:9, 1521:17, 1526:17, 1526:20, 1526:23, 1527:1, 1527:9, 1529:20, 1531:9, 1531:15, 1531:20, 1531:25, 1532:12, 1532:25, 1533:6, 1533:9, 1535:8, 1536:20, 1538:2

**AMARIN** [2] - 1216:4, 1216:4

**Amarin's** [28] - 1227:7, 1227:24, 1230:9, 1259:18, 1265:5, 1268:7, 1268:20, 1310:25, 1359:16, 1359:22, 1360:1, 1426:25, 1430:11, 1458:11, 1462:5, 1463:22, 1476:25, 1478:11, 1479:8, 1493:17, 1493:19, 1498:22, 1500:19, 1501:11, 1501:25, 1527:4, 1537:9, 1537:12

**American** [1] - 1313:2

**amount** [18] - 1235:5, 1236:2, 1236:16, 1254:1, 1272:7, 1272:9, 1281:2, 1281:19, 1336:2, 1382:25, 1385:21,

1423:8, 1427:22, 1429:4, 1444:13, 1500:17, 1521:16, 1526:15

**amounts** [2] - 1265:12, 1273:6

**analyses** [2] - 1312:21, 1536:23

**Analysis** [2] - 1234:16, 1418:9

**analysis** [85] - 1222:3, 1227:7, 1232:21, 1239:5, 1239:20, 1239:23, 1240:7, 1240:19, 1250:10, 1250:14, 1250:15, 1252:4, 1253:15, 1257:7, 1257:22, 1260:17, 1262:11, 1263:6, 1264:4, 1268:22, 1270:1, 1272:18, 1273:15, 1276:23, 1278:11, 1282:13, 1283:11, 1283:13, 1286:5, 1287:20, 1288:6, 1288:22, 1293:6, 1295:20, 1296:2, 1296:15, 1351:11, 1423:14, 1423:17, 1424:22, 1427:19, 1431:10, 1434:9, 1438:23, 1439:1, 1439:23, 1441:16, 1444:23, 1448:3, 1450:21, 1450:22, 1453:18, 1455:6, 1455:7, 1459:5, 1460:11, 1461:17, 1462:23, 1464:11, 1465:2, 1470:4, 1470:9, 1470:12, 1470:25, 1480:13, 1488:11, 1496:10, 1498:10, 1498:20, 1507:23, 1510:6, 1511:2, 1511:4, 1511:6, 1511:18, 1512:22, 1520:12, 1527:11, 1527:23, 1529:23, 1531:13, 1532:5, 1532:16, 1532:22, 1535:10

**analyst** [32] - 1245:3, 1257:18, 1449:15, 1449:16, 1449:18, 1449:21, 1449:24, 1449:25, 1450:6, 1452:25, 1453:2, 1455:20, 1455:24,

1456:5, 1456:9, 1456:13, 1460:15, 1461:13, 1461:15, 1464:22, 1465:1, 1487:2, 1508:25, 1509:13, 1509:22, 1509:25, 1513:21, 1514:13, 1518:16, 1518:17, 1521:15, 1521:20

**Analyst** [1] - 1505:24

**analyst's** [9] - 1238:14, 1239:1, 1242:6, 1243:14, 1243:18, 1243:20, 1244:23, 1463:14, 1518:5

**analysts** [49] - 1236:16, 1236:20, 1237:16, 1237:19, 1237:21, 1238:5, 1238:7, 1239:9, 1246:16, 1246:18, 1247:3, 1247:11, 1249:13, 1258:2, 1261:21, 1300:9, 1449:12, 1452:19, 1453:8, 1453:11, 1455:15, 1455:16, 1456:3, 1460:3, 1460:6, 1461:4, 1461:6, 1462:24, 1463:7, 1505:10, 1505:13, 1505:20, 1506:2, 1506:10, 1506:16, 1508:15, 1508:22, 1511:5, 1511:17, 1511:20, 1514:9, 1515:3, 1517:13, 1517:17, 1517:22, 1519:22, 1520:13, 1522:10

**analysts'** [36] - 1239:24, 1240:4, 1240:8, 1241:13, 1242:10, 1243:22, 1244:17, 1246:9, 1246:12, 1246:20, 1297:7, 1297:8, 1297:16, 1298:5, 1298:17, 1299:12, 1300:12, 1302:22, 1448:11, 1451:18, 1452:12, 1452:21, 1453:17, 1454:1, 1454:5, 1455:2, 1457:6, 1457:18, 1459:10, 1460:13, 1460:18, 1462:22, 1504:9, 1508:1, 1520:1, 1522:5

**analyze** [13] - 1220:10, 1220:13, 1226:25, 1231:5, 1240:3, 1240:8, 1253:17, 1265:5, 1265:10, 1282:21, 1288:1, 1476:24, 1512:21

**analyzed** [6] - 1219:23, 1240:22, 1250:22, 1272:24, 1284:3, 1498:17

**analyzes** [2] - 1222:13, 1515:8

**analyzing** [6] - 1281:25, 1316:17, 1317:2, 1419:12, 1424:16, 1468:13

**ANCHOR** [17] - 1254:18, 1256:8, 1256:11, 1256:13, 1256:24, 1256:25, 1257:2, 1257:3, 1257:9, 1300:4, 1425:18, 1425:19, 1526:18, 1527:2, 1528:24, 1533:2, 1533:20

**ANDAs** [2] - 1321:10, 1321:13

**animal** [2] - 1317:16, 1325:22

**announced** [1] - 1448:16

**announcement** [2] - 1271:1, 1505:6

**annual** [8] - 1223:25, 1231:9, 1252:18, 1252:25, 1305:4, 1427:16, 1429:9, 1499:25

**answer** [12] - 1326:5, 1394:20, 1399:24, 1402:13, 1402:16, 1403:8, 1403:9, 1411:2, 1438:15, 1452:5, 1452:7, 1495:8

**answered** [3] - 1374:16, 1410:8, 1535:21

**answering** [2] - 1374:9, 1402:22

**answers** [1] - 1480:16

**anti** [1] - 1353:14

**anti-emetics** [1] - 1353:14

**anticipate** [3] - 1538:25, 1539:16, 1539:17

**anticipated** [3] -

7

1336:23, 1340:4,
1507:1
**anticipating** [2] -
1297:24, 1522:11
**anticipation** [1] -
1267:24
**antithrombotics** [1] -
1353:16
**anyway** [1] - 1304:18
**apart** [1] - 1406:21
**AplusA** [1] - 1481:4
**apo** [23] - 1347:1,
1347:10, 1351:6,
1351:9, 1351:13,
1351:18, 1406:24,
1407:2, 1407:7,
1407:12, 1407:14,
1407:16, 1407:22,
1408:2, 1408:11,
1408:15, 1408:17,
1408:22, 1408:23,
1409:10, 1409:24,
1410:10, 1411:15
**apologize** [3] -
1306:3, 1492:5,
1523:24
**Appeal** [1] - 1221:8
**appeals** [1] - 1401:9
**appear** [2] - 1354:1,
1428:20
**appearances** [4] -
1252:6, 1252:19,
1491:13, 1491:19
**APPEARANCES** [2] -
1216:13, 1217:1
**Appearances** [1] -
1216:25
**appellate** [4] -
1400:23, 1401:3,
1401:10, 1401:13
**apple** [1] - 1517:7
**applicable** [1] -
1330:11
**applicant** [5] -
1325:15, 1325:24,
1326:4, 1326:6,
1326:14
**application** [2] -
1326:15, 1326:16
**applications** [3] -
1321:10, 1522:18,
1522:19
**applied** [4] - 1238:21,
1244:18, 1317:11,
1520:6
**applies** [1] - 1363:11
**apply** [4] - 1334:15,
1351:12, 1415:19,
1486:3
**applying** [4] -

1446:14, 1520:11,
1520:17, 1522:20
**apportion** [2] -
1282:21, 1288:1
**apportioned** [1] -
1534:4
**apportionment** [7] -
1282:12, 1282:16,
1283:11, 1283:13,
1287:21, 1288:22,
1289:3
**appreciation** [1] -
1536:15
**appreciative** [1] -
1275:19
**approach** [7] -
1218:10, 1311:15,
1319:20, 1348:8,
1417:14, 1511:12,
1516:13
**approached** [1] -
1466:6
**approaching** [1] -
1537:20
**appropriate** [40] -
1238:25, 1239:1,
1295:14, 1295:17,
1296:1, 1336:24,
1341:15, 1352:6,
1358:9, 1362:17,
1364:4, 1366:1,
1375:5, 1375:13,
1377:15, 1379:5,
1379:9, 1379:12,
1379:14, 1379:23,
1379:25, 1380:8,
1380:18, 1381:9,
1416:14, 1416:25,
1439:3, 1441:18,
1465:6, 1465:9,
1468:12, 1475:7,
1475:18, 1498:12,
1512:20, 1512:23,
1524:17
**Appropriate** [1] -
1335:15
**appropriately** [1] -
1278:7
**approval** [34] -
1237:16, 1239:9,
1241:5, 1258:19,
1258:20, 1259:1,
1259:6, 1300:1,
1320:23, 1322:1,
1324:5, 1332:18,
1339:25, 1368:13,
1368:20, 1369:7,
1373:3, 1394:2,
1394:4, 1395:13,
1395:25, 1396:1,

1396:23, 1397:10,
1398:12, 1398:14,
1401:23, 1402:11,
1450:10, 1450:13,
1450:21, 1451:15,
1451:25, 1489:8
**approve** [6] - 1326:18,
1344:19, 1355:7,
1397:12, 1407:11,
1407:21
**Approved** [2] -
1369:23, 1370:2
**approved** [66] -
1237:25, 1256:13,
1256:15, 1283:21,
1297:25, 1298:8,
1299:19, 1300:8,
1320:2, 1320:8,
1321:1, 1325:5,
1325:9, 1325:25,
1326:24, 1335:6,
1338:9, 1338:16,
1338:21, 1339:4,
1340:15, 1340:20,
1341:12, 1344:3,
1345:15, 1348:18,
1348:25, 1349:4,
1350:21, 1351:15,
1352:13, 1365:2,
1365:3, 1365:8,
1365:9, 1366:3,
1366:4, 1366:5,
1367:4, 1367:5,
1367:7, 1367:16,
1367:17, 1370:8,
1370:15, 1372:4,
1372:16, 1373:7,
1383:10, 1395:9,
1395:14, 1397:13,
1398:1, 1407:13,
1407:18, 1408:14,
1408:20, 1408:21,
1414:25, 1415:8,
1419:17, 1452:1,
1467:5, 1522:19,
1529:18
**approves** [1] -
1398:15
**April** [1] - 1314:8
**arbitration** [1] -
1221:9
**area** [5] - 1219:6,
1219:9, 1313:22,
1419:15, 1524:15
**areas** [2] - 1321:17,
1410:18
**arguable** [1] - 1399:10
**arguably** [1] - 1526:9
**argue** [2] - 1358:5,
1539:14

**argument** [1] -
1464:18
**arising** [1] - 1482:6
**arithmetic** [1] -
1285:11
**Army** [6] - 1315:20,
1315:25, 1316:18,
1316:19, 1318:4,
1319:6
**army** [1] - 1315:24
**arose** [1] - 1321:8
**arrive** [1] - 1302:24
**arriving** [2] - 1246:13,
1325:25
**art** [7] - 1226:10,
1226:17, 1245:10,
1292:21, 1293:17,
1347:20, 1408:24
**article** [4] - 1445:5,
1446:6, 1446:8,
1469:8
**articles** [1] - 1420:9
**ascertain** [1] - 1394:9
**ascribe** [2] - 1282:22,
1472:22
**ascribed** [1] - 1365:17
**ascribing** [1] -
1288:11
**aside** [1] - 1269:25,
1293:24
**aspect** [1] - 1335:19
**aspects** [4] - 1365:2,
1365:8, 1366:4,
1419:10
**aspiration** [2] -
1301:3, 1503:10
**aspirations** [5] -
1236:6, 1236:13,
1300:13, 1300:18,
1300:21
**assemble** [1] - 1466:6
**assembled** [1] -
1481:4
**assert** [1] - 1249:22
**Asserted** [1] - 1287:19
**asserted** [10] - 1249:9,
1250:12, 1259:14,
1288:21, 1289:12,
1490:25, 1493:20,
1495:2, 1495:5,
1526:8
**asserting** [1] - 1493:5
**assertion** [1] -
1372:10
**assess** [3] - 1239:20,
1421:17, 1441:16
**assessing** [2] -
1247:14, 1271:3
**assessment** [1] -
1524:2

**assessments** [1] -
1451:18
**assigned** [2] - 1288:2,
1316:18
**assignment** [9] -
1421:17, 1494:16,
1524:25, 1527:3,
1527:8, 1531:13,
1531:23, 1533:4,
1533:8
**assignments** [1] -
1316:9
**assist** [3] - 1219:17,
1221:23, 1326:21
**assistance** [5] -
1263:13, 1277:23,
1280:21, 1281:24,
1307:10
**assistant** [1] - 1267:15
**associate** [1] -
1418:18
**Associate** [1] -
1418:19
**associated** [19] -
1231:2, 1244:6,
1246:15, 1249:24,
1257:3, 1265:21,
1288:17, 1305:18,
1305:24, 1317:17,
1347:3, 1391:1,
1410:5, 1440:12,
1447:10, 1502:13,
1502:14, 1514:7,
1519:16
**Associates** [1] -
1477:10
**assume** [10] - 1239:2,
1255:14, 1255:15,
1289:6, 1345:6,
1375:7, 1382:15,
1448:13, 1464:8,
1519:5
**assumed** [7] -
1238:18, 1448:18,
1455:23, 1456:11,
1504:18, 1518:13,
1519:14
**assuming** [5] -
1448:16, 1456:9,
1456:10, 1514:12,
1538:22
**assumption** [1] -
1455:25
**assumptions** [14] -
1237:22, 1238:17,
1238:19, 1238:25,
1244:17, 1246:20,
1247:8, 1247:21,
1499:21, 1523:20,
1524:7, 1530:8,

8

1530:9
**attach** [1] - 1399:21
**attached** [1] - 1400:13
**attain** [1] - 1233:19
**attempts** [1] - 1236:3
**attended** [1] - 1315:24
**attention** [6] -
1304:19, 1368:3,
1499:12, 1508:5,
1530:17, 1534:12
**Attorney** [4] - 1217:3,
1217:5, 1217:7,
1217:13
**attorneys** [1] - 1527:4
**Attorneys** [3] -
1216:17, 1216:20,
1217:11
**attributable** [3] -
1222:16, 1223:4,
1427:3
**attribute** [4] - 1289:11,
1477:16, 1478:20,
1480:16
**attributed** [1] -
1287:23
**attributes** [8] -
1306:25, 1307:3,
1439:9, 1468:18,
1476:14, 1477:15,
1480:2, 1481:9
**audience** [2] -
1324:19, 1390:8
**August** [3] - 1448:14,
1448:17, 1477:11
**authored** [1] - 1442:19
**authority** [1] - 1348:13
**authors** [3] - 1445:7,
1446:17, 1447:2
**automatic** [1] -
1306:10
**availability** [2] -
1307:9, 1318:16
**available** [17] -
1227:20, 1227:24,
1272:25, 1284:18,
1296:5, 1296:6,
1325:12, 1328:4,
1401:3, 1401:10,
1450:5, 1452:16,
1460:13, 1476:6,
1488:21, 1503:24,
1508:23
**availably** [1] - 1307:10
**avenues** [1] - 1325:13
**average** [27] -
1238:21, 1238:25,
1427:16, 1429:9,
1433:6, 1433:7,
1433:10, 1440:25,
1441:3, 1441:10,

1441:13, 1444:20,
1447:6, 1447:13,
1448:11, 1457:5,
1458:20, 1459:3,
1459:8, 1460:19,
1469:21, 1469:23,
1470:7, 1470:17,
1518:19, 1520:16,
1521:18
**averaged** [1] - 1520:7
**averaging** [2] -
1515:4, 1520:10
**avoid** [1] - 1386:15
**aware** [19] - 1323:4,
1349:11, 1439:7,
1439:8, 1468:17,
1471:23, 1471:24,
1477:14, 1477:15,
1478:19, 1478:22,
1480:1, 1480:3,
1480:6, 1481:8,
1533:12, 1534:11,
1539:21
**awareness** [3] -
1303:5, 1471:2,
1533:13
**aways** [1] - 1279:18
**axis** [12] - 1244:5,
1244:6, 1425:6,
1425:7, 1427:12,
1429:6, 1436:23,
1449:4, 1458:16,
1473:20, 1473:21,
1484:24

**B**

**background** [7] -
1293:9, 1315:3,
1418:21, 1422:25,
1523:12, 1529:13
**backs** [1] - 1304:21
**backward** [2] -
1295:21, 1296:15
**backward-looking** [2]
- 1295:21, 1296:15
**bad** [8] - 1350:8,
1350:11, 1403:21,
1422:20, 1451:17,
1478:16, 1483:6,
1483:17
**bags** [2] - 1318:10,
1318:12
**bank** [1] - 1318:8
**bankruptcy** [1] -
1535:3
**banner** [1] - 1264:16
**bar** [6] - 1252:24,
1433:4, 1433:5,
1435:8, 1447:8,

1479:23
**Barabas** [1] - 1540:16
**BARABAS** [10] -
1217:10, 1218:7,
1218:12, 1218:20,
1218:23, 1220:17,
1220:19, 1220:22,
1221:3, 1221:13,
1221:18, 1228:23,
1229:20, 1229:25,
1230:3, 1230:8,
1232:4, 1232:5,
1234:1, 1234:7,
1234:13, 1235:14,
1235:20, 1242:19,
1243:5, 1243:10,
1243:11, 1245:24,
1246:5, 1251:1,
1251:3, 1251:19,
1251:25, 1252:2,
1254:21, 1255:2,
1255:7, 1255:17,
1256:5, 1256:6,
1260:22, 1261:1,
1261:11, 1262:6,
1262:19, 1263:2,
1263:16, 1263:23,
1263:24, 1264:18,
1264:24, 1265:1,
1266:3, 1266:6,
1266:8, 1266:18,
1266:23, 1267:3,
1267:4, 1268:9,
1268:11, 1269:7,
1269:14, 1269:15,
1270:17, 1270:20,
1271:11, 1271:16,
1271:24, 1272:1,
1272:14, 1272:17,
1274:11, 1274:16,
1274:24, 1275:2,
1275:21, 1275:24,
1276:8, 1276:16,
1278:6, 1278:9,
1278:25, 1279:9,
1279:13, 1280:3,
1280:8, 1280:16,
1280:17, 1282:25,
1283:2, 1283:12,
1283:24, 1284:7,
1284:15, 1285:1,
1285:9, 1285:18,
1285:21, 1286:16,
1286:24, 1287:1,
1287:9, 1287:16,
1290:20, 1290:22,
1291:15, 1308:17,
1310:22, 1311:2
**BARBARA** [1] -
1216:15
**Barriers** [1] - 1530:18

**bars** [3] - 1446:25,
1479:14, 1479:23
**base** [3] - 1268:18,
1519:17, 1522:15
**based** [46] - 1238:24,
1244:16, 1245:5,
1245:18, 1246:20,
1249:11, 1250:15,
1252:7, 1253:15,
1256:10, 1257:6,
1258:14, 1260:7,
1265:9, 1281:25,
1288:24, 1307:1,
1340:15, 1340:21,
1344:18, 1344:22,
1345:15, 1346:19,
1348:18, 1350:16,
1350:19, 1354:20,
1357:20, 1367:7,
1367:8, 1367:17,
1394:4, 1396:1,
1416:8, 1422:14,
1424:10, 1437:13,
1501:25, 1505:9,
1507:21, 1507:22,
1523:14, 1526:18,
1531:10, 1531:19,
1534:9
**baseline** [2] - 1347:1,
1407:7
**Basic** [1] - 1342:4
**basis** [26] - 1224:1,
1224:3, 1230:21,
1230:25, 1231:19,
1233:14, 1238:11,
1252:18, 1253:1,
1260:7, 1260:9,
1274:3, 1274:9,
1283:10, 1284:6,
1290:3, 1290:18,
1302:14, 1321:21,
1332:17, 1392:19,
1396:23, 1397:12,
1397:14, 1398:15
**became** [3] - 1316:12,
1316:13, 1480:5
**become** [10] - 1238:1,
1439:7, 1439:8,
1446:5, 1455:15,
1468:17, 1502:12,
1505:23, 1529:14
**becomes** [6] -
1401:14, 1441:9,
1441:12, 1478:22,
1519:20
**BEFORE** [1] - 1216:2
**began** [7] - 1271:10,
1315:18, 1425:21,
1448:5, 1526:18,
1531:21, 1533:22

**begin** [5] - 1322:13,
1355:16, 1436:22,
1449:7, 1492:19
**beginning** [10] -
1269:23, 1306:17,
1306:22, 1308:25,
1309:7, 1324:2,
1388:9, 1494:24,
1495:8, 1533:20
**begins** [3] - 1326:6,
1330:5, 1458:13
**begun** [1] - 1319:23
**behalf** [1] - 1218:13,
1220:15, 1292:4,
1301:2, 1303:2,
1311:21, 1313:18,
1357:11, 1417:17,
1492:16, 1493:1
**behavior** [4] -
1249:25, 1275:20,
1277:6, 1278:3
**behaviors** [1] - 1281:5
**behind** [1] - 1523:21
**beholder** [1] - 1396:21
**behooves** [1] - 1526:3
**believes** [1] - 1224:11
**below** [26] - 1254:16,
1257:14, 1338:9,
1338:11, 1338:17,
1338:18, 1344:4,
1344:5, 1347:6,
1347:13, 1351:3,
1351:4, 1357:25,
1358:1, 1359:1,
1381:7, 1381:15,
1397:9, 1397:16,
1397:18, 1398:8,
1398:10, 1407:4,
1478:18, 1523:2
**BENCH** [1] - 1216:12
**benchmark** [1] -
1509:7
**beneficiaries** [1] -
1432:2
**benefit** [21] - 1270:4,
1319:18, 1328:20,
1333:21, 1335:25,
1342:20, 1343:1,
1343:7, 1343:17,
1343:25, 1344:3,
1344:9, 1394:9,
1412:24, 1432:1,
1452:23, 1452:24,
1494:10, 1521:12,
1531:6
**benefits** [6] - 1336:23,
1337:19, 1338:4,
1432:10, 1509:13,
1510:1
**benefitted** [1] - 1336:3

9

**Berg** [2] - 1262:21, 1501:3
**Berndt** [1] - 1445:6
**best** [12] - 1296:18, 1300:23, 1302:24, 1368:4, 1375:4, 1378:11, 1380:15, 1394:25, 1406:20, 1500:14, 1500:18, 1516:20
**better** [2] - 1444:17, 1512:18
**between** [31] - 1222:18, 1223:9, 1223:13, 1237:1, 1241:25, 1255:20, 1282:7, 1292:11, 1310:2, 1326:11, 1342:12, 1361:20, 1402:10, 1421:18, 1423:24, 1425:7, 1425:15, 1426:18, 1426:20, 1427:10, 1446:7, 1450:2, 1455:14, 1468:21, 1469:22, 1484:21, 1507:13, 1514:8, 1514:21, 1519:12, 1534:4
**beyond** [9] - 1284:22, 1337:19, 1338:4, 1342:20, 1343:15, 1348:12, 1396:7, 1450:17, 1514:13
**big** [5] - 1301:14, 1508:21, 1509:18, 1510:8, 1510:19
**bigger** [2] - 1519:18, 1527:16
**billion** [30] - 1228:2, 1244:21, 1245:4, 1246:25, 1247:1, 1265:13, 1278:22, 1290:1, 1426:19, 1458:22, 1458:23, 1459:2, 1459:4, 1500:16, 1502:7, 1504:4, 1505:3, 1509:21, 1513:25, 1514:8, 1514:21, 1518:14, 1518:24, 1519:2, 1519:7, 1519:9, 1519:21, 1521:7
**billions** [4] - 1452:20, 1509:20, 1510:3, 1515:1
**binder** [1] - 1261:19
**binders** [3] - 1218:10, 1311:16, 1417:15

**bioequivalent** [1] - 1442:6
**biologic** [1] - 1219:22
**biologics** [2] - 1320:17, 1446:15
**Biopharmaceutical** [3] - 1420:12, 1465:15, 1466:3
**biopharmaceutical** [3] - 1466:10, 1466:13, 1466:17
**biotech** [5] - 1322:11, 1419:6, 1466:23, 1507:2, 1507:5
**biotechs** [1] - 1312:18
**bit** [18] - 1256:12, 1257:15, 1267:22, 1286:17, 1287:6, 1289:20, 1300:11, 1373:14, 1379:23, 1406:24, 1414:3, 1434:24, 1436:20, 1479:16, 1498:13, 1512:12, 1521:4, 1529:24
**blank** [1] - 1503:11
**blood** [9] - 1316:20, 1317:1, 1318:3, 1318:8, 1318:10, 1318:12, 1318:14
**blow** [7] - 1342:5, 1350:1, 1416:3, 1444:1, 1446:21, 1479:16
**blue** [10] - 1233:9, 1244:19, 1252:11, 1287:25, 1433:5, 1436:1, 1436:25, 1490:14, 1490:17, 1491:6
**blueprint** [1] - 1322:12
**bluish** [1] - 1435:8
**blurb** [1] - 1350:4
**Board** [1] - 1221:8
**bog** [1] - 1300:20
**boilerplate** [2] - 1499:3, 1499:6
**bone** [1] - 1386:15
**Book** [7] - 1283:14, 1284:21, 1286:14, 1287:5, 1288:5, 1289:12, 1493:6
**book** [11] - 1283:22, 1420:10, 1442:18, 1442:21, 1442:22, 1443:3, 1443:10, 1465:14, 1465:21, 1466:15, 1466:22
**borderline** [4] - 1488:13, 1489:2,

1489:7, 1490:22
**bottom** [34] - 1227:13, 1227:25, 1228:1, 1228:4, 1228:16, 1233:21, 1242:11, 1242:14, 1245:19, 1255:3, 1265:22, 1271:12, 1274:5, 1278:25, 1331:25, 1362:9, 1405:7, 1426:3, 1446:22, 1448:15, 1449:15, 1453:18, 1461:12, 1461:16, 1463:6, 1463:9, 1463:12, 1471:9, 1471:14, 1479:18, 1487:1, 1490:14, 1491:6, 1522:22
**bounded** [3] - 1372:5, 1372:17, 1373:7
**box** [3] - 1264:7, 1271:5, 1288:3
**brand** [3] - 1267:9, 1275:9, 1483:3
**Brand** [1] - 1264:19
**branded** [19] - 1305:8, 1305:10, 1305:13, 1305:17, 1305:24, 1306:2, 1306:4, 1307:4, 1307:12, 1307:13, 1309:8, 1310:1, 1434:22, 1437:4, 1437:6, 1437:11, 1475:22, 1484:22, 1493:1
**brands** [1] - 1306:1
**break** [10] - 1245:13, 1291:19, 1291:21, 1355:17, 1356:3, 1371:12, 1521:3, 1521:16, 1521:24
**break-even** [3] - 1521:3, 1521:16, 1521:24
**breakfast** [1] - 1356:1
**breaks** [1] - 1250:19
**Brealey** [1] - 1442:19
**brief** [3] - 1327:15, 1334:7, 1423:3
**briefly** [10] - 1219:3, 1259:18, 1267:6, 1315:2, 1315:13, 1334:17, 1442:21, 1486:20, 1490:6, 1492:19
**bright** [1] - 1293:8
**broaden** [1] - 1257:13
**broadened** [1] - 1533:5

**broader** [4] - 1411:1, 1434:4, 1436:1, 1436:3
**Brooks** [80] - 1292:5, 1296:23, 1298:24, 1301:6, 1301:17, 1303:7, 1304:14, 1308:12, 1314:1, 1314:23, 1316:4, 1318:20, 1320:11, 1328:6, 1329:15, 1329:25, 1331:16, 1332:19, 1335:10, 1335:13, 1336:12, 1339:7, 1341:2, 1342:3, 1345:4, 1345:10, 1349:12, 1350:1, 1350:24, 1416:2, 1420:15, 1421:12, 1424:3, 1424:23, 1427:6, 1428:24, 1430:25, 1431:15, 1432:24, 1433:13, 1434:25, 1436:16, 1437:21, 1438:19, 1439:19, 1442:15, 1443:15, 1443:25, 1445:2, 1445:24, 1446:20, 1447:24, 1448:25, 1454:21, 1456:21, 1458:2, 1459:18, 1460:22, 1462:14, 1464:13, 1468:8, 1469:5, 1469:18, 1470:9, 1471:4, 1473:14, 1475:1, 1477:6, 1478:7, 1478:25, 1479:15, 1480:8, 1480:25, 1481:18, 1482:8, 1482:23, 1483:8, 1484:16, 1486:19, 1487:22
**brought** [2] - 1307:4, 1451:10
**bucking** [2] - 1438:11, 1447:20
**budget** [1] - 1321:6
**budgeting** [1] - 1237:15
**Budoff's** [2] - 1254:5, 1360:13
**build** [1] - 1440:5
**built** [3] - 1510:21, 1512:15, 1522:24
**bullet** [8] - 1369:22, 1369:25, 1377:13, 1380:16, 1381:7, 1388:6, 1478:12,

1536:13
**bullish** [1] - 1300:7
**bunch** [1] - 1284:5
**Bureau** [1] - 1418:18
**Burling** [1] - 1313:18
**business** [4] - 1228:19, 1442:24, 1499:4, 1511:14
**businesses** [3] - 1440:3, 1440:4, 1440:7
**busy** [4] - 1244:2, 1331:6, 1331:10, 1333:18
**BY** [179] - 1218:23, 1220:19, 1221:3, 1221:18, 1230:8, 1232:5, 1234:13, 1235:20, 1243:11, 1246:5, 1251:3, 1252:2, 1255:2, 1256:6, 1261:1, 1261:11, 1262:6, 1263:2, 1263:24, 1265:1, 1267:4, 1268:11, 1269:15, 1270:20, 1272:1, 1272:17, 1275:2, 1275:24, 1276:16, 1278:9, 1279:13, 1280:17, 1283:2, 1287:1, 1287:16, 1290:22, 1292:8, 1297:1, 1299:1, 1301:8, 1301:19, 1303:9, 1304:16, 1308:20, 1312:10, 1314:3, 1314:19, 1315:1, 1316:6, 1318:22, 1320:12, 1324:1, 1328:8, 1329:4, 1329:17, 1330:2, 1331:18, 1332:12, 1332:22, 1335:16, 1336:16, 1339:9, 1341:4, 1342:6, 1345:5, 1349:14, 1350:3, 1351:1, 1353:1, 1357:13, 1360:7, 1361:13, 1364:1, 1364:19, 1365:20, 1367:12, 1371:13, 1372:13, 1378:19, 1388:5, 1391:20, 1399:14, 1402:2, 1403:7, 1404:4, 1405:2, 1409:8, 1409:20, 1411:3, 1412:20, 1413:5,

1413:22, 1414:5,
1414:19, 1416:5,
1418:2, 1420:17,
1421:14, 1424:5,
1425:1, 1426:16,
1427:8, 1429:1,
1431:2, 1431:16,
1433:1, 1433:15,
1435:2, 1436:18,
1437:24, 1438:21,
1439:21, 1442:16,
1443:17, 1444:2,
1445:3, 1446:1,
1446:23, 1448:1,
1449:2, 1452:10,
1454:23, 1456:23,
1458:4, 1459:20,
1460:24, 1462:3,
1462:16, 1463:21,
1464:7, 1464:14,
1465:12, 1466:1,
1468:10, 1469:6,
1469:19, 1470:10,
1471:6, 1473:16,
1474:18, 1475:3,
1477:8, 1478:9,
1479:2, 1480:10,
1481:1, 1481:20,
1482:10, 1483:1,
1483:9, 1484:2,
1484:18, 1485:19,
1486:21, 1487:24,
1490:8, 1492:18,
1493:10, 1494:21,
1497:9, 1499:10,
1499:17, 1501:21,
1506:21, 1513:9,
1517:12, 1518:4,
1518:9, 1520:21,
1524:20, 1525:4,
1528:3, 1528:8,
1530:16, 1531:1,
1532:8, 1533:16,
1536:4, 1536:9

**C**

**c)(15** [1] - 1404:20
**c)(2)(4** [1] - 1405:4
**calculate** [2] -
1446:12, 1538:10
**calculated** [2] -
1265:17, 1521:20
**calculating** [1] -
1433:18
**calculation** [24] -
1224:15, 1238:10,
1238:13, 1239:22,
1240:10, 1242:4,
1242:5, 1242:7,
1243:13, 1243:14,

1243:19, 1243:23,
1245:3, 1248:8,
1290:15, 1297:9,
1304:17, 1429:25,
1464:10, 1490:24,
1491:4, 1491:19,
1505:2, 1520:9
**calculations** [10] -
1243:15, 1244:7,
1247:17, 1295:1,
1295:4, 1296:3,
1502:6, 1504:1,
1504:18, 1517:23
**calendar** [1] - 1461:6
**California** [3] -
1217:6, 1312:24,
1316:16
**call-out** [2] - 1271:5,
1410:5
**campaign** [1] -
1259:21
**Campaign** [1] -
1264:19
**cannot** [2] - 1347:24,
1388:25
**Cantor** [4] - 1247:3,
1247:4, 1449:15,
1456:5
**cap** [4] - 1509:19,
1509:21, 1510:3,
1510:6
**capacity** [1] - 1313:19
**Capital** [1] - 1443:20
**capital** [4] - 1443:22,
1444:8, 1444:12,
1448:23
**caps** [1] - 1281:23
**capture** [1] - 1485:25
**captured** [1] - 1297:3
**captures** [1] - 1472:7
**capturing** [2] -
1434:17, 1435:18
**cardiovascular** [5] -
1408:25, 1422:1,
1426:24, 1523:7,
1531:6
**cards** [4] - 1263:4,
1263:13, 1267:15,
1429:19
**care** [2] - 1315:15,
1452:22
**Care** [5] - 1432:1,
1432:3, 1432:5,
1432:8, 1433:6
**career** [2] - 1315:18,
1319:5
**carefully** [2] -
1500:13, 1503:7
**Carl** [3] - 1311:14,
1312:5, 1540:9

**CARL** [2] - 1311:21,
1312:6
**carry** [1] - 1291:6
**carve** [1] - 1476:16
**case** [68] - 1222:7,
1222:11, 1287:24,
1288:4, 1288:18,
1291:14, 1293:18,
1306:20, 1310:24,
1311:9, 1313:15,
1313:20, 1328:22,
1331:23, 1332:5,
1334:11, 1341:21,
1349:20, 1353:7,
1357:15, 1359:13,
1359:16, 1383:10,
1386:23, 1387:12,
1408:11, 1409:23,
1410:9, 1411:13,
1415:17, 1421:16,
1424:17, 1424:18,
1432:17, 1434:16,
1440:11, 1441:17,
1441:24, 1443:5,
1445:9, 1446:17,
1453:4, 1453:7,
1461:2, 1461:20,
1462:7, 1463:15,
1463:25, 1465:18,
1469:11, 1470:16,
1477:25, 1481:11,
1482:16, 1483:20,
1486:4, 1488:14,
1490:22, 1493:15,
1500:23, 1501:8,
1503:10, 1514:10,
1514:23, 1522:15,
1531:21, 1532:9
**cases** [6] - 1370:5,
1444:25, 1492:22,
1492:25, 1508:25,
1512:20
**cash** [13] - 1440:16,
1442:11, 1442:12,
1444:12, 1444:16,
1457:1, 1457:12,
1458:9, 1458:10,
1470:1, 1486:22,
1520:10
**catch** [1] - 1392:18
**categories** [6] -
1250:25, 1251:8,
1251:14, 1252:5,
1259:16, 1423:11
**category** [10] - 1233:8,
1251:10, 1252:22,
1253:7, 1253:9,
1269:18, 1280:20,
1309:19, 1436:3,
1437:2

**causal** [4] - 1223:9,
1223:13, 1292:10,
1526:8
**caused** [2] - 1226:21,
1293:1
**causes** [3] - 1336:5,
1359:10, 1359:14
**caution** [1] - 1229:7
**cautions** [1] - 1499:3
**caveats** [1] - 1242:19
**CCR** [2] - 1216:22,
1540:4
**CDER** [9] - 1313:12,
1313:14, 1320:14,
1320:19, 1321:2,
1321:11, 1321:19,
1322:6
**cease** [3] - 1307:13,
1343:7, 1475:22
**ceasing** [1] - 1512:22
**celebrity** [3] - 1264:2,
1264:11, 1264:17
**Celebrity** [1] - 1264:19
**cells** [2] - 1318:12,
1318:15
**center** [2] - 1313:8,
1321:3
**Center** [7] - 1313:8,
1313:11, 1315:20,
1315:25, 1316:1,
1320:19, 1321:6
**centers** [1] - 1320:20
**Centers** [1] - 1419:24
**central** [1] - 1223:20
**cents** [3] - 1265:18,
1279:24, 1320:16
**certain** [17] - 1222:11,
1239:7, 1339:8,
1256:24, 1281:22,
1295:13, 1336:2,
1337:20, 1338:4,
1342:20, 1343:2,
1343:15, 1378:8,
1378:21, 1502:18
**certainly** [25] -
1219:24, 1254:11,
1254:17, 1256:18,
1257:24, 1270:8,
1289:23, 1294:9,
1296:7, 1297:24,
1298:13, 1306:13,
1310:9, 1382:3,
1389:19, 1396:7,
1406:6, 1476:20,
1493:3, 1503:6,
1522:17, 1522:19,
1524:6, 1524:8,
1526:15
**certainty** [2] -
1451:17, 1451:18

**Certified** [1] - 1505:24
**certify** [4] - 1221:16,
1323:21, 1421:10,
1540:2
**cetera** [3] - 1219:15,
1219:21, 1222:15
**CFO** [1] - 1503:10
**CFR** [3] - 1404:10,
1407:25
**challenge** [1] - 1368:6
**chance** [5] - 1228:25,
1242:20, 1255:8,
1473:8, 1490:1
**change** [16] - 1242:5,
1243:14, 1282:11,
1300:1, 1346:6,
1375:21, 1376:11,
1384:7, 1422:10,
1422:12, 1465:4,
1502:11, 1510:4,
1519:12, 1521:4,
1521:15
**changed** [3] -
1281:17, 1361:20,
1364:10
**changes** [13] -
1326:17, 1329:10,
1380:25, 1381:20,
1382:9, 1383:2,
1385:1, 1386:1,
1388:14, 1397:16,
1507:20, 1507:21,
1521:15
**changing** [2] - 1361:6,
1406:24
**channels** [2] - 1264:3,
1264:15
**chapter** [5] - 1443:12,
1443:18, 1443:19,
1465:21, 1468:4
**chapters** [1] - 1420:10
**characteristics** [4] -
1372:5, 1372:17,
1373:8, 1523:5
**characterization** [1] -
1519:21
**characterize** [1] -
1509:2
**Charles** [1] - 1357:10
**CHARLES** [1] -
1216:19
**chart** [14] - 1247:16,
1252:24, 1252:25,
1255:15, 1273:10,
1308:21, 1309:6,
1309:11, 1309:18,
1310:10, 1407:5,
1433:22, 1475:5
**check** [5] - 1323:10,
1403:21, 1503:11,

11

1505:12, 1505:19
**chemistry** [3] -
1293:15, 1315:5,
1315:6
**chemotherapeutic** [1]
- 1386:25
**chemotherapy** [1] -
1353:15
**Chicago** [1] - 1217:4
**chief** [1] - 1503:6
**choices** [1] - 1358:17
**cholesterol** [6] -
1350:8, 1350:11,
1422:21, 1478:17,
1483:7, 1483:18
**choose** [2] - 1256:19,
1471:16
**CHRISTOPHER** [1] -
1216:14
**chronic** [14] - 1339:23,
1340:2, 1340:15,
1340:20, 1358:11,
1359:17, 1359:18,
1359:23, 1360:22,
1361:1, 1361:10,
1363:8, 1363:13,
1373:22
**circle** [3] - 1235:2,
1287:25, 1371:14
**circulated** [1] -
1467:20
**circumstances** [6] -
1222:12, 1295:23,
1296:22, 1307:1,
1335:24, 1337:16
**citation** [1] - 1463:12
**cite** [12] - 1242:23,
1242:24, 1242:25,
1260:23, 1263:17,
1269:8, 1271:14,
1276:9, 1276:11,
1392:20, 1461:16
**cited** [2] - 1368:15,
1453:18
**Citi** [10] - 1247:4,
1247:5, 1247:7,
1506:16, 1507:11,
1507:23, 1517:20,
1518:5, 1519:6,
1519:10
**Citi's** [2] - 1518:13,
1518:25
**civilian** [1] - 1318:17
**claim** [2] - 1303:21,
1411:18
**claimed** [8] - 1223:4,
1223:6, 1245:4,
1292:11, 1493:15,
1495:4, 1495:18,
1521:6

**claiming** [1] - 1288:10
**claims** [48] - 1221:20,
1222:17, 1222:18,
1223:10, 1223:14,
1224:19, 1225:5,
1225:9, 1225:16,
1236:4, 1239:13,
1248:16, 1248:19,
1249:1, 1249:10,
1249:15, 1249:22,
1250:12, 1251:13,
1251:15, 1253:3,
1253:12, 1253:19,
1258:5, 1258:15,
1259:4, 1259:14,
1277:15, 1277:16,
1278:5, 1282:10,
1288:21, 1289:2,
1291:3, 1291:12,
1292:23, 1304:10,
1490:25, 1493:16,
1494:1, 1494:11,
1494:14, 1495:2,
1495:5, 1498:8,
1523:10, 1524:10,
1524:15
**CLAIRE** [1] - 1216:19
**clarify** [10] - 1255:21,
1274:21, 1292:14,
1293:9, 1295:8,
1325:23, 1361:19,
1402:4, 1402:21,
1404:1
**class** [5] - 1219:25,
1442:22, 1444:24,
1498:2, 1498:3
**classes** [2] - 1233:8,
1312:25
**clean** [1] - 1489:19
**clear** [32] - 1244:23,
1249:14, 1256:3,
1276:24, 1289:21,
1292:24, 1293:4,
1296:11, 1361:8,
1363:7, 1364:13,
1371:10, 1375:11,
1377:4, 1379:24,
1381:13, 1390:1,
1390:11, 1390:21,
1391:21, 1397:1,
1400:15, 1405:19,
1407:11, 1407:14,
1408:16, 1413:8,
1415:22, 1416:13,
1422:24, 1446:5,
1538:13
**clearly** [7] - 1248:13,
1370:7, 1370:14,
1415:7, 1415:18,
1512:19, 1522:25

**CLERK** [13] - 1218:15,
1271:15, 1271:17,
1311:23, 1312:2,
1415:25, 1417:19,
1454:10, 1515:16,
1515:18, 1516:6,
1538:9, 1539:11
**Clerk** [3] - 1454:8,
1538:7, 1538:12
**clients** [3] - 1295:4,
1323:8, 1493:4
**clinic** [2] - 1315:20
**clinical** [87] - 1254:15,
1254:17, 1262:9,
1288:25, 1307:3,
1307:7, 1312:20,
1313:24, 1313:25,
1316:8, 1316:17,
1317:2, 1317:4,
1317:5, 1317:8,
1317:18, 1317:21,
1318:2, 1319:10,
1319:12, 1322:15,
1331:24, 1332:2,
1332:14, 1332:17,
1332:21, 1332:25,
1333:1, 1333:5,
1333:14, 1333:16,
1333:23, 1333:25,
1335:9, 1339:22,
1340:6, 1340:9,
1340:10, 1340:16,
1340:22, 1340:23,
1340:24, 1345:11,
1345:24, 1346:1,
1346:19, 1347:7,
1348:22, 1348:24,
1349:4, 1352:20,
1366:14, 1368:6,
1379:18, 1379:21,
1380:25, 1382:12,
1384:25, 1392:12,
1393:3, 1393:19,
1394:5, 1394:15,
1394:16, 1396:3,
1396:22, 1398:16,
1398:19, 1404:5,
1404:19, 1404:23,
1405:7, 1405:12,
1405:19, 1405:20,
1406:11, 1406:12,
1413:14, 1414:14,
1425:15, 1471:25,
1476:19, 1523:12,
1523:20
**Clinical** [1] - 1330:22
**clinically** [1] - 1350:6
**clinician** [2] - 1403:19,
1404:2
**clinician's** [1] -

1327:23
**clinicians** [2] -
1257:12, 1331:13
**clinics** [1] - 1315:16
**close** [2] - 1387:20,
1510:24
**closer** [1] - 1503:2
**co** [22] - 1259:23,
1263:4, 1263:12,
1268:3, 1268:6,
1268:16, 1269:5,
1271:3, 1271:10,
1280:18, 1280:21,
1280:25, 1281:2,
1281:6, 1281:8,
1281:10, 1281:15,
1281:24, 1429:19,
1445:7, 1465:14
**Co** [2] - 1268:14,
1270:19
**co-authors** [1] -
1445:7
**co-edited** [1] -
1465:14
**co-pay** [12] - 1263:4,
1263:12, 1280:18,
1280:21, 1280:25,
1281:2, 1281:6,
1281:8, 1281:15,
1281:24, 1429:19
**co-payment** [1] -
1281:10
**Co-Promote** [1] -
1270:19
**Co-Promotion** [1] -
1268:14
**co-promotion** [7] -
1259:23, 1268:3,
1268:6, 1268:16,
1269:5, 1271:3,
1271:10
**coded** [1] - 1297:4
**coeditor** [1] - 1420:11
**collapsing** [3] -
1439:13, 1475:10,
1475:17
**colleague** [2] -
1311:12, 1466:4
**colleagues** [2] -
1311:8, 1417:5
**collect** [1] - 1472:6
**collected** [6] - 1423:9,
1429:4, 1430:8,
1449:8, 1450:8,
1460:4
**collects** [2] - 1273:3,
1428:9
**College** [1] - 1418:22
**colonel** [1] - 1315:24
**color** [1] - 1435:7

**colors** [1] - 1435:11
**column** [2] - 1346:4,
1346:5
**combination** [4] -
1247:18, 1354:7,
1354:10, 1354:16
**combined** [1] -
1253:24
**coming** [3] - 1229:13,
1476:9, 1491:9
**comment** [4] -
1257:16, 1321:9,
1321:12, 1366:21
**commenting** [1] -
1325:25
**comments** [1] -
1322:18
**Commercial** [1] -
1263:18
**commercial** [75] -
1219:12, 1220:16,
1221:21, 1222:1,
1222:5, 1223:8,
1223:15, 1223:18,
1223:22, 1224:6,
1224:13, 1224:22,
1225:2, 1226:5,
1235:24, 1236:25,
1239:6, 1247:25,
1248:5, 1249:2,
1249:6, 1253:25,
1258:7, 1258:18,
1258:21, 1263:9,
1288:7, 1289:19,
1289:24, 1290:6,
1290:8, 1290:24,
1291:13, 1292:16,
1293:24, 1294:2,
1295:9, 1295:14,
1295:20, 1295:24,
1300:2, 1303:15,
1303:25, 1421:18,
1421:19, 1423:4,
1423:17, 1423:18,
1423:24, 1424:7,
1424:11, 1424:14,
1424:17, 1427:18,
1429:10, 1431:4,
1434:8, 1435:17,
1441:17, 1459:6,
1459:7, 1465:5,
1465:10, 1468:13,
1470:14, 1470:22,
1474:21, 1474:23,
1484:15, 1485:5,
1488:18, 1491:18,
1491:21, 1520:4,
1533:14
**commercialization** [1]
- 1241:4

**commercially** [7] - 1304:3, 1422:13, 1423:23, 1424:11, 1439:2, 1467:13, 1504:24
**Commission** [1] - 1221:8
**common** [22] - 1222:25, 1236:15, 1270:7, 1346:9, 1346:12, 1387:12, 1387:14, 1414:11, 1414:12, 1431:12, 1431:13, 1433:12, 1437:10, 1439:5, 1440:2, 1442:24, 1480:16, 1480:18, 1480:21, 1500:7, 1507:2, 1509:8
**commonly** [5] - 1237:14, 1237:17, 1239:7, 1250:17, 1470:3
**communicate** [1] - 1327:6
**communicated** [1] - 1261:23
**communication** [1] - 1335:18
**communications** [1] - 1326:11
**community** [4] - 1261:24, 1269:1, 1277:13, 1318:17
**companies** [43] - 1219:17, 1219:18, 1232:15, 1236:15, 1236:20, 1237:14, 1237:17, 1264:9, 1294:22, 1301:2, 1305:10, 1305:11, 1306:2, 1306:4, 1306:8, 1322:11, 1325:3, 1325:4, 1327:25, 1329:6, 1331:2, 1348:7, 1419:17, 1419:19, 1424:12, 1442:8, 1443:1, 1444:19, 1467:1, 1467:15, 1477:19, 1477:21, 1493:2, 1499:2, 1500:7, 1500:10, 1501:17, 1502:20, 1503:4, 1503:20, 1507:5, 1520:4
**company** [35] - 1226:10, 1236:13, 1237:20, 1258:4, 1268:4, 1272:8,

1303:2, 1307:13, 1312:14, 1326:12, 1348:5, 1348:11, 1428:6, 1428:9, 1431:20, 1440:20, 1441:22, 1442:5, 1457:10, 1457:15, 1477:10, 1481:3, 1482:12, 1488:19, 1489:3, 1498:16, 1503:13, 1503:16, 1505:2, 1505:15, 1509:10, 1509:17, 1510:9, 1534:8, 1535:3
**Company's** [1] - 1240:20
**company's** [4] - 1444:17, 1499:8, 1503:7, 1507:15
**comparable** [2] - 1427:23, 1474:25
**comparative** [1] - 1475:25
**compare** [2] - 1237:5, 1433:4
**compared** [11] - 1231:18, 1233:15, 1240:15, 1242:1, 1265:14, 1273:7, 1305:11, 1305:14, 1462:4, 1463:22, 1510:9
**comparing** [2] - 1309:6, 1363:23
**comparison** [12] - 1334:18, 1433:17, 1433:20, 1433:21, 1434:1, 1435:5, 1435:9, 1435:12, 1435:25, 1471:16, 1472:3, 1472:6
**comparisons** [1] - 1474:5
**comparted** [1] - 1235:9
**compete** [1] - 1442:5
**competing** [1] - 1435:23
**competition** [3] - 1307:12, 1419:13, 1442:14
**competitive** [2] - 1238:3, 1476:1
**competitor** [1] - 1245:10
**competitors** [2] - 1226:17, 1274:4
**complement** [1] - 1269:20

**complete** [1] - 1527:11
**completed** [1] - 1462:25
**completely** [2] - 1334:25, 1351:21
**completes** [1] - 1272:9
**complex** [3] - 1236:7, 1300:24, 1301:21
**component** [2] - 1391:1, 1490:18
**compound** [1] - 1493:23
**comprises** [2] - 1327:5, 1365:25
**concede** [1] - 1510:23
**conceding** [1] - 1286:4
**conceive** [2] - 1226:11, 1226:21
**conceived** [2] - 1231:6, 1245:17
**concept** [6] - 1222:8, 1222:25, 1258:18, 1295:9, 1306:11, 1446:3
**conceptually** [1] - 1288:23
**concern** [3] - 1340:4, 1400:18, 1514:9
**concerned** [3] - 1318:9, 1402:10, 1514:20
**concerning** [16] - 1254:14, 1292:25, 1300:2, 1312:18, 1316:25, 1329:19, 1332:2, 1333:12, 1335:12, 1345:14, 1371:24, 1372:2, 1372:14, 1447:16, 1491:17, 1491:19
**concerns** [7] - 1337:24, 1338:3, 1381:20, 1382:9, 1383:2, 1386:1, 1388:13
**concise** [7] - 1331:7, 1333:11, 1333:17, 1337:2, 1341:13, 1374:3, 1374:16
**concisely** [3] - 1327:6, 1328:19, 1365:25
**conclude** [8] - 1234:18, 1240:12, 1423:3, 1423:21, 1465:10, 1480:11, 1538:25, 1539:3
**concluded** [5] -

1228:4, 1244:19, 1423:23, 1425:21, 1446:13
**concludes** [1] - 1224:24
**concluding** [2] - 1447:6, 1447:13
**conclusion** [15] - 1240:19, 1246:8, 1281:25, 1296:19, 1334:19, 1464:19, 1474:19, 1474:22, 1482:1, 1484:3, 1484:5, 1491:21, 1504:13, 1521:4, 1521:15
**conclusions** [4] - 1253:14, 1258:13, 1491:17, 1529:17
**Concomitant** [1] - 1352:24
**concomitant** [3] - 1353:13, 1353:20, 1353:24
**concurrent** [7] - 1351:22, 1352:4, 1354:22, 1355:5, 1411:18, 1411:23, 1412:3
**condition** [25] - 1226:1, 1324:11, 1328:19, 1334:8, 1336:1, 1336:2, 1339:23, 1340:3, 1358:11, 1359:18, 1359:21, 1366:2, 1366:11, 1367:1, 1368:2, 1372:6, 1372:18, 1373:8, 1373:23, 1379:11, 1386:21, 1386:24, 1403:20, 1408:18
**conditional** [1] - 1527:21
**conditions** [3] - 1289:1, 1366:15, 1383:7
**conduct** [4] - 1283:10, 1283:13, 1418:12, 1531:13
**conducted** [4] - 1423:14, 1425:8, 1425:15, 1482:12
**conducting** [2] - 1426:21, 1536:20
**confer** [1] - 1401:4
**Conference** [1] - 1301:12
**conference** [1] - 1301:14

**conferred** [1] - 1539:3
**confidential** [1] - 1229:2
**confined** [2] - 1296:2, 1296:7
**confirm** [1] - 1246:7
**confirms** [1] - 1350:13
**conflates** [2] - 1258:18, 1259:1
**confusion** [3] - 1516:20, 1538:12, 1538:16
**Congress** [1] - 1321:7
**conjunction** [1] - 1353:7
**consensus** [1] - 1455:14
**consequences** [2] - 1503:17, 1506:13
**conservative** [8] - 1453:11, 1453:15, 1456:1, 1456:2, 1514:11, 1514:15, 1518:1, 1519:18
**conservatively** [3] - 1448:18, 1455:23, 1456:11
**consider** [14] - 1231:20, 1282:3, 1283:8, 1327:22, 1331:13, 1333:13, 1333:23, 1408:13, 1434:4, 1442:11, 1466:9, 1499:5, 1504:25, 1511:2
**considerable** [1] - 1263:4
**consideration** [4] - 1226:4, 1362:23, 1363:4, 1363:10
**considerations** [7] - 1219:13, 1222:24, 1337:17, 1362:13, 1363:15, 1364:14, 1384:11
**Considerations** [1] - 1336:15
**considered** [8] - 1284:4, 1330:13, 1348:3, 1368:2, 1373:22, 1410:1, 1448:3, 1526:25
**considering** [4] - 1288:12, 1441:22, 1488:20, 1489:3
**considers** [7] - 1225:3, 1324:6, 1326:14, 1334:1, 1336:10, 1344:1, 1408:10

consist [1] - 1434:1
consistency [2] -
1399:7, 1518:1
consistent [21] -
1253:10, 1262:16,
1276:6, 1303:24,
1333:4, 1339:17,
1340:12, 1342:23,
1343:19, 1353:18,
1354:12, 1378:23,
1380:24, 1384:25,
1395:16, 1397:19,
1397:22, 1398:12,
1515:8, 1520:3,
1535:14
consistently [1] -
1241:5
consists [1] - 1440:9
CONSTANCE [1] -
1217:10
constant [3] -
1455:24, 1456:12,
1514:13
constitute [1] -
1284:24
constitutes [1] -
1495:25
construct [1] - 1222:6
constructed [2] -
1515:7, 1520:2
consult [5] - 1294:21,
1319:24, 1322:11,
1323:11, 1417:5
consultations [1] -
1322:17
consulting [9] -
1219:1, 1219:8,
1219:21, 1220:7,
1232:17, 1294:4,
1295:5, 1312:14,
1312:17
consumed [4] -
1368:13, 1368:21,
1369:7, 1373:3
consumer [8] -
1259:22, 1264:8,
1273:3, 1277:13,
1320:16, 1472:11,
1483:12, 1531:17
consumers [1] -
1526:22
contact [1] - 1506:2
contain [1] - 1229:1
contains [2] - 1324:5,
1467:8
content [13] - 1322:4,
1323:4, 1325:11,
1327:2, 1328:15,
1329:19, 1331:23,
1376:5, 1389:9,

1392:13, 1393:4,
1393:20, 1526:7
contents [1] - 1327:11
context [21] - 1222:2,
1222:23, 1273:19,
1295:18, 1299:24,
1300:4, 1325:16,
1325:25, 1335:17,
1342:12, 1347:22,
1349:24, 1352:7,
1365:18, 1367:22,
1375:3, 1416:17,
1423:17, 1424:6,
1444:22, 1479:4
continue [10] -
1216:25, 1276:19,
1307:16, 1355:22,
1357:25, 1362:19,
1364:6, 1377:17,
1392:20, 1468:23
Continued [1] -
1541:1
CONTINUED [1] -
1217:1
continued [8] -
1316:25, 1335:25,
1336:4, 1340:4,
1343:25, 1540:25,
1541:25, 1542:25
continues [2] -
1383:25, 1458:21
contraindications [1]
- 1330:9
contrary [1] - 1462:19
contrast [1] - 1386:19
contributions [1] -
1269:23
Control [1] - 1419:25
controlled [1] - 1408:9
conveniently [1] -
1346:3
convey [4] - 1393:14,
1415:7, 1526:21,
1526:23
conveys [3] - 1372:3,
1372:15, 1373:6
convince [1] - 1375:4
copy [5] - 1402:3,
1420:19, 1443:10,
1443:11, 1516:11
core [2] - 1359:12,
1443:3
Cornell [3] - 1418:7,
1418:8, 1418:15
corner [1] - 1228:1
coronary [3] -
1353:17, 1415:5,
1415:18
Corporate [1] -
1442:19

corporate [1] -
1442:20
Corporation [3] -
1261:13, 1269:9,
1276:10
correct [184] - 1254:3,
1260:3, 1275:6,
1293:2, 1293:7,
1293:15, 1293:21,
1293:22, 1293:25,
1295:6, 1296:4,
1297:12, 1297:19,
1298:4, 1298:5,
1298:11, 1300:15,
1304:23, 1305:1,
1305:6, 1306:15,
1307:5, 1307:8,
1307:25, 1308:3,
1308:10, 1308:23,
1309:1, 1309:4,
1309:9, 1309:20,
1310:2, 1310:5,
1310:11, 1322:23,
1334:21, 1336:17,
1338:16, 1361:10,
1361:15, 1363:10,
1363:20, 1364:16,
1364:17, 1364:23,
1365:4, 1365:10,
1366:12, 1367:2,
1367:7, 1368:1,
1372:6, 1372:18,
1373:16, 1373:20,
1374:6, 1374:14,
1375:6, 1375:22,
1376:24, 1377:6,
1377:7, 1377:10,
1377:11, 1377:18,
1377:23, 1378:2,
1378:9, 1379:9,
1379:16, 1380:4,
1380:19, 1381:22,
1382:11, 1385:7,
1386:16, 1387:7,
1387:18, 1388:16,
1388:22, 1389:2,
1389:3, 1389:13,
1389:14, 1389:24,
1390:3, 1390:7,
1390:13, 1390:23,
1391:2, 1391:10,
1391:15, 1391:24,
1392:9, 1392:14,
1393:10, 1393:23,
1395:18, 1395:21,
1395:25, 1396:10,
1396:14, 1396:19,
1397:5, 1397:10,
1397:19, 1397:23,
1398:3, 1398:13,
1399:3, 1400:24,

1403:13, 1403:14,
1403:22, 1404:24,
1404:25, 1405:22,
1406:9, 1406:18,
1407:12, 1407:17,
1407:22, 1408:2,
1408:3, 1408:6,
1408:18, 1409:11,
1409:25, 1410:11,
1410:19, 1411:5,
1411:11, 1411:15,
1412:4, 1412:14,
1413:11, 1416:24,
1427:2, 1432:15,
1435:25, 1439:17,
1449:25, 1450:4,
1450:6, 1450:9,
1450:12, 1451:23,
1452:3, 1456:15,
1457:20, 1459:12,
1461:18, 1472:14,
1493:2, 1493:6,
1493:18, 1493:23,
1494:2, 1494:8,
1496:22, 1496:23,
1497:6, 1497:7,
1498:2, 1498:5,
1498:15, 1498:18,
1498:23, 1501:2,
1502:11, 1503:5,
1504:20, 1514:1,
1517:16, 1517:19,
1517:20, 1518:15,
1520:15, 1521:21,
1522:7, 1525:18,
1533:24, 1534:20,
1540:2
correctly [1] - 1497:22
correlation [3] -
1223:9, 1223:13,
1292:10
corresponding [1] -
1491:7
corroborate [1] -
1451:2
cost [9] - 1227:9,
1230:17, 1280:25,
1281:6, 1281:9,
1281:16, 1305:2,
1305:10, 1448:23
Costs [1] - 1443:20
costs [24] - 1231:2,
1305:18, 1305:19,
1305:20, 1305:24,
1306:3, 1306:5,
1306:8, 1425:10,
1440:25, 1441:9,
1443:22, 1444:7,
1444:12, 1447:10,
1448:7, 1455:11,

1455:12, 1456:8,
1457:2, 1469:25,
1534:1, 1535:8
counsel [11] - 1218:5,
1392:5, 1401:4,
1402:8, 1410:13,
1422:23, 1493:17,
1493:19, 1495:21,
1513:11, 1538:8
counseling [2] -
1376:6, 1389:9
count [1] - 1287:3
counter [2] - 1281:21,
1320:24
counting [1] - 1300:9
country [1] - 1221:12
couple [15] - 1222:22,
1279:18, 1284:5,
1333:15, 1336:20,
1339:11, 1342:16,
1353:10, 1354:4,
1431:25, 1448:13,
1461:1, 1489:19,
1508:25, 1510:22
coupons [2] -
1267:14, 1307:10
Course [1] - 1313:2
course [17] - 1228:14,
1228:19, 1236:19,
1237:10, 1296:9,
1313:1, 1313:4,
1319:13, 1323:7,
1323:10, 1358:25,
1361:18, 1379:10,
1383:9, 1420:4,
1466:23, 1511:13
courses [2] - 1420:3,
1420:5
COURT [180] - 1216:1,
1218:4, 1218:11,
1218:21, 1220:24,
1221:1, 1221:16,
1229:1, 1229:17,
1229:24, 1230:2,
1230:4, 1234:6,
1234:10, 1235:17,
1243:2, 1243:8,
1246:3, 1251:22,
1255:11, 1255:25,
1256:2, 1261:3,
1262:2, 1262:4,
1262:25, 1263:21,
1264:22, 1266:7,
1266:12, 1266:17,
1266:21, 1267:1,
1269:12, 1271:18,
1271:21, 1274:19,
1276:14, 1279:6,
1280:5, 1280:7,
1280:10, 1280:13,

1283:23, 1284:13,
1284:16, 1285:7,
1285:12, 1285:19,
1286:7, 1286:11,
1286:20, 1287:14,
1291:18, 1291:23,
1291:25, 1308:18,
1311:1, 1311:4,
1311:8, 1311:17,
1311:20, 1312:8,
1314:17, 1323:20,
1329:2, 1332:10,
1342:1, 1355:15,
1355:18, 1355:21,
1356:2, 1357:4,
1371:4, 1371:9,
1388:3, 1400:1,
1400:4, 1400:16,
1400:25, 1401:19,
1401:24, 1402:12,
1402:16, 1402:24,
1403:5, 1404:1,
1409:13, 1410:15,
1410:21, 1410:24,
1417:6, 1417:10,
1417:16, 1417:25,
1421:4, 1421:10,
1426:7, 1426:11,
1426:13, 1428:16,
1428:22, 1430:17,
1430:22, 1432:22,
1436:10, 1436:14,
1437:19, 1443:10,
1443:13, 1445:21,
1450:25, 1451:5,
1451:21, 1451:24,
1452:4, 1453:23,
1454:3, 1454:5,
1454:8, 1454:11,
1454:15, 1454:18,
1454:20, 1456:19,
1457:24, 1459:16,
1461:24, 1462:1,
1462:12, 1463:20,
1464:5, 1468:3,
1469:16, 1473:5,
1473:11, 1474:10,
1474:14, 1474:16,
1478:5, 1481:16,
1482:21, 1485:17,
1486:17, 1487:9,
1487:16, 1487:18,
1490:4, 1492:2,
1492:8, 1492:10,
1515:10, 1515:14,
1515:17, 1515:19,
1515:22, 1516:2,
1516:5, 1516:8,
1516:22, 1517:2,
1517:6, 1517:9,
1523:22, 1524:5,

1524:11, 1530:14,
1535:23, 1537:7,
1537:16, 1537:19,
1537:24, 1538:4,
1538:7, 1538:11,
1538:20, 1539:7,
1539:10, 1539:13,
1539:23
**Court** [12] - 1216:23,
1220:14, 1221:16,
1221:23, 1323:20,
1421:10, 1445:15,
1445:19, 1516:17,
1522:21, 1539:24
**court** [18] - 1221:5,
1221:7, 1225:11,
1229:5, 1229:15,
1231:25, 1254:2,
1256:23, 1283:3,
1285:23, 1287:17,
1297:20, 1334:20,
1334:23, 1345:7,
1400:2, 1401:8,
1505:4
**Court's** [1] - 1531:15
**courtroom** [6] -
1229:4, 1229:16,
1422:4, 1437:25,
1459:21, 1490:23
**courts** [5] - 1221:11,
1226:12, 1526:20,
1526:23, 1531:24
**cover** [15] - 1283:6,
1284:8, 1284:10,
1284:11, 1285:10,
1287:3, 1287:8,
1288:13, 1289:9,
1299:4, 1442:18,
1493:22, 1495:9,
1496:7, 1524:15
**coverage** [1] - 1281:1
**covered** [27] - 1225:9,
1235:7, 1242:12,
1248:16, 1249:5,
1249:15, 1249:20,
1250:11, 1251:12,
1251:14, 1253:3,
1253:12, 1253:20,
1253:23, 1254:9,
1258:5, 1282:6,
1282:20, 1288:20,
1289:2, 1298:18,
1303:20, 1431:3,
1466:20, 1490:25,
1493:16, 1498:8
**covering** [4] -
1219:25, 1283:22,
1286:1, 1297:4
**covers** [3] - 1395:20,
1442:21, 1526:7

**Covington** [1] -
1313:18
**create** [3] - 1425:3,
1437:13, 1518:1
**created** [2] - 1508:7,
1511:13
**creating** [2] - 1303:5,
1428:4
**creation** [1] - 1325:9
**credentials** [3] -
1505:12, 1505:19,
1506:5
**credibility** [1] -
1510:18
**credit** [6] - 1258:25,
1259:9, 1288:9,
1288:15, 1288:16,
1289:6
**criteria** [1] - 1225:1
**criterion** [1] - 1347:20
**critical** [7] - 1226:15,
1320:6, 1336:9,
1368:24, 1370:6,
1370:13, 1388:17
**criticality** [1] - 1369:1
**criticisms** [2] -
1296:11, 1299:11
**criticized** [1] - 1296:8
**critique** [1] - 1247:16
**Cross** [3] - 1540:10,
1540:13, 1540:16
**cross** [8] - 1291:20,
1354:9, 1355:16,
1355:19, 1401:17,
1414:16, 1451:4,
1451:6
**CROSS** [3] - 1292:7,
1357:12, 1492:17
**cross-demonstrative**
[1] - 1414:16
**Cross-examination**
[3] - 1540:10,
1540:13, 1540:16
**cross-examination** [5]
- 1291:20, 1355:16,
1355:19, 1401:17,
1451:6
**CROSS-**
**EXAMINATION** [3] -
1292:7, 1357:12,
1492:17
**cross-examine** [1] -
1451:4
**cross-reference** [1] -
1354:9
**crucial** [2] - 1336:10,
1368:2
**cum** [2] - 1219:4,
1418:22
**cumulative** [13] -

1224:1, 1230:21,
1231:9, 1233:14,
1246:14, 1246:23,
1278:24, 1290:2,
1337:20, 1458:6,
1458:12, 1502:8,
1525:11
**cured** [1] - 1336:2
**current** [22] - 1260:15,
1268:18, 1283:17,
1286:14, 1302:4,
1307:22, 1314:9,
1329:13, 1329:22,
1330:16, 1333:4,
1333:7, 1337:6,
1337:22, 1339:18,
1340:13, 1342:24,
1343:19, 1353:19,
1354:13, 1362:10,
1362:24, 1363:3,
1364:21, 1415:24,
1420:21, 1422:8
**curriculum** [4] -
1220:21, 1314:7,
1314:8, 1420:19
**curtail** [1] - 1307:13
**curtailed** [2] -
1309:14, 1310:18
**customers** [2] -
1529:14, 1533:1
**cut** [2] - 1232:9,
1234:21
**cutting** [1] - 1523:22
**CV** [4] - 1220:21,
1420:19, 1420:20

## D

**D.C** [3] - 1216:17,
1216:20, 1316:23
**daily** [1] - 1321:21
**damages** [1] - 1219:14
**Dame** [1] - 1219:5
**DANIEL** [1] - 1216:16
**Danzon** [2] - 1466:5,
1466:12
**dark** [3] - 1490:14,
1490:17, 1491:6
**darn** [1] - 1510:24
**Dartmouth** [1] -
1418:22
**dash** [1] - 1517:4
**data** [97] - 1227:20,
1227:24, 1232:9,
1232:10, 1232:11,
1232:12, 1232:14,
1232:18, 1233:25,
1234:21, 1242:16,
1249:12, 1250:16,
1250:18, 1250:22,

1251:5, 1251:9,
1251:17, 1252:4,
1252:7, 1252:23,
1253:16, 1253:18,
1255:6, 1255:14,
1255:15, 1257:4,
1258:12, 1258:14,
1272:20, 1272:25,
1273:21, 1274:9,
1279:16, 1288:25,
1290:16, 1290:17,
1296:5, 1296:6,
1296:17, 1297:3,
1302:14, 1303:5,
1307:7, 1310:7,
1324:9, 1324:10,
1340:7, 1345:14,
1346:19, 1347:24,
1348:2, 1348:22,
1348:24, 1349:3,
1397:11, 1412:15,
1426:1, 1428:4,
1428:6, 1428:9,
1436:4, 1436:6,
1437:14, 1472:2,
1472:4, 1472:12,
1474:4, 1475:11,
1476:19, 1479:11,
1485:11, 1485:13,
1486:13, 1486:24,
1486:25, 1488:4,
1489:20, 1489:21,
1496:18, 1497:1,
1497:4, 1497:19,
1498:17, 1498:20,
1498:24, 1502:1,
1512:19, 1514:2,
1520:1, 1522:9,
1525:23, 1527:20,
1531:5, 1531:14,
1534:3
**dataset** [5] - 1234:19,
1250:18, 1250:19,
1488:4, 1489:22
**date** [8] - 1226:11,
1245:10, 1276:20,
1331:25, 1416:22,
1436:25, 1449:25,
1504:24
**dated** [2] - 1314:8,
1420:20
**days** [6] - 1318:11,
1334:3, 1386:14,
1388:9, 1431:14,
1467:24
**DC** [2] - 1315:23,
1319:2
**DDX** [90] - 1223:17,
1224:20, 1229:22,
1232:4, 1234:8,

15

1234:15, 1235:15, 1235:17, 1240:18, 1243:6, 1243:24, 1245:25, 1246:7, 1251:2, 1251:20, 1252:1, 1254:22, 1254:24, 1260:10, 1262:7, 1263:3, 1264:25, 1266:9, 1266:19, 1266:22, 1268:10, 1269:16, 1270:18, 1272:15, 1274:17, 1274:20, 1275:22, 1276:9, 1278:7, 1279:7, 1279:11, 1280:4, 1280:8, 1280:9, 1280:13, 1283:1, 1283:5, 1287:2, 1287:10, 1289:16, 1290:21, 1292:6, 1296:24, 1303:8, 1304:15, 1308:13, 1309:6, 1360:6, 1360:18, 1361:12, 1361:22, 1363:22, 1364:18, 1365:19, 1367:11, 1368:9, 1369:13, 1372:11, 1372:23, 1374:21, 1375:25, 1376:15, 1381:3, 1382:19, 1387:20, 1392:23, 1395:5, 1404:8, 1404:9, 1405:1, 1406:23, 1407:24, 1414:16, 1431:1, 1437:22, 1438:20, 1439:1, 1459:19, 1464:13, 1475:2, 1508:5, 1510:8, 1511:24, 1525:3, 1537:21

**deal** [1] - 1515:6
**deals** [1] - 1467:3
**decade** [1] - 1239:15
**decades** [1] - 1219:24
**December** [7] - 1297:18, 1297:21, 1421:25, 1422:10, 1450:13, 1462:6, 1483:13
**decide** [2] - 1391:9, 1467:15
**deciding** [1] - 1435:20
**decile** [1] - 1269:19
**deciliter** [27] - 1225:25, 1248:16, 1250:9, 1251:11, 1252:14, 1252:16,

1254:13, 1254:16, 1254:20, 1258:24, 1338:10, 1338:11, 1344:4, 1344:5, 1381:8, 1381:16, 1488:16, 1494:2, 1494:8, 1494:15, 1495:20, 1496:4, 1497:15, 1523:3, 1528:15, 1528:21, 1529:3
**decision** [17] - 1319:17, 1319:20, 1324:7, 1327:23, 1333:14, 1333:24, 1333:25, 1334:5, 1391:12, 1394:12, 1441:15, 1477:22, 1526:5, 1526:11, 1531:15, 1531:21, 1531:24
**decision-makers** [3] - 1477:22, 1526:5, 1526:11
**decision-making** [3] - 1333:14, 1333:24, 1333:25
**decisionmaking** [3] - 1319:14, 1319:15, 1319:25
**decisions** [11] - 1320:7, 1321:5, 1325:6, 1330:14, 1331:14, 1392:19, 1399:1, 1399:4, 1443:2, 1514:11, 1520:2
**declining** [3] - 1233:13, 1438:4, 1519:16
**decompose** [1] - 1510:6
**decrease** [3] - 1394:6, 1408:20, 1456:7
**decreased** [2] - 1521:7, 1521:21
**decreasing** [3] - 1438:10, 1438:18, 1453:15
**deductions** [3] - 1278:16, 1278:17, 1430:1
**deemed** [1] - 1520:13
**deepening** [1] - 1244:11
**deeper** [1] - 1379:11
**DEFENDANT** [4] - 1216:19, 1217:3, 1217:10, 1230:5
**defendants** [28] -

1218:8, 1234:2, 1234:7, 1235:14, 1242:20, 1243:5, 1245:24, 1251:19, 1254:23, 1255:8, 1262:22, 1264:19, 1266:3, 1266:6, 1274:11, 1274:16, 1276:12, 1279:4, 1280:3, 1310:22, 1357:11, 1371:25, 1373:24, 1412:1, 1467:24, 1492:16, 1493:6, 1539:12
**Defendants** [2] - 1216:9, 1218:13
**DEFENDANTS'** [2] - 1542:21, 1543:1
**Defendants'** [28] - 1221:2, 1230:7, 1234:12, 1235:19, 1243:4, 1243:9, 1246:4, 1251:24, 1256:4, 1262:5, 1263:1, 1263:18, 1263:22, 1264:23, 1266:14, 1269:10, 1269:13, 1271:23, 1275:1, 1276:15, 1279:8, 1280:15, 1287:15, 1334:15, 1517:8, 1530:15, 1540:15, 1542:10
**defendants'** [36] - 1218:5, 1221:13, 1229:21, 1260:23, 1266:9, 1361:10, 1363:3, 1371:23, 1372:3, 1372:8, 1372:15, 1373:12, 1373:14, 1374:3, 1375:11, 1375:16, 1377:5, 1377:9, 1381:14, 1389:7, 1389:13, 1389:15, 1389:22, 1390:2, 1390:21, 1390:25, 1391:8, 1395:20, 1405:24, 1406:7, 1411:21, 1411:25, 1412:1, 1412:7, 1412:23, 1413:9
**defer** [1] - 1311:11
**define** [4] - 1231:22, 1415:13, 1431:25, 1509:6
**defined** [1] - 1250:9
**defining** [1] - 1505:7
**definitely** [4] - 1242:8, 1257:23, 1300:9,

1345:24
**degree** [7] - 1315:4, 1418:23, 1499:23, 1500:5, 1500:12, 1501:13, 1501:15
**degrees** [1] - 1306:14
**deliberate** [1] - 1374:1
**deliver** [1] - 1459:2
**delivering** [4] - 1441:3, 1459:8, 1491:23, 1521:17
**delivery** [1] - 1526:10
**delta** [1] - 1241:25
**demonstrate** [3] - 1231:11, 1350:21, 1382:13
**demonstrated** [3] - 1354:6, 1394:5, 1396:22
**demonstrating** [1] - 1427:20
**demonstration** [1] - 1396:2
**demonstrative** [25] - 1228:21, 1232:8, 1234:10, 1234:14, 1234:15, 1234:17, 1235:18, 1240:18, 1242:17, 1243:6, 1243:8, 1243:25, 1255:12, 1261:5, 1261:9, 1262:1, 1266:13, 1266:24, 1267:2, 1272:19, 1278:10, 1283:4, 1381:4, 1414:16, 1414:20
**DEMONSTRATIVE** [4] - 1541:21, 1542:4, 1542:21, 1543:1
**demonstratives** [1] - 1255:20
**Department** [1] - 1418:9
**dependent** [2] - 1386:21
**depict** [1] - 1435:3
**depicted** [2] - 1427:9, 1430:3
**depicting** [1] - 1429:3
**depiction** [1] - 1304:18
**deposition** [36] - 1292:2, 1294:1, 1294:7, 1357:9, 1360:21, 1360:24, 1361:4, 1374:8, 1374:9, 1374:11, 1378:17, 1378:18, 1378:24, 1379:3,

1391:19, 1391:22, 1392:6, 1399:13, 1399:22, 1400:5, 1400:10, 1400:13, 1400:19, 1401:2, 1401:25, 1402:7, 1402:18, 1402:20, 1412:19, 1412:21, 1413:4, 1413:6, 1413:21, 1413:23, 1494:19, 1497:18
**depressive** [1] - 1340:1
**derivatives** [1] - 1433:25
**Describe** [1] - 1369:23
**describe** [13] - 1230:10, 1252:4, 1270:21, 1281:10, 1315:2, 1315:13, 1321:22, 1325:19, 1326:3, 1353:12, 1418:21, 1419:3, 1495:3
**described** [6] - 1329:14, 1383:8, 1398:17, 1435:6, 1444:9, 1499:24
**describes** [2] - 1328:19, 1467:8
**describing** [4] - 1276:25, 1342:18, 1365:22, 1405:25
**description** [5] - 1337:2, 1340:5, 1406:2, 1438:14, 1528:12
**descriptions** [1] - 1370:13
**descriptor** [1] - 1369:2
**descriptors** [4] - 1370:5, 1370:13, 1370:19, 1371:16
**deserved** [1] - 1368:3
**designated** [2] - 1221:4, 1221:6
**designations** [1] - 1311:3
**designed** [1] - 1302:17
**designing** [2] - 1316:17, 1317:2
**designs** [1] - 1312:20
**despite** [3] - 1394:10, 1398:22, 1498:7
**detail** [7] - 1223:24, 1225:7, 1268:18, 1269:3, 1340:10, 1419:10, 1436:20
**detailed** [2] - 1337:3,

16

1450:20
**detailing** [9] - 1259:22, 1264:13, 1267:6, 1267:8, 1273:4, 1275:9, 1277:13, 1472:9
**details** [5] - 1268:19, 1330:11, 1330:21, 1330:23, 1331:3
**determinants** [1] - 1433:17
**determinate** [1] - 1257:20
**determination** [2] - 1352:12, 1352:16
**determine** [12] - 1232:20, 1273:14, 1290:18, 1344:22, 1345:16, 1352:8, 1391:14, 1391:23, 1426:22, 1440:4, 1511:18, 1520:12
**determined** [13] - 1238:22, 1337:10, 1348:17, 1350:21, 1351:16, 1354:15, 1354:21, 1381:19, 1382:8, 1383:1, 1385:25, 1388:13, 1521:24
**develop** [9] - 1227:17, 1306:3, 1306:5, 1419:19, 1424:13, 1440:21, 1448:6, 1457:11, 1503:4
**developed** [5] - 1377:1, 1422:17, 1424:12, 1440:10, 1441:4
**developing** [7] - 1301:21, 1322:11, 1425:13, 1441:22, 1458:12, 1488:20, 1489:3
**Development** [1] - 1313:2
**development** [15] - 1227:12, 1312:18, 1313:4, 1322:12, 1324:5, 1325:21, 1326:10, 1425:8, 1440:12, 1444:25, 1448:5, 1467:1, 1489:12, 1507:7, 1534:1
**developments** [1] - 1322:25
**develops** [1] - 1415:11
**deviation** [1] - 1348:1
**devices** [1] - 1320:18

**DHA** [1] - 1536:15
**diagnosis** [5] - 1250:19, 1497:16, 1497:22, 1498:4, 1527:21
**diagram** [2] - 1287:18, 1287:20
**dialogue** [1] - 1326:13
**diet** [55] - 1350:6, 1352:4, 1358:9, 1359:2, 1362:18, 1362:19, 1367:7, 1367:9, 1367:18, 1367:25, 1368:14, 1368:21, 1369:8, 1371:25, 1372:3, 1372:15, 1372:19, 1373:4, 1374:25, 1375:5, 1375:13, 1375:17, 1375:22, 1376:6, 1376:8, 1376:9, 1376:11, 1379:19, 1380:3, 1380:18, 1380:25, 1381:16, 1381:20, 1382:9, 1382:25, 1383:2, 1384:7, 1384:14, 1384:23, 1385:1, 1385:21, 1386:1, 1388:14, 1389:9, 1393:12, 1393:16, 1397:9, 1397:17, 1415:11, 1415:21, 1416:8, 1416:11, 1416:14
**dietary** [3] - 1392:13, 1393:4, 1393:20
**dieting** [1] - 1398:10
**diets** [1] - 1379:10
**difference** [13] - 1241:9, 1241:10, 1241:25, 1255:20, 1266:24, 1342:12, 1382:14, 1402:10, 1447:12, 1507:13, 1509:3, 1514:8, 1514:21
**differences** [2] - 1238:6, 1512:9
**different** [35] - 1232:10, 1233:5, 1233:7, 1234:20, 1237:19, 1237:22, 1237:25, 1239:9, 1246:15, 1274:1, 1288:22, 1305:10, 1306:15, 1310:13, 1310:14, 1368:10, 1387:7, 1387:17, 1398:25, 1410:21,

1410:23, 1423:11, 1435:5, 1435:11, 1438:9, 1446:14, 1449:11, 1472:7, 1476:15, 1476:16, 1488:2, 1490:12, 1504:2, 1520:17
**differentiate** [1] - 1476:12
**differentiated** [1] - 1414:12
**differentiator** [2] - 1476:18, 1476:20
**differently** [1] - 1223:7
**difficulty** [1] - 1261:7
**digit** [3] - 1224:5, 1235:3, 1271:9
**digits** [2] - 1273:13, 1437:7
**DIRECT** [3] - 1218:22, 1312:9, 1418:1
**Direct** [3] - 1540:9, 1540:12, 1540:16
**direct** [29] - 1259:22, 1264:8, 1273:3, 1277:13, 1283:18, 1295:12, 1300:19, 1300:22, 1302:21, 1303:12, 1304:19, 1357:21, 1364:21, 1377:1, 1389:4, 1398:3, 1404:6, 1406:24, 1409:3, 1416:15, 1418:12, 1451:9, 1472:11, 1499:12, 1508:5, 1508:14, 1530:17, 1534:12, 1538:14
**direct-to-consumer** [4] - 1264:8, 1273:3, 1277:13, 1472:11
**directed** [5] - 1225:23, 1254:20, 1290:9, 1523:2, 1538:14
**directing** [1] - 1452:20
**direction** [1] - 1451:7
**directional** [1] - 1463:7
**directionally** [1] - 1450:21
**directly** [1] - 1410:8
**director** [5] - 1218:25, 1313:8, 1320:14, 1321:2, 1321:19
**disabled** [1] - 1432:2
**disagree** [8] - 1304:5, 1306:23, 1413:1, 1431:7, 1439:3, 1525:15, 1529:25, 1534:11

**disagreeing** [1] - 1507:13
**disagreements** [2] - 1248:3, 1282:12
**disagrees** [1] - 1236:1
**discipline** [4] - 1317:5, 1317:6, 1317:17
**disclosed** [5] - 1284:18, 1294:11, 1467:24, 1527:7, 1533:4
**disclosures** [1] - 1492:20
**discount** [10] - 1238:22, 1244:18, 1443:24, 1444:7, 1444:11, 1448:20, 1448:21, 1448:24, 1520:7, 1520:11
**discounted** [3] - 1457:1, 1457:9, 1457:12
**discounting** [1] - 1502:5
**Discounts** [2] - 1278:7, 1279:11
**discounts** [32] - 1225:18, 1250:2, 1259:17, 1277:17, 1277:22, 1278:11, 1278:18, 1279:19, 1279:25, 1282:1, 1282:3, 1291:9, 1302:12, 1302:20, 1303:11, 1303:22, 1304:1, 1304:4, 1304:22, 1429:20, 1429:23, 1430:1, 1431:5, 1431:8, 1431:11, 1431:12, 1431:13, 1431:22, 1433:9, 1433:11, 1485:22, 1486:1
**Discovery** [1] - 1469:9
**discovery** [1] - 1325:21
**discretion** [27] - 1256:19, 1376:5, 1376:7, 1378:2, 1378:8, 1378:10, 1378:22, 1379:9, 1379:16, 1380:12, 1380:14, 1384:22, 1389:8, 1391:9, 1391:14, 1391:23, 1392:12, 1393:3, 1393:19, 1397:4, 1398:22, 1406:19, 1413:10, 1413:12,

**disagreeing** — 1489:6, 1494:9, 1529:19
**discuss** [7] - 1230:22, 1249:23, 1277:17, 1282:11, 1326:7, 1333:1, 1506:2
**discussed** [20] - 1229:5, 1268:24, 1297:14, 1298:5, 1298:16, 1340:10, 1369:17, 1394:22, 1406:12, 1430:2, 1431:21, 1437:14, 1438:1, 1438:3, 1446:4, 1459:22, 1475:21, 1508:6, 1520:25, 1536:5
**discusses** [1] - 1260:4
**discussing** [4] - 1256:8, 1380:25, 1385:1, 1492:19
**Discussion** [2] - 1417:7, 1517:5
**discussion** [11] - 1258:10, 1258:17, 1309:23, 1354:10, 1414:21, 1414:23, 1416:6, 1422:4, 1422:7, 1439:22, 1485:20
**disease** [7] - 1328:20, 1366:2, 1370:11, 1372:5, 1372:17, 1373:8, 1415:5
**Disease** [5] - 1370:1, 1419:24, 1488:5, 1489:22, 1496:21
**diseased** [1] - 1414:24
**diseases** [1] - 1422:25
**dismiss** [1] - 1451:10
**disorder** [1] - 1340:1
**disowning** [1] - 1513:17
**disparate** [1] - 1290:14
**disparity** [3] - 1238:5, 1247:1, 1472:22
**dispensed** [1] - 1428:12
**displayed** [2] - 1430:5, 1473:20
**displaying** [1] - 1431:9
**dispute** [22] - 1219:11, 1219:16, 1220:6, 1232:16, 1258:8, 1282:14, 1284:9, 1285:6, 1295:8, 1295:11, 1295:16, 1357:16, 1357:23,

17

1358:6, 1358:13, 1525:9, 1525:14, 1528:23, 1529:9, 1529:10, 1529:12, 1535:24

**disputed** [2] - 1357:15, 1357:22

**disputing** [1] - 1379:2

**distinction** [1] - 1266:19

**distracted** [1] - 1382:7

**distribute** [2] - 1311:15, 1417:15

**distributed** [1] - 1472:9

**District** [1] - 1216:23

**DISTRICT** [3] - 1216:1, 1216:1, 1216:2

**divided** [2] - 1455:12, 1473:22

**division** [3] - 1319:10, 1321:24, 1321:25

**divisions** [1] - 1321:23

**docket** [2] - 1229:9, 1428:20

**doctor** [19] - 1377:22, 1379:16, 1380:11, 1391:14, 1391:23, 1392:2, 1397:4, 1397:7, 1397:14, 1397:18, 1398:7, 1398:8, 1398:11, 1399:15, 1403:11, 1403:16, 1406:16, 1406:19

**Doctor** [2] - 1408:16, 1408:23

**doctors** [19] - 1276:21, 1306:24, 1373:15, 1375:4, 1379:13, 1381:14, 1389:4, 1389:16, 1389:23, 1390:2, 1390:6, 1390:12, 1395:2, 1397:2, 1406:3, 1406:8, 1406:13, 1411:22, 1412:2

**doctors'** [1] - 1391:9

**document** [48] - 1220:20, 1228:17, 1228:20, 1233:23, 1242:24, 1263:8, 1263:17, 1265:25, 1274:7, 1301:10, 1314:4, 1324:4, 1328:9, 1331:9, 1331:19, 1332:20, 1345:6, 1349:13,

1349:15, 1349:19, 1371:5, 1374:7, 1414:23, 1420:18, 1430:7, 1431:17, 1442:17, 1445:4, 1445:8, 1461:19, 1462:6, 1465:13, 1465:17, 1469:7, 1469:10, 1477:9, 1481:2, 1482:11, 1482:24, 1483:19, 1515:11, 1516:23, 1528:5, 1532:7, 1533:19, 1534:14, 1537:9

**documents** [25] - 1228:18, 1229:1, 1242:10, 1242:14, 1255:3, 1255:4, 1255:8, 1255:9, 1268:7, 1270:24, 1281:13, 1290:12, 1304:13, 1328:4, 1369:15, 1426:3, 1426:8, 1426:13, 1428:18, 1436:13, 1470:25, 1486:25, 1492:6, 1501:10, 1533:3

**Dollar** [1] - 1272:15

**dollar** [6] - 1241:9, 1265:19, 1279:24, 1308:22, 1320:16, 1475:8

**dollars** [28] - 1226:19, 1227:22, 1227:23, 1228:2, 1233:2, 1241:23, 1242:3, 1247:11, 1265:13, 1272:8, 1273:2, 1273:6, 1277:20, 1277:25, 1278:21, 1278:23, 1279:17, 1290:1, 1425:9, 1426:19, 1429:5, 1449:5, 1452:20, 1473:22, 1473:23, 1502:3, 1510:25, 1515:1

**Dollars** [1] - 1274:7

**domain** [2] - 1312:19, 1382:4

**domestic** [1] - 1221:9

**done** [13] - 1281:4, 1287:11, 1287:22, 1288:1, 1293:6, 1296:20, 1298:15, 1302:8, 1400:12, 1439:11, 1448:10, 1520:23, 1526:13

**Dosage** [1] - 1416:15

**dosage** [46] - 1324:11, 1330:8, 1335:8, 1337:1, 1337:4, 1341:9, 1341:12, 1341:14, 1341:15, 1341:16, 1342:8, 1342:10, 1342:18, 1342:24, 1343:2, 1343:5, 1344:7, 1344:12, 1344:15, 1352:19, 1352:22, 1353:3, 1353:19, 1354:1, 1354:17, 1354:22, 1355:1, 1355:3, 1364:15, 1376:16, 1376:17, 1376:23, 1377:5, 1377:8, 1377:13, 1377:25, 1380:23, 1381:13, 1384:12, 1386:11, 1388:7, 1388:21, 1389:1, 1404:22, 1405:22

**Dose** [1] - 1336:15

**dose** [10] - 1257:14, 1317:13, 1319:21, 1337:17, 1342:20, 1342:21, 1343:15, 1343:17, 1386:14, 1388:9

**doses** [1] - 1317:14

**Dosing** [1] - 1342:5

**dosing** [5] - 1336:24, 1389:1, 1395:10, 1404:21, 1405:21

**dot** [1] - 1458:23

**dots** [1] - 1455:17

**dotted** [4] - 1453:7, 1453:10, 1455:22, 1480:17

**double** [3] - 1268:18, 1271:8, 1273:13

**down** [19] - 1244:13, 1267:22, 1300:20, 1311:5, 1329:16, 1342:15, 1347:11, 1351:9, 1417:11, 1480:21, 1509:24, 1511:7, 1511:9, 1511:23, 1512:16, 1536:13, 1538:5

**download** [1] - 1323:5

**downloaded** [1] - 1323:11

**downside** [1] - 1522:16

**dozens** [2] - 1287:5, 1289:9

**DR** [1] - 1217:10

**Dr** [167] - 1221:22, 1224:9, 1224:11, 1229:10, 1231:25, 1235:25, 1238:10, 1238:12, 1239:20, 1240:3, 1240:9, 1242:4, 1242:5, 1243:12, 1243:16, 1244:8, 1244:15, 1245:8, 1245:12, 1246:13, 1246:19, 1247:17, 1248:3, 1254:5, 1257:25, 1258:8, 1258:10, 1258:22, 1282:13, 1282:15, 1287:22, 1289:11, 1290:9, 1295:8, 1295:16, 1296:8, 1296:12, 1297:8, 1297:17, 1298:2, 1299:11, 1300:16, 1311:14, 1312:11, 1314:4, 1314:20, 1315:2, 1316:2, 1316:7, 1318:23, 1323:17, 1323:21, 1324:2, 1324:13, 1328:9, 1329:5, 1329:18, 1330:3, 1330:15, 1331:19, 1332:13, 1332:23, 1333:4, 1334:20, 1334:24, 1335:2, 1335:17, 1336:17, 1337:6, 1338:8, 1338:14, 1338:16, 1340:12, 1341:5, 1342:7, 1343:10, 1345:6, 1345:13, 1347:15, 1349:8, 1349:15, 1351:4, 1351:20, 1351:25, 1353:2, 1355:11, 1357:7, 1358:3, 1360:8, 1360:13, 1360:15, 1361:4, 1361:14, 1366:17, 1376:20, 1402:1, 1402:12, 1402:24, 1403:5, 1404:1, 1409:13, 1410:15, 1414:6, 1414:20, 1416:6, 1416:17, 1417:10, 1417:14, 1418:3, 1420:18, 1421:7, 1421:10, 1421:15, 1425:2, 1426:17, 1427:9, 1429:2, 1431:17, 1433:2, 1433:16, 1435:3,

1436:19, 1437:13, 1437:25, 1438:22, 1439:22, 1442:17, 1443:18, 1444:4, 1445:4, 1445:23, 1446:24, 1448:2, 1449:3, 1451:16, 1454:24, 1456:24, 1458:5, 1459:21, 1460:25, 1462:4, 1462:17, 1464:8, 1464:15, 1465:13, 1466:2, 1469:7, 1470:11, 1471:7, 1473:17, 1474:19, 1475:4, 1477:9, 1478:10, 1481:2, 1481:23, 1482:11, 1483:10, 1484:19, 1487:25, 1490:9, 1490:24, 1492:1, 1492:13, 1506:1, 1524:3

**draft** [9] - 1322:13, 1322:18, 1326:7, 1326:16, 1329:5, 1329:6, 1329:11, 1341:19, 1348:8

**drafted** [1] - 1331:12

**drafting** [1] - 1322:2

**draw** [4] - 1240:19, 1253:14, 1294:20, 1320:1

**drawn** [1] - 1293:5

**draws** [1] - 1394:23

**dreams** [2] - 1228:13, 1300:13

**drive** [8] - 1225:15, 1263:15, 1267:17, 1277:14, 1277:19, 1277:25, 1278:19, 1301:21

**driven** [11] - 1223:3, 1259:13, 1260:1, 1288:25, 1289:4, 1423:19, 1431:5, 1470:14, 1470:23, 1507:18, 1507:20

**driver** [3] - 1474:22, 1484:14, 1485:5

**driving** [3] - 1258:3, 1471:2, 1533:13

**DRL's** [1] - 1364:23

**drop** [1] - 1358:25

**dropped** [1] - 1245:3

**drug** [159] - 1252:6, 1252:19, 1258:20, 1267:13, 1280:25, 1281:2, 1283:21, 1312:18, 1313:4,

1313:24, 1317:3, 1317:10, 1317:12, 1319:21, 1319:23, 1320:2, 1320:7, 1320:8, 1321:9, 1321:20, 1321:24, 1322:5, 1322:12, 1322:13, 1322:15, 1322:16, 1322:19, 1323:1, 1323:18, 1323:22, 1324:3, 1324:4, 1324:5, 1324:7, 1324:23, 1325:5, 1325:15, 1325:21, 1325:24, 1326:10, 1326:12, 1326:15, 1326:18, 1326:22, 1326:24, 1327:3, 1327:4, 1327:8, 1327:14, 1328:3, 1328:20, 1330:12, 1330:21, 1332:16, 1333:2, 1334:4, 1335:22, 1336:4, 1337:8, 1337:11, 1337:18, 1337:24, 1339:16, 1339:23, 1340:1, 1340:15, 1340:20, 1342:19, 1343:1, 1346:9, 1346:12, 1347:19, 1347:21, 1347:25, 1348:3, 1348:14, 1348:16, 1348:24, 1348:25, 1349:2, 1349:3, 1349:4, 1349:5, 1353:7, 1354:6, 1354:16, 1357:17, 1365:3, 1365:9, 1366:3, 1366:5, 1370:8, 1370:14, 1370:22, 1371:18, 1380:14, 1382:4, 1382:23, 1385:19, 1386:22, 1387:18, 1388:10, 1390:16, 1393:15, 1394:9, 1395:22, 1396:21, 1397:2, 1398:15, 1403:22, 1406:8, 1406:19, 1407:19, 1408:21, 1413:16, 1414:25, 1415:4, 1415:8, 1423:11, 1427:23, 1428:11, 1432:1, 1434:11, 1434:20, 1437:11, 1440:13, 1440:17, 1440:21, 1457:11, 1466:24, 1467:5,

1467:6, 1468:13, 1468:17, 1468:18, 1471:15, 1471:21, 1471:23, 1471:24, 1475:13, 1475:15, 1476:9, 1476:14, 1476:15, 1489:4, 1491:12, 1491:19, 1500:15, 1512:21, 1515:9, 1522:18, 1522:19
**Drug** [6] - 1313:2, 1313:9, 1313:11, 1370:1, 1419:18, 1469:9
**drug's** [7] - 1333:12, 1343:6, 1353:24, 1434:10, 1438:10, 1469:1, 1472:1
**drugs** [72] - 1220:1, 1220:5, 1224:4, 1232:2, 1235:1, 1267:10, 1310:4, 1310:10, 1316:13, 1316:14, 1317:1, 1317:6, 1317:7, 1317:18, 1318:16, 1319:19, 1320:5, 1320:17, 1320:22, 1320:23, 1320:24, 1321:1, 1321:25, 1323:18, 1323:22, 1339:25, 1343:23, 1419:17, 1419:19, 1423:12, 1432:6, 1433:21, 1434:4, 1434:5, 1434:12, 1434:14, 1434:22, 1434:23, 1435:19, 1436:2, 1444:25, 1446:6, 1446:8, 1446:13, 1446:18, 1447:3, 1447:5, 1447:10, 1447:13, 1447:20, 1467:13, 1468:14, 1468:20, 1468:23, 1469:22, 1469:23, 1475:9, 1475:16, 1475:19, 1476:2, 1476:5, 1476:15, 1494:10, 1507:6, 1507:9, 1520:4, 1527:25
**Drugs** [3] - 1320:19, 1321:7, 1336:14
**drugs'** [2] - 1471:10, 1472:18
**DU** [1] - 1216:2
**due** [7] - 1253:19, 1340:2, 1358:17,

1423:19, 1424:1, 1499:23, 1514:11
**duplicative** [1] - 1294:14
**duration** [48] - 1318:8, 1319:22, 1334:25, 1335:5, 1335:22, 1336:25, 1337:8, 1337:11, 1337:17, 1338:18, 1338:23, 1339:2, 1339:14, 1339:15, 1339:24, 1340:5, 1340:15, 1341:15, 1342:18, 1342:21, 1343:2, 1343:3, 1343:6, 1343:15, 1343:17, 1344:1, 1344:6, 1344:13, 1344:16, 1373:16, 1373:20, 1374:5, 1374:14, 1374:18, 1376:24, 1377:6, 1377:10, 1388:22, 1389:12, 1390:17, 1391:14, 1391:23, 1395:10, 1395:15, 1396:14, 1396:19, 1397:5
**Duration** [1] - 1336:15
**durations** [2] - 1399:1, 1406:18
**during** [20] - 1253:4, 1265:15, 1309:11, 1313:8, 1315:14, 1315:18, 1315:22, 1316:13, 1316:24, 1331:10, 1346:8, 1347:10, 1357:20, 1358:21, 1364:6, 1374:11, 1377:18, 1393:16, 1513:13, 1533:17
**duties** [1] - 1321:11
**duty** [1] - 1319:11
**dwarfs** [1] - 1233:18
**DX** [54] - 1220:18, 1220:23, 1221:1, 1242:15, 1242:23, 1242:25, 1243:2, 1251:16, 1255:4, 1255:12, 1255:13, 1255:18, 1260:23, 1261:4, 1261:12, 1262:19, 1262:20, 1262:22, 1263:17, 1263:18, 1264:18, 1264:19, 1265:23, 1266:3, 1269:8, 1269:10, 1269:12, 1271:12, 1274:6,

1274:12, 1274:19, 1276:9, 1276:12, 1276:18, 1279:1, 1279:4, 1279:6, 1286:14, 1287:12, 1298:25, 1361:22, 1362:9, 1363:24, 1376:18, 1405:8, 1407:3, 1512:25, 1513:3
**dynamic** [4] - 1236:7, 1269:20, 1300:24, 1309:10
**dynamics** [2] - 1232:17, 1238:3

# E

**e-mail** [2] - 1262:14, 1262:20
**e.g** [8] - 1330:8, 1337:20, 1339:25, 1353:14, 1353:15, 1354:8, 1382:23, 1385:19
**early** [5] - 1312:18, 1450:1, 1461:5, 1472:1, 1475:15
**earnings** [9] - 1261:13, 1261:14, 1261:18, 1261:23, 1268:23, 1269:9, 1270:2, 1276:4, 1276:10
**easier** [4] - 1247:4, 1503:2, 1517:2
**easy** [1] - 1286:22
**eat** [1] - 1356:1
**economic** [29] - 1219:1, 1220:13, 1222:13, 1223:1, 1224:13, 1225:1, 1226:14, 1226:16, 1226:20, 1228:6, 1231:3, 1231:6, 1231:17, 1235:11, 1235:23, 1236:4, 1239:5, 1244:24, 1245:9, 1245:16, 1245:18, 1246:12, 1247:12, 1247:14, 1259:3, 1288:2, 1288:8, 1289:3, 1523:21
**Economic** [1] - 1418:19
**economically** [7] - 1222:9, 1231:1, 1236:23, 1259:8, 1282:21, 1288:14,

1503:5
**economics** [20] - 1219:5, 1219:9, 1221:11, 1221:14, 1221:17, 1222:7, 1226:4, 1418:23, 1418:24, 1419:5, 1419:6, 1421:7, 1421:11, 1424:10, 1466:7, 1466:9, 1466:12, 1466:16, 1467:10, 1524:1
**Economics** [4] - 1418:20, 1420:11, 1465:15, 1466:2
**economist** [2] - 1285:3, 1494:16
**economists** [2] - 1503:1, 1503:22
**economy** [1] - 1432:4
**edit** [1] - 1326:17
**edited** [3] - 1465:14, 1466:2, 1466:4
**editing** [1] - 1322:3
**Editor** [1] - 1418:19
**educated** [1] - 1306:24
**education** [5] - 1219:3, 1314:11, 1315:9, 1320:1, 1380:6
**educational** [3] - 1315:2, 1418:21, 1420:23
**effect** [4] - 1346:2, 1388:24, 1412:5, 1450:19
**effected** [3] - 1375:21, 1376:11, 1384:7
**effective** [23] - 1317:14, 1326:23, 1327:8, 1330:12, 1330:21, 1336:10, 1339:16, 1344:23, 1345:16, 1348:18, 1348:21, 1350:22, 1351:16, 1352:9, 1354:7, 1354:16, 1354:21, 1390:22, 1412:12, 1413:16, 1419:17, 1480:22, 1482:3
**effectively** [2] - 1317:11, 1333:3
**effectiveness** [9] - 1271:3, 1322:16, 1333:12, 1339:23, 1353:8, 1353:15, 1353:25, 1396:2, 1396:22

**effects** [6] - 1346:9, 1346:12, 1346:17, 1349:22, 1351:5, 1351:12
**efficacious** [1] - 1483:5
**efficacy** [11] - 1324:9, 1324:10, 1337:10, 1340:4, 1381:19, 1382:8, 1383:1, 1386:1, 1387:3, 1388:13, 1390:13
**Effort** [1] - 1478:13
**efforts** [8] - 1259:19, 1260:2, 1262:10, 1262:15, 1268:16, 1269:21, 1375:4, 1476:25
**egregious** [1] - 1297:13
**eight** [3] - 1305:5, 1425:11, 1519:20
**EIMERIC** [1] - 1217:5
**either** [13] - 1250:4, 1396:10, 1400:7, 1400:20, 1411:22, 1412:3, 1440:14, 1442:12, 1449:5, 1457:2, 1484:12, 1487:18, 1507:6
**ELAINA** [1] - 1216:15
**elderly** [3] - 1432:2, 1432:5, 1432:11
**element** [3] - 1326:13, 1378:11, 1410:2
**elements** [3] - 1326:9, 1326:12, 1448:3
**Elevate** [1] - 1264:1
**elevations** [1] - 1347:3
**elicit** [1] - 1451:14
**ELIKAN** [1] - 1216:15
**eliminated** [1] - 1364:15
**elimination** [1] - 1359:13
**elsewhere** [2] - 1276:7, 1396:16
**emetics** [1] - 1353:14
**emphasize** [1] - 1380:17
**emphasizing** [1] - 1349:6
**employ** [2] - 1372:20, 1375:24
**employed** [6] - 1218:24, 1312:11, 1312:13, 1312:14, 1418:4, 1418:6
**employer** [1] - 1432:12

**enable** [2] - 1330:12, 1330:21
**enabled** [1] - 1489:8
**encourage** [13] - 1275:19, 1278:3, 1326:22, 1334:9, 1372:20, 1373:15, 1390:18, 1394:25, 1395:23, 1396:12, 1411:22, 1411:25, 1412:2
**encouragement** [6] - 1368:3, 1378:15, 1379:1, 1394:18, 1398:22, 1416:14
**encourages** [15] - 1277:6, 1359:21, 1373:17, 1378:13, 1389:19, 1391:11, 1392:11, 1393:2, 1393:14, 1393:18, 1395:3, 1403:23, 1406:4, 1412:6, 1412:15
**encouraging** [3] - 1341:14, 1378:4, 1389:23
**end** [18] - 1308:3, 1308:7, 1309:4, 1309:8, 1310:4, 1324:4, 1326:18, 1365:24, 1366:15, 1370:25, 1400:14, 1401:1, 1401:5, 1401:22, 1453:9, 1476:7, 1505:7, 1522:3
**ended** [6] - 1460:7, 1461:3, 1461:14, 1463:3, 1463:9, 1533:20
**ending** [3] - 1294:6, 1462:6, 1463:23
**endorse** [2] - 1397:25, 1537:9
**endpoint** [2] - 1398:18, 1398:20
**engage** [11] - 1315:18, 1364:4, 1375:5, 1375:13, 1377:15, 1377:21, 1379:25, 1380:8, 1381:9, 1382:15, 1416:25
**engaged** [2] - 1220:9, 1316:2
**engages** [2] - 1319:16, 1348:5
**engaging** [1] - 1319:25
**enhance** [2] -

1353:15, 1353:25
**enhanced** [1] - 1275:18
**enrolled** [3] - 1405:14, 1523:4, 1525:1
**ensure** [2] - 1319:4, 1339:15
**enter** [17] - 1220:22, 1234:2, 1446:19, 1448:17, 1461:23, 1473:2, 1474:7, 1474:11, 1483:23, 1489:25, 1490:1, 1504:20, 1504:22, 1505:6, 1510:14, 1515:25
**entered** [3] - 1268:3, 1269:1, 1515:25
**entering** [1] - 1515:20
**enters** [3] - 1437:6, 1437:9, 1475:23
**entire** [14] - 1235:5, 1252:25, 1282:23, 1287:23, 1309:12, 1330:25, 1439:16, 1442:13, 1443:3, 1456:25, 1458:25, 1468:13, 1512:22, 1538:23
**entirely** [6] - 1246:17, 1295:21, 1296:2, 1297:11, 1368:7, 1391:8
**entirety** [4] - 1288:9, 1289:7, 1330:13, 1331:14
**entitled** [22] - 1233:22, 1234:15, 1251:4, 1260:11, 1263:17, 1264:18, 1265:2, 1265:23, 1268:13, 1270:18, 1272:15, 1274:6, 1275:22, 1278:7, 1279:2, 1279:11, 1287:18, 1332:20, 1335:14, 1342:4, 1524:8, 1540:3
**entrants** [1] - 1476:1
**entrenched** [2] - 1536:14, 1537:3
**entry** [4] - 1446:9, 1446:18, 1448:14, 1448:19
**enumerated** [2] - 1426:3, 1487:1
**enumerating** [1] - 1536:25
**EPA** [2] - 1493:23, 1531:6

**epidemiologic** [1] - 1527:23
**epidemiological** [1] - 1358:20
**epilepsy** [1] - 1354:8
**equal** [2] - 1457:14, 1476:2
**equally** [3] - 1334:15, 1351:12, 1520:15
**equated** [1] - 1519:24
**equivalents** [1] - 1283:21
**ERIC** [1] - 1216:16
**Ernie** [1] - 1445:6
**errors** [1] - 1505:18
**especially** [1] - 1239:17
**essential** [9] - 1324:6, 1324:8, 1327:7, 1330:11, 1330:20, 1330:22, 1331:2, 1333:19, 1339:15
**essentially** [12] - 1222:5, 1251:8, 1265:19, 1279:23, 1287:22, 1288:8, 1302:10, 1334:19, 1440:8, 1443:1, 1491:5, 1520:7
**establish** [10] - 1223:8, 1223:12, 1236:24, 1249:2, 1292:15, 1306:5, 1351:15, 1399:8, 1409:4, 1476:4
**established** [10] - 1222:6, 1269:18, 1285:2, 1319:4, 1319:10, 1380:24, 1384:25, 1476:3, 1476:8, 1494:25
**establishing** [1] - 1386:20
**estimate** [7] - 1250:10, 1302:24, 1303:3, 1317:23, 1322:7, 1449:17, 1510:2
**estimated** [4] - 1246:14, 1460:7, 1491:9, 1491:15
**estimates** [3] - 1452:16, 1499:22, 1534:21
**estimating** [1] - 1470:4
**estimation** [1] - 1254:5
**et** [4] - 1216:8, 1219:14, 1219:21, 1222:15

**ethyl** [6] - 1226:2, 1250:7, 1377:17, 1377:18, 1380:10, 1407:6
**evaluate** [7] - 1232:6, 1245:9, 1317:12, 1398:23, 1475:8, 1477:19, 1520:4
**evaluated** [2] - 1318:3, 1339:22
**evaluating** [5] - 1321:25, 1322:1, 1347:18, 1348:20, 1476:25
**evaluation** [2] - 1348:21, 1506:5
**Evaluation** [2] - 1313:9, 1313:12
**evaluations** [1] - 1283:22
**evaporates** [1] - 1245:6
**event** [12] - 1224:16, 1247:10, 1290:25, 1297:16, 1298:16, 1468:1, 1501:11, 1507:23, 1517:22, 1521:19, 1532:24, 1535:1
**events** [4] - 1415:5, 1422:1, 1426:24, 1523:7
**evidence** [161] - 1220:23, 1221:2, 1222:10, 1224:13, 1224:23, 1224:25, 1225:12, 1228:24, 1230:6, 1230:7, 1234:3, 1234:11, 1234:12, 1235:19, 1235:23, 1236:4, 1236:9, 1236:11, 1236:13, 1236:22, 1236:24, 1239:12, 1242:21, 1243:4, 1243:9, 1245:25, 1246:4, 1247:13, 1247:23, 1247:24, 1248:4, 1251:20, 1251:24, 1253:18, 1254:23, 1254:24, 1255:9, 1255:22, 1256:4, 1260:4, 1260:24, 1262:5, 1262:23, 1263:1, 1263:19, 1263:22, 1264:20, 1264:23, 1266:4, 1266:10, 1266:14, 1268:5, 1269:10, 1269:13,

1269:23, 1271:14,
1271:17, 1271:23,
1274:12, 1274:17,
1274:20, 1274:22,
1275:1, 1276:1,
1276:12, 1276:15,
1279:4, 1279:8,
1280:15, 1284:21,
1286:15, 1286:19,
1287:12, 1287:15,
1287:19, 1289:8,
1291:13, 1293:4,
1295:14, 1296:18,
1298:9, 1299:20,
1308:15, 1308:19,
1314:18, 1329:3,
1332:11, 1341:24,
1342:2, 1349:13,
1369:15, 1387:25,
1388:4, 1398:16,
1400:9, 1401:14,
1421:2, 1421:5,
1424:14, 1426:15,
1428:23, 1430:24,
1432:20, 1432:23,
1435:18, 1436:11,
1437:20, 1443:8,
1443:14, 1445:12,
1445:22, 1453:24,
1454:7, 1456:20,
1458:1, 1459:17,
1461:23, 1462:2,
1462:13, 1463:18,
1464:3, 1464:6,
1467:18, 1467:20,
1468:7, 1469:14,
1469:17, 1470:2,
1470:13, 1470:22,
1471:1, 1472:23,
1473:13, 1474:2,
1474:17, 1478:3,
1478:6, 1481:14,
1481:17, 1482:19,
1482:22, 1483:23,
1484:1, 1485:18,
1486:18, 1487:11,
1487:21, 1490:5,
1492:3, 1492:11,
1515:25, 1517:8,
1527:8, 1530:12,
1530:15, 1532:15,
1532:17, 1533:9
**Evidence** [2] -
1255:24, 1274:23
**EVIDENCE** [3] -
1540:19, 1541:3,
1542:4
**evident** [2] - 1248:14,
1257:4
**ex** [1] - 1453:1

**exacerbated** [1] -
1249:16
**exact** [1] - 1346:17
**exactly** [4] - 1380:7,
1390:20, 1408:19,
1528:22
**Examination** [5] -
1540:9, 1540:10,
1540:12, 1540:13,
1540:16
**examination** [10] -
1291:20, 1355:16,
1355:19, 1401:17,
1451:6, 1533:17,
1534:16, 1538:15,
1540:10, 1540:16
**EXAMINATION** [7] -
1218:22, 1292:7,
1312:9, 1357:12,
1414:4, 1418:1,
1492:17
**examine** [3] - 1372:9,
1451:4, 1477:1
**examined** [2] -
1423:5, 1470:21
**examining** [1] -
1419:16
**example** [20] - 1240:5,
1247:19, 1276:24,
1297:14, 1370:20,
1371:17, 1386:9,
1386:11, 1386:23,
1387:16, 1412:9,
1415:2, 1415:4,
1419:14, 1456:5,
1462:20, 1497:12,
1503:9, 1516:23,
1527:20
**examples** [7] -
1236:19, 1246:7,
1277:11, 1307:15,
1316:7, 1330:19,
1419:16
**exceed** [1] - 1451:21
**exceeded** [1] - 1461:3
**exceeding** [1] -
1444:16
**exceeds** [5] - 1343:17,
1441:13, 1447:10,
1459:3, 1521:18
**except** [1] - 1475:20
**excerpt** [1] - 1516:17
**excessive** [1] - 1474:2
**exclude** [3] - 1465:3,
1521:2, 1522:2
**excluded** [2] - 1504:6,
1520:23
**excluding** [2] -
1253:9, 1521:6
**exclusivity** [7] -

1310:2, 1442:4,
1446:9, 1448:10,
1453:9, 1475:23,
1504:19
**excuse** [3] - 1262:19,
1276:9, 1289:10
**excused** [3] - 1311:7,
1417:12, 1538:6
**executes** [1] - 1325:14
**executive** [1] - 1313:3
**exemplary** [1] -
1265:8
**exercise** [16] -
1285:11, 1359:2,
1362:18, 1362:20,
1375:5, 1375:13,
1376:4, 1380:3,
1380:18, 1381:16,
1389:8, 1392:12,
1393:3, 1393:19,
1397:9, 1397:17
**exercises** [1] - 1358:9
**exercising** [1] -
1398:10
**exhibit** [65] - 1229:22,
1230:1, 1234:8,
1235:15, 1243:6,
1245:20, 1245:22,
1246:1, 1246:3,
1246:10, 1251:17,
1251:20, 1251:23,
1252:3, 1254:23,
1254:25, 1265:5,
1265:23, 1266:1,
1266:10, 1266:20,
1267:1, 1267:2,
1268:13, 1274:6,
1274:8, 1274:15,
1274:17, 1279:1,
1279:7, 1279:15,
1280:4, 1284:20,
1285:14, 1285:22,
1286:17, 1286:19,
1301:18, 1426:5,
1428:14, 1430:14,
1436:8, 1437:17,
1453:21, 1456:17,
1457:22, 1459:14,
1468:15, 1473:2,
1474:8, 1485:15,
1487:21, 1487:22,
1489:25, 1506:22,
1515:11, 1515:15,
1515:21, 1516:6,
1516:10, 1516:17,
1516:23, 1530:18,
1533:17, 1534:9
**Exhibit** [76] - 1221:2,
1229:17, 1230:6,
1230:7, 1234:11,

1234:12, 1235:19,
1243:9, 1246:4,
1251:24, 1262:5,
1263:1, 1263:22,
1264:23, 1269:13,
1271:23, 1275:1,
1276:15, 1279:8,
1280:15, 1287:15,
1297:15, 1308:19,
1314:18, 1329:3,
1332:11, 1342:2,
1388:4, 1421:5,
1428:23, 1430:19,
1432:23, 1436:11,
1437:20, 1443:14,
1445:22, 1446:21,
1453:24, 1456:20,
1458:1, 1459:17,
1462:2, 1462:13,
1464:6, 1468:6,
1468:7, 1469:17,
1473:13, 1474:17,
1478:6, 1481:17,
1482:22, 1484:1,
1485:18, 1486:18,
1487:10, 1490:5,
1492:3, 1492:11,
1513:21, 1515:25,
1516:3, 1516:10,
1516:11, 1516:12,
1516:19, 1517:3,
1517:8, 1520:22,
1528:2, 1530:12,
1530:15, 1532:10,
1536:3, 1538:13,
1538:16
**exhibited** [1] - 1228:8
**Exhibits** [6] - 1243:4,
1256:4, 1266:14,
1426:15, 1430:24,
1454:7
**exhibits** [11] - 1229:6,
1229:8, 1229:13,
1242:21, 1245:21,
1255:5, 1255:21,
1255:23, 1428:19,
1486:17, 1487:9
**EXHIBITS** [7] -
1540:19, 1541:3,
1541:21, 1542:4,
1542:10, 1542:21,
1543:1
**existed** [1] - 1309:10
**existence** [1] - 1288:5,
1293:23
**existing** [1] - 1270:14
**expand** [1] - 1257:12,
1268:17, 1269:3
**expanded** [1] -
1267:23

**expect** [10] - 1269:2,
1269:20, 1276:19,
1304:1, 1346:20,
1351:8, 1424:10,
1440:22, 1460:15,
1503:16
**expectation** [2] -
1457:16, 1539:3
**expectations** [2] -
1507:21, 1507:22
**expected** [12] -
1440:14, 1442:13,
1443:23, 1444:8,
1444:11, 1446:19,
1448:22, 1457:9,
1459:1, 1489:4,
1502:20, 1503:20
**expecting** [1] -
1440:21
**expenditure** [1] -
1474:20
**expenditures** [5] -
1280:2, 1425:14,
1456:7, 1471:9,
1472:5
**expense** [2] - 1525:10,
1525:16
**expenses** [5] -
1227:10, 1227:11,
1227:12, 1227:18,
1230:17, 1230:18,
1265:18, 1455:9
**expensive** [8] -
1419:20, 1428:1,
1434:18, 1434:22,
1434:24, 1476:7,
1476:8, 1489:17
**experience** [16] -
1254:10, 1254:11,
1293:12, 1293:14,
1314:12, 1318:18,
1320:2, 1346:16,
1346:20, 1347:5,
1380:6, 1420:24,
1439:5, 1500:10,
1503:10, 1506:15
**experienced** [4] -
1242:2, 1403:19,
1446:8, 1446:18
**experiences** [1] -
1222:9
**expert** [46] - 1221:5,
1221:6, 1221:10,
1221:14, 1221:17,
1283:8, 1283:15,
1283:16, 1283:19,
1285:4, 1294:6,
1298:3, 1298:21,
1299:2, 1299:8,
1299:11, 1305:21,

21

1313:15, 1313:24, 1323:17, 1323:21, 1365:15, 1367:14, 1369:5, 1372:24, 1373:9, 1376:2, 1382:20, 1383:6, 1395:6, 1398:15, 1403:25, 1410:17, 1421:7, 1421:11, 1450:5, 1451:14, 1466:9, 1466:12, 1468:2, 1513:3, 1515:21, 1524:15, 1537:8, 1537:10, 1537:17

**expertise** [3] - 1294:20, 1313:23, 1321:18

**experts** [3] - 1222:23, 1511:3, 1511:17

**explain** [24] - 1223:24, 1225:7, 1225:17, 1226:5, 1231:12, 1235:24, 1238:11, 1243:25, 1249:8, 1251:5, 1259:18, 1267:6, 1272:18, 1278:11, 1320:14, 1323:7, 1334:17, 1343:10, 1343:22, 1381:4, 1387:15, 1442:21, 1448:2, 1453:7

**explained** [5] - 1234:20, 1248:23, 1327:1, 1333:18, 1391:16

**explaining** [5] - 1249:11, 1270:3, 1321:8, 1443:23, 1485:7

**explains** [2] - 1225:12, 1325:12

**explanation** [1] - 1514:14

**explicit** [2] - 1390:5, 1412:10

**express** [2] - 1334:14, 1412:7

**expressed** [7] - 1234:24, 1273:2, 1273:9, 1296:10, 1301:3, 1334:15, 1365:16

**expresses** [2] - 1279:17, 1396:18

**expressing** [1] - 1272:10

**extended** [4] - 1318:14, 1468:15,

1468:23, 1517:25

**extensive** [1] - 1259:20

**extensively** [1] - 1298:6

**extent** [14] - 1255:19, 1266:18, 1266:24, 1271:21, 1285:13, 1343:16, 1409:9, 1473:7, 1473:11, 1477:1, 1479:9, 1537:4, 1537:5, 1538:11

**extrapolated** [1] - 1517:25

**extrapolation** [1] - 1518:13

**extrapolations** [1] - 1453:10

**extreme** [3] - 1246:23, 1246:24, 1387:12

**extrinsic** [8] - 1225:15, 1250:1, 1259:13, 1259:15, 1291:8, 1293:2, 1303:18, 1304:9

**eyes** [1] - 1396:20

## F

**face** [1] - 1466:23

**FaceBook** [1] - 1264:16

**faces** [1] - 1307:12

**facie** [1] - 1293:20

**facilitate** [1] - 1333:1

**facing** [1] - 1442:14

**fact** [25] - 1225:13, 1228:8, 1235:6, 1241:7, 1253:20, 1282:4, 1294:5, 1295:3, 1296:2, 1303:19, 1305:3, 1310:9, 1344:16, 1347:10, 1349:8, 1350:13, 1367:21, 1377:8, 1396:21, 1398:25, 1406:11, 1498:7, 1505:2, 1517:17, 1535:1

**factor** [2] - 1303:18, 1414:12

**factors** [19] - 1223:5, 1225:15, 1249:21, 1250:1, 1259:13, 1259:15, 1277:19, 1291:8, 1292:17, 1292:18, 1292:19, 1292:23, 1293:2, 1304:9, 1424:1,

1424:16, 1470:14, 1499:24, 1499:25

**factory** [1] - 1440:6

**facts** [3] - 1295:23, 1296:22, 1307:1

**facts-and-circumstances** [1] - 1307:1

**fail** [2] - 1381:7, 1381:15

**failed** [1] - 1236:2

**failure** [2] - 1382:13

**fair** [25] - 1300:18, 1308:2, 1410:15, 1451:19, 1495:15, 1495:20, 1496:2, 1496:5, 1496:16, 1497:15, 1497:21, 1502:13, 1502:25, 1506:6, 1509:11, 1513:16, 1520:9, 1520:14, 1522:24, 1524:18, 1530:6, 1531:18, 1534:25, 1536:1, 1537:11

**fairly** [1] - 1509:2

**faith** [4] - 1236:17, 1300:22, 1302:24, 1303:3

**fall** [7] - 1225:9, 1250:24, 1253:5, 1309:19, 1394:2, 1397:9, 1527:13

**falls** [2] - 1437:5, 1524:9

**familiar** [7] - 1306:11, 1347:15, 1401:8, 1404:12, 1436:14, 1505:15

**families** [1] - 1319:7

**far** [9] - 1227:25, 1233:1, 1236:2, 1238:6, 1245:11, 1274:22, 1346:5, 1440:2, 1446:25

**FARNOLY** [1] - 1216:16

**fashion** [1] - 1518:1

**faster** [1] - 1470:6

**fatty** [6] - 1433:25, 1435:9, 1435:15, 1435:25, 1436:21, 1437:1

**favorable** [2] - 1502:12

**FDA** [149] - 1256:23, 1258:19, 1258:20, 1259:1, 1287:7, 1288:12, 1298:8, 1299:13, 1299:19,

1300:1, 1313:5, 1313:7, 1315:22, 1316:24, 1320:2, 1320:8, 1320:10, 1320:15, 1320:16, 1321:6, 1321:14, 1322:19, 1322:24, 1323:5, 1323:17, 1323:21, 1324:5, 1324:6, 1324:24, 1325:1, 1325:2, 1325:5, 1325:8, 1325:10, 1325:12, 1325:14, 1325:15, 1325:24, 1326:7, 1326:11, 1326:17, 1326:18, 1326:24, 1327:22, 1327:25, 1328:14, 1329:19, 1330:25, 1331:2, 1331:4, 1331:12, 1332:2, 1335:11, 1336:8, 1336:9, 1336:18, 1337:10, 1337:24, 1338:3, 1338:16, 1338:21, 1339:4, 1340:13, 1342:7, 1343:22, 1343:25, 1344:3, 1344:9, 1344:19, 1344:22, 1345:16, 1347:5, 1347:12, 1347:18, 1347:23, 1348:7, 1348:8, 1348:10, 1348:17, 1348:25, 1349:4, 1350:21, 1351:16, 1352:8, 1352:22, 1353:3, 1353:23, 1354:15, 1354:20, 1355:7, 1364:13, 1367:4, 1367:5, 1367:16, 1367:23, 1367:25, 1368:2, 1368:4, 1368:12, 1368:16, 1368:19, 1368:23, 1368:25, 1369:6, 1372:20, 1373:2, 1373:22, 1377:2, 1377:25, 1378:7, 1378:14, 1378:20, 1379:14, 1381:19, 1382:8, 1382:14, 1383:1, 1385:25, 1387:10, 1387:14, 1388:13, 1388:15, 1394:7, 1394:25, 1395:1, 1395:14, 1395:24, 1396:13, 1397:11, 1398:1, 1398:15,

1398:19, 1398:20, 1403:25, 1404:9, 1407:11, 1407:21, 1408:10, 1408:19, 1408:20, 1410:1, 1410:3, 1410:7, 1410:20, 1411:1, 1529:18, 1531:21

**FDA's** [34] - 1283:21, 1322:25, 1323:6, 1323:13, 1329:10, 1329:12, 1329:22, 1330:15, 1333:4, 1333:7, 1333:16, 1337:6, 1337:22, 1339:18, 1340:16, 1340:21, 1342:23, 1343:19, 1345:20, 1348:13, 1352:12, 1352:16, 1353:19, 1354:13, 1369:12, 1390:15, 1394:2, 1395:13, 1396:1, 1396:23, 1397:10, 1398:12, 1398:14, 1410:16

**FDA-approved** [8] - 1320:2, 1348:25, 1349:4, 1367:4, 1367:5, 1367:16, 1398:1, 1529:18

**feature** [4] - 1292:16, 1293:1, 1414:12, 1422:18

**featured** [1] - 1470:19

**features** [26] - 1292:20, 1421:19, 1423:20, 1423:25, 1428:3, 1429:15, 1434:20, 1470:15, 1470:19, 1471:2, 1477:2, 1479:22, 1480:6, 1480:23, 1482:6, 1483:16, 1484:10, 1486:10, 1496:8, 1496:11, 1526:10, 1526:14, 1527:10, 1532:17, 1532:21, 1533:11

**featuring** [2] - 1477:2, 1484:8

**February** [4] - 1363:23, 1450:2, 1455:14, 1463:13

**Federal** [2] - 1255:23, 1274:23

**federal** [2] - 1221:6, 1221:11

**feed** [1] - 1447:15

**feedback** [1] - 1295:4

22

**fellowship** [1] - 1316:15

**felt** [1] - 1394:7

**fenofibrate** [4] - 1220:8, 1233:9, 1310:4, 1310:10

**fenofibrates** [6] - 1232:2, 1235:9, 1309:19, 1309:23, 1310:1, 1434:7

**few** [13] - 1219:24, 1232:9, 1232:10, 1247:3, 1292:3, 1293:9, 1305:8, 1335:11, 1345:3, 1357:10, 1361:19, 1363:18, 1459:11

**field** [6] - 1245:17, 1316:11, 1318:11, 1419:8, 1466:16, 1468:2

**fifth** [1] - 1444:3

**fight** [1] - 1256:23

**figure** [20] - 1250:22, 1426:1, 1429:3, 1430:5, 1430:7, 1434:15, 1439:13, 1439:15, 1449:13, 1458:6, 1458:7, 1468:19, 1475:10, 1475:11, 1486:2, 1497:25, 1502:8, 1512:10, 1518:23, 1521:8

**Figure** [3] - 1469:20, 1469:21

**figures** [4] - 1439:12, 1439:17, 1453:12, 1456:4

**file** [1] - 1326:15

**filed** [2] - 1422:14, 1426:2

**files** [1] - 1268:7

**filings** [3] - 1498:22, 1498:25, 1500:19

**fill** [2] - 1275:17, 1280:24

**filled** [8] - 1277:2, 1423:7, 1427:11, 1427:13, 1427:14, 1485:8, 1488:25, 1489:1

**filling** [1] - 1486:7

**final** [2] - 1342:15, 1519:24

**finally** [4] - 1423:14, 1470:24, 1472:11, 1490:23

**Finance** [1] - 1442:19

**finance** [8] - 1219:1,

1420:6, 1442:20, 1442:22, 1442:23, 1442:24, 1444:24, 1489:17

**Financial** [3] - 1265:24, 1279:2, 1505:24

**financial** [18] - 1230:9, 1237:1, 1242:16, 1277:21, 1278:4, 1303:18, 1304:18, 1426:1, 1430:9, 1459:11, 1463:2, 1487:1, 1498:17, 1501:25, 1503:6, 1505:9, 1522:5, 1525:12

**findings** [3] - 1531:10, 1531:21, 1532:4

**fine** [5] - 1299:9, 1355:17, 1395:4, 1409:16, 1516:25

**finish** [1] - 1539:8

**firm** [4] - 1219:1, 1312:17, 1506:11, 1526:3

**firms** [15] - 1431:13, 1431:23, 1433:7, 1440:3, 1441:5, 1448:23, 1450:8, 1452:14, 1466:23, 1471:20, 1475:14, 1475:22, 1505:22, 1507:8

**first** [60] - 1218:17, 1223:19, 1223:20, 1224:23, 1245:5, 1250:5, 1258:23, 1260:14, 1261:5, 1268:15, 1269:9, 1276:8, 1276:10, 1283:5, 1285:23, 1289:18, 1306:18, 1311:24, 1312:3, 1321:23, 1322:17, 1332:24, 1336:20, 1339:10, 1339:11, 1342:17, 1346:3, 1352:2, 1353:11, 1369:4, 1376:3, 1382:21, 1383:14, 1385:10, 1386:14, 1388:9, 1409:16, 1417:20, 1431:7, 1433:22, 1442:3, 1444:1, 1444:6, 1446:17, 1447:1, 1462:22, 1462:24, 1463:8, 1470:13, 1471:10, 1471:12,

1471:19, 1471:21, 1476:5, 1479:13, 1488:17, 1490:12, 1498:19, 1525:22

**fiscal** [1] - 1462:5

**fish** [1] - 1281:21

**fit** [3] - 1252:21, 1257:23, 1378:11

**Fitzgerald** [1] - 1247:4

**five** [40] - 1246:15, 1285:24, 1297:10, 1299:17, 1320:20, 1434:6, 1437:7, 1447:5, 1448:11, 1449:11, 1450:8, 1452:12, 1452:23, 1453:4, 1454:5, 1455:2, 1455:15, 1455:16, 1455:17, 1456:15, 1457:6, 1460:6, 1460:18, 1464:25, 1475:10, 1475:17, 1504:9, 1504:23, 1505:9, 1508:22, 1509:13, 1515:2, 1517:17, 1518:2, 1518:19, 1520:7, 1520:16, 1521:12

**five-analyst** [1] - 1509:13

**five-year** [1] - 1447:5

**fixed** [1] - 1281:18

**flawed** [2] - 1238:10, 1290:17

**flow** [6] - 1444:12, 1457:1, 1457:12, 1458:9, 1486:22

**flows** [6] - 1440:16, 1442:11, 1442:12, 1458:10, 1470:2, 1520:10

**flyers** [1] - 1264:12

**focus** [19] - 1294:1, 1316:11, 1345:11, 1350:4, 1364:20, 1369:4, 1376:15, 1377:20, 1405:13, 1406:23, 1408:24, 1419:5, 1446:25, 1478:12, 1479:13, 1481:21, 1485:1, 1506:1, 1509:15

**focused** [6] - 1297:11, 1398:20, 1425:16, 1425:19, 1509:16, 1532:23

**focuses** [2] - 1278:15, 1317:6

**focusing** [1] - 1373:13

**fold** [2] - 1305:5, 1491:16

**folic** [3] - 1386:13, 1387:1, 1388:9

**follow** [10] - 1237:16, 1284:13, 1285:21, 1306:21, 1326:24, 1393:13, 1402:8, 1448:13, 1524:19

**follow-on** [1] - 1306:21

**follow-up** [4] - 1284:13, 1285:21, 1448:13, 1524:19

**followed** [3] - 1315:19, 1392:1, 1426:22

**following** [2] - 1283:20, 1342:11

**follows** [8] - 1218:14, 1311:22, 1330:6, 1337:15, 1339:21, 1342:17, 1354:5, 1417:18

**Food** [1] - 1419:18

**foothold** [1] - 1476:11

**footing** [1] - 1457:14

**footnote** [3] - 1302:9, 1350:13, 1369:19

**FOR** [4] - 1216:14, 1216:19, 1217:3, 1217:10

**Force** [1] - 1319:6

**force** [3] - 1267:20, 1270:15, 1479:8

**forecast** [47] - 1228:12, 1237:20, 1238:7, 1241:10, 1242:6, 1243:14, 1295:25, 1300:11, 1446:18, 1449:16, 1449:22, 1450:14, 1452:24, 1453:5, 1453:8, 1455:21, 1455:24, 1456:3, 1456:10, 1458:14, 1460:16, 1460:19, 1461:6, 1461:7, 1461:15, 1463:5, 1463:11, 1502:14, 1502:24, 1503:2, 1504:3, 1504:10, 1505:18, 1507:14, 1508:4, 1509:24, 1510:13, 1512:17, 1513:24, 1514:13, 1518:13, 1518:25, 1519:10, 1519:13, 1519:15, 1520:24

**forecasted** [9] -

1235:22, 1448:12, 1449:5, 1449:18, 1449:19, 1450:7, 1455:1, 1455:4, 1455:16

**forecasting** [15] - 1236:16, 1237:10, 1458:17, 1460:5, 1461:2, 1461:11, 1461:13, 1462:24, 1463:7, 1500:14, 1500:18, 1501:19, 1503:13, 1508:1, 1520:23

**forecasts** [45] - 1224:11, 1236:3, 1236:18, 1236:20, 1237:2, 1237:4, 1237:5, 1237:7, 1237:9, 1237:12, 1237:13, 1237:18, 1238:6, 1238:19, 1239:21, 1239:24, 1240:1, 1240:15, 1240:16, 1240:22, 1240:25, 1244:16, 1245:5, 1246:9, 1247:2, 1300:12, 1300:18, 1449:11, 1449:24, 1460:14, 1502:18, 1502:19, 1503:20, 1503:23, 1505:9, 1507:19, 1512:6, 1514:6, 1519:6, 1520:7, 1522:5, 1522:23, 1522:24

**foregoing** [2] - 1424:13, 1540:2

**form** [7] - 1236:25, 1263:13, 1272:2, 1277:22, 1374:15, 1448:11, 1500:1

**format** [8] - 1322:4, 1323:5, 1325:11, 1327:2, 1327:5, 1328:15, 1329:20, 1331:22

**formed** [3] - 1332:17, 1433:18, 1433:20

**former** [1] - 1466:4

**forming** [19] - 1328:21, 1332:4, 1334:11, 1341:20, 1349:19, 1432:16, 1443:4, 1445:8, 1448:3, 1461:19, 1462:7, 1463:14, 1463:24, 1465:17, 1469:10, 1477:24,

1481:10, 1482:15,
1483:19
**formulary** [1] - 1281:2
**forth** [6] - 1292:21,
1307:7, 1320:18,
1324:12, 1325:22,
1429:23
**forward** [9] - 1249:13,
1254:11, 1291:6,
1296:8, 1296:12,
1296:14, 1296:20,
1300:17, 1301:4
**forward-looking** [5] -
1249:13, 1296:8,
1296:12, 1296:14,
1300:17
**forwarded** [1] -
1262:20
**Foundation** [1] -
1419:24
**foundation** [3] -
1261:10, 1465:23,
1468:2
**founded** [2] - 1312:14,
1313:1
**four** [13] - 1242:14,
1294:5, 1294:12,
1301:25, 1315:8,
1398:9, 1435:15,
1437:2, 1447:9,
1470:6, 1472:7,
1486:17, 1492:22
**four-year** [1] - 1315:8
**fourth** [4] - 1246:17,
1261:13, 1263:25,
1536:13
**fraction** [3] - 1253:22,
1281:8, 1359:6
**frame** [2] - 1533:22,
1534:7
**framework** [1] -
1226:6
**Francisco** [5] -
1217:6, 1301:15,
1312:24, 1316:16,
1316:19
**FRE** [12] - 1426:5,
1428:14, 1430:14,
1436:8, 1437:17,
1453:21, 1456:17,
1457:22, 1459:14,
1473:3, 1474:8,
1485:15
**free** [3] - 1275:15,
1276:25, 1402:8
**French** [3] - 1216:22,
1540:4, 1540:4
**frequency** [4] -
1250:23, 1268:19,
1319:22, 1341:15

**Friday** [1] - 1539:17
**front** [11] - 1277:12,
1294:9, 1298:23,
1314:7, 1327:14,
1383:16, 1471:20,
1499:18, 1501:22,
1506:22, 1528:9
**front-loaded** [1] -
1471:20
**fruition** [1] - 1238:20
**Fulbright** [1] - 1315:6
**fulfillment** [5] -
1275:18, 1275:20,
1277:7, 1278:4,
1281:5
**full** [13] - 1218:16,
1311:24, 1312:3,
1315:14, 1327:10,
1327:18, 1339:10,
1386:14, 1416:4,
1442:1, 1444:1,
1461:6, 1536:23
**full-time** [1] - 1315:14
**functions** [1] -
1294:25
**FUNDAKOWSKI** [1] -
1216:19
**fundamentally** [1] -
1236:5
**funded** [1] - 1419:23
**funds** [5] - 1419:22,
1440:21, 1457:11,
1475:21, 1495:4,
1503:1, 1503:3,
1503:19
**future** [44] - 1224:12,
1224:17, 1235:22,
1236:6, 1236:11,
1236:14, 1237:10,
1238:6, 1239:2,
1240:16, 1244:16,
1244:20, 1246:20,
1246:25, 1247:22,
1248:12, 1248:13,
1248:14, 1248:18,
1249:5, 1249:17,
1257:21, 1257:25,
1258:3, 1258:25,
1259:6, 1259:7,
1259:9, 1290:10,
1298:14, 1300:23,
1301:22, 1457:17,
1499:22, 1500:5,
1500:9, 1500:14,
1501:12, 1502:17,
1502:19, 1507:16,
1517:14

## G

**gain** [2] - 1322:14,
1476:11

**gained** [1] - 1297:21
**garner** [5] - 1233:14,
1235:3, 1235:11,
1290:4, 1309:16
**gears** [2] - 1345:2,
1502:9
**gemfibrozil** [4] -
1232:3, 1233:10,
1235:10, 1434:7
**gender** [1] - 1415:17
**General** [1] - 1330:4
**general** [23] - 1227:11,
1227:17, 1281:23,
1305:8, 1305:13,
1305:23, 1309:19,
1336:7, 1348:4,
1353:2, 1364:25,
1366:7, 1383:14,
1385:11, 1404:13,
1414:10, 1451:15,
1452:19, 1455:11,
1469:2, 1476:2,
1500:11, 1507:20
**generally** [21] -
1237:19, 1237:21,
1276:25, 1306:11,
1313:22, 1325:8,
1339:13, 1340:7,
1386:24, 1404:14,
1419:22, 1432:9,
1442:4, 1456:7,
1466:20, 1468:14,
1475:21, 1495:4,
1503:1, 1503:3,
1503:19
**generate** [7] -
1223:25, 1226:18,
1236:2, 1241:22,
1257:2, 1265:14,
1269:5
**generated** [9] -
1227:21, 1228:1,
1228:9, 1228:15,
1230:15, 1230:20,
1241:22, 1452:21,
1489:16
**generating** [1] -
1231:3
**generic** [44] - 1262:21,
1302:1, 1305:9,
1305:11, 1305:14,
1305:24, 1306:8,
1307:12, 1307:21,
1307:23, 1307:24,
1310:15, 1320:24,
1323:17, 1323:22,
1382:3, 1427:25,
1428:1, 1434:2,
1434:15, 1434:22,
1435:24, 1437:6,

1437:8, 1437:11,
1438:17, 1442:14,
1446:9, 1446:18,
1448:14, 1448:17,
1448:19, 1475:20,
1475:23, 1475:24,
1484:23, 1485:3,
1485:10, 1486:6,
1486:8, 1486:10,
1493:4, 1504:20,
1504:22
**genericized** [1] -
1476:10
**generics** [5] - 1302:8,
1305:16, 1442:6,
1446:19, 1476:6
**genetic** [2] - 1358:7,
1390:25
**germane** [2] - 1501:9,
1535:6
**Germany** [1] - 1315:7
**given** [11] - 1279:24,
1292:25, 1326:1,
1379:11, 1451:19,
1475:25, 1506:25,
1510:19, 1512:23,
1529:13, 1538:23
**Gleason** [1] - 1218:25
**goods** [1] - 1227:9
**Government** [1] -
1220:15
**Grabowski** [2] -
1469:9, 1469:21
**graduate** [3] -
1418:13, 1420:5,
1442:25
**graduated** [3] -
1219:4, 1315:9,
1418:22
**grams** [2] - 1346:25,
1407:6
**grand** [1] - 1278:23
**granted** [9] - 1230:4,
1256:2, 1299:13,
1323:20, 1422:10,
1430:23, 1450:22,
1490:4, 1492:10
**graph** [18] - 1232:18,
1232:20, 1232:22,
1232:25, 1233:6,
1233:24, 1234:20,
1244:2, 1245:11,
1247:19, 1252:10,
1279:17, 1430:10,
1433:2, 1446:21,
1468:11, 1475:4,
1511:25
**graphs** [1] - 1232:9
**grasp** [1] - 1331:10
**great** [2] - 1230:16,

1305:2
**greater** [13] - 1225:25,
1249:19, 1250:9,
1251:10, 1252:13,
1252:21, 1258:24,
1284:17, 1305:25,
1394:6, 1457:2,
1518:25, 1519:10
**greatly** [1] - 1237:7
**green** [4] - 1288:3,
1433:4, 1435:8,
1449:14
**gross** [32] - 1220:17,
1251:2, 1251:25,
1264:25, 1268:9,
1270:17, 1272:14,
1275:22, 1278:6,
1278:15, 1279:10,
1282:25, 1287:10,
1290:21, 1302:11,
1302:14, 1302:19,
1303:23, 1360:6,
1378:16, 1399:11,
1429:18, 1430:1,
1484:21, 1484:25,
1485:1, 1485:3,
1485:21, 1486:4,
1525:23, 1525:24
**Gross** [2] - 1279:12,
1361:12
**grounded** [1] - 1222:7
**group** [15] - 1286:2,
1286:3, 1359:7,
1398:19, 1414:11,
1414:13, 1415:16,
1433:21, 1434:1,
1434:3, 1434:4,
1435:10, 1436:21,
1466:7, 1480:13
**groups** [3] - 1433:18,
1433:20, 1435:5
**growing** [9] - 1230:15,
1230:16, 1304:11,
1305:1, 1305:3,
1434:17, 1439:6,
1449:19
**grown** [1] - 1279:20
**growth** [13] - 1230:20,
1230:25, 1244:16,
1244:20, 1248:18,
1269:22, 1271:9,
1301:22, 1453:15,
1468:15, 1485:8,
1491:14, 1519:16
**guarantee** [1] - 1500:9
**guess** [10] - 1232:3,
1261:6, 1285:21,
1285:24, 1286:16,
1287:10, 1308:4,
1387:11, 1503:12,

24

1536:19
**guidance** [36] -
1322:2, 1327:25,
1328:4, 1328:12,
1329:6, 1329:7,
1329:10, 1329:11,
1329:12, 1329:14,
1329:19, 1331:22,
1332:2, 1333:22,
1335:11, 1336:8,
1336:18, 1340:19,
1341:8, 1341:10,
1341:17, 1342:8,
1352:22, 1353:3,
1354:15, 1354:20,
1368:16, 1369:3,
1369:12, 1369:13,
1370:20, 1371:7,
1373:21, 1377:3,
1394:14
**guidances** [6] -
1322:19, 1323:5,
1323:13, 1325:12,
1327:2, 1328:2
**guide** [1] - 1342:9
**guidelines** [1] -
1370:4
**guides** [1] - 1394:25

**H**

**H-o-f-m-a-n-n** [1] -
1218:19
**H.C** [30] - 1240:19,
1240:24, 1241:14,
1243:18, 1244:23,
1245:2, 1246:24,
1247:19, 1257:15,
1257:16, 1257:18,
1449:21, 1459:22,
1460:10, 1461:2,
1461:4, 1461:5,
1461:10, 1461:16,
1462:4, 1462:18,
1462:23, 1463:4,
1463:12, 1464:20,
1465:3, 1465:6,
1504:3, 1504:6,
1521:2
**half** [8] - 1265:13,
1269:24, 1278:24,
1426:19, 1463:10,
1468:11, 1478:12,
1486:5
**half-way** [1] - 1478:12
**HAN** [1] - 1216:15
**hand** [8] - 1275:15,
1338:21, 1344:9,
1346:4, 1481:22,
1501:24, 1528:11,

1536:10
**Handbook** [1] -
1420:11
**handbook** [3] -
1420:13, 1466:21,
1467:7
**handle** [1] - 1401:7
**handled** [1] - 1419:15
**hang** [1] - 1402:24
**happy** [1] - 1229:13
**hard** [7] - 1261:8,
1317:23, 1322:7,
1331:10, 1449:10,
1506:10, 1509:6
**harm** [1] - 1219:14
**hazard** [2] - 1246:11,
1296:19
**hazards** [1] - 1290:10
**heading** [3] - 1336:14,
1369:20, 1384:11
**Health** [6] - 1232:13,
1316:22, 1318:25,
1319:3, 1418:20,
1445:6
**health** [12] - 1319:17,
1428:2, 1429:14,
1429:21, 1431:14,
1431:23, 1432:9,
1433:10, 1434:19,
1476:13, 1526:2
**Healthcare** [1] -
1419:25
**healthcare** [7] -
1419:5, 1419:11,
1420:4, 1420:6,
1432:4, 1442:22,
1444:24
**hear** [6] - 1224:10,
1235:25, 1257:25,
1258:22, 1335:1,
1359:3
**heard** [24] - 1220:5,
1222:22, 1225:22,
1231:24, 1248:1,
1248:9, 1254:5,
1254:18, 1256:12,
1257:11, 1257:15,
1258:4, 1270:6,
1287:6, 1301:11,
1358:21, 1358:23,
1358:24, 1359:9,
1392:7, 1429:22,
1439:22, 1441:15,
1464:8
**hearing** [3] - 1294:7,
1309:15, 1392:7
**hearsay** [1] - 1465:24
**heavily** [3] - 1265:21,
1277:12, 1480:7
**heavy** [1] - 1479:24

**held** [4] - 1316:10,
1417:7, 1418:14,
1517:5
**help** [3] - 1278:3,
1402:1, 1516:17
**helpful** [4] - 1365:13,
1445:14, 1445:19
**hemorrhaging** [1] -
1239:19
**Henry** [2] - 1469:9,
1469:21
**heparin** [1] - 1353:16
**herself** [1] - 1522:21
**hesitated** [1] - 1362:7
**HEYDORN** [1] -
1217:3
**high** [75] - 1225:24,
1250:8, 1250:24,
1251:12, 1252:13,
1256:15, 1260:18,
1269:19, 1270:7,
1271:8, 1279:21,
1302:13, 1304:7,
1305:23, 1306:18,
1325:19, 1332:13,
1341:11, 1348:4,
1350:7, 1415:12,
1418:11, 1421:15,
1421:24, 1422:3,
1423:21, 1425:16,
1425:19, 1426:22,
1433:24, 1440:9,
1450:14, 1451:19,
1460:17, 1461:11,
1483:17, 1488:12,
1488:13, 1488:15,
1489:1, 1489:2,
1489:5, 1489:7,
1489:14, 1490:16,
1490:18, 1490:21,
1490:22, 1491:10,
1491:15, 1494:5,
1495:22, 1496:3,
1496:12, 1496:15,
1497:16, 1497:23,
1498:4, 1499:23,
1500:5, 1500:11,
1501:13, 1501:14,
1503:25, 1506:17,
1506:25, 1507:12,
1507:24, 1508:15,
1515:4, 1523:8,
1529:19
**high-decile** [1] -
1269:19
**higher** [16] - 1303:24,
1305:14, 1305:17,
1305:24, 1434:20,
1435:8, 1444:20,
1460:7, 1468:25,

1472:1, 1485:2,
1485:9, 1486:5,
1490:18, 1502:22,
1522:18
**highest** [1] - 1468:20
**highlight** [4] -
1343:10, 1370:25,
1499:15, 1536:13
**highlighted** [10] -
1227:14, 1278:21,
1330:24, 1346:4,
1388:6, 1395:8,
1405:15, 1407:2,
1407:4, 1480:22
**highlighting** [2] -
1368:10, 1504:15
**highlights** [3] -
1246:11, 1327:15,
1327:20
**highly** [5] - 1245:15,
1307:1, 1386:21,
1438:12, 1505:22
**HIKMA** [3] - 1216:8,
1216:19, 1217:3
**Hikma** [6] - 1301:1,
1301:10, 1301:20,
1302:3, 1302:15,
1308:15
**Hikma's** [7] - 1301:10,
1364:23, 1376:18,
1381:5, 1381:23,
1405:8, 1407:3
**hired** [3] - 1220:12,
1321:5, 1511:9
**historic** [2] - 1249:14,
1289:22
**historical** [13] -
1240:3, 1240:8,
1244:10, 1249:4,
1249:12, 1253:15,
1258:14, 1498:17,
1501:25, 1502:15,
1507:1, 1522:20
**historically** [1] -
1240:13
**history** [3] - 1236:19,
1415:5, 1415:17
**hit** [1] - 1229:9
**Hochschule** [1] -
1315:7
**Hof** [1] - 1490:24
**Hofmann** [105] -
1218:9, 1218:18,
1218:19, 1218:24,
1220:20, 1221:4,
1221:14, 1221:16,
1221:19, 1224:21,
1228:16, 1230:9,
1231:10, 1232:6,
1234:17, 1235:21,

1238:9, 1243:13,
1243:24, 1245:19,
1246:6, 1248:1,
1251:4, 1252:3,
1254:14, 1255:4,
1256:7, 1259:12,
1259:25, 1260:13,
1261:14, 1262:12,
1263:7, 1264:5,
1265:4, 1265:22,
1267:5, 1268:12,
1269:25, 1270:21,
1272:2, 1272:18,
1274:5, 1275:3,
1275:25, 1276:17,
1277:8, 1277:17,
1278:10, 1279:14,
1280:18, 1282:11,
1283:3, 1283:8,
1283:13, 1283:15,
1285:2, 1285:16,
1285:24, 1287:2,
1287:17, 1288:19,
1289:15, 1290:23,
1291:15, 1292:1,
1292:9, 1297:2,
1298:20, 1301:9,
1303:10, 1304:17,
1308:16, 1308:21,
1310:20, 1311:5,
1422:5, 1422:8,
1428:7, 1430:2,
1438:1, 1438:3,
1438:22, 1438:25,
1439:14, 1439:15,
1439:23, 1441:15,
1450:18, 1450:23,
1451:5, 1452:15,
1459:22, 1460:1,
1460:2, 1460:9,
1462:20, 1464:9,
1464:16, 1475:5,
1486:3, 1490:24,
1505:17, 1508:7,
1534:21
**HOFMANN** [2] -
1218:13, 1540:15
**Hofmann's** [9] -
1292:5, 1429:22,
1431:1, 1431:4,
1437:22, 1491:19,
1513:12, 1525:7,
1534:14
**hold** [3] - 1312:23,
1313:7, 1418:17
**hole** [1] - 1505:3
**Honor** [171] - 1218:7,
1218:8, 1218:10,
1218:20, 1220:22,
1220:25, 1221:13,

1221:15, 1224:24, 1228:23, 1229:3, 1229:19, 1229:20, 1229:21, 1229:23, 1230:5, 1234:1, 1234:9, 1235:16, 1242:19, 1243:1, 1243:7, 1243:10, 1245:24, 1246:2, 1251:21, 1255:1, 1255:10, 1255:17, 1255:19, 1256:5, 1263:20, 1263:23, 1264:21, 1264:24, 1266:5, 1266:8, 1266:11, 1266:15, 1266:18, 1271:20, 1271:24, 1274:11, 1274:18, 1274:24, 1276:13, 1279:5, 1279:9, 1280:3, 1280:6, 1280:12, 1280:16, 1283:7, 1283:12, 1284:7, 1285:1, 1286:16, 1286:24, 1287:11, 1287:13, 1291:16, 1291:24, 1308:14, 1308:17, 1310:22, 1311:6, 1311:11, 1311:13, 1311:15, 1312:7, 1314:14, 1323:16, 1323:24, 1328:24, 1332:7, 1341:23, 1355:13, 1355:14, 1356:5, 1357:6, 1388:2, 1399:17, 1414:2, 1417:4, 1417:8, 1417:13, 1417:24, 1421:1, 1421:3, 1421:6, 1421:9, 1426:4, 1426:6, 1426:12, 1428:13, 1428:15, 1430:13, 1430:15, 1432:19, 1432:21, 1436:7, 1436:9, 1437:16, 1437:18, 1443:7, 1445:11, 1445:13, 1450:16, 1451:1, 1452:9, 1453:20, 1454:4, 1454:19, 1456:16, 1457:21, 1457:23, 1459:13, 1459:15, 1461:22, 1461:25, 1462:9, 1463:17, 1465:20, 1465:22, 1467:17, 1467:19, 1469:13, 1469:15, 1473:1,

1473:4, 1474:7, 1474:9, 1474:15, 1478:2, 1481:13, 1482:18, 1483:22, 1485:14, 1485:16, 1486:12, 1486:16, 1487:4, 1487:12, 1489:24, 1492:4, 1492:9, 1492:12, 1515:13, 1515:16, 1515:24, 1516:4, 1516:14, 1516:15, 1516:16, 1517:1, 1517:11, 1523:24, 1524:19, 1530:11, 1530:13, 1536:1, 1537:18, 1537:23, 1538:1, 1538:2, 1538:9, 1538:19, 1539:2, 1539:6, 1539:11, 1539:21
**HONORABLE** [1] - 1216:2
**hope** [5] - 1269:4, 1302:25, 1303:2, 1503:4, 1539:3
**hopeful** [1] - 1300:7
**hopefully** [1] - 1277:1
**hopes** [6] - 1228:13, 1236:6, 1236:13, 1236:18, 1300:13, 1503:12
**hoping** [2] - 1297:24, 1347:5
**horizon** [1] - 1503:2
**horizontal** [6] - 1244:5, 1425:6, 1449:4, 1455:18, 1470:1, 1473:20
**hospital** [1] - 1315:15
**hour** [1] - 1355:20
**housekeeping** [1] - 1399:18
**huge** [5] - 1241:9, 1241:10, 1242:1, 1248:6
**humans** [9] - 1316:14, 1317:2, 1317:3, 1317:7, 1317:12, 1317:19, 1320:6, 1326:6
**hundred** [3] - 1219:25, 1241:22, 1288:15
**hundreds** [7] - 1227:22, 1242:3, 1247:11, 1277:25, 1317:24, 1322:7
**Huttner** [1] - 1539:5
**HUTTNER** [1] - 1217:10, 1539:5,

1539:8
**hypertension** [1] - 1340:1
**hypertriglyceridemia** [38] - 1220:4, 1344:24, 1345:18, 1349:25, 1351:8, 1351:18, 1352:10, 1355:9, 1359:10, 1366:12, 1366:25, 1367:2, 1367:5, 1367:24, 1391:1, 1394:6, 1396:25, 1407:14, 1408:15, 1408:18, 1408:22, 1409:1, 1409:11, 1409:25, 1410:6, 1410:11, 1411:5, 1411:11, 1411:14, 1412:13, 1415:12, 1416:9, 1416:12, 1421:24, 1423:1, 1495:11, 1495:14, 1497:6
**hypothetical** [6] - 1382:17, 1383:9, 1383:13, 1383:15, 1504:25, 1535:4
**hypotheticals** [1] - 1383:11

**I**

**i.e** [2] - 1386:15, 1415:6
**icosapent** [30] - 1226:2, 1250:7, 1361:9, 1373:15, 1375:12, 1377:17, 1377:18, 1380:2, 1380:10, 1381:17, 1381:21, 1382:10, 1388:14, 1389:16, 1389:24, 1390:2, 1390:22, 1391:9, 1397:7, 1403:12, 1403:16, 1406:3, 1406:14, 1406:17, 1407:6, 1411:22, 1412:2, 1412:8, 1412:24, 1413:11
**ID** [3] - 1540:19, 1541:3, 1542:4
**idea** [4] - 1275:14, 1277:1, 1289:3, 1519:22
**identical** [2] - 1364:22, 1376:19
**identification** [2] - 1415:16, 1515:23

**identified** [11] - 1246:14, 1284:18, 1342:22, 1343:18, 1344:10, 1366:1, 1414:7, 1460:2, 1480:13, 1511:20, 1515:11
**identifies** [2] - 1328:14, 1334:8
**identify** [20] - 1220:20, 1229:14, 1246:7, 1252:7, 1313:22, 1343:3, 1343:6, 1353:12, 1353:20, 1354:9, 1354:18, 1354:23, 1366:2, 1370:7, 1370:14, 1403:1, 1415:18, 1440:10, 1440:16, 1479:6
**identifying** [2] - 1302:8, 1412:24
**Identifying** [1] - 1332:20
**illegal** [1] - 1348:3
**Illinois** [1] - 1217:4
**illustrate** [2] - 1314:21, 1425:3
**imagine** [1] - 1511:8
**immodest** [1] - 1466:15
**impact** [15] - 1243:21, 1247:16, 1257:7, 1258:10, 1260:17, 1262:11, 1263:5, 1263:6, 1264:4, 1268:22, 1270:1, 1276:23, 1325:5, 1435:17, 1536:15
**impactful** [1] - 1318:3
**impeach** [1] - 1400:20
**implication** [1] - 1410:4
**implications** [1] - 1294:2
**implicitly** [2] - 1389:16, 1389:23
**implied** [8] - 1390:7, 1390:8, 1390:12, 1390:14, 1404:15, 1405:5, 1408:5, 1408:9
**implies** [2] - 1377:21, 1453:15
**imply** [4] - 1388:25, 1404:20, 1404:21, 1405:21
**implying** [1] - 1406:2
**Importance** [3] - 1260:11, 1268:13,

1275:23
**importance** [13] - 1257:16, 1260:4, 1260:6, 1261:24, 1262:17, 1263:12, 1263:14, 1268:5, 1268:8, 1270:13, 1276:2, 1451:11, 1460:12
**important** [41] - 1226:4, 1228:10, 1231:16, 1245:7, 1257:22, 1260:20, 1276:6, 1279:18, 1317:8, 1317:13, 1323:12, 1327:19, 1333:14, 1333:16, 1333:23, 1333:24, 1334:4, 1334:5, 1337:17, 1365:2, 1365:8, 1366:4, 1390:19, 1408:10, 1410:1, 1410:5, 1410:20, 1427:23, 1432:5, 1439:10, 1455:7, 1467:15, 1468:25, 1475:12, 1476:20, 1477:5, 1488:19, 1489:13, 1501:7, 1514:25, 1535:14
**importantly** [6] - 1241:12, 1429:19, 1470:4, 1470:22, 1488:17, 1514:17
**improper** [1] - 1451:4
**improve** [3] - 1281:4, 1397:15, 1515:2
**improved** [1] - 1479:20
**IMS** [2] - 1232:13, 1432:14
**inaccurate** [2] - 1240:2, 1240:13
**inappropriate** [1] - 1408:13
**inappropriately** [2] - 1521:1, 1521:14
**inaudible** [1] - 1416:1
**INC** [2] - 1216:4, 1216:8
**incentive** [1] - 1511:14
**incentives** [23] - 1225:19, 1250:3, 1259:17, 1277:18, 1277:21, 1277:23, 1277:24, 1278:12, 1278:18, 1279:20, 1279:25, 1280:20, 1282:1, 1282:3,

1291:10, 1302:12, 1303:11, 1303:23, 1304:2, 1304:4, 1304:22, 1431:6, 1475:14

**Incentives** [2] - 1278:8, 1279:12

**include** [30] - 1320:23, 1321:19, 1324:10, 1327:10, 1327:15, 1337:2, 1342:11, 1344:1, 1348:22, 1353:5, 1355:2, 1355:4, 1363:3, 1370:6, 1370:12, 1374:4, 1374:5, 1374:16, 1374:17, 1419:16, 1422:3, 1426:25, 1433:21, 1434:5, 1521:23, 1523:8, 1524:22, 1533:5, 1534:18, 1535:18

**included** [20] - 1251:5, 1321:4, 1337:12, 1337:21, 1340:7, 1342:10, 1363:9, 1387:13, 1390:4, 1390:17, 1404:16, 1405:6, 1408:6, 1414:14, 1465:1, 1496:11, 1504:10, 1529:23, 1534:15, 1539:15

**includes** [11] - 1232:1, 1244:23, 1325:16, 1357:17, 1357:24, 1358:4, 1358:13, 1359:4, 1395:20, 1395:25, 1495:18

**including** [15] - 1219:17, 1264:3, 1268:19, 1323:18, 1323:22, 1344:19, 1419:23, 1432:6, 1434:6, 1438:17, 1460:18, 1487:1, 1489:13, 1499:24, 1500:22

**inclusion** [1] - 1464:10

**Inclusion** [1] - 1332:21

**income** [13] - 1240:23, 1241:13, 1241:15, 1241:16, 1241:19, 1241:22, 1241:25, 1246:15, 1246:25, 1502:7, 1512:2, 1512:12, 1520:8

**incomplete** [3] - 1231:1, 1289:5, 1405:10

**inconsistent** [3] - 1399:2, 1400:20, 1403:13

**incorporated** [2] - 1264:17, 1448:8

**incorporating** [1] - 1511:12

**incorrectly** [1] - 1280:10

**increase** [23] - 1291:5, 1346:8, 1346:21, 1427:16, 1427:17, 1427:18, 1429:9, 1453:5, 1456:3, 1458:21, 1478:16, 1478:23, 1480:12, 1480:14, 1480:15, 1480:19, 1480:20, 1482:4, 1483:6, 1484:12, 1491:16, 1519:15, 1532:22

**increased** [8] - 1278:20, 1305:4, 1305:5, 1343:16, 1386:15, 1427:14, 1429:8, 1480:6

**increases** [3] - 1465:1, 1468:22, 1478:23

**increasing** [15] - 1422:20, 1427:22, 1435:22, 1438:12, 1438:17, 1453:13, 1453:14, 1468:23, 1477:4, 1479:20, 1491:23, 1495:11, 1495:23, 1496:13, 1533:10

**increment** [1] - 1318:15

**incur** [3] - 1306:2, 1306:4, 1306:8

**incurred** [5] - 1227:15, 1448:6, 1471:9, 1534:1, 1535:8

**incurring** [1] - 1458:11

**IND** [1] - 1326:8

**Indeed** [2] - 1385:6, 1385:13

**indeed** [1] - 1382:22

**indefinitely** [1] - 1373:18

**independent** [3] - 1408:8, 1506:4, 1527:23

**independently** [1] - 1529:11

**Index** [6] - 1488:6, 1489:22, 1496:22, 1540:25, 1541:25, 1542:25

**indicate** [2] - 1455:20, 1482:2

**indicated** [23] - 1235:22, 1336:6, 1340:2, 1359:17, 1359:23, 1360:21, 1361:9, 1363:8, 1363:13, 1371:4, 1371:5, 1371:11, 1375:16, 1376:8, 1407:16, 1433:23, 1434:5, 1448:15, 1449:12, 1497:19, 1507:24, 1523:6, 1528:4

**indicates** [15] - 1228:8, 1244:20, 1428:2, 1428:11, 1429:12, 1455:8, 1458:17, 1458:25, 1459:7, 1499:20, 1506:24, 1529:5, 1529:6, 1534:7, 1536:21

**indicating** [2] - 1444:6, 1447:2

**Indication** [2] - 1369:20, 1369:23

**indication** [114] - 1228:7, 1248:10, 1254:12, 1256:14, 1256:22, 1257:6, 1257:11, 1257:20, 1258:23, 1267:25, 1291:6, 1297:22, 1297:23, 1298:4, 1298:8, 1299:13, 1299:19, 1300:4, 1302:18, 1338:19, 1340:20, 1349:7, 1354:10, 1361:8, 1361:23, 1362:1, 1362:2, 1362:10, 1362:12, 1362:13, 1362:25, 1363:9, 1363:14, 1363:15, 1364:14, 1364:20, 1364:21, 1365:2, 1365:8, 1365:25, 1366:4, 1366:10, 1366:13, 1366:14, 1366:16, 1366:18, 1366:20, 1366:24, 1367:4, 1367:6, 1367:23, 1370:7, 1370:21, 1370:22,

1371:10, 1371:17, 1371:18, 1372:3, 1372:15, 1373:12, 1373:13, 1373:14, 1373:19, 1373:20, 1374:3, 1374:13, 1374:16, 1374:22, 1374:25, 1375:11, 1375:16, 1375:20, 1377:8, 1381:24, 1384:5, 1384:10, 1395:9, 1395:20, 1407:12, 1407:21, 1408:1, 1408:8, 1411:4, 1411:9, 1411:10, 1415:6, 1416:7, 1416:11, 1421:21, 1421:22, 1422:1, 1422:8, 1422:10, 1422:15, 1427:24, 1450:11, 1450:14, 1450:19, 1451:7, 1451:10, 1452:1, 1471:17, 1471:18, 1483:13, 1489:5, 1489:9, 1489:15, 1510:4, 1522:12, 1529:2, 1529:18, 1531:5

**indications** [52] - 1237:25, 1256:18, 1259:6, 1328:15, 1328:17, 1329:20, 1330:16, 1331:3, 1331:8, 1334:7, 1335:8, 1335:12, 1336:8, 1337:1, 1337:7, 1337:12, 1338:1, 1338:7, 1338:23, 1339:1, 1339:14, 1340:8, 1352:19, 1364:22, 1365:1, 1365:7, 1365:22, 1365:24, 1366:8, 1366:19, 1367:25, 1368:3, 1368:15, 1368:22, 1369:9, 1370:12, 1373:5, 1376:22, 1384:11, 1388:20, 1396:16, 1404:15, 1404:17, 1404:21, 1404:22, 1405:5, 1408:4, 1408:6, 1408:7, 1411:6, 1411:7, 1414:8

**indicative** [6] - 1223:22, 1233:19, 1245:14, 1253:25, 1289:23, 1290:6

**indicator** [2] -

1372:19, 1435:21

**indicators** [1] - 1282:7

**indicia** [3] - 1223:16, 1293:24, 1294:3

**individual** [2] - 1330:13, 1331:14

**individually** [1] - 1229:13

**INDs** [2] - 1321:10, 1321:13

**indulgence** [1] - 1417:5

**industries** [2] - 1294:24, 1419:7

**industry** [43] - 1219:17, 1238:5, 1240:4, 1240:8, 1250:17, 1272:22, 1301:11, 1305:9, 1419:11, 1420:6, 1421:8, 1421:11, 1428:10, 1441:11, 1441:14, 1441:19, 1442:4, 1459:3, 1459:9, 1465:24, 1466:8, 1466:10, 1466:13, 1466:17, 1467:10, 1467:21, 1469:2, 1470:17, 1474:24, 1484:7, 1500:16, 1502:17, 1505:10, 1505:13, 1505:20, 1506:9, 1511:3, 1511:17, 1512:24, 1515:8, 1521:18, 1522:20, 1526:1

**Industry** [3] - 1420:12, 1465:16, 1466:3

**industry-wide** [1] - 1522:20

**inference** [1] - 1537:12

**inform** [3] - 1322:15, 1334:9, 1341:18

**Information** [2] - 1342:5, 1369:22

**information** [86] - 1229:2, 1232:14, 1254:14, 1267:13, 1273:3, 1278:13, 1290:13, 1290:17, 1296:5, 1296:6, 1296:14, 1319:24, 1320:5, 1321:15, 1322:14, 1324:5, 1324:8, 1324:14, 1324:20, 1325:9, 1325:11, 1326:1, 1326:4, 1326:21,

1327:7, 1327:10, 1327:16, 1327:19, 1327:22, 1330:20, 1332:14, 1333:11, 1333:19, 1333:23, 1334:9, 1336:22, 1337:3, 1337:4, 1337:12, 1337:16, 1340:6, 1340:8, 1341:13, 1342:8, 1342:10, 1342:12, 1346:16, 1347:6, 1348:12, 1353:6, 1379:19, 1379:23, 1395:22, 1396:5, 1399:9, 1408:19, 1416:4, 1428:11, 1430:6, 1430:8, 1451:3, 1452:15, 1452:19, 1459:11, 1468:4, 1471:22, 1476:13, 1488:22, 1501:24, 1503:24, 1505:5, 1508:23, 1511:5, 1514:25, 1522:10, 1522:25, 1526:4, 1526:21, 1526:23, 1526:25, 1527:5, 1531:9, 1531:16, 1532:2

**informative** [2] - 1397:25, 1535:9

**informing** [3] - 1389:23, 1406:13, 1453:17

**infringement** [3] - 1226:21, 1311:10, 1524:15

**inherently** [2] - 1298:10, 1299:21

**initial** [9] - 1244:19, 1258:20, 1259:5, 1269:22, 1285:9, 1387:6, 1425:14, 1439:12, 1471:18

**initiate** [2] - 1386:13, 1388:8

**initiating** [2] - 1359:14, 1416:23

**initiation** [1] - 1416:18

**innovation** [1] - 1419:13

**inpatients** [1] - 1315:15

**input** [5] - 1295:4, 1321:17, 1348:9, 1455:7, 1501:6

**inputs** [2] - 1511:4, 1520:1

**insert** [1] - 1324:14

**inserted** [1] - 1321:16

**instance** [5] - 1336:4, 1461:10, 1462:18, 1463:4, 1512:11

**instances** [6] - 1294:11, 1461:2, 1464:20, 1464:24, 1512:14, 1515:3

**instead** [6] - 1253:10, 1340:9, 1391:8, 1435:20, 1511:2, 1511:17

**Institute** [2] - 1316:19, 1318:4

**Institutes** [1] - 1319:3

**instruct** [1] - 1389:16

**instructing** [2] - 1389:18, 1416:25

**instruction** [1] - 1398:11

**instructs** [1] - 1386:12

**insulate** [2] - 1281:9, 1281:15

**insurance** [4] - 1281:1, 1431:23, 1432:10, 1432:11

**insurers** [11] - 1428:2, 1429:14, 1429:21, 1431:14, 1432:9, 1432:10, 1433:10, 1434:19, 1476:13, 1486:9, 1526:2

**intake** [8] - 1364:5, 1377:16, 1379:6, 1379:15, 1380:1, 1380:9, 1381:9, 1417:1

**intellectual** [7] - 1219:2, 1219:10, 1219:19, 1219:20, 1220:10, 1220:14

**intend** [5] - 1325:5, 1347:12, 1480:14, 1480:15, 1532:22

**intended** [9] - 1324:19, 1327:6, 1328:20, 1353:13, 1367:23, 1368:12, 1368:20, 1369:6, 1373:2

**intending** [1] - 1466:22

**intends** [4] - 1331:7, 1353:23, 1372:20, 1377:2

**intense** [4] - 1259:20, 1259:23, 1272:11, 1291:8

**intensity** [5] - 1260:6, 1272:6, 1473:19,

1484:5, 1484:6

**intensive** [1] - 1474:24

**intensively** [1] - 1472:24

**intent** [1] - 1396:25

**intention** [2] - 1331:13, 1480:12

**interact** [1] - 1325:15

**interchangeable** [1] - 1448:24

**interchangeably** [1] - 1324:17

**interest** [3] - 1378:12, 1380:15, 1406:20

**interested** [2] - 1316:13, 1477:13

**internal** [7] - 1262:13, 1263:8, 1268:2, 1270:24, 1315:17, 1316:12, 1430:7

**internally** [3] - 1237:14, 1258:2, 1271:3

**International** [1] - 1221:7

**international** [1] - 1221:9

**internet** [1] - 1323:6

**internship** [1] - 1315:14

**interpret** [2] - 1380:22, 1392:16

**interpretation** [3] - 1394:10, 1438:9, 1536:22

**interpreted** [1] - 1408:19

**interpreting** [1] - 1410:7

**interrupt** [1] - 1401:16

**intersects** [1] - 1458:16

**intervals** [1] - 1336:24

**intervene** [1] - 1401:6

**introducing** [2] - 1443:20, 1444:6

**invalidity** [2] - 1222:11, 1311:9

**invented** [2] - 1295:9, 1318:13

**invention** [10] - 1222:17, 1223:5, 1223:6, 1226:11, 1231:7, 1245:17, 1292:11, 1424:8, 1493:15, 1495:18

**inventions** [1] - 1424:10

**invest** [2] - 1514:25, 1529:20

**invested** [4] - 1226:19, 1265:20, 1277:12, 1489:11

**investigates** [1] - 1317:18

**investigations** [1] - 1317:6

**investing** [5] - 1237:17, 1260:19, 1261:24, 1276:5, 1448:22

**investment** [4] - 1268:25, 1274:2, 1443:2, 1458:19

**investments** [1] - 1452:21

**investor** [1] - 1301:14

**investors** [18] - 1440:20, 1440:25, 1441:3, 1441:10, 1444:13, 1444:21, 1457:10, 1457:14, 1458:19, 1459:3, 1459:8, 1499:3, 1500:8, 1503:15, 1506:12, 1514:25, 1521:17

**investors'** [1] - 1443:23, 1444:8, 1448:22

**invoice** [1] - 1485:25

**involve** [2] - 1294:25, 1418:11

**involved** [6] - 1271:8, 1288:17, 1317:20, 1317:22, 1322:1, 1480:24

**involves** [1] - 1325:21

**involving** [5] - 1219:10, 1220:10, 1220:14, 1220:16, 1444:25

**IQVIA** [32] - 1232:11, 1232:12, 1232:23, 1233:3, 1233:25, 1250:16, 1272:20, 1274:9, 1302:9, 1302:14, 1302:20, 1428:6, 1428:7, 1428:8, 1428:9, 1431:20, 1432:13, 1436:6, 1437:14, 1472:4, 1472:5, 1472:7, 1474:4, 1485:13, 1488:4, 1489:21, 1489:23, 1496:24, 1496:25, 1525:23

**IRELAND** [1] - 1216:5

**irreparable** [1] -

1219:14

**issue** [30] - 1225:10, 1248:6, 1267:18, 1282:20, 1282:22, 1282:24, 1284:22, 1287:24, 1288:3, 1288:11, 1290:9, 1291:7, 1336:5, 1353:9, 1358:23, 1359:12, 1387:18, 1399:18, 1400:5, 1400:16, 1401:6, 1402:13, 1409:6, 1410:21, 1441:15, 1464:9, 1484:9, 1533:11, 1535:2

**issued** [3] - 1243:17, 1244:22, 1329:19

**Issues** [1] - 1530:19

**issues** [16] - 1219:9, 1219:12, 1220:10, 1220:13, 1220:15, 1238:7, 1319:17, 1320:25, 1321:8, 1329:13, 1345:3, 1358:7, 1408:25, 1466:22, 1467:4, 1467:5

**IT** [52] - 1224:18, 1248:2, 1248:10, 1248:15, 1249:17, 1254:12, 1254:19, 1256:9, 1256:11, 1257:6, 1257:10, 1257:13, 1257:17, 1257:19, 1258:3, 1258:4, 1267:24, 1287:18, 1291:5, 1297:22, 1298:3, 1298:4, 1298:6, 1298:17, 1299:13, 1300:1, 1300:7, 1300:9, 1426:21, 1450:11, 1450:14, 1450:19, 1451:6, 1451:10, 1452:1, 1489:12, 1489:17, 1510:5, 1522:6, 1522:23, 1523:1, 1523:15, 1524:9, 1524:22, 1529:21, 1533:22, 1534:2, 1534:6, 1534:8, 1535:8, 1535:11, 1535:18

**item** [2] - 1230:13, 1499:25

**items** [2] - 1429:18, 1430:4

**itself** [2] - 1476:12,

1493:23
**Ivan** [3] - 1218:9,
1218:18, 1540:15
**IVAN** [2] - 1218:13,
1218:19

## J

**JAMES** [1] - 1217:10
**January** [6] - 1216:6,
1301:10, 1301:15,
1332:1, 1450:2,
1481:4
**JANUARY** [2] -
1218:1, 1357:1
**Japanese** [1] - 1268:3
**Jefferies** [4] -
1246:23, 1514:4,
1514:21, 1517:20
**JEFFREY** [1] -
1216:14
**JELIS** [7] - 1531:5,
1531:11, 1531:14,
1531:21, 1532:4,
1532:13, 1533:1
**Jersey** [1] - 1217:11
**job** [3] - 1294:21,
1503:7, 1506:13
**Johnson** [1] - 1419:24
**joined** [1] - 1316:20
**JOSEPH** [1] - 1216:15
**journal** [4] - 1273:4,
1418:20, 1445:5,
1469:8
**journals** [2] - 1420:10,
1472:10
**JP** [1] - 1301:12
**JUDGE** [1] - 1216:2
**judgment** [4] -
1345:20, 1368:4,
1368:25, 1387:10
**July** [1] - 1329:16
**jumping** [1] - 1286:17

## K

**Kansas** [1] - 1315:10
**Kathryn** [1] - 1540:4
**Kathyrn** [1] - 1216:22
**KEANE** [1] - 1216:14
**keep** [6] - 1397:17,
1398:10, 1445:16,
1466:18, 1510:11,
1523:22
**keeping** [1] - 1310:24
**Kennedy** [19] -
1228:24, 1255:25,
1261:3, 1262:2,
1284:10, 1291:18,
1292:3, 1311:12,

1355:23, 1409:13,
1409:14, 1451:8,
1493:11, 1523:22,
1538:14, 1540:9,
1540:10, 1540:12,
1540:16
**KENNEDY** [311] -
1216:14, 1216:15,
1220:25, 1221:15,
1229:3, 1229:12,
1229:19, 1229:23,
1234:4, 1234:9,
1235:16, 1243:1,
1243:7, 1246:2,
1251:21, 1255:1,
1255:10, 1256:1,
1261:6, 1262:3,
1262:24, 1263:20,
1264:21, 1266:5,
1266:11, 1266:15,
1269:11, 1271:20,
1274:13, 1274:18,
1276:13, 1279:5,
1280:6, 1280:12,
1283:7, 1283:25,
1284:20, 1286:4,
1286:9, 1286:13,
1287:13, 1291:24,
1292:1, 1292:8,
1296:23, 1297:1,
1298:24, 1299:1,
1301:6, 1301:8,
1301:17, 1301:19,
1303:7, 1303:9,
1304:14, 1304:16,
1308:12, 1308:20,
1310:20, 1311:13,
1311:18, 1312:7,
1312:10, 1314:1,
1314:3, 1314:14,
1314:19, 1314:23,
1315:1, 1316:4,
1316:6, 1318:20,
1318:22, 1320:12,
1323:16, 1323:24,
1324:1, 1328:6,
1328:8, 1328:24,
1329:4, 1329:15,
1329:17, 1329:25,
1330:2, 1331:16,
1331:18, 1332:7,
1332:12, 1332:19,
1332:22, 1335:10,
1335:16, 1336:12,
1336:16, 1339:7,
1339:9, 1341:2,
1341:4, 1341:23,
1342:3, 1342:6,
1345:2, 1345:5,
1345:10, 1349:12,
1349:14, 1350:1,

1350:3, 1350:24,
1351:1, 1352:21,
1353:1, 1355:11,
1355:24, 1356:1,
1356:4, 1388:2,
1403:24, 1409:2,
1409:7, 1409:15,
1414:2, 1414:5,
1414:15, 1414:19,
1415:23, 1416:2,
1416:5, 1417:4,
1417:8, 1417:13,
1417:24, 1418:2,
1420:15, 1420:17,
1421:1, 1421:6,
1421:12, 1421:14,
1424:3, 1424:5,
1424:23, 1425:1,
1426:4, 1426:9,
1426:16, 1427:6,
1427:8, 1428:13,
1428:17, 1428:24,
1429:1, 1430:13,
1430:16, 1430:18,
1430:25, 1431:2,
1431:15, 1431:16,
1432:19, 1432:24,
1433:1, 1433:13,
1433:15, 1434:25,
1435:2, 1436:7,
1436:12, 1436:16,
1436:18, 1437:16,
1437:21, 1437:24,
1438:19, 1438:21,
1439:19, 1439:21,
1442:15, 1442:16,
1443:7, 1443:11,
1443:15, 1443:17,
1443:25, 1444:2,
1445:2, 1445:3,
1445:11, 1445:18,
1445:23, 1446:1,
1446:20, 1446:23,
1447:24, 1448:1,
1448:25, 1449:2,
1450:18, 1451:9,
1451:23, 1452:3,
1452:8, 1452:10,
1453:20, 1453:25,
1454:14, 1454:19,
1454:21, 1454:23,
1456:16, 1456:21,
1456:23, 1457:21,
1458:2, 1458:4,
1459:13, 1459:18,
1459:20, 1460:22,
1460:24, 1461:22,
1462:3, 1462:9,
1462:14, 1462:16,
1463:17, 1463:21,
1464:2, 1464:7,

1464:13, 1464:14,
1465:11, 1465:12,
1465:20, 1465:25,
1466:1, 1467:17,
1467:23, 1468:8,
1468:10, 1469:5,
1469:6, 1469:13,
1469:18, 1469:19,
1470:8, 1470:10,
1471:4, 1471:6,
1473:1, 1473:6,
1473:14, 1473:16,
1474:7, 1474:11,
1474:18, 1475:1,
1475:3, 1477:6,
1477:8, 1478:2,
1478:7, 1478:9,
1478:25, 1479:2,
1479:15, 1480:8,
1480:10, 1480:25,
1481:1, 1481:13,
1481:18, 1481:20,
1482:8, 1482:10,
1482:18, 1482:23,
1483:1, 1483:8,
1483:9, 1483:22,
1484:2, 1484:16,
1484:18, 1485:14,
1485:19, 1486:12,
1486:19, 1486:21,
1487:4, 1487:12,
1487:17, 1487:20,
1487:24, 1489:24,
1490:6, 1490:8,
1491:25, 1492:4,
1492:12, 1515:20,
1516:4, 1516:14,
1523:18, 1523:24,
1530:13, 1535:21,
1537:4, 1538:2,
1538:18
**Ketchum** [1] - 1229:10
**Key** [1] - 1530:19
**key** [6] - 1240:22,
1327:16, 1483:2,
1483:4, 1483:5,
1526:4
**kind** [9] - 1231:14,
1237:8, 1244:2,
1263:9, 1265:7,
1387:12, 1393:12,
1432:3, 1449:10
**kinds** [3] - 1312:25,
1466:20, 1472:5
**Klein** [11] - 1355:15,
1357:5, 1357:8,
1357:10, 1371:4,
1400:18, 1401:24,
1414:6, 1416:7,
1539:2, 1540:10

**KLEIN** [68] - 1216:19,
1314:16, 1323:19,
1329:1, 1332:9,
1341:25, 1355:17,
1355:20, 1355:25,
1357:6, 1357:9,
1357:13, 1360:6,
1360:7, 1361:12,
1361:13, 1363:21,
1364:1, 1364:18,
1364:19, 1365:19,
1365:20, 1367:11,
1367:12, 1371:3,
1371:7, 1371:10,
1371:13, 1372:11,
1372:13, 1378:16,
1378:19, 1387:25,
1388:5, 1391:17,
1391:20, 1399:11,
1399:14, 1399:17,
1400:3, 1400:8,
1400:24, 1401:12,
1401:20, 1402:2,
1402:15, 1402:17,
1402:23, 1403:3,
1403:7, 1404:3,
1404:4, 1405:1,
1405:2, 1409:4,
1409:8, 1409:20,
1410:23, 1411:3,
1412:17, 1412:20,
1413:2, 1413:5,
1413:19, 1413:22,
1413:25, 1417:9,
1539:22
**Klein's** [2] - 1410:25,
1414:21
**knowledge** [10] -
1294:20, 1329:18,
1329:22, 1332:1,
1358:19, 1380:6,
1477:16, 1531:9,
1531:19, 1532:2
**knowledgeable** [2] -
1477:23, 1481:9
**known** [11] - 1232:13,
1340:3, 1342:19,
1343:1, 1343:14,
1432:13, 1475:15,
1476:3, 1476:8,
1490:15, 1522:8
**Kowa** [14] - 1268:4,
1268:8, 1268:14,
1269:1, 1269:2,
1269:17, 1270:4,
1270:5, 1270:13,
1270:15, 1271:2,
1271:7, 1271:10
**KOWA** [1] - 1268:4
**Kowa's** [1] - 1268:16

**KURYS** [1] - 1216:15

# L

**label** [180] - 1238:1, 1248:11, 1249:18, 1252:16, 1252:21, 1253:2, 1254:1, 1254:2, 1254:5, 1254:6, 1254:8, 1256:18, 1256:25, 1258:10, 1291:6, 1298:1, 1300:5, 1320:3, 1320:8, 1322:13, 1322:15, 1324:3, 1324:4, 1324:13, 1325:17, 1326:7, 1326:12, 1326:16, 1326:18, 1326:19, 1326:24, 1327:3, 1327:4, 1327:14, 1327:19, 1328:3, 1328:16, 1328:18, 1330:25, 1331:5, 1331:23, 1331:24, 1333:6, 1334:11, 1334:13, 1334:24, 1335:4, 1335:5, 1337:7, 1338:12, 1338:24, 1339:2, 1340:25, 1341:10, 1341:12, 1341:19, 1343:3, 1344:7, 1344:12, 1344:16, 1344:19, 1345:8, 1345:9, 1347:7, 1347:15, 1347:16, 1347:18, 1347:22, 1347:25, 1348:3, 1348:5, 1348:13, 1348:25, 1349:7, 1350:17, 1351:21, 1354:17, 1355:2, 1355:4, 1357:16, 1357:24, 1358:4, 1358:13, 1359:4, 1359:20, 1361:9, 1361:14, 1361:17, 1363:5, 1363:18, 1363:23, 1363:24, 1364:11, 1364:22, 1366:14, 1366:22, 1371:24, 1372:9, 1376:18, 1376:20, 1378:8, 1378:11, 1378:13, 1378:15, 1378:21, 1379:13, 1379:14, 1379:17, 1379:22, 1381:5, 1381:23, 1382:2, 1382:16,

1383:11, 1383:13, 1383:22, 1384:18, 1385:14, 1385:16, 1387:7, 1387:13, 1387:23, 1388:8, 1388:12, 1389:18, 1390:4, 1390:6, 1390:10, 1390:12, 1390:17, 1391:11, 1391:13, 1391:22, 1392:16, 1392:20, 1393:9, 1393:13, 1394:11, 1394:12, 1394:23, 1394:25, 1395:2, 1395:22, 1396:5, 1396:11, 1396:18, 1397:3, 1398:2, 1398:4, 1398:5, 1398:22, 1399:3, 1399:7, 1401:23, 1402:11, 1403:13, 1403:23, 1405:8, 1406:7, 1406:16, 1407:3, 1407:15, 1407:18, 1408:14, 1408:21, 1410:17, 1412:11, 1413:8, 1413:12, 1413:13, 1415:24, 1416:17, 1416:18, 1416:24, 1510:5, 1522:12, 1523:6
**labeled** [7] - 1245:1, 1254:12, 1256:14, 1257:11, 1257:20, 1258:23, 1330:4
**labeling** [63] - 1321:20, 1321:25, 1322:8, 1323:1, 1323:18, 1328:1, 1330:6, 1330:8, 1330:12, 1330:17, 1331:12, 1331:13, 1332:25, 1334:15, 1340:11, 1344:18, 1344:22, 1345:15, 1345:21, 1346:10, 1346:13, 1348:18, 1348:21, 1350:21, 1351:15, 1352:13, 1352:15, 1353:4, 1354:23, 1363:3, 1367:5, 1367:16, 1376:4, 1376:6, 1381:22, 1382:11, 1382:22, 1383:4, 1384:24, 1385:7, 1385:9, 1385:13, 1386:3, 1386:12, 1388:16, 1388:18, 1388:25, 1389:5,

1390:15, 1392:11, 1393:2, 1393:8, 1393:18, 1393:22, 1395:17, 1397:1, 1397:19, 1397:22, 1404:16, 1405:6, 1408:5, 1410:16, 1412:23
**labelled** [2] - 1256:21, 1267:25
**labelling** [2] - 1359:13, 1397:24
**labels** [32] - 1322:3, 1322:5, 1322:19, 1323:23, 1325:5, 1361:10, 1361:20, 1363:3, 1363:23, 1364:2, 1364:23, 1371:24, 1372:8, 1374:3, 1377:5, 1377:9, 1381:14, 1389:7, 1389:13, 1389:15, 1389:22, 1390:2, 1390:21, 1390:25, 1391:8, 1405:24, 1411:21, 1411:25, 1412:1, 1412:7, 1412:24, 1413:9
**LABORATORIES** [1] - 1217:10
**lack** [15] - 1224:17, 1228:5, 1249:24, 1253:13, 1253:24, 1257:24, 1258:6, 1282:7, 1282:9, 1291:4, 1291:5, 1291:11, 1296:10, 1304:9, 1340:6
**lacking** [1] - 1249:20
**lacks** [3] - 1225:5, 1248:19, 1249:9
**lady** [1] - 1334:2
**laid** [1] - 1468:1
**landscape** [3] - 1282:16, 1289:4, 1289:6
**language** [7] - 1363:10, 1363:16, 1384:18, 1412:23, 1499:3, 1499:5, 1499:7
**large** [9] - 1267:19, 1283:16, 1307:16, 1358:16, 1479:25, 1507:8, 1509:2, 1509:13, 1509:20
**largely** [1] - 1476:10
**larger** [4] - 1284:11, 1414:13, 1529:15,

1530:4
**largest** [2] - 1233:9, 1320:20
**Las** [1] - 1217:8
**last** [36] - 1218:17, 1219:24, 1220:6, 1222:23, 1225:22, 1229:9, 1231:25, 1247:18, 1248:9, 1251:7, 1254:7, 1254:18, 1256:12, 1257:12, 1265:8, 1270:6, 1271:1, 1279:16, 1287:6, 1292:2, 1294:12, 1299:16, 1309:22, 1311:24, 1312:4, 1317:15, 1334:20, 1372:25, 1382:6, 1411:17, 1415:2, 1417:21, 1492:22, 1499:15, 1511:23, 1516:6
**lasted** [3] - 1316:21, 1405:25, 1406:13
**lasts** [1] - 1406:12
**late** [1] - 1450:2
**latest** [2] - 1329:18, 1450:4
**laude** [2] - 1219:4, 1418:22
**launch** [13] - 1227:18, 1231:7, 1231:8, 1244:11, 1273:1, 1277:11, 1278:22, 1440:4, 1440:5, 1444:15, 1473:20, 1489:16, 1503:4
**launched** [12] - 1227:15, 1306:18, 1306:23, 1307:18, 1307:25, 1308:9, 1308:25, 1446:7, 1447:5, 1468:20, 1469:22, 1471:15
**launches** [1] - 1471:21
**launching** [2] - 1440:13, 1458:12
**law** [3] - 1222:7, 1423:17, 1424:6
**Law** [7] - 1216:17, 1216:20, 1217:3, 1217:5, 1217:7, 1217:11, 1217:13
**lawsuit** [1] - 1480:24
**lawyers** [1] - 1294:3
**lay** [1] - 1261:9
**layer** [1] - 1277:24
**layers** [1] - 1233:5

**LDL** [25] - 1345:14, 1345:18, 1346:2, 1346:5, 1346:21, 1347:3, 1349:10, 1349:23, 1350:12, 1350:17, 1350:20, 1351:12, 1422:20, 1477:4, 1478:15, 1478:16, 1478:23, 1479:21, 1480:20, 1482:4, 1483:6, 1495:12, 1495:23, 1533:10, 1536:15
**LDL-C** [25] - 1345:14, 1345:18, 1346:2, 1346:5, 1346:21, 1347:3, 1349:10, 1349:23, 1350:12, 1350:17, 1350:20, 1351:12, 1422:20, 1477:4, 1478:15, 1478:16, 1478:23, 1479:21, 1480:20, 1482:4, 1483:6, 1495:12, 1495:23, 1533:10, 1536:15
**LDLs** [1] - 1496:13
**lead** [2] - 1270:14, 1331:9
**leader** [1] - 1219:2
**leading** [1] - 1294:12
**leads** [1] - 1334:19
**learn** [1] - 1301:1
**learned** [3] - 1316:16, 1465:23, 1493:16
**least** [17] - 1241:16, 1304:25, 1335:7, 1352:17, 1390:3, 1390:23, 1391:11, 1394:18, 1396:24, 1406:4, 1406:14, 1447:19, 1498:14, 1506:16, 1519:9, 1523:8, 1531:20
**leave** [6] - 1264:13, 1294:3, 1382:1, 1391:8, 1392:15, 1445:18
**leaves** [6] - 1275:14, 1380:5, 1380:11, 1384:22, 1391:13, 1391:22
**leaving** [6] - 1322:24, 1378:1, 1378:8, 1378:21, 1379:14, 1397:4
**led** [1] - 1285:10
**leeway** [1] - 1539:14
**left** [27] - 1228:16, 1233:1, 1233:21,

30

1242:11, 1242:14,
1244:4, 1244:9,
1245:11, 1245:19,
1252:10, 1265:22,
1267:15, 1271:12,
1274:5, 1278:25,
1318:11, 1346:4,
1449:7, 1449:13,
1461:5, 1462:21,
1479:14, 1479:24,
1481:22, 1501:24,
1528:11, 1538:24
**left-hand** [4] - 1346:4,
1481:22, 1501:24,
1528:11
**legal** [5] - 1222:6,
1494:4, 1494:17,
1495:25, 1523:12
**legally** [3] - 1286:5,
1349:3, 1350:15
**legend** [1] - 1458:24
**length** [4] - 1340:9,
1340:17, 1340:22,
1405:19
**lengthy** [2] - 1228:14,
1331:9
**less** [17] - 1227:9,
1248:15, 1252:16,
1355:20, 1396:10,
1406:9, 1428:1,
1434:18, 1434:22,
1434:24, 1461:14,
1476:7, 1476:8,
1502:12, 1502:18,
1502:25
**Letterman** [3] -
1315:20, 1316:19,
1318:4
**level** [25] - 1230:15,
1230:20, 1260:15,
1260:18, 1302:13,
1303:22, 1305:23,
1306:18, 1313:3,
1325:19, 1332:13,
1341:11, 1348:4,
1418:11, 1420:5,
1421:15, 1423:21,
1440:9, 1450:15,
1451:19, 1456:12,
1498:4, 1527:13,
1527:17
**Levels** [1] - 1251:5
**levels** [41] - 1220:3,
1251:12, 1252:13,
1252:20, 1254:16,
1317:1, 1347:1,
1347:11, 1358:1,
1359:1, 1397:8,
1398:10, 1407:7,
1411:15, 1412:12,

1422:2, 1422:20,
1425:20, 1426:22,
1433:24, 1434:5,
1477:3, 1479:19,
1480:23, 1482:4,
1483:6, 1483:17,
1488:2, 1488:12,
1490:15, 1494:1,
1494:7, 1494:14,
1495:10, 1495:19,
1495:22, 1496:12,
1497:14, 1497:21,
1523:2, 1530:4
**leverage** [1] - 1270:14
**licensed** [3] - 1324:6,
1324:21, 1324:22
**licensing** [2] -
1219:20, 1467:3
**lies** [1] - 1262:8
**life** [7] - 1219:17,
1301:11, 1318:10,
1318:14, 1386:24,
1469:1, 1471:10
**life-threatening** [1] -
1386:24
**lifecycle** [27] -
1306:12, 1306:15,
1306:17, 1306:22,
1308:3, 1308:7,
1309:1, 1309:4,
1309:7, 1309:8,
1310:5, 1423:14,
1424:22, 1439:11,
1440:17, 1448:10,
1456:25, 1459:1,
1466:24, 1467:12,
1468:13, 1472:1,
1472:25, 1475:14,
1505:7, 1512:22,
1515:9
**lifecycles** [2] -
1468:14, 1472:18
**lifestyle** [2] - 1358:17,
1397:15
**lifetime** [2] - 1446:12,
1446:13
**lifting** [1] - 1481:22
**lighter** [1] - 1436:1
**likely** [6] - 1270:10,
1275:16, 1351:9,
1532:20, 1532:21,
1539:8
**likewise** [1] - 1449:21
**limit** [17] - 1337:8,
1337:11, 1339:2,
1339:13, 1344:13,
1344:16, 1367:6,
1367:16, 1367:23,
1368:12, 1368:20,
1369:6, 1373:2,

1377:1, 1377:22,
1387:14, 1387:15
**limitation** [31] -
1335:17, 1335:18,
1336:5, 1336:18,
1337:21, 1337:25,
1338:5, 1344:1,
1344:6, 1344:15,
1355:4, 1361:1,
1366:24, 1371:23,
1372:2, 1372:14,
1373:6, 1374:4,
1374:5, 1374:17,
1374:18, 1377:2,
1386:20, 1387:13,
1396:13, 1406:21,
1413:13, 1415:19,
1416:13, 1524:12
**Limitations** [1] -
1335:15
**limitations** [10] -
1335:21, 1336:9,
1336:22, 1341:16,
1362:3, 1366:1,
1366:10, 1366:25,
1396:15, 1411:18
**limited** [21] - 1259:13,
1327:20, 1335:20,
1336:25, 1339:15,
1359:17, 1359:23,
1360:22, 1361:10,
1363:8, 1363:13,
1370:22, 1371:18,
1395:10, 1411:4,
1411:8, 1416:7,
1416:11, 1488:15,
1491:18, 1536:14
**LIMITED** [1] - 1216:5
**limiting** [2] - 1390:16,
1393:9
**limits** [1] - 1377:10
**line** [38] - 1227:13,
1227:25, 1228:4,
1230:12, 1230:13,
1244:9, 1244:10,
1244:12, 1244:20,
1245:1, 1279:17,
1293:8, 1352:2,
1374:12, 1391:18,
1403:2, 1407:2,
1412:18, 1413:2,
1413:3, 1436:25,
1437:3, 1444:3,
1446:2, 1449:14,
1449:15, 1449:22,
1449:23, 1450:23,
1455:18, 1458:13,
1458:16, 1468:22,
1470:1, 1494:24,
1495:8, 1502:2,

1522:22
**linear** [1] - 1453:10
**linearly** [1] - 1453:14
**lines** [14] - 1293:5,
1299:17, 1358:21,
1378:17, 1399:12,
1403:3, 1413:19,
1415:2, 1453:7,
1453:10, 1455:19,
1455:22, 1473:24,
1494:20
**linkage** [1] - 1399:8
**lipid** [12] - 1351:22,
1352:5, 1354:22,
1355:5, 1362:18,
1379:20, 1411:18,
1411:23, 1412:3,
1422:25, 1479:20
**lipid-altering** [5] -
1352:5, 1354:22,
1355:5, 1411:23,
1412:3
**lipid-lowering** [1] -
1379:20
**lipidologists** [1] -
1410:3
**lipidology** [1] -
1293:12
**lipids** [2] - 1347:9,
1398:8
**list** [9] - 1283:14,
1283:16, 1283:17,
1302:1, 1319:17,
1336:9, 1365:1,
1365:7, 1366:3
**listed** [22] - 1242:11,
1255:3, 1283:9,
1283:20, 1284:1,
1284:4, 1284:5,
1284:23, 1285:14,
1285:17, 1286:1,
1288:2, 1288:6,
1289:12, 1301:25,
1349:7, 1377:2,
1379:20, 1454:1,
1475:9, 1493:6
**listen** [2] - 1410:24,
1506:12
**listing** [3] - 1284:21,
1286:14, 1287:5
**lists** [1] - 1330:19
**litigation** [3] - 1294:4,
1366:17, 1366:23
**Livalo** [1] - 1270:5
**livelihood** [1] -
1511:10
**lives** [1] - 1441:20
**loaded** [1] - 1471:20
**located** [1] - 1319:2
**lodge** [1] - 1401:1

**lodged** [1] - 1401:10
**Long-Term** [1] -
1336:15
**long-term** [13] -
1247:21, 1337:20,
1338:22, 1339:4,
1340:2, 1344:19,
1357:17, 1359:19,
1373:25, 1389:17,
1389:24, 1390:6,
1390:13
**look** [63] - 1223:1,
1224:11, 1224:12,
1225:4, 1226:9,
1226:12, 1226:15,
1227:4, 1231:2,
1231:17, 1231:22,
1232:17, 1232:25,
1234:21, 1236:3,
1237:4, 1239:10,
1244:22, 1247:21,
1248:24, 1249:2,
1252:17, 1259:5,
1273:19, 1282:2,
1299:16, 1301:6,
1302:18, 1322:17,
1351:2, 1369:3,
1369:13, 1377:4,
1385:12, 1387:20,
1391:25, 1394:15,
1424:16, 1431:21,
1434:10, 1439:4,
1439:10, 1439:12,
1447:3, 1461:1,
1461:7, 1463:2,
1468:12, 1468:19,
1472:25, 1473:18,
1475:12, 1475:18,
1490:6, 1491:12,
1494:17, 1497:12,
1501:10, 1509:7,
1511:24, 1513:20,
1527:8, 1533:8
**looked** [31] - 1241:12,
1252:6, 1265:8,
1273:20, 1297:17,
1302:23, 1308:16,
1310:12, 1335:11,
1405:4, 1407:25,
1423:6, 1423:10,
1424:19, 1455:1,
1456:14, 1457:19,
1466:25, 1469:22,
1470:13, 1470:24,
1481:5, 1482:5,
1482:13, 1490:11,
1491:12, 1526:6,
1530:10, 1532:10,
1532:16
**looking** [52] - 1223:2,

31

1224:2, 1226:7, 1226:18, 1231:13, 1232:20, 1233:21, 1236:6, 1245:11, 1245:19, 1247:2, 1249:4, 1249:13, 1253:1, 1253:22, 1259:2, 1271:6, 1272:7, 1281:13, 1282:18, 1283:5, 1295:21, 1296:8, 1296:12, 1296:14, 1296:15, 1296:19, 1296:20, 1300:17, 1304:8, 1304:12, 1305:21, 1339:10, 1340:20, 1351:4, 1367:13, 1372:24, 1381:5, 1385:6, 1441:23, 1442:1, 1446:6, 1446:16, 1471:19, 1498:19, 1507:15, 1507:16, 1510:8, 1511:10, 1513:24, 1514:20, 1537:22

**looks** [8] - 1222:16, 1230:24, 1230:25, 1234:23, 1299:4, 1299:5, 1401:9, 1469:3

**lose** [1] - 1475:22

**loss** [14] - 1226:22, 1226:25, 1227:3, 1227:8, 1227:13, 1240:23, 1241:13, 1265:9, 1296:3, 1457:2, 1457:8, 1457:14, 1463:10, 1502:7

**losses** [27] - 1227:15, 1227:22, 1227:23, 1228:2, 1228:9, 1228:15, 1230:20, 1231:9, 1239:19, 1241:23, 1242:1, 1244:11, 1244:14, 1246:23, 1290:2, 1440:11, 1440:12, 1440:18, 1441:24, 1442:12, 1458:7, 1458:11, 1461:13, 1461:14, 1463:8, 1505:1

**lost** [3] - 1236:1, 1289:25, 1310:2

**louder** [1] - 1392:8

**Lovaza** [44] - 1232:3, 1233:10, 1262:21, 1273:7, 1307:18,

1307:21, 1307:25, 1308:2, 1309:3, 1309:8, 1309:14, 1427:25, 1428:1, 1433:23, 1434:2, 1437:4, 1437:6, 1471:8, 1471:11, 1471:17, 1472:18, 1472:20, 1473:19, 1473:25, 1474:3, 1474:25, 1484:20, 1484:23, 1485:3, 1486:6, 1486:8, 1486:11, 1488:1, 1488:3, 1488:22, 1489:1, 1490:12, 1490:19, 1490:22, 1527:21, 1536:14, 1537:2

**Lovaza's** [4] - 1308:7, 1437:6, 1438:18, 1485:10

**low** [10] - 1224:5, 1460:18, 1461:3, 1461:11, 1485:7, 1503:25, 1508:16, 1508:19, 1515:4, 1534:22

**lower** [9] - 1252:20, 1254:13, 1350:7, 1435:24, 1472:17, 1483:15, 1483:17, 1502:20, 1502:22

**lowering** [17] - 1224:4, 1231:18, 1232:1, 1233:4, 1233:16, 1234:25, 1273:8, 1290:5, 1309:23, 1351:18, 1362:18, 1379:20, 1438:4, 1480:23, 1482:3, 1483:6, 1496:11

**Ls** [1] - 1228:19

**lunch** [5] - 1355:14, 1355:17, 1355:23, 1356:3

## M

**M.D** [2] - 1311:21, 1540:9

**Madison** [2] - 1217:11, 1418:25

**magna** [2] - 1219:4, 1418:22

**magnitude** [1] - 1431:22

**mail** [2] - 1262:14, 1262:20

**main** [4] - 1222:8,

1259:16, 1325:13, 1408:8

**maintain** [12] - 1338:11, 1338:17, 1338:22, 1344:5, 1344:10, 1358:1, 1359:1, 1381:7, 1381:15, 1397:8, 1398:10, 1467:22

**major** [6] - 1219:25, 1318:15, 1339:25, 1422:1, 1426:23, 1466:22

**majority** [12] - 1225:8, 1225:13, 1247:8, 1249:14, 1252:18, 1253:11, 1257:5, 1291:2, 1303:19, 1478:14, 1488:24, 1493:3

**majors** [1] - 1219:5

**makers** [3] - 1477:22, 1526:5, 1526:11

**Management** [1] - 1418:10

**management** [8] - 1260:19, 1261:21, 1262:14, 1268:25, 1270:3, 1270:12, 1276:4, 1420:7

**managing** [2] - 1218:25, 1467:6

**manner** [2] - 1326:23, 1327:9

**manufacturer** [6] - 1342:9, 1348:14, 1348:16, 1348:24, 1349:2, 1349:3

**manufacturers** [4] - 1325:2, 1341:18, 1431:22, 1433:6

**manufactures** [2] - 1322:2, 1353:5

**March** [2] - 1461:17, 1463:23

**margin** [8] - 1455:3, 1455:4, 1455:6, 1455:8, 1455:21, 1455:23, 1508:2, 1514:12

**margines** [1] - 1456:2

**margins** [3] - 1450:7, 1456:6, 1510:25

**MARINE** [18] - 1256:14, 1361:8, 1362:10, 1362:12, 1364:21, 1366:10, 1366:13, 1366:14, 1366:16, 1366:18, 1366:20, 1366:22,

1405:25, 1425:16, 1425:18, 1489:9, 1528:14, 1533:19

**mark** [4] - 1516:7, 1516:8, 1516:9, 1516:22

**marked** [4] - 1513:2, 1515:14, 1516:6, 1516:10

**Market** [1] - 1270:18

**market** [99] - 1222:15, 1224:3, 1227:24, 1228:15, 1231:11, 1231:22, 1232:1, 1232:6, 1232:7, 1232:17, 1233:4, 1233:11, 1233:12, 1234:23, 1235:11, 1253:5, 1273:8, 1273:20, 1273:24, 1290:1, 1290:4, 1298:7, 1299:18, 1300:24, 1301:3, 1302:4, 1302:13, 1303:4, 1303:6, 1305:16, 1306:5, 1307:4, 1309:10, 1309:12, 1309:13, 1423:10, 1423:12, 1424:20, 1424:21, 1427:25, 1429:13, 1433:19, 1434:2, 1434:8, 1434:10, 1434:16, 1435:4, 1435:9, 1435:16, 1436:20, 1436:24, 1437:1, 1437:4, 1437:7, 1437:9, 1438:8, 1438:13, 1439:4, 1439:5, 1439:6, 1439:11, 1439:12, 1440:10, 1442:4, 1442:14, 1446:9, 1448:10, 1453:9, 1467:6, 1468:16, 1470:6, 1471:10, 1471:12, 1471:21, 1475:14, 1475:22, 1475:25, 1476:3, 1476:9, 1476:11, 1477:18, 1478:11, 1490:13, 1504:19, 1504:20, 1504:22, 1507:7, 1509:19, 1509:21, 1510:3, 1510:6, 1522:4, 1526:2, 1526:3, 1530:3, 1531:21

**marketed** [4] -

1306:14, 1474:2, 1476:21, 1501:7

**marketing** [99] - 1225:18, 1250:1, 1259:16, 1259:18, 1259:21, 1260:1, 1260:5, 1260:6, 1260:7, 1260:15, 1260:20, 1261:25, 1262:10, 1262:15, 1262:18, 1263:15, 1264:7, 1265:5, 1265:11, 1265:13, 1265:17, 1265:20, 1265:21, 1267:8, 1269:4, 1271:13, 1272:2, 1272:5, 1272:24, 1273:17, 1273:22, 1274:9, 1275:4, 1277:9, 1277:21, 1280:2, 1282:4, 1291:9, 1292:20, 1303:18, 1305:25, 1306:18, 1306:24, 1307:14, 1309:6, 1309:14, 1310:6, 1310:9, 1310:16, 1310:18, 1424:1, 1456:7, 1467:2, 1470:16, 1470:18, 1470:20, 1470:24, 1471:9, 1471:20, 1471:25, 1472:5, 1472:7, 1472:17, 1472:19, 1472:24, 1473:18, 1473:21, 1473:22, 1474:1, 1474:20, 1474:23, 1475:13, 1475:22, 1476:25, 1477:2, 1477:19, 1478:11, 1479:6, 1483:16, 1484:6, 1484:14, 1525:10, 1525:15, 1525:20, 1525:23, 1526:6, 1526:10, 1526:12, 1527:5, 1527:8, 1527:9, 1527:11, 1531:17, 1532:1, 1532:3, 1532:17, 1533:7, 1533:9

**Marketing** [3] - 1260:11, 1265:2, 1478:13

**marketplace** [73] - 1222:10, 1222:16, 1222:18, 1223:2, 1223:3, 1223:9, 1223:13, 1223:21, 1223:23, 1224:24,

32

1224:25, 1225:3,
1225:4, 1225:17,
1226:7, 1226:13,
1226:14, 1228:8,
1228:12, 1228:14,
1231:11, 1231:18,
1231:21, 1233:20,
1235:4, 1235:12,
1236:8, 1236:9,
1236:12, 1239:12,
1239:16, 1239:17,
1239:18, 1247:13,
1247:15, 1247:22,
1247:23, 1247:24,
1248:24, 1248:25,
1249:4, 1253:18,
1253:24, 1259:4,
1260:1, 1272:13,
1273:18, 1277:14,
1277:19, 1282:8,
1282:9, 1282:13,
1282:19, 1287:23,
1288:9, 1289:22,
1289:23, 1290:10,
1290:19, 1290:25,
1291:11, 1296:16,
1298:9, 1299:20,
1301:20, 1302:4,
1302:16, 1423:5,
1427:21, 1452:12,
1481:25, 1527:17,
1537:3
**markets** [3] - 1220:7,
1502:10, 1527:24
**marrow** [1] - 1386:16
**massive** [7] - 1228:15,
1230:20, 1231:9,
1239:18, 1243:21,
1244:14
**massively** [1] - 1224:1
**master's** [2] - 1313:3
**masters** [1] - 1418:23
**match** [1] - 1334:4
**material** [6] - 1345:12,
1346:23, 1351:3,
1351:4, 1527:7,
1527:8
**materialize** [4] -
1236:18, 1236:21,
1237:12, 1239:3
**materially** [2] -
1364:22, 1376:19
**materials** [3] -
1267:15, 1527:1,
1532:24
**math** [2] - 1305:3,
1534:7
**mathematics** [1] -
1315:4
**Mathers** [1] - 1393:1

**matter** [11] - 1221:19,
1289:13, 1340:13,
1358:20, 1368:25,
1388:17, 1451:15,
1504:1, 1507:20,
1510:23, 1540:3
**matters** [2] - 1294:15,
1469:3
**maximize** [1] -
1504:10
**maximum** [2] -
1389:12, 1395:15
**MEAGAN** [1] -
1216:14
**mean** [67] - 1227:8,
1230:14, 1231:12,
1235:24, 1237:3,
1247:1, 1249:8,
1253:20, 1256:17,
1258:12, 1261:9,
1273:16, 1278:2,
1282:17, 1282:18,
1284:20, 1286:4,
1286:13, 1288:23,
1292:19, 1295:12,
1298:12, 1299:6,
1300:3, 1300:20,
1302:17, 1307:3,
1307:10, 1307:24,
1308:4, 1310:17,
1324:8, 1333:24,
1343:6, 1346:15,
1347:22, 1360:3,
1366:13, 1366:14,
1366:16, 1372:7,
1377:11, 1390:14,
1393:11, 1394:21,
1415:15, 1416:18,
1416:20, 1423:16,
1429:16, 1445:18,
1496:16, 1498:3,
1501:14, 1507:14,
1508:20, 1510:2,
1510:21, 1514:12,
1514:14, 1514:17,
1518:16, 1519:2,
1522:14, 1525:22,
1532:15, 1537:15
**meaning** [5] - 1346:7,
1379:11, 1408:7,
1447:12, 1457:9
**meaningful** [1] -
1236:13
**means** [11] - 1222:2,
1225:24, 1257:2,
1279:23, 1281:18,
1309:15, 1343:22,
1375:3, 1379:23,
1434:17, 1440:24
**meant** [3] - 1229:25,

1390:18, 1487:14
**measure** [7] -
1231:20, 1239:16,
1259:24, 1272:5,
1274:2, 1275:4,
1295:13
**measured** [1] -
1519:17
**measurement** [1] -
1239:6
**measures** [1] -
1272:11
**measuring** [2] -
1295:9, 1474:1
**mechanism** [1] -
1526:10
**Medi** [5] - 1432:1,
1432:3, 1432:5,
1432:8, 1433:6
**Medi-Care** [5] -
1432:1, 1432:3,
1432:5, 1432:8,
1433:6
**media** [2] - 1264:3,
1264:15
**median** [7] - 1346:6,
1346:7, 1346:9,
1346:12, 1346:25,
1407:7, 1514:16
**medical** [16] - 1285:4,
1315:13, 1316:2,
1316:7, 1319:2,
1319:7, 1319:12,
1319:13, 1320:1,
1320:17, 1334:2,
1366:11, 1367:1,
1432:6, 1489:6,
1494:17
**Medical** [4] - 1315:10,
1315:20, 1315:25,
1316:1
**medication** [5] -
1352:5, 1353:6,
1353:24, 1354:22,
1397:17
**Medication** [1] -
1352:24
**medications** [3] -
1353:13, 1353:21,
1411:19
**medicinal** [1] -
1293:14
**medicine** [10] -
1293:10, 1315:9,
1315:11, 1315:17,
1315:24, 1316:12,
1324:24, 1334:10,
1395:2, 1397:20
**medicines** [2] -
1419:20, 1419:21

**meet** [1] - 1438:14
**meeting** [1] - 1326:8
**meetings** [1] -
1326:11
**members** [1] - 1319:7
**men** [1] - 1334:2
**mention** [6] - 1242:9,
1242:22, 1253:7,
1366:22, 1390:25,
1408:1
**mentioned** [28] -
1222:1, 1222:20,
1225:20, 1240:17,
1242:15, 1248:21,
1250:16, 1256:8,
1259:12, 1259:25,
1267:6, 1267:19,
1268:24, 1272:2,
1275:3, 1317:3,
1317:20, 1320:13,
1321:4, 1327:21,
1424:19, 1428:7,
1432:13, 1434:14,
1443:24, 1452:11,
1475:12, 1496:4
**mentioning** [1] -
1484:11
**mergers** [1] - 1467:2
**merit** [1] - 1292:11
**merits** [2] - 1223:11,
1537:1
**message** [8] -
1476:24, 1477:4,
1478:15, 1479:3,
1479:4, 1479:5,
1479:6, 1526:6
**messages** [6] -
1470:19, 1477:20,
1477:22, 1479:11,
1479:17, 1484:8
**messenger** [1] -
1264:2
**met** [2] - 1292:2,
1357:9
**method** [12] - 1225:9,
1225:23, 1226:1,
1250:7, 1421:23,
1422:19, 1440:2,
1443:2, 1447:3,
1493:20, 1495:10,
1495:22
**methodological** [1] -
1247:20
**methodology** [3] -
1224:14, 1248:7,
1441:18
**methods** [3] - 1446:3,
1446:11, 1446:14
**metric** [1] - 1231:20
**metrics** [4] - 1222:14,

1226:4, 1240:23,
1304:18
**Michael** [1] - 1492:15
**MICHAEL** [2] -
1216:14, 1217:12
**mid** [2] - 1284:4,
1284:19
**middle** [4] - 1393:1,
1433:5, 1449:23,
1534:24
**might** [13] - 1235:25,
1257:25, 1258:22,
1270:9, 1326:8,
1402:1, 1429:20,
1453:2, 1460:20,
1471:24, 1479:6,
1479:8, 1511:19
**Mike** [1] - 1292:3
**military** [4] - 1318:9,
1318:16, 1319:2,
1319:5
**milligrams** [36] -
1225:25, 1248:16,
1250:9, 1251:10,
1252:14, 1252:16,
1254:13, 1254:16,
1254:20, 1257:5,
1257:14, 1258:24,
1338:10, 1338:11,
1344:4, 1344:5,
1381:8, 1381:16,
1488:16, 1494:2,
1494:8, 1494:15,
1495:14, 1495:20,
1496:16, 1497:14,
1523:3, 1523:10,
1523:16, 1524:22,
1528:15, 1528:20,
1529:3, 1534:20,
1535:12, 1535:19
**million** [57] - 1228:1,
1230:16, 1233:2,
1233:15, 1233:17,
1241:6, 1241:8,
1241:9, 1241:16,
1241:17, 1241:18,
1241:22, 1241:23,
1247:5, 1265:13,
1265:16, 1278:22,
1425:11, 1427:15,
1429:7, 1429:8,
1441:24, 1449:8,
1461:7, 1461:9,
1461:14, 1463:1,
1463:3, 1463:8,
1472:20, 1472:21,
1508:12, 1508:18,
1509:9, 1509:17,
1510:8, 1510:25,
1512:4, 1512:5,

1514:4, 1518:11,
1519:1, 1519:10,
1519:14, 1519:15,
1519:19, 1525:10,
1525:11, 1525:19,
1528:17, 1529:7,
1534:3, 1534:8,
1535:2

**millions** [10] -
1227:21, 1227:22,
1242:3, 1247:11,
1277:25, 1425:9,
1429:5, 1449:5,
1452:20, 1514:25

**mind** [4] - 1248:3,
1401:21, 1415:14,
1510:11

**minimize** [2] -
1353:14, 1353:24

**minimum** [3] -
1389:12, 1395:15,
1537:1

**minority** [1] - 1252:21

**minus** [5] - 1346:6,
1429:18, 1455:10,
1455:11

**minute** [4] - 1302:22,
1313:10, 1405:16,
1503:18

**minutes** [4] - 1335:12,
1355:21, 1539:12

**MIRANDA** [1] - 1216:2

**misinformation** [1] -
1302:16

**miss** [1] - 1468:25

**Miss** [3] - 1454:8,
1538:7, 1538:12

**misspeak** [1] -
1487:17

**misspoke** [1] -
1487:14

**mistaken** [1] - 1513:19

**mistakenly** [1] -
1504:11

**misunderstood** [1] -
1230:2

**mitigate** [1] - 1353:9

**model** [24] - 1443:21,
1499:4, 1504:4,
1504:8, 1504:14,
1505:7, 1505:9,
1510:15, 1510:16,
1511:12, 1514:3,
1514:7, 1514:18,
1515:7, 1520:3,
1520:23, 1520:25,
1521:5, 1521:10,
1521:11, 1521:24,
1522:2

**modeled** [1] - 1446:13

**modeling** [1] - 1505:5

**models** [2] - 1244:1,
1504:2

**modification** [3] -
1337:1, 1382:2,
1382:16

**modify** [1] - 1381:24

**molecules** [1] -
1446:15

**moment** [5] - 1312:22,
1369:3, 1371:15,
1374:24, 1537:23

**Monday** [1] - 1539:20

**monetization** [1] -
1219:19

**money** [16] - 1236:2,
1289:25, 1310:16,
1310:17, 1310:19,
1457:15, 1467:1,
1472:8, 1486:8,
1489:9, 1489:10,
1500:17, 1503:8,
1503:15, 1503:16,
1503:18

**monitor** [1] - 1319:22

**monitoring** [1] -
1320:25

**monitors** [1] - 1348:7

**monotherapy** [8] -
1352:3, 1352:7,
1352:9, 1355:7,
1412:6, 1412:16,
1413:17

**month** [4] - 1281:14,
1281:20, 1303:4,
1316:1

**monthly** [1] - 1484:22

**months** [3] - 1302:10,
1308:5, 1504:23

**Morgan** [1] - 1301:12

**morning** [21] - 1218:4,
1291:19, 1291:20,
1292:1, 1292:9,
1294:5, 1312:11,
1422:5, 1428:7,
1429:22, 1437:23,
1438:23, 1439:23,
1450:24, 1459:21,
1462:20, 1464:16,
1475:5, 1475:21,
1490:23, 1521:9

**most** [31] - 1223:20,
1235:6, 1280:23,
1282:5, 1297:20,
1309:18, 1318:5,
1320:4, 1323:10,
1332:1, 1333:20,
1345:9, 1419:17,
1427:23, 1433:20,
1435:10, 1438:17,

1440:2, 1442:24,
1452:16, 1471:21,
1480:16, 1480:18,
1480:21, 1489:11,
1495:22, 1498:20,
1503:22, 1512:20,
1520:13, 1534:1

**mostly** [2] - 1315:19,
1400:21

**motion** [1] - 1539:15

**motivated** [1] - 1226:9

**motivation** [4] -
1226:20, 1231:6,
1245:9, 1386:20

**motivations** [1] -
1245:16

**move** [40] - 1228:23,
1229:22, 1235:14,
1242:20, 1245:25,
1251:19, 1255:16,
1255:18, 1255:22,
1260:23, 1262:22,
1263:18, 1264:19,
1266:3, 1266:9,
1269:10, 1276:12,
1280:3, 1286:19,
1287:11, 1299:9,
1308:15, 1311:9,
1364:13, 1387:25,
1404:3, 1426:10,
1428:17, 1445:23,
1445:24, 1452:8,
1464:2, 1473:2,
1473:6, 1486:13,
1487:15, 1492:2,
1530:11, 1536:1

**moved** [5] - 1254:22,
1254:24, 1255:9,
1255:22, 1382:14

**mover** [1] - 1476:5

**moves** [4] - 1314:14,
1328:24, 1332:7,
1462:9

**moving** [4] - 1255:13,
1266:21, 1426:7,
1484:19

**MR** [586] - 1218:7,
1218:12, 1218:20,
1218:23, 1220:17,
1220:19, 1220:22,
1220:25, 1221:3,
1221:13, 1221:15,
1221:18, 1228:23,
1229:3, 1229:12,
1229:19, 1229:20,
1229:23, 1229:25,
1230:3, 1230:8,
1232:4, 1232:5,
1234:1, 1234:4,
1234:7, 1234:9,

1234:13, 1235:14,
1235:16, 1235:20,
1242:19, 1243:1,
1243:5, 1243:7,
1243:10, 1243:11,
1245:24, 1246:2,
1246:5, 1251:1,
1251:3, 1251:19,
1251:21, 1251:25,
1252:2, 1254:21,
1255:1, 1255:2,
1255:7, 1255:10,
1255:17, 1256:1,
1256:5, 1256:6,
1260:22, 1261:1,
1261:6, 1261:11,
1262:3, 1262:6,
1262:19, 1262:24,
1263:2, 1263:16,
1263:20, 1263:23,
1263:24, 1264:18,
1264:21, 1264:24,
1265:1, 1266:3,
1266:5, 1266:6,
1266:8, 1266:11,
1266:15, 1266:18,
1266:23, 1267:3,
1267:4, 1268:9,
1268:11, 1269:7,
1269:11, 1269:14,
1269:15, 1270:17,
1270:20, 1271:11,
1271:16, 1271:20,
1271:24, 1272:1,
1272:14, 1272:17,
1274:11, 1274:13,
1274:16, 1274:18,
1274:24, 1275:2,
1275:21, 1275:24,
1276:8, 1276:13,
1276:16, 1278:6,
1278:9, 1278:25,
1279:5, 1279:9,
1279:13, 1280:3,
1280:6, 1280:8,
1280:12, 1280:16,
1280:17, 1282:25,
1283:2, 1283:7,
1283:12, 1283:24,
1283:25, 1284:7,
1284:15, 1284:20,
1285:1, 1285:9,
1285:18, 1285:21,
1286:4, 1286:9,
1286:13, 1286:16,
1286:24, 1287:1,
1287:9, 1287:13,
1287:16, 1290:20,
1290:22, 1291:15,
1291:24, 1292:1,
1292:8, 1296:23,

1297:1, 1298:24,
1299:1, 1301:6,
1301:8, 1301:17,
1301:19, 1303:7,
1303:9, 1304:14,
1304:16, 1308:12,
1308:17, 1308:20,
1310:20, 1310:22,
1311:2, 1311:11,
1311:13, 1311:18,
1312:7, 1312:10,
1314:1, 1314:3,
1314:14, 1314:16,
1314:19, 1314:23,
1315:1, 1316:4,
1316:6, 1318:20,
1318:22, 1320:12,
1323:16, 1323:19,
1323:24, 1324:1,
1328:6, 1328:8,
1328:24, 1329:1,
1329:4, 1329:15,
1329:17, 1329:25,
1330:2, 1331:16,
1331:18, 1332:7,
1332:9, 1332:12,
1332:19, 1332:22,
1335:10, 1335:16,
1336:12, 1336:16,
1339:7, 1339:9,
1341:2, 1341:4,
1341:23, 1341:25,
1342:3, 1342:6,
1345:2, 1345:5,
1345:10, 1349:12,
1349:14, 1350:1,
1350:3, 1350:24,
1351:1, 1352:21,
1353:1, 1355:11,
1355:17, 1355:20,
1355:24, 1355:25,
1356:1, 1356:4,
1357:6, 1357:9,
1357:13, 1360:6,
1360:7, 1361:12,
1361:13, 1363:21,
1364:1, 1364:18,
1364:19, 1365:19,
1365:20, 1367:11,
1367:12, 1371:3,
1371:7, 1371:10,
1371:13, 1372:11,
1372:13, 1378:16,
1378:19, 1387:25,
1388:2, 1388:5,
1391:17, 1391:20,
1399:11, 1399:14,
1399:17, 1400:3,
1400:8, 1400:24,
1401:12, 1401:20,
1402:2, 1402:15,

1402:17, 1402:23, 1403:3, 1403:7, 1403:24, 1404:3, 1404:4, 1405:1, 1405:2, 1409:22, 1409:4, 1409:7, 1409:8, 1409:15, 1409:20, 1410:23, 1411:3, 1412:17, 1412:20, 1413:2, 1413:5, 1413:19, 1413:22, 1413:25, 1414:2, 1414:5, 1414:15, 1414:19, 1415:23, 1416:2, 1416:5, 1417:4, 1417:8, 1417:9, 1417:13, 1417:24, 1418:2, 1420:15, 1420:17, 1421:1, 1421:3, 1421:6, 1421:9, 1421:12, 1421:14, 1424:3, 1424:5, 1424:23, 1425:1, 1426:4, 1426:6, 1426:9, 1426:12, 1426:16, 1427:6, 1427:8, 1428:13, 1428:15, 1428:17, 1428:21, 1428:24, 1429:1, 1430:13, 1430:15, 1430:16, 1430:18, 1430:21, 1430:25, 1431:2, 1431:15, 1431:16, 1432:19, 1432:21, 1432:24, 1433:1, 1433:13, 1433:15, 1434:25, 1435:2, 1436:7, 1436:9, 1436:12, 1436:16, 1436:18, 1437:16, 1437:18, 1437:21, 1437:24, 1438:19, 1438:21, 1439:19, 1439:21, 1442:15, 1442:16, 1443:7, 1443:9, 1443:11, 1443:15, 1443:17, 1443:25, 1444:2, 1445:2, 1445:3, 1445:11, 1445:13, 1445:18, 1445:23, 1446:1, 1446:20, 1446:23, 1447:24, 1448:1, 1448:25, 1449:2, 1450:16, 1450:18, 1451:1, 1451:9, 1451:23, 1452:3, 1452:8, 1452:10,

1453:20, 1453:22, 1453:25, 1454:4, 1454:14, 1454:19, 1454:21, 1454:23, 1456:16, 1456:18, 1456:21, 1456:23, 1457:21, 1457:23, 1458:2, 1458:4, 1459:13, 1459:15, 1459:18, 1459:20, 1460:22, 1460:24, 1461:22, 1461:25, 1462:3, 1462:9, 1462:11, 1462:14, 1462:16, 1463:17, 1463:19, 1463:21, 1464:2, 1464:4, 1464:7, 1464:13, 1464:14, 1465:11, 1465:12, 1465:20, 1465:22, 1465:25, 1466:1, 1467:17, 1467:19, 1467:23, 1468:8, 1468:10, 1469:5, 1469:6, 1469:13, 1469:15, 1469:18, 1469:19, 1470:8, 1470:10, 1471:4, 1471:6, 1473:1, 1473:4, 1473:6, 1473:10, 1473:14, 1473:16, 1474:7, 1474:9, 1474:11, 1474:15, 1474:18, 1475:1, 1475:3, 1477:6, 1477:8, 1478:2, 1478:4, 1478:7, 1478:9, 1478:25, 1479:2, 1479:15, 1480:8, 1480:10, 1480:25, 1480:1, 1481:13, 1481:15, 1481:18, 1481:20, 1482:8, 1482:10, 1482:18, 1482:20, 1482:23, 1483:1, 1483:8, 1483:9, 1483:22, 1483:24, 1484:2, 1484:16, 1484:18, 1485:14, 1485:16, 1485:19, 1486:12, 1486:16, 1486:19, 1486:21, 1487:4, 1487:8, 1487:12, 1487:17, 1487:20, 1487:24, 1489:24, 1490:3, 1490:6, 1490:8, 1491:25, 1492:4, 1492:9, 1492:12,

1492:13, 1492:15, 1492:18, 1493:8, 1493:10, 1494:19, 1494:21, 1497:8, 1497:9, 1499:9, 1499:10, 1499:15, 1499:17, 1501:20, 1501:21, 1506:19, 1506:21, 1512:25, 1513:7, 1513:9, 1515:12, 1515:20, 1515:24, 1516:4, 1516:14, 1516:15, 1516:16, 1516:25, 1517:11, 1517:12, 1518:3, 1518:4, 1518:8, 1518:9, 1520:19, 1520:21, 1523:18, 1523:24, 1524:6, 1524:18, 1524:20, 1525:2, 1525:4, 1528:2, 1528:3, 1528:7, 1528:8, 1530:11, 1530:13, 1530:16, 1530:24, 1531:1, 1532:6, 1532:8, 1533:15, 1533:16, 1535:21, 1536:1, 1536:4, 1536:8, 1536:9, 1537:4, 1537:15, 1537:18, 1537:21, 1537:25, 1538:2, 1538:18, 1539:2, 1539:21, 1539:22
**MS** [2] - 1539:5, 1539:8
**multicenter** [1] - 1318:2
**multiple** [4] - 1282:20, 1288:5, 1453:4, 1479:20
**multiplied** [1] - 1491:6
**must** [18] - 1292:10, 1333:1, 1337:2, 1337:8, 1337:11, 1338:2, 1342:11, 1342:13, 1342:21, 1343:17, 1365:1, 1365:7, 1366:2, 1386:13, 1404:15, 1404:21, 1405:5, 1408:4
**myelosuppression** [1] - 1386:15
**Myers** [1] - 1442:19

## N

**N-i-c-h-o-l-s-o-n** [1] -

1417:23
**NA** [2] - 1253:8, 1253:9
**name** [16] - 1218:16, 1218:17, 1218:18, 1292:3, 1311:24, 1312:3, 1312:4, 1312:5, 1398:25, 1417:20, 1417:21, 1492:15
**namely** [1] - 1483:16
**names** [1] - 1505:15
**narrow** [1] - 1387:5
**national** [2] - 1264:2, 1318:2
**National** [6] - 1316:1, 1319:3, 1418:18, 1488:5, 1489:22, 1496:21
**nationally** [1] - 1428:12
**nature** [5] - 1219:6, 1246:8, 1340:2, 1470:18, 1519:18
**Nature** [1] - 1469:8
**Naval** [1] - 1315:25
**Navy** [1] - 1319:6
**NDA** [6] - 1312:15, 1312:16, 1312:17, 1322:21, 1325:16, 1326:1
**NDAs** [1] - 1321:13
**NDTI** [14] - 1250:18, 1251:9, 1252:4, 1252:5, 1253:16, 1253:18, 1255:6, 1258:12, 1288:24, 1297:4, 1488:5, 1496:18, 1497:4, 1527:20
**nearly** [3] - 1228:2, 1283:16, 1290:1
**necessarily** [2] - 1270:23, 1499:22
**Necessary** [1] - 1369:22
**necessary** [6] - 1229:14, 1286:12, 1339:13, 1344:1, 1373:18, 1387:5
**need** [15] - 1224:25, 1229:15, 1285:12, 1285:20, 1300:20, 1306:23, 1306:24, 1326:5, 1333:18, 1397:17, 1398:9, 1440:22, 1454:8, 1512:21, 1539:19
**needed** [3] - 1321:8, 1327:7, 1460:14

**needs** [7] - 1229:4, 1292:25, 1319:7, 1334:9, 1357:25, 1476:12, 1476:13
**negative** [10] - 1440:18, 1441:7, 1441:8, 1447:7, 1447:12, 1447:14, 1447:23, 1458:13, 1461:15, 1514:5
**negatively** [1] - 1450:23
**net** [38] - 1227:9, 1230:13, 1239:10, 1239:14, 1239:21, 1240:9, 1240:23, 1240:25, 1278:16, 1304:19, 1304:21, 1304:25, 1305:4, 1429:4, 1429:7, 1429:16, 1429:18, 1429:25, 1430:3, 1431:9, 1431:10, 1441:6, 1441:16, 1441:17, 1447:6, 1485:20, 1485:21, 1488:9, 1490:25, 1491:11, 1502:7, 1508:10, 1525:11, 1525:16, 1525:24
**Net** [55] - 1224:15, 1238:10, 1238:13, 1238:22, 1239:5, 1239:7, 1242:5, 1243:12, 1244:1, 1244:7, 1244:21, 1244:25, 1246:13, 1247:17, 1248:4, 1290:15, 1295:1, 1295:3, 1295:10, 1295:12, 1424:21, 1439:23, 1440:1, 1440:2, 1440:23, 1441:2, 1442:8, 1443:2, 1443:21, 1444:19, 1444:22, 1447:13, 1447:18, 1458:17, 1459:1, 1462:23, 1464:9, 1464:22, 1465:2, 1465:8, 1467:14, 1469:23, 1470:5, 1488:10, 1504:4, 1504:12, 1504:15, 1505:8, 1513:20, 1513:25, 1514:3, 1521:6, 1521:20, 1521:23
**NEVADA** [3] - 1216:1, 1218:1, 1357:1

35

**Nevada** [4] - 1216:7,
1216:23, 1217:8,
1217:13
**never** [6] - 1390:21,
1390:25, 1398:4,
1499:1, 1500:25,
1501:3
**new** [38] - 1257:6,
1271:6, 1284:24,
1291:6, 1297:21,
1318:2, 1318:13,
1320:22, 1320:23,
1321:9, 1321:25,
1322:12, 1322:13,
1323:17, 1323:22,
1325:15, 1325:22,
1325:24, 1326:15,
1361:14, 1361:17,
1363:18, 1363:24,
1364:10, 1419:19,
1419:21, 1422:10,
1439:5, 1440:4,
1440:5, 1440:6,
1476:1, 1476:9,
1522:18, 1526:1
**New** [1] - 1217:11
**next** [24] - 1216:25,
1218:8, 1223:17,
1224:20, 1234:14,
1235:21, 1238:9,
1239:2, 1239:15,
1246:6, 1270:18,
1277:17, 1279:10,
1286:17, 1337:14,
1339:20, 1343:11,
1383:24, 1417:13,
1496:7, 1538:21,
1540:25, 1541:25,
1542:25
**Nexus** [1] - 1224:22
**nexus** [63] - 1219:12,
1220:16, 1221:21,
1222:18, 1222:20,
1222:21, 1222:23,
1223:12, 1223:13,
1223:15, 1223:18,
1223:21, 1224:7,
1224:17, 1225:1,
1225:4, 1225:5,
1225:16, 1239:13,
1248:19, 1248:21,
1248:22, 1249:2,
1249:3, 1249:6,
1249:9, 1249:20,
1249:24, 1253:13,
1253:24, 1257:7,
1257:24, 1258:6,
1258:11, 1258:18,
1258:21, 1259:2,
1259:3, 1259:10,

1277:16, 1282:7,
1282:9, 1288:7,
1288:22, 1289:19,
1290:8, 1290:24,
1291:1, 1291:4,
1291:5, 1291:11,
1292:15, 1296:10,
1303:21, 1421:18,
1423:16, 1423:18,
1423:22, 1423:24,
1451:11, 1470:8,
1470:12, 1524:7
**Niacin** [1] - 1233:10
**niacin** [1] - 1434:7
**Niaspan** [2] - 1220:8,
1232:2
**Nicholson** [94] -
1221:22, 1224:9,
1224:11, 1231:25,
1235:25, 1238:12,
1239:20, 1240:3,
1240:9, 1243:16,
1244:8, 1244:15,
1245:12, 1245:21,
1246:10, 1246:13,
1246:19, 1247:8,
1257:25, 1258:8,
1258:22, 1282:15,
1287:22, 1289:11,
1295:8, 1295:16,
1296:8, 1296:12,
1297:8, 1297:17,
1298:2, 1299:11,
1300:16, 1417:14,
1417:22, 1418:3,
1420:18, 1421:7,
1421:10, 1421:15,
1425:2, 1426:17,
1427:9, 1429:2,
1431:17, 1433:2,
1433:16, 1435:3,
1436:19, 1437:13,
1437:25, 1438:22,
1439:22, 1442:17,
1443:18, 1444:4,
1445:4, 1445:23,
1446:24, 1448:2,
1449:3, 1454:24,
1456:24, 1458:5,
1459:21, 1460:25,
1462:4, 1462:17,
1464:8, 1464:15,
1465:13, 1466:2,
1468:3, 1469:7,
1470:11, 1471:7,
1473:17, 1474:19,
1475:4, 1477:9,
1478:10, 1481:2,
1481:23, 1482:11,
1483:10, 1484:19,
1487:25, 1490:9,

1492:1, 1492:13,
1506:1, 1524:3,
1524:14, 1538:5
**NICHOLSON** [2] -
1417:17, 1540:12
**Nicholson's** [11] -
1238:10, 1242:4,
1242:5, 1243:12,
1245:8, 1247:17,
1248:3, 1258:10,
1282:13, 1290:9,
1451:16
**nine** [1] - 1247:5
**ninety** [1] - 1247:6
**ninety-two** [1] -
1247:6
**NO** [1] - 1445:13
**nobody** [1] - 1532:24
**non** [1] - 1432:10
**none** [2] - 1289:14,
1454:4
**nonetheless** [3] -
1348:5, 1378:13,
1394:11
**nonobviousness** [8] -
1219:13, 1222:11,
1222:24, 1223:16,
1236:24, 1293:24,
1488:18, 1529:22
**nonpatented** [1] -
1298:18
**nonuse** [1] - 1413:13
**nonusers** [2] - 1480:2,
1480:3
**noon** [3] - 1355:13,
1355:24, 1356:6
**normal** [5] - 1228:19,
1488:13, 1489:1,
1489:7, 1490:21
**note** [5] - 1245:7,
1266:16, 1427:23,
1457:5, 1467:23
**noted** [1] - 1329:10
**notes** [3] - 1261:12,
1262:20, 1280:11
**nothing** [7] - 1278:5,
1282:15, 1300:18,
1300:21, 1396:11,
1417:8, 1417:9
**notice** [3] - 1302:3,
1329:5, 1410:19
**noticed** [1] - 1399:18
**noticing** [1] - 1411:1
**notion** [1] - 1444:7
**Notre** [1] - 1219:5
**novelty** [3] - 1223:4,
1223:6, 1249:1
**November** [1] -
1234:16
**NPV** [37] - 1239:23,

1242:4, 1243:19,
1243:23, 1245:3,
1248:7, 1295:18,
1297:9, 1444:4,
1444:15, 1447:17,
1447:22, 1448:3,
1453:17, 1455:6,
1458:13, 1458:16,
1458:21, 1498:9,
1504:1, 1504:18,
1505:2, 1510:15,
1510:16, 1510:22,
1511:2, 1511:4,
1511:6, 1512:11,
1512:15, 1514:7,
1514:16, 1520:9,
1521:3, 1521:15,
1521:16, 1522:2
**number** [33] -
1238:13, 1246:18,
1250:10, 1252:11,
1254:18, 1268:7,
1284:10, 1284:11,
1284:17, 1284:18,
1285:25, 1287:7,
1294:18, 1301:25,
1358:16, 1371:8,
1403:2, 1423:6,
1423:8, 1427:10,
1479:25, 1486:25,
1492:23, 1507:6,
1508:21, 1509:10,
1509:18, 1510:9,
1511:23, 1516:18,
1516:19, 1525:24,
1529:9
**numbers** [17] -
1228:10, 1228:11,
1242:10, 1246:17,
1253:8, 1265:9,
1450:9, 1451:2,
1451:13, 1471:14,
1485:8, 1502:3,
1512:16, 1519:24,
1525:9, 1525:24,
1530:1
**numerous** [3] -
1220:12, 1325:18,
1326:11
**nutritional** [8] -
1364:5, 1377:16,
1379:6, 1379:15,
1380:1, 1380:9,
1381:9, 1417:1

---

**O**

**oath** [1] - 1400:9
**object** [5] - 1261:8,
1286:7, 1450:16,
1515:20, 1537:6

**objection** [113] -
1220:24, 1220:25,
1221:15, 1229:23,
1234:4, 1234:9,
1235:16, 1243:1,
1243:7, 1246:2,
1251:21, 1255:1,
1255:10, 1255:25,
1256:1, 1261:4,
1262:3, 1262:24,
1263:20, 1264:21,
1266:5, 1266:11,
1269:11, 1271:19,
1271:20, 1274:13,
1274:18, 1276:13,
1279:5, 1280:6,
1280:11, 1280:12,
1283:7, 1284:6,
1284:19, 1285:10,
1285:15, 1285:20,
1286:6, 1286:23,
1287:13, 1308:17,
1314:16, 1323:19,
1329:1, 1332:9,
1341:25, 1374:15,
1388:2, 1403:24,
1409:2, 1409:6,
1409:19, 1421:3,
1421:9, 1426:6,
1426:10, 1426:11,
1426:12, 1428:15,
1428:21, 1430:15,
1430:21, 1432:21,
1436:9, 1437:18,
1443:9, 1445:13,
1445:17, 1452:4,
1452:5, 1452:6,
1453:22, 1454:3,
1456:18, 1457:23,
1459:15, 1461:24,
1461:25, 1462:11,
1463:19, 1464:4,
1465:24, 1467:19,
1467:22, 1467:24,
1468:5, 1469:15,
1473:4, 1473:10,
1474:9, 1474:14,
1474:15, 1478:4,
1481:15, 1482:20,
1483:24, 1485:16,
1486:16, 1487:8,
1490:3, 1492:8,
1516:2, 1516:4,
1516:13, 1516:14,
1523:18, 1523:23,
1523:25, 1530:13,
1535:21, 1537:4,
1537:19
**objective** [19] -
1222:10, 1223:16,
1228:11, 1235:23,

36

1236:4, 1236:8,
1236:12, 1236:22,
1236:24, 1239:12,
1239:16, 1247:12,
1247:23, 1290:18,
1293:24, 1295:14,
1296:18, 1511:12,
1515:1
**objectively** [1] -
1237:3
**observations** [1] -
1347:9
**observe** [2] - 1397:11,
1424:12
**observed** [2] - 1347:2,
1526:16
**obtain** [2] - 1428:10,
1442:2
**obtained** [1] - 1257:10
**obvious** [5] - 1424:8,
1424:15, 1452:5,
1452:7, 1453:7
**obviously** [6] -
1220:8, 1284:9,
1310:6, 1357:9,
1360:15, 1384:17
**obviousness** [1] -
1293:21
**occasions** [2] -
1220:12, 1321:16
**occur** [1] - 1503:21
**occurred** [1] - 1383:8
**occurs** [2] - 1507:22,
1521:3
**October** [1] - 1302:10
**OF** [2] - 1216:1,
1216:12
**off-label** [18] -
1252:16, 1253:2,
1254:2, 1254:6,
1254:8, 1256:18,
1256:25, 1258:10,
1338:12, 1347:16,
1347:18, 1347:22,
1348:3, 1348:5,
1350:17, 1398:2,
1398:4, 1398:5
**offer** [17] - 1221:13,
1421:6, 1426:5,
1428:14, 1430:14,
1430:18, 1431:13,
1445:11, 1453:21,
1456:16, 1457:21,
1459:13, 1463:18,
1465:20, 1469:13,
1478:2, 1481:13
**offered** [3] - 1281:11,
1292:24, 1293:20
**offering** [14] - 1285:4,
1408:16, 1409:5,

1409:9, 1409:18,
1409:23, 1410:9,
1410:16, 1411:13,
1429:21, 1431:23,
1432:10, 1485:6
**offers** [9] - 1280:19,
1323:16, 1341:23,
1421:1, 1432:19,
1436:7, 1443:7,
1467:17, 1482:18
**offhand** [1] - 1261:7
**office** [2] - 1267:16,
1275:15
**Office** [1] - 1220:10,
1220:13
**officer** [1] - 1503:7
**officers** [2] - 1500:19,
1501:11
**offices** [1] - 1264:14
**Official** [2] - 1216:22,
1540:5
**officially** [2] - 1287:11,
1297:25
**offset** [1] - 1453:2
**offsetting** [1] -
1460:20
**often** [14] - 1280:21,
1300:24, 1302:8,
1322:17, 1323:9,
1323:14, 1326:13,
1348:7, 1452:19,
1467:12, 1467:13,
1476:8, 1484:11,
1503:20
**oftentimes** [1] -
1237:6
**oil** [1] - 1281:21
**old** [4] - 1362:12,
1362:13, 1364:10,
1364:14
**Omacor** [1] - 1307:18
**omega-3** [8] -
1269:19, 1270:9,
1433:25, 1435:9,
1435:14, 1435:25,
1436:21, 1437:1
**omega-3s** [3] -
1220:8, 1232:3,
1235:10
**omit** [3] - 1465:6,
1521:2, 1521:14
**omitted** [1] - 1504:11
**on-invoice** [1] -
1485:25
**on-label** [5] - 1252:21,
1254:1, 1254:5,
1300:5, 1347:15
**once** [9] - 1272:20,
1307:12, 1318:10,
1351:2, 1462:25,

1467:6, 1468:15,
1472:25, 1476:6
**oncology** [1] -
1315:20
**one** [117] - 1222:13,
1223:19, 1225:3,
1226:4, 1226:19,
1227:25, 1230:24,
1233:9, 1236:10,
1236:23, 1237:3,
1238:15, 1243:16,
1243:20, 1245:3,
1246:22, 1248:23,
1248:24, 1249:3,
1250:4, 1257:18,
1260:12, 1262:13,
1264:7, 1264:10,
1268:12, 1268:23,
1272:12, 1276:1,
1276:3, 1279:22,
1281:17, 1282:14,
1286:2, 1288:20,
1289:17, 1291:1,
1291:7, 1294:4,
1296:11, 1299:10,
1299:16, 1300:16,
1301:1, 1316:1,
1317:25, 1321:23,
1327:24, 1328:14,
1331:4, 1345:9,
1349:7, 1369:15,
1383:19, 1384:2,
1387:12, 1399:18,
1408:8, 1409:5,
1418:12, 1420:5,
1431:1, 1434:1,
1435:10, 1437:22,
1438:11, 1441:2,
1442:23, 1446:5,
1451:7, 1452:25,
1460:2, 1460:3,
1460:6, 1460:20,
1464:20, 1465:7,
1465:9, 1468:24,
1475:16, 1480:16,
1481:5, 1482:1,
1482:13, 1486:3,
1490:10, 1497:5,
1504:2, 1504:3,
1504:4, 1504:6,
1504:11, 1505:23,
1506:16, 1507:15,
1507:16, 1509:14,
1509:25, 1512:19,
1514:14, 1516:24,
1520:25, 1521:1,
1521:14, 1521:20,
1524:18, 1537:23
**one-third** [2] -
1288:20, 1497:5
**ones** [4] - 1238:17,

1383:8, 1487:5,
1517:21
**open** [1] - 1310:24
**opening** [4] - 1244:15,
1359:25, 1360:8,
1360:11
**operating** [21] -
1227:7, 1227:10,
1227:13, 1240:23,
1241:12, 1241:15,
1241:16, 1241:19,
1241:25, 1450:7,
1455:20, 1455:23,
1456:2, 1456:6,
1461:13, 1463:8,
1508:2, 1510:24,
1512:2, 1512:12,
1514:12
**opine** [1] - 1445:20
**opinion** [60] -
1223:19, 1223:20,
1224:6, 1224:21,
1235:21, 1238:9,
1238:11, 1261:10,
1284:24, 1285:4,
1289:18, 1290:7,
1290:23, 1292:25,
1299:10, 1303:14,
1304:12, 1334:24,
1335:2, 1338:9,
1339:4, 1344:6,
1344:18, 1344:22,
1345:15, 1350:15,
1350:19, 1352:8,
1352:12, 1355:7,
1388:12, 1389:15,
1389:22, 1390:11,
1409:5, 1409:23,
1410:1, 1410:9,
1411:13, 1422:12,
1422:13, 1422:16,
1429:11, 1431:7,
1433:11, 1435:10,
1435:17, 1438:7,
1439:10, 1447:15,
1452:14, 1465:4,
1466:14, 1488:8,
1521:2, 1523:21,
1524:7, 1525:19,
1537:5, 1537:6
**opinions** [40] -
1223:18, 1224:23,
1231:10, 1277:8,
1289:16, 1289:17,
1293:20, 1293:23,
1296:9, 1300:2,
1328:21, 1332:4,
1334:11, 1334:14,
1341:20, 1349:19,
1409:10, 1409:18,

1422:11, 1422:17,
1425:3, 1432:16,
1443:4, 1445:8,
1451:16, 1461:19,
1462:7, 1463:14,
1463:24, 1465:17,
1467:7, 1469:11,
1477:24, 1481:10,
1482:15, 1483:20,
1498:23, 1500:23,
1501:7, 1528:5
**Opportunities** [1] -
1530:22, 1531:2
**opportunities** [1] -
1536:24
**opportunity** [15] -
1229:8, 1234:5,
1266:16, 1274:14,
1424:13, 1428:19,
1443:22, 1444:7,
1444:12, 1445:16,
1460:19, 1474:13,
1486:15, 1489:6,
1492:7
**Opportunity** [1] -
1443:20
**opposed** [8] -
1266:23, 1292:17,
1293:1, 1509:14,
1512:17, 1527:18,
1529:15, 1530:5
**optimally** [1] -
1375:19
**optimistic** [1] -
1460:20
**option** [1] - 1516:24
**orange** [5] - 1244:12,
1245:1, 1283:22,
1437:3, 1449:23
**Orange** [7] - 1283:14,
1284:21, 1286:14,
1287:5, 1288:5,
1289:12, 1493:6
**order** [18] - 1223:7,
1227:3, 1231:3,
1236:23, 1241:6,
1249:1, 1250:22,
1253:10, 1281:4,
1292:14, 1317:10,
1324:22, 1333:20,
1353:8, 1386:25,
1493:25, 1494:13,
1508:2
**ordinary** [5] - 1226:10,
1226:17, 1245:9,
1293:17, 1408:24
**organization** [2] -
1321:6, 1322:22
**organizations** [1] -
1505:24

37

**orient** [2] - 1240:21, 1244:3
**original** [3] - 1366:19, 1521:11, 1529:17
**ostensibly** [1] - 1434:12
**otherwise** [6] - 1293:6, 1401:6, 1401:17, 1435:19, 1452:6, 1527:1
**ourselves** [1] - 1491:18
**out-marketing** [1] - 1273:17
**out-promoting** [1] - 1273:17
**out-shouting** [1] - 1273:17
**outcome** [1] - 1398:23
**outlay** [1] - 1444:16
**outlier** [3] - 1243:17, 1244:24, 1297:13
**outlining** [1] - 1444:18
**outreach** [2] - 1264:17, 1269:3
**outset** [2] - 1248:23, 1250:1
**outshout** [1] - 1309:13
**outside** [7] - 1219:16, 1399:9, 1403:25, 1409:2, 1523:19, 1524:1, 1524:3
**outsized** [1] - 1273:22
**outspending** [1] - 1273:16
**outspent** [1] - 1309:13
**outweighs** [1] - 1343:25
**oval** [1] - 1271:5
**over-the-counter** [2] - 1281:21, 1320:24
**overall** [7] - 1253:14, 1281:25, 1286:3, 1320:15, 1432:4, 1447:15, 1474:19
**overestimated** [2] - 1460:3, 1464:21
**overestimating** [3] - 1453:1, 1509:1
**overlap** [1] - 1288:23
**overlooking** [1] - 1372:22
**overly** [4] - 1460:20, 1510:22, 1512:15
**overreach** [3] - 1380:20, 1380:21, 1380:22
**overrule** [1] - 1468:5
**overruled** [1] - 1452:4
**overview** [1] - 1420:4

**own** [10] - 1240:7, 1246:19, 1268:1, 1298:15, 1360:4, 1391:12, 1511:1, 1511:18, 1517:23, 1520:12
**Oxford** [1] - 1466:5

**P**

**P-e-c-k** [1] - 1312:6
**P08** [1] - 1371:6
**pack** [2] - 1275:12
**package** [1] - 1324:13
**PAGE** [4] - 1540:8, 1541:2, 1542:3, 1543:1
**page** [81] - 1216:25, 1242:23, 1242:24, 1242:25, 1251:16, 1269:8, 1276:9, 1276:11, 1283:18, 1298:25, 1301:18, 1314:7, 1327:14, 1327:17, 1327:20, 1330:1, 1332:20, 1335:13, 1336:13, 1339:8, 1342:3, 1345:11, 1352:23, 1361:21, 1361:22, 1362:9, 1370:17, 1371:6, 1371:7, 1371:8, 1371:11, 1374:12, 1376:1, 1378:17, 1383:24, 1391:17, 1392:24, 1399:12, 1403:1, 1403:3, 1412:18, 1413:19, 1432:24, 1433:3, 1435:6, 1443:15, 1444:1, 1445:24, 1446:21, 1446:22, 1465:14, 1468:8, 1468:12, 1469:18, 1478:7, 1479:1, 1479:3, 1480:9, 1481:18, 1482:23, 1493:14, 1499:9, 1499:12, 1506:20, 1513:7, 1518:8, 1520:20, 1528:7, 1528:9, 1530:17, 1530:24, 1532:6, 1532:10, 1536:8, 1540:25, 1541:25, 1542:25
**pages** [2] - 1395:6, 1407:3
**panels** [1] - 1221:9
**par** [1] - 1281:20

**paragraph** [36] - 1283:19, 1298:25, 1299:17, 1299:24, 1302:1, 1305:21, 1339:10, 1342:15, 1342:17, 1343:12, 1365:21, 1367:14, 1367:15, 1368:9, 1368:10, 1368:11, 1372:23, 1372:24, 1373:1, 1376:2, 1382:19, 1383:12, 1383:18, 1383:19, 1383:22, 1383:25, 1384:2, 1384:3, 1385:5, 1392:23, 1392:25, 1395:5, 1444:1, 1446:3, 1499:13
**parameters** [1] - 1479:20
**PARK** [1] - 1216:15
**part** [36] - 1295:5, 1321:11, 1322:21, 1322:24, 1326:15, 1336:17, 1370:6, 1400:7, 1401:2, 1415:14, 1423:19, 1431:23, 1431:25, 1432:1, 1432:3, 1432:8, 1433:6, 1433:11, 1446:11, 1460:11, 1476:12, 1483:12, 1489:11, 1494:16, 1499:25, 1502:2, 1516:23, 1520:8, 1522:25, 1524:24, 1527:3, 1528:5, 1531:12, 1531:23, 1533:14
**particular** [51] - 1250:20, 1271:7, 1272:8, 1295:18, 1316:11, 1325:16, 1325:17, 1327:4, 1330:4, 1332:23, 1334:23, 1341:14, 1341:17, 1343:7, 1345:13, 1347:9, 1352:15, 1355:22, 1366:15, 1368:14, 1368:21, 1369:1, 1369:8, 1371:24, 1372:3, 1372:15, 1373:4, 1373:15, 1377:23, 1379:15, 1381:6, 1381:21, 1382:10, 1383:3, 1386:2, 1387:17, 1388:15, 1393:11,

1396:19, 1397:5, 1398:17, 1405:21, 1416:11, 1424:18, 1438:3, 1449:16, 1460:1, 1467:11, 1481:21, 1510:18, 1532:10
**particularly** [4] - 1238:4, 1317:25, 1444:24, 1464:10
**parties** [2] - 1284:16, 1286:18
**partly** [1] - 1451:9
**partner's** [1] - 1322:22
**partnered** [1] - 1270:4
**Partners** [3] - 1312:15, 1312:16, 1312:17
**parts** [4] - 1327:4, 1362:2, 1400:5, 1472:25
**party** [2] - 1229:1, 1313:17
**pass** [6] - 1245:14, 1248:13, 1248:19, 1249:18, 1300:25, 1465:24
**passage** [10] - 1330:3, 1330:19, 1332:24, 1333:16, 1333:22, 1339:20, 1339:21, 1340:12, 1353:11, 1353:23
**past** [4] - 1291:7, 1343:1, 1400:12, 1502:18
**Patent** [2] - 1220:9, 1221:8
**patent** [10] - 1222:11, 1282:16, 1289:4, 1289:5, 1423:17, 1424:6, 1424:17, 1484:9, 1527:10, 1532:21
**patented** [22] - 1222:17, 1292:16, 1293:1, 1421:19, 1422:18, 1423:19, 1423:25, 1470:15, 1471:1, 1477:2, 1479:22, 1480:6, 1480:23, 1482:6, 1483:16, 1484:10, 1496:7, 1496:11, 1526:10, 1526:13, 1532:17, 1533:11
**patentee** [1] - 1292:15
**Patents** [2] - 1287:18, 1287:19
**patents** [110] - 1222:19, 1223:10,

1223:11, 1223:14, 1224:19, 1225:6, 1225:10, 1225:14, 1225:17, 1225:20, 1225:21, 1225:23, 1235:8, 1239:13, 1248:17, 1248:20, 1249:1, 1249:6, 1249:10, 1249:16, 1249:20, 1249:22, 1250:6, 1250:12, 1251:13, 1251:15, 1253:3, 1253:6, 1253:13, 1253:20, 1254:9, 1258:6, 1258:16, 1259:4, 1259:10, 1259:11, 1259:14, 1277:15, 1278:1, 1278:5, 1282:6, 1282:10, 1282:20, 1282:22, 1282:23, 1282:24, 1283:5, 1283:8, 1283:11, 1283:14, 1283:16, 1283:20, 1284:1, 1284:3, 1284:4, 1284:8, 1284:10, 1284:17, 1284:18, 1284:23, 1285:5, 1285:10, 1285:13, 1285:16, 1285:25, 1286:1, 1286:3, 1286:9, 1287:3, 1287:7, 1287:24, 1288:2, 1288:3, 1288:6, 1288:10, 1288:12, 1288:16, 1288:17, 1288:21, 1289:2, 1289:7, 1289:9, 1289:12, 1291:4, 1291:12, 1292:20, 1292:23, 1293:21, 1298:19, 1303:20, 1304:10, 1422:19, 1424:14, 1441:20, 1466:25, 1484:9, 1488:14, 1491:1, 1493:6, 1493:20, 1493:22, 1494:5, 1494:6, 1495:1, 1495:3, 1495:5, 1495:9, 1495:21, 1526:7
**patents-at-suit** [1] - 1248:20
**patents-in-suit** [53] - 1222:19, 1223:10, 1223:11, 1223:14, 1224:19, 1225:6, 1225:10, 1225:14,

1225:17, 1225:20, 1225:21, 1235:8, 1239:13, 1248:17, 1249:1, 1249:6, 1249:10, 1249:16, 1249:20, 1249:22, 1250:6, 1250:12, 1251:13, 1251:15, 1253:3, 1253:6, 1253:13, 1253:20, 1254:9, 1258:6, 1258:16, 1259:4, 1259:14, 1277:15, 1278:1, 1278:5, 1282:10, 1285:5, 1288:16, 1288:21, 1289:2, 1289:7, 1291:4, 1291:12, 1292:23, 1293:21, 1298:19, 1303:20, 1304:10, 1491:1, 1495:1, 1495:3, 1495:5

**pathway** [2] - 1238:2, 1382:5

**Patient** [1] - 1370:1

**patient** [94] - 1250:20, 1251:9, 1263:13, 1267:15, 1275:14, 1275:17, 1275:20, 1277:6, 1277:23, 1278:4, 1280:21, 1281:5, 1281:7, 1281:9, 1281:16, 1281:19, 1307:10, 1319:16, 1319:18, 1319:23, 1324:23, 1327:8, 1333:21, 1334:5, 1336:11, 1346:15, 1357:25, 1358:8, 1365:3, 1365:9, 1366:6, 1366:11, 1367:1, 1367:6, 1367:17, 1370:7, 1370:11, 1370:14, 1372:4, 1372:16, 1373:7, 1375:12, 1375:21, 1376:11, 1377:15, 1377:21, 1378:12, 1379:16, 1380:15, 1382:24, 1384:6, 1384:13, 1385:20, 1387:6, 1387:14, 1387:15, 1387:16, 1390:19, 1393:15, 1397:5, 1397:8, 1397:15, 1398:7, 1398:11, 1406:20, 1414:7, 1414:10, 1414:24, 1415:7,

1415:11, 1415:22, 1416:12, 1425:17, 1425:20, 1429:19, 1483:11, 1483:12, 1490:19, 1494:1, 1494:7, 1494:14, 1495:19, 1498:2, 1498:3, 1498:10, 1523:10, 1523:15, 1524:21, 1527:22, 1528:20, 1529:5, 1529:6

**patient's** [1] - 1415:13

**patients** [133] - 1220:3, 1225:23, 1225:25, 1235:7, 1248:15, 1249:15, 1250:8, 1250:23, 1250:24, 1252:8, 1252:12, 1252:19, 1254:15, 1254:20, 1256:15, 1256:20, 1257:5, 1257:14, 1258:5, 1258:24, 1264:16, 1267:14, 1267:16, 1270:7, 1275:10, 1280:19, 1282:6, 1288:25, 1315:15, 1315:19, 1344:24, 1345:17, 1346:20, 1351:10, 1351:17, 1352:10, 1355:8, 1358:7, 1358:11, 1358:14, 1358:16, 1358:24, 1359:4, 1359:6, 1359:18, 1362:17, 1364:4, 1367:24, 1368:13, 1368:20, 1369:7, 1370:23, 1371:19, 1373:3, 1375:5, 1379:19, 1379:25, 1380:8, 1381:8, 1381:15, 1394:5, 1405:13, 1411:10, 1411:22, 1412:2, 1412:12, 1413:15, 1414:11, 1414:13, 1415:5, 1415:17, 1416:8, 1416:25, 1421:23, 1422:2, 1422:3, 1423:11, 1425:16, 1425:19, 1426:22, 1428:2, 1429:13, 1432:5, 1433:24, 1434:11, 1434:19, 1435:19, 1437:10, 1439:7, 1468:17, 1476:4, 1476:13, 1476:16, 1486:9,

1488:2, 1488:11, 1488:12, 1488:15, 1488:25, 1489:1, 1489:7, 1489:14, 1490:15, 1490:21, 1491:10, 1491:15, 1491:22, 1494:10, 1495:10, 1495:22, 1496:12, 1497:6, 1497:13, 1497:20, 1498:3, 1523:2, 1523:4, 1523:7, 1524:22, 1524:25, 1526:2, 1527:13, 1527:17, 1527:18, 1528:12, 1529:14, 1529:19, 1530:4, 1530:5, 1530:9, 1534:19, 1535:12, 1535:19

**Patricia** [1] - 1466:4

**pattern** [1] - 1455:19

**pause** [1] - 1399:17

**pay** [23] - 1263:4, 1263:12, 1273:10, 1280:18, 1280:21, 1280:24, 1280:25, 1281:2, 1281:6, 1281:7, 1281:8, 1281:15, 1281:18, 1281:24, 1413:2, 1428:3, 1429:14, 1429:19, 1434:20, 1444:14, 1506:13

**pay-no-more-than** [1] - 1281:18

**paying** [1] - 1486:9

**payment** [1] - 1281:10

**pays** [1] - 1281:19

**PDX** [61] - 1314:24, 1316:5, 1318:21, 1318:23, 1320:11, 1421:13, 1424:4, 1424:24, 1425:23, 1425:24, 1426:5, 1426:25, 1427:3, 1427:7, 1428:5, 1428:14, 1428:25, 1430:6, 1430:14, 1433:14, 1435:1, 1436:5, 1436:8, 1436:17, 1437:17, 1439:20, 1447:25, 1449:1, 1453:18, 1453:21, 1454:22, 1456:13, 1456:22, 1457:21, 1458:3, 1459:13, 1460:23, 1462:15, 1470:9, 1471:5, 1473:2,

1474:8, 1484:17, 1485:12, 1485:15, 1485:22, 1486:13, 1486:24, 1487:13, 1487:22, 1488:7, 1489:19, 1489:25, 1490:7, 1492:5, 1493:9, 1497:8, 1497:10, 1501:20, 1533:15, 1534:12

**Peck** [54] - 1311:14, 1312:5, 1312:11, 1314:4, 1314:20, 1315:2, 1316:2, 1316:7, 1318:23, 1323:17, 1323:21, 1324:2, 1324:13, 1328:9, 1329:5, 1329:18, 1330:3, 1330:15, 1331:19, 1332:13, 1332:23, 1333:4, 1335:17, 1336:17, 1337:6, 1340:12, 1341:5, 1342:7, 1343:10, 1345:6, 1345:13, 1347:15, 1349:8, 1349:15, 1351:4, 1351:20, 1353:2, 1355:11, 1357:7, 1360:8, 1361:14, 1366:17, 1402:1, 1402:12, 1402:24, 1403:5, 1404:1, 1409:13, 1410:15, 1414:6, 1414:20, 1416:6, 1416:17, 1417:10

**PECK** [2] - 1311:21, 1540:9

**peer** [1] - 1420:9

**Peggie** [1] - 1401:4

**penalize** [1] - 1348:13

**pending** [3] - 1402:25, 1451:15, 1451:16

**Penn** [1] - 1466:5

**people** [11] - 1232:16, 1254:13, 1294:20, 1300:6, 1300:22, 1302:23, 1317:8, 1432:11, 1486:7, 1503:23, 1511:14

**people's** [1] - 1511:10

**per** [34] - 1225:25, 1248:16, 1250:9, 1251:11, 1252:14, 1252:16, 1254:13, 1254:16, 1254:20, 1257:14, 1258:24, 1281:14, 1281:20,

1338:10, 1338:11, 1344:4, 1344:5, 1346:25, 1381:8, 1381:16, 1407:6, 1472:20, 1484:22, 1488:16, 1494:2, 1494:8, 1494:15, 1495:20, 1496:4, 1497:14, 1523:3, 1528:15, 1528:21, 1529:3

**percent** [50] - 1235:4, 1245:4, 1253:23, 1254:8, 1273:12, 1273:21, 1273:23, 1273:24, 1279:21, 1279:22, 1279:23, 1288:15, 1290:4, 1303:16, 1304:6, 1309:16, 1310:11, 1346:6, 1346:7, 1346:22, 1350:7, 1394:6, 1413:15, 1427:16, 1429:9, 1433:8, 1433:10, 1435:15, 1435:16, 1436:3, 1437:2, 1437:5, 1437:7, 1437:10, 1448:21, 1455:18, 1458:20, 1478:15, 1480:3, 1486:2, 1497:13, 1497:20, 1498:7, 1520:17, 1521:21, 1522:17, 1525:16

**Percentage** [1] - 1279:12

**percentage** [23] - 1224:5, 1234:24, 1235:4, 1241:10, 1252:11, 1265:17, 1272:10, 1273:9, 1293:3, 1303:23, 1346:20, 1423:11, 1434:11, 1455:13, 1488:2, 1490:14, 1490:20, 1508:20, 1509:3, 1519:17, 1521:22, 1525:16, 1534:23

**percentages** [3] - 1279:17, 1491:5, 1534:22

**perception** [1] - 1262:21

**perceptions** [1] - 1470:25

**perfect** [2] - 1392:8, 1516:25

**perfectly** [1] - 1360:3

**perform** [5] - 1250:10, 1268:1, 1322:21, 1472:2, 1498:9
**Performance** [1] - 1270:19
**performance** [68] - 1222:16, 1222:18, 1223:2, 1223:3, 1223:9, 1223:14, 1223:21, 1224:12, 1224:17, 1225:3, 1225:4, 1225:17, 1226:8, 1226:13, 1226:14, 1227:7, 1228:11, 1230:10, 1231:14, 1231:17, 1235:23, 1236:5, 1236:9, 1236:11, 1236:12, 1239:12, 1239:17, 1246:20, 1247:13, 1247:14, 1247:22, 1247:23, 1248:24, 1248:25, 1249:4, 1249:9, 1253:19, 1253:22, 1253:25, 1258:1, 1259:4, 1259:7, 1259:13, 1260:1, 1260:5, 1261:22, 1277:14, 1277:19, 1282:8, 1282:10, 1282:13, 1282:19, 1287:23, 1288:9, 1289:22, 1290:10, 1291:1, 1291:12, 1292:12, 1423:5, 1431:5, 1438:13, 1499:22, 1500:9, 1500:15, 1507:16
**performed** [4] - 1231:19, 1253:21, 1439:1, 1471:24
**performing** [5] - 1297:9, 1438:8, 1440:12, 1470:11, 1496:10
**perhaps** [5] - 1341:14, 1435:11, 1497:22, 1531:15, 1531:25
**period** [37] - 1227:19, 1228:14, 1234:22, 1234:23, 1238:18, 1252:25, 1253:4, 1265:15, 1273:24, 1304:6, 1337:20, 1338:4, 1343:8, 1343:23, 1381:21, 1382:10, 1383:3, 1386:2, 1387:17, 1388:15, 1395:16,

1416:22, 1439:16, 1442:13, 1446:10, 1447:6, 1448:7, 1456:3, 1463:23, 1468:15, 1468:23, 1468:25, 1475:21, 1502:23, 1502:24, 1505:7, 1517:14
**periods** [5] - 1240:13, 1241:15, 1295:25, 1396:6, 1510:22
**permission** [5] - 1256:24, 1257:1, 1526:21, 1526:23, 1531:25
**permissive** [3] - 1394:11, 1394:20, 1395:4
**permits** [1] - 1348:13
**permitted** [2] - 1397:21, 1430:20
**person** [4] - 1226:10, 1245:9, 1293:17, 1481:22
**personal** [1] - 1358:19
**personally** [3] - 1410:7, 1444:22, 1501:14
**persons** [2] - 1226:17, 1408:24
**perspective** [22] - 1223:2, 1225:10, 1226:15, 1226:16, 1228:6, 1235:12, 1246:12, 1247:12, 1247:20, 1259:3, 1263:15, 1288:8, 1289:4, 1291:13, 1296:16, 1482:2, 1484:6, 1494:4, 1494:18, 1495:25, 1502:5, 1529:22
**pertaining** [2] - 1331:22, 1383:13
**pessimistic** [5] - 1460:21, 1463:4, 1510:23, 1512:13, 1512:15
**Ph.D** [2] - 1418:24, 1419:1
**PHARMA** [1] - 1216:4
**pharma** [2] - 1237:24, 1304:2
**pharmaceutical** [64] - 1219:7, 1219:9, 1219:18, 1219:22, 1221:11, 1221:14, 1221:17, 1232:14, 1232:15, 1236:8, 1238:3, 1238:5,

1250:17, 1264:9, 1267:7, 1268:4, 1272:21, 1275:8, 1293:14, 1294:22, 1295:10, 1303:24, 1305:9, 1305:10, 1305:13, 1305:14, 1306:2, 1306:4, 1306:12, 1325:3, 1325:4, 1327:25, 1329:6, 1348:5, 1378:7, 1378:21, 1419:6, 1419:12, 1420:6, 1420:7, 1421:7, 1421:11, 1428:10, 1431:13, 1431:23, 1433:6, 1433:7, 1439:4, 1440:3, 1441:4, 1441:20, 1448:23, 1466:23, 1467:12, 1469:2, 1471:20, 1477:19, 1493:1, 1500:10, 1502:10, 1502:15, 1502:20, 1507:5, 1507:8
**PHARMACEUTICALS** [2] - 1216:4, 1216:8
**Pharmaceuticals** [1] - 1268:4
**pharmacies** [1] - 1428:11
**pharmacokinetics** [1] - 1317:1
**pharmacology** [6] - 1313:25, 1317:4, 1317:5, 1317:9, 1319:10, 1319:12
**pharmacy** [1] - 1280:24
**phase** [1] - 1534:10
**phrase** [6] - 1317:3, 1364:10, 1365:16, 1372:19, 1381:7, 1381:8
**physical** [8] - 1315:6, 1364:5, 1377:16, 1379:15, 1380:1, 1380:9, 1381:9, 1417:1
**physically** [1] - 1267:12
**physician** [40] - 1268:17, 1319:16, 1319:24, 1320:1, 1324:6, 1326:21, 1326:22, 1327:18, 1334:1, 1334:8, 1341:14, 1351:8,

1373:17, 1378:2, 1378:9, 1378:10, 1378:22, 1378:25, 1379:8, 1380:13, 1390:18, 1391:12, 1392:19, 1393:25, 1394:11, 1394:12, 1394:14, 1394:22, 1394:24, 1395:11, 1396:23, 1398:21, 1399:1, 1399:4, 1413:14, 1478:22, 1480:19, 1531:17, 1531:22, 1532:25
**physician's** [3] - 1333:20, 1380:5, 1482:1
**physicians** [71] - 1256:18, 1256:21, 1264:13, 1267:12, 1267:13, 1268:20, 1270:16, 1275:10, 1319:5, 1321:14, 1346:20, 1368:5, 1372:4, 1372:16, 1373:6, 1376:4, 1376:7, 1379:10, 1380:24, 1384:24, 1386:13, 1389:8, 1392:11, 1393:2, 1393:18, 1410:3, 1413:9, 1434:18, 1468:16, 1471:23, 1471:24, 1472:10, 1476:14, 1476:22, 1477:5, 1477:14, 1478:14, 1478:18, 1478:20, 1479:5, 1479:7, 1479:9, 1479:12, 1479:24, 1480:1, 1480:5, 1480:13, 1480:22, 1481:8, 1482:7, 1484:4, 1484:10, 1484:11, 1489:5, 1494:9, 1526:2, 1526:18, 1527:2, 1527:9, 1529:18, 1531:20, 1532:3, 1532:18, 1532:19, 1532:20, 1533:12
**physicians'** [4] - 1263:5, 1325:6, 1470:25, 1480:11
**picked** [1] - 1435:11
**picture** [3] - 1231:1, 1231:4, 1245:18
**pie** [7] - 1252:24, 1308:21, 1309:6, 1309:11, 1309:18,

1475:4
**pills** [1] - 1398:9
**pin** [10] - 1242:22, 1242:23, 1242:24, 1260:23, 1263:17, 1269:8, 1271:14, 1276:9, 1276:11
**pipeline** [4] - 1219:20, 1295:5, 1301:21, 1302:1
**pipelines** [1] - 1294:22
**pivotal** [2] - 1452:19, 1467:9
**placebo** [5] - 1346:6, 1347:2, 1347:4, 1359:6, 1407:8
**placed** [4] - 1362:17, 1382:24, 1384:13, 1385:20
**places** [1] - 1413:13
**plaintiffs** [6] - 1216:6, 1223:7, 1228:25, 1234:2, 1311:13, 1539:11
**Plaintiffs** [2] - 1311:21, 1417:17
**PLAINTIFFS** [1] - 1216:14
**plaintiffs'** [2] - 1221:21, 1255:7
**PLAINTIFFS'** [1] - 1541:21
**Plaintiffs'** [45] - 1230:6, 1234:11, 1308:19, 1311:9, 1314:18, 1329:3, 1332:11, 1342:2, 1388:4, 1415:25, 1417:13, 1421:5, 1426:15, 1428:23, 1430:24, 1432:23, 1436:11, 1437:20, 1443:14, 1445:22, 1453:24, 1454:7, 1456:20, 1458:1, 1459:17, 1462:2, 1462:13, 1464:6, 1468:7, 1469:17, 1473:13, 1474:17, 1478:6, 1481:17, 1482:22, 1484:1, 1485:18, 1486:18, 1487:10, 1490:5, 1492:11, 1540:8, 1540:19, 1541:3, 1542:4
**plan** [5] - 1285:19, 1285:20, 1286:3, 1538:21, 1539:16

40

**planned** [1] - 1268:16
**planning** [4] -
 1237:15, 1263:9,
 1484:12, 1536:20
**plans** [3] - 1286:5,
 1431:24, 1480:19
**play** [13] - 1292:18,
 1325:8, 1374:10,
 1378:16, 1391:17,
 1399:12, 1399:19,
 1401:17, 1402:18,
 1402:19, 1412:17,
 1413:19, 1432:3
**played** [15] - 1291:9,
 1291:10, 1378:18,
 1391:19, 1399:13,
 1400:1, 1400:2,
 1400:5, 1400:14,
 1400:15, 1400:20,
 1402:20, 1412:19,
 1413:4, 1413:21
**players** [1] - 1226:16
**PLC** [3] - 1261:13,
 1269:9, 1276:10
**PLESSIS** [1] - 1217:5
**point** [34] - 1264:10,
 1281:17, 1282:14,
 1283:25, 1285:12,
 1286:2, 1286:11,
 1355:14, 1380:16,
 1387:9, 1399:10,
 1409:17, 1415:20,
 1426:20, 1459:25,
 1464:15, 1471:22,
 1472:18, 1475:17,
 1475:19, 1475:20,
 1478:12, 1503:12,
 1504:9, 1510:17,
 1511:16, 1515:4,
 1521:1, 1521:3,
 1521:11, 1521:24,
 1523:19, 1525:22,
 1535:14
**pointed** [2] - 1243:17,
 1374:24
**pointing** [1] - 1270:25
**points** [4] - 1306:15,
 1366:15, 1478:10,
 1479:8
**policy** [1] - 1420:7
**Policy** [1] - 1418:9
**polytherapy** [1] -
 1413:18
**poor** [3] - 1253:24,
 1506:13, 1527:15
**population** [21] -
 1297:5, 1367:6,
 1367:17, 1370:7,
 1370:14, 1372:4,
 1372:16, 1373:7,

1387:6, 1387:15,
 1387:16, 1415:7,
 1425:17, 1425:21,
 1490:19, 1498:10,
 1523:16, 1524:21,
 1528:20, 1529:6,
 1531:22
**populations** [1] -
 1330:10
**portfolio** [1] - 1507:8
**portion** [9] - 1233:6,
 1280:25, 1281:7,
 1336:18, 1342:7,
 1353:3, 1393:9,
 1407:4, 1492:25
**portions** [4] - 1346:1,
 1399:22, 1400:13,
 1405:12
**posed** [1] - 1523:25
**position** [10] -
 1312:23, 1313:7,
 1340:16, 1340:21,
 1359:16, 1359:20,
 1359:22, 1360:2,
 1418:8, 1418:11
**positions** [4] -
 1312:22, 1318:23,
 1360:4, 1418:17
**positive** [29] -
 1241:15, 1276:21,
 1277:4, 1438:13,
 1440:14, 1440:15,
 1440:18, 1441:2,
 1441:7, 1441:8,
 1441:9, 1441:12,
 1444:15, 1444:19,
 1447:18, 1447:22,
 1457:4, 1458:15,
 1459:1, 1465:8,
 1467:14, 1470:5,
 1504:12, 1504:15,
 1508:24, 1514:16,
 1514:18, 1521:3,
 1521:16
**positively** [1] -
 1450:22
**possible** [13] - 1392:3,
 1414:15, 1416:3,
 1452:17, 1452:22,
 1485:5, 1508:3,
 1508:4, 1509:12,
 1509:23, 1511:15,
 1511:22, 1534:10
**post** [2] - 1453:1,
 1473:20
**post-launch** [1] -
 1473:20
**postdating** [1] -
 1451:14
**postmarketing** [1] -

1320:25
**posts** [1] - 1316:9
**potential** [17] -
 1223:16, 1224:12,
 1226:5, 1226:17,
 1229:18, 1235:22,
 1236:3, 1236:4,
 1267:12, 1303:20,
 1517:14, 1527:24,
 1528:19, 1529:6,
 1529:14, 1531:16
**potentially** [9] -
 1226:7, 1236:24,
 1249:2, 1250:11,
 1253:6, 1253:23,
 1254:9, 1434:12,
 1490:25
**practice** [16] - 1219:2,
 1315:11, 1315:13,
 1315:15, 1324:24,
 1331:10, 1380:25,
 1384:25, 1395:1,
 1395:3, 1397:20,
 1397:21, 1422:19,
 1493:25, 1494:13,
 1500:7
**practices** [2] -
 1378:14, 1395:1
**practicing** [2] - 1496:1
**practitioner** [1] -
 1324:21
**practitioners** [5] -
 1333:13, 1333:18,
 1333:23, 1334:2,
 1375:24
**pre** [1] - 1326:8
**precautions** [1] -
 1330:10
**precede** [2] - 1380:3,
 1384:23
**preceded** [1] - 1392:1
**precise** [2] - 1492:23,
 1510:1
**precisely** [2] -
 1440:24, 1518:20
**precision** [1] - 1453:5
**preclude** [1] - 1375:12
**predate** [1] - 1227:18
**predict** [1] - 1300:23
**predicted** [8] - 1241:5,
 1241:14, 1241:15,
 1241:17, 1241:18,
 1246:19, 1415:21,
 1461:4
**predicting** [4] -
 1246:23, 1246:25,
 1317:1, 1456:6
**prediction** [1] -
 1460:16
**predictions** [5] -

1237:22, 1240:22,
 1240:25, 1241:1,
 1247:9
**prefer** [1] - 1355:15
**preference** [3] -
 1396:18, 1412:8,
 1412:10
**preferred** [1] -
 1413:17
**premise** [1] - 1222:8
**premium** [3] - 1428:3,
 1429:14, 1486:10
**prepare** [10] -
 1237:17, 1242:16,
 1245:21, 1250:18,
 1251:17, 1255:5,
 1274:8, 1314:20,
 1328:1, 1456:13
**prepared** [9] -
 1221:23, 1227:1,
 1228:19, 1232:9,
 1232:18, 1270:23,
 1283:15, 1295:4,
 1450:5
**prepares** [1] - 1237:13
**preparing** [3] -
 1228:20, 1233:24,
 1265:25
**prescribe** [10] -
 1256:19, 1270:9,
 1327:7, 1397:7,
 1403:11, 1403:16,
 1406:3, 1406:8,
 1434:19, 1529:19
**prescribed** [5] -
 1233:3, 1250:20,
 1252:19, 1258:9,
 1326:25
**prescriber** [8] -
 1327:7, 1331:6,
 1331:11, 1332:15,
 1335:19, 1347:8,
 1372:20, 1390:9
**prescribers** [17] -
 1252:7, 1267:16,
 1269:3, 1269:20,
 1270:9, 1270:10,
 1275:18, 1309:15,
 1347:12, 1439:7,
 1439:8, 1476:4,
 1526:22, 1526:24,
 1531:16, 1531:17,
 1532:21
**prescribes** [2] -
 1393:25, 1395:11
**prescribing** [33] -
 1249:25, 1252:9,
 1263:5, 1267:13,
 1270:10, 1270:16,
 1275:20, 1277:6,

1278:3, 1281:5,
 1324:14, 1324:19,
 1325:6, 1325:9,
 1326:1, 1326:4,
 1327:10, 1327:18,
 1327:21, 1327:23,
 1330:14, 1330:20,
 1331:14, 1332:14,
 1346:16, 1380:25,
 1381:17, 1385:1,
 1416:4, 1478:19,
 1478:20, 1478:24,
 1479:25
**prescription** [37] -
 1232:1, 1234:24,
 1238:3, 1251:9,
 1269:22, 1273:21,
 1275:8, 1275:10,
 1275:13, 1275:17,
 1280:24, 1290:5,
 1297:3, 1320:23,
 1321:20, 1321:24,
 1322:5, 1322:8,
 1323:1, 1323:18,
 1324:3, 1324:4,
 1324:22, 1333:20,
 1380:4, 1384:23,
 1394:13, 1432:1,
 1432:6, 1438:23,
 1438:25, 1484:22,
 1484:24, 1484:25,
 1485:1, 1488:3,
 1530:10
**Prescription** [2] -
 1233:23, 1234:15
**prescriptions** [55] -
 1225:14, 1232:23,
 1232:24, 1233:3,
 1233:7, 1233:15,
 1233:17, 1233:18,
 1233:25, 1235:5,
 1235:7, 1249:14,
 1249:17, 1249:19,
 1249:25, 1250:11,
 1250:23, 1252:12,
 1253:2, 1253:4,
 1253:11, 1253:15,
 1257:3, 1258:9,
 1267:18, 1269:5,
 1271:6, 1271:7,
 1271:9, 1277:2,
 1282:5, 1288:20,
 1291:3, 1297:4,
 1304:9, 1368:7,
 1423:7, 1423:8,
 1424:19, 1424:20,
 1427:11, 1427:14,
 1427:15, 1429:12,
 1438:4, 1438:10,
 1438:11, 1438:16,
 1438:18, 1480:1,

41

1480:12, 1485:8,
1485:9, 1488:25,
1498:1
**Present** [56] -
1224:15, 1238:10,
1238:13, 1238:22,
1239:5, 1239:7,
1242:5, 1243:12,
1244:1, 1244:7,
1244:21, 1244:25,
1246:13, 1247:17,
1248:4, 1290:15,
1295:1, 1295:3,
1295:10, 1295:12,
1424:21, 1439:23,
1440:1, 1440:2,
1440:23, 1441:2,
1442:9, 1443:2,
1443:19, 1443:21,
1444:19, 1444:20,
1444:22, 1447:14,
1447:18, 1458:18,
1459:1, 1462:23,
1464:9, 1464:22,
1465:2, 1465:8,
1467:14, 1469:24,
1470:5, 1488:10,
1504:5, 1504:12,
1504:15, 1505:8,
1513:20, 1513:25,
1514:3, 1521:6,
1521:21, 1521:23
**present** [25] - 1225:24,
1239:10, 1239:14,
1239:22, 1240:9,
1248:15, 1250:8,
1250:24, 1270:7,
1289:1, 1334:23,
1348:10, 1431:10,
1438:22, 1441:6,
1441:16, 1441:17,
1444:13, 1444:16,
1447:2, 1447:6,
1447:9, 1447:11,
1470:1, 1470:3
**presentation** [1] -
1308:16
**presentations** [1] -
1325:13
**presented** [4] -
1252:12, 1398:16,
1481:4, 1486:3
**presenting** [1] -
1252:8
**preservation** [3] -
1316:20, 1318:3,
1318:14
**president** [2] -
1218:25, 1500:22
**presume** [1] - 1445:19

**pretreatment** [7] -
1381:20, 1382:9,
1383:2, 1386:1,
1386:13, 1387:1,
1388:14
**pretty** [11] - 1227:15,
1248:13, 1253:9,
1270:7, 1271:8,
1293:4, 1378:15,
1399:7, 1427:16,
1508:20, 1510:24
**prevail** [2] - 1505:1
**prevalence** [1] -
1431:21
**prevent** [3] - 1380:24,
1384:24, 1500:13
**prevention** [1] -
1415:6
**Prevention** [1] -
1419:25
**previous** [4] -
1438:14, 1439:12,
1456:14, 1459:11
**previously** [11] -
1221:4, 1367:24,
1368:13, 1368:21,
1369:7, 1370:23,
1371:19, 1373:3,
1513:10, 1513:19,
1536:5
**price** [20] - 1433:8,
1467:2, 1470:21,
1470:23, 1484:22,
1484:24, 1484:25,
1485:1, 1485:3,
1485:7, 1485:9,
1485:10, 1485:21,
1486:4, 1507:1,
1507:14, 1507:18,
1507:20, 1507:21
**priced** [3] - 1434:20,
1435:24, 1486:5
**prices** [1] - 1305:14
**pricing** [4] - 1219:21,
1419:13, 1424:2,
1484:20
**prima** [1] - 1293:20
**primarily** [4] -
1278:18, 1317:17,
1324:21, 1534:5
**primary** [2] - 1320:2,
1349:6
**principal** [1] - 1326:13
**principles** [3] -
1319:13, 1331:4,
1442:20
**Principles** [2] -
1330:4, 1442:18
**print** [2] - 1264:2,
1264:12

**priority** [2] - 1226:11,
1245:10
**private** [3] - 1432:8,
1432:9, 1433:10
**privileged** [1] -
1316:14
**probability** [5] -
1426:23, 1478:24,
1480:6, 1522:20,
1530:9
**problem** [1] - 1239:23
**problems** [1] -
1514:22
**procedure** [1] -
1375:24
**proceed** [9] - 1218:6,
1218:20, 1291:24,
1312:7, 1357:5,
1417:24, 1454:19,
1538:22, 1539:17
**proceedings** [1] -
1540:2
**process** [7] - 1325:20,
1325:21, 1326:3,
1401:5, 1410:17,
1451:25, 1517:4
**processing** [1] -
1479:9
**produce** [2] - 1503:20,
1520:3
**produced** [7] - 1227:2,
1227:20, 1268:8,
1426:1, 1430:7,
1431:21, 1477:11
**produces** [1] - 1428:9
**product** [90] -
1219:20, 1222:9,
1223:3, 1223:10,
1223:22, 1227:2,
1227:8, 1227:17,
1227:18, 1228:7,
1228:12, 1228:15,
1228:19, 1230:13,
1231:8, 1231:9,
1231:21, 1233:7,
1233:19, 1236:1,
1237:20, 1238:3,
1245:8, 1245:13,
1247:15, 1250:21,
1259:7, 1265:9,
1267:18, 1272:8,
1272:12, 1272:25,
1275:11, 1275:16,
1281:9, 1281:16,
1282:19, 1288:13,
1289:9, 1289:25,
1292:12, 1294:22,
1295:5, 1295:10,
1301:25, 1303:24,
1304:3, 1304:19,

1304:21, 1305:1,
1305:4, 1305:5,
1306:6, 1306:12,
1306:13, 1306:14,
1306:19, 1306:21,
1307:4, 1307:12,
1308:7, 1309:8,
1429:13, 1435:20,
1439:5, 1440:5,
1440:8, 1440:10,
1440:23, 1441:23,
1442:7, 1442:13,
1448:17, 1467:12,
1471:3, 1472:25,
1474:25, 1476:21,
1477:5, 1477:23,
1484:12, 1484:13,
1485:6, 1488:20,
1491:23, 1502:16,
1507:17, 1525:21,
1526:1
**product's** [4] - 1236:9,
1306:22, 1306:25,
1424:7
**production** [1] -
1455:10
**products** [40] -
1219:7, 1219:22,
1220:2, 1220:8,
1231:19, 1231:24,
1233:4, 1233:9,
1233:16, 1237:24,
1267:7, 1272:9,
1272:13, 1273:8,
1273:13, 1275:8,
1283:21, 1290:5,
1301:21, 1305:13,
1305:15, 1305:17,
1305:24, 1309:19,
1310:14, 1320:17,
1434:18, 1435:23,
1437:12, 1438:16,
1439:7, 1441:4,
1441:13, 1441:20,
1467:2, 1476:7,
1484:7, 1502:11,
1503:4
**products'** [2] -
1292:25, 1306:17
**profession** [4] -
1505:23, 1505:25,
1511:11, 1511:23
**professional** [1] -
1420:24
**professor** [2] -
1312:23, 1418:9
**proffer** [2] - 1403:25,
1409:3, 1523:19
**proffered** [2] - 1524:4,
1524:6

**profile** [4] - 1262:9,
1307:4, 1307:7,
1468:20
**profit** [16] - 1226:22,
1226:25, 1227:2,
1227:8, 1265:9,
1296:3, 1455:3,
1455:4, 1455:6,
1455:8, 1455:12,
1457:4, 1457:6,
1457:8, 1457:13
**profitability** [7] -
1222:15, 1226:3,
1226:15, 1228:5,
1230:22, 1498:10,
1498:13
**profitable** [4] -
1455:15, 1455:17,
1498:14, 1499:1
**profits** [14] - 1223:25,
1226:18, 1236:3,
1423:15, 1424:22,
1440:14, 1440:18,
1442:2, 1442:12,
1458:8, 1458:14,
1470:2, 1515:9,
1520:10
**program** [5] - 1276:2,
1280:18, 1281:18,
1316:20, 1319:11
**programs** [8] -
1280:22, 1281:11,
1281:24, 1312:19,
1418:13, 1429:20,
1442:24, 1442:25
**progress** [1] - 1326:10
**project** [9] - 1237:15,
1238:17, 1239:9,
1419:14, 1440:23,
1441:2, 1444:14,
1444:15
**project's** [1] - 1444:11
**projected** [7] - 1442:1,
1453:9, 1508:11,
1517:14, 1518:10,
1520:8
**projecting** [1] - 1506:8
**projection** [3] -
1462:5, 1463:22,
1519:5
**projections** [25] -
1239:2, 1240:4,
1240:9, 1240:20,
1248:13, 1298:7,
1298:10, 1298:14,
1298:15, 1299:18,
1299:21, 1459:23,
1499:21, 1500:5,
1501:12, 1502:19,
1506:3, 1510:19,

42

1511:3, 1511:19,
1514:10, 1514:22,
1517:18, 1517:23,
1520:14
**projects** [2] - 1444:20,
1467:16
**promote** [12] -
1256:10, 1256:18,
1256:21, 1256:24,
1257:1, 1257:8,
1257:10, 1348:16,
1350:15, 1350:19,
1527:2, 1532:13
**Promote** [1] - 1270:19
**promoted** [2] -
1349:9, 1484:3
**promoting** [9] -
1257:3, 1270:5,
1273:17, 1348:25,
1349:4, 1470:17,
1526:18, 1531:10,
1532:25
**promotion** [24] -
1219:21, 1225:18,
1250:2, 1259:16,
1259:23, 1268:3,
1268:6, 1268:16,
1269:5, 1271:3,
1271:10, 1272:3,
1273:23, 1277:9,
1280:2, 1282:4,
1291:9, 1347:16,
1347:18, 1347:19,
1347:22, 1348:6,
1424:1, 1527:5
**Promotion** [2] -
1260:11, 1268:14
**Promotional** [2] -
1272:15, 1274:7
**promotional** [7] -
1259:18, 1260:2,
1268:1, 1275:4,
1308:22, 1475:8,
1527:1
**pronounce** [1] -
1387:11
**pronunciation** [1] -
1313:13
**proper** [1] - 1334:10
**property** [7] - 1219:2,
1219:10, 1219:19,
1219:20, 1220:11,
1220:14
**proportion** [1] -
1249:19
**proposed** [9] - 1322:5,
1325:17, 1334:15,
1364:23, 1373:12,
1373:14, 1381:5,
1382:2, 1405:8

**prospective** [1] -
1483:11
**proud** [1] - 1317:25
**proven** [3] - 1350:7,
1408:8, 1483:16
**provide** [22] - 1222:10,
1235:23, 1236:11,
1247:12, 1247:24,
1267:13, 1267:14,
1275:9, 1298:9,
1299:20, 1327:25,
1330:11, 1330:20,
1330:22, 1332:15,
1341:13, 1396:5,
1456:10, 1476:13,
1526:4, 1531:16
**provided** [14] -
1220:7, 1321:17,
1335:21, 1449:11,
1449:16, 1452:19,
1455:20, 1462:20,
1492:21, 1493:1,
1498:1, 1517:17,
1529:20, 1532:24
**provider** [1] - 1232:12
**provides** [12] - 1251:8,
1290:18, 1312:17,
1320:6, 1333:19,
1335:25, 1342:19,
1343:1, 1376:6,
1424:14, 1435:18,
1472:23
**providing** [8] -
1333:10, 1427:21,
1429:13, 1444:20,
1456:4, 1460:14,
1514:24
**public** [12] - 1229:2,
1229:9, 1260:8,
1260:19, 1270:12,
1276:5, 1321:7,
1328:4, 1348:15,
1428:20, 1500:4,
1505:5
**publically** [2] -
1325:11, 1448:16
**publicly** [2] - 1499:2,
1499:8
**publish** [2] - 1420:8,
1466:7
**published** [11] -
1240:25, 1241:2,
1241:3, 1420:9,
1420:10, 1420:13,
1445:5, 1445:6,
1469:9, 1486:15
**publishers** [1] -
1466:5
**publishes** [2] -
1328:2, 1348:12

**publishing** [1] -
1473:9
**pull** [17] - 1349:13,
1371:5, 1372:9,
1383:18, 1493:8,
1494:19, 1497:8,
1499:9, 1501:20,
1506:19, 1512:25,
1513:1, 1513:8,
1518:3, 1520:19,
1525:2, 1528:2
**pulled** [1] - 1534:14
**pulling** [2] - 1435:19,
1512:16
**pure** [1] - 1531:6
**purple** [1] - 1470:1
**purported** [2] -
1247:22, 1283:10
**purpose** [10] -
1332:13, 1332:15,
1333:5, 1336:7,
1341:11, 1341:13,
1341:17, 1342:7,
1353:2, 1477:12
**purposes** [17] -
1229:5, 1229:14,
1237:15, 1237:16,
1247:25, 1266:25,
1293:18, 1313:11,
1352:2, 1400:23,
1422:17, 1424:17,
1433:18, 1476:25,
1488:18, 1534:15
**pursuant** [2] -
1255:23, 1426:5
**pursue** [1] - 1467:15
**pursuing** [1] - 1444:19
**put** [18] - 1220:17,
1240:18, 1246:17,
1252:24, 1273:19,
1280:10, 1287:19,
1296:13, 1300:3,
1331:2, 1365:13,
1365:19, 1382:4,
1384:1, 1396:13,
1425:24, 1458:23,
1511:9
**putting** [3] - 1302:15,
1347:6, 1457:13
**PX** [122] - 1228:17,
1229:11, 1233:22,
1234:3, 1245:20,
1301:7, 1308:15,
1314:2, 1314:9,
1314:11, 1314:15,
1328:7, 1328:21,
1328:25, 1329:5,
1329:18, 1330:1,
1331:17, 1332:1,
1332:4, 1332:8,

1332:10, 1335:11,
1341:3, 1341:5,
1341:20, 1341:24,
1342:4, 1345:4,
1349:13, 1350:25,
1352:21, 1367:13,
1369:14, 1370:18,
1371:8, 1372:25,
1376:3, 1382:20,
1383:18, 1387:22,
1388:1, 1392:24,
1395:6, 1415:23,
1420:16, 1420:23,
1421:2, 1421:4,
1426:8, 1426:10,
1428:18, 1430:19,
1431:15, 1432:16,
1432:20, 1432:25,
1442:15, 1443:4,
1443:8, 1443:10,
1443:13, 1443:16,
1445:2, 1445:11,
1445:21, 1454:2,
1456:16, 1461:17,
1461:23, 1462:1,
1462:6, 1462:10,
1463:13, 1463:18,
1463:23, 1464:3,
1465:11, 1465:20,
1467:18, 1468:9,
1469:5, 1469:13,
1472:12, 1473:7,
1474:12, 1477:6,
1477:24, 1478:2,
1478:5, 1478:8,
1480:25, 1481:10,
1481:13, 1482:9,
1482:15, 1482:19,
1483:8, 1483:10,
1483:19, 1483:23,
1486:14, 1487:6,
1487:15, 1490:1,
1492:6, 1499:9,
1499:11, 1506:19,
1518:3, 1518:5

**Q**

**Q-1** [1] - 1265:24
**Q-4** [1] - 1265:24
**Q1** [1] - 1279:2
**Q4** [1] - 1279:2
**qualifications** [1] -
1392:21
**qualified** [1] - 1392:3
**qualifiers** [5] -
1368:24, 1370:6,
1370:13, 1370:19,
1371:16
**qualify** [1] - 1393:13

**qualifying** [1] - 1392:4
**qualitative** [4] -
1225:12, 1260:7,
1265:7, 1277:10
**qualitatively** [3] -
1222:14, 1249:12,
1262:17
**Quality** [1] - 1420:1
**quantitative** [6] -
1225:12, 1253:17,
1260:8, 1277:11,
1293:3, 1293:6
**quantitatively** [4] -
1222:14, 1249:12,
1253:12, 1262:17
**quantity** [1] - 1484:5
**quarter** [10] - 1253:4,
1261:13, 1261:20,
1269:9, 1276:10,
1278:22, 1462:22,
1462:25, 1463:9,
1498:19
**Quarterly** [2] -
1265:24, 1279:2
**quarterly** [4] -
1268:23, 1276:4,
1278:14, 1463:23
**quarters** [1] - 1253:2
**questioned** [1] -
1393:12
**questions** [26] -
1285:16, 1286:8,
1286:23, 1291:16,
1292:3, 1305:8,
1310:21, 1336:20,
1339:11, 1342:16,
1352:2, 1353:10,
1354:4, 1355:12,
1357:11, 1357:20,
1361:19, 1414:1,
1448:13, 1492:1,
1492:16, 1493:11,
1497:10, 1524:8,
1524:14, 1537:25
**quibble** [1] - 1294:18
**quick** [2] - 1253:7,
1297:2
**quickly** [1] - 1511:24
**Quintiles** [1] - 1432:14
**quite** [8] - 1229:6,
1283:9, 1431:12,
1431:13, 1433:12,
1434:24, 1460:16,
1473:25
**quote** [38] - 1260:14,
1260:18, 1260:22,
1261:2, 1261:5,
1261:8, 1261:17,
1261:20, 1262:7,
1262:11, 1263:3,

43

1263:6, 1263:16, 1263:25, 1264:4, 1268:15, 1268:22, 1268:23, 1269:7, 1269:16, 1269:25, 1276:3, 1276:8, 1276:17, 1276:23, 1330:7, 1332:24, 1333:9, 1336:21, 1339:12, 1339:21, 1343:13, 1346:14, 1350:5, 1353:11, 1354:5

**quotes** [4] - 1260:12, 1265:8, 1268:12, 1276:1

**quoting** [1] - 1375:7

## R

**R&D** [19] - 1227:16, 1230:18, 1305:25, 1425:10, 1425:14, 1426:17, 1426:25, 1427:3, 1440:24, 1441:9, 1441:24, 1447:3, 1448:7, 1455:11, 1456:8, 1469:25, 1534:1, 1534:11, 1535:8

**raise** [2] - 1399:18, 1467:1

**raised** [1] - 1467:25

**raising** [6] - 1345:18, 1349:10, 1350:8, 1350:17, 1350:20, 1483:17

**range** [2] - 1342:18, 1536:23

**ranged** [1] - 1472:19

**ranges** [1] - 1425:10

**rate** [16] - 1238:22, 1244:18, 1303:15, 1443:23, 1443:24, 1444:7, 1444:8, 1448:20, 1448:21, 1448:22, 1448:24, 1453:15, 1506:25, 1519:16, 1520:7, 1520:11

**rather** [10] - 1230:22, 1281:18, 1439:13, 1446:16, 1456:9, 1456:10, 1475:17, 1490:11, 1508:3, 1509:1

**ratio** [1] - 1473:21

**rationale** [2] - 1270:3, 1275:17

**re** [1] - 1253:8

**re-run** [1] - 1253:8

**reach** [5] - 1296:18, 1326:9, 1468:15, 1469:23, 1506:4

**reached** [3] - 1286:18, 1318:10, 1382:13

**read** [21] - 1298:3, 1330:19, 1342:23, 1343:12, 1353:18, 1354:12, 1365:23, 1372:25, 1382:21, 1383:21, 1384:3, 1389:4, 1399:24, 1401:18, 1406:7, 1445:16, 1454:9, 1467:21, 1472:10, 1495:8, 1522:21

**readable** [2] - 1331:5

**readily** [1] - 1331:5

**reading** [11] - 1365:11, 1365:12, 1374:7, 1374:8, 1379:1, 1379:22, 1389:7, 1390:9, 1396:23, 1398:18, 1413:14

**readout** [1] - 1522:8

**reads** [13] - 1330:6, 1332:24, 1333:9, 1336:21, 1337:15, 1339:12, 1339:21, 1342:17, 1350:5, 1353:11, 1354:5, 1394:12, 1394:22

**ready** [4] - 1218:5, 1311:9, 1333:18, 1357:5

**real** [7] - 1253:7, 1296:19, 1442:9, 1503:15, 1503:16, 1503:18, 1510:19

**reality** [3] - 1262:22, 1463:10, 1502:18

**realized** [1] - 1460:8

**really** [26] - 1233:18, 1236:10, 1236:22, 1240:15, 1248:14, 1257:12, 1259:8, 1275:19, 1277:15, 1277:23, 1277:24, 1281:8, 1281:15, 1283:10, 1303:20, 1366:22, 1380:17, 1385:11, 1415:22, 1442:11, 1443:3, 1448:24, 1466:22, 1467:4, 1515:5, 1535:6

**realm** [1] - 1524:1

**reason** [22] - 1337:11, 1355:23, 1356:2,

1377:1, 1387:2, 1387:5, 1390:16, 1399:2, 1410:4, 1441:19, 1456:1, 1464:22, 1485:4, 1489:13, 1506:12, 1524:13, 1525:9, 1529:9, 1529:10, 1529:11, 1529:25, 1537:2

**reasonable** [1] - 1290:18

**reasonableness** [2] - 1237:8, 1239:21

**reasonably** [2] - 1247:14, 1406:6

**reasons** [10] - 1250:20, 1295:19, 1300:16, 1382:24, 1385:20, 1387:3, 1403:15, 1403:18, 1484:11, 1488:17

**reassigned** [1] - 1316:21

**rebate** [1] - 1486:2

**Rebates** [2] - 1278:8, 1279:11

**rebates** [31] - 1225:19, 1250:2, 1259:17, 1277:18, 1277:22, 1278:11, 1278:17, 1279:20, 1279:25, 1282:1, 1282:3, 1291:10, 1302:12, 1303:11, 1303:22, 1304:1, 1304:4, 1304:22, 1429:20, 1429:23, 1430:1, 1431:5, 1431:8, 1431:11, 1431:12, 1431:14, 1431:22, 1433:9, 1433:12, 1485:22, 1485:25

**rebuttal** [1] - 1311:9

**recalculated** [1] - 1244:25

**recalling** [1] - 1479:12

**recap** [1] - 1328:17

**receive** [2] - 1419:1, 1432:11

**received** [69] - 1221:2, 1230:6, 1230:7, 1234:11, 1234:12, 1235:19, 1243:4, 1243:9, 1246:4, 1251:24, 1256:4, 1262:5, 1263:1, 1263:22, 1264:23, 1266:14, 1269:13, 1271:23, 1275:1,

1276:15, 1279:8, 1280:15, 1287:15, 1308:19, 1314:18, 1329:3, 1332:11, 1342:2, 1388:4, 1418:23, 1421:5, 1421:22, 1421:25, 1426:15, 1428:23, 1429:7, 1430:24, 1432:23, 1436:11, 1437:20, 1441:10, 1443:14, 1445:22, 1453:24, 1454:7, 1456:20, 1458:1, 1458:20, 1459:17, 1462:2, 1462:13, 1464:6, 1468:7, 1469:17, 1473:13, 1474:17, 1478:6, 1481:17, 1482:22, 1484:1, 1485:18, 1486:18, 1487:10, 1489:15, 1490:5, 1492:11, 1510:15, 1517:8, 1530:15

**receiving** [11] - 1252:20, 1362:19, 1364:6, 1377:17, 1380:2, 1380:10, 1384:14, 1417:1, 1433:7, 1441:12, 1488:3

**recent** [7] - 1307:15, 1332:1, 1345:9, 1438:17, 1447:20, 1450:9, 1510:4

**recently** [2] - 1283:9, 1301:2

**recess** [6] - 1291:22, 1356:6, 1454:13, 1454:16, 1454:17, 1539:20

**recognize** [20] - 1314:4, 1328:9, 1331:19, 1341:5, 1345:6, 1349:15, 1361:23, 1362:10, 1387:22, 1413:15, 1420:18, 1431:17, 1442:17, 1445:4, 1465:13, 1477:9, 1481:2, 1482:11, 1483:10, 1518:5

**recognized** [2] - 1221:10, 1232:13

**recollection** [2] - 1400:21, 1532:12

**recommend** [2] - 1353:23, 1384:13

**recommendation** [3] -

1354:1, 1355:2, 1377:22

**recommendations** [3] - 1392:13, 1393:5, 1393:21

**recommended** [2] - 1336:24, 1353:13

**recommending** [1] - 1355:4

**recommends** [2] - 1375:17, 1376:8

**record** [24] - 1218:17, 1229:2, 1242:22, 1271:11, 1311:23, 1312:3, 1357:10, 1370:17, 1376:17, 1381:5, 1391:21, 1391:25, 1399:25, 1400:7, 1400:11, 1400:22, 1401:2, 1401:9, 1401:18, 1417:7, 1417:21, 1499:16, 1517:5, 1540:2

**recording** [7] - 1378:18, 1391:19, 1399:13, 1402:20, 1412:19, 1413:4, 1413:21

**recoup** [1] - 1440:24

**recouped** [2] - 1441:9, 1458:19

**recouping** [1] - 1447:3

**rectangle** [1] - 1480:17

**red** [5] - 1233:11, 1235:2, 1252:15, 1318:12, 1318:14

**redact** [6] - 1255:8, 1266:16, 1274:14, 1428:19, 1486:15, 1492:7

**redaction** [1] - 1229:18

**redactions** [6] - 1234:2, 1242:20, 1430:20, 1473:8, 1474:13, 1490:2

**Reddy's** [1] - 1376:20

**REDDY'S** [1] - 1217:10

**Redirect** [1] - 1540:10

**redirect** [5] - 1310:23, 1392:5, 1402:9, 1414:3, 1538:3

**REDIRECT** [1] - 1414:4

**REDUCE** [52] - 1224:18, 1248:2, 1248:10, 1248:15,

44

1249:17, 1254:12,
1254:19, 1256:9,
1256:11, 1257:6,
1257:10, 1257:13,
1257:17, 1257:19,
1258:3, 1258:4,
1267:24, 1287:18,
1291:5, 1297:22,
1298:3, 1298:4,
1298:6, 1298:17,
1299:13, 1300:1,
1300:7, 1300:9,
1426:21, 1450:11,
1450:14, 1450:19,
1451:6, 1451:10,
1452:1, 1489:12,
1489:17, 1510:5,
1522:6, 1522:23,
1523:1, 1523:15,
1524:9, 1524:22,
1529:21, 1533:22,
1534:2, 1534:6,
1534:8, 1535:8,
1535:11, 1535:18
**reduce** [18] - 1220:2,
1241:14, 1338:21,
1344:10, 1344:23,
1345:17, 1349:9,
1350:16, 1350:20,
1351:17, 1352:9,
1355:8, 1407:12,
1412:12, 1426:23,
1434:5, 1477:3,
1533:10
**REDUCE-IT** [52] -
1224:18, 1248:2,
1248:10, 1248:15,
1249:17, 1254:12,
1254:19, 1256:9,
1256:11, 1257:6,
1257:10, 1257:13,
1257:17, 1257:19,
1258:3, 1258:4,
1267:24, 1287:18,
1291:5, 1297:22,
1298:3, 1298:4,
1298:6, 1298:17,
1299:13, 1300:1,
1300:7, 1300:9,
1426:21, 1450:11,
1450:14, 1450:19,
1451:6, 1451:10,
1452:1, 1489:12,
1489:17, 1510:5,
1522:6, 1522:23,
1523:1, 1523:15,
1524:9, 1524:22,
1529:21, 1533:22,
1534:2, 1534:6,
1534:8, 1535:8,
1535:11, 1535:18

**reduced** [7] - 1346:25,
1407:6, 1408:12,
1425:17, 1425:20,
1457:17, 1479:19
**reduces** [1] - 1357:24
**reducing** [19] -
1232:7, 1349:24,
1407:14, 1408:15,
1408:17, 1408:22,
1408:23, 1409:10,
1409:24, 1410:10,
1411:14, 1421:23,
1422:1, 1422:20,
1433:24, 1436:2,
1495:10, 1495:22,
1523:7
**reduction** [5] -
1338:22, 1344:11,
1346:21, 1347:2,
1410:6
**reductions** [1] -
1234:5
**Reed** [1] - 1315:25
**refer** [8] - 1313:11,
1322:18, 1352:3,
1366:10, 1366:25,
1407:24, 1471:14,
1494:5
**reference** [30] -
1232:7, 1233:22,
1234:17, 1240:18,
1243:25, 1252:3,
1265:4, 1265:23,
1272:19, 1274:6,
1275:25, 1278:10,
1279:1, 1287:2,
1337:3, 1340:17,
1340:22, 1349:22,
1350:11, 1354:9,
1395:3, 1468:11,
1469:20, 1481:23,
1515:22, 1528:14,
1528:17, 1530:18,
1531:2, 1536:11
**referenced** [4] -
1240:9, 1369:12,
1448:9, 1532:3
**referencing** [1] -
1349:9
**referred** [5] - 1250:18,
1280:21, 1300:12,
1324:13, 1522:23
**referring** [14] -
1232:11, 1259:15,
1363:14, 1366:11,
1366:12, 1383:21,
1384:17, 1385:7,
1387:23, 1388:7,
1393:22, 1476:18,
1510:3, 1528:22

**refers** [1] - 1264:12
**reflect** [12] - 1302:11,
1302:20, 1314:11,
1322:14, 1329:22,
1337:6, 1352:16,
1400:22, 1420:23,
1430:11, 1450:9,
1450:10
**reflected** [7] -
1330:24, 1337:25,
1338:5, 1345:20,
1352:13, 1427:3,
1502:3
**reflecting** [1] -
1327:16
**refresh** [2] - 1400:21,
1532:12
**regard** [6] - 1345:20,
1352:12, 1366:8,
1373:20, 1396:9,
1403:8
**regarding** [12] -
1228:4, 1246:8,
1262:21, 1285:5,
1293:23, 1342:10,
1352:22, 1392:12,
1393:3, 1393:19,
1479:12, 1486:22
**regardless** [2] -
1358:8, 1412:13
**regards** [1] - 1220:15
**regimen** [5] - 1362:18,
1362:20, 1380:18,
1395:10, 1405:21
**regimens** [2] - 1389:1,
1404:22
**regularly** [6] - 1219:8,
1219:16, 1232:15,
1232:16, 1272:21,
1294:20
**regulate** [5] - 1324:24,
1325:1, 1347:21,
1395:1, 1395:2
**regulated** [1] -
1505:23
**regulates** [3] -
1320:16, 1320:17,
1325:2
**regulation** [11] -
1313:4, 1313:24,
1320:22, 1322:25,
1323:17, 1325:10,
1327:1, 1373:21,
1404:19, 1405:4,
1407:25
**regulations** [6] -
1312:20, 1323:22,
1377:4, 1404:10,
1404:12, 1404:14
**regulatory** [4] -

1238:2, 1312:19,
1382:5, 1398:15
**Regulatory** [1] -
1313:2
**REIG** [1] - 1217:5
**REIG-PLESSIS** [1] -
1217:5
**reinforces** [1] -
1460:12
**reject** [2] - 1224:14,
1236:5
**relate** [11] - 1224:18,
1249:14, 1257:5,
1258:20, 1287:20,
1302:18, 1320:15,
1392:21, 1455:6,
1497:13, 1535:11
**related** [27] - 1227:16,
1228:2, 1233:7,
1241:18, 1250:23,
1251:6, 1254:15,
1265:11, 1274:3,
1278:1, 1298:17,
1321:20, 1329:13,
1363:9, 1497:5,
1497:20, 1498:10,
1507:15, 1523:15,
1523:19, 1524:2,
1526:13, 1526:25,
1527:5, 1531:14,
1534:19
**relates** [7] - 1219:14,
1250:7, 1258:5,
1264:15, 1360:20,
1409:24, 1410:10
**relating** [3] - 1319:17,
1321:1, 1322:2
**relation** [1] - 1526:9
**relationship** [2] -
1237:1, 1271:9
**relationships** [2] -
1269:19, 1270:15
**relative** [24] - 1224:3,
1224:4, 1231:17,
1231:19, 1234:25,
1265:18, 1272:8,
1273:10, 1274:3,
1290:3, 1346:6,
1347:1, 1347:3,
1407:7, 1423:12,
1472:1, 1472:17,
1474:3, 1474:24,
1474:25, 1486:8,
1486:10, 1507:22
**relatively** [6] -
1279:21, 1419:20,
1475:15, 1479:25,
1480:7, 1507:6
**relevant** [22] -
1231:22, 1286:5,

1288:6, 1327:23,
1333:20, 1335:5,
1336:23, 1394:23,
1399:22, 1400:13,
1407:4, 1408:17,
1409:10, 1411:14,
1424:8, 1427:18,
1429:10, 1433:21,
1434:8, 1435:10,
1467:7, 1535:2
**reliability** [2] - 1237:9,
1240:16
**reliable** [5] - 1236:11,
1239:5, 1239:16,
1320:4, 1502:25
**reliance** [3] - 1290:10,
1298:9, 1299:21
**relied** [26] - 1228:20,
1233:23, 1247:14,
1255:5, 1265:25,
1274:7, 1297:8,
1298:14, 1300:10,
1300:17, 1349:19,
1445:8, 1453:17,
1459:10, 1460:10,
1461:19, 1462:7,
1465:17, 1468:4,
1483:19, 1496:18,
1497:1, 1498:22,
1517:13, 1518:6,
1522:6
**relies** [3] - 1239:21,
1290:16, 1298:17
**rely** [15] - 1236:23,
1306:10, 1328:21,
1329:6, 1332:4,
1341:20, 1401:15,
1432:16, 1443:4,
1463:13, 1463:24,
1469:10, 1477:24,
1481:10, 1482:15
**relying** [7] - 1246:12,
1299:11, 1457:18,
1474:4, 1507:11,
1511:2, 1511:16
**remain** [1] - 1523:23
**remained** [2] -
1393:15, 1455:24
**remaining** [2] -
1448:11, 1538:21
**remains** [1] - 1320:20
**remember** [23] -
1299:14, 1299:15,
1303:11, 1308:5,
1309:22, 1338:12,
1351:23, 1406:25,
1411:19, 1414:20,
1416:6, 1416:9,
1439:24, 1444:3,
1464:11, 1475:4,

45

1492:23, 1513:15,
1517:21, 1518:16,
1518:19, 1518:23,
1532:20
**remembered** [1] -
1532:19
**remind** [2] - 1248:21,
1292:2
**reminding** [2] -
1436:22, 1500:8
**reminds** [1] - 1327:18
**remove** [2] - 1348:14,
1464:22
**removed** [4] - 1242:6,
1243:15, 1244:24,
1362:24
**removing** [3] -
1243:20, 1245:2,
1521:20
**Reno** [3] - 1216:7,
1216:23, 1217:13
**RENO** [2] - 1218:1,
1357:1
**repeat** [9] - 1340:18,
1346:11, 1349:1,
1360:10, 1361:16,
1365:5, 1372:12,
1411:24, 1535:17
**rephrase** [6] -
1250:15, 1366:23,
1389:21, 1391:4,
1407:20, 1409:21
**replace** [1] - 1380:18
**replacement** [1] -
1281:2
**replaying** [1] -
1401:21
**reply** [15] - 1243:19,
1244:25, 1246:10,
1365:12, 1365:14,
1365:21, 1367:13,
1505:16, 1513:3,
1513:21, 1515:12,
1516:1, 1520:20,
1520:22
**report** [84] - 1241:2,
1241:3, 1243:17,
1243:18, 1243:19,
1243:21, 1244:15,
1244:19, 1244:22,
1244:23, 1244:25,
1245:5, 1246:11,
1283:9, 1283:15,
1283:16, 1283:19,
1283:23, 1284:2,
1285:17, 1294:6,
1297:12, 1298:21,
1299:2, 1299:8,
1300:6, 1305:21,
1346:9, 1346:12,

1365:12, 1365:15,
1365:17, 1365:21,
1367:14, 1369:5,
1369:11, 1372:24,
1373:10, 1376:2,
1376:13, 1382:20,
1383:6, 1383:16,
1385:3, 1386:7,
1386:18, 1392:24,
1393:6, 1395:6,
1431:20, 1450:5,
1450:17, 1451:2,
1451:14, 1451:22,
1462:22, 1463:13,
1463:14, 1464:22,
1465:4, 1468:5,
1477:12, 1492:20,
1496:19, 1497:1,
1500:1, 1505:17,
1507:12, 1509:25,
1510:7, 1513:3,
1513:17, 1513:21,
1515:12, 1515:21,
1516:1, 1518:5,
1519:7, 1520:20,
1520:22, 1521:11,
1528:4, 1534:15
**Reported** [1] -
1216:22
**reported** [3] - 1287:7,
1289:8, 1405:20
**reporter** [1] - 1400:2
**Reporter** [2] -
1216:22, 1540:5
**reporting** [1] -
1453:12
**reports** [51] - 1238:14,
1239:1, 1241:4,
1241:13, 1242:10,
1243:23, 1244:17,
1246:12, 1246:21,
1257:18, 1297:7,
1297:9, 1297:16,
1298:3, 1298:5,
1298:17, 1299:12,
1300:9, 1302:23,
1422:14, 1428:10,
1448:11, 1449:12,
1449:25, 1450:4,
1450:6, 1452:13,
1452:21, 1452:23,
1453:17, 1454:1,
1454:6, 1455:2,
1456:14, 1456:15,
1457:6, 1457:18,
1459:10, 1460:13,
1460:18, 1465:1,
1487:2, 1492:22,
1501:2, 1501:4,
1504:9, 1505:13,

1505:20, 1508:1,
1514:24
**represent** [11] -
1233:6, 1236:8,
1241:24, 1294:11,
1301:9, 1326:20,
1337:22, 1360:1,
1360:3, 1382:1,
1499:11
**representation** [2] -
1512:1, 1519:8
**representations** [1] -
1348:2
**representatives** [3] -
1267:11, 1267:19,
1268:21
**represented** [2] -
1287:25, 1321:6
**representing** [1] -
1500:4
**represents** [3] -
1272:7, 1329:12,
1520:3
**reps** [3] - 1267:21,
1268:2, 1472:8
**reputable** [5] - 1450:7,
1452:14, 1505:16,
1511:21, 1514:24
**reputation** [3] -
1452:12, 1476:5,
1506:11
**request** [11] - 1230:4,
1254:24, 1255:8,
1256:2, 1274:12,
1274:16, 1323:20,
1428:19, 1430:19,
1490:4, 1492:10
**requests** [1] - 1430:22
**require** [8] - 1326:17,
1326:24, 1331:12,
1348:14, 1381:14,
1388:13, 1465:22,
1523:10
**required** [9] - 1370:20,
1371:17, 1381:20,
1382:9, 1383:2,
1386:1, 1387:3,
1441:25, 1444:16
**requirement** [4] -
1342:14, 1380:11,
1384:21, 1390:4
**requirements** [1] -
1312:20
**requires** [7] - 1328:14,
1331:4, 1347:23,
1359:13, 1373:25,
1386:24, 1495:19
**requiring** [2] -
1359:19, 1390:2
**reread** [1] - 1379:17

**research** [28] -
1227:11, 1315:18,
1316:2, 1316:7,
1316:8, 1316:11,
1316:15, 1316:20,
1316:25, 1317:5,
1318:3, 1318:7,
1318:13, 1319:11,
1320:22, 1418:12,
1418:18, 1419:3,
1419:11, 1419:22,
1419:23, 1425:8,
1440:12, 1445:1,
1448:5, 1467:1,
1477:18, 1489:11
**Research** [7] - 1313:9,
1313:12, 1316:19,
1318:4, 1418:19,
1420:1, 1506:16
**reservation** [1] -
1490:1
**reserve** [2] - 1310:24,
1311:2
**residency** [2] -
1315:14, 1315:17
**resonated** [1] - 1482:6
**resonating** [4] -
1477:4, 1477:22,
1484:10, 1532:18
**resource** [1] - 1320:6
**respect** [46] - 1224:6,
1224:21, 1229:11,
1232:14, 1247:22,
1248:7, 1259:21,
1282:16, 1283:11,
1289:18, 1290:7,
1290:23, 1291:11,
1334:25, 1335:19,
1335:22, 1341:16,
1351:11, 1361:1,
1369:1, 1374:5,
1374:18, 1378:10,
1382:15, 1382:16,
1388:23, 1396:6,
1396:7, 1410:16,
1413:10, 1423:21,
1494:6, 1494:11,
1496:3, 1508:10,
1510:18, 1512:1,
1514:9, 1517:22,
1520:13, 1523:16,
1524:7, 1525:10,
1528:24, 1531:20,
1533:25
**respective** [1] -
1364:23
**respond** [2] - 1221:20,
1224:8
**responded** [1] -
1243:17

**responding** [2] -
1392:25, 1505:17
**response** [1] -
1480:18
**responsibilities** [3] -
1321:2, 1321:19,
1321:22
**responsibility** [3] -
1320:21, 1323:5,
1325:14
**responsible** [3] -
1321:3, 1321:24,
1474:20
**responsive** [1] -
1403:10
**rest** [2] - 1474:24,
1539:20
**restrictions** [6] -
1256:20, 1256:25,
1257:9, 1281:22,
1531:16, 1531:25
**restrictive** [2] -
1396:7, 1396:9
**result** [9] - 1259:8,
1269:17, 1269:21,
1288:14, 1363:2,
1384:23, 1510:4,
1510:5, 1519:24
**resulting** [2] -
1244:21, 1444:13
**results** [16] - 1237:1,
1237:7, 1240:14,
1241:8, 1241:20,
1244:1, 1257:10,
1267:24, 1290:17,
1295:24, 1347:13,
1502:15, 1522:6,
1522:24, 1532:13,
1533:1
**resume** [2] - 1355:22,
1517:10, 1539:20
**resumption** [1] -
1268:19
**retained** [1] - 1313:15
**retirees** [1] - 1319:8
**retrospect** [1] -
1460:17
**return** [19] - 1226:18,
1440:21, 1440:22,
1440:25, 1441:3,
1441:10, 1441:13,
1443:23, 1444:8,
1448:22, 1457:10,
1457:16, 1458:20,
1459:2, 1459:3,
1503:16, 1503:17,
1521:17
**returned** [1] - 1315:8
**returns** [5] - 1276:20,
1277:5, 1429:19,

1444:21, 1459:8
**revenue** [11] -
1222:15, 1240:23,
1240:25, 1277:3,
1447:11, 1457:2,
1489:16, 1506:14,
1508:10, 1518:11,
1534:19
**revenues** [6] - 1241:1,
1241:5, 1241:10,
1241:11, 1455:10,
1517:14
**reverted** [1] - 1393:15
**review** [27] - 1221:20,
1226:22, 1228:25,
1229:8, 1230:9,
1254:14, 1261:14,
1320:22, 1321:9,
1321:12, 1322:6,
1323:6, 1326:17,
1334:12, 1398:19,
1400:23, 1401:3,
1401:11, 1401:13,
1420:9, 1430:20,
1473:8, 1474:13,
1490:2, 1532:9,
1537:1
**reviewed** [9] - 1295:3,
1297:17, 1334:13,
1452:13, 1476:21,
1495:1, 1495:2,
1496:18, 1528:4
**reviewers** [2] - 1368:5,
1368:25
**reviewing** [3] -
1321:15, 1322:3,
1325:16
**Reviews** [1] - 1469:8
**reviews** [1] - 1321:16
**revised** [2] - 1243:18,
1504:8
**revising** [3] - 1325:25,
1504:14, 1521:10
**rewards** [1] - 1511:21
**right-hand** [1] -
1536:10
**rise** [1] - 1456:10
**rises** [1] - 1436:2
**rising** [1] - 1456:6
**risk** [12] - 1343:16,
1343:25, 1386:15,
1499:23, 1499:25,
1500:6, 1500:12,
1501:13, 1506:17,
1506:25, 1507:12,
1507:24
**Risks** [1] - 1506:24
**risks** [2] - 1337:19,
1338:4
**risky** [1] - 1343:24

**Robert** [1] - 1419:24
**robust** [1] - 1276:19
**role** [6] - 1274:1,
1291:8, 1292:18,
1432:3, 1467:2,
1470:21
**rough** [1] - 1313:13
**roughly** [8] - 1241:8,
1283:5, 1287:2,
1305:7, 1327:5,
1355:20, 1518:25,
1519:9
**ROUNDS** [97] -
1217:12, 1421:3,
1421:9, 1426:6,
1426:12, 1428:15,
1428:21, 1430:15,
1430:21, 1432:21,
1436:9, 1437:18,
1443:9, 1445:13,
1450:16, 1451:1,
1453:22, 1454:4,
1456:18, 1457:23,
1459:15, 1461:25,
1462:11, 1463:19,
1464:4, 1465:22,
1467:19, 1469:15,
1473:4, 1473:10,
1474:9, 1474:15,
1478:4, 1481:15,
1482:20, 1483:24,
1485:16, 1486:16,
1487:8, 1490:3,
1492:9, 1492:13,
1492:15, 1492:18,
1493:8, 1493:10,
1494:19, 1494:21,
1497:8, 1497:9,
1499:9, 1499:10,
1499:15, 1499:17,
1501:20, 1501:21,
1506:19, 1506:21,
1512:25, 1513:7,
1513:9, 1515:12,
1515:24, 1516:15,
1517:11, 1517:12,
1518:3, 1518:4,
1518:8, 1518:9,
1520:19, 1520:21,
1524:6, 1524:18,
1524:20, 1525:2,
1525:4, 1528:2,
1528:3, 1528:7,
1528:8, 1530:11,
1530:16, 1530:24,
1531:1, 1532:6,
1532:8, 1533:15,
1533:16, 1536:1,
1536:4, 1536:8,
1536:9, 1537:15,

1537:18, 1537:21,
1537:25
**Rounds** [6] - 1450:25,
1492:15, 1515:10,
1517:9, 1524:5,
1540:13
**rounds** [5] - 1454:3,
1492:8, 1535:24,
1537:7, 1538:15
**row** [2] - 1346:4,
1448:15
**rows** [2] - 1433:22,
1434:6
**RPR** [2] - 1216:22,
1540:4
**rule** [2] - 1285:20,
1325:8
**Rule** [2] - 1255:23,
1539:15
**rules** [1] - 1390:15
**Rules** [2] - 1255:23,
1274:23
**run** [4] - 1253:8,
1441:20, 1519:19,
1519:23

## S

**safe** [17] - 1317:14,
1326:22, 1327:8,
1330:12, 1330:21,
1336:10, 1339:16,
1344:23, 1345:16,
1348:10, 1348:18,
1348:20, 1350:22,
1351:16, 1352:8,
1354:21, 1390:22
**safely** [5] - 1317:11,
1333:2, 1337:18,
1337:24, 1386:25
**safety** [20] - 1307:7,
1320:25, 1322:15,
1324:8, 1324:10,
1333:13, 1336:5,
1337:10, 1340:4,
1353:9, 1381:19,
1382:8, 1382:24,
1383:1, 1385:20,
1385:25, 1387:2,
1388:13, 1390:16,
1396:2
**Sales** [1] - 1279:12
**sales** [173] - 1225:8,
1225:15, 1227:9,
1228:3, 1230:10,
1230:13, 1230:15,
1230:16, 1230:20,
1230:23, 1230:24,
1230:25, 1231:3,
1236:14, 1244:20,

1248:12, 1249:3,
1250:11, 1254:2,
1254:6, 1257:5,
1258:25, 1259:7,
1259:9, 1260:15,
1260:20, 1262:10,
1262:15, 1263:15,
1265:11, 1265:14,
1265:18, 1265:19,
1267:11, 1267:19,
1267:20, 1268:2,
1268:18, 1268:20,
1269:21, 1270:15,
1271:13, 1277:25,
1278:15, 1278:16,
1278:19, 1278:24,
1287:23, 1288:15,
1288:17, 1289:7,
1291:2, 1302:11,
1302:18, 1302:19,
1303:19, 1303:23,
1304:20, 1304:21,
1304:24, 1305:1,
1305:4, 1305:5,
1305:25, 1423:8,
1423:9, 1424:20,
1429:4, 1429:7,
1429:16, 1429:17,
1429:18, 1429:25,
1430:1, 1430:3,
1430:11, 1431:9,
1439:6, 1446:13,
1446:14, 1446:19,
1448:8, 1448:12,
1448:18, 1449:5,
1449:8, 1449:11,
1449:16, 1449:19,
1449:22, 1449:24,
1450:7, 1450:10,
1453:1, 1453:8,
1453:12, 1453:16,
1455:1, 1455:2,
1455:10, 1455:12,
1455:13, 1460:3,
1460:7, 1461:3,
1461:7, 1461:8,
1462:19, 1462:25,
1463:3, 1463:5,
1464:21, 1464:25,
1468:15, 1468:19,
1468:22, 1468:25,
1472:8, 1473:21,
1473:22, 1479:8,
1485:20, 1485:21,
1485:22, 1488:9,
1488:10, 1488:11,
1488:12, 1489:8,
1489:13, 1489:14,
1489:16, 1490:25,
1491:7, 1491:9,
1491:12, 1491:15,

1491:16, 1497:5,
1497:13, 1497:20,
1498:8, 1503:20,
1507:14, 1507:18,
1508:1, 1510:9,
1510:13, 1511:7,
1511:9, 1518:10,
1518:14, 1519:6,
1519:15, 1525:10,
1525:11, 1525:16,
1525:20, 1525:23,
1525:24, 1529:23,
1535:2
**sample** [2] - 1275:15,
1509:13
**Samples** [1] - 1263:4
**samples** [13] -
1267:14, 1275:9,
1275:11, 1275:19,
1276:5, 1276:20,
1276:22, 1276:25,
1277:5, 1277:14,
1307:9, 1427:9
**Sampling** [1] -
1275:23
**sampling** [6] -
1259:22, 1263:12,
1273:4, 1275:3,
1275:7, 1276:2
**San** [5] - 1217:6,
1301:15, 1312:24,
1316:16, 1316:19
**save** [1] - 1486:7
**saw** [7] - 1234:19,
1257:4, 1280:2,
1281:12, 1302:6,
1360:18, 1513:13
**scenario** [5] - 1245:1,
1397:14, 1398:17,
1522:16, 1536:20
**scenarios** [1] -
1522:15
**Scholarship** [1] -
1315:6
**School** [2] - 1315:10,
1466:5
**school** [1] - 1319:2
**schools** [1] - 1334:3
**Science** [1] - 1313:3
**science** [2] - 1317:11,
1422:25
**sciences** [2] -
1219:17, 1301:11
**Sciences** [2] -
1316:22, 1319:1
**scientific** [5] - 1494:4,
1494:17, 1524:2,
1537:5, 1537:6
**scientifically** [1] -
1326:20

scientist [3] - 1285:3, 1494:3, 1503:9
scientists [1] - 1321:15
scope [17] - 1357:16, 1394:2, 1395:13, 1395:24, 1397:10, 1398:1, 1398:12, 1398:14, 1401:22, 1401:23, 1402:11, 1403:25, 1409:2, 1450:17, 1451:21, 1524:9
screen [8] - 1230:1, 1232:19, 1261:19, 1361:22, 1362:21, 1363:13, 1404:9, 1414:16
scroll [2] - 1329:16, 1342:15
seal [1] - 1229:15
sealed [1] - 1229:4
Sean [3] - 1417:14, 1417:22, 1540:12
SEAN [2] - 1417:17, 1417:22
seated [7] - 1218:4, 1218:15, 1291:23, 1357:4, 1417:19, 1454:18, 1523:23
SEC [6] - 1426:2, 1487:2, 1498:22, 1498:25, 1499:5, 1499:8
second [29] - 1224:6, 1261:2, 1262:7, 1269:16, 1269:24, 1276:17, 1290:7, 1297:7, 1319:13, 1333:8, 1346:4, 1350:4, 1354:4, 1377:13, 1380:16, 1381:6, 1385:10, 1399:18, 1409:15, 1417:5, 1422:1, 1422:19, 1440:19, 1448:15, 1480:21, 1483:13, 1502:9, 1511:25, 1538:9
secondary [4] - 1219:13, 1222:24, 1294:3, 1415:6
section [134] - 1328:2, 1328:16, 1328:18, 1328:19, 1329:20, 1330:6, 1330:16, 1330:22, 1331:3, 1331:9, 1331:24, 1332:2, 1332:14, 1332:20, 1332:25,

1333:5, 1333:17, 1334:7, 1335:9, 1335:12, 1336:8, 1337:2, 1337:5, 1337:7, 1337:12, 1338:1, 1338:7, 1338:19, 1338:24, 1339:1, 1339:14, 1340:8, 1340:10, 1340:17, 1340:22, 1340:23, 1340:24, 1341:9, 1341:12, 1341:19, 1342:4, 1342:11, 1342:16, 1342:24, 1343:2, 1343:5, 1344:2, 1344:7, 1344:12, 1344:15, 1345:11, 1345:24, 1345:25, 1346:1, 1346:19, 1347:7, 1348:22, 1348:25, 1349:4, 1352:23, 1353:4, 1353:12, 1353:20, 1354:2, 1354:8, 1354:11, 1354:17, 1354:23, 1355:1, 1355:3, 1362:13, 1364:15, 1365:1, 1365:7, 1365:18, 1365:22, 1365:25, 1366:2, 1368:1, 1368:4, 1368:15, 1368:22, 1369:9, 1373:5, 1376:16, 1376:18, 1376:19, 1376:22, 1376:23, 1377:5, 1377:13, 1378:1, 1379:18, 1379:21, 1380:17, 1380:23, 1381:6, 1381:13, 1382:23, 1384:12, 1384:13, 1385:15, 1386:12, 1388:8, 1388:21, 1388:22, 1389:2, 1394:15, 1396:16, 1398:19, 1404:5, 1404:10, 1404:11, 1404:16, 1404:23, 1405:6, 1405:7, 1405:12, 1405:20, 1405:22, 1405:24, 1406:11, 1406:13, 1408:6, 1411:7, 1413:14, 1414:8, 1416:16, 1478:13, 1479:17
Section [2] - 1332:21, 1416:16
sections [23] - 1327:5,

1327:16, 1327:21, 1327:22, 1330:5, 1330:8, 1330:17, 1330:20, 1330:25, 1331:7, 1335:5, 1345:23, 1352:15, 1352:20, 1373:13, 1377:9, 1388:18, 1388:25, 1390:12, 1404:16, 1405:6, 1408:5, 1416:3
see [133] - 1227:14, 1227:21, 1230:14, 1230:18, 1230:19, 1231:8, 1231:19, 1232:19, 1233:12, 1233:13, 1235:2, 1237:21, 1238:4, 1238:12, 1240:1, 1241:7, 1243:20, 1244:12, 1245:2, 1245:20, 1246:22, 1249:19, 1252:17, 1253:1, 1253:11, 1262:16, 1265:18, 1268:5, 1271:8, 1271:18, 1273:11, 1276:1, 1276:19, 1278:20, 1279:19, 1289:21, 1290:3, 1290:12, 1299:4, 1299:23, 1301:23, 1301:25, 1302:9, 1314:8, 1331:25, 1346:5, 1350:9, 1362:21, 1364:8, 1367:19, 1367:22, 1368:17, 1368:23, 1369:20, 1370:2, 1370:9, 1370:25, 1378:14, 1379:6, 1381:11, 1381:14, 1383:20, 1383:22, 1383:25, 1384:7, 1391:25, 1393:6, 1394:15, 1400:6, 1402:12, 1402:16, 1405:9, 1405:15, 1407:9, 1414:23, 1414:25, 1415:9, 1416:13, 1425:10, 1425:17, 1425:20, 1434:10, 1434:13, 1437:3, 1438:22, 1447:4, 1447:8, 1447:19, 1449:10, 1449:18, 1449:21, 1449:23, 1453:12, 1456:5, 1461:12, 1462:21, 1463:6, 1463:9, 1468:21,

1471:1, 1472:16, 1473:24, 1483:15, 1484:25, 1488:24, 1490:17, 1490:20, 1491:14, 1494:22, 1495:6, 1496:8, 1500:2, 1506:24, 1508:10, 1509:7, 1511:25, 1512:3, 1513:5, 1513:22, 1518:10, 1528:11, 1528:14, 1528:17, 1528:25, 1529:2, 1530:18, 1531:2, 1531:7, 1532:15, 1533:19, 1536:10, 1536:16, 1539:15
seeing [5] - 1276:6, 1277:4, 1513:15, 1532:5, 1532:11
seek [13] - 1234:2, 1234:7, 1242:20, 1243:5, 1245:24, 1245:25, 1251:19, 1262:22, 1263:18, 1264:19, 1266:19, 1279:4, 1507:25
seeking [2] - 1537:5, 1537:6
seeks [1] - 1483:22
seem [1] - 1535:9
sees [3] - 1291:1, 1291:7, 1378:11
segment [1] - 1438:4
segments [2] - 1447:9, 1491:6
select [1] - 1370:11
selected [4] - 1365:3, 1365:9, 1366:5, 1414:24
Selected [1] - 1369:25
self [1] - 1289:8
self-reported [1] - 1289:8
selling [7] - 1227:10, 1230:17, 1305:14, 1429:5, 1442:6, 1455:11, 1468:20
senior [6] - 1260:18, 1261:20, 1268:25, 1270:3, 1270:12, 1276:4
sense [14] - 1231:17, 1244:24, 1427:24, 1441:9, 1447:23, 1463:7, 1481:7, 1507:25, 1508:25, 1509:13, 1509:20, 1509:22, 1520:15, 1526:8

sent [1] - 1310:19
sentence [17] - 1330:5, 1330:6, 1332:24, 1333:8, 1336:21, 1337:14, 1337:15, 1339:11, 1339:17, 1342:17, 1343:11, 1353:11, 1354:5, 1364:2, 1368:10, 1385:11, 1395:7
sentences [9] - 1372:25, 1376:3, 1376:12, 1382:21, 1383:5, 1383:14, 1386:18, 1392:21, 1499:16
separate [3] - 1294:15, 1512:6, 1516:18
separately [1] - 1516:11
September [1] - 1522:9
series [5] - 1238:24, 1440:13, 1440:17, 1440:18, 1441:23
seriously [1] - 1506:15
serve [1] - 1319:6
served [1] - 1299:2
service [5] - 1232:12, 1319:6, 1319:7, 1440:5, 1440:8
Services [3] - 1315:23, 1316:22, 1318:25
services [3] - 1220:7, 1315:25, 1432:6
set [10] - 1325:10, 1397:11, 1436:1, 1442:1, 1447:13, 1476:16, 1479:13, 1511:20, 1522:10, 1522:25
setting [7] - 1219:11, 1219:16, 1220:6, 1232:16, 1232:17, 1258:18, 1322:3
settings [3] - 1239:7, 1239:8, 1295:13
settlement [1] - 1448:16
setup [1] - 1490:10
seven [5] - 1316:24, 1320:20, 1320:21, 1386:14, 1388:9
seventh [1] - 1446:2
several [5] - 1237:4, 1297:8, 1488:17,

48

1522:14, 1535:24
**severe** [32] - 1220:3,
1251:11, 1344:24,
1345:17, 1351:17,
1352:10, 1355:8,
1359:9, 1366:12,
1366:24, 1367:2,
1367:5, 1367:24,
1391:1, 1408:18,
1408:25, 1409:11,
1409:24, 1410:6,
1410:10, 1411:4,
1411:11, 1411:14,
1412:13, 1415:12,
1416:9, 1416:12,
1421:24, 1423:1,
1495:11, 1495:13,
1497:6
**shall** [1] - 1516:7
**share** [39] - 1222:15,
1224:3, 1231:11,
1232:6, 1233:11,
1234:24, 1235:11,
1273:20, 1273:21,
1273:25, 1290:4,
1309:17, 1423:10,
1423:13, 1424:21,
1433:19, 1434:2,
1434:8, 1434:10,
1434:16, 1434:17,
1435:4, 1435:9,
1435:14, 1435:16,
1435:19, 1436:2,
1436:21, 1436:24,
1437:1, 1437:4,
1437:7, 1438:23,
1439:1, 1439:4,
1439:6, 1439:11,
1439:13
**Share** [9] - 1234:15,
1259:24, 1272:3,
1272:5, 1272:18,
1273:9, 1273:12,
1273:14
**shared** [1] - 1414:11
**sharing** [2] - 1307:11
**Sheinberg** [9] -
1334:20, 1334:24,
1338:8, 1338:14,
1338:16, 1351:20,
1351:25, 1358:3,
1361:4
**Sheinberg's** [2] -
1335:2, 1360:15
**shelf** [1] - 1318:14
**shepherd** [1] - 1503:7
**shift** [1] - 1437:11
**short** [7] - 1238:18,
1339:24, 1340:16,
1340:21, 1358:25,

1395:21, 1395:25
**short-term** [6] -
1339:24, 1340:16,
1340:21, 1358:25,
1395:21, 1395:25
**shorter** [2] - 1396:6,
1406:17
**shorthand** [2] -
1366:18, 1366:23
**shortly** [1] - 1446:5
**shouting** [2] -
1272:13, 1273:17
**show** [27] - 1223:8,
1250:14, 1259:10,
1271:17, 1292:15,
1299:6, 1402:1,
1431:10, 1433:3,
1433:16, 1434:2,
1444:4, 1447:18,
1449:3, 1461:1,
1462:17, 1465:23,
1471:7, 1479:11,
1479:23, 1484:20,
1487:25, 1490:9,
1491:22, 1505:17,
1508:24, 1513:2
**showed** [14] -
1290:13, 1394:16,
1436:25, 1439:17,
1458:7, 1464:24,
1475:5, 1488:9,
1497:4, 1502:22,
1510:21, 1512:11,
1525:23, 1532:25
**showing** [21] -
1308:21, 1309:11,
1425:5, 1425:6,
1427:10, 1429:2,
1436:19, 1436:20,
1436:25, 1454:24,
1455:3, 1456:24,
1456:25, 1458:5,
1460:25, 1469:20,
1469:25, 1472:16,
1473:17, 1473:18,
1485:4
**shown** [12] - 1229:24,
1230:12, 1270:21,
1279:14, 1285:22,
1346:17, 1348:17,
1446:24, 1513:10,
1513:18, 1525:5,
1525:7
**shows** [31] - 1227:9,
1235:9, 1539:18,
1243:21, 1247:1,
1247:5, 1271:2,
1273:16, 1274:1,
1282:9, 1291:10,
1310:7, 1427:11,

1427:13, 1433:4,
1433:5, 1433:17,
1435:4, 1438:7,
1439:1, 1449:4,
1454:25, 1458:11,
1469:21, 1471:8,
1483:11, 1484:21,
1488:1, 1497:25,
1502:6
**side** [9] - 1233:1,
1334:18, 1435:8,
1481:22, 1501:24,
1528:11, 1536:10,
1538:8
**side-by-side** [1] -
1334:18
**signal** [1] - 1379:8
**signed** [1] - 1500:19
**significance** [5] -
1261:24, 1282:2,
1292:22, 1441:6,
1472:22
**significant** [15] -
1227:10, 1227:15,
1228:9, 1235:11,
1236:2, 1260:16,
1260:20, 1274:1,
1274:2, 1280:1,
1291:8, 1304:11,
1304:25, 1306:3,
1306:5
**significantly** [9] -
1267:23, 1268:17,
1269:2, 1273:22,
1307:13, 1408:11,
1423:25, 1479:19,
1502:14
**silent** [4] - 1334:25,
1335:4, 1351:21,
1374:13
**similar** [19] - 1229:9,
1251:7, 1258:13,
1269:17, 1434:12,
1441:4, 1441:13,
1461:12, 1463:6,
1471:17, 1472:24,
1473:25, 1481:5,
1482:5, 1483:4,
1484:6, 1490:10
**similarly** [1] - 1404:20
**simple** [1] - 1529:24
**simply** [20] - 1225:5,
1236:21, 1243:20,
1245:14, 1247:20,
1278:2, 1285:21,
1285:22, 1285:23,
1289:6, 1302:13,
1302:19, 1323:11,
1344:4, 1378:1,
1389:15, 1410:7,

1439:15, 1521:19
**single** [9] - 1224:5,
1235:3, 1320:4,
1327:24, 1392:20,
1437:7, 1438:10,
1440:16, 1475:11
**SIPES** [6] - 1216:14,
1311:11, 1316:16,
1516:25, 1539:2,
1539:21
**Sipes** [1] - 1311:8
**sit** [1] - 1519:22
**situation** [5] -
1298:13, 1424:12,
1486:6, 1488:19
**Situations** [1] -
1335:14
**situations** [5] -
1226:12, 1271:7,
1357:24, 1358:4,
1368:6
**six** [22] - 1227:23,
1239:18, 1285:24,
1287:24, 1288:10,
1295:23, 1296:17,
1318:15, 1429:3,
1436:2, 1439:13,
1439:16, 1442:3,
1446:17, 1468:24,
1471:10, 1471:12,
1471:19, 1473:19,
1490:12, 1491:16,
1493:5
**six-fold** [1] - 1491:16
**six-year** [2] - 1439:13,
1439:16
**size** [10] - 1301:3,
1302:4, 1302:13,
1303:3, 1303:6,
1509:10, 1509:17,
1510:9, 1527:24
**sizeable** [1] - 1433:12
**skewed** [1] - 1510:16
**skill** [5] - 1226:10,
1226:17, 1245:10,
1293:17, 1408:24
**slide** [91] - 1222:4,
1223:17, 1224:20,
1227:1, 1227:5,
1228:16, 1231:13,
1233:21, 1240:21,
1242:11, 1242:14,
1246:6, 1251:2,
1251:4, 1253:8,
1260:10, 1265:2,
1265:8, 1270:18,
1270:22, 1270:23,
1271:1, 1271:2,
1271:12, 1272:15,
1275:22, 1275:25,

1278:7, 1279:10,
1279:11, 1279:16,
1279:19, 1292:6,
1292:10, 1297:3,
1297:4, 1360:18,
1360:20, 1362:5,
1370:18, 1384:2,
1425:2, 1425:5,
1425:23, 1425:25,
1426:25, 1427:9,
1427:10, 1429:2,
1430:6, 1433:16,
1433:17, 1435:3,
1436:4, 1436:19,
1437:13, 1438:1,
1438:7, 1443:24,
1449:3, 1454:1,
1454:24, 1455:1,
1456:14, 1456:24,
1460:1, 1460:25,
1461:16, 1462:17,
1463:12, 1464:16,
1471:7, 1472:13,
1472:15, 1473:17,
1478:13, 1484:20,
1486:22, 1487:5,
1487:25, 1488:1,
1488:7, 1489:20,
1490:9, 1490:10,
1493:8, 1493:12,
1508:7, 1525:5
**slides** [12] - 1221:23,
1251:7, 1255:21,
1311:19, 1314:20,
1417:15, 1431:1,
1437:22, 1457:19,
1459:11, 1498:19,
1534:15
**slightly** [1] - 1452:25
**sliver** [1] - 1233:11
**slowly** [1] - 1329:10
**small** [10] - 1224:5,
1235:3, 1286:2,
1290:4, 1359:6,
1441:4, 1446:14,
1448:22, 1507:6,
1509:10
**smaller** [4] - 1461:14,
1463:10, 1465:8,
1510:2
**snapshot** [1] -
1369:18
**social** [2] - 1264:3,
1264:15
**sold** [3] - 1227:9,
1279:24, 1501:7
**sole** [1] - 1257:20,
1292:16
**Solicitor** [1] - 1220:13
**solid** [3] - 1449:15,

49

1449:22, 1455:19
**solution** [1] - 1400:17
someone [2] -
1226:21, 1511:8
**sometimes** [22] -
1219:8, 1219:11,
1219:13, 1267:9,
1275:8, 1294:25,
1323:13, 1324:13,
1333:13, 1359:9,
1419:18, 1433:12,
1460:15, 1460:17,
1472:9, 1503:24,
1503:25, 1508:15,
1508:24, 1516:22
somewhat [2] -
1447:20, 1507:15
**SONNENSCHEIN** [1] -
1216:16
**sorry** [28] - 1229:25,
1230:3, 1233:2,
1233:17, 1254:21,
1254:22, 1257:13,
1261:3, 1266:21,
1276:9, 1280:10,
1299:12, 1311:25,
1321:11, 1346:12,
1349:2, 1367:4,
1392:18, 1401:16,
1409:13, 1412:1,
1435:13, 1452:6,
1487:14, 1491:9,
1501:23, 1517:9,
1525:14
**sort** [11] - 1372:22,
1383:14, 1389:19,
1392:20, 1399:8,
1424:16, 1476:5,
1477:18, 1511:9,
1522:20, 1524:1
**sought** [1] - 1279:3
**sound** [5] - 1236:23,
1294:13, 1326:20,
1518:21, 1534:9
**sounds** [7] - 1310:3,
1375:10, 1436:14,
1487:20, 1492:23,
1516:25, 1521:22
**source** [4] - 1228:18,
1320:2, 1320:4,
1333:19
**sourced** [1] - 1496:24
**sources** [3] - 1425:24,
1472:12, 1498:24
**space** [4] - 1237:24,
1501:17, 1529:15,
1529:16
**span** [2] - 1466:22,
1467:4
**speaking** [5] -

1313:22, 1325:8,
1404:14, 1503:3,
1503:19
**speaks** [1] - 1438:12
**specialize** [2] -
1419:11, 1419:12
**specialized** [1] -
1419:8
**specialty** [1] - 1419:4
**specific** [22] -
1263:14, 1281:10,
1330:10, 1331:23,
1342:9, 1376:25,
1377:6, 1382:25,
1384:17, 1385:21,
1388:22, 1388:23,
1393:9, 1412:5,
1449:16, 1453:12,
1455:20, 1456:4,
1477:15, 1505:13,
1507:10, 1513:15
**specifically** [25] -
1219:9, 1220:16,
1221:10, 1229:4,
1256:13, 1263:11,
1264:10, 1289:16,
1328:14, 1375:23,
1383:21, 1411:21,
1411:25, 1412:2,
1419:6, 1420:7,
1423:6, 1426:2,
1462:21, 1470:16,
1477:3, 1477:15,
1481:8, 1489:21,
1532:3
**specified** [2] -
1338:18, 1338:23
**specifies** [1] - 1388:22
**specify** [2] - 1376:23,
1377:6
**specifying** [1] -
1395:15
**speculated** [1] -
1236:10
**speculating** [2] -
1237:11, 1239:15
**speculative** [10] -
1238:24, 1239:3,
1245:15, 1247:21,
1290:14, 1290:16,
1295:25, 1298:10,
1298:15, 1299:22
**spell** [4] - 1218:16,
1311:24, 1312:3,
1417:20
**spelled** [1] - 1312:5
**Spend** [2] - 1265:2,
1272:16
**spend** [6] - 1265:5,
1308:22, 1309:7,

1426:17, 1475:8,
1500:17
**spending** [13] -
1272:25, 1310:16,
1425:8, 1425:10,
1427:1, 1427:3,
1448:6, 1471:25,
1472:16, 1472:17,
1472:19, 1473:22,
1475:13
**spends** [1] - 1500:16
**spent** [13] - 1265:10,
1265:19, 1272:8,
1272:9, 1272:12,
1273:7, 1273:11,
1310:17, 1315:19,
1426:19, 1472:8,
1525:20, 1534:8
**sponsor** [3] - 1275:9,
1382:15, 1394:8
**sponsors** [2] - 1267:9,
1310:14
**spot** [2] - 1503:25,
1512:12
**spot-on** [1] - 1512:12
**spreadsheet** [1] -
1278:14
**stabilization** [5] -
1381:20, 1382:9,
1383:3, 1386:2,
1388:14
**stable** [1] - 1508:3
**stacking** [7] -
1232:18, 1232:20,
1232:22, 1232:25,
1233:6, 1233:24,
1234:20
**staff** [1] - 1321:5
**stage** [1] - 1312:18
**stakeholders** [1] -
1526:4
**stand** [5] - 1373:9,
1374:19, 1376:12,
1383:5, 1386:18
**standard** [1] - 1259:5
**standardized** [1] -
1327:2
**standards** [5] -
1322:3, 1323:4,
1325:10, 1326:19,
1505:25
**standing** [1] - 1369:10
**stands** [3] - 1447:23,
1496:21, 1530:21
**start** [9] - 1275:16,
1292:5, 1324:2,
1355:25, 1357:14,
1372:1, 1376:6,
1385:6, 1456:7
**started** [6] - 1267:21,

1281:14, 1289:21,
1318:7, 1425:12,
1517:4
**starting** [8] - 1227:19,
1244:4, 1244:12,
1279:22, 1308:1,
1336:13, 1444:3,
1446:2
**state** [7] - 1218:16,
1221:7, 1311:23,
1312:2, 1380:3,
1384:22, 1417:20
**statement** [39] -
1227:9, 1327:17,
1330:15, 1330:25,
1359:25, 1362:24,
1363:4, 1364:14,
1364:16, 1366:7,
1366:8, 1368:19,
1369:10, 1373:11,
1373:19, 1376:25,
1377:12, 1379:24,
1380:7, 1385:11,
1388:23, 1390:1,
1390:5, 1395:18,
1395:19, 1400:8,
1400:20, 1401:22,
1403:10, 1405:13,
1407:4, 1412:5,
1412:10, 1413:1,
1463:3, 1536:18,
1536:19, 1537:9,
1537:13
**statements** [19] -
1226:22, 1226:25,
1227:3, 1230:10,
1249:13, 1260:7,
1265:10, 1327:15,
1347:23, 1348:1,
1351:15, 1360:9,
1360:11, 1373:9,
1426:2, 1430:9,
1487:1, 1499:8,
1525:12
**States** [2] - 1220:9,
1221:7
**states** [4] - 1276:18,
1283:20, 1351:7,
1498:25
**STATES** [1] - 1216:1
**statin** [8] - 1270:6,
1270:8, 1270:11,
1412:8, 1412:14,
1412:25, 1413:10,
1413:16
**statistical** [2] -
1312:21, 1382:14
**stay** [4] - 1323:12,
1397:18, 1415:21,
1456:11

**stayed** [1] - 1322:25
**steady** [1] - 1319:4
**steep** [1] - 1244:20
**stemming** [1] - 1526:9
**step** [4] - 1256:23,
1311:5, 1417:10,
1538:5
**stick** [1] - 1521:12
**still** [25] - 1253:9,
1310:6, 1310:15,
1310:17, 1310:19,
1322:8, 1329:22,
1336:17, 1385:7,
1446:9, 1448:10,
1465:8, 1465:9,
1486:4, 1486:6,
1491:14, 1504:12,
1504:15, 1505:1,
1512:12, 1521:2,
1521:16, 1521:17,
1536:14, 1537:3
**stipulate** [1] - 1284:16
**stipulated** [1] -
1410:13
**stipulation** [3] -
1285:13, 1286:12
**stock** [9] - 1506:17,
1507:1, 1507:12,
1507:14, 1507:18,
1507:20, 1507:21,
1507:24
**stockholders** [1] -
1444:17
**stocks** [1] - 1507:2
**stop** [4] - 1227:6,
1397:8, 1397:16,
1398:9
**storage** [1] - 1318:7
**straight** [1] - 1520:16
**strategy** [1] - 1263:10
**Street** [1] - 1449:12
**strength** [1] - 1262:8
**strengthen** [1] -
1422:15
**strengthens** [1] -
1422:12
**Strengths** [1] -
1530:21
**strengths** [5] -
1481:24, 1482:3,
1483:3, 1483:5
**stretches** [1] -
1415:20
**strike** [7] - 1349:2,
1355:2, 1372:1,
1425:23, 1502:23,
1527:15, 1529:5
**strong** [1] - 1228:7,
1253:18, 1264:1,
1282:7, 1378:15,

50

1389:19, 1399:8,
1435:18, 1435:21,
1475:14
**stronger** [1] - 1378:3
**strongly** [1] - 1464:25
**structure** [2] -
1320:15, 1326:25
**structured** [2] -
1319:19, 1382:12
**structures** [1] -
1305:11
**students** [3] -
1319:12, 1420:2,
1443:20
**studied** [10] - 1220:6,
1257:23, 1258:12,
1258:13, 1260:6,
1296:7, 1315:6,
1358:20, 1482:2,
1506:9
**studies** [24] - 1291:1,
1317:16, 1317:18,
1317:21, 1321:12,
1325:22, 1331:24,
1332:2, 1332:14,
1332:21, 1332:25,
1333:1, 1333:5,
1333:12, 1333:17,
1335:9, 1340:10,
1340:17, 1340:22,
1345:11, 1346:19,
1404:19, 1467:9
**Studies** [1] - 1332:21
**studies'** [1] - 1345:24
**study** [50] - 1259:23,
1288:2, 1289:5,
1292:22, 1298:12,
1317:8, 1326:6,
1340:23, 1340:24,
1346:1, 1347:7,
1348:22, 1348:24,
1349:4, 1366:15,
1379:18, 1379:21,
1394:15, 1398:19,
1404:5, 1404:23,
1405:7, 1405:12,
1405:14, 1405:19,
1405:20, 1405:25,
1406:2, 1406:7,
1406:11, 1406:12,
1406:13, 1413:14,
1414:14, 1466:7,
1470:7, 1477:10,
1481:3, 1482:12,
1483:4, 1510:5,
1524:24, 1526:19,
1526:22, 1527:2,
1531:10, 1532:13,
1533:1, 1533:2,
1534:8

**Study** [1] - 1330:22
**studying** [4] - 1231:7,
1259:10, 1259:11,
1526:1
**stuff** [6] - 1264:12,
1277:20, 1296:8,
1296:12, 1296:14,
1307:11
**sub** [2] - 1369:22,
1369:25
**sub-bullet** [2] -
1369:22, 1369:25
**subgroup** [4] -
1414:10, 1415:13,
1415:16, 1415:22
**subgroups** [6] -
1365:4, 1365:10,
1366:6, 1370:11,
1414:7, 1414:24
**Subgroups** [1] -
1370:1
**subject** [11] - 1229:18,
1234:1, 1255:7,
1281:22, 1329:23,
1492:6, 1499:23,
1500:5, 1500:11,
1501:12, 1501:16
**subjective** [1] - 1246:8
**subjects** [1] - 1319:9
**submit** [1] - 1516:17
**submitted** [2] -
1294:6, 1487:2
**submitting** [2] -
1501:2, 1501:3
**Subpopulations** [1] -
1370:1
**subpopulations** [2] -
1370:12, 1414:24
**subscriber** [1] -
1268:17
**subsection** [5] -
1335:13, 1335:14,
1336:7, 1336:13,
1336:14
**subsequent** [4] -
1315:17, 1316:18,
1439:12, 1446:14
**subsequently** [1] -
1315:11
**subset** [2] - 1286:2,
1491:22
**subsidize** [3] - 1281:5,
1281:15, 1281:19
**substantial** [8] -
1427:16, 1441:23,
1470:15, 1490:20,
1491:14, 1492:25,
1526:15, 1535:8
**substantially** [8] -
1314:9, 1420:20,

1437:5, 1472:17,
1485:2, 1485:9,
1490:18, 1522:6
**substantively** [1] -
1451:12
**substitutable** [1] -
1307:24
**substitute** [1] - 1437:8
**substitution** [1] -
1306:10
**subtly** [1] - 1453:3
**subtract** [1] - 1539:14
**subtracted** [2] -
1430:4, 1431:11
**subtracting** [1] -
1431:8
**succeed** [1] - 1262:8
**success** [87] -
1219:12, 1220:16,
1221:21, 1222:1,
1222:6, 1222:10,
1223:8, 1223:15,
1223:18, 1223:23,
1224:7, 1224:13,
1224:22, 1224:24,
1224:25, 1225:2,
1226:5, 1228:8,
1231:12, 1231:21,
1233:20, 1235:13,
1235:24, 1236:25,
1239:6, 1247:24,
1247:25, 1248:5,
1249:2, 1249:7,
1253:25, 1258:7,
1258:18, 1258:21,
1288:7, 1289:19,
1289:23, 1289:24,
1290:6, 1290:8,
1290:19, 1290:24,
1291:14, 1292:17,
1292:25, 1293:25,
1294:2, 1295:15,
1295:20, 1296:16,
1298:9, 1299:20,
1300:2, 1303:15,
1303:25, 1421:18,
1421:19, 1423:4,
1423:17, 1423:19,
1423:24, 1423:25,
1424:7, 1424:17,
1427:18, 1429:10,
1434:8, 1435:17,
1441:17, 1459:6,
1459:7, 1465:5,
1465:10, 1468:13,
1470:14, 1470:22,
1474:21, 1474:23,
1484:15, 1485:5,
1488:18, 1491:18,
1491:22, 1520:5,

1525:21, 1533:14
**successful** [9] -
1222:9, 1304:3,
1422:13, 1423:23,
1424:11, 1440:8,
1467:13, 1503:5,
1504:24
**successfully** [6] -
1257:1, 1375:21,
1376:11, 1382:25,
1384:7, 1385:21
**sufficiency** [2] -
1321:9, 1321:12
**sufficient** [1] -
1339:24
**sufficiently** [3] -
1336:3, 1394:9,
1397:24
**suggest** [10] -
1355:13, 1355:23,
1375:20, 1376:10,
1382:22, 1384:5,
1385:14, 1389:1,
1404:21, 1405:21
**suggested** [3] -
1404:15, 1405:5,
1408:5
**suggestion** [1] -
1378:1
**suggestions** [1] -
1322:18
**suit** [58] - 1222:19,
1223:10, 1223:11,
1223:14, 1224:19,
1225:6, 1225:10,
1225:14, 1225:17,
1225:20, 1225:21,
1235:8, 1239:13,
1248:17, 1248:20,
1249:1, 1249:6,
1249:10, 1249:16,
1249:20, 1249:22,
1250:6, 1250:12,
1251:13, 1251:15,
1253:3, 1253:6,
1253:13, 1253:20,
1254:9, 1258:6,
1258:16, 1259:4,
1259:14, 1277:15,
1278:1, 1278:5,
1282:10, 1285:5,
1285:25, 1288:16,
1288:21, 1289:2,
1289:7, 1291:4,
1291:12, 1292:23,
1293:21, 1298:19,
1303:20, 1314:10,
1421:20, 1484:9,
1491:1, 1495:1,
1495:3, 1495:5,

1527:10
**summaries** [1] -
1333:11
**summarize** [3] -
1219:3, 1277:8,
1318:23
**summarized** [3] -
1227:4, 1261:25,
1278:15
**summarizes** [1] -
1467:8
**summarizing** [1] -
1302:13
**Summary** [3] -
1265:24, 1279:2,
1287:19
**summary** [53] -
1220:21, 1222:4,
1227:1, 1229:22,
1231:10, 1234:8,
1235:15, 1245:20,
1245:22, 1245:25,
1246:3, 1251:17,
1251:20, 1251:22,
1254:23, 1254:24,
1255:5, 1255:20,
1255:22, 1256:4,
1265:22, 1266:1,
1266:10, 1266:20,
1266:22, 1267:1,
1274:5, 1274:8,
1274:17, 1274:20,
1274:22, 1279:1,
1279:7, 1279:14,
1280:4, 1289:16,
1300:19, 1327:11,
1426:5, 1428:14,
1430:14, 1436:8,
1437:17, 1453:21,
1456:17, 1457:22,
1459:14, 1473:2,
1474:8, 1481:3,
1485:15, 1489:25,
1492:3
**summer** [3] - 1292:2,
1298:21, 1299:3
**summing** [1] -
1265:12
**SunTrust** [4] - 1247:4,
1247:5, 1247:7,
1449:24
**supervised** [1] -
1321:14
**supplemental** [1] -
1522:18
**supply** [1] - 1319:4
**support** [5] - 1303:15,
1307:14, 1339:25,
1429:19, 1488:7
**supported** [2] -

51

1347:24, 1348:2
**supporting** [2] -
1255:14, 1321:12
**supportive** [1] -
1235:12
**supports** [7] - 1261:5,
1261:10, 1388:12,
1412:15, 1447:17,
1491:21, 1531:5
**suppose** [1] - 1411:16
**supposed** [2] -
1380:18, 1405:20
**suppression** [1] -
1386:16
**surprise** [3] - 1294:10,
1301:1, 1301:5
**surveillance** [1] -
1320:25
**survey** [6] - 1252:7,
1478:11, 1480:11,
1481:5, 1481:24,
1483:2
**sustained** [2] -
1452:6, 1537:19
**swing** [4] - 1246:25,
1509:9, 1510:8,
1510:19
**switch** [2] - 1345:2,
1502:9
**switching** [1] -
1415:25
**sworn** [3] - 1218:14,
1311:22, 1417:18
**SWOT** [3] - 1530:18,
1530:21, 1536:22
**symptom** [1] - 1366:3
**syndrome** [1] -
1353:17
**synergistic** [1] -
1270:4
**synergy** [1] - 1270:13
**system** [4] - 1226:1,
1318:3, 1318:14,
1420:5

## T

**Table** [7] - 1345:11,
1345:12, 1346:17,
1346:24, 1351:2,
1351:4, 1407:2
**table** [4] - 1240:24,
1346:3, 1347:6,
1347:13
**take-away** [1] -
1478:10
**take-aways** [1] -
1279:18
**talks** [3] - 1261:21,
1263:9, 1333:22

**tandem** [2] - 1375:18,
1376:9
**Target** [1] - 1270:19
**target** [2] - 1264:16,
1268:17
**targeted** [3] - 1262:10,
1262:15, 1268:20
**tasked** [1] - 1527:10
**taught** [3] - 1319:13,
1319:20, 1442:23
**teach** [11] - 1312:25,
1313:1, 1319:9,
1322:12, 1413:9,
1418:12, 1420:2,
1420:3, 1420:5,
1444:24, 1466:16
**teaches** [1] - 1443:1
**teaching** [6] -
1318:18, 1318:23,
1319:12, 1390:6,
1419:3, 1420:3
**team** [2] - 1269:21,
1316:20
**technical** [3] -
1222:22, 1285:4,
1422:24
**technique** [3] -
1267:8, 1267:9,
1267:17
**techniques** [1] -
1316:16
**Technische** [1] -
1315:7
**television** [1] -
1264:11
**temporal** [1] - 1238:7
**ten** [9] - 1239:2,
1245:5, 1313:1,
1397:7, 1397:15,
1397:16, 1398:7,
1398:8, 1517:14
**ten-year** [1] - 1517:14
**tend** [5] - 1419:20,
1432:5, 1434:22,
1435:23, 1475:25
**tends** [2] - 1471:20,
1471:25
**tens** [1] - 1227:21
**tenure** [1] - 1320:10
**term** [38] - 1247:21,
1307:23, 1337:20,
1338:22, 1339:4,
1339:24, 1340:2,
1340:7, 1340:16,
1340:21, 1344:11,
1344:19, 1347:18,
1347:20, 1352:3,
1352:6, 1357:17,
1358:25, 1359:19,
1373:25, 1375:3,

1377:20, 1377:21,
1377:25, 1378:7,
1378:20, 1379:5,
1389:17, 1389:24,
1390:6, 1390:13,
1395:21, 1395:25,
1398:4, 1408:2,
1429:16, 1479:3,
1496:15
**Term** [1] - 1336:15
**terminology** [1] -
1398:2
**terms** [29] - 1224:2,
1224:17, 1227:13,
1252:8, 1254:1,
1256:14, 1257:24,
1257:25, 1264:7,
1270:25, 1291:5,
1308:4, 1324:16,
1328:15, 1347:15,
1431:25, 1467:9,
1472:17, 1476:18,
1478:11, 1479:11,
1480:11, 1481:24,
1483:2, 1484:20,
1506:14, 1519:23,
1523:20, 1527:25
**test** [4] - 1237:8,
1239:25, 1240:14,
1435:7
**testified** [26] -
1218:14, 1220:14,
1226:3, 1249:8,
1288:19, 1292:9,
1294:5, 1294:7,
1294:16, 1311:22,
1334:21, 1334:24,
1351:20, 1389:4,
1391:21, 1417:18,
1422:5, 1450:24,
1451:24, 1468:4,
1490:24, 1492:21,
1497:18, 1505:8,
1508:14, 1523:9
**testify** [5] - 1404:2,
1451:5, 1451:12,
1537:10, 1537:11
**testifying** [5] -
1294:19, 1301:2,
1303:3, 1338:8,
1403:19
**testimony** [58] -
1221:24, 1248:9,
1257:16, 1267:5,
1297:11, 1300:19,
1303:12, 1314:21,
1338:12, 1351:23,
1357:20, 1358:21,
1358:23, 1358:24,
1359:9, 1360:13,

1360:16, 1361:4,
1361:6, 1363:7,
1363:9, 1363:12,
1374:19, 1378:20,
1379:3, 1382:1,
1388:7, 1390:20,
1392:6, 1392:9,
1399:15, 1400:10,
1400:19, 1401:14,
1402:4, 1402:5,
1402:7, 1408:17,
1410:16, 1412:21,
1413:6, 1413:23,
1416:9, 1429:22,
1431:4, 1439:24,
1451:20, 1464:11,
1493:1, 1508:14,
1513:12, 1513:14,
1524:16, 1525:6,
1525:8, 1526:12,
1536:6, 1539:9
**Teva** [3] - 1448:17,
1504:19, 1505:6
**textbooks** [1] -
1442:24
**TG** [39] - 1231:18,
1309:23, 1346:25,
1347:2, 1351:5,
1351:8, 1351:12,
1421:23, 1422:2,
1422:3, 1422:20,
1425:16, 1425:17,
1425:19, 1425:20,
1426:22, 1433:24,
1434:5, 1436:1,
1438:4, 1477:3,
1479:19, 1480:23,
1482:3, 1483:6,
1483:17, 1488:2,
1488:12, 1490:15,
1490:16, 1494:5,
1495:22, 1495:23,
1497:16, 1497:21,
1497:23, 1498:4,
1533:10
**TG-lowering** [1] -
1231:18
**TGs** [7] - 1338:9,
1338:17, 1344:4,
1344:5, 1350:20,
1381:7, 1421:24
**TGs'** [1] - 1338:11
**THE** [207] - 1216:2,
1216:14, 1218:4,
1218:11, 1218:15,
1218:18, 1218:21,
1220:24, 1221:1,
1221:16, 1229:11,
1229:17, 1229:24,
1230:2, 1230:4,

1230:5, 1234:6,
1234:10, 1235:17,
1243:2, 1243:8,
1246:3, 1251:22,
1255:11, 1255:25,
1256:2, 1261:3,
1262:2, 1262:4,
1262:25, 1263:21,
1264:22, 1266:7,
1266:12, 1266:17,
1266:21, 1267:1,
1269:12, 1271:15,
1271:17, 1271:18,
1271:21, 1274:19,
1276:14, 1279:6,
1280:5, 1280:7,
1280:10, 1280:13,
1283:23, 1284:13,
1284:16, 1285:7,
1285:12, 1285:19,
1286:7, 1286:11,
1286:20, 1287:14,
1291:18, 1291:23,
1291:25, 1308:18,
1311:1, 1311:4,
1311:6, 1311:8,
1311:17, 1311:20,
1311:23, 1311:25,
1312:2, 1312:5,
1312:8, 1314:17,
1323:20, 1329:2,
1332:10, 1342:1,
1355:15, 1355:18,
1355:21, 1356:2,
1357:4, 1357:8,
1371:4, 1371:9,
1388:3, 1400:1,
1400:4, 1400:16,
1400:25, 1401:19,
1401:21, 1401:24,
1402:12, 1402:14,
1402:16, 1402:21,
1402:24, 1403:5,
1404:1, 1409:13,
1410:15, 1410:19,
1410:21, 1410:24,
1415:25, 1417:6,
1417:10, 1417:16,
1417:19, 1417:22,
1417:25, 1421:4,
1421:10, 1426:7,
1426:11, 1426:13,
1428:16, 1428:22,
1430:17, 1430:22,
1432:22, 1436:10,
1436:14, 1437:19,
1443:10, 1443:13,
1445:21, 1450:25,
1451:5, 1451:21,
1451:24, 1452:4,
1453:23, 1454:3,

1454:5, 1454:8,
1454:10, 1454:11,
1454:15, 1454:18,
1454:20, 1456:19,
1457:24, 1459:16,
1461:24, 1462:1,
1462:12, 1463:20,
1464:5, 1468:3,
1469:16, 1473:5,
1473:11, 1474:10,
1474:14, 1474:16,
1478:5, 1479:17,
1481:16, 1482:21,
1485:17, 1486:17,
1487:9, 1487:16,
1487:18, 1490:4,
1492:2, 1492:8,
1492:10, 1492:14,
1515:10, 1515:14,
1515:16, 1515:17,
1515:18, 1515:19,
1515:22, 1516:2,
1516:5, 1516:6,
1516:8, 1516:22,
1517:2, 1517:6,
1517:9, 1523:22,
1524:5, 1524:11,
1530:14, 1535:23,
1537:7, 1537:16,
1537:19, 1537:24,
1538:4, 1538:7,
1538:9, 1538:11,
1538:20, 1539:7,
1539:10, 1539:11,
1539:13, 1539:23
**theoretically** [2] -
1226:20, 1288:15
**theories** [1] - 1245:8
**theory** [3] - 1245:16,
1248:7, 1485:4
**therapeutic** [7] -
1219:25, 1269:18,
1283:21, 1316:14,
1319:14, 1319:15,
1319:25
**Therapeutic** [3] -
1488:5, 1489:22,
1496:21
**therapies** [3] - 1334:6,
1370:24, 1371:20
**therapy** [24] - 1334:25,
1335:6, 1335:25,
1336:10, 1346:8,
1351:23, 1354:7,
1354:8, 1354:9,
1354:10, 1354:16,
1354:18, 1354:24,
1355:5, 1359:19,
1373:20, 1373:25,
1374:6, 1374:18,

1389:12, 1398:24,
1411:23, 1412:3,
1416:23
**thereafter** [2] -
1458:21, 1519:16
**therefore** [4] -
1253:13, 1258:6,
1406:8
**Thero** [3] - 1262:21,
1500:22, 1501:1
**they've** [15] - 1227:21,
1230:20, 1235:3,
1240:13, 1257:8,
1259:21, 1260:8,
1265:20, 1269:1,
1273:24, 1278:20,
1279:21, 1289:25,
1290:3, 1309:12
**thinking** [10] -
1329:13, 1329:23,
1330:16, 1337:7,
1337:22, 1339:18,
1340:13, 1342:24,
1353:19, 1354:13
**thinks** [4] - 1379:14,
1380:14, 1406:20,
1537:13
**third** [8] - 1224:21,
1229:1, 1263:3,
1288:20, 1290:23,
1395:7, 1497:5,
1499:12
**third-party** [1] -
1229:1
**thirds** [2] - 1258:9,
1258:14
**thousand** [1] -
1398:25
**thousands** [2] -
1427:12
**threat** [1] - 1536:21
**threatening** [1] -
1386:24
**Threats** [1] - 1530:22
**threats** [2] - 1536:11,
1536:24
**three** [24] - 1253:2,
1273:21, 1273:24,
1289:17, 1315:5,
1318:11, 1324:16,
1335:7, 1352:17,
1394:1, 1395:12,
1403:12, 1403:15,
1403:16, 1403:21,
1415:2, 1420:3,
1426:13, 1448:24,
1479:14, 1486:5,
1504:22, 1512:6,
1534:4
**three-quarters** [1] -

1253:2
**threshold** [1] - 1293:8
**thrombolytics** [1] -
1353:17
**throughout** [3] -
1221:11, 1326:10,
1400:19
**throwing** [1] - 1331:8
**Thursday** [1] -
1539:17
**tied** [6] - 1224:17,
1248:14, 1248:25,
1249:5, 1256:21,
1259:9
**timeline** [1] - 1244:5
**timing** [9] - 1376:5,
1376:7, 1377:12,
1380:12, 1384:10,
1389:8, 1392:13,
1393:4, 1393:20
**tiny** [1] - 1233:10
**title** [2] - 1447:1,
1465:14
**today** [21] - 1221:24,
1229:5, 1229:15,
1239:11, 1244:14,
1281:13, 1284:11,
1292:4, 1313:11,
1314:21, 1322:8,
1324:17, 1334:14,
1356:1, 1361:6,
1420:21, 1425:3,
1430:2, 1451:20,
1467:7, 1513:13
**today's** [1] - 1504:24
**together** [2] - 1419:19,
1425:24
**took** [9] - 1252:23,
1273:6, 1315:6,
1441:15, 1464:9,
1469:23, 1491:5,
1506:7, 1519:12
**tool** [2] - 1239:8,
1264:7
**tools** [7] - 1263:12,
1263:14, 1264:6,
1264:7, 1278:1,
1278:4
**top** [18] - 1230:12,
1233:11, 1240:24,
1251:10, 1277:20,
1280:1, 1327:17,
1350:2, 1371:6,
1371:11, 1383:24,
1405:3, 1468:11,
1468:19, 1471:8,
1483:4, 1518:10,
1531:3
**topic** [4] - 1382:18,
1411:17, 1443:18,

1484:19
**topics** [4] - 1282:11,
1406:24, 1466:20,
1468:2
**Total** [1] - 1274:6
**total** [12] - 1228:2,
1232:22, 1233:2,
1233:4, 1233:6,
1265:5, 1271:6,
1278:23, 1278:24,
1302:19, 1303:6,
1310:10
**totaled** [1] - 1233:16
**totality** [1] - 1293:4
**totally** [1] - 1366:21
**touched** [2] - 1250:1,
1442:8
**toward** [1] - 1523:2
**towards** [6] - 1308:2,
1308:7, 1309:4,
1331:25, 1479:14,
1479:17
**toxicity** [4] - 1337:20,
1343:16, 1353:14,
1353:25
**track** [4] - 1272:24,
1440:7, 1466:18
**tracked** [2] - 1252:11,
1252:15
**tracks** [2] - 1251:9,
1252:6
**trade** [1] - 1278:3
**Trade** [1] - 1221:7
**traded** [2] - 1499:2,
1499:8
**Trademark** [1] -
1220:10
**trailing** [1] - 1302:10
**trained** [2] - 1319:5,
1379:10
**training** [4] - 1293:10,
1314:11, 1315:5,
1316:12
**transcribe** [1] - 1400:2
**transcript** [18] -
1269:9, 1276:11,
1399:19, 1399:20,
1399:22, 1399:23,
1400:1, 1400:10,
1400:13, 1400:14,
1401:2, 1401:10,
1401:25, 1402:3,
1402:17, 1494:20,
1540:2
**TRANSCRIPT** [1] -
1216:12
**transcription** [3] -
1399:20, 1400:6,
1400:7
**transcripts** [3] -

1261:13, 1261:15,
1261:18
**transition** [1] -
1291:19
**translate** [1] - 1277:2
**treat** [6] - 1319:21,
1394:13, 1394:18,
1406:4, 1467:11
**treated** [7] - 1334:8,
1370:23, 1371:19,
1386:21, 1494:7,
1497:24, 1520:15
**treating** [16] - 1226:1,
1324:11, 1351:7,
1387:16, 1396:7,
1396:9, 1396:24,
1396:25, 1409:10,
1409:24, 1410:10,
1411:4, 1411:10,
1411:14, 1423:1,
1488:15
**treatise** [1] - 1465:23
**treatment** [26] -
1254:15, 1336:25,
1337:19, 1338:4,
1344:3, 1344:9,
1347:10, 1364:7,
1374:14, 1376:24,
1377:6, 1377:10,
1377:18, 1387:6,
1387:7, 1388:22,
1391:15, 1391:24,
1393:16, 1396:19,
1397:8, 1407:13,
1408:14, 1408:21,
1422:25
**trend** [11] - 1281:23,
1423:7, 1423:9,
1423:12, 1429:10,
1431:9, 1436:21,
1438:11, 1439:11,
1447:20, 1488:10
**trending** [1] - 1434:13
**trends** [3] - 1424:19,
1424:20, 1424:21
**trial** [67] - 1224:18,
1248:2, 1248:10,
1248:15, 1254:2,
1254:19, 1256:8,
1256:9, 1256:11,
1256:13, 1256:14,
1256:24, 1256:25,
1257:2, 1257:4,
1257:7, 1257:9,
1257:17, 1257:19,
1258:3, 1258:5,
1267:24, 1294:7,
1297:20, 1298:3,
1312:20, 1318:2,
1332:17, 1340:16,

1340:17, 1340:21, 1340:23, 1352:20, 1358:22, 1394:5, 1394:7, 1394:16, 1396:3, 1396:22, 1398:16, 1398:18, 1399:23, 1400:10, 1400:14, 1401:1, 1401:5, 1408:9, 1413:16, 1425:16, 1425:18, 1425:19, 1426:21, 1489:12, 1489:18, 1522:7, 1523:1, 1523:15, 1524:2, 1529:21, 1534:2, 1535:11, 1535:18, 1539:16

**TRIAL** [1] - 1216:12

**Trial** [1] - 1221:8

**trials** [17] - 1254:15, 1313:25, 1316:17, 1317:2, 1322:15, 1332:17, 1339:22, 1339:24, 1340:6, 1340:9, 1382:12, 1425:15, 1425:21, 1471:25, 1523:20, 1533:20, 1534:4

**tricks** [1] - 1278:2

**Tricor** [1] - 1310:1

**tried** [4] - 1300:4, 1367:24, 1369:19, 1467:4

**Triglyceride** [1] - 1251:4

**triglyceride** [24] - 1220:3, 1224:4, 1232:1, 1232:7, 1233:4, 1233:16, 1234:25, 1251:12, 1252:13, 1252:20, 1254:16, 1273:8, 1290:5, 1412:12, 1494:1, 1494:7, 1494:14, 1495:10, 1495:19, 1496:12, 1497:14, 1523:2, 1527:17, 1530:4

**triglyceride-lowering** [7] - 1224:4, 1232:1, 1233:4, 1233:16, 1234:25, 1273:8, 1290:5

**triglycerides** [41] - 1225:24, 1250:8, 1250:24, 1256:16, 1270:8, 1338:22, 1344:10, 1344:11, 1344:23, 1345:17, 1346:21, 1349:10,

1350:7, 1350:16, 1351:17, 1352:9, 1355:8, 1357:25, 1358:7, 1358:17, 1359:1, 1381:15, 1415:12, 1421:23, 1488:15, 1495:15, 1496:4, 1496:11, 1496:16, 1523:11, 1523:17, 1524:23, 1527:14, 1528:15, 1528:20, 1528:25, 1529:3, 1534:20, 1535:12, 1535:19

**Trilipix** [1] - 1310:1

**true** [15] - 1231:3, 1237:19, 1309:14, 1367:21, 1373:11, 1389:6, 1492:21, 1502:17, 1511:19, 1519:25, 1535:13, 1535:16, 1536:18, 1536:19, 1537:13

**truly** [2] - 1331:5, 1388:17

**truncate** [1] - 1468:24

**truth** [1] - 1515:5

**truthful** [1] - 1326:20

**TRX** [1] - 1232:23

**try** [10] - 1244:2, 1275:16, 1307:16, 1440:4, 1452:22, 1476:16, 1505:25, 1508:2, 1508:23, 1536:23

**trying** [17] - 1231:5, 1245:8, 1302:24, 1386:19, 1393:14, 1399:8, 1400:4, 1451:2, 1451:14, 1460:1, 1464:16, 1481:7, 1503:13, 1506:10, 1507:25, 1537:14, 1538:21

**TUESDAY** [2] - 1218:1, 1357:1

**tune** [1] - 1273:23

**turn** [29] - 1223:17, 1224:20, 1232:4, 1234:14, 1235:21, 1240:7, 1243:24, 1246:6, 1251:1, 1252:1, 1260:10, 1264:25, 1268:9, 1270:17, 1272:14, 1275:21, 1278:6, 1279:10, 1283:1, 1287:9, 1289:15, 1290:20, 1329:25, 1332:19, 1345:10,

1404:5, 1458:14, 1470:5, 1470:8

**turning** [2] - 1242:4, 1243:12

**turns** [1] - 1441:6

**TV** [3] - 1264:2, 1264:9, 1264:11

**twelfth** [1] - 1470:6

**two** [60] - 1224:23, 1238:14, 1240:22, 1244:1, 1247:6, 1255:3, 1258:9, 1258:14, 1259:16, 1263:12, 1286:8, 1286:23, 1316:15, 1318:8, 1318:11, 1318:15, 1334:18, 1346:7, 1361:20, 1363:23, 1366:19, 1372:5, 1372:17, 1372:25, 1373:7, 1376:3, 1376:12, 1382:21, 1383:5, 1383:14, 1404:9, 1404:12, 1419:18, 1420:5, 1425:15, 1433:17, 1433:20, 1433:22, 1435:5, 1446:25, 1464:24, 1467:24, 1472:18, 1473:24, 1479:22, 1480:16, 1480:21, 1480:23, 1482:6, 1486:5, 1499:16, 1504:2, 1509:12, 1509:14, 1512:14, 1514:9, 1517:17, 1517:22, 1527:25, 1533:10

**two-and-a-half** [1] - 1486:5

**two-year** [1] - 1316:15

**tying** [2] - 1259:3, 1288:10

**type** [10] - 1226:19, 1277:23, 1379:19, 1397:14, 1397:18, 1398:11, 1419:14, 1472:6, 1499:7, 1535:9

**Type** [1] - 1270:19

**types** [8] - 1226:20, 1278:17, 1309:23, 1358:4, 1358:14, 1359:4, 1419:16, 1472:7

**typical** [3] - 1328:12, 1437:8, 1477:18

**typically** [9] - 1267:12, 1275:18, 1306:2,

1306:4, 1306:7, 1306:8, 1307:13, 1399:21, 1507:18

**typos** [1] - 1269:25

## U

**U.S** [9] - 1216:23, 1220:15, 1302:4, 1302:9, 1420:4, 1446:7, 1447:5, 1468:21, 1469:22

**ultimately** [1] - 1522:11

**unable** [1] - 1375:12

**uncertainties** [1] - 1499:4

**uncertainty** [12] - 1238:2, 1336:23, 1337:18, 1338:3, 1499:23, 1500:6, 1501:13, 1501:17, 1501:18, 1502:13, 1502:14, 1508:21

**unclear** [1] - 1325:23

**under** [33] - 1222:11, 1225:9, 1245:7, 1253:5, 1254:20, 1257:5, 1274:22, 1297:5, 1309:19, 1337:16, 1345:12, 1352:23, 1369:20, 1377:13, 1383:7, 1400:9, 1408:9, 1428:14, 1430:14, 1436:8, 1437:7, 1437:17, 1453:21, 1456:17, 1457:22, 1459:14, 1463:5, 1473:3, 1474:8, 1485:15, 1502:6, 1505:2, 1506:24

**under-forecast** [1] - 1463:5

**underestimated** [2] - 1462:19, 1464:25

**underestimating** [2] - 1453:3, 1509:1

**undergraduate** [3] - 1315:4, 1315:5, 1420:4

**underlying** [17] - 1228:18, 1229:6, 1229:8, 1233:25, 1242:16, 1251:16, 1255:15, 1274:14, 1426:8, 1428:18, 1430:19, 1436:12, 1454:1, 1454:5, 1486:13, 1486:24,

1492:6

**undermines** [3] - 1257:24, 1277:16, 1303:20

**underneath** [1] - 1346:23

**understood** [3] - 1405:11, 1495:13, 1497:19

**undertake** [1] - 1236:16

**undertaken** [6] - 1244:7, 1259:20, 1267:9, 1277:22, 1290:16, 1316:8

**undertook** [3] - 1256:23, 1315:8, 1321:16

**undisputed** [1] - 1225:8

**unfair** [1] - 1537:16

**unfold** [1] - 1236:7

**Uniform** [1] - 1318:25

**Uniformed** [2] - 1315:23, 1316:22

**unique** [2] - 1223:10, 1292:11

**UNITED** [1] - 1216:1

**United** [2] - 1220:9, 1221:7

**University** [9] - 1219:4, 1312:24, 1315:9, 1315:23, 1316:15, 1316:22, 1318:25, 1418:7, 1418:24

**unless** [6] - 1339:15, 1341:8, 1382:24, 1385:20, 1534:10, 1537:19

**unpack** [1] - 1289:20

**unprofitable** [1] - 1224:1

**unquote** [4] - 1337:5, 1339:16, 1340:11, 1353:17

**unrelated** [9] - 1223:5, 1224:18, 1225:14, 1249:21, 1258:15, 1259:14, 1277:15, 1291:3, 1525:20

**unreliability** [2] - 1243:22, 1247:2

**unreliable** [8] - 1238:11, 1239:4, 1289:5, 1290:14, 1290:16, 1290:17, 1298:10, 1299:22

**unsound** [5] - 1231:1, 1247:21, 1259:8,

1282:21, 1288:14
**unsuccessful** [1] - 1300:5
**unusual** [1] - 1447:21
**unwilling** [1] - 1375:13
**unwise** [1] - 1348:11
**up** [74] - 1220:17, 1229:13, 1230:15, 1240:18, 1265:12, 1267:22, 1283:4, 1284:13, 1285:21, 1294:12, 1310:7, 1310:10, 1310:11, 1334:4, 1342:5, 1347:9, 1349:13, 1350:1, 1365:13, 1365:19, 1371:5, 1372:9, 1379:8, 1379:16, 1380:5, 1383:18, 1388:19, 1388:20, 1391:8, 1391:13, 1391:22, 1397:4, 1402:8, 1416:3, 1427:14, 1428:12, 1434:13, 1435:15, 1444:1, 1446:19, 1446:21, 1448:13, 1451:10, 1458:21, 1460:7, 1461:3, 1461:14, 1463:3, 1463:9, 1467:4, 1476:7, 1479:16, 1489:19, 1493:8, 1494:19, 1497:8, 1499:9, 1501:20, 1506:19, 1511:6, 1512:25, 1513:1, 1513:8, 1513:12, 1518:3, 1520:19, 1521:8, 1522:3, 1524:19, 1525:2, 1525:7, 1528:2
**update** [2] - 1271:13, 1450:20
**Update** [1] - 1263:18
**updated** [2] - 1323:14
**updates** [1] - 1323:10
**uphold** [1] - 1505:25
**upper** [1] - 1449:12
**upside** [3] - 1248:14, 1248:18, 1522:15
**upward** [2] - 1429:10, 1458:14
**USA** [1] - 1216:8
**usage** [49] - 1251:9, 1328:15, 1328:17, 1329:20, 1330:16, 1331:3, 1331:8,

1334:7, 1335:8, 1335:12, 1336:8, 1337:2, 1337:7, 1337:12, 1338:1, 1338:7, 1338:19, 1338:24, 1339:1, 1339:14, 1340:8, 1352:19, 1354:11, 1362:13, 1362:23, 1363:4, 1363:10, 1363:15, 1364:13, 1365:1, 1365:7, 1365:22, 1365:24, 1366:8, 1367:25, 1368:4, 1368:15, 1368:22, 1369:9, 1373:5, 1374:4, 1374:17, 1376:22, 1384:11, 1384:12, 1388:20, 1396:16, 1404:22, 1414:8
**useful** [3] - 1318:10, 1331:5, 1447:1
**users** [1] - 1479:24
**uses** [10] - 1232:23, 1368:4, 1377:25, 1378:7, 1378:20, 1394:2, 1404:15, 1404:21, 1405:5, 1408:4
**USPTO** [1] - 1220:12
**USUHS** [1] - 1319:9

---

## V

**vacuum** [2] - 1231:15, 1304:12
**valid** [1] - 1515:7
**validity** [1] - 1225:10
**valuable** [2] - 1471:21, 1471:22
**valuation** [3] - 1219:18, 1294:22, 1295:5
**value** [40] - 1239:10, 1239:14, 1239:22, 1240:9, 1245:4, 1257:21, 1258:4, 1264:1, 1282:21, 1282:23, 1288:2, 1288:11, 1289:10, 1289:11, 1295:10, 1298:16, 1419:21, 1424:11, 1424:14, 1427:21, 1427:22, 1429:13, 1431:10, 1435:21, 1435:22, 1441:6, 1441:16, 1441:18, 1444:13, 1444:16, 1447:2,

1447:6, 1447:9, 1447:11, 1470:1, 1470:3, 1491:23, 1507:16, 1520:4
**Value** [56] - 1224:15, 1238:10, 1238:13, 1238:23, 1239:5, 1239:7, 1242:5, 1243:12, 1244:1, 1244:7, 1244:21, 1244:25, 1246:13, 1247:17, 1248:4, 1290:15, 1295:1, 1295:3, 1295:10, 1295:12, 1424:21, 1439:23, 1440:1, 1440:2, 1440:23, 1441:2, 1442:9, 1443:2, 1443:19, 1443:21, 1444:19, 1444:20, 1444:23, 1447:14, 1447:19, 1458:18, 1459:2, 1462:23, 1464:9, 1464:23, 1465:2, 1465:8, 1467:14, 1469:24, 1470:5, 1488:11, 1504:5, 1504:13, 1504:16, 1505:8, 1513:20, 1513:25, 1514:3, 1521:7, 1521:21, 1521:23
**values** [2] - 1244:6, 1457:17
**valuing** [1] - 1444:25
**variance** [12] - 1241:8, 1508:11, 1508:18, 1508:24, 1509:8, 1509:17, 1509:24, 1510:2, 1510:14, 1510:16, 1514:15, 1514:17
**variances** [3] - 1241:24, 1247:10, 1512:4
**variation** [1] - 1514:17
**varied** [3] - 1267:21, 1281:12, 1358:23
**varies** [1] - 1306:13
**variety** [2] - 1295:19, 1499:24
**various** [8] - 1221:9, 1222:13, 1242:10, 1257:11, 1270:15, 1304:18, 1322:16, 1390:12
**vary** [2] - 1237:7, 1281:3
**varying** [1] - 1306:14

**Vascepa** [409] - 1223:21, 1223:24, 1224:4, 1225:5, 1225:8, 1225:15, 1226:8, 1226:23, 1227:7, 1227:15, 1228:3, 1228:5, 1230:11, 1230:14, 1230:21, 1231:11, 1231:14, 1231:18, 1233:13, 1233:18, 1234:23, 1234:25, 1235:10, 1235:12, 1239:19, 1241:5, 1244:6, 1244:11, 1244:16, 1244:20, 1248:4, 1248:11, 1249:9, 1251:6, 1252:9, 1252:19, 1253:5, 1253:15, 1253:19, 1256:10, 1257:14, 1258:9, 1258:25, 1259:13, 1259:19, 1259:21, 1260:1, 1260:5, 1260:12, 1260:16, 1260:20, 1262:9, 1263:5, 1263:15, 1264:1, 1264:18, 1265:3, 1265:6, 1265:11, 1265:21, 1267:20, 1268:6, 1269:6, 1269:22, 1272:3, 1273:1, 1273:7, 1273:10, 1273:11, 1273:12, 1273:16, 1274:2, 1274:4, 1275:12, 1275:23, 1277:9, 1277:12, 1277:14, 1277:25, 1278:19, 1278:24, 1281:11, 1282:1, 1282:8, 1282:16, 1283:6, 1283:22, 1284:8, 1284:10, 1284:11, 1285:11, 1286:1, 1286:15, 1287:4, 1287:8, 1287:24, 1288:6, 1288:10, 1288:20, 1289:22, 1291:1, 1291:12, 1296:3, 1297:22, 1301:3, 1302:4, 1303:4, 1304:18, 1305:17, 1308:9, 1308:24, 1309:7, 1309:12, 1310:11, 1334:13, 1334:24, 1335:5, 1338:9, 1338:10, 1338:17,

1338:21, 1338:24, 1339:2, 1339:4, 1340:25, 1344:3, 1344:7, 1344:12, 1344:15, 1344:16, 1344:18, 1344:19, 1344:23, 1345:8, 1345:16, 1345:20, 1346:8, 1346:15, 1346:25, 1347:2, 1347:10, 1349:9, 1349:18, 1350:6, 1350:16, 1350:19, 1350:22, 1351:16, 1351:22, 1352:4, 1352:8, 1352:13, 1352:15, 1353:8, 1354:21, 1354:23, 1355:1, 1355:4, 1355:7, 1357:16, 1357:24, 1358:1, 1358:25, 1359:7, 1359:13, 1359:14, 1359:17, 1359:23, 1360:22, 1361:9, 1361:14, 1361:17, 1361:23, 1362:10, 1362:19, 1362:20, 1362:24, 1363:4, 1363:15, 1363:18, 1363:23, 1363:24, 1364:6, 1364:7, 1364:22, 1366:18, 1366:19, 1366:20, 1367:7, 1367:17, 1371:24, 1374:13, 1374:16, 1375:17, 1375:20, 1376:7, 1376:9, 1376:10, 1380:17, 1381:1, 1383:10, 1383:13, 1383:22, 1384:5, 1384:6, 1384:14, 1384:18, 1385:1, 1385:9, 1385:14, 1385:15, 1390:6, 1390:13, 1391:13, 1391:22, 1392:11, 1393:2, 1393:8, 1393:9, 1393:18, 1393:22, 1393:25, 1395:9, 1395:11, 1395:14, 1395:21, 1395:25, 1397:15, 1397:19, 1397:22, 1397:24, 1398:7, 1398:12, 1407:11, 1407:13, 1407:16, 1407:21, 1412:11, 1415:24, 1416:7, 1416:19, 1416:23,

1417:2, 1421:17, 1421:22, 1421:25, 1422:13, 1423:3, 1423:7, 1423:9, 1423:10, 1423:12, 1423:23, 1424:20, 1425:9, 1425:13, 1425:17, 1425:20, 1426:23, 1427:4, 1427:11, 1427:13, 1427:14, 1427:20, 1427:24, 1428:1, 1428:3, 1429:5, 1429:8, 1429:15, 1431:5, 1433:21, 1433:23, 1434:1, 1434:3, 1434:15, 1434:20, 1435:5, 1435:9, 1435:15, 1435:18, 1435:21, 1435:23, 1438:8, 1438:14, 1439:1, 1440:11, 1447:16, 1447:18, 1447:23, 1448:4, 1448:6, 1448:12, 1449:6, 1449:9, 1449:17, 1449:18, 1450:7, 1453:1, 1453:8, 1455:4, 1455:17, 1458:8, 1458:12, 1459:1, 1459:6, 1459:7, 1460:4, 1461:3, 1461:7, 1461:8, 1462:19, 1462:25, 1463:3, 1465:4, 1465:7, 1465:10, 1470:14, 1470:17, 1470:23, 1471:1, 1471:8, 1471:12, 1472:16, 1472:24, 1473:19, 1473:24, 1474:2, 1474:23, 1475:20, 1476:9, 1477:3, 1477:14, 1477:16, 1477:17, 1478:19, 1478:21, 1478:23, 1479:12, 1479:19, 1479:25, 1480:2, 1480:7, 1480:12, 1480:14, 1480:16, 1480:20, 1480:22, 1481:8, 1482:3, 1483:3, 1483:12, 1483:16, 1484:4, 1484:20, 1484:22, 1485:2, 1485:6, 1485:7, 1486:4, 1486:7, 1486:10, 1488:9, 1488:21,

1489:4, 1489:6, 1489:14, 1489:16, 1490:11, 1490:13, 1490:15, 1490:21, 1490:25, 1491:7, 1491:11, 1491:18, 1491:21, 1497:5, 1497:20, 1497:24, 1498:1, 1498:8, 1498:25, 1501:6, 1501:12, 1504:19, 1504:20, 1504:23, 1508:2, 1518:14, 1519:6, 1522:6, 1522:12, 1526:13, 1526:18, 1527:6, 1527:21, 1529:15, 1529:19, 1531:10, 1532:13, 1532:25, 1533:7, 1533:10
**Vascepa's** [40] - 1232:6, 1233:11, 1257:6, 1276:2, 1277:19, 1282:13, 1304:25, 1305:4, 1346:2, 1349:22, 1351:5, 1351:12, 1351:21, 1368:12, 1368:20, 1369:6, 1373:2, 1421:21, 1422:7, 1423:5, 1423:15, 1433:18, 1434:16, 1436:2, 1437:1, 1441:16, 1446:16, 1448:9, 1448:18, 1456:25, 1458:17, 1464:21, 1470:5, 1471:18, 1472:19, 1474:20, 1478:15, 1481:24, 1485:9, 1486:5
**vast** [10] - 1225:8, 1225:13, 1247:8, 1249:14, 1252:18, 1253:11, 1257:4, 1285:25, 1291:2, 1303:19
**Vegas** [1] - 1217:8
**vehicles** [2] - 1264:2, 1264:12
**ven** [2] - 1287:18, 1287:20
**verbiage** [2] - 1347:13, 1347:24
**verify** [1] - 1529:11
**version** [10] - 1329:18, 1409:15, 1409:16, 1427:25, 1434:15, 1437:11, 1442:6, 1458:6, 1475:20,

1504:20
**versions** [2] - 1307:24
**versus** [18] - 1241:11, 1250:24, 1254:1, 1262:22, 1272:12, 1274:4, 1287:19, 1290:4, 1292:23, 1305:9, 1316:16, 1434:11, 1473:19, 1484:20, 1484:22, 1484:23, 1485:21
**vertical** [9] - 1233:1, 1244:5, 1425:7, 1427:12, 1429:5, 1436:23, 1446:25, 1473:21, 1484:24
**viable** [2] - 1318:12, 1442:13
**vice** [1] - 1218:25
**vice-president** [1] - 1218:25
**video** [8] - 1378:18, 1391:19, 1399:13, 1400:5, 1402:20, 1412:19, 1413:4, 1413:21
**videos** [1] - 1399:19
**view** [17] - 1295:20, 1298:7, 1304:6, 1320:4, 1333:5, 1333:7, 1333:16, 1335:4, 1340:19, 1342:14, 1343:9, 1353:19, 1375:2, 1391:16, 1451:11, 1452:11, 1468:12
**View** [1] - 1233:23
**virtually** [1] - 1219:25
**visible** [1] - 1269:24
**visit** [3] - 1267:12, 1381:1, 1385:2
**vitae** [4] - 1220:21, 1314:7, 1314:8, 1420:19
**VLDL** [4] - 1347:1, 1351:5, 1351:9, 1351:12
**VLDL-C** [4] - 1347:1, 1351:5, 1351:9, 1351:12
**Voice** [8] - 1259:24, 1272:3, 1272:4, 1272:5, 1272:19, 1273:9, 1273:12, 1273:14
**volatile** [2] - 1507:7, 1508:4
**volatility** [3] - 1243:22, 1507:1, 1507:14
**Volume** [1] - 1216:8

**voluminous** [1] - 1229:7
**vs** [1] - 1216:7

# W

**WainWright** [52] - 1240:6, 1240:17, 1240:20, 1240:24, 1241:14, 1242:1, 1243:18, 1244:23, 1245:3, 1246:24, 1247:19, 1257:15, 1257:16, 1257:19, 1297:12, 1449:21, 1459:22, 1460:10, 1461:2, 1461:4, 1461:5, 1461:10, 1461:13, 1461:17, 1462:4, 1462:18, 1462:24, 1463:4, 1463:13, 1464:10, 1464:20, 1464:24, 1465:3, 1465:7, 1504:3, 1504:7, 1508:12, 1509:22, 1510:12, 1510:18, 1510:22, 1510:24, 1512:1, 1512:11, 1513:24, 1514:2, 1514:21, 1520:23, 1521:2, 1521:6, 1521:23, 1522:2
**wait** [3] - 1370:21, 1381:14, 1403:5
**walked** [1] - 1351:11
**Wall** [1] - 1449:12
**Walter** [1] - 1315:25
**wants** [2] - 1387:14, 1402:8
**warnings** [1] - 1330:9
**Washington** [5] - 1216:17, 1216:20, 1315:23, 1316:23, 1319:2
**ways** [5] - 1232:10, 1322:16, 1358:5, 1505:18, 1533:6
**weak** [1] - 1290:25
**Weaknesses** [1] - 1530:21
**weaknesses** [1] - 1536:24
**website** [4] - 1281:13, 1301:10, 1323:6, 1483:12
**Wednesday** [5] - 1539:1, 1539:4, 1539:9, 1539:10, 1539:18

**week** [18] - 1220:6, 1222:23, 1225:22, 1229:9, 1231:25, 1248:9, 1251:7, 1254:7, 1254:18, 1256:12, 1257:12, 1270:6, 1287:6, 1309:22, 1334:20, 1538:21, 1538:23, 1539:20
**weekend** [1] - 1302:6
**weeks** [44] - 1284:5, 1318:8, 1318:15, 1344:20, 1344:25, 1363:19, 1390:3, 1390:23, 1391:11, 1394:1, 1394:8, 1394:19, 1395:12, 1396:8, 1396:10, 1396:22, 1396:24, 1397:2, 1397:8, 1397:15, 1397:16, 1398:7, 1398:8, 1398:23, 1399:9, 1403:12, 1403:15, 1403:16, 1403:21, 1405:14, 1405:25, 1406:3, 1406:5, 1406:8, 1406:9, 1406:13, 1406:14, 1406:21
**weight** [2] - 1520:17, 1524:16
**weights** [1] - 1481:22
**well-controlled** [1] - 1408:9
**well-known** [2] - 1476:3, 1476:8
**well-trained** [1] - 1319:5
**WEST** [1] - 1217:7
**Wharton** [2] - 1442:23, 1466:5
**whereas** [2] - 1439:17, 1480:2
**WHITT** [1] - 1216:15
**whole** [17] - 1299:24, 1379:22, 1384:1, 1384:4, 1389:5, 1389:7, 1392:16, 1392:20, 1393:22, 1406:16, 1408:14, 1412:11, 1413:8, 1413:9, 1413:13, 1438:5, 1447:13
**wide** [8] - 1378:2, 1378:8, 1378:22, 1380:11, 1392:12, 1393:3, 1393:19, 1522:20

widely [4] - 1232:13, 1467:20, 1467:21
widely-recognized [1] - 1232:13
wildly [1] - 1290:13
willing [6] - 1428:3, 1429:14, 1434:19, 1444:14, 1466:6, 1476:17
window [2] - 1455:24, 1514:13
Wisconsin [1] - 1418:24
wishes [1] - 1503:13
withdraw [3] - 1286:6, 1343:11, 1409:19
withheld [3] - 1375:21, 1376:10, 1384:6
witness [12] - 1218:8, 1218:13, 1221:14, 1221:21, 1311:7, 1311:16, 1311:21, 1417:12, 1417:17, 1537:8, 1537:17, 1538:6
WITNESS [12] - 1218:18, 1311:6, 1311:25, 1312:5, 1357:8, 1401:21, 1402:14, 1402:21, 1410:19, 1417:22, 1479:17, 1492:14
WITNESSES [2] - 1540:8, 1540:15
witnesses [4] - 1225:22, 1254:18, 1310:23, 1310:25
wonder [1] - 1445:14
Wood [1] - 1419:24
word [8] - 1310:13, 1329:11, 1352:6, 1378:14, 1390:4, 1390:15, 1398:5, 1506:7
words [16] - 1257:21, 1292:10, 1326:19, 1369:4, 1393:13, 1395:14, 1433:9, 1434:18, 1444:18, 1446:16, 1458:18, 1459:2, 1468:22, 1473:25, 1480:5, 1486:9
works [2] - 1265:15, 1512:24
world [3] - 1288:13, 1442:9, 1535:7
worth [4] - 1270:25, 1277:5, 1394:20,

1419:20
wrap [1] - 1388:20
write [4] - 1275:10, 1275:13, 1324:22, 1341:18
writing [2] - 1368:6, 1394:12
written [8] - 1235:7, 1252:12, 1282:5, 1304:10, 1327:6, 1328:2, 1340:25, 1400:6
wrote [6] - 1300:6, 1369:11, 1505:13, 1505:20, 1511:7, 1511:22

# Y

year [58] - 1223:25, 1227:22, 1227:23, 1230:21, 1252:10, 1252:15, 1252:18, 1278:15, 1278:20, 1278:22, 1279:19, 1279:22, 1289:25, 1315:8, 1316:1, 1316:15, 1319:13, 1429:9, 1439:13, 1439:16, 1439:17, 1439:18, 1440:9, 1440:16, 1447:5, 1449:17, 1449:20, 1457:1, 1457:8, 1457:13, 1458:7, 1458:8, 1458:9, 1458:19, 1460:3, 1460:6, 1461:6, 1462:5, 1470:2, 1470:6, 1472:20, 1475:18, 1482:13, 1497:12, 1500:17, 1517:14, 1519:19, 1521:16, 1522:4
year's [1] - 1458:10
year-by-year [3] - 1457:1, 1457:8, 1458:7
years [50] - 1227:24, 1237:4, 1239:2, 1239:18, 1245:6, 1256:17, 1294:6, 1294:12, 1295:23, 1296:17, 1304:6, 1307:15, 1308:4, 1313:1, 1315:5, 1315:18, 1316:24, 1329:11, 1418:16, 1419:9, 1425:6, 1429:3, 1436:23,

1438:17, 1440:13, 1441:21, 1442:3, 1442:5, 1446:17, 1449:15, 1454:25, 1455:20, 1468:22, 1468:24, 1469:23, 1470:6, 1471:10, 1471:12, 1471:15, 1471:19, 1473:19, 1475:11, 1475:17, 1490:12, 1490:13, 1491:7, 1492:22, 1519:20, 1520:8
yellow [2] - 1227:14, 1278:21
young [1] - 1432:7
yourself [1] - 1466:9

# Z

zero [8] - 1303:24, 1304:2, 1304:4, 1440:24, 1448:19, 1455:18, 1458:18, 1469:24
ZS [2] - 1477:10, 1480:13